CHRISTOPHER WARD, CA Bar No. 238777
   cward@foley.com
**FOLEY & LARDNER LLP**
555 SOUTH FLOWER STREET, SUITE 3500
LOS ANGELES, CA 90071-2411
TELEPHONE:  213.972.4500
FACSIMILE:  213.486.0065

JASON WU, CA Bar No. 313368
   jwu@foley.com
**FOLEY & LARDNER LLP**
555 CALIFORNIA STREET, SUITE 1700
SAN FRANCISCO, CA 94104-1520
TELEPHONE:  415.434.4484
FACSIMILE:   415.434.4507

Attorneys for Defendant MENZIES
AVIATION, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Renaldo Navarro,<br><br>                      Plaintiff,<br><br>     vs.<br><br>Menzies Aviation, Inc., DOING BUSINESS AS MENZIES; and DOES 1 through 10, inclusive,<br><br>                   Defendants. | Case No. 3:19-cv-8157<br><br>**DEFENDANT MENZIES AVIATION, INC.'S APPENDIX OF SUPPORTING EVIDENCE IN SUPPORT OF ITS MOTION AND MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>State Court Action Filed:  10/23/19<br><br>Action Removed:  December 16, 2019 |

4842-4031-3294.2

Defendant Menzies Aviation, Inc. hereby submits this Appendix of Supporting Evidence ("AOE") with true and correct copies of the exhibits referenced below and attached hereto in support of its Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment.

| Exhibit | Description |
|---|---|
| 1. | Declaration of Tracy Aguilera |
| 2. | Declaration of Christopher Ward |
| 3. | Declaration of John Qually |
| 4. | Declaration of July Macapagal |
| 5. | Declaration of Jayson Manalang |
| 6. | Declaration of Angelo Sadiq |
| 7. | Declaration of Wesley Faatalale |
| 8. | Declaration of Roberto Pangalilangan |
| 9. | Declaration of Efren DeLos Reyes |
| 10. | Declaration of Rex Tosco |
| 11. | Declaration of Modesto Compas |
| 12. | Excerpts from the Deposition Transcript of Plaintiff Renaldo Navarro taken on July 23, 2020 (authenticated in Ward Declaration at p. 2, ¶ 2 [Exhibit 2 to AOE]) |
| 13. | Excerpts from Volume I of the Deposition Transcript of John Qually taken on July 27, 2020 (authenticated in Ward Declaration at p. 2, ¶ 3 [Exhibit 2 to AOE]) |
| 14. | Excerpts from Volume II of the Deposition Transcript of John Qually taken on July 28, 2020 (authenticated in Ward Declaration at p. 2, ¶ 3 [Exhibit 2 to AOE]) |
| 15. | Excerpts from the Deposition Transcript of Tracy Aguilera taken on August 25, 2020 (authenticated in Ward Declaration at p. 2, ¶ 4 [Exhibit 2 to AOE]) |
| 16. | Excerpts from the Deposition Transcript of Raul Vargas taken on August 25, 2020 (authenticated in Ward Declaration at p. 2, ¶ 5 [Exhibit 2 to AOE]) |
| 17. | Excerpts from the Deposition Transcript of Andrew Dodge taken on July 28, 2020 (authenticated in Ward Declaration at pp. 2-3, ¶ 6 [Exhibit 2 to AOE]) |

| Exhibit | Description |
|---|---|
| 18. | Fueling Supervisor Job Description (authenticated in Aguilera Declaration at p. 2, ¶ 3 [Exhibit 1 to AOE]) |
| 19. | Excerpts from the Menzies Aviation California Employee Handbook (authenticated in Aguilera Declaration at p. 2, ¶ 4 [Exhibit 1 to AOE]) |
| 20. | Excerpts from the Menzies Aviation International Code of Conduct (authenticated in Aguilera Declaration at p. 2, ¶ 4 [Exhibit 1 to AOE]) |
| 21. | August 16, 2018 Written Complaint submitted by Andrew Dodge with supporting text message screen shot (authenticated in Plaintiff Deposition Excerpts at 55:18-57:9 [Exhibit 12 to AOE] and at Dodge Deposition Excerpts at 42:9-45:21 [Exhibit 17 to AOE]) |
| 22. | First Petition regarding Andrew Dodge (authenticated in in Plaintiff Deposition Excerpts at 51:24-53:16 [Exhibit 12 to AOE] and Aguilera Deposition Excerpts at 26:10-27:1 [Exhibit 15 to AOE]) |
| 23. | Written Statement prepared by John Qually (authenticated in Qually Declaration at p. 2, ¶ 3 [Exhibit 3 to AOE]) |
| 24. | Statement prepared by Plaintiff and submitted to Menzies (authenticated in Plaintiff Deposition Excerpts at 95:9-98:10 [Exhibit 12 to AOE]) |
| 25. | Fueler Statements submitted to Menzies during investigation (authenticated in Aguilera Declaration at pp. 2-3, ¶ 5 [Exhibit 1 to AOE]) |
| 26. | Email Chain regarding termination decision (authenticated in Aguilera Declaration at p. 3, ¶ 6 [Exhibit 1 to AOE]) |
| 27. | Second Petition regarding Andrew Dodge (authenticated in Plaintiff Deposition Excerpts at 54:5-55:9 [Exhibit 12 to AOE]) |

| Exhibit | Description |
|---|---|
| 28. | Photographic image of what appears to be a letter authored by Rafael Vasquez and dated November 18, 2019 (authenticated in Ward Declaration at p 3, ¶ 7 [Exhibit 2 to AOE]) |
| 29. | Text messages produced by Plaintiff between Plaintiff and "Rafael" (authenticated in Plaintiff Deposition Excerpts at 102:20-103:6 and 104:11-17 [Exhibit 12 to AOE]) |

DATED:  October 15, 2020

**FOLEY & LARDNER LLP**
Christopher Ward
Jason Wu


_____*/s/ Christopher Ward*_____
CHRISTOPHER WARD
Attorneys for Defendant MENZIES AVIATION,
INC.

# EXHIBIT 1

1  CHRISTOPHER WARD, CA Bar No. 238777
    cward@foley.com
2  **FOLEY & LARDNER LLP**
   555 SOUTH FLOWER STREET, SUITE 3500
3  LOS ANGELES, CA 90071-2411
   TELEPHONE:  213.972.4500
4  FACSIMILE:   213.486.0065

5  JASON WU, CA Bar No. 313368
    jwu@foley.com
6  **FOLEY & LARDNER LLP**
   555 CALIFORNIA STREET, SUITE 1700
7  SAN FRANCISCO, CA 94104-1520
   TELEPHONE:  415.434.4484
8  FACSIMILE:   415.434.4507

9
   Attorneys for Defendant MENZIES
10 AVIATION, INC.

11              **UNITED STATES DISTRICT COURT**

12            **NORTHERN DISTRICT OF CALIFORNIA**

13

14 Renaldo Navarro,                          )  Case No. 3:19-cv-8157
                                             )
15                            Plaintiff,     )  **DECLARATION OF TRACY AGUILERA**
                                             )
16           vs.                             )
                                             )
17 Menzies Aviation, Inc., DOING BUSINESS AS )
18 MENZIES; and DOES 1 through 10, inclusive, )
                                             )  State Court Action Filed:  10/23/19
19                            Defendants.     )
                                             )  Action Removed:  December 16, 2019
20                                           )
                                             )
21                                           )
                                             )
22                                           )
                                             )
23

24

25

26

27

28

4819-9098-6958.1

## DECLARATION OF TRACY AGUILERA

I, Tracy Aguilera, declare as follows:

1.      I am employed by Menzies Aviation as the Human Resources Manager for the Company's operations at San Francisco International Airport ("SFO"). I have been employed by Menzies in the SFO Human Resources Department since 1997 and have held my current position as Human Resources Manager since March 2010. I have personal knowledge of the facts contained in this declaration, and if called upon as a witness, I could and would competently testify thereto.

2.      Menzies Aviation has operated at SFO for decades, competing for commercial aviation ground handling contracts with other subcontractors such as Swissport and Aircraft Service International, Inc. ("ASIG"). On February 1, 2017, Menzies Aviation, Inc. completed the acquisition of Aircraft Service International, Inc. from BBA Aviation, and thereafter continued to operate the ASIG business at SFO under the trade name Menzies Aviation. As part of that acquisition, Menzies inherited SFO ASIG employees from BBA Aviation. At the time Menzies completed this acquisition and for many years prior, the Service Employees International Union (the "Union") had represented the non-exempt Fuelers of ASIG, and the SEIU has continued to represent those Fuelers on an uninterrupted basis since the Menzies acquisition of ASIG.

3.      One of the positions maintained by ASIG and now Menzies within the Fueling Department, both before and after the Menzies acquisition, is Fueling Supervisor. A true and correct copy of the job description for the Fueling Supervisor position after it was re-branded under the Menzies Aviation trade name is attached hereto as **Exhibit 18**.

4.      After Menzies completed the acquisition of ASIG, it adopted and applied the Menzies Aviation employment policies and procedures to all former ASIG employees at SFO, including those in the Fueling Department. Including amongst those policies are Menzies' California Employee Handbook and its international Code of Conduct. A true and correct copy of excerpts of the California Employee Handbook are attached hereto as **Exhibit 19**, and a true and correct copy of excerpts of the Code of Conduct are attached hereto as **Exhibit 20**.

5.      In my capacity as Human Resources Manager, my job responsibilities include maintaining as business records all the personnel file and related Human Resources material generated

DECLARATION OF TRACY AGUILERA
Case No. 3:19-cv-8157

by Menzies and received by Menzies from other sources. I keep such records in my own files housed within my office, which I keep locked to ensure no unauthorized individuals can access such materials. In the course of an investigation into a petition received by Menzies regarding Andrew Dodge in August 2018, three Menzies employees provided written statements regarding the circumstances of placing their signature on that petition. These statements were prepared by Menzies employees themselves, based on their own personal knowledge, during the August 2018 time period of the investigation. I received the original copies of these three statements, filed them within Renaldo Navarro's personnel file, and retain possession of and control over the originals of these three statements in the ordinary course of my business, just as I do regularly with respect to other investigation and Human Resources/personnel-related materials. True and correct copies of these three statements provided to Menzies are attached hereto as **Exhibit 25**.

6.      In addition to the three statements contained within Exhibit 23, as part of the investigation into the petition I referenced above, I exchanged several emails with former SFO Director of Operations Raul Vargas and former SFO Safety Supervisor Kevin Blumberg regarding the process of the investigation and potential outcomes. Following completion of that investigation and the decision to terminate Plaintiff's employment, I personally printed a copy of that email exchange and placed it into Plaintiff's personnel file, and to this day I have continued to retain possession and control over Plaintiff's personnel file and the materials therein, including the email exchange I have just described. A true and correct copy of that email exchange is attached hereto as **Exhibit 26**.

7.      Following commencement of this litigation, I received from Menzies' legal counsel copies of a letter appearing to be authored by Union steward Rafael Vazquez and what look like text messages between Plaintiff and Mr. Vasquez. I do not recall ever seeing these documents prior to commencement of this litigation, and Menzies does not have copies of these documents either within Plaintiff's personnel file or any other record.

///

///

///

///

DECLARATION OF TRACY AGUILERA
Case No. 3:19-cv-8157

4819-9098-6958.1

1    I declare under penalty of perjury under the laws of the States of California, and the laws of the

2    United States, that the foregoing is true and correct.

3    Executed on October 14, 2020 at Burlingame, California.

4

5

6    Tracy Aguilera

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF TRACY AGUILERA
Case No. 3:19-cv-8157

4819-9098-6958.1

# EXHIBIT 2

CHRISTOPHER WARD, CA Bar No. 238777
  cward@foley.com
**FOLEY & LARDNER LLP**
555 SOUTH FLOWER STREET, SUITE 3500
LOS ANGELES, CA 90071-2411
TELEPHONE:  213.972.4500
FACSIMILE:    213.486.0065

JASON WU, CA Bar No. 313368
  jwu@foley.com
**FOLEY & LARDNER LLP**
555 CALIFORNIA STREET, SUITE 1700
SAN FRANCISCO, CA 94104-1520
TELEPHONE:  415.434.4484
FACSIMILE:    415.434.4507

Attorneys for Defendant MENZIES
AVIATION, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Renaldo Navarro, | Case No. 3:19-cv-8157 |
| Plaintiff, | **DECLARATION OF CHRISTOPHER WARD** |
| vs. | |
| Menzies Aviation, Inc., DOING BUSINESS AS MENZIES; and DOES 1 through 10, inclusive, | |
| Defendants. | State Court Action Filed:  10/23/19 |
| | Action Removed:  December 16, 2019 |

4816-9823-7646.1

## DECLARATION OF CHRISTOPHER WARD

I, Christopher Ward, declare as follows:

1.      I am an attorney admitted to practice before all state and federal courts in the State of California, including the United States District Court for the Northern District of California, and a partner at Foley & Lardner LLP, counsel of record for Defendant Menzies Aviation, Inc.  I have personal knowledge of the facts contained in this declaration, and if called upon as a witness, I could and would competently testify thereto.

2.      On July 23, 2020, I took the deposition of Plaintiff Renaldo Navarro.  Following that deposition, I received a certified copy of the transcript of that deposition, and I have read, reviewed and maintained a copy of that transcript in connection with this matter.  A true and correct copy of excerpts from the transcript of Plaintiff's deposition is attached hereto as **Exhibit 12**.

3.      On July 27, 2020, Plaintiff's counsel deposed Menzies' Duty Manager John Qualley for a first time, and on July 28, 2020, Plaintiff's counsel completed the deposition of Mr. Qually.  Following those depositions, I received a certified copy of the transcripts of both deposition, and I have read, reviewed and maintained a copy of those transcripts in connection with this matter.  A true and correct copy of excerpts from Volume I of the transcript of Mr. Qually's deposition is attached hereto as **Exhibit 13**, and a true and correct copy of excerpts from Volume II of the transcript of Mr. Qually's deposition is attached hereto as **Exhibit 14**.

4.      On August 25, 2020, Plaintiff's counsel deposed Menzies' Human Resources Manager Tracy Aguilera.  Following that deposition, I received a certified copy of the transcript of the deposition, and I have read, reviewed and maintained a copy of that transcript in connection with this matter.  A true and correct copy of excerpts from Ms. Aguilera's deposition is attached hereto as **Exhibit 15**.

5.      On August 25, 2020, Plaintiff's counsel deposed Menzies' former SFO Director of Operations Raul Vargas.  Following that deposition, I received a certified copy of the transcript of the deposition, and I have read, reviewed and maintained a copy of that transcript in connection with this matter.  A true and correct copy of excerpts from Mr. Vargas's deposition is attached hereto as **Exhibit 16**.

6.      On July 28, 2020, Plaintiff's counsel deposed Menzies' Fueling Supervisor Andrew

Dodge.  Following that deposition, I received a certified copy of the transcript of the deposition, and I have read, reviewed and maintained a copy of that transcript in connection with this matter.  A true and correct copy of excerpts from Mr. Dodge's deposition is attached hereto as **Exhibit 17**.

7.     On March 17, 2020, Plaintiff's counsel served on me Plaintiff's Fed. R. Civ. P. 26(a)(1) Initial Disclosures, which included a production of 14 total documents.  One of those documents, Bates marked "Renaldo Navarro 000009" appears to be a picture of a letter authored by a Rafael Vasquez.  I had never seen this document prior to receiving Plaintiff's Initial Disclosures production because it was not part of any of the files Menzies Aviation provided me in response to my file requests regarding Plaintiff.  A true and correct copy of "Renaldo Navarro 000009" produced to me by Plaintiff's counsel is attached hereto as **Exhibit 28**.

I declare under penalty of perjury under the laws of the States of California and Illinois, and the laws of the United States, that the foregoing is true and correct.

Executed on October 15, 2020 at Elmhurst, Illinois.


*/s/ Christopher Ward*
Christopher Ward

DECLARATION OF CHRISTOPHER WARD
Case No. 3:19-cv-8157

4816-9823-7646.1

# EXHIBIT 3

1   CHRISTOPHER WARD, CA Bar No. 238777
        cward@foley.com
2   **FOLEY & LARDNER LLP**
    555 SOUTH FLOWER STREET, SUITE 3500
3   LOS ANGELES, CA 90071-2411
    TELEPHONE:  213.972.4500
4   FACSIMILE:   213.486.0065

5   JASON WU, CA Bar No. 313368
        jwu@foley.com
6   **FOLEY & LARDNER LLP**
    555 CALIFORNIA STREET, SUITE 1700
7   SAN FRANCISCO, CA 94104-1520
    TELEPHONE:  415.434.4484
8   FACSIMILE:   415.434.4507

9
    Attorneys for Defendant MENZIES
10  AVIATION, INC.

11              **UNITED STATES DISTRICT COURT**

12              **NORTHERN DISTRICT OF CALIFORNIA**

13

14  Renaldo Navarro,                          )   Case No. 3:19-cv-8157
                                              )
15                          Plaintiff,        )   **DECLARATION OF JOHN QUALLY**
                                              )
16              vs.                           )
                                              )
17  Menzies Aviation, Inc., DOING BUSINESS AS )
18  MENZIES; and DOES 1 through 10, inclusive,)
                                              )   State Court Action Filed:  10/23/19
19                          Defendants.       )
                                              )   Action Removed:  December 16, 2019
20                                            )
                                              )
21                                            )
                                              )
22                                            )
                                              )
23

24

25

26

27

28

4840-7686-8046.1

1

### DECLARATION OF JOHN QUALLY

2    I, John Qually, declare as follows:

3         1.    I am employed by Menzies Aviation as a Duty Manager for the Company's operations at

4    San Francisco International Airport ("SFO"). I have been employed by either Menzies or a predecessor

5    business known as ASIG at SFO since approximately 2005 and have held my current position as Duty

6    Manager for approximately four years. I have personal knowledge of the facts contained in this

7    declaration, and if called upon as a witness, I could and would competently testify thereto.

8         2.    In the August 2018 time period, I typically worked the morning shift and would take the

9    handoff for my responsibilities from employees coming off the graveyard shift. As a consequence, I did

10   not often work directly with Plaintiff Renaldo Navarro and most of my interactions with him occurred

11   during this "handoff" between the graveyard and morning shifts. Because Plaintiff worked the

12   graveyard shift and I handled the morning shift, I was asked by Menzies to notify Plaintiff that he had

13   been suspended in August 2018 pending an investigation.

14        3.    After I notified Plaintiff of the suspension on or about August 23, 2018, I immediately

15   prepared a written statement summarizing what I remembered as the information communicated to

16   Plaintiff by me during that interaction. After preparing that statement, I provided it to Menzies

17   management for inclusion in the investigation records. A true and correct copy of the written statement

18   I prepared is attached hereto as **Exhibit 23**.

19        I declare under penalty of perjury under the laws of the States of California, and the laws of the

20   United States, that the foregoing is true and correct.

21        Executed on October 14, 2020 at Burlingame, California.

22

23

24                                                    _____
                                                      John Qually
25

26

27

28

DECLARATION OF JOHN QUALLY
Case No. 3:19-cv-8157

4840-7636-8046.1

# EXHIBIT 4

## DECLARATION OF JULY MACAPAGAL

I, July Macapagal, hereby state and declare as follows:

1.          I am currently employed by Menzies Aviation ("Menzies") at San Francisco International Airport ("SFO"). Currently, my job title at Menzies is Fueling Supervisor, a title that I have held since approximately 2017. Prior to that, I held the title of Fueler with ASIG. I have personal knowledge of the facts contained in this declaration, and if called upon as a witness, I believe that I could and would competently testify to the same facts as stated in this declaration.

2.          I am familiar with Renaldo Navarro. Around August 2018, Mr. Navarro was a Fueling Supervisor for Menzies at SFO.

3.          Around 2018, I learned that there was a petition being circulated regarding Andrew Dodge, another Fueling Supervisor for Menzies at SFO. I had heard that the petition was being circulated to make complaints about Dodge.

4.          I signed the signature page that was being circulated in connection with the petition. By signing it, I believed I was saying that there should be some corrective action to address fuelers' complaints with Dodge. I did not sign the petition with the goal of demoting or removing Dodge. I never saw or read the petition itself. I only saw and signed the signature page. I also never asked any other Fueler to sign the petition nor otherwise took steps to support it beyond my own signature, as I thought it would be inappropriate for me, in my role as Supervisor, to do so.

5.          I knew that some of the fuelers I supervised had problems with how Dodge ran his operation. Because of that, I felt pressure to sign the signature page so that I could back up and support my fuelers. I also felt pressured to sign the signature page because Navarro had trained me when I was a Fueler, and I felt like I needed to back him up because of what he had done for me. I reported to Menzies in 2018 when asked that I felt pressured to sign the petition.

6.          My best recollection, which I cannot say with complete certainty, is that Navarro was one of the individuals driving the petition. I believe this because Navarro was constantly

complaining about Dodge behind his back.  Navarro and Dodge used to get along well, but after Dodge was promoted to Fueling Supervisor, Navarro and Dodge would constantly get into arguments.  In my opinion, both of their behaviors were childish but it did appear to me that Navarro had it out for Dodge and was regularly taking actions that undermined Dodge.

7.      I informed Tracy Aguilera, who works in Menzies' Human Resources Department, that I felt pressure to sign the signature page as noted above.

8.      I did not have any problems with Dodge abusing his authority or harassing me, and I am not aware of Dodge abusing his authority towards fuelers or harassing fuelers.  I have never complained to Menzies or anyone else about harassment from Dodge.  I am also not aware of any other Fueler expressing concerns about alleged harassment from Dodge

9.      I am executing this declaration voluntarily and of my own free will.  No one at Menzies has pressured me to sign this declaration, promised me any type of benefit or positive treatment from signing it, or threatened me with negative consequences for deciding not to sign it.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

Executed this ⎍th day of September 2020, at San Francisco, California.


July Macapagal

# EXHIBIT 5

## DECLARATION OF JAYSON MANALANG

I, Jayson Manalang, hereby state and declare as follows:

1.     I am currently employed by Menzies Aviation ("Menzies") at San Francisco International Airport ("SFO").  Currently, my job title at Menzies is Fueler, a title that I have held since 1997 (prior to 2017, I held this title with ASIG).  I have personal knowledge of the facts contained in this declaration, and if called upon as a witness, I believe that I could and would competently testify to the same facts as stated in this declaration.

2.     I am familiar with Renaldo Navarro.  Around 2018, Mr. Navarro was a Fueling Supervisor for Menzies at SFO.

3.     When Mr. Navarro was employed by Menzies, Mr. Navarro approached me with a petition while I was on duty at Menzies and asked me to sign it.  He told me it was a petition against Andrew Dodge to teach him a lesson.  I told Mr. Navarro, no, I did not want to sign the petition.  I ignored him and made myself busy doing my job so he could not ask me to sign again. I did not want to sign the petition, because I did not want to get involved or get in trouble, because Mr. Navarro and Mr. Dodge were both supervisors.

4.     After that, Mr. Navarro asked me one or two more times to sign the petition again. The last time Mr. Navarro asked me, I signed the petition.  I did not want to sign the petition.  I only signed the petition so that Mr. Navarro would stop bothering me.

5.     I felt pressured by Mr. Navarro to sign the petition.  I felt pressured because Mr. Navarro was a supervisor, and I was worried he would give me a hard time for not signing the petition.

6.     I am executing this declaration voluntarily and of my own free will.  No one at Menzies has pressured me to sign this declaration, promised me any type of benefit or positive treatment from signing it, or threatened me with negative consequences for deciding not to sign it.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

Executed this 4th day of September 2020, at San Francisco, California.

[Jayson Manalang]

# EXHIBIT 6

## DECLARATION OF ANGELO SADIQ

I, Angelo Sadiq, hereby state and declare as follows:

1.      I am currently employed by Menzies Aviation ("Menzies") at San Francisco International Airport ("SFO"), and have worked for Menzies at SFO since approximately August 2017.  In 2018, my job title at Menzies was Fueler.  I have personal knowledge of the facts contained in this declaration, and if called upon as a witness, I believe that I could and would competently testify to the same facts as stated in this declaration.

2.      I am familiar with Renaldo Navarro.  Around 2018, Mr. Navarro was a Fueling Supervisor for Menzies at SFO.

3.      In 2018, Mr. Navarro approached me with a paper that had the several signatures on it, and he asked me to sign it.  Mr. Navarro did not explain to me what I was signing. However, I had previously seen many similar signature pages before relating to the company, such as safety protocol documents, that fuelers would have to sign.  I assumed that Mr. Navarro was collecting signatures for a similar reason, and signed the paper without asking Mr. Navarro what it was for.

4.      Later the same day, I learned from other fuelers that the signatures were being used as part of a petition against Andrew Dodge.

5.      If I had known that the signatures were being used as part of a petition against Andrew Dodge, I would not have signed it, because I did not want to get involved in that.

6.      Later that day, I spoke with Isiah Banks, another fueler, and he said he also signed a signature page without knowing what it was for.  I informed Mr. Banks that I had learned from other fuelers that the signatures were being used as part of a petition against Andrew Dodge.  Mr. Banks also stated that if he had known this beforehand, he would not have signed the signature page.

7.      I am executing this declaration voluntarily and of my own free will.  No one at Menzies has pressured me to sign this declaration, promised me any type of benefit or positive treatment from signing it, or threatened me with negative consequences for deciding not to sign

it.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

Executed this 4th day of September 2020, at San Francisco, California.

Angelo Sadiq

# EXHIBIT 7

## DECLARATION OF WESLEY FAATALALE

I, Wesley Faatalale, hereby state and declare as follows:

1.      Around August 2018, I was employed by Menzies Aviation ("Menzies") at San Francisco International Airport ("SFO").  My job title at Menzies at that time was Fueler.  I have personal knowledge of the facts contained in this declaration, and if called upon as a witness, I believe that I could and would competently testify to the same facts as stated in this declaration.

2.      I am familiar with Renaldo Navarro.  At the time around August 2018, Mr. Navarro was a Fueling Supervisor for Menzies at SFO.

3.      In 2018, Mr. Navarro approached me with a petition while I was waiting to clock out at Menzies and asked me to sign the petition.  I reviewed the petition and saw that it was a petition to remove Andrew Dodge from his job at Menzies.  I did not feel comfortable signing the petition, and I told Mr. Navarro that I would not sign it.

4.      The next day, Mr. Navarro approached me again with the petition while I was waiting to clock out.  This time, instead of asking me, he told me to look at the petition and sign it.

5.      Again, I did not want to sign the petition and did not feel comfortable signing the petition that Mr. Navarro presented to me.  However, I felt pressured by Mr. Navarro to sign the petition because he was approaching me for a second time, and he was telling me to sign the petition more sternly this time.  I also felt pressured by Mr. Navarro to sign the petition because he was a Fueling Supervisor, and I was a Fueler.

6.      I also saw Mr. Navarro approach approximately 10-15 other Fuelers with the petition.  It looked to me that Mr. Navarro was taking the same approach with those individuals by instructing them to sign the petition.  Approximately 5-10 of those Fuelers stated they would not sign the petition.  Sometime after, Mr. Navarro again approached the 5-10 Fuelers who stated they would not sign the petition, and asked them to sign the petition again.  I do not know whether those 5-10 Fuelers signed.

7.      I also spoke with three Fuelers at the time, James Johnson, Rohit Kumar, and

Malik, regarding the petition that Mr. Navarro asked me to sign. All three of them stated that Mr. Navarro asked them to sign a petition. All three of them did not want to sign the petition.

8.     I am executing this declaration voluntarily and of my own free will. No one at Menzies has pressured me to sign this declaration, promised me any type of benefit or positive treatment from signing it, or threatened me with negative consequences for deciding not to sign it.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

Executed this 4th day of September 2020, at San Francisco, California.

Wesley Faatalale

# EXHIBIT 8

## DECLARATION OF ROBERTO PANGALILINGAN

I, Roberto Pangalilingan, hereby state and declare as follows:

1.      I am currently employed by Menzies Aviation ("Menzies") at San Francisco International Airport ("SFO"). Currently, my job title at Menzies is Fueler, a title that I have held for approximately 10 years (prior to 2017, I held this title with ASIG). I have personal knowledge of the facts contained in this declaration, and if called upon as a witness, I believe that I could and would competently testify to the same facts as stated in this declaration.

2.      Some time ago, another fueler named Jezen Canlas approached me with a petition regarding Andrew Dodge. I read the petition and signed it. My only reason for signing it was based on operational concerns and not Dodge's manner of communicating or working with Fuelers.

3.      I like Dodge and his manner of communicating with Fuelers and others, but sometimes he does things differently from other supervisors. Sometimes, he sets up the flights too close, so I have heard that Fuelers have to skip their breaks. I personally never had a problem with breaks, but I heard about other Fuelers not getting breaks.

4.      I did not have any problems with Dodge abusing his authority or harassing me and have never complained to Menzies or anyone else about harassment from Dodge. I am also not aware of any other Fueler expressing concerns about alleged harassment from Dodge.

5.      I am executing this declaration voluntarily and of my own free will. No one at Menzies has pressured me to sign this declaration, promised me any type of benefit or positive treatment from signing it, or threatened me with negative consequences for deciding not to sign it.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

Executed this _16_ th day of September 2020, at San Francisco, California.

_(signature)_
_____
Roberto Pangalilingan

# EXHIBIT 9

## DECLARATION OF EFREN DELOS REYES

I, Efren DeLos Reyes, hereby state and declare as follows:

      1.    I am currently employed by Menzies Aviation ("Menzies") at San Francisco International Airport ("SFO"). Currently, my job title at Menzies is Fueler, a title that I have held since 1995 (prior to 2017, I held this title with ASIG). I have personal knowledge of the facts contained in this declaration, and if called upon as a witness, I believe that I could and would competently testify to the same facts as stated in this declaration.

      2.    In 2018, another Fueler named Jezen Canlas approached me with a petition regarding Andrew Dodge. I read the petition and signed it. My only reason for signing it was based on operational concerns and not Dodge's manner of communicating or working with Fuelers.

      3.    Before his promotion to Fueling Supervisor, Dodge was a good Fueler. However, in my opinion Dodge was not completely ready to be promoted to Fueling Supervisor because he was still learning how to run the show and organize the schedules of Fuelers and flights.

      4.    I did not have any problems with Dodge abusing his authority or harassing me, and have never complained to Menzies or anyone else about harassment from Dodge. I am also not aware of any other Fueler expressing concerns about alleged harassment from Dodge.

      5.    I am executing this declaration voluntarily and of my own free will. No one at Menzies has pressured me to sign this declaration, promised me any type of benefit or positive treatment from signing it, or threatened me with negative consequences for deciding not to sign it.

      I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

      Executed this _16_ th day of September 2020, at San Francisco, California.

Efren DeLos Reyes

4835-4720-6090.1

# EXHIBIT 10

## DECLARATION OF REX TOSCO

I, Rex Tosco, hereby state and declare as follows:

1.  I am currently employed by Menzies Aviation ("Menzies") at San Francisco International Airport ("SFO").  Currently, my job title at Menzies is Fueler, a title that I have held for approximately 25 years (prior to 2017, I held this title with ASIG).  I have personal knowledge of the facts contained in this declaration, and if called upon as a witness, I believe that I could and would competently testify to the same facts as stated in this declaration.

2.  A couple of years ago, someone approached me with a signature page and asked me to sign it.  I do not remember exactly who it was, but I remember feeling that I should sign the signature page because the person presenting it to me was asking me to do so and I felt that I needed to sign it.

3.  There was no letter or anything else with the signature page.  I just saw a signature page by itself.  Nobody explained to me what the signature was for.

4.  I signed the signature page so that nobody would get mad even though I did not know what it was that I was signing.  I thought it was okay because other people signed it too.

5.  I later learned that the signature was to get someone out or fired at Menzies.  I did not know this before signing the signature page.

6.  I am executing this declaration voluntarily and of my own free will.  No one at Menzies has pressured me to sign this declaration, promised me any type of benefit or positive treatment from signing it, or threatened me with negative consequences for deciding not to sign it.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

Executed this _16_ th day of September 2020, at San Francisco, California.

_____
Rex Tosco

# EXHIBIT 11

## DECLARATION OF MODESTO COMPAS

I, Modesto Compas, hereby state and declare as follows:

1.       I am currently employed by Menzies Aviation ("Menzies") at San Francisco International Airport ("SFO"). Currently, my job title at Menzies is Fueler, a title that I have held for approximately 5 years (prior to 2017, I held this title with ASIG). I have personal knowledge of the facts contained in this declaration, and if called upon as a witness, I believe that I could and would competently testify to the same facts as stated in this declaration.

2.       I am familiar with Renaldo Navarro. Around August 2018, Mr. Navarro was a Fueling Supervisor for Menzies at SFO.

3.       Around 2018, I was approached by Mr. Navarro with a petition regarding Andrew Dodge. Mr. Navarro asked me to sign the petition and I did so. My only reason for signing it was based on operational concerns and not Dodge's manner of communicating or working with Fuelers.

4.       I had heard complaints from some other Fuelers that they were not getting breaks when working with Dodge because of the way he set up flights. I never personally had any such problems with Dodge however.

5.       Also, sometimes, when I called Andrew, he would not answer the phone. I heard that Andrew has sleep apnea, which may be why he did not answer the phone.

6.       I did not have any problems with Dodge abusing his authority or harassing me and have never complained to Menzies or anyone else about harassment from Dodge. I am also not aware of any other Fueler expressing concerns about alleged harassment from Dodge.

7.       I am executing this declaration voluntarily and of my own free will. No one at Menzies has pressured me to sign this declaration, promised me any type of benefit or positive treatment from signing it, or threatened me with negative consequences for deciding not to sign it.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

Executed this **30**th day of September 2020, at San Francisco, California.

Modesto Compas

# EXHIBIT 12

                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF CALIFORNIA


RENALDO NAVARRO,                    )  **CERTIFIED COPY**
                                    )
              Plaintiff,            )
                                    )
       vs.                          )  Case No.
                                    )  3:19-cv-08157-VC
MENZIES AVIATION, INC., DOING       )
BUSINESS AS MENZIES; and            )
DOES 1 through 10, inclusive,       )
                                    )
              Defendants.           )
_____)




          Webex deposition of RENALDO NAVARRO, VOLUME I,

taken remotely on behalf of the Defendant, beginning at

9:41 a.m. and ending at 4:23 p.m., on Thursday,

July 23, 2020, before JOANNA B. BROWN, Certified

Shorthand Reporter No. 8570, RPR, CRR, RMR.

2

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFF RENALDO NAVARRO:
 3          LIBERATION LAW GROUP, P.C.
            BY:  ARLO GARCIA URIARTE, ESQ.
 4          2760 Mission Street
            San Francisco, California 94110
 5          (415) 695-1000
            (415) 695-1006 Fax
 6          arlo@liberationlawgroup.com
 7   FOR DEFENDANT MENZIES AVIATION, INC., dba MENZIES:
 8          FOLEY & LARDNER LLP
            BY:  CHRISTOPHER G. WARD, ESQ.
 9          555 South Flower Street, Suite 3300
            Los Angeles, California 90071-2411
10          (213) 972-4500
            (213) 486-0065 Fax
11          cward@foley.com
12   ALSO PRESENT:
13          CAROLINE CARRERA, TAGALOG INTERPRETER #301298
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
 1                    I N D E X
 2   EXAMINATION OF:                          PAGE
 3   RENALDO NAVARRO
 4
 5            BY MR. WARD                         7
 6            BY MR. URIARTE                    115
 7
 8                  E X H I B I T S
 9   DEFENDANT'S                               PAGE
10   Exhibit 1   Aircraft Service International
                 Group "Incident Report" dated
11               March 18, 2007, Bates
                 No. MENZIES_000146 (1 page)     34
12
     Exhibit 2   Aircraft Service International
13               Group "Notice to Employees as to
                 Change in Relationship," Bates
14               Nos. MENZIES_000143 and
                 MENZIES_000144 (2 pages)        35
15
     Exhibit 3   Aircraft Service International
16               Group "Incident Report" dated
                 March 30, 2009, Bates
17               No. MENZIES_000140 (1 page)     38
18   Exhibit 4   "Employee Coaching Document"
                 for a May 30, 2009, warning,
19               Bates No. MENZIES_000139 (1 page)  39
20   Exhibit 5   "Employee Coaching Document"
                 for a May 18, 2010, warning,
21               Bates Nos. MENZIES_000135 and
                 MENZIES_000136 (2 pages)        40
22
     Exhibit 6   "Employee Coaching Document"
23               for a May 3, 2012, warning,
                 Bates No. MENZIES_000126 (1 page)  41
24
     Exhibit 7   June 30, 2013, warning document,
25               Bates No. MENZIES_000127 (1 page)  42
```

4

```
 1                    E X H I B I T S
 2   DEFENDANT'S                                      PAGE
 3   Exhibit 8    Letter to "Menzies Management"
                  from Menzies fueler, Bates
 4                Nos. MENZIES_000152 -
                  MENZIES_000154 (3 pages)            54
 5
     Exhibit 9    Second petition against
 6                Andrew Dodge, Bates
                  No. MENZIES_000150 (1 page)         54
 7
     Exhibit 10   Text-message exchange, Bates
 8                No. MENZIES_000088 (1 page)         56
 9   Exhibit 11   Handwritten statement by
                  Christopher Lawrence, Bates
10                No. MENZIES_000086 (1 page)         64
11   Exhibit 12   Handwritten statement by
                  Andrew Dodge August 16, 2018,
12                Bates No. MENZIES_000089
                  (1 page)                            66
13
     Exhibit 13   "Employee Performance Development,"
14                Bates No. MENZIES_000099 (1 page)   79
15   Exhibit 14   Typed statement by John Qually,
                  Bates No. MENZIES_000084 (1 page)   82
16
     Exhibit 15   Set of documents produced, Bates
17                Nos. RenaldoNavarro 000001 -
                  RenaldoNavarro 000014 (14 pages)    95
18
     Exhibit 16   Plaintiff's Initial Disclosures
19                Pursuant to Federal Rule of
                  Civil Procedure 26(a)(1)
20                (3 pages)                           105
21
22                 UNANSWERED QUESTIONS
23                   PAGE    LINE
24                    14      10
25
```

5

1                    Remotely; Thursday, July 23, 2020

2                           9:41 a.m.

3

4                    CAROLINE CARRERA,

5         having been duly sworn, translated English into

6          Tagalog and Tagalog into English as follows:

7

8                    RENALDO NAVARRO,

9              having been duly sworn, was examined

10                  and testified as follows:

11

12         THE REPORTER:  Good morning.  My name is

13   Joanna Brown.  I am a California certified stenographic

14   reporter.  Due to the current national emergency of the

15   COVID-19 virus, this deposition is being handled via

16   remote means.

17         Today's date is Thursday, July 23, 2020, and

18   the time is approximately 9:41 a.m.  This is the

19   deposition of Renaldo Navarro in the matter of

20   Renaldo Navarro v. Menzies Aviation, Inc.  This is

21   venued in the United States District Court, Northern

22   District of California.  The case number is

23   3:19-cv-08157-VC.

24         At this time, I will ask counsel to identify

25   yourselves, state who you represent, and agree on the

6

```
 1   bit earlier, is that the only time you've been a party
 2   to a lawsuit?
 3       A    Yes, sir.
 4       Q    Have you ever made any type of legal claim
 5   against a former employer other than Menzies?
 6       A    There was, sir.
 7       Q    What was that?
 8       A    At Swissport.  It's the name of the company,
 9   Swissport.
10       Q    And specifically what type of legal claim did
11   you make against Swissport, if it was not a lawsuit?
12            MR. URIARTE:  I'm going to -- I'm just going
13   to instruct the witness not to answer right now.
14            Chris, can we, like, just meet and confer for
15   a second here?
16            He has a settlement agreement with Swissport,
17   and it has a confidentiality clause.  So we cannot --
18   I guess what we could say is that they were
19   employment-related claims with regards to his
20   employment at Swissport.
21            MR. WARD:  Okay.  May I -- did he -- what I'd
22   like to know is if Mr. Navarro made any type of
23   administrative claim against Swissport or if it was
24   purely a private settlement prior to any type of formal
25   action.
```

14

```
 1              MR. URIARTE:  It was a private settlement.
 2  Yeah.
 3              MR. WARD:  Okay.  We are going to need to come
 4  back to that, but I'll move on at the moment.
 5       Q    Let me ask, what is the approximate date of
 6  that settlement agreement?
 7       A    What's that for?  Swissport?
 8       Q    Yes.  What is the date of that settlement
 9  agreement, approximately?
10       A    I no longer -- I'm no longer sure about 2013
11  or '14.  I no longer remember, 2014, 2013, 2015, like
12  that.
13       Q    Is it your belief that -- well, strike that
14  question.  Were you --
15              Was your employment with Swissport terminated
16  involuntarily?
17              MR. URIARTE:  Yeah.  I mean, Chris, I don't
18  want to make this process difficult.  I'm just not
19  certain as we sit here whether he'd be violating his
20  confidentiality agreement if he answered that, you
21  know.  I'm not certain with regards to that.  Look, if
22  I can send to you a copy of the settlement agreement, I
23  would, but I'm just not -- I think we have a notice
24  requirement with regard to that.  We would have to
25  notify Swissport before we divulge.
```

15

1          MR. WARD:  All right.

2     Q   Mr. Navarro, is it your belief that if you

3   make legal claims against a former employer, that you

4   are likely to get a settlement from them?

5          MR. URIARTE:  Objection.  Vague and ambiguous.

6   Calls for a legal conclusion.

7          THE INTERPRETER:  Sorry.  Vague and ambiguous

8   and what?  What's the other one?

9          MR. URIARTE:  Calls for a legal conclusion.

10         You can answer, Mr. Navarro, if you

11   understand.

12         THE WITNESS:  Yes.  Please repeat.

13   BY MR. WARD:

14     Q   My question is, is it your belief that if you

15   make legal claims against a former employer, you are

16   likely to get a settlement?

17     A   Yes, sir.

18     Q   Is that what you are doing in this lawsuit?

19     A   Yes, sir.

20     Q   Is it your belief that employers are likely to

21   give you a settlement if you make claims against them

22   regardless of the merit of those claims?

23         MR. URIARTE:  Objection.  Calls for a legal

24   conclusion.  Vague and ambiguous.

25         THE WITNESS:  Please repeat the question

16

```
 1    again.

 2              MR. WARD:  Sure.

 3        Q    Is it your belief that if you make legal

 4    claims against a former employer, you are likely to get

 5    a settlement from them regardless of the merit of those

 6    claims?

 7        A    Yes, sir.

 8              MR. URIARTE:  Mr. Navarro, are you

 9    understanding the Tagalog interpretation?

10              THE WITNESS:  (Inaudible.)

11              MR. URIARTE:  You have to answer in Tagalog.

12              MR. URIARTE:  Yeah.  I mean, I have --

13              THE INTERPRETER:  Just a second.  Let me

14    interpret that.

15              THE WITNESS:  It seems it's far from my

16    understanding in Tagalog.

17              MR. URIARTE:  I think -- Ms. Carrera, I

18    understand your proficiency and your amazing use of the

19    official, traditional, government-level Tagalog, but

20    it's sure not what usual, normal people in Tagalog

21    would use in the street.  There are two forms of

22    Tagalog.  There's the Tagalog that is normally used

23    around the country by normal people, but when you use

24    words like (speaks Tagalog) -- I went to a university

25    there, and I spoke formal Tagalog; but normal people
```

17

1     Q     And did you graduate?

2     A     Are you asking how long?  How long, sir?

3     Q     Yes.

4     A     Yes, sir.

5     Q     Did you attend any type of college or

6    university in the Philippines?

7     A     Yes, sir.

8     Q     Where was that?

9     A     Philippine College of Criminology, but I did

10   not finish it.

11    Q     Any other type of schooling in the Philippines

12   other than high school and what you just mentioned

13   prior to moving to the United States?

14    A     No more, sir.

15    Q     Can you please identify for me all of your

16   employers prior to Menzies Aviation since you

17   arrived -- well, let me start over.

18           After you moved to the United States, can you

19   please list all of your employers up to Menzies.

20    A     In 2005, when I got here, I worked at

21   Service Fair part-time -- oh, Service Air part-time.

22   2005, in September, I started at ASIG Aviation.  In

23   2005, where I worked for, it was purchased by

24   Swissport.  It was purchased in 2015 by Swissport, and

25   in 2016, ASIG was purchased by Menzies.

23

```
1       Q    Did I understand you correctly that you worked

2    for ASIG -- you've had two different periods of time

3    where you were employed by ASIG?

4       A    What do you mean two different times?

5       Q    So let me do it this way:  First you -- first

6    you started at Service Air; right?

7       A    Yes, sir.

8       Q    And did you remain employed by Service Air up

9    to when Swissport purchased Service Air?

10           THE INTERPRETER:  Please repeat the question.

11           MR. WARD:  Sure.

12           From when he started at Service Air until the

13   purchase by Service Air of Swissport, was he

14   continuously employed by Service Air?

15           THE WITNESS:  Yes, it was continuous.

16   BY MR. WARD:

17      Q    Okay.  And then, when you started your

18   employment with ASIG in approximately 2016, was that

19   the first time you had worked for ASIG?

20      A    What I did was work in 2005 at ASIG up to 2016

21   when Menzies purchased ASIG, and I continuously worked

22   for them.

23      Q    I see.  You were working for both Service Air

24   and ASIG at the same time?

25      A    Yes, sir.  I'm sorry.  Different.  They were
```

24

```
 1   different.

 2       Q    Okay.  Did you ever have any type of

 3   supervisory job at Service Air?

 4            THE INTERPRETER:  Please repeat the question.

 5            MR. WARD:  Sure.

 6       Q    At Service Air, did you have any type of

 7   supervisory responsibilities?

 8       A    No, sir.

 9       Q    The only supervisory job you've had was at

10   ASIG and Menzies; right?

11       A    Yes, sir.

12       Q    Have you ever declared bankruptcy?

13       A    No, sir.

14       Q    Have you ever been convicted of a felony in

15   the United States?

16       A    No, sir.

17       Q    And you understand that Menzies purchased ASIG

18   at some point a couple of years ago; correct?

19       A    2016, sir.

20       Q    While you were employed by ASIG, you were

21   promoted to supervisor; right?

22       A    Yes, sir.

23       Q    And at that time, were you given additional

24   job responsibilities as a supervisor?

25       A    Yes, sir.
```

25

```
 1       Q     What did you understand those additional
 2   responsibilities to include?
 3       A     First of all, with people.  Before you were
 4   with people and then you had to handle people, and
 5   then -- and also, with the flight, you should be able
 6   to distribute it to the people equally.
 7       Q     And when you say "distribute," are you talking
 8   about distributing the amount of work across the people
 9   you supervise equally?
10       A     Yes, sir.
11       Q     The supervisory job that you received at ASIG,
12   was it fuel?
13             THE INTERPRETER:  I'm sorry.  Was it what?
14   Hello?
15             MR. URIARTE:  There's an audio issue.
16             THE INTERPRETER:  I didn't get the complete
17   question.
18             MR. URIARTE:  Chris, your screen -- Chris,
19   your screen shows a muted icon again.
20             MR. WARD:  I just lost sound in here again.
21   Can you -- I cannot hear anything that anybody is
22   saying, but I think you can all hear me.  Can somebody
23   nod their head yes.
24             MR. URIARTE:  Yes.
25             THE INTERPRETER:  Yes, yes.
```

26

```
1              MR. URIARTE:  Can we get off the record?

2              MR. WARD:  Off the record again, please.

3              (Off the record.)

4              MR. WARD:  Are we back on the record?

5              THE INTERPRETER:  Yes, I'm here.

6              MR. WARD:  All right.  Can you read off the

7    last question that I asked as well as the response.  I

8    missed all of that.

9              (The record was read as follows:  "The

10             supervisory job that you received at ASIG,

11             was it fuel?")

12             MR. WARD:  All right.  I couldn't hear that,

13   and there's all kinds of background noise.  Can you

14   read the question and answer again, please.

15             (The record was read as follows:  "The

16             supervisory job that you received at ASIG,

17             was it fuel?")

18   BY MR. WARD:

19        Q    All right.  So the question, Mr. Navarro, the

20   supervisory job that you had at ASIG, was it fueling

21   supervisor?

22        A    Yes, sir.  Yes, sir.

23        Q    And is that the same job you held until your

24   termination of employment?

25        A    Yes, sir.
```

27

```
1        Q    Do you consider the fueling-supervisor

2   position to be part of company management?

3        A    Yes, sir.  Yes, sir.

4        Q    Do you consider that fueling-supervisory

5   position to be a leadership role?

6        A    Yes, sir.

7        Q    In your opinion, is it important for

8   supervisors to be at work when they are expected to be

9   there?

10            THE INTERPRETER:  I didn't get the first part

11  of the question.  Please repeat that.

12            MR. WARD:  Sure.

13       Q    In your opinion, is it important for

14  supervisors to be at work when they are expected to be

15  there?

16            THE INTERPRETER:  I'd ask that to be repeated.

17  Sorry.  There are some breaks in the words.

18  BY MR. WARD:

19       Q    In your opinion, Mr. Navarro, is it important

20  for supervisors to be at work when they are expected to

21  be at work?

22       A    Yes, sir.

23       Q    In your opinion, is it important for

24  supervisors to be honest in their communications with

25  their employer?
```

28

```
1       A     Yes, sir.

2       Q     In your opinion, is it important for

3   supervisors to follow company policy?

4       A     Yes, sir.

5       Q     In your opinion, is it important for

6   supervisors to set a positive example for

7   nonsupervisory employees?

8           MR. URIARTE:  Objection.  Vague and ambiguous.

9           You can answer, Mr. Navarro.

10           THE WITNESS:  Yes, sir.

11  BY MR. WARD:

12       Q     In your opinion, is it important for a

13  supervisor to support the other members of company

14  management?

15       A     Yes, sir.

16       Q     In your opinion, is it important for

17  supervisors to work effectively with other company

18  supervisors?

19       A     Are you referring to another company, sir?

20       Q     I'm just referring to, in a supervisory

21  capacity, is it important -- is it important, in your

22  opinion, to work effectively with other supervisors?

23       A     Yes, sir.

24       Q     In your opinion as a supervisor, is it

25  important to avoid undermining the authority of other
```

29

```
1    supervisors?

2              THE INTERPRETER:  This is the interpreter.  I

3    would like to consult a word first.

4              MR. WARD:  Sure.

5              THE WITNESS:  Please repeat that, sir.

6              MR. WARD:  Sure.

7        Q    As a supervisor, in your opinion, is it

8    important not to undermine the authority of other

9    supervisors?

10       A    Yes, sir.

11       Q    As a supervisor, is it appropriate, in your

12   opinion, to involve nonsupervisory employees in

13   personal disputes?

14             MR. URIARTE:  Objection.  Vague and ambiguous.

15   Chris, did you say other supervisors or other

16   nonsupervisors?

17             MR. WARD:  I will have the reporter repeat my

18   question, please.

19             (The record was read as follows:  "As a

20             supervisor, is it appropriate, in your

21             opinion, to involve nonsupervisory

22             employees in personal disputes?")

23             THE WITNESS:  Yes, sir.  That's correct.

24   BY MR. WARD:

25       Q    And as a supervisor, should you avoid
```

30

1    involving nonsupervisory employees in personal

2    grievances?

3         A    Yes, sir.

4         Q    As a supervisor, should you avoid pressuring

5    employees to get involved in personal grievances?

6         A    Will you please repeat the question again.

7         Q    Sure.  As a supervisor, is it important to

8    avoid pressuring employees, nonsupervisory employees,

9    to get involved in personal grievances?

10             MR. URIARTE:  Before you answer that question,

11   Mr. Navarro, remember the instruction earlier.  If you

12   do not understand the question that is said in Tagalog,

13   indicate that if you are having a problem with the

14   Tagalog interpretation.  Do say that so that we know

15   where the problem is.  I just want to make sure that

16   you do that.  Okay?  Great, Mr. Navarro.

17             THE INTERPRETER:  This is the interpreter

18   speaking.  I would like to have the question, please,

19   repeated.

20             MR. WARD:  Sure.

21        Q    My question is, in your opinion, should a

22   supervisor avoid pressuring nonsupervisory employees to

23   become involved in personal disputes?

24        A    No, sir.

25        Q    Why not?

31

1        A      For example, it's my own problem.  Why should

2    I involve them in my own problem?

3        Q      And if you had a conflict with another

4    supervisor, in your opinion, should non- -- scratch

5    that.  Start over.

6            As a supervisor, if you have a conflict with

7    another supervisor, is it your understanding that

8    nonsupervisory employees should not be brought into

9    that problem?

10            THE INTERPRETER:  Should that be -- I'm sorry.

11    Chris, should not be what?

12            MR. WARD:  I'll just ask a different question

13    again.

14            THE INTERPRETER:  Okay.

15    BY MR. WARD:

16        Q      As a supervisor, is it your understanding that

17    you should not bring nonsupervisory employees into

18    conflicts you have with another supervisor?

19        A      That's correct, sir.

20        Q      As a supervisor, if you ask a nonsupervisory

21    employee to sign something, do you think you should

22    first explain to the employee what you are asking them

23    to sign?

24            THE INTERPRETER:  Just a second.  I have to

25    translate this again.

32

1             THE WITNESS:  That's correct, sir.

2    BY MR. WARD:

3        Q    In your opinion, if a company has an opinion

4    that a supervisor has been pressuring nonsupervisory

5    employees --

6             THE INTERPRETER:  This is the interpreter.

7    It's breaking up.

8             MR. WARD:  I'll try again.

9             THE INTERPRETER:  Go ahead.

10   BY MR. WARD:

11       Q    In your opinion, if a company has a good-faith

12   belief that a supervisor has been intimidating

13   nonsupervisory employees, would that be a valid basis

14   for termination of the supervisor?

15            MR. URIARTE:  Objection.  Calls for a legal

16   conclusion.  Vague and ambiguous.

17            THE WITNESS:  I think it depends, sir.

18   BY MR. WARD:

19       Q    What would it depend upon?

20       A    It depends on what the employee wants to tell

21   them on what intimidation the employee is talking

22   about.

23       Q    In your opinion, is it important for employees

24   to take responsibility for their errors?

25            THE INTERPRETER:  Please repeat that.

33

```
 1              MR. WARD:  Sure.
 2      Q      In your opinion, is it important for employees
 3  to take responsibility for their errors?
 4      A      Yes, sir.
 5      Q      Okay.  I'm going to do my best to see if we
 6  can make this work.  I am sharing a document that I am
 7  going to mark as Exhibit 1 to your deposition.
 8              Are you able to see that?
 9      A      Yes, sir.
10      Q      Are you able to see the full exhibit -- the
11  full page?
12      A      No, sir.  Just the date of incident, sir.
13      Q      How about now?
14      A      Yes, sir.
15              (Deposition Exhibit 1 was marked for
16              identification, a copy of which is
17              attached hereto.)
18  BY MR. WARD:
19      Q      Have you ever seen Exhibit 1 before?
20      A      No, sir.
21      Q      To your knowledge, in March of 2007, were you
22  ever spoken to by a supervisor about not following
23  instructions?
24      A      I don't remember anything (inaudible), what
25  they were instructing me.
```

34

```
 1              MR. WARD:  We are off the record.

 2              (Off the record.)

 3              MR. WARD:  Let's go back on the record.

 4       Q     Mr. Navarro, are you familiar with an

 5    individual by the name of Andrew Dodge?

 6       A     Yes, sir.

 7       Q     And at the time that you were employed by

 8    Menzies, was Mr. Dodge also a supervisor?

 9       A     Yes, sir.

10       Q     And he was also a fueling supervisor; correct?

11       A     Yes, sir.

12       Q     So the same position you held; correct?

13       A     Yes, sir.

14       Q     Do you recall that there was some type of

15    petition that was circulated, complaining about

16    Andrew Dodge?

17              THE INTERPRETER:  I'm sorry.  Complaining

18    about what?

19    BY MR. WARD:

20       Q     Complaining about Andrew Dodge?

21       A     Yes, sir.

22       Q     And how did you first learn about that

23    petition?

24              THE INTERPRETER:  I'm sorry.  Please repeat

25    that.
```

43

```
 1    BY MR. WARD:

 2        Q    Anybody else you can identify by name who

 3    asked you to sign the petition?

 4        A    I forgot the others, but it was Jezen and

 5    Rafael.

 6        Q    Did you sign the petition?

 7        A    Yes, sir.

 8        Q    Did you think it was appropriate to get

 9    involved in a petition against another supervisor?

10             MR. URIARTE:  Objection.  Vague and calls for

11    a legal conclusion.

12             You can answer, Mr. Navarro.  You can answer

13    after my objection.

14             THE WITNESS:  Please repeat the question.

15    BY MR. WARD:

16        Q    The question was did you think it was

17    appropriate to sign a petition against another

18    supervisor?

19             MR. URIARTE:  Same objection.

20             THE WITNESS:  Maybe because, you know -- just

21    on the right, you know.

22    BY MR. WARD:

23        Q    I don't understand your answer, Mr. Navarro.

24        A    If we know that what they are fighting for

25    against Andrew Dodge is right, so why not help them and
```

46

1   also help the company also --

2       Q    Do you think --

3       A    -- to correct the wrong things that

4   Andrew Dodge did.

5       Q    And do you think signing a petition about

6   Andrew Dodge might undermine Andrew Dodge's authority

7   with nonsupervisory employees?

8       A    They are the ones who are signing that.  They

9   know the bad things that Andrew Dodge was doing to me;

10  and, also, the things he was doing against the fueler,

11  that was not good.

12      Q    My question is different.  My question is did

13  you think signing a petition against Andrew Dodge might

14  undermine Andrew Dodge's authority?

15          MR. URIARTE:  Objection.  Vague and ambiguous.

16          THE WITNESS:  Maybe not, sir.

17  BY MR. WARD:

18      Q    Maybe not or no?

19      A    No, no (In English).

20          THE INTERPRETER:  This is the interpreter.  I

21  interpreted "not" and "no" the same word.

22          THE WITNESS:  No, sir.

23  BY MR. WARD:

24      Q    Why not?

25      A    If what's being said is the ones that is

47

```
1        A    Yes, sir.

2        Q    If Andrew Dodge had complained to

3   nonsupervisory employees about you, do you think that

4   would have been appropriate for him to do so?

5             THE INTERPRETER:  Please repeat that question.

6             MR. WARD:  Sure.

7        Q    If Andrew Dodge had complained to

8   nonsupervisory employees about you, do you think

9   Andrew Dodge would be acting appropriately?

10            MR. URIARTE:  Objection.  Lacks foundation.

11  Vague and incomplete hypothetical.

12            THE WITNESS:  It depends on him.  I do not

13  know what he is thinking of.

14  BY MR. WARD:

15       Q    Now, prior to signing this petition, you had

16  previously submitted complaints about Mr. Dodge;

17  correct?

18       A    Yes, sir.

19       Q    When was that?

20            THE INTERPRETER:  The interpreter would like

21  to inquire.

22            THE WITNESS:  I no longer remember.  The

23  people told me what Andrew was doing.  So I had that --

24  I had that reported to the superiors.

25  ///
```

49

```
 1                THE INTERPRETER:  Yeah.  I stand corrected.  I
 2    omitted Renil.
 3                MR. WARD:  Let's strike that question.  I'll
 4    ask it again.
 5        Q    So other than Randy Davies, Nico, Tracy,
 6    Renil, and John Qually, is there anybody else who you
 7    communicated complaints about Andrew Dodge to?
 8        A    No more.
 9        Q    How much time passed, approximately, between
10    when you communicated these complaints and when you
11    signed the petition?
12        A    Maybe those are years.  Years.
13        Q    And in between when you communicated the
14    complaints and when you signed the petition, did you
15    make, yourself, any other complaints involving
16    Andrew Dodge?
17        A    No more -- no, sir.
18                MR. URIARTE:  Is this a good time for lunch?
19    We have lunch being delivered.  So --
20                MR. WARD:  We can go maybe for another 10 or
21    15 minutes first, if that's all right.
22                MR. URIARTE:  That's okay.  Yeah.  Maybe --
23    yeah, closer to 10 hopefully.
24                MR. WARD:  All right.  I am going to mark
25    as Exhibit 7 a document which has the Bates Nos. -152
```

51

1    to -154.

2        Q    Mr. Navarro, this is a three-page document.

3    So let me know when you've reviewed the first page, and

4    then I'll move to the next one.

5        A    Yes, sir.

6        Q    Okay.  Can I flip to the next page?

7            MR. URIARTE:  I'm trying to magnify it because

8    it's really small.  Is that okay, Mr. Navarro?

9            THE WITNESS:  Okay.

10   BY MR. WARD:

11       Q    All right.  Have you had a chance to look at

12   this first page?

13       A    Yes, sir.

14       Q    Let me know when you've had a chance to look

15   at this second page.

16       A    Yes, sir.

17       Q    And how about this third page?  Have you seen

18   this?

19       A    Yes.  The supervisor also.

20       Q    All right.  Do you recognize this document

21   I've marked as Exhibit 7?

22       A    Yes, sir.

23       Q    And is this the petition that was presented to

24   you for signature?

25       A    Yes, sir.

52

1    Q    This first page that I have up right now, is

2    that what the petition looked like when it was

3    presented to you?

4         THE INTERPRETER:  Please repeat the question.

5    The audio is breaking up.

6    BY MR. WARD:

7    Q    For this first page that I have up in front of

8    you right now marked as -152, is that what the petition

9    looked like when it was presented to you?

10   A    Yes, sir.

11   Q    And is that your signature on line 16 there on

12   the second page of this exhibit?

13   A    Yes, sir.

14   Q    And you are the one who placed your signature

15   there?

16   A    Yes, sir.

17        MR. WARD:  All right.  I'm going to mark this

18   Exhibit 8.  It's Bates No. -150.

19   Q    Mr. Navarro, let me know when you've had a

20   chance to review this.

21        THE REPORTER:  Mr. Ward, can we go off the

22   record one moment?

23        MR. WARD:  Sure.

24        (Off the record.)

25        MR. WARD:  We are back on the record.

53

```
 1              The reporter just clarified for me that

 2     documents Bates No. -152 to -154 I had marked as

 3     Exhibit 7, but it should actually be 8; is that right?

 4              THE REPORTER:  Yes.

 5              MR. WARD:  So then this document I have up

 6     right now, Bates No. -150, is actually going to be

 7     Exhibit 9.

 8                   (Deposition Exhibits 8 and 9 were marked

 9                   for identification by the reporter,

10                   copies of which are attached hereto.)

11     BY MR. WARD:

12          Q    Have you had a chance to look at Exhibit 9

13     here?

14          A    I already read it, sir.

15          Q    Prior to today, have you ever seen this

16     Exhibit 9?

17          A    They gave me a copy.

18          Q    When you say "they," who is "they"?

19          A    The shop steward gave it to me, Rafael.

20          Q    Did Rafael give this to you after you had

21     signed the petition?

22          A    I think this is the second petition, that this

23     is the second petition they made against Andrew Dodge.

24          Q    So is it your testimony that there were two

25     petitions against Andrew Dodge?
```

54

```
 1        A    The first one was the first one that you

 2   showed with my signing, and I think this is the second.

 3        Q    Okay.  Did you ever sign this second petition?

 4        A    I was not -- no longer able to sign it because

 5   they already terminated me at that time.

 6        Q    I see.  So this, Exhibit 9, you first saw it

 7   after your termination?

 8        A    When they terminated me and the people signed

 9   that petition, I was given a copy by Rafael.

10        Q    I just want to be clear though.  The copy of

11   this, Exhibit 9 that you received from Rafael, did you

12   receive that before or after your termination?

13        A    I was already terminated.

14        Q    Okay.  Did you ever have any text-message

15   communication with Mr. Dodge about the petition against

16   him?

17        A    No, sir.

18             MR. WARD:  I'm going to mark this as

19   Exhibit 10, and this is Bates-numbered -88.

20             (Deposition Exhibit 10 was marked for

21             identification by the reporter, a

22             copy of which is attached hereto.)

23   BY MR. WARD:

24        Q    On the lower half of the page, Mr. Navarro, it

25   looks like a screen capture of some text messages.
```

55

```
1    Have you ever seen those messages before?

2         A    Yes.

3              MR. WARD:  I'm sorry.  The reporter, can you

4    repeat my question, please, the last one I just asked.

5              (The record was read as follows:  "On

6              the lower half of the page, Mr. Navarro,

7              it looks like a screen capture of some

8              text messages.  Have you ever seen those

9              messages before?")

10   BY MR. WARD:

11        Q    Where have you seen this before today,

12   Mr. Navarro?

13        A    It's here.

14        Q    So wait.  Is your testimony that this is the

15   first time you've ever seen what appears to be text

16   messages?

17        A    I already saw that on the cell phone of the

18   supervisor.

19        Q    All right.  When you say "on the cell phone of

20   the supervisor," what supervisor?

21        A    The cell phone that we were using.

22        Q    Okay.  So is it fair to state -- where it says

23   "Ray Navarro" on this screen capture and then there's

24   some messages below there, did you write that?

25        A    Yes, sir.
```

56

1      Q      At the very bottom there, where it says

2      "...remember all people sign to that petition agains

3      you but i never submit it yet," what did you mean when

4      you wrote "i never submit it yet"?

5      A      What I meant there is because the petition

6      letter was given to me to be submitted to Raul Vargas,

7      I did not submit it; but the people told me that I

8      should submit the petition so that they would know what

9      Andrew was doing.

10      Q      Who specifically told you that you should be

11      the one to submit the petition?

12      A      Because, at that meeting, Raul Vargas was

13      there.  He was our director.  He said that we -- that I

14      submit it --

15             THE INTERPRETER:  Just a second.

16             THE WITNESS:  It's just, in that meeting, I

17      was told "Please give this to Raul Vargas."

18      BY MR. WARD:

19      Q      And my question is who is the specific person

20      who told you to give it to Raul Vargas?

21      A      I was just given the petition -- the petition

22      letter.  I don't remember the person anymore.  That's

23      why I just gave it to Raul.

24      Q      Why did you delay in submitting the petition

25      after you were asked to do so?

57

1    statement, or what purports to be a statement, provided

2    by Christopher Lawrence, stating that Renaldo Navarro

3    had you sign the papers without fully explaining to me

4    what it was for.

5          Do you have any idea what Mr. Lawrence might

6    be referring to there?

7          THE INTERPRETER:  What's the last name, sir,

8    again?

9          MR. WARD:  Lawrence.

10         THE WITNESS:  I do not know what he's saying

11   because I was not the one who asked him to sign.  So I

12   do not know what he wrote here.

13   BY MR. WARD:

14   Q    Did you ever provide any type of papers to

15   Mr. Lawrence and ask him to sign them?

16   A    No, sir.

17   Q    Do you have any personal knowledge whether

18   Mr. Lawrence provided this statement to Menzies?

19   A    I do not know any.

20   Q    Do you have any reason to dispute whether

21   other fuelers provided statements to Menzies regarding

22   their disagreement with the petition against Mr. Dodge?

23         MR. URIARTE:  Objection.  Vague and ambiguous.

24         THE WITNESS:  I do not know any of that.

25   ///

65

```
 1    BY MR. WARD:

 2        Q    Are you aware that Mr. Dodge made a complaint

 3    to Menzies about you?

 4        A    I do not know.

 5             MR. WARD:  I'm going to mark as Exhibit 12

 6    what is Bates No. -89.

 7             (Deposition Exhibit 12 was marked for

 8             identification by the reporter, a

 9             copy of which is attached hereto.)

10             MR. URIARTE:  What was the Bates number?

11             MR. WARD:  This is -89.

12             MR. URIARTE:  Thank you.

13    BY MR. WARD:

14        Q    Let me know when you've had a chance to review

15    this, Mr. Navarro.

16        A    Yes, I've read it already.

17        Q    Have you ever seen this document before today?

18        A    That's right.

19             MR. URIARTE:  Okay.  Mr. Navarro, I want you

20    to read the whole document word for word -- okay? --

21    not that you've seen it, but I think the question is --

22    he wants you to read it, Mr. Navarro.

23             MR. WARD:  I think the question I asked was

24    had Mr. Navarro ever seen this document prior to today.

25             THE WITNESS:  No, sir.
```

66

```
 1   BY MR. WARD:

 2       Q    Okay.  I'll represent to you that this is a

 3   statement provided to Menzies by Andrew Dodge.  I want

 4   you to note in the second line there where it says

 5   "Ray Navarro, he has been very rude to me by telling me

 6   that the company don't need me."

 7            Do you see that?

 8       A    Yes, sir.

 9       Q    And did you ever tell Mr. Dodge that the

10   company doesn't need him?

11       A    I did not say anything like that.

12       Q    Do you see the next line where Mr. Dodge

13   represents that you told him he's a bad supervisor?

14       A    I said that due to the complaints of the

15   people about their breaks and not able to take their

16   breaks, their lunch break, and the amount of work that

17   was being given to them by him.

18       Q    So those are things that you said directly to

19   Mr. Dodge?

20       A    He knows about that because he knew himself

21   that there were a lot of complaints about him.  He

22   knows about what the fuelers were saying about him.

23       Q    My question is different though.  It's did you

24   tell those things to Mr. Dodge directly yourself?

25       A    No, sir.
```

67

1        Q    Did you ever tell him that you were a bad

2    super- -- that he's a bad supervisor?

3        A    No, sir.

4        Q    Did you ever tell Mr. Dodge that he causes

5    delays?

6        A    Please repeat that.

7        Q    Sure.   Did you tell Mr. Dodge that he -- that

8    all he does is cause delays?

9        A    I said that because the shift of Dodge was

10    2:00 to 6:00 and my shift was 12:00 to 6:00 and then --

11    the shift of Dodge is 2:00 to 10:00.   Those who are

12    going to work at 1:50, when I get them, 5:00 to 1:00 --

13    those who start at 5:00 to 1:00, they told me the

14    problems.

15        Q    So is that a yes?   You told Mr. Dodge that he

16    causes delays?

17        A    Are you referring to a flight -- delayed

18    flights?

19        Q    I'm referring to what you said directly to

20    Mr. Dodge about these various complaints.

21              Did you communicate any of these employee

22    complaints about him to him yourself?

23        A    The people themselves were the ones that --

24    the people told me about it, and I told him also what

25    the people feel about him.

68

1      Q    So it's true that you told Mr. Dodge directly

2    about these various complaints that employees purported

3    to have about him; correct?

4      A    Yes, sir.

5      Q    Where Mr. Dodge writes below that that you

6    follow him around and love to make a big scene in front

7    of other workers, did you ever try -- did you ever

8    confront Mr. Dodge about what these employees said,

9    these other employees?

10     A    No, sir.

11     Q    Did you ever talk to Mr. Dodge at all about

12   these various complaints in front of nonsupervisory

13   employees?

14     A    No, sir.  When Dodge and I speak to each

15   other, we are just by ourselves.

16     Q    Do you see where Mr. Dodge wrote that you

17   would follow him around and make hand gestures at him?

18     A    Ever since, I do not follow Dodge around

19   because we are different shifts.  I'm coming in.  He's

20   leaving.

21     Q    So you deny ever making hand gestures or

22   following Mr. Dodge around?

23     A    I don't know anything about that.  I do not do

24   that.

25     Q    Do you see where Mr. Dodge wrote that you told

                                                              69

1    him that you would turn a petition in against him?

2        A    I told that to him on text.

3        Q    Okay.  So that at least is something of a true

4    statement; right?

5        A    How is that?

6        Q    Well, you said in the text message that you

7    have a petition that you haven't turned in; right?

8        A    Yes, sir.  That's the one.

9        Q    At some point, did you ever learn that Menzies

10   was investigating you based on Mr. Dodge's complaint?

11       A    I do not know.  I do not know anything about

12   that.

13       Q    At some point, you learned you were being

14   suspended, though; correct?

15           THE INTERPRETER:  I'm sorry.  Repeat that,

16   Mr. Ward.

17   BY MR. WARD:

18       Q    At some point after you signed the petition,

19   you learned that you were being suspended; correct?

20       A    When --

21           THE INTERPRETER:  This is the interpreter.  I

22   would like to inquire.

23           THE WITNESS:  When we had the meeting, I

24   submitted the petition after.  That day, I was on duty,

25   graveyard shift, and John called me, arrived.  He told

70

```
 1   me to wait for Raul Vargas, and then that was the time
 2   Raul Vargas suspended me.
 3   BY MR. WARD:
 4        Q    And prior to that meeting, you had not
 5   submitted this petition; is that true?
 6        A    No, sir, because -- only at that meeting
 7   because I have no time to go there to submit the
 8   petition because I was working.  I was working assigned
 9   jobs.
10        Q    Okay.  So you were called into a meeting;
11   right?
12        A    Yes, sir.  Yes, sir.
13        Q    And that was the meeting with Raul and
14   John Qually that you just mentioned; right?
15        A    He was not there.  It was just Renil, Nico,
16   and the other manager who was, like, a Chinese.  And
17   John Qually was just on the phone.  He was just on the
18   phone.
19        Q    At the time that meeting started, you had not
20   submitted the petition; correct?
21        A    Yes, sir.
22        Q    And then did you submit the petition during
23   that meeting?
24        A    Also the same location after the meeting.
25        Q    What were you told was the reason for the
```

71

1      Q    What were you told was the reason for your

2    suspension?

3      A    What Raul told me was that I should not have

4    signed the petition because I am with management -- I

5    was with management.

6      Q    Were you given any other reasons for why you

7    were being suspended?

8      A    No other reason was given, just that.

9      Q    Were you presented with any type of

10   documentation or disciplinary notice regarding your

11   suspension at that meeting?

12     A    They did not give any.

13     Q    At any point, did you have a meeting or a

14   conversation with John Qually regarding your

15   suspension?

16     A    No, sir.  After Raul suspended me, I left.

17     Q    So it's your testimony that at no point was

18   Mr. Qualley involved in any conversations or

19   communications with you about your suspension; true?

20     A    I don't know any.  All I know is Qually told

21   me that Raul will talk to me, to wait for Raul.

22     Q    And other than Qually telling you to wait for

23   Raul, did Qually have any other involvement in the

24   communications to you about your suspension or about

25   your signature of the petition?

77

1    Andrew Dodge when you provided it to Raul?

2        A    No, sir.

3        Q    When did, to your understanding, Mr. Menzies

4    first hear about that petition?

5        A    Menzies learned about the petition on that day

6    that I gave it to them.

7        Q    Okay.  So, in other words, to your

8    understanding, Menzies learned about the petition from

9    you; correct?

10       A    When I gave it to Raul, that's when Menzies

11   learned about it.

12       Q    At the time that you learned -- I'm sorry.

13   After you learned that you were being suspended, did

14   you provide anything to Menzies in response to that

15   suspension?

16       A    They had me make a letter if I would like to

17   repeat that again.

18       Q    And when you say "they," is that either Kevin

19   or Raul that asked you to provide that letter?

20       A    Raul told me to make a letter.  Raul told me

21   to make the letter, and then Kevin told me what kind of

22   letter it's going to be.  Kevin told me to tell them

23   what happened and that he will not meddle with the

24   people anymore -- that I will not meddle with the

25   people anymore.

85

```
 1      Q    That was something you were instructed to put
 2   in the letter?
 3      A    That's what Kevin told me to put in the
 4   letter, to tell them that I will not be meddling with
 5   the people anymore like that.
 6      Q    And then what, to your understanding, was
 7   meant by "not meddling with the people anymore"?
 8      A    Maybe with regard to the petition like that.
 9      Q    What do you mean by that answer?
10           THE INTERPRETER:  This is the interpreter.  I
11   would like him to repeat.
12           THE WITNESS:  I think what he wants me to say
13   is if, next time, they wanted to sign a petition, do
14   not sign that anymore.
15   BY MR. WARD:
16      Q    After you were suspended, did you ever work
17   another shift at Menzies?
18      A    In other words, because I could no longer go
19   back to the same one because of the stress that
20   happened to me.
21      Q    I'm sorry.  The question I asked was after you
22   learned you were suspended, you never worked another
23   shift at Menzies; correct?
24      A    Are you referring to Menzies, sir?
25      Q    Yes.
```

86

```
 1      A   Not anymore.
 2      Q   Okay.  But once you started your suspension --
 3   right? -- the next thing that happened was you were
 4   terminated.  You never came back to work; right?
 5      A   After my suspension, I was handed a
 6   termination letter.
 7      Q   Okay.  And in between when you started your
 8   suspension and then when you were provided that
 9   termination letter, you never worked another shift at
10   Menzies; right?
11      A   Yes, sir.
12      Q   How much time passed between when you learned
13   you had been suspended and when you learned you had
14   been terminated?
15          THE INTERPRETER:  Please repeat that, sir.
16          MR. WARD:  Sure.
17      Q   How much time passed between when you learned
18   of your suspension from Menzies and your termination of
19   employment from Menzies?
20      A   After I was suspended, three days after, Tracy
21   called me to go to her office because she was going to
22   tell me something.
23      Q   Is that when you learned you had been
24   terminated, when you went to Tracy's office?
25      A   She gave me the paper, the termination letter.
```

87

1       Q     Is that a yes?

2             That's when you learned you had been

3     terminated, when you met with Tracy?

4       A     Yes, sir.

5       Q     Was anybody else present at the time that you

6     met with Tracy other than yourself and Tracy?

7       A     She was with a female there.

8       Q     Was she another Menzies employer, that female?

9       A     Maybe, sir.

10      Q     You don't know who she was, in other words?

11      A     No, sir.

12      Q     So other than Tracy and this unidentified

13    female, nobody else was present; is that true?

14      A     Yes, sir.

15      Q     What did Menzies tell you was the reason they

16    were terminating your employment?

17      A     All I remember that Tracy told me was that you

18    should not have signed it because you were at

19    management site.

20      Q     And when she said you should not have signed

21    it, she was referring to the petition, to your

22    understanding?

23      A     Yes, sir.

24      Q     Were you told that there was any reason for

25    your termination other than signing the petition?

88

```
1       A      No more, sir.

2       Q      Are you aware of any documents that would

3   indicate that there was a reason for your termination

4   other than you signing the petition?

5       A      No, sir.  What's written on the termination

6   was just code of conduct.

7       Q      Okay.  What about with respect to the decision

8   to suspend your employment?

9               Were you given any explanation other than you

10  signing the petition?

11      A      She did not say anything -- any more.

12      Q      Are you aware of any documents that would

13  indicate there was a reason for your suspension other

14  than your signing the petition?

15      A      I no longer know any.

16      Q      At the time that you were informed you were

17  being suspended, did anybody mention anything about

18  your race?

19      A      The other employees, sir.

20      Q      How about anybody in Menzies management?

21              Did anybody say anything about your race being

22  a factor in the decision to suspend you?

23      A      Nothing was said like that by them.

24      Q      Other than with respect to your termination,

25  did anyone say anything -- did anyone in Menzies
```

89

1    management, rather, say anything about your race having

2    (Inaudible) in that termination?

3              THE INTERPRETER:  I'm sorry.  I didn't get

4    your whole question, sir.

5              MR. WARD:  Sure.

6    Q    With respect to termination of your

7    employment, did anyone at Menzies management say that

8    race was a factor in that termination?

9    A    I do not know, sir.

10   Q    How about with respect to your suspension?

11             Did anybody say your national origin was a

12   factor in the decision to suspend you?

13   A    I do not know that also.

14   Q    What about with respect to the decision to

15   terminate your employment?

16             Did anybody at Menzies say that your national

17   origin was a factor in that decision?

18   A    Please repeat that, sir.

19   Q    Sure.  With respect to the decision to

20   terminate your employment, did anybody in Menzies

21   management indicate that your national origin was a

22   factor in that decision?

23   A    I do not know, sir.

24   Q    Is it your belief that your race played any

25   role in the decision to suspend you?

90

```
1        A      Yes, sir.

2        Q      What is that belief based on?

3        A      Maybe because I'm an Asian and he is white.

4        Q      And when you say "maybe," are you just

5    speculating?

6        A      No, sir.

7        Q      Do you have any evidence that supports the

8    belief that your race played a role in your suspension?

9               MR. URIARTE:  Objection.  Calls for a legal

10   conclusion.

11              THE WITNESS:  Please repeat.  Please repeat

12   the question.

13              MR. WARD:  Sure.

14       Q      Do you have any evidence that supports your

15   belief that your race played a role in your

16   termination?

17       A      Yes, sir.

18       Q      What evidence is that?

19       A      First of all, I'm Asian.  He's white.  Second,

20   all the problems, we have brought it up to management.

21   And then why is it that myself, who is taking action in

22   behalf of the others, I am the one being terminated and

23   not himself?

24              I am the one taking care also of this effect

25   on management, on the company too.
```

91

1      Q      Nobody ever told you, from Menzies, that your
2  race was a factor; true?
3      A      No, sir.
4      Q      Who told you that your race was a factor?
5      A      Yes, I've seen it because how come that --
6  even if we tell the company about this person, nothing
7  is being done to reform, to suspend or to terminate
8  him.  He has delays up to 20 flights a day.  With us,
9  just one delay, and we hear from them.  With him, there
10  would be five or six delays, but nothing is done about
11  it.
12      Q      That doesn't answer my question, Mr. Navarro.
13              My question is who told you that your race was
14  a factor in either the termination or suspension
15  decision?
16      A      I see what they did to me.
17      Q      You are not answering my question,
18  Mr. Navarro.  The question is who told you?
19              Not what you think or what you feel or what
20  you believe, but who told you?
21      A      I have a lot of Asian coworkers that, when
22  they commit a mistake, they are already terminated.
23      Q      Okay.  And you are still not answering the
24  question, sir.
25              The question is who told you that your race

92

1  was a factor in the decision to either terminate or

2  suspend you?

3          MR. URIARTE:  Maybe if you quantified the

4  universal "who," then maybe he could more possibly --

5          MR. WARD: I don't need to qualify it.  He can

6  either tell me who did it, or he can say, no, he

7  didn't.  I need an answer to the question I asked.

8          MR. URIARTE:  That would be great.  We have,

9  like, great easy cases.  It's like management told the

10 terminated employee "Hey, I terminated you because I'm

11 discriminating against you."  It's, like, a great

12 question there, Chris.  But other than that,

13 (inaudible).

14         MR. WARD:  I'm entitled to an answer to it,

15 sir.

16         MR. URIARTE:  Yeah, but the question is --

17         (Simultaneous speaking.)

18         MR. WARD:  No.  You and I can debate the

19 merits of the legal system later.  I want an answer

20 from the witness -- who told him this? -- because he

21 testified someone did.

22         THE WITNESS:  No one was telling me, but

23 that's what I feel from what happened.

24 BY MR. WARD:

25     Q    And is it true that you cannot identify any

                                                          93

1    documents that say your race was a factor in the

2    decision to terminate or suspend you?

3             MR. URIARTE:  Objection.  Calls for a legal

4    conclusion.

5             THE WITNESS:  Please repeat again.

6             MR. WARD:  Sure.

7        Q     Is it true that you cannot identify any

8    document that indicates your race was a factor in the

9    decision to terminate or suspend you?

10            MR. URIARTE:  Calls for a legal conclusion.

11            THE WITNESS:  I do not know.

12   BY MR. WARD:

13       Q     You do not know whether any such document

14   exists; is that your testimony?

15       A     Yes, sir.

16       Q     And has anybody ever told you that your

17   national origin was a factor in Menzies' decision to

18   suspend or terminate you?

19       A     No, sir, but that's what I feel.

20       Q     And is it true that you are not aware of any

21   documents that indicate your national origin was a

22   factor in (inaudible)?

23            THE INTERPRETER:  I'm sorry.  A factor in

24   what?

25   ///

94

```
 1   BY MR. WARD:

 2        Q    Is it true that you are not aware of any

 3   documents that indicate your national origin was a

 4   factor in the suspension or termination decision?

 5             MR. URIARTE:   Objection.   Calls for a legal

 6   conclusion.

 7             THE WITNESS:   I do not know, sir.

 8   BY MR. WARD:

 9        Q    The letter that you are asked to provide, did

10   you provide such a letter?

11             THE INTERPRETER:   I'm sorry.   The letter he

12   was asked to provide?

13             MR. WARD:   Right.   At the time he was -- at

14   the time he was notified he was being suspended, he was

15   asked to provide a letter, and my question is did he

16   provide such a letter?

17             THE WITNESS:   Yes.   I gave it to Kevin.

18             MR. WARD:   All right.   I am going to mark as

19   Exhibit 15, if I can find it here -- sorry -- a set of

20   documents that were produced to us in the Bates

21   No. RenaldoNavarro -1 to -14.

22             (Deposition Exhibit 15 was marked for

23             identification by the reporter, a

24             copy of which is attached hereto.)

25   ///
```

95

1  BY MR. WARD:

2      Q    All right.  Let me get to the right page

3  here.  So looking at this first page of Exhibit 15,

4  Mr. Navarro, do you recognize this document?

5      A    Yes, sir.

6      Q    What is this document?

7      A    I did not know who made this, but I saw that.

8      Q    Is it your testimony that you did not write

9  this Navarro Exhibit 1?

10         THE INTERPRETER:  Again, repeat that.  There

11  is breaking up in the audio.

12  BY MR. WARD:

13      Q    Are you saying, Mr. Navarro, that you are not

14  the person who wrote this document that we are looking

15  at right now?

16         MR. URIARTE:  Do you want me to make it

17  bigger, Mr. Navarro?

18         THE WITNESS:  Yes.

19         Please repeat the question, sir.

20         MR. WARD:  Sure.

21      Q    Let me just ask this:  Are you the one who

22  wrote this, what's marked here as Navarro No. 1?

23      A    All I remember is the one at the last part.

24  All I remember is what's written here on the last part.

25  If this is the benefits for the sake of my job, I will

96

```
 1    not intervene again, just do and focus on my job.  But
 2    I do not remember the things about it, the words
 3    written above it.  If you could show what I wrote down,
 4    I would know where it came from, but this one, the
 5    stuff above it, I do not know.
 6        Q    So is it your testimony that you did not write
 7    all of the content on this page?
 8        A    If you give me the letter that I wrote, I
 9    would remember all of that, but with this one,
10    especially the last one, that was what Kevin told me to
11    say.  But with regard to the stuff above it, I do not
12    remember this.
13        Q    So am I understanding correctly, you did not
14    write everything on this page?  Yes or no?
15        A    Maybe I wrote all of this, maybe.
16        Q    As you sit here today, you just can't say one
17    way or another; is that true?
18        A    Which is it?  Which is it?  Are you referring
19    that I could not say one way or the other?
20        Q    The entire document, did you write this entire
21    document, or did somebody else write it?
22        A    I'm the one who made this.
23        Q    Okay.  You just told me you are the one who
24    made the entire letter -- or I'm sorry -- the entire
25    document.
```

97

1        A     Yes.  I was told to write that by Raul Vargas

2    and Kevin.

3        Q     Is this the letter that you provided in

4    response to the request from Kevin and Raul?

5              THE INTERPRETER:  I'm sorry.  Please repeat

6    that.

7    BY MR. WARD:

8        Q     Is this the letter that you provided in

9    response to the request from Kevin and Raul?

10       A     Yes, sir.

11       Q     How did you transmit this to Kevin?

12             THE INTERPRETER:  I'm sorry.  How did he --

13             MR. WARD:  How did he transmit this?  How did

14   he give it to Kevin?  Did he give it to him by hand?

15   Did he email it?

16             THE WITNESS:  When they suspended me, Kevin

17   told me to make a letter.  So I went to my car and made

18   that, and then, before I left, I gave it to Kevin.

19   BY MR. WARD:

20       Q     You wrote this document that we are looking at

21   right now, the first page of Exhibit 15, in your car?

22       A     Yes, sir.

23       Q     Did you keep a computer in your car?

24       A     I did not have a computer.  I hand-wrote it.

25   That's why, what I say right now, I hand-wrote it.  But

98

1    prepared this.

2         Q    But your testimony is that somebody gave you

3    this document; right?

4         A    Yes.  It may be Kevin who gave this to me, who

5    typed this in his computer and gave me a copy because I

6    have no computer.

7         Q    I don't want you to speculate, though,

8    Mr. Navarro.  I want you to tell me what you know

9    happened.

10           Did Kevin type this up and give it to you, or

11   are you guessing that might be what happened?

12        A    I am the one who wrote this down, but who

13   typed it in the computer, I no longer remember.

14        Q    Okay.  But it's your testimony that it wasn't

15   you who typed it; is that true?

16        A    Yes, sir.

17        Q    It's the same thing today?

18           You have no memory of how you came to be in

19   possession of this typed version; is that true?

20        A    I no longer remember, but what I remember is

21   the letter that the attorney had me prepare, this is

22   the one.

23        Q    All right.  This is now page 2 of Exhibit 15.

24   I want to ask you, do you recognize this typed version?

25           Have you seen it before?

101

```
 1      A    I have a copy of this.  I have a copy that I

 2  gave to my attorney.

 3      Q    Are you the one who created this typed

 4  version?

 5      A    It's not myself.

 6      Q    Where did you get it from?

 7      A    The people gave it to me.

 8      Q    Who?

 9      A    I no longer remember.  All the documents that

10  I think we need, I gave them all to my attorney.  So

11  all of the documents are with my attorney.

12      Q    But as you sit here today, looking at this

13  document stamped RenaldoNavarro -2, you don't remember

14  who gave that to you; is that true?

15           THE INTERPRETER:  I did not get the question.

16  BY MR. WARD:

17      Q    Just looking at page 2 of Exhibit 15, is it

18  true that you do not recall who gave this page to you?

19      A    Yes, sir.

20           MR. WARD:  All right.  I'm showing the

21  witness, still on Exhibit 15, the page Bates-marked

22  Navarro No. 11.

23      Q    Do you recognize what this screen capture

24  appears to show, Mr. Navarro?

25      A    Yes, sir.  Yes, sir.
```

                                                              102

1       Q      Is this a text message that you have on your
2    phone?
3       A      Yes, sir.
4       Q      And do you still have this text-message chain
5    on your device?
6       A      It's still there, sir.
7       Q      Don't delete it, please.
8              What about this page that is -- I think it's
9    RenaldoNavarro -12.  What is that?
10      A      This was by the supervisor.  I was no longer
11   there, but this was just texted to me.  This was --
12   this text was sent to me saying "Sorry.  Andrew fell
13   asleep, but his hours were already running."
14      Q      Okay.  This appears to be -- so is this a
15   message somebody named Mark sent to you?
16      A      Yes, sir.
17      Q      Okay.  Which side of this text-message chain
18   is yours?  Is it the left side with the image or the
19   right side where it says "Date 11-7-18"?
20      A      This date.
21      Q      Who is Mark?  Who is the Mark that's referred
22   to in this message?
23      A      This was the person, also a supervisor --
24   Andrew was supposed to replace him.
25      Q      So, in other words, this was another

                                                              103

```
 1   supervisor at Menzies?

 2      A    When I was no longer there.  He was the

 3   supervisor when I was no longer at Menzies.

 4      Q    Okay.  And is this a screen capture of a text

 5   message you had with -- or a text capture you had with

 6   this individual, Mark?

 7      A    He just sent a text to me.

 8      Q    Okay.  Do you still have those texts on your

 9   device?

10      A    Yes, sir.

11      Q    Don't delete them, please.  How about this

12   next page?  It looks like it's -- or next two pages,

13   13 and 14?  Are these also text messages that you

14   received?

15      A    Yes, sir.

16      Q    Do you still have them on your device?

17      A    It's still there, sir.

18      Q    Okay.  Don't delete that, please.

19           MR. URIARTE:  Chris, can we take a five-minute

20   break to rest?

21           MR. WARD:  Sure.  That's fine.  It's 3:37.  Do

22   you want to reconvene at 3:45?

23           MR. URIARTE:  Sounds good.

24           MR. WARD:  Thank you.  We are off the record.

25           (Off the record.)
```

104

```
 1              THE INTERPRETER:  I'm sorry.  Please repeat
 2    that.
 3    BY MR. URIARTE:
 4        Q    The petition was signed by at least one
 5    supervisor; is that correct?
 6        A    Yes.
 7        Q    Do you know how many signed -- how many
 8    supervisors signed the petition?
 9        A    Two, sir.
10        Q    What are those names?
11        A    July Macapagal.
12        Q    Who else?
13        A    And Renaldo Navarro, myself.
14             MR. URIARTE:  No further questions.
15             MR. WARD:  Give me just a second.
16             All right.  I have no follow-up at this point.
17    Counsel and I agreed off the record that we would not
18    be concluding Mr. Navarro's deposition subject to some
19    questioning about his -- or I should say potential
20    questioning about Mr. Navarro's settlement agreement
21    with Swissport, which we'll meet and confer about as
22    necessary; but, otherwise, we can conclude today's
23    deposition, at least this first and potentially last
24    day of Mr. Navarro's deposition.  And at this point --
25    we don't do any stipulations on the record anymore, at
```

117

```
1    least in San Francisco.  Some L.A. attorneys still do

2    it unless there's something that you want to add, Arlo.

3              MR. URIARTE:  No.

4              MR. WARD:  All right.  I think we are

5    concluded, then, for the day.  I appreciate everybody's

6    time and patience with this process, especially with

7    the technology glitches on my end.  Off the record.

8              (Deposition session concluded at 4:23 p.m.)

9                              -oOo-

10

11

12              I certify (or declare) under penalty of

13    perjury under the laws of the State of California that

14    the foregoing is true and correct.

15

16    Executed at _____ on _____.
                           (Place)                    (Date)

17

18              _____
                            (Signature of Deponent)

19

20

21

22

23

24

25
```

                                                              118

```
1              DEPOSITION OFFICER'S CERTIFICATE
2   STATE OF CALIFORNIA )
                        ) ss.
3   COUNTY OF ORANGE    )

4

5              I, Joanna B. Brown, hereby certify:
6              I am a duly qualified Certified Shorthand
7   Reporter in the State of California, holder of
8   Certificate Number CSR 8570 issued by the Court
9   Reporters Board of California and which is in full
10  force and effect. (Fed. R. Civ. P. 28(a)).
11             I am authorized to administer oaths or
12  affirmations pursuant to California Code of Civil
13  Procedure, Section 2093(b) and prior to being examined,
14  the witness was first duly sworn by me.
15  (Fed R. Civ. P. 28(a), 30(f)(1)).
16             I am not a relative or employee or attorney or
17  counsel of any of the parties, nor am I a relative or
18  employee of such attorney or counsel, nor am I
19  financially interested in this action.
20  (Fed R. Civ. P. 28).
21             I am the deposition officer that
22  stenographically recorded the testimony in the
23  foregoing deposition, and the foregoing transcript is a
24  true record of the testimony given by the witness.
25  (Fed. R. Civ. P. 30(f)(1)).
```

119

1          Before completion of the deposition, review of

2    the transcript [XX] was [ ] was not requested.  If

3    requested, any changes made by the deponent (and

4    provided to the reporter) during the period allowed,

5    are appended hereto. (Fed. R. Civ. P. 30(e)).

6

7

8    Dated: August 4, 2020

9

10                          Joanna B. Brown

11                          _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          120

## ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name:       RENALDO NAVARRO v. MENZIES AVIATION, INC.
Case Number:     3:19-cv-08157-VC
Dep. Date:       August 4, 2020
Deponent:        RENALDO NAVARRO
Place:           Via Zoom

## CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reasons Therefore |
|-----|-----|-----------|-------------|-------------------|
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |

_____
Signature of Deponent

_____

# EXHIBIT 13

1              IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5    RENALDO NAVARRO,

6                    Plaintiff,

7    v.                          No.  3:19-CV-8157

8    MENZIES AVIATION, INC.,
     doing business as MENZIES
9    and DOES 1 through 10,
     inclusive,
10
                     Defendants.
11   _____/

12   Zoom Remote Deposition of

13        JOHN QUALLY

14    Monday, July 27, 2020

15          Volume I

16     (Pages 1 through 32)

17      CERTIFIED COPY

18

19

20

21   REPORTED BY:  CINDY TUGAW, CSR #4805

22

23

                NOGARA REPORTING SERVICE
24              5 Third Street, Suite 415
             San Francisco, California 94103
25                 (415) 398-1889

1                         I N D E X

2                                           Page Number

3      EXAMINATION BY MR. URIARTE                 4

4                      ---o0o---

5                    E X H I B I T S

6      Plaintiff's

7      Exhibit 1      Plaintiff Renaldo            9
                      Navarro's Notice of
8                     Deposition of John
                      Qually
9
       Exhibit 2      Missed Punch Form           28
10

11                    ---o0o---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 106 of 312

1           BE IT REMEMBERED that, pursuant to Notice of

2    Taking Deposition and on Monday, the 27th day of July,

3    2020, commencing at the hour of 8:58 o'clock a.m.

4    thereof, via Zoom videoconference, before me, CINDY

5    TUGAW, a Certified Shorthand Reporter in the State of

6    California, personally appeared,

7                       JOHN QUALLY,

8    Called as a witness by the Plaintiff, having been by me

9    first duly sworn, was examined and testified as

10   hereinafter set forth.

11                      ---o0o---

12               APPEARANCES OF COUNSEL

13   For the Plaintiff
          LIBERATION LAW GROUP, P.C.
14        2760 Mission Street
          San Francisco, California 94110
15        BY:  ARLO GARCIA URIARTE, Attorney at Law
          (415) 695-1000
16

17   For the Defendants
          FOLEY & LARDNER, LLP
18        555 California Street, Suite 1700
          San Francisco, California 94104
19        BY:  JASON Y. WU, Attorney at Law
          (415) 984-9848
20

     Also Present:  David Ho, Zoom Host.
21
                        ---o0o---
22

23

24

25

1    THE REPORTER:  At this time, I will ask counsel to

2    stipulate on the record that there is no objection to

3    this deposition officer administering a binding oath to

4    the witness via Zoom, starting with the noticing

5    attorney.

6         MR. URIARTE:  So stipulated.

7         THE REPORTER:  Mr. Wu?

8         MR. WU:  So stipulated on behalf of defendant,

9    Menzies Aviation.

10                   EXAMINATION BY MR. URIARTE

11        MR. URIARTE:  Q.  Good morning, Mr. Qually.  My

12   name is Arlo Uriarte.  I am attorney for Renaldo

13   Navarro.  Do you understand that?

14        A.  Yes.

15        Q.  And you are aware that Mr. Navarro has an

16   action against Menzies for his termination?

17        A.  I heard, yes.

18        Q.  And you know that you are here for your

19   deposition as a witness?

20        A.  Yes.

21        MR. URIARTE:  David, can we have Exhibit 1 brought

22   up, please.

23        ZOOM HOST:  Give me one second.  I'm bringing it

24   up right now.  Hold on.

25        MR. URIARTE:  Okay.

Case 3:19-cv-08157-VC    Document 28-1    Filed 10/15/20    Page 108 of 312

1    Q.   Okay.  All right.  So let's see.  So you

2    said -- when you started with ASIG -- and is that the

3    right way to call it, ASIG, by the way, A-S-I-G, ASIG?

4    Do you guys say that, ASIG?

5         A.   Yes.

6         Q.   When you started with ASIG, what was your

7    position with them?

8         A.   Supervisor.

9         Q.   Can you tell me what the duties of a

10   supervisor would be?

11        A.   The duties are basically overseeing of the --

12   overseeing and assigning the flights to the fuelers and

13   making communication with the airlines on -- as we go

14   through the day.

15        Q.   And by 2018, how many fuelers were assigned to

16   a supervisor?  Do you remember?

17        A.   It could -- I guess it varies by shift.

18        Q.   I see.  What would be the range, like would

19   you say between three and ten, or was there like a

20   range?

21        A.   I guess it depends on the shift.  Some shifts

22   had upwards of 12 to 15.  Some shifts had anywhere from

23   three to four.

24        Q.   Gotcha.  And the interesting -- or the date

25   most interesting for us is August of 2018 because

1        A.  Yeah.

2        Q.  What was the next?

3        A.  Ramp service.

4        Q.  Lead ramp services.  Okay.  And how long were

5   you with United?

6        A.  Eight and a half years.

7        Q.  So when did you become a duty manager for ASIG

8   or Menzies?

9        A.  It was back -- honestly, I don't remember the

10  exact date, but it's been -- I've been a duty manager

11  for roughly four years.

12       Q.  Four years now?

13       A.  Yeah.

14       Q.  Okay.  So like 2016, around that time?

15       A.  Around that time.

16       Q.  Were you a duty manager by the time Menzies

17  came in?

18       A.  Around that time, yes.

19       Q.  Like close, yeah.  I guess the key question is

20  when Menzies took over ASIG, were you already a duty

21  manager or you became a duty manager after Menzies came

22  in?

23       A.  I was already.

24       Q.  Okay.  Gotcha.  All right.

25           So we were talking about the role of

1   supervisors with regards to how they work with fuelers,

2   right?  You said earlier that you would -- one of the

3   duties would be to assign flights to the fuelers for

4   the shift, right?

5        A.  Yes.

6        Q.  That's one of the duties.  What other duties

7   do supervisors have?

8        A.  They -- besides assigning the flights, they

9   are obviously in communication with airlines as needed.

10  They're overseeing the safety of the operation, making

11  sure that, you know, everything is going safely.

12       Q.  Okay.  So is it the supervisor that's actually

13  on the headphone with the plane during the fueling

14  operation, or with the airline?

15       A.  No.

16       Q.  No?  That could be any of the fuelers?

17       A.  Well, the fuelers don't communicate with the

18  flight crew.  They communicate with the airline

19  representative.

20       Q.  Gotcha.  Okay.  And who is that?  Is that the

21  fueler or is that the supervisor?

22       A.  Sometimes both.  But, in general, when you're

23  actually fueling, it would be more so the fueler than

24  the supervisor.

25       Q.  Okay.  Are supervisors sometimes -- like do

1        A.   Yes.

2        Q.   Okay.  And then what other duties do

3   supervisors have with regards to the fuelers?

4        A.   Basically, you know, for operational purposes,

5   it's making sure that the flights are getting done, the

6   fuelers are getting to the flights when they're

7   supposed to, you know, addressing whatever issues may

8   come up.

9        Q.   What about giving breaks, for example, like

10  timing the breaks, when people can go for meal periods,

11  when people can go for their ten-minute breaks, is that

12  the supervisor's duties?

13       A.   Yes.

14       MR. WU:  Objection.  Relevance.

15       MR. URIARTE:  Q.  And then what about clocking in

16  and clocking out, do the supervisors have any duties

17  with regards to that?

18       MR. WU:  Same objection.

19       THE WITNESS:  No.

20       MR. URIARTE:  Q.  Like if there are issues with

21  regards to they forgot to clock out or, oh, they forgot

22  to clock in, something like that, is that the

23  supervisor's duty or is that somebody else's?

24       MR. WU:  Same objection.

25       MR. URIARTE:  Q.  Mr. Qually?

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 112 of 312

1  supervisor, is that correct?

2      A.  I had no -- that would be my guess.  I don't

3  know -- I don't have any knowledge on where he started,

4  but that's my understanding.

5      MR. WU:  I don't want you to guess.

6      MR. URIARTE:  Q.  Yeah, no guessing.

7          I guess what I was leading to was whether you

8  had any part in recommending or having Mr. Navarro be

9  promoted from fueler to supervisor.  Do you remember

10  anything like that?

11      A.  No.

12      Q.  So you weren't part of that process at all?

13      A.  No.

14      Q.  Did you and Mr. Navarro get along at all?  Was

15  your relationship cordial or was it combative?  How

16  would you characterize your relationship with Mr.

17  Navarro?

18      A.  Working relationship was okay.  No, you know,

19  just -- it was okay.

20      Q.  Did Mr. Navarro ever bring up any complaints

21  to you?

22      A.  From time to time, yes.

23      Q.  And what would be the nature of those

24  complaints?

25      A.  Varies.  Could be airline issue, staffing

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 113 of 312

1    issue.  It just depends on the day and what he felt to

2    complain about.

3         Q.  And before his termination, did he ever bring

4    up complaints against Andrew Dodge to you?

5         A.  Yes.

6         Q.  And what was the nature of those complaints?

7         A.  It wasn't many.  Let's see if I can remember,

8    because it's been a while.  But there was probably

9    one -- I can remember at least one where Andrew might

10   have been caught seen sleeping on the job.

11        Q.  And he brought that up to you?

12        A.  Yes.

13        Q.  So was Andrew also a graveyard shift

14   supervisor?

15        A.  Yes.  At that time.

16        Q.  Okay.  So you're coming in to work, and Mr.

17   Navarro is mentioning to you that maybe Andrew Dodge

18   was sleeping on the job.  And so what would you, as a

19   duty manager, do about that?

20        A.  Well, there were different shifts, so they

21   weren't working together.

22        Q.  Okay.

23        A.  So when the complaints came, I addressed the

24   complaints with Andrew.

25        Q.  Okay.

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 114 of 312

1    A.  And it was brought up to the higher-ups.

2    Q.  And who were the higher-ups at that time?

3    A.  Let's see.  Who was it?  Renil was one of

4  them.

5    Q.  Who?

6    A.  Renil Lal.  Because he was the acting GM at

7  the time, so --

8    Q.  Okay.  Anybody else, do you remember?

9    A.  No.

10    Q.  Did anything happen because of the complaints

11  that Andrew Dodge was sleeping?  Do you know what

12  happened to Andrew Dodge?  Was he reprimanded?  Was he

13  written up?

14       Did anything happen because of that?

15    A.  Not that I know of.

16    Q.  Did Mr. Dodge explain to you what happened or

17  did he admit it or anything like that?

18    A.  He did.  He had sleep depravation -- or sleep

19  apnea, sorry.

20    Q.  So he had sleep apnea, and so --

21    A.  According to what I heard, what the

22  explanation was, at times it's easy for a person to

23  fall asleep.

24    Q.  Aside from his -- aside from Mr. Navarro

25  mentioning that Mr. Dodge was sleeping, any other

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 115 of 312

1          CERTIFICATE OF WITNESS

2                ---o0o---

3

4         I, JOHN QUALLY, hereby declare under

5    penalty of perjury that I have read the foregoing

6    deposition testimony; and that the same is a true

7    and correct transcription of my said testimony

8    except as corrected pursuant to my rights under

9    Rule 30(e) of the Federal Rules of Civil

10   Procedure.

11

12              _____

13                        Signature

14              _____

15                          Date

16

17

18

19

20

21

22

23

24

25

1  STATE OF CALIFORNIA      )
                            )
2  COUNTY OF SAN FRANCISCO )

3          I, CINDY TUGAW, a Certified Shorthand Reporter

4  of the State of California, duly authorized to

5  administer oaths pursuant to Section 8211 of the

6  California Code of Civil Procedure, do hereby certify

7  that

8                    JOHN QUALLY,

9  the witness in the foregoing deposition, was by me duly

10 sworn to testify the truth, the whole truth and nothing

11 but the truth in the within-entitled cause; that said

12 testimony of said witness was reported by me, a

13 disinterested person, and was thereafter transcribed

14 under my direction into typewriting and is a true and

15 correct transcription of said proceedings.

16         I further certify that I am not of counsel or

17 attorney for either or any of the parties in the

18 foregoing deposition and caption named, nor in any way

19 interested in the outcome of the cause named in said

20 caption.

21         Dated the 7th day of August, 2020.

22

23

24

25         CINDY TUGAW
           CSR No. 4805 (California)

```
 1    John Qually
      c/o Foley & Lardner
 2    555 California Street, Suite 1700
      San Francisco, CA 94104
 3    Attn:  Jason Y. Wu, Esq.

 4    Date:  August 7th, 2020
      Re:  Navarro vs. Menzies
 5    Deposition Date:  Monday, July 27, 2020

 6    Dear Mr. Qually,

 7         Please be advised the original transcript of
      your deposition is ready for your review.
 8         Pursuant to FRCP Rule 30(e), you have
      30 days following the date of this notice to read,
 9    correct if necessary, and sign your transcript unless
      the attending parties and the deponent agree on the
10    record or otherwise in writing to a longer or shorter
      time period.  The deponent may change the form or the
11    substance of the answer to a question, and may either
      approve the transcript of the deposition by signing it,
12    or refuse to approve the transcript by not signing it.
      You are not required by law to read and sign your
13    deposition transcript.  All parties will be informed of
      the corrections.  The original transcript will then be
14    sealed and sent to the examining attorney pursuant to
      the applicable law.
15         You may either come to our office to read and
      sign the original transcript, or you may contact your
16    attorney or the attorney who arranged for you to be
      present at your deposition.  If they have ordered a
17    copy of the transcript, you may review their copy and
      make corrections by submitting, signing and returning
18    the attached form.  If you choose to review your
      transcript at our office, please call first to make an
19    appointment.  Should you have any question regarding
      these instructions, please call.
20
      Sincerely,
21


22
      NOGARA REPORTING SERVICE
23    5 Third Street, Suite 415
      San Francisco, California 94103
24    (415) 398-1889

25    cc:  All counsel, original deposition
```

# EXHIBIT 14

1            IN THE UNITED STATES DISTRICT COURT

2        IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5    RENALDO NAVARRO,

6              Plaintiff,

7    v.                              No.  3:19-CV-8157

8    MENZIES AVIATION, INC.,
     doing business as MENZIES
9    and DOES 1 through 10,
     inclusive,
10
               Defendants.
11    _____/

12   Zoom Remote Deposition of

13        JOHN QUALLY

14    Tuesday, July 28, 2020

15         Volume II

16     (Pages 33 through 58)

17

       **CERTIFIED COPY**
18

19

20

21

22   REPORTED BY:  CINDY TUGAW, CSR #4805

23
                NOGARA REPORTING SERVICE
24              5 Third Street, Suite 415
             San Francisco, California 94103
25                  (415) 398-1889

1                          I N D E X

2                                            Page Number

3     EXAMINATION BY MR. URIARTE                    36

4                        ---o0o---

5                      E X H I B I T S

6     Plaintiff's

7     Exhibit 6      Employee Performance        46
                     Development dated
8                    8/20/18

9                 PREVIOUSLY MARKED EXHIBITS

10    Exhibit 10     Statement by Rafael         53
                     Vasquez dated 11/18/18
11
                        ---o0o---
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           BE IT REMEMBERED that, pursuant to Notice of

2   Taking Deposition and on Tuesday, the 28th day of July,

3   2020, commencing at the hour of 2:07 o'clock p.m.

4   thereof, via Zoom videoconference, before me, CINDY

5   TUGAW, a Certified Shorthand Reporter in the State of

6   California, personally appeared,

7                       JOHN QUALLY,

8   called as a witness by the Plaintiff, having been by me

9   previously duly sworn, was examined and testified

10  further as hereinafter set forth.

11                      ---o0o---

12                APPEARANCES OF COUNSEL

13  For the Plaintiff
         LIBERATION LAW GROUP, P.C.
14       2760 Mission Street
         San Francisco, California 94110
15       BY:  ARLO GARCIA URIARTE, Attorney at Law
         (415) 695-1000
16

17  For the Defendants
         FOLEY & LARDNER, LLP
18       555 California Street, Suite 1700
         San Francisco, California 94104
19       BY:  JASON Y. WU, Attorney at Law
         (415) 984-9848
20

21  Also Present:  David Ho, Zoom Host.

                        ---o0o---
22

23

24

25

1    EXAMINATION BY MR. URIARTE

2    MR. URIARTE:  Let's get back on the record.

3    Q.  Mr. Qually, how are you?  Thank you for coming

4  back today.

5    Off the record we had a little bit of a

6  clarification discussion with your counsel.  And I just

7  wanted you to confirm that, in preparation for your

8  deposition, that aside from your counsel, you also

9  spoke with Tracy from HR, Andrew Dodge, and also Ran --

10    A.  Randy Davies.

11    Q.  -- Randy Davies, correct?

12    A.  Correct.

13    Q.  And then, aside from those people, did you

14  talk to anybody else in preparation --

15    A.  No.

16    Q.  -- for your deposition?

17    A.  No.

18    Q.  That's a no?

19    A.  No.

20    Q.  Great.  So let's just jump right in here.

21  Yesterday you were having a little bit of a difficulty

22  trying to remember the different supervisors and

23  different managers that were at Menzies Aviation office

24  in 2018.  And I've got a list of names here.  I wanted

25  to throw it by you.  In August of 2018, Nico, N-i-c-o,

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 123 of 312

1  Q.  And I read your note, and I think I've got to

2  piece it together a little bit, and let me see if this

3  is correct.  What happened was, after the suspension

4  meeting, they asked you to deliver the suspension

5  notice, and then Ray Navarro -- a couple of days later,

6  and then Ray Navarro would not sign it.  Is that how it

7  happened?

8      A.  He, as I remember, trying to serve him with a

9  suspension document, and he did refuse to sign.

10     Q.  But that was -- when did you try to serve --

11 when did you try to serve it to Ray Navarro?  Did that

12 happen after the meeting, same day?

13     A.  I believe it must have -- I can't remember a

14 hundred percent, but it must have been before the

15 meeting.

16     Q.  Okay.

17     A.  But like I say, I don't have -- not knowing

18 when Tracy had the meeting, but, you know, so my guess

19 would be -- like I say, it's a guess, but it was

20 probably before the meeting with them.

21     Q.  So because it's a guess, you don't actually

22 know whether it was before the meeting or after the

23 meeting?

24     A.  Correct.

25     Q.  You don't remember.

1    at all?

2         MR. WU:   I'm going to object here on grounds of

3    attorney-client privilege and instruct the witness to

4    answer only as to whether he's seen the document

5    outside of any confidential or communications with his

6    attorneys.

7         MR. URIARTE:   Q.   That's correct, Mr. Qually, yes.

8    So my question really is whether you've ever seen the

9    -- either of the petitions, either of the two petitions

10   that were circulated, and not because your attorney

11   showed it to you but because of other events.

12        A.   As I said, no.

13        Q.   Would it be accurate to state that as a duty

14   manager, that Andrew Dodge is an employee that you

15   would have been supervising?

16        A.   At some point, yes.

17        Q.   And so it wasn't like an interest of yours to

18   figure out what it is that the fuelers were complaining

19   about against Dodge?   That wasn't an interest of yours?

20        MR. WU:   Objection.   Vague.

21        You can answer if you understand the question.

22        THE WITNESS:   I did not hear complaints directly

23   from the fuelers.

24        MR. URIARTE:   Q.   Okay.   So you're saying none of

25   the fuelers ever came up to you and said, hey, these

1    negatives things are happening?  You never heard that?

2        A.  No.

3        Q.  What about the video, did you ever see that

4    video where they put together a video of Mr. Dodge

5    sleeping and all that?  Did you see that one?

6        A.  No.

7        Q.  You knew that a petition was going around

8    against Mr. Dodge?  Did you know that, as it was

9    happening?

10       A.  I have heard through -- that, yes, there was.

11       Q.  And did you see the note that Andrew Dodge

12   wrote, the statement he wrote around the same time that

13   the petition was going around, was that something that

14   you saw?

15       A.  I did not.

16       Q.  Do you know one way or the other if Menzies

17   Aviation ever did an investigation with regards to the

18   facts that are contained within those petitions?

19       A.  No.

20       Q.  You don't know?

21       A.  I don't know if -- what was done with all the

22   information.

23       Q.  I see.  Were you made aware at some point that

24   Mr. Dodge was suffering from sleep apnea?

25       A.  Yes.

1    Q.   And how were you made aware of that?

2    A.   He brought it to our attention.

3    Q.   Do you know when that was?

4    A.   No, I don't have the exact date.

5    Q.   Was it before or after the termination of Ray

6  Navarro?

7    A.   Before.

8    Q.   A lot of time before?  I think Mr. Dodge came

9  in in 2016.  And then Ray Navarro was August of 2018.

10  So that's kind of like the time frame there.  I don't

11  know if that assists you, but do you know about when

12  Mr. Dodge let you know of his condition?

13    A.   I don't have the exact date, no.

14    Q.   And did you see any kind of medical note or a

15  medical slip or anything like that written by a doctor?

16    A.   Personally, no.

17    Q.   Did somebody tell you that he had one?

18    A.   He told me he gave it to the general manager

19  at the time, Renil.

20    Q.   Renil Lal?

21    A.   Yes.

22    Q.   Did Mr. Lal ever talk to you about the note,

23  the medical note?

24    A.   No.

25    Q.   Was there some sort of accommodation or a game

1  plan with regards to how to deal with the sleep apnea,

2  anything like that?

3      A.  Nothing directed to me.

4      Q.  Did you think that maybe the sleep apnea

5  condition was interfering with his job?

6      A.  No.

7      Q.  You didn't think that it's of concern?

8      A.  There's always a concern, but I don't believe

9  it interfered with his job.

10     Q.  And why is that?

11     A.  Because most of the time, as I heard, it was

12 already, like, early in the morning, like, 1:00, 2:00,

13 3:00 o'clock in the morning when there's nothing on the

14 airport.  When he's actually on the airport, he was not

15 sleeping.  He was actually doing his job.

16     Q.  Did you see that one picture of him where he's

17 inside the truck and he's sleeping?  Did you see that

18 one?

19     A.  I've seen one, yes.

20     Q.  And that's not a concern at all for Menzies?

21     A.  For me personally or Menzies?  Me, personally,

22 the time frame, no.  Whether the company did, I can't

23 say.

24     Q.  So I guess you weren't part of some sort of

25 discussion as to whether his condition interfered with

1    him being able to correctly perform his job functions,

2    right?  You weren't purview to that type of discussion?

3        A.  Correct.

4        Q.  Have you seen the termination notice of

5    Renaldo Navarro?

6        A.  No.

7        Q.  So you saw only the suspension notice, right?

8        A.  Correct.

9        Q.  And then you actually -- did you write that?

10   Did you actually -- were you the one who wrote it?

11       A.  The one that basically saying that he -- that

12   I attempted to serve him the suspension notice and he

13   refused to sign?

14       Q.  No, no, let me put it up, that way we're

15   talking about the same thing.  I'm talking about the

16   actual notice itself.

17           So it's Exhibit 6, please, David.

18           (Plaintiff's Exhibit 6 marked for

19           identification.)

20       MR. URIARTE:  Q.  Do you see that, Mr. Qually?

21       A.  Oh, that one.  Okay.  Yes, I did -- that was

22   the one -- that was the -- okay, yes.  That was a

23   suspension document that was tried to serve to

24   Mr. Navarro that he refused to sign.

25       Q.  Correct.  So my question first is did you type

1    this up?

2        A.   Yes.

3        Q.   So you typed it up, is that right?

4        A.   You know what, hold on a minute.  No, I did

5    not type that.

6        Q.   Okay.  So somebody gave this to you to -- for

7    example, it seems like somebody filled out the field

8    "Employee Name:  Renaldo Navarro," "Today's Date,"

9    "Airport/Location," "Clock #," "Department."  Somebody

10   put that information in there.

11            Were you the one who put that in there?

12       A.   Negative, no.

13       Q.   Do you know who did that?

14       A.   Do I remember, no.  There's only --

15       Q.   Who asked you to serve the document?

16       A.   I believe it was HR.

17       Q.   Meaning Tracy?

18       A.   Tracy.

19       Q.   Okay.  So this might refresh your recollection

20   with regards to before or after the meeting.  So it

21   says "Today's Date" on the top there, and it says

22   August 20, 2018.  Do you see that?

23       A.   Okay.

24       Q.   And then, if you scroll down and you see your

25   signature, it's a different date.  Your signature has a

1    date of August 23.  Do you see that?

2         A.  Yes.

3         Q.  Does that help you or refresh your

4    recollection at all with regards to when you served

5    this?

6         A.  When he refused to sign, I dated it on the

7    23rd because that's when I tried to serve it to him.

8         Q.  I see.  So that's when your encounter with him

9    actually happened, is that correct?

10        A.  Correct.

11        Q.  So you only had one encounter with him, one

12   attempt?

13        A.  Correct.

14        Q.  And because he was not -- he wasn't working at

15   that point, correct?

16        MR. WU:  Objection.  Vague.

17        THE WITNESS:  I can't remember --

18        MR. WU:  You can answer if you understand the

19   question.

20        THE WITNESS:  I understand the question.  I don't

21   remember if that was his scheduled shift.  I don't

22   remember if that was his scheduled day or not.

23        MR. URIARTE:  Q.  I understand you're a little

24   confused.  By the time you were trying to serve him,

25   was he already serving the suspension or he had not

1    started serving the suspension?  Do you see what I'm

2    saying?

3         A.   He -- best of my knowledge, he had not served

4    his suspension.

5         Q.   So he didn't start serving the suspension

6    until you tried to serve him the suspension notice, is

7    that correct?

8         A.   To the best of my knowledge, yes.

9         Q.   Okay.  Did you leave him with a copy?

10        A.   He had a copy, yes.

11        Q.   When you say he had a copy, was the copy --

12   the copy that he had, that came from you or --

13        A.   He took a picture of it with his phone.

14        Q.   I see.  Okay.  So, okay.  All right.  And then

15   let me just read under goal and the expectation part

16   there, it says, "It is expected that employees will

17   follow all policies and procedures.  Failure to follow

18   Company policies and procedures will result in further

19   disciplinary action up to and including termination."

20             Do you read that?

21        A.   Yes.

22        Q.   Are you knowledgeable at all with regards to

23   the policies and procedures that this notice was

24   talking about?

25        A.   Directly, no.

1    no.

2         Q.  Did you -- like either part of the petition or

3    part of what was happening, or anything like that, did

4    you ever have a discussion with Mr. Dodge with regards

5    to his fuelers and his fuelers maybe not being able to

6    take breaks?  Did you ever engage in such a discussion

7    with him?

8         A.  It probably came up once or twice, yes.

9         Q.  And was this once or twice before the

10   termination of Mr. Navarro?

11        A.  Likely, yes.

12        Q.  And can you tell us what your memory is of

13   that, like, what was that discussion about?

14        A.  Basically fuelers not being able to take a

15   break just by the fact that they were shorthanded or

16   just lots of flights.  Nothing I can remember in

17   general, but those are usually the only things that

18   would prevent that.

19        Q.  Okay.  And what brought up the need to talk to

20   Mr. Andrew Dodge about the breaks and his fuelers?

21   What brought it up to you?  What kind of triggered

22   that?

23        MR. WU:  Objection.  Assumes facts not in

24   evidence.

25        THE WITNESS:  Sometimes a fueler would complain to

1    me, but that's it.

2         MR. URIARTE:  Q.  And did Mr. Dodge have any

3    opinion or did he kind of have his position as to why

4    these breaks were short -- I mean, the breaks weren't

5    happening, or the breaks were late, or anything like

6    that?

7              Did Andrew Dodge try to explain himself as to

8    why those things were happening?

9         MR. WU:  Objection.  Assumes facts not in

10   evidence.

11        THE WITNESS:  Yes.

12        MR. URIARTE:  Q.  And what would he say in those

13   discussions?

14        A.  He gave me the explanation of what happened

15   during the night and why some fuelers weren't able to

16   get a longer break than they did or any break at all.

17   And that's it, you know.

18             We -- there is a policy where, if they don't

19   get a break, they get a missed meal penalty.  So they

20   get paid for their lunch.

21        Q.  Did you ever have a discussion with a Rafael

22   Vasquez about Andrew Dodge?

23        A.  I might have at one point.  I don't recall.

24        Q.  And what do you remember as to that

25   discussion?

1   that at all?

2        A.   If I talked to Rafael, it would have been

3   before.

4        Q.   So here he says something about "I have spoken

5   to The Menzies Aviation Fueling Director Raul Vargas on

6   three separate occasions regarding Mr. Andrew Dodge,

7   who continues to abuse his authority and at times

8   harass Fuelers under his charge."

9             Do you have any information or knowledge with

10  regards to that allegation, "continues to abuse his

11  authority and at times harass Fuelers under his

12  charge"?

13            Does that ring a bell at all, Mr. Qually?

14       A.   No.

15       Q.   And in the complaint that you received against

16  Andrew Dodge, was there any type of language along

17  these lines or actions along these lines, like

18  harassing, abusing authority?

19            Was that the types of complaints that you

20  received?

21       A.   No.

22       Q.   So you received complaints about meal breaks

23  and rest breaks, but nothing about harassing fuelers,

24  right?  You never heard that type of complaint?

25       A.   Correct.

1                    CERTIFICATE OF WITNESS

2                          ---o0o---

3

4           I, JOHN QUALLY, hereby declare under

5    penalty of perjury that I have read the foregoing

6    deposition testimony; and that the same is a true

7    and correct transcription of my said testimony

8    except as corrected pursuant to my rights under

9    Rule 30(e) of the Federal Rules of Civil

10   Procedure.

11

12          _____

13                              Signature

14          _____

15                              Date

16

17

18

19

20

21

22

23

24

25

1   STATE OF CALIFORNIA      )
                             )
2   COUNTY OF SAN FRANCISCO )

3          I, CINDY TUGAW, a Certified Shorthand Reporter

4   of the State of California, duly authorized to

5   administer oaths pursuant to Section 8211 of the

6   California Code of Civil Procedure, do hereby certify

7   that

8                      JOHN QUALLY,

9   the witness in the foregoing deposition, was by me duly

10  sworn to testify the truth, the whole truth and nothing

11  but the truth in the within-entitled cause; that said

12  testimony of said witness was reported by me, a

13  disinterested person, and was thereafter transcribed

14  under my direction into typewriting and is a true and

15  correct transcription of said proceedings.

16         I further certify that I am not of counsel or

17  attorney for either or any of the parties in the

18  foregoing deposition and caption named, nor in any way

19  interested in the outcome of the cause named in said

20  caption.

21         Dated the 7th day of August, 2020.

22

23

24

25         CINDY TUGAW
           CSR No. 4805 (California)

1    John Qually
     c/o Foley & Lardner
2    555 California Street, Suite 1700
     San Francisco, CA 94104
3    Attn:  Jason Y. Wu, Esq.

4    Date:  August 7th, 2020
     Re:  Navarro vs. Menzies
5    Deposition Date:  Tuesday, July 28, 2020

6    Dear Mr. Qually,

7            Please be advised the original transcript of
     your deposition is ready for your review.
8            Pursuant to FRCP Rule 30(e), you have
     30 days following the date of this notice to read,
9    correct if necessary, and sign your transcript unless
     the attending parties and the deponent agree on the
10   record or otherwise in writing to a longer or shorter
     time period.  The deponent may change the form or the
11   substance of the answer to a question, and may either
     approve the transcript of the deposition by signing it,
12   or refuse to approve the transcript by not signing it.
     You are not required by law to read and sign your
13   deposition transcript.  All parties will be informed of
     the corrections.  The original transcript will then be
14   sealed and sent to the examining attorney pursuant to
     the applicable law.
15           You may either come to our office to read and
     sign the original transcript, or you may contact your
16   attorney or the attorney who arranged for you to be
     present at your deposition.  If they have ordered a
17   copy of the transcript, you may review their copy and
     make corrections by submitting, signing and returning
18   the attached form.  If you choose to review your
     transcript at our office, please call first to make an
19   appointment.  Should you have any question regarding
     these instructions, please call.
20
     Sincerely,
21


22
     NOGARA REPORTING SERVICE
23   5 Third Street, Suite 415
     San Francisco, California 94103
24   (415) 398-1889

25   cc:  All counsel, original deposition

# EXHIBIT 15

1            IN THE UNITED STATES DISTRICT COURT

2        IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5    RENALDO NAVARRO,

6                    Plaintiff,

7    v.                                No.  3:19-CV-8157

8    MENZIES AVIATION, INC.,
     doing business as MENZIES
9    and DOES 1 through 10,
     inclusive,
10
                     Defendants.
11    _____/

12   Zoom Remote Deposition of

13        TRACY AGUILERA

14    Tuesday, August 25, 2020

15

16         **CERTIFIED COPY**

17

18

19

20

21   REPORTED BY:  CINDY TUGAW, CSR #4805

22

23

24            NOGARA REPORTING SERVICE
              5 Third Street, Suite 415
25          San Francisco, California 94103
                 (415) 398-1889

```
1                    I N D E X

2                                    Page Number

3    EXAMINATION BY MR. URIARTE              5

4    EXAMINATION BY MR. WU                  48

5    FURTHER EXAMINATION BY MR. URIARTE     53

6                    ---o0o---

7              E X H I B I T S

8    Plaintiff's

9    Exhibit 8    Petition to Menzies        26
                  Management from Menzies
10                 Fuelers

11   Exhibit 9    Termination notice for     48
                  Renaldo Navarro
12
     Exhibit 11   Employee Performance       35
13                Development dated
                  8/29/2018
14
     Exhibit 12   Email chain culminating    31
15                in an email from Raul
                  Vargas to Tracy Aguilera
16                dated August 29, 2018

17   Exhibit 13   Menzies Aviation Code of   18
                  Conduct
18
     Exhibit 14   Menzies Aviation Employee  21
19                Handbook California - 2017

20   Exhibit 15   Menzies Aviation Applicant 23
                  Declaration Form
21
     Exhibit 17   Employee Performance       43
22                Development Steps to
                  Progressive Discipline
23
     Exhibit 18   Job Description, Fueling   54
24                Supervisor (North America)

25
```

1                    I N D E X

2                 (Continued)

3   Plaintiff's                        Page Number

4   Exhibit 19    Letter from Rafael Vasquez     41
                  to whom it may concern
5                 dated 11/18/2018 with
                  attached petition
6
    Exhibit 20    Menzies Aviation Employee       44
7                 Handbook California - 2018

8                    ---o0o---

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BE IT REMEMBERED that, pursuant to Notice of

2   Taking Deposition and on Tuesday, the 25th day of

3   August, 2020, commencing at the hour of 1:04 o'clock

4   p.m. thereof, via Zoom videoconference, before me,

5   CINDY TUGAW, a Certified Shorthand Reporter in the

6   State of California, personally appeared,

7                    TRACY AGUILERA,

8   called as a witness by the Plaintiff, having been by me

9   first duly sworn, was examined and testified as

10  hereinafter set forth.

11                    ---o0o---

12             APPEARANCES OF COUNSEL

13  For the Plaintiff
         LIBERATION LAW GROUP, P.C.
14       2760 Mission Street
         San Francisco, California 94110
15       BY:  ARLO GARCIA URIARTE, Attorney at Law
         (415) 695-1000
16

17  For the Defendants
         FOLEY & LARDNER, LLP
18       555 California Street, Suite 1700
         San Francisco, California 94104
19       BY:  JASON Y. WU, Attorney at Law
         (415) 984-9848
20

21  Also Present:  David Ho, Zoom Host.

                   ---o0o---
22

23

24

25

1          THE REPORTER:  At this time, I will ask counsel to

2     stipulate on the record that there is no objection to

3     this deposition officer administering a binding oath to

4     the witness via Zoom, starting with the noticing

5     attorney.

6          MR. URIARTE:  No objection from plaintiff.

7          MR. WU:  And no objections for defendant, Menzies

8     Aviation.

9               (Whereupon, the Witness was duly sworn by the

10              Reporter.)

11                  EXAMINATION BY MR. URIARTE

12        MR. URIARTE:  Q.  Good afternoon, Ms. Aguilera.

13        A.  Good afternoon.

14        Q.  Could you please state and spell your full

15    legal name for the record.

16        A.  Tracy T r-a-c-y, Marie, M-a-r-i-e, Aguilera,

17    A-g-u-i-l-e-r-a.

18        Q.  Thank you.  Have you had your deposition taken

19    before?

20        A.  Yes.

21        Q.  And how many times?

22        A.  Two or three.  A couple times.

23        Q.  And are these like as part of your duties as

24    an HR professional?

25        A.  Yes.

1    A.  Yes.

2    Q.  And you know who Renaldo Navarro is?

3    A.  Yes.

4    Q.  How long did you actually work with Mr.

5    Navarro?

6    A.  When Menzies Aviation purchased ASIG, so it

7    would be around 2017.

8    Q.  So Menzies arrived -- do you remember what

9    part of the year Menzies actually started their

10   operation in SFO --

11   A.  Yeah --

12   Q.  -- for ASIG?

13   A.  Oh, for ASIG.  Could have been June or July.

14   Q.  So about June or July 2017?

15   A.  Yes.

16   Q.  And then were you already at SFO doing other

17   parts of airport services for Menzies?

18   A.  Yes.

19   Q.  And then how long has Menzies been in San

20   Francisco Airport?

21   A.  I can't give you an exact date.

22   Q.  Yeah, what about yourself, about how long --

23   A.  I've been at SFO since 1997.

24   Q.  All for Menzies?

25   A.  No.

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 145 of 312

1    that you're using for today's testimony?

2          A.   No.

3          Q.   What's the highest level of education that you

4    finished with?

5          A.   High school.

6          Q.   And then any kind of HR-related classes that

7    you've taken in the last five years?

8          A.   No.

9          Q.   Any wage and hour related seminars or classes

10   that you've taken in the last five years?

11         A.   I'm sorry, I can't hear you.  I didn't.

12         Q.   Any kind of wage and hour seminars or

13   compliance classes or anything like that?

14         A.   No.

15         Q.   And then how long have you been an HR manager

16   for Menzies at SFO airport?

17         A.   Ten years.

18         Q.   When Menzies took over ASIG, did Menzies bring

19   with it its own employment policies and handbook?

20         A.   They had one, yes.

21         Q.   Were those distributed to the employees that

22   they took over in July of 2017?

23         A.   I'm sorry, can you repeat the question.

24         Q.   Sure.  When Menzies took over ASIG in July of

25   2017, did they distribute the Menzies employment

1    handbooks and policies --

2         A.   Not right at the time, no.

3         Q.   When were those eventually distributed?

4         A.   I don't have an exact date.  I do know that we

5    posted the notice stating that they would be following

6    the Menzies Aviation policies.

7         Q.   Okay.  And where was that notice posted?

8         A.   It was posted in the employee bulletin board.

9         Q.   And then where would -- like if somebody

10   wanted to see them, where would they see them?

11        A.   They would see them in the HR department.  We

12   were preparing a package for them.

13        Q.   If somebody needed to see them, you said they

14   could see it in the HR department, is that correct?

15        A.   Yes, once we put them all together.

16        Q.   By August of 2018, had you put them all

17   together?

18        A.   I believe they did have a package for them.

19        Q.   For each one of them?

20        A.   Yes.

21        Q.   Are you certain of that or are you guessing on

22   that?

23        A.   No, I believe they did have a package put

24   together.

25        Q.   And when you say "they," who's "they"?

1   right, you give it to the employees and then they

2   acknowledge receipt of it, correct?

3        A.   Yes.

4        Q.   And they acknowledge that they have been given

5   one, isn't that the practice?

6             So the practice, Ms. Aguilera, is that once

7   the handbooks become available, you provide the

8   handbook to the employee and then they sign an

9   acknowledgment for receipt of them, is that correct?

10       A.   Yes.

11       Q.   And then are you familiar with the Menzies

12   code of conduct?

13       A.   Yes.

14       Q.   And that's another kind of set of policies or

15   paperwork that's given to each employee, is that

16   correct?

17       A.   It's in the handbook, yes.

18       Q.   Oh, so it's part of the handbook?

19       A.   Yes, it is.

20       Q.   Is there a separate acknowledgment of receipt

21   for the code of conduct or it's all just one?

22       A.   It's all just one.

23       Q.   Was there ever a training with regards to the

24   Menzies California handbook and code of conduct?  Was

25   there any kind of training like that?

1    A.   There was, when the employees came in to sign

2    all the documents, we went over the documents with

3    them.

4        Q.   So how did that go?  You called some of the

5    employees one by one or like a seminar?  How did that

6    go?

7        A.   They would come in according to their

8    schedule, if they didn't have flights, they would come

9    into the HR department.  We would -- I would arrange it

10   with their manager.

11       Q.   Like how many people would come in at one

12   time?

13       A.   A couple at a time.

14       Q.   And then when you said you would go over it

15   with them, you actually went through some of the pages

16   and --

17       A.   What they were signing, yes.

18       Q.   What they signed.

19       A.   Either myself or my clerk.

20       Q.   I see.  Do you have an independent

21   recollection of doing something like that with

22   Mr. Renaldo Navarro?

23       A.   No, I can't say that I do.  I didn't do a lot

24   of them.  My clerk did a lot of them, most of them.

25       Q.   In July or August of 2018, who was your clerk?

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 149 of 312

1    A.  I believe it was Loretta Katoa.

2    Q.  We're going to need a spelling for the last

3 name.

4    A.  K-a-t-o-a.

5    Q.  Was there another clerk or was it just

6 Loretta?

7    A.  No, I had Loretta and I had another clerk, her

8 name was Precious.

9    Q.  Do you remember her last name?

10    A.  Sagaga.

11    Q.  Do you know the spelling of that?

12    A.  I believe it's S-a-g-a-g-a.

13    Q.  What is your understanding as to why Menzies

14 terminated Mr. Navarro?

15    A.  For harassment.

16    Q.  And as you know, harassment is a bit of a term

17 of art in employment circles.  So what type of

18 harassment are we talking about?  When you say

19 harassment in this circumstance, what kind of

20 harassment?

21    A.  Unprofessional conduct, forcing employees

22 to -- pressuring employees.

23    Q.  Pressuring employees to sign the petition, is

24 that what you mean?

25    A.  Yes.

1      Q.  Any other reason?

2      A.  No.

3      Q.  Is it your understanding that -- is it your

4  understanding that somehow in the code of conduct

5  there's something there that addresses the concern that

6  you're not supposed to force employees to sign a

7  petition?

8      A.  Yes.

9      Q.  And do you remember seeing something like that

10  in the code of conduct?

11      A.  Yes.

12      MR. URIARTE:  So, David, can we get Exhibit 13,

13  please.

14          (Plaintiff's Exhibit 13 marked for

15           identification.)

16      ZOOM HOST:  I sent a Chat to Tracy, and she should

17  be able to open that link, and she has a laptop, so she

18  can see the whole document.

19      MR. URIARTE:  Okay.  Very good.  So you're not

20  going to open it over here or --

21      ZOOM HOST:  If you like, I can do that.  It's up

22  to you.

23      MR. URIARTE:  Yeah, can we do that?

24      ZOOM HOST:  Okay.  Sure.  Coming back up.

25      MR. URIARTE:  I think Jason and I are kind of used

1   memory is that they had the handbook at that point

2   already, is that correct?

3        A.   Yes.

4        Q.   And who would know for certain whether that's

5   true or not?

6        A.   The documents should be in the files.

7        Q.   Yeah, well, I guess what I can represent to

8   you is that -- and I should show you that -- let's look

9   at Exhibit 15, please.

10            (Plaintiff's Exhibit 15 marked for

11            identification.)

12       MR. URIARTE:   Q.   So here is one of those

13   documents that lists the signature.  If we look below,

14   it's got a blank, no employee name, no employee

15   signature.  This was produced to us by your attorneys.

16            And so I have yet -- I mean, I guess, if you

17   get back to your office and you see some sort of

18   acknowledgment form that has Mr. Navarro's signature on

19   it, I think that would be helpful, but we have yet to

20   see that.

21            Okay, Ms. Aguilera?  Did you understand my

22   request?

23       A.   Yes.

24       Q.   All right.   How did you first find out that

25   there was a petition circulating about Andrew Dodge?

1    A.  The union notified me.

2    Q.  And how did they notify you?

3    A.  They called me.  It wasn't "they."  Charles

4    called me, the man named Charles that worked in the

5    union office.

6    Q.  And what did Charles say to you?

7    A.  He said, "Tracy, are you aware that there's a

8    petition being circulated?  Our members -- several

9    members have called and complained that they were being

10   forced to sign a petition."

11   Q.  Okay.  And then anything else that Charles

12   said to you?

13   A.  No.

14   Q.  And so, in response to that, what did you do?

15   A.  Well, I asked him if he had a copy of the

16   petition and who was being forced, but he never got

17   back to me on that.  With that being said, I made

18   contact with the acting general manager at the time,

19   and his name was Renil Lal, and I told him that I

20   received the call from the union.

21   Q.  Okay.  And did Renil get you a copy of the

22   petition?

23   A.  Not right away.  I don't believe -- no, he did

24   not.

25   Q.  Do you know how long before you actually got a

1    copy of it?

2         A.   I got it -- actually, I got it from Raul

3    Vargas.  I'd seen it.

4         Q.   I see.  Okay.  And did you read the petition

5    itself?

6         A.   I've seen the names on there, yes, but I

7    didn't go through each one.  I'm sorry.

8         Q.   What about the topic that the petition was

9    talking about, did you read that part?

10        A.   No, I -- I gave everything to Kevin Blumberg

11   to open up an investigation.

12        Q.   And what was the investigation for?

13        A.   Well, to find out what was going on.

14        Q.   What do you mean, "to find out what was going

15   on"?

16        A.   With the petition, why it was being

17   circulated.

18        Q.   Okay.  And then what was the conclusion of

19   Kevin, the security person?

20        A.   The conclusion?

21        Q.   Yes.

22        A.   It was that Rey Navarro was forcing employees

23   to sign a petition to have Andrew Dodge removed.

24        Q.   Okay.  And that's what is contained in the

25   email, right, is that what you're talking about, where

1    Mr. Blumberg actually sent an email to you with the

2    result of his investigation?

3         A.  Yes.

4         Q.  Okay.  So that's with regards to the inquiry

5    as to Mr. Navarro's involvement in the petition itself,

6    right?  But what about the part of, like, what the

7    fuelers were complaining about?  Was that ever

8    investigated?

9         A.  I'm sorry, can you repeat that.

10        Q.  Sure.  What about the part, that section of

11   the petition where the fuelers are asking for certain

12   relief or what they're complaining about, right, in the

13   petition, was that part of the petition ever

14   investigated?

15        A.  What part are you talking about?

16        MR. URIARTE:  Okay.  Let me show you.  So let's

17   bring up Exhibit 8.

18             (Plaintiff's Exhibit 8 marked for

19             identification.)

20        MR. URIARTE:  Q.  Can you see Exhibit 8,

21   Ms. Aguilera?

22        A.  Yes.

23        Q.  Do you remember this to be the petition that

24   we're talking about?

25        A.  This is the one that I believe was given to

1    Raul Vargas.

2         Q.   Okay.   Let's scroll to page 2 just to make

3    sure Ms. Aguilera sees the whole document.   It's a

4    three-page document.

5              And this is the one that has Renaldo Navarro's

6    signature on line 16, as you see there.   Do you see

7    that, Ms. Aguilera?

8         A.   Yes.

9         Q.   Okay.   And then it also has the signature of

10   the other supervisor, July Macapagal.   Do you see that?

11        A.   Yes.

12        Q.   Okay.   So we've been calling this the first

13   petition.   So if we scroll back to page 1 -- and I

14   understand that you've said that you asked the security

15   department or Raul Vargas asked the security department

16   to investigate the role of Mr. Navarro.   I understand

17   that part.

18             What I'm now distinguishing with you is with

19   regards to the subject matter of this petition.   And

20   I'll let you read it, or if you want, I can read it for

21   you.

22             Are you able to read it fine, Ms. Aguilera?

23        A.   Yes, I know how to read, yes.

24        Q.   Okay.   So it says, "We the fuelers on Menzies

25   130 side would like to make a petition against Andrew

1    Dodge.   The way he supervised is very unprofessional

2    when he run the operation or supervised, people are not

3    [taking] their breaks it's because the way he set up

4    the flights" -- okay?  -- "and he always blaming the

5    people there's a delay or always saying lack of

6    manpower and trucks issues."

7         Okay.  So let's just stop there.  That part of

8    the petition, was that ever investigated?

9         A.  The whole scenario was investigated by Kevin

10   Blumberg.

11        Q.  Aside from the email that contains some of

12   Mr. Blumberg's conclusion, is there another document

13   that addresses these concerns?

14        A.  I don't have them.

15        Q.  So if there is an investigation, it would be

16   part of what Mr. Blumberg engaged in, correct?  Is that

17   correct?

18        A.  Yes.

19        Q.  Okay.  Let's go on to the next one.  "The

20   truth is he doesn't know how to run the show, we also

21   addressed the problem to the higher position managers

22   (Nicco, John and Renil) as usual nothing happened,

23   looks like they always covering his mistake or maybe

24   these managers don't know anything about fueling also

25   like Andrew Dodge lack of experience about fueling."

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 157 of 312

1    document that writes or has further conclusions

2    regarding his investigation?  Ms. Aguilera?

3         A.   No, I don't have a copy of it.

4         Q.   Okay.  I guess my question is more -- when we

5    see Mr. Blumberg's product or result of his

6    investigation into the petition, this is what we're

7    looking at right here, the email that he wrote to you

8    with his conclusions, is that correct?

9         A.   This says a statement, yes.

10        Q.   Aside from this statement, is there any other

11   written document?

12        A.   Not that I have.

13        Q.   And here his conclusion really is

14   "unprofessional behavior by a supervisor."  Do you see

15   that?

16        A.   Yes, I see it.

17        Q.   Just taking that kind of like in its

18   isolation, "unprofessional behavior by a supervisor,"

19   would that result in a termination?  Is that something

20   that would normally result in a termination?

21        A.   It depends on the caliber of the -- what he's

22   done.

23        Q.   And your recommendation actually was not to

24   terminate, correct?

25        A.   Myself and our directors, yes -- my director,

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 158 of 312

1    yes.  Talin.

2        Q.   Correct.  So Talin and yourself had a

3    discussion, and your recommendation to Mr. Vargas was

4    not to terminate but instead issue a final warning, is

5    that correct?

6        A.   It was not to terminate, yes.

7        Q.   Did you recommend the final warning to

8    Mr. Vargas?

9        A.   I was going to.  Oh, to Mr. Vargas, no.  Let

10   me back up, I'm sorry.

11       Q.   Go ahead.

12       A.   Yes, I did write up the document, but it

13   was -- and my recommendation was made.

14       Q.   Did you actually send that document to

15   Mr. Vargas?

16       A.   I don't believe so.

17       Q.   Now, was there ever a discussion between you

18   and Mr. Vargas about, hey, there's an option here of

19   issuing a final warning; was that discussion made?

20       A.   No.  I gave my recommendation.

21       Q.   So you gave your recommendation of not

22   terminating, but you didn't communicate an option to

23   Mr. Vargas.  Is that an accurate way of characterizing

24   it?

25       A.   Not via email.  After I made my

1    recommendation, and he came up to my office and we

2    discussed it, and that's when Kevin came up and said --

3    and gave me the details of the investigation.

4         Q.   And so Raul Vargas went to your office, you

5    had a discussion about it, and in that discussion the

6    final warning option was discussed?

7         A.   He asked me why I came to that conclusion of

8    not to terminate, and I told him based on Renaldo's

9    tenure and what was in his personnel file.

10        Q.   Okay.   And what's your opinion as to why

11   Mr. Vargas did not follow that recommendation?

12        A.   After speaking with Mr. Vargas and Kevin in my

13   office and them going into detail about harassment, my

14   opinion changed, and I reviewed it with my director,

15   and we were in agreement to terminate him.

16        Q.   And then I guess I understand all of that.

17   But I think the only kind of unclear portion of that is

18   the -- and maybe let's pull it up.

19        MR. URIARTE:   If we could pull up Exhibit 11.   I

20   wanted to kind of focus on the issue of the issuance of

21   the final warning and what Mr. Vargas knew about that.

22             (Plaintiff's Exhibit 11 marked for

23             identification.)

24        MR. URIARTE:   Q.   And issuance is not the right

25   word, right?   You drafted a document of final warning.

1    Q.   That's a typo with the date?

2    A.   Yeah, it shouldn't have been October.

3    Q.   Okay.  So it should have been October 27,

4    2018?

5    A.   No, I believe --

6    Q.   I mean -- yeah.

7    A.   I believe it should have been August 27th.

8    Q.   Okay.  So you believe that to be a typo?

9    A.   I believe so.

10   Q.   All right.  So are you saying that two days

11   before Mr. Navarro was terminated, Mr. Rafael Martinez

12   also gave Raul Vargas a petition asking Andrew to be

13   removed?

14   A.   Yes.

15   Q.   With regards to the suspension on August 20,

16   who recommended and approved the suspension?

17   A.   Raul Vargas and Kevin Blumberg.

18   Q.   Before the issue with the petition, did you

19   receive any complaints or did you hear about complaints

20   from fuelers against Andrew Dodge?

21   A.   Only from Rey.

22   Q.   Did you see the pictures that were circulating

23   of Mr. Andrew Dodge sleeping on the job?  Was that

24   something that you saw?

25   A.   Yes, I did see one.

1   Q.   And that was before the petition, correct?

2   A.   Yes.

3   Q.   And Rey complaining about Andrew Dodge,

4   wouldn't you say that that could have been part of his

5   duties as a supervisor?

6   A.   Yes.

7   Q.   Aside from Rey, you did not hear from fuelers

8   complaining about Andrew Dodge?

9   A.   No.

10   Q.   At that time, in July or August of 2018, aside

11   from Mr. Dodge, was there any other white supervisor

12   working for the fueling department?

13   A.   I -- I really don't know.  I can't -- I don't

14   know.

15   Q.   It could be that Mr. Dodge was the only white

16   supervisor?

17   A.   Could be.

18   Q.   Did you ever have a discussion with Renil with

19   regards to Rey Navarro's complaints against Andrew

20   Dodge?

21   A.   Yes.

22   Q.   And how many times do you think Renaldo

23   Navarro complained to Renil about Andrew Dodge?  Do you

24   remember any of that?

25   A.   No.

```
 1        Q.   Was it more than two times?

 2        A.   Possibly.

 3        Q.   Less than five and more than two, maybe?

 4        A.   Possibly.

 5        Q.   And with regards to -- and this happened

 6   before the petition, correct?

 7        A.   Him showing me the picture, yes.

 8        Q.   And then did you see the video, the kind of

 9   comical video that the fuelers made?

10        A.   No.

11        Q.   What about Renil and you discussing complaints

12   against Andrew Dodge, how many times did you guys

13   discuss that?

14        A.   I spoke to Renil a couple of times and told

15   him Rey's concerns.

16        Q.   Okay.   And what did Renil say?

17        A.   He would check into it.

18        Q.   Any result from it or any kind of follow-up

19   from it from Renil?

20        A.   No, he said he would -- well, he told me that

21   he would talk to Andrew, and that's it.   Rey didn't

22   come in and make formal complaints.   He would just --

23   he showed me the picture and the picture was Andrew

24   Dodge sitting in his car outside after -- sleeping in

25   his truck after he was off work.
```

1    A.  Yes.

2    Q.  It says that, quote, "On September 6th, 2018"

3  -- it's about nine days after the termination of

4  Mr. Navarro -- "I was asked by Menzies fuelers to write

5  a Petition on behalf of the Fuelers on 130 side vs.

6  Andrew Dodge.  The petition was written out and signed

7  by the Fuelers" and then turned over to the union.  In

8  addition, it was also given to Raul Vargas.

9         Were you made aware of this particular

10  petition?

11    A.  After it was given to Raul Vargas and given to

12  Kevin Blumberg.

13    Q.  So, and just to make sure we're speaking of

14  the same thing, so there was a first petition, and this

15  seems to be the second petition.  And this is a

16  separate petition, you understand that?

17    A.  Yes.

18    Q.  What came out of this second petition, if

19  anything?

20    A.  Nothing on the HR side.  There was no union

21  grievance, there was no complaint by the union except

22  for the original phone call I received.

23    Q.  And so you said it was given to Mr. Blumberg.

24  Was an investigation actually done because of this

25  second petition?

1      A.   If I'm not mistaken, this is for the same

2    issue.

3      Q.   So no additional investigation was done?

4      A.   Not to my knowledge.

5    MR. URIARTE:   Now, let's go to Exhibit 17, please.

6         (Plaintiff's Exhibit 17 marked for

7         identification.)

8    MR. URIARTE:   Q.   Okay.   You see Exhibit 17, I

9    believe it's Employee Performance Development and Steps

10   to Progressive Discipline.

11        If you could go down a little bit, David, that

12   would be better.

13        This is a reverse pyramid here.   And you're

14   familiar with this, Ms. Aguilera?

15     A.   Yes, I am.

16     Q.   My question here really is how come

17   progressive discipline was not instituted?

18     A.   Harassment has zero tolerance.

19     Q.   And was it discussed as an option?

20     A.   I'm sorry?

21     Q.   Was it discussed as an option?

22     A.   Progressive discipline for harassment?

23     Q.   Yes.

24     A.   No.

25     Q.   Is that written somewhere where harassment,

1   later on about the extent to which you had discussions

2   regarding Andrew Dodge's work performance.  If there

3   were issues with Andrew Dodge's work performance, would

4   those typically be brought to your attention or to

5   someone else's attention?

6        A.  Usually it would go to the manager, if there

7   were issues, it would go to -- it's a protocol.  It

8   would go to the supervisor, the supervisor would go to

9   the general manager, the general manager would go to

10  the director.

11        Usually if there's -- I usually get involved

12  if it comes down to a final warning or a suspension

13  pending termination.

14        Q.  Okay.  But in terms of everyday work

15  performance, that's something that you're not usually

16  involved with?

17        A.  No.

18        MR. WU:  David, we can take off Exhibit 8.  Thank

19  you.

20        Q.  Mr. Uriarte also asked you about some pictures

21  of Andrew Dodge that you had seen.

22        A.  Yes.

23        Q.  I think I lost count.  How many photos have

24  you seen?

25        A.  One or two.  I believe I can really remember

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 166 of 312

1   one.

2      Q.   And in that -- I'm sorry, I didn't mean to

3   interrupt.

4      A.   Possibly two.   I'm trying to think.   There was

5   one sitting -- oh, there was one sitting in the truck,

6   but he was off duty.   And he had a habit of just

7   sitting in his truck after he got off work, and he

8   would sleep in front of the parking lot in his truck,

9   take a quick nap.

10         And I know he'd be off work because I come to

11   work at 8:30, and he'd get off work -- I think his

12   schedule ended, like, 6:00 or 7:00.   But I would go up

13   and sometimes I'd knock on the window and say, "Are you

14   okay?"

15         "Oh, yeah, I'm just taking a nap before I

16   drive home."

17         "Okay."   So I knew he was off the clock.

18      Q.   Okay.   And do you remember anything about the

19   other photo that you might have seen?

20      A.   I believe I seen one of him sitting in the

21   supervisor chair, but, again, he was off duty.

22      Q.   And how were you able -- I'm sorry, I didn't

23   mean to interrupt.

24      A.   I was going to say I knew he was off duty

25   because his shift ended at, again, 6:00 or 7:00.   I

1   come in at 8:30.  And it was -- like the picture

2   outside, it was, you know, after 8:30, it was light

3   out, and I actually seen him.  But the one in the

4   office I only know because, you know, even Rey would

5   say, "This is what I took this morning," and Rey would

6   come in later.

7       Q.  Okay.  So just to make sure I understood that

8   all correctly, the photo where Andrew was sleeping in

9   his truck, you could tell he was off duty because there

10  was light out in the photo?

11      A.  Yes, it was light, because I come in at 8:30

12  in the morning, and he's off work by then.

13      Q.  And the second photo with Andrew sleeping in

14  the supervisor's office, you knew that he was off duty

15  because Rey mentioned that it was a photo he took in

16  the morning?

17      A.  Yeah, exactly, yes.

18      Q.  And Andrew would be off duty in the morning?

19      A.  Yes, because he worked graveyard.

20      Q.  Do you remember Mr. Uriarte asking you whether

21  Mr. Navarro complaining about any issues with Andrew

22  Dodge would be part of Mr. Navarro's duties as a

23  supervisor?

24      A.  Yes.

25      Q.  And do you remember answering yes to that

1      A.  Yes, it's in the job description.

2      MR. URIARTE:  Okay.  No further questions.

3      MR. WU:  Nothing else from me.

4      MR. URIARTE:  Thank you, Ms. Aguilera.  Thank you

5  very much.

6      MR. WU:  Thanks so much for your time, Tracy.

7      THE WITNESS:  Thank you.

8          (Whereupon, the concluded at 2:51

9          o'clock p.m.)

10                     ---o0o---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF WITNESS

2                         ---o0o---

3

4          I, TRACY AGUILERA, hereby declare under

5    penalty of perjury that I have read the foregoing

6    deposition testimony; and that the same is a true

7    and correct transcription of my said testimony

8    except as corrected pursuant to my rights under

9    Rule 30(e) of the Federal Rules of Civil

10   Procedure.

11

12          _____

                          Signature

13

14          _____

                            Date

15

16

17

18

19

20

21

22

23

24

25

1    STATE OF CALIFORNIA     )
                             )
2    COUNTY OF SAN FRANCISCO )

3         I, CINDY TUGAW, a Certified Shorthand Reporter

4    of the State of California, duly authorized to

5    administer oaths pursuant to Section 8211 of the

6    California Code of Civil Procedure, do hereby certify

7    that

8                   TRACY AGUILERA,

9    the witness in the foregoing deposition, was by me duly

10   sworn to testify the truth, the whole truth and nothing

11   but the truth in the within-entitled cause; that said

12   testimony of said witness was reported by me, a

13   disinterested person, and was thereafter transcribed

14   under my direction into typewriting and is a true and

15   correct transcription of said proceedings.

16        I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   caption.

21        Dated the 10th day of September, 2020.

22

23

24

                 CINDY TUGAW
25               CSR No. 4805 (California)

1   Tracy Aguilera
    c/o Foley & Lardner
2   555 California Street, Suite 1700
    San Francisco, CA 94104
3   Attn:  Jason Y. Wu, Esq.

4   Date:  September 10, 2020
    Re:  Navarro vs. Menzies
5   Deposition Date:  Tuesday, August 25, 2020

6   Dear Ms. Aguilera,

7           Please be advised the original transcript of
    your deposition is ready for your review.
8           Pursuant to FRCP Rule 30(e), you have 30 days
    following the date of this notice to read, correct if
9   necessary, and sign your transcript unless the
    attending parties and the deponent agree on the record
10  or otherwise in writing to a longer or shorter time
    period.  The deponent may change the form or the
11  substance of the answer to a question, and may either
    approve the transcript of the deposition by signing it,
12  or refuse to approve the transcript by not signing it.
    You are not required by law to read and sign your
13  deposition transcript.  All parties will be informed of
    the corrections.  The original transcript will then be
14  sealed and sent to the examining attorney pursuant to
    the applicable law.
15          You may either come to our office to read and
    sign the original transcript, or you may contact your
16  attorney or the attorney who arranged for you to be
    present at your deposition.  If they have ordered a
17  copy of the transcript, you may review their copy and
    make corrections by submitting, signing and returning
18  the attached form.  If you choose to review your
    transcript at our office, please call first to make an
19  appointment.  Should you have any question regarding
    these instructions, please call.
20
    Sincerely,
21

22
    NOGARA REPORTING SERVICE
23  5 Third Street, Suite 415
    San Francisco, California 94103
24  (415) 398-1889

25  cc:  All counsel, original deposition

# EXHIBIT 16

1          IN THE UNITED STATES DISTRICT COURT

2      IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5   RENALDO NAVARRO,

6                 Plaintiff,

7   v.                              No.  3:19-CV-8157

8   MENZIES AVIATION, INC.,
    doing business as MENZIES
9   and DOES 1 through 10,
    inclusive,
10
                  Defendants.
11   _____/

12   Zoom Remote Deposition of

13       RAUL VARGAS

14    Tuesday, August 25, 2020

15      **CERTIFIED COPY**

16

17

18

19

20

21   REPORTED BY:  CINDY TUGAW, CSR #4805

22

23
                NOGARA REPORTING SERVICE
24              5 Third Street, Suite 415
             San Francisco, California 94103
25                 (415) 398-1889

```
 1                        I N D E X

 2                                        Page Number

 3     EXAMINATION BY MR. URIARTE              4

 4     EXAMINATION BY MR. WU                  73

 5     FURTHER EXAMINATION BY MR. URIARTE     74

 6                       ---o0o---

 7                   E X H I B I T S

 8     Plaintiff's

 9     Exhibit 1      Plaintiff Renaldo        9
                      Navarro's Amended Notice
10                    of Deposition of Raul
                      Vargas
11
       Exhibit 8      Petition to Menzies     26
12                    Management from Menzies
                      Fuelers
13
       Exhibit 9      Termination notice for  60
14                    Renaldo Navarro

15     Exhibit 11     Employee Performance    61
                      Development dated
16                    8/29/2018

17     Exhibit 12     Email chain culminating 66
                      in an email from Raul
18                    Vargas to Tracy Aguilera
                      dated August 29, 2018
19
       Exhibit 19     Letter from Rafael Vasquez  43
20                    to whom it may concern
                      dated 11/18/2018 with
21                    attached petition

22                       ---o0o---

23

24

25
```

1          BE IT REMEMBERED that, pursuant to Notice of

2     Taking Deposition and on Tuesday, the 25th day of

3     August, 2020, commencing at the hour of 9:03 o'clock

4     a.m. thereof, via Zoom videoconference, before me,

5     CINDY TUGAW, a Certified Shorthand Reporter in the

6     State of California, personally appeared,

7                         RAUL VARGAS,

8     called as a witness by the Plaintiff, having been by me

9     first duly sworn, was examined and testified as

10    hereinafter set forth.

11                        ---o0o---

12                  APPEARANCES OF COUNSEL

13    For the Plaintiff
           LIBERATION LAW GROUP, P.C.
14         2760 Mission Street
           San Francisco, California 94110
15         BY:  ARLO GARCIA URIARTE, Attorney at Law
           (415) 695-1000
16

17    For the Defendants
           FOLEY & LARDNER, LLP
18         555 California Street, Suite 1700
           San Francisco, California 94104
19         BY:  JASON Y. WU, Attorney at Law
           (415) 984-9848
20

      Also Present:  David Ho, Zoom Host.
21
                          ---o0o---
22

23

24

25

1       THE REPORTER:  Good morning.  At this time, I will

2  ask counsel to stipulate on the record that there is no

3  objection to this deposition officer administering a

4  binding oath to the witness via Zoom, starting with the

5  noticing attorney.

6       MR. URIARTE:  No objection.

7       MR. WU:  And no objections on behalf of Menzies

8  Aviation.

9            (Whereupon, the Witness was duly sworn by the

10           Reporter.)

11                 EXAMINATION BY MR. URIARTE

12       MR. URIARTE:  Good morning, Mr. Vargas.

13       A.  Good morning.

14       Q.  Could you please state and spell your name for

15  the record.

16       A.  Yes, so my name is Raul Vargas, R-a-u-l, last

17  name V, as in Victor, a-r-g-a-s.

18       Q.  Okay.  And if I ask you what your formal name

19  is, like, for example, what's on your passport or

20  something like that, what would you say?

21       A.  Raul Herman Vargas Aroca.

22       Q.  And so, Herman, Herman is H-e-r-m-a-n, is that

23  what it is?  Herman, did you hear me?

24       A.  Yes, it's H-e-r-m-a-n.

25       Q.  And then I missed your mother's maiden name.

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 177 of 312

1    around in the workplace?

2         A.  I don't recall that.

3         Q.  Would you say that it was going around for a

4    month already and then his termination happened?

5         A.  I don't recall it.

6         Q.  Can you give me your best estimate, like a

7    week, or do you have a time frame in your head at all?

8         A.  I don't have a time frame in my head right

9    now.

10        Q.  So you don't remember kind of like whether it

11   was days or weeks?

12        A.  I don't remember when this was brought to my

13   attention.

14        Q.  And "this" being the petition, correct?

15        A.  In relation to the petition.

16        Q.  I think, Mr. Vargas, we need you to speak up a

17   little bit or maybe get closer to the microphone.

18        A.  Yes.

19        Q.  Thank you.  So what about this:  Do you

20   remember who brought the petition to your attention?

21        A.  Tracy Aguilera.

22        Q.  So it was HR who actually let you know that,

23   hey, there's this petition going around?

24        A.  HR.

25        Q.  Aside from Tracy, did anybody else talk to you

1    about the petition?

2         A.   Nobody else talked to me.   She was the first

3    person who talked to me about the petition.

4         Q.   Okay.   And then when you say she's the first

5    person, was she also the only person that talked to you

6    about the petition?

7         A.   No.

8         Q.   Did anybody else talk to you about the

9    petition before Mr. Navarro's termination?

10        A.   Yes.

11        Q.   Who else?

12        A.   Our operation manager for fuel.

13        Q.   Who was that?

14        A.   I don't recall his last name.   Renil.

15        Q.   Renil?

16        A.   Renil.

17        Q.   R-e-n-i-l?

18        A.   That is, yes.

19        Q.   I believe he's not with the company anymore,

20   correct?

21        A.   He's not.

22        Q.   Do you know where he is right now?

23        A.   I do not know.

24        Q.   All right.   Aside from Renil, did anybody else

25   talk to you about the petition?

1    A.  Nobody else.

2    Q.  Okay.  What did Renil tell you about the

3 petition?

4    A.  That there was a petition going around to

5 terminate Andrew.

6    Q.  To terminate Andrew.  Anything else?

7    A.  Nothing else that I can recall.

8    Q.  Okay.  Did you actually read the petition?

9    A.  I read the petition, yes, I did.

10   Q.  And you read the petition before the

11 termination?

12   A.  Yes, I did.

13   Q.  And when you read it, that's what it said, to

14 terminate Andrew?

15   A.  I don't recall exactly what it says, but it

16 was about Andrew's performance, and it was about

17 removing Andrew from the position.

18   Q.  And then, aside from saying that to you,

19 anything else Renil told you about the petition?

20   A.  Nothing else -- nothing else that I can

21 recall.

22   Q.  Okay.  What about Tracy, what did she talk to

23 you about the petition?

24   A.  Well, Tracy told me about everything that she

25 was getting information from.  The first conversation I

1    had with her, it was about somebody from the union

2    contacting her to let her know that somebody was

3    requesting to sign a petition to the employees.

4         Q.   Anything else?

5         A.   Yes.   She mentioned that -- that employees

6    were -- were not agreeing on signing it.

7         Q.   Okay.   Anything else?

8         A.   Nothing else that I can recall.

9         Q.   And then, with regards to the content of the

10   petition, after you read it, did you make any decision

11   related to the contents of the petition?

12        A.   Yes, I talked to Tracy to -- to have the

13   investigation.

14        Q.   What type of investigation?

15        A.   An investigation about the petition and about

16   the -- how the petition was made.

17        Q.   How the petition was --

18        A.   Performed.

19        Q.   Was performed?

20        A.   Yes.

21        Q.   So you mean, when you say "how the petition

22   was performed," you mean how the petition was put

23   together, correct?

24        A.   Yes.

25        Q.   Anything else that you asked Tracy to do in

1    relation to the petition?

2         A.   Nothing else at that time.

3         Q.   Okay.   And so you said to do an investigation

4    about the petition.   What does that mean?   What did you

5    actually tell Tracy to do?

6         A.   To perform an investigation about how --

7    because we received some calls from the union, and also

8    received some information about Andrew, that he

9    received a message from Navarro.   So at that time it

10   was important for me to understand how that petition

11   was created.   How they did it.

12        Q.   All right.   And then you said also about how

13   the petition was put together.   So why was it important

14   for you to know how or who put together the petition?

15        A.   Because of the feedback that I received from

16   Tracy, from HR.

17        Q.   And what's that information that you received

18   from HR?

19        A.   As I said before, she told me that somebody

20   from the union contact her telling her that there was a

21   person asking for sign a petition, who was forcing the

22   employees to do it.

23        Q.   And did you ever find out who actually put

24   together the petition?

25        A.   Yes, we did.

1    Q.  And who was it?

2    A.  Mr. Navarro.

3    Q.  I'm sorry?

4    A.  Mr. Navarro.

5    Q.  And how did you reach -- how was that

6    conclusion reached?  Like how did you guys reach the

7    conclusion that Mr. Navarro wrote the petition?

8    A.  There was an investigation done, performed by

9    the safety department.

10   Q.  So the safety department person actually said

11   Mr. Navarro wrote the petition, is that your

12   understanding?

13   A.  Yes.  And also because of the messages that

14   Andrew received from Mr. Navarro.

15   Q.  Right.  But that message said, "I'm holding on

16   to the petition.  I haven't submitted it."  It doesn't

17   say, "I wrote the petition that I'm going to give."  Do

18   you know what I'm saying?  It says, "I'm holding on to

19   the petition and I haven't submitted it."

20        So I don't know how that text message kind of

21   leads to the conclusion that he wrote it.  Can you

22   explain it to me?

23   MR. WU:  Objection.  Assumes facts not in

24   evidence.

25        You can answer if you understand the question.

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 183 of 312

1          MR. URIARTE:  Q.  Mr. Vargas?

2          A.  Well, I think that when you receive a message

3     from -- I don't know where -- somebody in relation to a

4     petition, that is an alert.

5          Q.  Is what?

6          A.  Is an alert.

7          Q.  Okay.  But I guess my question is how does

8     that text message lead you to conclude that Mr. Navarro

9     wrote the petition?

10         A.  That was not the one that drove me to

11    understand that Mr. Navarro did the petition.

12         Q.  What did make you understand that Mr. Navarro

13    wrote it?

14         A.  Well, because the investigation from the

15    safety department.

16         Q.  Okay.  So the investigation from the safety

17    department actually has a report?

18         A.  They have statements from employees.

19         Q.  Statements from employees.  Okay.  Anything

20    else?

21         A.  They had a statement from employees and their

22    final outcome out of the investigation.

23         Q.  Are you talking about the final outcome as

24    they wrote it in the email?

25         A.  Yes.

1     this petition.

2          A.  Well, and if I can go back --

3          Q.  Yes.

4          A.  -- I never asked to investigate on who wrote

5     the petition.

6          Q.  So for you that wasn't important?

7          A.  No.

8          Q.  So when you finally concluded that termination

9     was the proper discipline, that wasn't part of the --

10    for you, that's not the important part, right?

11         A.  About who wrote the petition, no, no, not at

12    all.

13         Q.  For you it was, hey, you've got this guy

14    forcing employees to sign the petition.  That's what it

15    was, right?

16         A.  Yes.

17         Q.  I got it.  Okay.  So that leads to the

18    question of when -- so let's say August 29 is

19    eventually the time that he gets terminated.  Do you

20    remember about when you concluded in your head, hey, I

21    need to terminate Mr. Navarro?  Do you remember when?

22         A.  The specific date, no, but it should be around

23    that time.

24         Q.  Like within days of it or within a week or --

25         A.  I cannot tell.  I don't -- I don't recall it.

1        A.   I don't recall the date.

2        Q.   Okay.  So, but before concluding that Navarro

3    actually forced employees to sign the petition, I kind

4    of want to make sure that I get all of the steps that

5    you took to be satisfied that your conclusion was

6    correct.  All right?

7        A.   Yes.

8        Q.   So I saw the investigation statement.  I saw

9    the letters from the employees.  That's understandable.

10   But other than that -- and then you talked to Tracy as

11   well, right?  You had email communication with Tracy.

12   Other than those steps, did you do any other steps?

13       A.   No.  Well, actually I was waiting for the

14   final outcome from the investigation.  And it was not

15   just the feedback that I received from the safety

16   department.  Also the conversations I had with Tracy in

17   relation to this case.

18       Q.   Okay.  But did you ever ask the safety

19   department, hey, did you guys talk to the fuelers?

20       A.   Yes, I did.

21       Q.   And what did they say?

22       A.   They told me that they -- he was -- so the

23   safety department told me that Mr. Navarro was forcing

24   employees to sign the petition, and he was creating --

25   he was harassing people to have this petition signed.

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 186 of 312

1    Q.  Okay.  So forcing employees to sign the

2    petition.  What's wrong with that?

3    A.  Well, I think that when you have -- you take

4    advantage of your rank, that is harassment because of

5    how the other people feel.

6    Q.  Anything else that's wrong with that?

7    A.  Yes.  So when they use this rank, people feel

8    scared of having this confrontation with the

9    supervisor, so they prefer to sign the petition without

10   understanding what the petition was for.

11   Q.  So are you saying that the safety department

12   talked to everybody that signed that petition and

13   verified whether they actually signed it or not?

14   A.  I cannot guarantee that they talked to hundred

15   percent of the employees.

16   Q.  Okay.  But do you know how many people they

17   talked to?

18   A.  I don't know exactly how many people they

19   talked to.

20   Q.  And then you used the word "harassment."  How

21   are you using that word "harassment"?  What do you mean

22   by that?

23   A.  Well, for me, harassment is pretty much --

24   it's to force or intimidate people.  So, in this case,

25   when he's taking his rank as a supervisor, telling

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 187 of 312

1    people to sign a petition that they don't know what

2    it's for, that for me is intimidation.  And that's how

3    they -- the employees felt.

4        Q.  How many employees are we talking about --

5        A.  Well --

6        Q.  -- that felt like that?

7        A.  I'm sorry?

8        Q.  How many employees felt like that?

9        A.  I cannot tell you exactly the number of, but I

10   can tell you in terms of the -- the statements we

11   received.  There were around three employees.

12       Q.  And then there were over 20 people who signed

13   the petition, right?

14       A.  Yeah.

15       Q.  So out of the more than 20 people who signed

16   the petition, three people felt like, oh, maybe I

17   didn't read it and then I signed it and maybe I --

18       MR. WU:  Objection.  Objection.  Lack of

19   foundation.  Calls for speculation.  Misstates prior

20   testimony.

21       MR. URIARTE:  Q.  So, Mr. Vargas, when your

22   attorney objects, we allow him to finish his objection

23   so that it's written into the record.  Please allow him

24   to finish, and then you can answer afterwards unless

25   your attorney tells you not to answer.  Okay?

1    A.   So, for me, if we have people that feel that

2    way, it's really important to ensure that we have the

3    right environment for our employees.  Harassment is a

4    really important matter in our environment in a

5    business.

6    Q.   I got that.  I got that.  So you've got three

7    people complaining about the way that the harassment --

8    A.   We have -- remember -- sorry, can I --

9    Q.   Please, please.

10    Q.   So, remember, we had those three guys, but

11    also we had some feedback from the union saying that

12    this person was harassing people to sign the petition.

13    Q.   Okay.  But what about the subject matter of

14    the petition itself?  Weren't they doing the same thing

15    as well?  You said it's very important for you that

16    people work in a proper environment, right?

17    A.   Yes.

18    Q.   But the nature of the petition itself kind of

19    complains about the environment, right?

20    A.   Yes.

21    Q.   Okay.  So isn't that also a valid concern?

22    A.   It is.  Definitely it is.

23    Q.   Okay.  And what was done about that?

24    A.   Well, I think that it's important from the

25    extent of the document, where the document is coming

1    Tracy and Renil?  Does that make sense?

2         A.  I cannot confirm a hundred percent that this

3    was the one.

4         Q.  Okay.  So if we go down a little bit, yeah,

5    you'll see Mr. Navarro's signature on this one.

6         A.  Yes.

7         Q.  And this document actually comes from your

8    company, if you see the Menzies number there, Menzies

9    153.  And so line 24 there on the second page -- I'm

10   sorry, line 16 of the second page has Mr. Navarro's

11   signature.  Do you see that?

12        A.  Yes.

13        Q.  All right.  So, again, going back to your

14   conclusion earlier, you're saying, if you think that

15   Mr. Navarro was forcing all of these people to sign the

16   petition, you believe the petition is now without

17   validity, is that correct?

18        A.  Well, I don't think that it has the same

19   validity, definitely.  Now, what is most important to

20   bring out is that I had a conversation with HR about

21   Andrew, because they were -- in the letter I believe

22   they complained also about him falling asleep on the

23   operation.

24             So I had this conversation with HR.  And they

25   explained to me and they addressed that issue before I

1    started working at Menzies.  Because, again, I started

2    June 2018.  And this was happening -- this happened in

3    August.

4         Q.  Yes.  Right.  So you started in June of 2018,

5    and this was happening in August.  So you didn't have

6    that much kind of context with regard to what was

7    happening from the last year, is that correct?

8         A.  (Indicates affirmatively.)

9         Q.  Mr. Vargas?

10        A.  Yes.

11        MR. WU:  Arlo, I'm sorry to interrupt.  Can we

12   take a quick break in the next five minutes?  Whatever

13   is a good stopping point for now.

14        MR. URIARTE:  That's fine.  We can take a break

15   now.  No problem.

16        MR. WU:  Thanks a lot, Arlo.  Let's go off the

17   record.

18        MR. URIARTE:  No problem.

19             (Brief recess.)

20        MR. URIARTE:  Q.  So we were talking about Exhibit

21   8, Mr. Vargas.  My question is with regards to the

22   actual things that the fuelers were complaining about.

23   And I just want to clarify something.

24             Was there ever an investigation by Menzies

25   with regard to the context or the content of their

1   petition, the subject matter of their petition?

2       A.  Well, there was an investigation before in

3   terms of what they were complaining about, that this

4   was happening at the company.  And that was the

5   conversation that I had with Tracy, with HR, in

6   relation to this petition, what they were saying.

7       Q.  And what was the result of that investigation?

8       A.  Well, that Andrew pretty much falls asleep

9   because he has sleep onea [sic].

10      Q.  You're talking about sleep apnea?

11      A.  Yes.

12      Q.  Anything else?

13      A.  And -- no, nothing else.

14      Q.  What about the complaint that rest breaks or

15  breaks were being -- were being missed or not taken?

16      A.  I don't recall about that.

17      Q.  What about like delays that were being caused

18  by Andrew, was that ever investigated?

19      A.  No, no, not brought to my attention.

20      Q.  So when you read this petition, I guess the

21  focus became Mr. Navarro asking people to sign the

22  petition.  That was your focus, right?

23      A.  Yeah.  The environment that he create by doing

24  that.

25      Q.  Okay.  And you didn't really put focus on the

1    environment that Mr. Dodge was creating as alleged by

2    this petition?

3         A.   Well, I did when I asked HR about that

4    petition, about those things that happened before I got

5    there, and that was what I received from HR.

6         Q.   So what I heard you say, they already --

7         A.   That they already took action on it.

8         Q.   And that's with regard to the sleep apnea?

9         A.   That is regard of everything.

10        Q.   Okay.  So you're saying you did ask Tracy

11   about what the fuelers were talking about in the

12   petition, correct?

13        A.   (Indicates affirmatively.)

14        Q.   Okay.  And that involved what was happening to

15   Andrew Dodge before, and something about sleep apnea

16   and sleeping and him falling asleep, correct?

17        A.   Yes.

18        Q.   Anything else, aside from that, that came as a

19   result of your inquiry with regards to the petition?

20        A.   Also that, for me, nothing else for me to take

21   action for.

22        MR. WU:  And, Raul, if you could just give a brief

23   pause between the end of Arlo's question and the

24   beginning of your answer.  I think sometimes, when

25   there's a bit of overlap, is when we're getting that

1    feedback and it's becoming a little unclear.

2         THE WITNESS:  Okay.

3         MR. URIARTE:  Q.  Did you ever have a discussion

4    with Mr. Navarro, before this whole petition started,

5    did you ever have a discussion with Mr. Navarro about

6    Andrew Dodge?

7         A.  Not that I recall.

8         Q.  So you don't remember him going up to you and

9    trying to talk to you about concerns about Andrew

10   Dodge?

11        A.  No, I don't recall that.

12        Q.  Aside from the petition and maybe Mr. Navarro,

13   did you ever get complaints against -- or about Andrew

14   Dodge in those -- June, July, August, the time you were

15   there?

16        A.  No, I did not.

17        Q.  And so you were not involved in the promotion

18   of Mr. Dodge, correct?

19        A.  No, I was not.

20        Q.  And before being at Menzies at the San

21   Francisco Airport, where were you working?

22        A.  I was working for TAS.

23        Q.  What does that mean?

24        A.  TAS, Total Airport Services.  I worked there

25   as a general manager in San Francisco.

1    like, June to August of 2018.  What were your duties

2    and responsibilities?

3        A.  Pretty much whatever -- as US director of

4    operation, I'm looking for different -- different

5    elements.  So I have four different elements.  The

6    first one is financial.  I look for all the financials

7    of the station, all the four business lines that we

8    have there at that moment, which it was the fueling

9    business, the ramp business, the cargo business and the

10   GSC business.  GSC is ground service equipment.  So we

11   provide service to all the equipment that pretty much

12   you see on the runway.

13        So I look also in terms of customer service,

14   all the retention or attraction of new customers,

15   interactions.  I also look into the safety, ensuring

16   that we run a smooth operation in a safe basis, putting

17   all the safety processes in place to reduce every kind

18   of risk out there on the ramp or in the different

19   departments.

20        And I also look into the people.  What I mean

21   by the people, well, I make sure that environments, the

22   retention, the attraction of new employees, and how can

23   we retain employees in the long-term.

24        Q.  Okay.  Thank you for that.  Being that you

25   were new to the San Francisco Airport operation, before

1    pulling the trigger and actually recommending the

2    termination of Mr. Navarro, did you talk to anyone with

3    regards to that decision?

4         A.   Yes.   I talked to HR.

5         Q.   Who else?

6         A.   I talked to HR and nobody else about that

7    decision.

8         Q.   So you didn't talk to Renil and say, "Renil, I

9    know you've been here a while.   What do you think about

10   this?"

11        A.   I don't recall it, talking to Renil.

12        Q.   How much did you know about Mr. Navarro at the

13   time that you terminated him?

14        A.   I didn't know that much about Mr. Navarro.

15        Q.   Okay.   Did you know that he had been working

16   for Menzies a long time at that point?

17        A.   Yes, I did.

18        Q.   And then what were you trying to accomplish by

19   choosing to terminate Mr. Navarro?

20        A.   Well, I think that, as I said before, my job

21   there is to ensure that we can retain employees.   And

22   the only way to retain employees is to ensure an

23   environment where they work is a good environment.   So

24   when you have one person, just one person, complaining

25   about supervisor harassment, then you need to take

1    actions.

2        Q.  So your belief is that it was all Mr. Navarro

3    complaining, it was just him?

4        A.  I think that, based on the statements we

5    received, they were focused on that -- on him.

6        Q.  Okay.  But what about all those other people

7    that signed the petition?

8        A.  Well, as I said before, we need to ensure that

9    environment is good.  So, for me, just one person

10   complaining about harassment, it's an issue.

11       Q.  Okay.

12       A.  More than one, then you have a petition signed

13   by people.  So we have a person, and more than one

14   person being harassed to sign a petition, that is a

15   huge issue for me.

16       MR. URIARTE:  Okay.  All right.  Can we take a

17   look at Exhibit 8 again, please.

18           David, are you there?

19       ZOOM HOST:  Yes, coming up shortly.

20       MR. URIARTE:  Thank you.

21       ZOOM HOST:  Give me one second.  It's not coming

22   up.

23       MR. URIARTE:  No problem.  Thank you, David.

24       Q.  Let's go to the top part of Exhibit 8, please.

25   So it says, "To:  Menzies Management.  Sir/madam."

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 197 of 312

1          A.   "We think this is the right time to broadcast

2     the problem in this company.  We are hoping this

3     problem will be addressed."

4          Q.   Okay.  Was this problem ever addressed,

5     Mr. Vargas?

6          A.   It was addressed at the moment, but I was not

7     there.

8          Q.   I'm sorry?

9          A.   It was addressed at the moment because this is

10    old case, but I was not there when that happened.

11         Q.   Okay.  When did you go to Los Angeles?

12         A.   September.

13         Q.   Of?

14         A.   September -- September 1st, 2019.

15         Q.   So that was a year later, right?

16         A.   Yes.

17         Q.   So within -- from August to -- August 2018 to

18    September 2019, was there anything done about what was

19    written here?

20         A.   No, as I said before, the conversation with

21    HR, because I was not aware of all this that was

22    happening with Andrew, I had a conversation with HR

23    where they -- where HR told me about what happened and

24    what the final outcome of that investigation was.

25         Q.   With regards to the investigation on the sleep

1  apnea, is that correct?

2      A.  In regards to the issues that they were

3  having -- that they are complaining about Andrew.

4      Q.  Okay.  So it says, "the way he supervised is

5  very unprofessional when he run the operation or

6  supervised."  Anything that was done about that?

7      A.  At the moment that I get there, I hadn't had

8  any problem with Andrew.  And I didn't get any

9  complaint from any fueler in relation to Andrew.

10     Q.  Did you talk to any of the fuelers about the

11 way he supervises is very unprofessional and run the

12 operation or supervise?

13     A.  I'm sorry, no, I did not talk to any fuelers

14 about the way he supervise.

15     Q.  Do you know if Tracy or HR did that?

16     A.  In the conversations we had, it wasn't

17 specific about his performance in terms of OTP, which

18 is operational -- on time performance, I'm sorry.

19     Q.  And then it says -- okay.  I'm sorry, I think

20 we missed the last part.  Did you say something there?

21     A.  No.

22     Q.  Okay.  "People are not taking their breaks

23 it's because the way he set up the flights."  That one,

24 did you ask about that?  Was that something that was

25 taken care of?

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 199 of 312

1      A.   Well, I didn't receive no complaints about

2   people not taking the breaks.   And I want to -- can

3   I -- the policy that I have, when I manage people, is

4   really open.   And what I do is I always invite people,

5   when they have issues, to talk about the problems they

6   have.   The moment that I raised all those points with

7   people, I never would receive no complaints from no

8   fueler in relation to Andrew's performance.

9      Q.   Okay.   But if you see the second page there of

10   this petition, they did.   They did come forward, right?

11   Because you have 25, 26 people signing.

12         If you have an open-door policy about letting

13   you know about the complaint, wasn't this what these

14   people are doing?   I don't see how --

15      MR. WU:   Objection.   Lack of foundation.

16   Misstates prior testimony.

17         You can answer if you understand the question.

18      THE WITNESS:   I think that that question I already

19   answered.

20      MR. URIARTE:   Q.   Which is you don't believe that

21   these people were really complaining?

22      A.   We have people feel harassed to sign this

23   petition.

24      Q.   So you feel every one of these people were

25   harassed to sign this petition, is that correct?

1    Q.   And then did HR give you recommendation with

2    regards to other options available aside from

3    termination?

4    A.   Well, the recommendation -- the recommendation

5    from HR was not to terminate him.

6    Q.   And you didn't follow that?

7    A.   No, actually, I asked why those

8    recommendations, which I think it's normal procedure.

9    Q.   So you're saying you asked the recommendation

10   from HR, and then what did HR say?

11   A.   That based on the -- on the recommendation and

12   the conversation they had with the director, they're

13   recommending not to terminate, but it was just -- I'm

14   sorry, that it was just a recommendation, I'm sorry.

15   Q.   Okay.  So HR's recommendation is not to

16   terminate, right?

17   A.   Yes.

18   Q.   But you did not follow that, right?

19   A.   No, because I -- I needed to see the final

20   outcome of the investigation to take the right

21   decision.

22   Q.   And what did you see in the final outcome that

23   made you conclude that termination was the right

24   action?

25   A.   I get the final outcome from safety department

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 201 of 312

1    with the statements, plus the messages from Navarro to

2    Andrew, plus, well, the letter with the petition, the

3    call from the union in that there is somebody

4    instigating the people to sign this petition.

5         Q.   Okay.   Weren't there other options available?

6         MR. WU:   Objection.   Vague.

7              You can answer.

8         THE WITNESS:   There are always different options.

9         MR. URIARTE:   Q.   Did you consider those options?

10        A.   I think the harassment for me is -- is very

11   important.   I need to look into the environment for all

12   the employees and not just one.

13        Q.   Okay.

14        A.   And I think that is important that this person

15   was supervisor.

16        Q.   So you're saying the harassment is so

17   important that that was like a very big part of why you

18   decided to terminate.   That's what you're saying?

19        A.   Yes.

20        Q.   So what did you learn -- what if you learned

21   that harassment was also going on between Andrew Dodge

22   and the fuelers, would that be enough to terminate

23   Andrew Dodge?

24        MR. WU:   Objection.   Improper hypothetical.   Lacks

25   foundation.

1          You can answer.

2          THE WITNESS:  We investigated everything.

3    Everything -- we need to investigate everything to look

4    into how that is affecting the employees.

5          MR. URIARTE:  Q.  Right.  I know you have to

6    investigate.  I guess my hypothetical is more, if you

7    learned that harassment was actually going on between

8    Andrew Dodge and his fuelers, then it would lead to the

9    conclusion that he should be terminated, too, right?

10         MR. WU:  Same objection.

11         MR. URIARTE:  Q.  Is that correct, Mr. Vargas?

12         A.  It is.  I protect the team.

13         Q.  I was looking at some of your corporate

14   documents with regards to handbooks and HR materials

15   and all that.  And there's this thing called

16   progressive discipline.  Were you aware of that?

17         A.  Yes, I am.

18         Q.  Okay.  And why is it that you did not use

19   progressive discipline in this situation?

20         A.  Because there are cases that they're severe,

21   and then that's one of the outcome of the

22   investigation.

23         Q.  So it's like serious enough to terminate?

24         A.  Yes.

25         Q.  Is that a yes?

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 203 of 312

1     A.   Yes, it is a yes.

2     Q.   Okay.  And then did you ask or were you

3  curious, maybe you should have had a conversation with

4  Mr. Navarro?

5     A.   I don't participate in the investigations.

6     Q.   Maybe like a phone call to Mr. Navarro to get

7  his side of the story?

8     A.   No, I do not.  I do not participate in any

9  investigation.

10    Q.   And do you know whether or not they actually

11 talked to Mr. Navarro and got his side of the story?

12    A.   I just get the final outcome.

13    Q.   You just get the final decision?

14    A.   The final outcome for -- from the

15 investigation.

16    Q.   My question is different.  My question is when

17 you were looking at all the different elements to

18 decide whether to terminate or not, did you try to find

19 out whether somebody talked to Mr. Navarro to get his

20 side of the story?

21    A.   No, I did not.  I did not try to find out.

22    Q.   Would you say that's kind of like basic

23 investigation right there?

24    MR. WU:  Objection.  Lack of foundation.  Improper

25 hypothetical.

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 204 of 312

1        You can answer if you know.

2        THE WITNESS:  I won't say that is -- it all

3   depends on the kind of investigation they're running.

4        MR. URIARTE:  Q.  They -- what's the last word?

5        A.  They are running.

6        Q.  That they are running.  Okay.  But you didn't

7   look into what kind of investigation they were running?

8        A.  I just look into the final outcome of the

9   investigation.

10        Q.  And you never, like, got into your head and

11   said, what does Mr. Navarro say about all of this?

12   That's not something that you ever asked yourself?

13        A.  No, I do not.  I do not because I just look

14   into the final outcome of the investigation.  So I

15   think that that question is for the people who perform

16   the investigation.

17        Q.  So you said earlier that the goal of

18   terminating Mr. Navarro was to protect the employees

19   from the harassment, right?  The environment of

20   harassment, correct?

21        A.  Yes.

22        Q.  How is it different, in achieving that goal,

23   how is termination different from, let's say, a

24   suspension?

25        A.  Well, I think that is important, too, if you

1    find out that there is a harassment in the -- in the

2    crew and in the environment, then the only way for you

3    to ensure that we remove that harassment from the

4    environment is to remove the person who is doing the

5    harassment.    In that every case is different, but when

6    you have three people complaining about it, and at the

7    same time you have a petition involving another

8    employee which you're trying to achieve by harassing

9    people is -- is not good.

10        Q.    Okay.   But the part about that that needs a

11   little bit of explanation is you have this -- you say

12   at the same time you have this petition, but what about

13   the people that actually wrote the petition, right?   So

14   they have a concern, right?   So --

15        A.    Well, we go back to the same -- to the same

16   conversations we had before, of the petition, when you

17   have somebody that is pushing somebody to sign a paper

18   that they don't even know what it's for.

19        Q.    Right.   For those three people, right?

20        A.    Could be one, two, three, I don't know.

21        Q.    Now, in your emails, you mentioned July or

22   Julie Macapagal, it M-a-c-a-p-a-g-a-l.   Actually, the

23   name of an old Filipino president.   July Macapagal.

24   Does that name sound familiar to you?

25        A.    He's also part of a supervisor crew.

1     Q.   Was an investigation ever conducted?

2     A.   Well, I investigate.  I saw the name of the

3  person that it was on that list.  And I request to open

4  an investigation about that person.

5     Q.   Was an investigation opened?

6     A.   Yeah, but because I needed to know if this

7  supervisor was also -- was also harassed to sign

8  this -- this petition.

9     Q.   Okay.  And what was the result of the

10 investigation?

11    A.   That he was.

12    Q.   I'm sorry?

13    A.   That he was.  He was also intimidated to sign

14 the paper.

15    Q.   I'm unclear about that.  What is that --

16 that's a person, a guy, right?  A male?

17    A.   Yes.

18    Q.   He's a guy.

19    A.   Yes.

20    Q.   So what was -- what was Mr. Macapagal -- what

21 did Mr. Macapagal do?

22    A.   He's a supervisor.

23    Q.   Yeah, and he signed the petition, correct?

24    A.   The petition, yes.

25    Q.   And then what was the result of the

1    investigation on Mr. Macapagal?

2        A.   That he was forced to sign that paper.

3        Q.   That he was forced to sign the paper, is that

4    correct?

5        A.   Yes.

6        Q.   You talked to Mr. Macapagal?

7        A.   No, I did not.

8        Q.   Okay.  So who gave you the results of the

9    investigation?

10       A.   Safety department.  It was a conversation we

11   had.

12       Q.   Over the telephone?

13       A.   No, person to person.

14       Q.   Who in the safety department?

15       A.   Kevin Blumberg.

16       MR. URIARTE:  Let me get you, before we forget, so

17   it's Kevin Blumberg, B-l-u-m-b-e-r-g.  All right.

18       Q.   So he told you that Mr. Macapagal told him

19   that he was forced to sign the petition, is that

20   correct?

21       A.   Yes.

22       Q.   Did you review the termination notice before

23   it was issued?

24       A.   No, I did not.

25       MR. URIARTE:  I just want to make sure we're clear

1    on this.  Exhibit 9, please, David.  Thank you.

2              (Plaintiff's Exhibit 9 marked for

3              identification.)

4         MR. URIARTE:  So if you could just scroll all the

5    way, David, so Mr. Vargas can see the whole document.

6    So this will be Exhibit 9.  This is "Notice to

7    Employees as to Change in Relationship" dated August

8    29, 2018.  I'm good with my word with regard to the

9    date there, even though Jason did not want to go with

10   me on it.

11        Q.  So do you see that, Mr. Vargas?

12        A.  Yes, I see that.

13        Q.  Okay.  So you didn't see this document before

14   it was issued?

15        A.  I don't recall it, but it looks like the first

16   time that I see this document.

17        Q.  No problem.  And then when it says "Code of

18   Conduct," does that mean anything to you?

19        A.  Yeah.

20        Q.  What does that mean to you?

21        A.  It means that the person was not conducting

22   correctly.

23        Q.  Okay.  And specifically what was he not

24   conducting correctly?

25        A.  He was forcing people to sign a petition.

1    Q.   Okay.   Anything else that he wasn't doing

2  correctly?

3    A.   I think that is enough for me.

4    Q.   I'm just trying to complete things, so I'm

5  sorry I keep saying, "Anything else?   Anything else?"

6  I'm just making sure it's complete.

7        So aside from him forcing people to sign the

8  petition, anything else that might have caused him to

9  violate code of conduct, or was that it?

10   A.   I think that -- I think that -- well, no,

11 nothing -- well, but the reason why we terminate --

12   Q.   Yeah.

13   A.   -- because of forcing people to sign a

14 petition.

15   MR. URIARTE:  Gotcha.   Okay.

16        And then could we have Exhibit 11, please.

17        (Plaintiff's Exhibit 11 marked for

18        identification.)

19   MR. URIARTE:  Q.  So here's Exhibit 11.  This one

20 was given to us by your lawyers as well.  It's Menzies

21 95, if you look on the bottom.

22   A.   Can you repeat that.

23   Q.   I'm sorry?

24   A.   Can you repeat it, please.

25   Q.   Sure.  So this is Exhibit 11.  This is a

1    Q.  All right.  And here it says this option, I

2    guess, would have placed Mr. Navarro on final warning

3    for unprofessional conduct of a supervisor, right?  Do

4    you see that?

5    A.  Yes.

6    Q.  And it says "distributing a petition and

7    disruption of the workforce."  Do you see that?

8    A.  Yes, I do see it.

9    Q.  And then it says, "You are being placed on a

10   Final Warning which is your last and final opportunity

11   to" -- we don't know.  I'm thinking it's like "change

12   your behavior," maybe.  I don't know.  We don't know

13   that.  And then, "Any infraction, no matter how minor

14   in any of the 4 categories of Attendance, Conduct,

15   Safety or Work Performance, may result in your

16   immediate discharge."  Do you see that?

17   A.  Yes, I see that.

18   Q.  And then the Final Warning box is marked.

19   A.  Uh-huh.  Yes.

20   Q.  Okay.  And then if you see a little bit down,

21   just to make sure, there's no signature because it was

22   not used, presumably, correct?  So my question about

23   this document is what's wrong with this option,

24   Mr. Vargas?

25   MR. WU:  Objection.  Improper hypothetical.  Lacks

1    foundation.

2         THE WITNESS:   I think that, based on the

3    investigation we come up with, this was not the option,

4    the right option for me at that moment.

5         MR. URIARTE:   Q.   Thinking about it now and

6    knowing a little bit more about the situation?

7         A.   I already had final outcome of the

8    investigation.   Make sure I need to have the right -- I

9    need to take the right decision.

10        Q.   You still think it's the right decision then,

11   Mr. Vargas?

12        A.   I do believe that it was the right decision,

13   and that's why I took it.   And you can tell when I

14   asked Tracy on -- in terms of her recommendation,

15   because I needed to ensure that we had all information

16   available to take the right decision moving forward.

17        Q.   Okay.   I guess I would have to ask, though,

18   don't you think that a final warning, one more little

19   mistake, may have resulted in the same outcome for you

20   in your goal of eliminating harassment?   Because your

21   goal is to eliminate harassment.

22        A.   Yes.

23        Q.   And a final warning like this --

24        MR. WU:   Improper -- sorry, I didn't know if you

25   were done with your question.   I don't mean to cut off

1    your question, Arlo.

2         MR. URIARTE:  It's okay, Jason.  Go ahead with

3    your objection.

4         MR. WU:  The objection is improper hypothetical

5    and lack of foundation.

6         MR. URIARTE:  Q.  Mr. Vargas?

7         A.  I'm sorry, but I don't know.  That's the

8    reason why I'm thinking about risk, I need to ensure

9    that we can reduce the risk as much as we can.  So

10   since I don't know what's going to happen with a

11   warning, the way for me to reduce the risk is

12   terminating the person.

13        Q.  Go ahead.

14        A.  With enough documentation to support that

15   decision.

16        Q.  Right.  And for you the documentation is the

17   conclusion of the security people, right?  And then the

18   statement of the three people that you're talking

19   about.

20        A.  Do you want me to go through it?

21        Q.  No, no, we've gone through it.  Don't worry

22   about it.  But that's your position, you felt like you

23   had enough documentation to do a termination?

24        A.  Yes.

25        Q.  And you're avoiding the risk.  Now, the risk

1    Q.  Okay.  So at this point did you think that you

2    needed to investigate more?

3    A.  Yes, definitely, because she was not answering

4    my question on that -- at that point.

5    Q.  Okay.  Very good.  All right.  And then if we

6    go up a little bit.  So here is your response, I guess,

7    August 29 at 5:01 p.m.  And you kind of made the

8    decision to terminate Mr. Navarro, correct?

9    A.  Yes.

10   Q.  So in the hour between 4:04 p.m. and 5:01

11   p.m., what additional investigation occurred?

12   A.  Well, we had a -- we had a conversation with

13   HR also, and I reviewed all the documentation in terms

14   of what the outcome of the investigation was.  And at

15   that point I took the decision to terminate Mr.

16   Navarro.

17   Q.  Okay.  Anything else that you did in that

18   hour?

19   A.  Well, we talked -- as I say, we talked with

20   HR, talked about the case.  We collected all the

21   documentation, put all the documentation together.  And

22   then we took the right -- the last decision, and that's

23   why I send that email to HR.

24   Q.  At this point you were not provided a document

25   with regard to the final warning, right?  You didn't

1    review that at this point?

2         A.   No, I did not.   That's HR.   And I think that

3    is also important to remember -- it's important to

4    remark that HR take decisions -- decisions in terms

5    of --

6         Q.   In terms of?

7         A.   The person.

8         Q.   HR made decisions in terms of the person, you

9    said?

10        A.   Of the person, exactly.

11        Q.   And what do you mean by that?

12        A.   Because they look into everything that you're

13   saying, or they take a look to the seniority of the

14   person, that this person is being 15 years at the

15   company, so they look on the -- on the recommendation

16   of the document, warnings and all that, and then, based

17   on that, they gave a recommendation.

18             Now, we, as directors, we look into the more

19   open situation of -- in terms of the whole operation,

20   how this will affect the rest of the employees.   And

21   during that -- during that meeting, of course, we

22   agreed on -- on a final termination for Mr. Navarro.

23        Q.   And when you say "agreed," who actually agreed

24   with you?

25        A.   HR.

1    Q.  Meaning Talin and Tracy?

2    A.  Yes.  So then Tracy agreed because she had a

3  conversation with Talin, so we all agreed on -- on this

4  termination.

5         MR. URIARTE:  Okay.  Why don't we take a

6  five-minute break and then we'll be right back.  Thank

7  you.

8         MR. WU:  All right.

9              (Brief recess.)

10        MR. URIARTE:  Okay, Mr. Vargas, it looks like I

11  have no further questions for you today.

12        THE WITNESS:  Okay.

13        MR. WU:  And I have just a few questions for you,

14  Raul.

15                 EXAMINATION BY MR. WU

16   MR. WU:  Q.  So, Raul, during the time you were

17  the director of operations at SFO, aside from the

18  petition, did you hear of any complaints that Andrew

19  Dodge was harassing employees?

20   A.  No, I did not.

21   Q.  During the time you were the director of

22  operations at SFO, aside from the petition, did you

23  hear of any complaints that Andrew Dodge wasn't giving

24  fuelers breaks?

25   A.  No, I did not.

1    Q.   During the time you were the director of

2  operations at SFO, aside from the petition that we've

3  already been discussing, did you hear any complaints

4  that Andrew Dodge wasn't running the operation

5  smoothly?

6    A.   I did not.

7    Q.   During the time you were director of

8  operations at SFO, aside from the petition, have you

9  heard any complaints about Andrew's job performance?

10   A.   No, I did not.

11   Q.   During the time you were the director of

12 operations at SFO, did you ever hear of any grievance

13 filed by the union against Andrew Dodge?

14   A.   There is nothing on Andrew Dodge.

15   MR. WU:  Okay.  I think that's all the questions I

16 have on my end, Arlo, unless you have any further

17 questions.

18   MR. URIARTE:  Yeah, let me just follow up with

19 what you just said.

20              FURTHER EXAMINATION BY MR. URIARTE

21   MR. URIARTE:  Q.  Mr. Vargas, you said there was

22 nothing on Andrew Dodge, right?  One, two, three, four,

23 five items there.  You never heard anybody complaining

24 about harassing him, you never heard that he was not

25 giving breaks, you never heard that he was not running

1    Q.  And when you say you do not recall, does that

2    mean it could have happened or does that mean you

3    didn't do it?

4    A.  It means that I don't have anything documented

5    that's important, and I don't recall having a

6    conversation.

7    Q.  Okay.  What about with Tracy or with HR?  Do

8    you recall talking to them about all these different

9    items?

10    A.  We had a conversation, as I said, in terms of

11    the investigation and in terms of what the letter --

12    letter said about Andrew, as I explained it before, and

13    nothing else on that.

14    MR. URIARTE:  Okay.  All right.  Thank you.

15    THE WITNESS:  Thank you.

16    MR. URIARTE:  Thank you, Mr. Vargas.

17    MR. WU:  Thank you very much for your time, Raul.

18    We appreciate it.

19    THE WITNESS:  Thank you very much.

20    MR. URIARTE:  We'll stop the record.

21    (Whereupon, the concluded at 11:15

22    o'clock a.m.)

23    ---o0o---

24

25

1                CERTIFICATE OF WITNESS

2                      ---o0o---

3

4          I, RAUL VARGAS, hereby declare under

5    penalty of perjury that I have read the foregoing

6    deposition testimony; and that the same is a true

7    and correct transcription of my said testimony

8    except as corrected pursuant to my rights under

9    Rule 30(e) of the Federal Rules of Civil

10   Procedure.

11

12          _____

                        Signature

13

14          _____

                          Date

15

16

17

18

19

20

21

22

23

24

25

1    STATE OF CALIFORNIA      )
                              )
2    COUNTY OF SAN FRANCISCO )

3            I, CINDY TUGAW, a Certified Shorthand Reporter

4    of the State of California, duly authorized to

5    administer oaths pursuant to Section 8211 of the

6    California Code of Civil Procedure, do hereby certify

7    that

8                    RAUL VARGAS,

9    the witness in the foregoing deposition, was by me duly

10   sworn to testify the truth, the whole truth and nothing

11   but the truth in the within-entitled cause; that said

12   testimony of said witness was reported by me, a

13   disinterested person, and was thereafter transcribed

14   under my direction into typewriting and is a true and

15   correct transcription of said proceedings.

16           I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   caption.

21           Dated the 10th day of September, 2020.

22

23

24

25                   CINDY TUGAW
                     CSR No. 4805 (California)

1    Raul Vargas
     c/o Foley & Lardner
2    555 California Street, Suite 1700
     San Francisco, CA 94104
3    Attn:  Jason Y. Wu, Esq.

4    Date:  September 10, 2020
     Re:  Navarro vs. Menzies
5    Deposition Date:  Tuesday, August 25, 2020

6    Dear Mr. Vargas,

7            Please be advised the original transcript of
     your deposition is ready for your review.
8            Pursuant to FRCP Rule 30(e), you have 30 days
     following the date of this notice to read, correct if
9    necessary, and sign your transcript unless the
     attending parties and the deponent agree on the record
10   or otherwise in writing to a longer or shorter time
     period.  The deponent may change the form or the
11   substance of the answer to a question, and may either
     approve the transcript of the deposition by signing it,
12   or refuse to approve the transcript by not signing it.
     You are not required by law to read and sign your
13   deposition transcript.  All parties will be informed of
     the corrections.  The original transcript will then be
14   sealed and sent to the examining attorney pursuant to
     the applicable law.
15           You may either come to our office to read and
     sign the original transcript, or you may contact your
16   attorney or the attorney who arranged for you to be
     present at your deposition.  If they have ordered a
17   copy of the transcript, you may review their copy and
     make corrections by submitting, signing and returning
18   the attached form.  If you choose to review your
     transcript at our office, please call first to make an
19   appointment.  Should you have any question regarding
     these instructions, please call.
20
     Sincerely,
21


22
     NOGARA REPORTING SERVICE
23   5 Third Street, Suite 415
     San Francisco, California 94103
24   (415) 398-1889

25   cc:  All counsel, original deposition

# EXHIBIT 17

1              IN THE UNITED STATES DISTRICT COURT

2         IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5    RENALDO NAVARRO,

6                   Plaintiff,

7    v.                                  No.  3:19-CV-8157

8    MENZIES AVIATION, INC.,
     doing business as MENZIES
9    and DOES 1 through 10,
     inclusive,
10
                    Defendants.
11   _____/

12   Zoom Remote Deposition of

13        ANDREW DODGE

14    Tuesday, July 28, 2020

15       **CERTIFIED COPY**

16

17

18

19

20   REPORTED BY:  CINDY TUGAW, CSR #4805

21

22

23             NOGARA REPORTING SERVICE
              5 Third Street, Suite 415
24          San Francisco, California 94103
                 (415) 398-1889
25

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 223 of 312

1                              I N D E X

2                                                   Page Number

3     EXAMINATION BY MR. URIARTE                        4

4                           ---o0o---

5                        E X H I B I T S

6     Plaintiff's

7     Exhibit 3      Copy of two photographs        26

8     Exhibit 5      Statement by Andrew Dodge       42
                     dated 8-16-18
9
      Exhibit 8      Petition from Menzies           33
10                   fuelers to Menzies
                     Management
11
      Exhibit 10     Statement by Rafael             40
12                   Vasquez dated 11/18/18

13                          ---o0o---

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 224 of 312

1    　　　　　BE IT REMEMBERED that, pursuant to Notice of

2    Taking Deposition and on Tuesday, the 28th day of July,

3    2020, commencing at the hour of 9:00 o'clock a.m.

4    thereof, via Zoom videoconference, before me, CINDY

5    TUGAW, a Certified Shorthand Reporter in the State of

6    California, personally appeared,

7    　　　　　　　　　　ANDREW DODGE,

8    Called as a witness by the Plaintiff, having been by me

9    first duly sworn, was examined and testified as

10   hereinafter set forth.

11   　　　　　　　　　---o0o---

12   　　　　　　APPEARANCES OF COUNSEL

13   For the Plaintiff
     　　　LIBERATION LAW GROUP, P.C.
14   　　　2760 Mission Street
     　　　San Francisco, California 94110
15   　　　BY:  ARLO GARCIA URIARTE, Attorney at Law
     　　　(415) 695-1000
16

17   For the Defendants
     　　　FOLEY & LARDNER, LLP
18   　　　555 California Street, Suite 1700
     　　　San Francisco, California 94104
19   　　　BY:  JASON Y. WU, Attorney at Law
     　　　(415) 984-9848
20

     Also Present:  David Ho, Zoom Host.
21
     　　　　　　　　　---o0o---
22

23

24

25

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 225 of 312

```
1          ZOOM HOST:  Good morning.  I am David Ho and I
2      will be the Zoom host.  I am going to be -- as soon as
3      the deposition gets going, I'll be off screen and I'll
4      mute myself.  The only time you will hear my voice if
5      there are any exhibits that you need to bring up.  And
6      so, Cindy, take it away.
7          THE REPORTER:  At this time, I will ask counsel to
8      stipulate on the record that there is no objection to
9      this deposition officer administering a binding oath to
10     the witness via Zoom, starting with the noticing
11     attorney.
12         MR. URIARTE:  No objection.
13         MR. WU:  No objections for defendant Menzies
14     Aviation.
15             (Whereupon, the Witness was duly sworn by the
16             Reporter.)
17                 EXAMINATION BY MR. URIARTE
18         MR. URIARTE:  Q.  Good morning, Mr. Dodge.  My
19     name is Arlo Uriarte.  I am attorney for Renaldo
20     Navarro in this matter of Mr. Navarro against Menzies.
21             Are you aware of that?
22     A.  Yes.
23     Q.  Okay.  Would you please state and then spell
24     your full name for the record, please.
25     A.  Yeah.  Andrew Dodge, A-n-d-r-e-w, and then
```

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 226 of 312

1    D-o-d-g-e.

2        Q.   Okay.   And, Mr. Dodge, what's your current

3    position with Menzies?

4        A.   I am a supervisor here at Menzies.

5        Q.   Have you had your deposition taken before?

6        A.   Yes.

7        Q.   And in what context?

8        A.   Can you, like, rephrase the question?

9        Q.   Yeah.   Why was your deposition -- why did you

10   provide a deposition?

11       A.   I had an incident on the -- on the airport.

12       Q.   Okay.   So it was your case or was it somebody

13   else's case?

14       A.   It was somebody else's versus Menzies.

15       Q.   Gotcha.   And do you remember the name of that

16   person?

17       A.   The first name.   It was a police officer named

18   Robert.

19       Q.   Okay.   So it was a police officer who filed a

20   lawsuit against Menzies, and you were a witness?

21       MR. WU:   I'm just going to object, relevance, to

22   this line of questioning.

23          But you can answer.

24       THE WITNESS:   It was something against Menzies

25   Aviation because I was a part of it.

1       A.   No, more like two hours.

2       Q.   Okay.  Sounds good.  All right.

3            Can you tell me the highest level of education

4   that you achieved.

5       A.   I have some college.

6       Q.   Did you graduate from college?

7       A.   No, I did not.

8       Q.   And when you say college, what college did you

9   go to?

10      A.   I attended DeAnza Community College.

11      Q.   Did you get an AA?

12      A.   No.  I was going for my AA.

13      Q.   And when was the last time you actually

14  participated in a class at DeAnza?  Like what year?

15      A.   I want to say like 2015, 2016.

16      Q.   And what were you trying -- what AA were you

17  trying to graduate?

18      A.   Criminal justice.

19      Q.   And when did you start with Menzies?  What

20  year?

21      A.   February of 2016.

22      Q.   So February of 2016, is that with Menzies

23  already?

24      A.   That was when we were ASIG.

25      Q.   So that's still ASIG.

1    A.   Yeah.

2    Q.   And then shortly thereafter -- shortly

3    thereafter, Menzies came in, is that correct?

4    A.   Yeah, Menzies came in, like, 2018, or

5    something like that, or in 2000 -- or like in the

6    middle of 2018, I want to say.

7    Q.   All right.   What was the position you had when

8    you started with ASIG?

9    A.   When I first started at ASIG, I was a fueler.

10   Q.   How long were you a fueler for before becoming

11   a supervisor?

12   A.   I want to say about a year.

13   Q.   And who approved your promotion to supervisor

14   from a fueler?

15   A.   Renil Lal, the general manager at the time.

16   Q.   The termination of Mr. Navarro is about August

17   of 2018.  Do you remember that?

18   A.   Yeah, I remember him not being there anymore.

19   Q.   And in August of 2018, you were a supervisor,

20   correct?

21   A.   Yes.

22   Q.   And your shift was -- can you tell me, what

23   was your shift?

24   A.   During the time -- like, your question is,

25   like -- like, now or in the past?

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 229 of 312

1    Q.   In August of 2018.

2    A.   I was -- I was doing swing shift and -- which

3    would start -- swing shift.   It would probably start

4    around, what, 2:00 or 3:00 in the afternoon until about

5    11:00 p.m. at night.   And then I would also cover

6    graveyard at the time, which started around 11:00 p.m.

7    to about 7:00 a.m., if someone called off work.   I also

8    covered people's call sicks as well.

9    Q.   Gotcha.   Okay.   So if you had your regular

10   shift, which was the swing shift, of 2:00 to 3:00 until

11   11:00 p.m., you sometimes overlapped with the beginning

12   of Renaldo Navarro's shift, is that correct, graveyard?

13   A.   So I would see -- I would see Ray and give him

14   an update on the shift on what's going on and what

15   needs to be done, who's here, who called out.   And

16   sometimes you go a little past that because operation

17   can be a little bit busy, but we never overlapped by no

18   more than 30 minutes or 20 minutes.

19   Q.   So it would be kind of like a handoff?

20   A.   Yeah.   It's always a handoff to the next

21   supervisor.   You give them the cell phone and just talk

22   about what happened on the operation, and stuff that

23   needs to be done, or flights that come in, or flights

24   that were delayed, or anything about what's going on

25   with the fuelers, or anything about the equipment, you

Case 3:19-cv-08157-VC Document 28-1 Filed 10/15/20 Page 230 of 312

1    know, stuff like that.

2         Q.  Gotcha.  And then, aside from yourself, so you

3    have Andrew Dodge, you have Renaldo Navarro, a

4    supervisor.  Who else were supervisors at that time, in

5    August of 2018?

6         A.  Just a quick question.  When you mean

7    supervisors, are you talking about supervisors as,

8    like, in general all the supervisors, or are you

9    talking about supervisors that I just worked with on my

10   side of the airport?

11        Q.  No, I'm talking about the same level as you,

12   so, like, fueling --

13        A.  So on my operation on my side of the airport,

14   it was me, Ray Navarro, July -- I can't pronounce his

15   last name.  July, Edsel and Tevita.

16        Q.  What was the last one?  I'm sorry.

17        A.  Tevita.

18        Q.  How do you spell that?

19        A.  T-e-v-i-t-a.

20        Q.  Okay.  And when you say your side, is that the

21   103?  Is what you guys called it?

22        A.  The one at the time, yes, it was is 130 side.

23   The 1-3-0 side.

24        Q.  I mean 130.

25        A.  Yes.

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 231 of 312

1            Why don't you give me -- have your duties --

2    have your duties as a supervisor changed from August

3    2018 to today?

4        A.   Well, up until the Corona virus in March it

5    was the same, but now I just got back from furlough, so

6    I'm kind of just doing training as of right now, going

7    back.

8        Q.   Gotcha.  Yeah, I mean, I think everybody is

9    hoping that things kind of go back to normal hopefully

10   soon, but it doesn't look that way.

11           Okay.  So let's just talk about your duties.

12   And I really want to focus on your duties and

13   responsibilities with regards to August of 2018 as a

14   supervisor.

15       A.   Yeah.

16       Q.   Can you tell me what you remember to be your

17   duties and responsibilities.

18       A.   So as a supervisor at the time -- at the time

19   was to -- when you first come in, was to get the other

20   supervisor's information:  Get the cell phone, find out

21   who's on the operation, who called out sick.  After

22   that it was to schedule the flights.

23           So I would set up -- find out what flight are

24   coming in during my shift, what time the plane was

25   coming in, what time the plane was leaving, and from

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 232 of 312

1   there put fuelers on a schedule for, hey, you're going

2   to go from this flight to this flight.

3           And also, after that, it was to drive on the

4   airport and just monitor the fuelers, if they needed

5   help with something, or also monitor their safety.  So

6   making sure they're wearing their uniform.  Making sure

7   they're wearing their vest, earplugs, had their boots

8   on.  Make sure -- just come and check on them and make

9   sure their equipment is running properly.

10          And also, if they call me, I would go assist

11  them, or, you know -- and also just change things

12  throughout the operation.  Maybe the guy might call me

13  and be, hey, my flight never showed up, and then I

14  might just change their flights around.

15      Q.  Right.  Were you also in charge of providing

16  breaks for people, like when they can go on --

17      A.  Oh, yes, of course.  So you would -- when you

18  schedule flights, you would -- before their fifth hour,

19  California law, you try to find a break period for 30

20  minutes.  There were days that sometimes the way the

21  flights came in, you know, the guys would be fueling

22  and would go over that because they're still on the

23  aircraft.  You can't just leave the aircraft.  They

24  would have to take their break after they were done

25  fueling the aircraft.

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 233 of 312

1       Q.  Right.   So the fuelers under your supervision,

2   they depended on you for when they can take their

3   breaks?

4       A.  Yes.   They would take -- some of the guys

5   were, Hey, I need to take a break, or asking ahead of

6   time, Hey, what time am I taking my break?   So

7   everything would be coordinated depending on what's

8   going on on the operation at the time.

9       Q.  And then, like you said, there are times where

10  the fuelers would depend on you to help out with a

11  particular situation.   So you become kind of like an

12  extra hand as well?

13      A.  Say that again.   Like, what do you mean?

14  Sorry.

15      Q.  Like if they're busy or they're shorthanded,

16  you could come in also to help them?

17      A.  Yeah, if there was something going on in the

18  operation, I would report to my duty manager, know

19  what's going on, let him know, Hey, we're short.   Can I

20  get some assistance from your side?   And if we didn't

21  have the manpower, I would help on a flight and hook up

22  and help, you know.

23      Q.  Exactly.   Okay.   And then, during the swing

24  shift, how many fuelers did you normally supervise?

25      A.  On a busy day, on a really busy day, I have

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 234 of 312

1    between maybe eight to ten guys on a really busy day,

2    with full staff.

3        Q.  Gotcha.  And then if it's slow or not too

4    busy --

5        A.  There's some nonbusy days.  Probably --

6        MR. WU:  Andrew, make sure you hear Arlo's entire

7    question before you start.

8        THE WITNESS:  Sorry.

9        MR. URIARTE:  Q.  Yeah, because, Andrew, sometimes

10   it gets hard for the court reporter, for Cindy, to

11   actually kind of write down what we're saying if we're

12   talking on top of each other.  So let's give each

13   other -- let's try give each other like a pause in

14   between.

15       A.  Okay.

16       Q.  Thank you.  So you said -- we were talking

17   about, like, maybe on a slow or a normal day, how many

18   people would you supervise?

19       A.  About maybe five or six guys.

20       Q.  Okay.  In August of 2018, did you have some

21   sort of accommodation or medical condition that where

22   you actually asked the employer for an accommodation in

23   the workplace?

24       A.  I had given Renil Lal a doctor's note at the

25   time, like in 2017, from my doctor, having sleep apnea.

1    Q.  And did you and the company or Renil kind of

2    go through how to deal with the condition, the medical

3    condition, with regards to your job and, you know, what

4    type of -- was there any type of accommodation worked

5    out?

6    A.  I don't recall any conversation with Renil.  I

7    just don't remember the conversations we had in the

8    past.

9    Q.  Okay.

10   A.  I don't remember.

11   Q.  Did you have some sort of official or in place

12   disability accommodation that kind of changed your

13   normal workday that the company had to accommodate?

14   Was something like that in place?

15   A.  Well, they tried, like I said -- I mean, how

16   you say, like it was -- I remember trying to stay doing

17   things, stay -- like stay on top of doing things, try

18   not to just, you know, sit in one place.  Just move

19   around.

20   Q.  Right.  I guess I'm asking more from like a

21   formal perspective.  Usually different companies deal

22   with this in different ways, but usually, when an

23   employee goes to an employer and says, hey, I have this

24   medical condition that affects my workday, usually

25   something is worked out, and then some things written

1    what was in place, whether there was something --

2        A.  Yes.

3        Q.  -- in writing, or was it more informal, and

4    you just told them the condition and nothing else.

5        A.  Well, like, even with a piece of paper from

6    the doctor stating, because, like I said, in the past

7    people were saying, like, I was just sleeping, but I

8    provided a doctor's note showing what I had.  I didn't,

9    you know -- I didn't know about it either until I had

10   to go see the doctor, and that's when I provided them

11   with a note what I had because I had to go to sleep

12   tests and all that, and they finally diagnosed me with

13   that.  And I had to show proof why it was happening,

14   you know.

15       Q.  Okay.  So then who did you actually give that

16   doctor's note to?

17       A.  Renil.

18       Q.  To Renil.  And then did Renil talk to you

19   about it?

20       A.  I don't remember the -- we sat down.  I just

21   don't remember the conversation.

22       Q.  Okay.  Did you guys work something out?  Was

23   there some sort of game plan or --

24       A.  I don't remember, to be honest.

25       Q.  Okay.

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 237 of 312

1          identification.)

2          MR. URIARTE:  Q.  Mr. Dodge, do you know if

3     clicking on the Chat box -- there you go.  We have a

4     screen share.  Do you see it?

5          A.  Yes.

6          Q.  Great.  So when we were talking about

7     sleeping, I guess these pictures were taken of you.  So

8     you're saying that when you were falling asleep in the

9     office or in the vehicle like that, that was part of

10    your sleep apnea condition?

11         MR. WU:  Objection.

12         THE WITNESS:  Yeah.

13         MR. WU:  Objection.  Assumes facts not in evidence

14    that these are photos of him.

15         MR. URIARTE:  So, Mr. Dodge, just let your

16    attorney finish his objection, and then you can answer

17    after if you understand the question.

18         THE WITNESS:  Sorry.  Can you repeat the question

19    one more time?  Sorry.

20         MR. URIARTE:  Q.  Yes.  So in these photographs,

21    that's you, right, in the photograph?

22         A.  Yeah, that's me, yes.

23         Q.  And are you saying that when you fall asleep

24    like this, that you -- that these events right here

25    were part of your sleep apnea condition?

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 238 of 312

1    A.   I can tell you that in the photo, the one with

2    the truck, yes.   The one in the office, that was at the

3    end -- I was done with my shift already.

4    Q.   Gotcha.   And do you remember if the one in the

5    office was after a graveyard shift?   Is that what that

6    was?

7    A.   I can't remember the dates.   It's in the

8    office.   I don't remember.   But I remember this -- I

9    remember this photo.

10    Q.   Gotcha.   So you're saying the one in the

11    office you were already done with your shift, and you

12    went to the office to just nod off, is that correct?

13    A.   I was done.   I had transferred all my

14    information.   I went to the office and, yeah, fell

15    asleep.

16    Q.   And then the vehicle, is this -- the vehicle

17    is a vehicle located in the tarmac?   Is that where it

18    is?

19    A.   It's black and white, so I can't -- yeah.

20    Q.   Okay.   But you remember that the vehicle --

21    when you were sleeping in the vehicle in this

22    photograph, that was because of sleep apnea, is that

23    correct?

24    A.   Yeah, yes.

25    Q.   Okay.   So we're done with Exhibit 3.

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 239 of 312

1      Can you tell me, by August of 2018, how long

2  you had been working with Renaldo Navarro at that time?

3      A.  Good question.  Do you mean like how long had

4  I been working with him as a co-worker, as like a --

5  how do you say -- as a -- supervisors together or as,

6  in general, a fueler and a supervisor?

7      Q.  Yes.  In general.

8      A.  Since I began working for ASIG in 2016, I was

9  his night fueler.  So I began working with him as a

10  night fueler, and then once I got promoted, I became a

11  swing supervisor, so I would transfer my information to

12  him.

13      And then while -- our schedules changed, and

14  then I would cover the days he was off as a swing -- I

15  mean, as a graveyard.  And then there -- if someone

16  called off, and I would see him from the night shift or

17  into the morning shift, or I would cover his sick day.

18  So, yeah, I worked with him a lot.

19      Q.  Gotcha.  And what was your general opinion

20  with regards to Ray Navarro and how he did his job?

21      A.  Oh, Ray's a great supervisor.  There's no

22  questions asked.  He was there for a long time, and,

23  you know, he's -- he did his job.

24      Q.  And you and Ray -- at some point you and Ray

25  started to have, like, difference of opinion with

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 240 of 312

1   you.  Him saying I shouldn't be a supervisor.  Stuff

2   like that.

3        Q.  Yeah.  And when you say scheduling, you're

4   talking about how you're scheduling the fuelers with

5   regards to their workday and them being able to take

6   breaks?  Is that what it is?

7        A.  Yeah, scheduling meaning how I schedule my

8   flights to my crew.

9        Q.  And then breaks, what were the complaints

10  about breaks?

11       A.  He was saying that I was giving the breaks

12  late or not giving their breaks at all.  Stuff like

13  that.

14       Q.  Did you ever inquire, you or Renil, with

15  regard to, like, where he was getting his information?

16  Because he wasn't working with you, so how did he know

17  about the breaks and the scheduling and all of that?

18       A.  Renil would -- Renil would investigate, find

19  out what was going on from fuelers and ask what was

20  going on.  And, if anything, Renil -- if anything was

21  questioned, Renil would ask me.  But the main question,

22  Renil would ask me if I am giving the fuelers breaks.

23  He never said fuelers are complaining.  It would be

24  more like, Andrew, what did you -- can I see what you

25  did, or can I see your text messages, stuff like that,

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 241 of 312

1    to see what I was doing.  But he never said, hey,

2    Andrew, so and so said they didn't get their break.

3    You know what I mean?

4         Q.  Okay.  And did Renil ever suggest to you a

5    better what way of doing things?  Was there anything

6    like that?

7         A.  No, because -- no, because Renil knew how the

8    operation was as well.  Him being a general manager,

9    he's been in that position knowing how the schedules

10   work as well.  He sees that.

11        Q.  Okay.  And Renil thought that you were

12   providing the breaks properly?

13        A.  Yeah.

14        MR. URIARTE:  Okay.  Let me show you Exhibit 8.

15        VIDEO OPERATOR:  Okay.  I will bring that up

16   shortly.

17        MR. URIARTE:  Okay.

18             (Plaintiff's Exhibit 8 marked for

19             identification.)

20        MR. URIARTE:  Are you doing a screen share on

21   that, David?

22        THE WITNESS:  I see it now.

23        MR. URIARTE:  Great.  Okay.  Do you know what

24   Exhibit 8 is?  I'll give you some time to take a look

25   at that.  Do you see that at all?

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 242 of 312

1    depends on how long you're waiting for that fuel to be

2    done, you're waiting for that mechanic to be done.  And

3    then, you know, we always serve out a break.  You know

4    what I mean?  They'd get their breaks.

5         Q.  Right.  But sometimes they'd just be --

6         A.  It just depends on how the flights are coming

7    in and stuff like that, you know.  That's how -- how we

8    ran it, you know, and that's how I was trained as well.

9    You just -- and also, like I said, sometimes you're

10   short manpower and sometimes you fuel longer a little

11   bit and then get your break.  It just depends, like I

12   said, on the schedule.

13        Q.  I see.  What about this item here with regards

14   to "Andrew Dodge lack of experience about fueling"?

15   What do you think about that?

16        A.  To be honest, that's just -- I don't know -- I

17   don't know what word he used for that, but I became a

18   supervisor because I know what I was doing.  I was

19   trained on everything.  I was actually -- at the time,

20   before Menzies bought us, I was considered a Class A

21   fueler, which is one of the top fuelers.  Like, having

22   that title is really high, meaning I know how to do

23   everything, from fueling, defueling, driving every

24   piece of equipment on the thing, knowing how to fix

25   equipment.  It's just the knowledge of fueling in

1   general, safety.  I was, like, one of the top people.

2       Q.  Okay.  Aside from this petition, did you have

3   fuelers go up to you and complain to you about their

4   breaks, like maybe they're late, maybe they're short,

5   or anything like that?

6           Was that something that was happening in or

7   around August of 2018?

8       A.  I actually had people asking me, Hey, when am

9   I going to get my break?  And, you know, they'll come

10  up to me, ask me what's going on, or can I see what

11  you're planning, and I always talk to my fuelers.

12  That's the main thing about the job, is communication,

13  communication, talking and finding out, you know,

14  plans, planning things out.

15      Q.  So why do you think these fuelers, you know,

16  all 26 of them, signed a petition against you?  Why

17  would that happen?

18      A.  Honestly, I don't know -- actually, a lot of

19  these names on here that I see people call me saying

20  that, you know, they were forced to sign a petition.

21  And they would tell me, Hey, I didn't want to sign it,

22  you know, but they were forced to sign it, or they

23  didn't read it, or stuff like that.

24      Q.  I see.  And they were forced to sign the

25  petition.  Like, do you know by whom and why they were

Case 3:19-cv-08157-VC Document 28-1 Filed 10/15/20 Page 244 of 312

1    forced to sign the petition?

2        A.  A lot of the guys -- a lot of the guys on the

3    list would call me and say Ray was telling them to sign

4    the paper to try to get me terminated or -- how do you

5    say -- demoted from being a supervisor.

6        Q.  Gotcha.  And then do you know who Rafael

7    Vasquez is?

8        A.  Yeah.  At the time, he was one -- a fueler and

9    a union representative.

10       Q.  Okay.  Did you know that it was actually

11   Rafael Vasquez who put together the petition?

12       MR. WU:  Objection.  Assumes facts not in

13   evidence.

14       MR. URIARTE:  Q.  Did you know that, Mr. Dodge?

15       A.  No, I did not.

16       MR. URIARTE:  Let's go ahead and put up Exhibit

17   10.

18           (Plaintiff's Exhibit 10 marked for

19           identification.)

20       MR. URIARTE:  Q.  So here we go.  So this one will

21   be Exhibit 10.  And as you see, it's signed by Rafael

22   Vasquez.  I think there's a date in the bottom there of

23   November 18, 2018, when he signed this statement.

24           So did you have problems with Rafael Vasquez

25   at all in or around August or November of 2018?  Were

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 245 of 312

1    you having problems with him, Mr. Dodge?

2         A.   Rafael didn't work with me on my side of the

3    airport.

4         Q.   Oh, I see.   I see.   So he's on another side of

5    the airport?

6         A.   Yes.

7         Q.   Gotcha.   Okay.   So it looks like, from this

8    statement that he signed, that says that he was asked

9    by Menzies Aviation fuelers to write a petition on

10   behalf of the fuelers on the 130 side.

11        Did you know that they -- that these fuelers

12   submitted two petitions?   Did you know that?

13        A.   No, I did not.

14        Q.   Okay.   So, based on your responses, is it fair

15   to say that nobody from Menzies Aviation ever sat you

16   down to discuss one or two petitions that were written

17   out against you at that time while it was happening?

18        A.   No.   I'm the one that brought it up to Renil,

19   saying that there was a petition going around, because

20   one of the fuelers had called me about it.

21        Q.   So you knew that a petition was going around,

22   but nobody from Menzies Aviation management ever kind

23   of, like, sat down with you or talked to you about it,

24   right?   Is that correct?

25        A.   No, I don't -- I never, no.

1    Q.  And you found out that there was a petition

2    going around against you, but you never read the actual

3    petition.  Is that how it was?

4    A.  Yeah, I never got to see it, no.

5    Q.  And you're saying that the first time you saw

6    it was actually a part of this litigation.  Is that

7    what you're saying?

8    A.  Yes.

9    MR. URIARTE:  Let's put up Exhibit 5, please.

10   VIDEO OPERATOR:  Okay.  Coming up shortly.

11   MR. URIARTE:  Thank you.

12        (Plaintiff's Exhibit 5 marked for

13        identification.)

14   MR. URIARTE:  It's not a very good copy, so I

15   guess Exhibit 5, Mr. Dodge, if we can just make it

16   smaller so he sees the whole thing.  There you go.

17   A.  Yeah.

18   Q.  Is this the letter that you wrote after you

19   found out that a petition was being turned in against

20   you?

21   A.  I can't read what I wrote, but I think this is

22   the one I wrote after I found out there was a petition.

23   One of the fuelers called me.

24   Q.  Correct.  Correct.  If you go to the bottom of

25   it, I think this is your signature, right?

1      A.   Yeah.

2      Q.   That one there?

3      A.   Yes.

4      Q.   Okay.  And did you have a meeting with Menzies

5  management about this letter at all?

6      A.   I do not recall -- I don't remember from when

7  I wrote it.  I think I wrote it during my shift, and I

8  turned it in or -- I either wrote it in the office with

9  Raul at the time or -- I just don't remember.

10     Q.   I see.  I see.  So it's possible that you

11  wrote it with the assistance of Raul.  Is that what

12  you're saying?

13     A.   Yeah, it was Raul or Renil that told me to

14  write -- write a statement.

15     Q.   And why did they tell you to write a

16  statement?  Do you know?

17     A.   Just to have it on file that they were going

18  to look into it.

19     Q.   Okay.  But how did that meeting start?  Was

20  that -- like, why did you kind of arrive at that

21  meeting?

22     A.   Like, why did I -- are you saying, like, why

23  did I write it or --

24     Q.   No.  Well, you said that you had a meeting

25  with Raul or Renil --

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 248 of 312

1    A.  It wasn't a meeting.  It was more like a --

2    like you walk in, let them know, hey, this is what's

3    going on on the operation.  Like, here's -- like this

4    is what people are telling me.

5    Q.  Okay.

6    A.  And they tell you, hey, just write statement

7    down and --

8    Q.  Okay.  Okay.  So it started with a fueler

9    calling you and saying, Hey, there's a petition going

10   around against you.  Is that how it started?

11   A.  Yes.

12   Q.  Okay.  And then, with that information, you

13   then go to Renil or Raul.  We don't know, right?  Renil

14   or Raul or both of them?

15   A.  Yeah, it was either/or.  Yeah, it was

16   either/or.

17   Q.  So you went to either one of them to tell them

18   that?  What exactly did you tell them?

19   A.  "Oh, hey, I got a phone call from a couple of

20   fuelers on my personal cell at home saying that

21   they" -- "there was a petition going around against me

22   that they didn't want to sign, but they felt forced to

23   sign it."

24        And then when I told them that -- I don't

25   remember if it was Renil or Raul -- they just told me

1    to write a statement down and to turn it in to them and

2    that they would look into it.

3        Q.   All right.   And then when you say -- how much

4    help did you get from Renil or Raul with regards to

5    writing the statement?   Like, did you guys --

6        A.   I don't know what -- like, from there on, I

7    don't know what they -- how they did their

8    investigation or anything like that.   So I just went on

9    and kept doing my job.

10        Q.   I see.   But with regards to writing the

11    statement, are these words totally yours?

12            Like, you sat there and started --

13        A.   Yeah, I went to a different office and wrote

14    this statement.

15        Q.   I see.   I see.   Okay.   And then you turned it

16    in?

17        A.   Yes.

18        Q.   Would it be not accurate to say that they

19    helped you with the words that are in this statement?

20        A.   Those are all me.   No, they didn't help me

21    with wording at all.

22        Q.   All right.   But when they said -- when they

23    told you to write this statement, did they tell you

24    what to write about?

25        A.   No.   They just said write -- like, write

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 250 of 312

1    what's going on, like, why -- you know, what you heard.

2    Stuff like that.

3        MR. URIARTE:  All right.  So we're done with

4    Exhibit 8.  I need like a five-minute break.  Let's see

5    where we are.  Let's take a five-minute break.  Off the

6    record.

7        MR. WU:  That's fine.  Thank you.

8            (Brief recess.)

9        MR. URIARTE:  Let's go back on the record.  We

10   don't have much more, but let me go through a couple

11   more here.

12       Q.  Mr. Dodge, you said that a fueler had called

13   you that a petition was going around.  Do you remember

14   who that fueler was?

15       A.  Yeah, Mario Caballero -- Caballero.  Mario

16   Caballero.

17       Q.  And you said that he felt like he was forced

18   to sign the petition or he didn't understand the

19   petition.  Is that what he said?

20       A.  When I -- when I received a phone call from

21   him, his first words, "Hey, Andrew, just want to let

22   you know there's a petition going around.  I didn't

23   want to sign it, but he made me sign it.  I'm just

24   letting you know.  I don't want to get into trouble or

25   anything."

1          And then -- and I said -- told him thank you,

2    and I would -- I said, "Thank you, and I will," you

3    know, "talk to management."

4          Q.  Okay.  And when you say "he made me sign it,"

5    who's "he"?

6          A.  He mentioned Ray Navarro.

7          Q.  Okay.  And, then, let's go back to Exhibit 10,

8    please.

9          VIDEO OPERATOR:  Hold on.  I'll bring it up.

10         MR. URIARTE:  Thank you.

11         THE WITNESS:  Okay.

12         MR. URIARTE:  Q.  So I wanted to discuss something

13   here.  It says, "There have been two separate Petitions

14   turned into Menzies Aviation Fueling Department

15   Director Raul Vargas."  Do you see that?

16         A.  Yes.

17         Q.  Okay.  Did Raul Vargas ever talk to you about

18   these two petitions?

19         A.  Sorry, can you repeat that one more time.  You

20   broke up.

21         Q.  Sure.  Did Raul Vargas ever talk to you about

22   two petitions being signed against you?

23         A.  No, he did not.

24         Q.  Did Raul Vargas ever talk to you about how you

25   give your breaks, and fuelers complaining against you,

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 252 of 312

1    or anything like that?

2         A.  No, he did not.

3         Q.  Did anybody from Menzies, you know, from John

4    Qually, the duty mangers, or Renil Lal at that time,

5    did any one of them kind of, like, talk to you about

6    maybe, you know, you giving your breaks better or

7    having some sort of plan of action?

8         A.  Like I said before, Renil and I spoke, but he

9    just wanted -- he reviews my schedules.  I used to turn

10   in -- we'd turn, like, you know, a shift report in

11   every night.

12        Q.  Okay.

13        A.  And, also, I would turn in my schedules to him

14   so he would see everything written down, so -- from

15   what I did.  So, basically, for example, with let's say

16   fueler A, I'd write down his flights, and in the middle

17   I'll put a "B," stands for break, and what else he did.

18   You know what I mean?  And then I also -- he could

19   research the times, you know, because -- with the phone

20   app or online.

21        Q.  Okay.  And you went through -- you went

22   through meetings with Renil Lal about that in around

23   August of 2018?

24        A.  I -- I don't remember the time or date, any of

25   that.

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 253 of 312

1      Q.   Did Mr. Lal ever tell you that he was doing

2    that as part of, you know, investigating these

3    petitions against you?

4      A.   No.   He one time mentioned that Ray was

5    complaining, so he just wanted to see what I did

6    compared -- you know, compared to other supervisors and

7    how they were doing their schedules.

8      Q.   I see.   And -- okay.   And out of those

9    meetings, was any kind of -- was there any

10   recommendation given to you as to, like, do your job

11   better, or was there any comment or anything like that?

12     A.   I don't recall what he said to me at all.

13     Q.   Did you have to change the way you were doing

14   things in order to give your breaks better or something

15   like that?

16     A.   No.   Up until March, I was doing the same way.

17     Q.   And you're saying up until March of 2020?

18     A.   Yeah, until I got furloughed, yes.

19     Q.   Okay.   Also in Exhibit 10, it says, "I have

20   spoken to The Menzies Aviation Fueling Director Raul

21   Vargas on three separate occasions regarding Mr. Dodge,

22   who continues to abuse his authority and at times

23   harass Fuelers under his charge."

24          Do you see that?

25     A.   Yes, I do see that.   Yeah.

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 254 of 312

1    Q.  What do you think -- what's your opinion on

2    that with regard to Rafael Vargas stating that you

3    continue to abuse your authority?

4         Do you know anything about that?

5    A.  I mean --

6    MR. WU:  Objection.  Assumes facts not in

7    evidence.

8         But you can answer.

9    MR. URIARTE:  Q.  Mr. Dodge?

10   A.  Sorry.  Okay.  I -- I mean, from when I see

11   that, I can tell you that's just not true.  I mean,

12   I've never harassed any of my employees or any of that

13   type of circumstance.

14   Q.  I see.  When you say -- when it says "abuse

15   his authority," like how would you be able to abuse

16   your authority during your shifts?

17   A.  Honestly, I don't know how I could abuse my

18   authority to this current day.  I'm still a supervisor

19   here --

20   Q.  I see.

21   A.  -- with the same employees.

22   Q.  I'm sorry.  What was that?

23   A.  I said I'm still a supervisor here with the

24   same employees.

25   Q.  Okay.  And have any fuelers gotten a complaint

Case 3:19-cv-08157-VC Document 28-1 Filed 10/15/20 Page 255 of 312

1    against you that you were harassing them?

2        A.   No.

3        Q.   Have any of the fuelers ever come up to you

4    and said, hey, Andrew, you know, you're doing this

5    wrong, or, you know, complained to you about not giving

6    their breaks, or them working too hard because you're

7    not doing your job?   Anything along those lines?

8        A.   I've had fuelers just come up to me and try

9    to, like, give suggestions on how they want to -- how

10   they see things -- on how they see things, but, you

11   know -- and then I have to explain to them what's going

12   on, and I'd show them, and they would understand.

13   That's about it.

14        But I've never had -- I've had someone coming

15   up to me asking when they would get their break, and I

16   would explain to them as well, you know, the situation,

17   and they would understand.

18       Q.   I see.  All right.  Can we go back to Exhibit

19   5, please.  Okay.  I know it's hard to read, but I was

20   going to start with -- well, that first sentence kind

21   of ends with "the company don't need me, that I'm a bad

22   supervisor, and all I do is cause delays."

23        What do you mean by that, "all I do is cause

24   delays"?

25       MR. WU:  Objection.  Objection.  Assumes facts not

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 256 of 312

1    Q.  Oh, okay.  So he told Ray not to come early

2    anymore.  Do you see that?

3    A.  Okay, yeah.  That's a -- yeah, yeah.

4    Q.  So that would be Jeff Cook or --

5    A.  No, that's Jeff -- I don't remember his last

6    name.  I can get his last name for you, but I just

7    don't remember his last name.

8    Q.  And that Jeff -- that Jeff, you said, works

9    for Menzies in Seattle International?

10   A.  Yeah, that's his main station, yes.

11   Q.  I see.  So how come he would get involved in

12   telling Ray not to come in early?

13   A.  So the reason -- we were going through a

14   transition, you know, from ASIG to Menzies.  At the

15   time, Renil was the acting general manager.  Raul

16   Vargas was the director -- new director we had, so they

17   were getting things together.  So Jeff would come down

18   and help our station.

19   MR. URIARTE:  Gotcha.  Okay.  I have no further

20   questions.

21   MR. WU:  No questions on my end either.

22   MR. URIARTE:  Okay.  Thank you, Mr. Dodge.  Thank

23   you for your time today.  Thank you for providing this

24   deposition.

25   THE WITNESS:  You're welcome.

1          (Whereupon, the deposition

2     concluded at 10:32 o'clock a.m.)

3               ---o0o---

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 258 of 312

1               CERTIFICATE OF WITNESS

2                     ---o0o---

3

4        I, ANDREW DODGE, hereby declare under

5   penalty of perjury that I have read the foregoing

6   deposition testimony; and that the same is a true

7   and correct transcription of my said testimony

8   except as corrected pursuant to my rights under

9   Rule 30(e) of the Federal Rules of Civil

10  Procedure.

11

12        _____

13                      Signature

14        _____

15                        Date

16

17

18

19

20

21

22

23

24

25

1    STATE OF CALIFORNIA      )
                              )
2    COUNTY OF SAN FRANCISCO  )

3          I, CINDY TUGAW, a Certified Shorthand Reporter

4    of the State of California, duly authorized to

5    administer oaths pursuant to Section 8211 of the

6    California Code of Civil Procedure, do hereby certify

7    that

8                       ANDREW DODGE,

9    the witness in the foregoing deposition, was by me duly

10   sworn to testify the truth, the whole truth and nothing

11   but the truth in the within-entitled cause; that said

12   testimony of said witness was reported by me, a

13   disinterested person, and was thereafter transcribed

14   under my direction into typewriting and is a true and

15   correct transcription of said proceedings.

16         I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   caption.

21         Dated the 7th day of August, 2020.

22

23

24

25              CINDY TUGAW
                CSR No. 4805 (California)

1    Andrew Dodge
     c/o Foley & Lardner
2    555 California Street, Suite 1700
     San Francisco, CA 94104
3    Attn:  Jason Y. Wu, Esq.

4    Date:  August 7th, 2020
     Re:  Navarro vs. Menzies Aviation
5    Deposition Date:  Tuesday, July 28, 2020

6    Dear Mr. Dodge,

7         Please be advised the original transcript of
     your deposition is ready for your review.
8         Pursuant to FRCP Rule 30(e), you have
     30 days following the date of this notice to read,
9    correct if necessary, and sign your transcript unless
     the attending parties and the deponent agree on the
10   record or otherwise in writing to a longer or shorter
     time period.  The deponent may change the form or the
11   substance of the answer to a question, and may either
     approve the transcript of the deposition by signing it,
12   or refuse to approve the transcript by not signing it.
     You are not required by law to read and sign your
13   deposition transcript.  All parties will be informed of
     the corrections.  The original transcript will then be
14   sealed and sent to the examining attorney pursuant to
     the applicable law.
15        You may either come to our office to read and
     sign the original transcript, or you may contact your
16   attorney or the attorney who arranged for you to be
     present at your deposition.  If they have ordered a
17   copy of the transcript, you may review their copy and
     make corrections by submitting, signing and returning
18   the attached form.  If you choose to review your
     transcript at our office, please call first to make an
19   appointment.  Should you have any question regarding
     these instructions, please call.
20
     Sincerely,
21


22
     NOGARA REPORTING SERVICE
23   5 Third Street, Suite 415
     San Francisco, California 94103
24   (415) 398-1889
     cc:  All counsel, original deposition
25

# EXHIBIT 18



# Job Description, Fueling Supervisor (North America)

**Department**:     Los Angeles-Fueling
**Reports To:**     Manager
**FLSA Status:**    Non-Exempt (Hourly)

## Job Purpose Summary: Supervises and coordinates air carrier fueling and service operations.

## Primary Accountabilities and Duties:

- Comfortably and continuously lift/move 70 lbs.
- Duties include, but are not limited to;
- Ensuring the effective operation of the air carrier fueling function;
- Issuing written and oral instructions;
- Ensuring workforce adherence to safety procedures;
- Conduct investigations of irregular operations, such as accidents, injuries and/or delay, and prepare comprehensive reports on same;
- Recommending manpower requirements;
- Maintaining harmony among workers and resolving grievances;
- Performing or assisting subordinates in performing duties;
- Ensuring disciplinary procedures are conducted in accordance with e in a fair, timely, and consistent manner;
- Uphold the company's commitment to Equal Employment Opportunity; Carrying out supervisory responsibilities in accordance with the organization's policies and applicable laws;
- Ability to comply with attendance/tardiness standards.

## Essential Skills and Qualifications:

- Must be at least 18 years of age.
- 1 year certificate from a college or technical school 6 months to 1 year job related experience preferred
- Valid Driver's License Possess/Maintain a valid Driver's License and other government agency required identification/seals or authorizations
- Must be able to speak, read, and write in English
- Ability to perform basic math calculations
- Must pass pre-employment drug test
- Must be available and flexible to work variable shifts including weekends and holidays Work is done indoors and outdoors.
- Must be comfortable working in all weather conditions with exposure to loud noises
- Able to routinely lift, push and pull up to 70 lbs.

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF  

## Employee Acknowledgement

I, _____, acknowledge review of this job description.  I realize that it is subject to change or amendment as deemed appropriate by Menzies Aviation.

I also understand that all job duties are not described above and that I will be expected to perform other related duties as directed by my supervisor and management.

Signature: _____ Date: _____



EXCELLENCE FROM TOUCHDOWN TO TAKEOFF

MENZIES_000203

# EXHIBIT 19



MENZIES
AVIATION

# EMPLOYEE HANDBOOK

## California

## TABLE OF CONTENTS

1.1 Purposes Of This Handbook ........................................................................................ 4

1.2 Company Values ........................................................................................................ 4

2.1 Employment-At-Will .................................................................................................. 5

2.2 Introductory Period .................................................................................................... 5

2.3 Employment Eligibility Verification ............................................................................ 5

2.4 Equal Employment Opportunity ................................................................................. 5

2.5 Zero Tolerance For Discrimination And Harassment .................................................. 6

2.6 Reasonable Accommodation ..................................................................................... 8

2.7 Open Door Policy ....................................................................................................... 8

2.8 Safety Policy .............................................................................................................. 8

2.9 Security Policy ........................................................................................................... 9

2.10 Use Of Electronic Devices ...................................................................................... 10

2.11 Training .................................................................................................................. 10

2.12 Railway Labor Act Notice ....................................................................................... 11

3.1 Part-Time and Full-Time Employees ........................................................................ 12

3.2 Exempt And Non-Exempt Employees ...................................................................... 12

3.3 Working Hours and Days .......................................................................................... 12

3.4 Meal Periods ............................................................................................................ 12

3.5 Rest Periods ............................................................................................................. 13

3.6 Employee Rest ......................................................................................................... 13

3.7 Overtime .................................................................................................................. 14

3.8 Transfers and Promotions ........................................................................................ 14

3.9 Payroll Schedules ..................................................................................................... 15

3.10 Employee Pay ......................................................................................................... 15

3.11 Personnel Records .................................................................................................. 15

4.1 Code of Conduct ...................................................................................................... 16

4.2 Progressive Discipline .............................................................................................. 17

4.3 Attendance .............................................................................................................. 18

4.4 Alcohol and Drug Abuse .......................................................................................... 18

4.5 Uniform Attire & Appearance .................................................................................. 20

4.6 Conflict of Interest ................................................................................................... 21

5.1 Health And Welfare Benefit Plan ............................................................................. 22



EXCELLENCE FROM TOUCHDOWN TO TAKEOFF

5.2 Eligibility ........................................................................................................... 22

5.3 Benefit Election Period ....................................................................................... 22

5.4 COBRA ................................................................................................................ 23

5.5 Vacation, Sick Leave And Paid Time Off ............................................................ 23

5.6 Family and Medical Leave Act ............................................................................ 23

5.7 Pregnancy Disability Leave ................................................................................ 25

5.8 Bereavement Leave ............................................................................................ 26

5.9 Military Leave ..................................................................................................... 26

5.10 Voting Time Off ................................................................................................ 26

5.11 Time Off For School Activities ......................................................................... 26

5.12 Workers' Compensation ................................................................................... 27

6.1 Internet Use ....................................................................................................... 28

6.2 E-Mail Use .......................................................................................................... 29

6.3 Voice Mail ........................................................................................................... 29

6.4 Monitoring Of Email And Internet Usage .......................................................... 29

6.5 Use Of Company Property .................................................................................. 29

6.6 Confidential Information Security ...................................................................... 30

6.7 Non-Solicitation/Disclosure ............................................................................... 31

6.8 Bulletin Board ..................................................................................................... 31

6.9 Travel .................................................................................................................. 31

6.10 Claiming Business Expenses ............................................................................. 31

6.11 Personal Belongings ......................................................................................... 31

6.12 Media Communications .................................................................................... 32

7.1 Resignation, Termination and Layoff ................................................................ 32

7.2 Exit Interview ..................................................................................................... 32

7.3 Terminations ...................................................................................................... 32

7.4 Layoff .................................................................................................................. 32

7.5 Final Paycheck .................................................................................................... 32

7.6 Employment References .................................................................................... 33

## SECTION 1 - INTRODUCTION

### 1.1 Purposes Of This Handbook

This Employee Handbook is intended to explain some of the key terms and conditions of employment on a non-exempt basis with the Menzies Aviation family of companies, which includes Menzies Aviation, Aeroground, ASIG and Simplicity (USA).   This version of the Employee Handbook supersedes all previously issued handbooks.

Every employee is expected to read this Employee Handbook carefully as it is a valuable reference for understanding your employment.  The Company reserves the right to revise, modify, delete, and/or add to any and all policies, procedures, work rules, or benefits stated in this Employee Handbook or in any other document.  No oral statements or representations can in any way alter the provisions of this Employee Handbook.   This Employee Handbook is not a contract of employment.

Not all Company policies and procedures are set out in this Employee Handbook.  We have summarized only some of the more important ones.  Additionally, if your employment is subject to a different contract setting forth terms and conditions of employment, in the event of a conflict between that contract and the provisions of this Employee Handbook, the contract will govern. If you have any questions or concerns about this Employee Handbook or any other policy or procedure please ask your local Human Resources representative.

### 1.2 Company Values

**Spirit** is our way of doing business. It represents the core values that our employees must adhere to in doing their job. These values are:
**S**afety and Security
We take responsibility for the safety and security of ourselves, our customers, and our co-workers.
**P**assion
We work hard and enjoy our job, we do it to the best of our ability, and we put the customer at the heart of everything we do.
**I**nnovation
We encourage and reward ability and creativity, look for better ways to do our job, and have a "can do" attitude open to new ideas.
**R**eliability
We take pride in our work, we do it well, and we follow through on commitments to consistently deliver the best to our customers.
**I**ntegrity
We treat others with dignity and respect, we are trustworthy, and we act with high professional, moral, and ethical standards in supporting Company goals, values, and decision-making.
**T**eamwork
We participate and involve others in team efforts, we cooperate with others and share resources, we see things from the "other point" of view, and we take responsibility to fix mistakes so that they don't happen again.

MENZIES_000302

## SECTION 2 – GENERAL EMPLOYMENT POLICIES

### 2.1 Employment-At-Will

Employment with the Company is at-will, meaning that either you or the Company can terminate your employment at any time, with or without cause or notice. This policy of at-will employment is the sole and entire agreement between you and Company as to the duration of employment and the circumstances under which employment can be terminated.

Nothing in this Employee Handbook or any other Company policy alters or modifies the at-will nature of your employment.  This policy of at-will employment may not be modified orally or in writing by any individual or document other than by a written employment agreement signed by the Senior Vice President, Americas.  The Company's policy of at-will employment further allows it in its sole discretion to modify or change any terms or conditions of employment, including, but not limited to, assigning duties to employees outside their customary assignments.

### 2.2 Introductory Period

The first 90 days of employment are considered an Introductory Period. During this period, your supervisor will work with you to help you perform your job successfully. This period provides you with the opportunity to evaluate your job satisfaction and provides the Company with the opportunity to evaluate your performance. Employees who complete the Introductory Period are not automatically entitled to a salary increase, transfer, promotion, job reclassification, or continued employment.

### 2.3 Employment Eligibility Verification

U.S. immigration law prohibits employers from recruiting, hiring, or continuing to employ undocumented immigrants who are not eligible to work in the United States. The Immigration Reform and Control Act (IRCA) establishes employment eligibility verification procedures that all employers must follow when filling a job vacancy. IRCA also prohibits employers from discriminating in recruitment, hiring, or discharge on the basis of national origin or citizenship status.

The U.S. Citizenship and Immigration Services within the Department of Homeland Security administers and enforces regulations implementing IRCA's requirement that employers verify employees' legal authorization to work. Under the regulations, employers must obtain from each new employee certification of identity and authorization to work in the United States. If you are not legally authorized to work in the United States or become unauthorized, you must inform Human Resources immediately.

### 2.4 Equal Employment Opportunity

The Company is an equal opportunity employer and makes employment decisions exclusively on the basis of merit.  The Company prohibits unlawful discrimination based on race, color, creed, sex, religion, age, national origin or ancestry, citizenship, physical or mental disability, military or veteran status, marital status, medical condition, genetic information, sexual orientation, gender, gender expression or identity, or any other category protected by federal, state, or local law.  All such discrimination is unlawful and all individuals employed by Menzies Aviation are prohibited

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF



from engaging in this type of conduct. The Company further will make all employment decisions, including but not limited to, recruitment, hiring, promotion, retention, compensation, training, discipline and termination of employment decisions without regard to any characteristic protected by federal, state or local law.

## 2.5 Zero Tolerance For Discrimination And Harassment

Pursuant to its policy of equal employment opportunity, the Company is committed to compliance with all applicable laws providing equal employment opportunities and has therefore adopted a policy of zero tolerance with respect to workplace discrimination and harassment. This policy of zero tolerance for discrimination and harassment applies to all individuals at every level of the Company's operations and prohibits harassment or discrimination against any employee whether or not the incidents occur on Company premises and whether or not the incidents occur during working hours. Supervisors, co-workers and third-parties with whom Company employees encounter through their job duties are prohibited from engaging in unlawful behavior under both federal law and the California Fair Employment and Housing Act ("FEHA").

**Sexual Harassment**
The Company's policy of zero tolerance for discrimination and harassment includes a zero tolerance policy with respect to unlawful sexual harassment. Sexual harassment is a form of unlawful sex discrimination that occurs when an employee is subject to unwelcome sexual attention or conduct affecting the terms or conditions of employment. Sexual harassment includes sexually oriented conduct which is sufficiently pervasive or severe and that unreasonably interferes with an employee's job performance or creates an intimidating, hostile, or offensive working environment. Examples of unlawful sexual harassment include unwanted sexual attention from co-workers of a persistent or offensive nature, promises to an employee to reward an employee if he or she complies with a sexually-oriented request or a threat of adverse treatment for refusing a sexually-oriented request, engaging in sexually suggestive and unwelcome behavior in the workplace, such as touching another employee, making sexually explicit commentary, leering or ogling at another employee, commenting inappropriately on a co-worker's physical appearance, displaying, storing, or transmitting pornographic or sexually oriented messages or materials in the workplace or using Company equipment or facilities to do so, making sexual or romantic advances toward an employee who has previously rejected such advances, and/or retaliating against an employee for reporting or threatening to report sexual harassment, or for participating in a Company investigation into an allegation of sexual harassment.

**Other Types Of Unlawful Harassment**
The Company's policy of zero tolerance for discrimination and harassment also includes a zero tolerance policy with respect to unlawful harassment on the basis of race, color, creed, sex, religion, age, national origin or ancestry, citizenship, physical or mental disability, veteran status, marital status, medical condition including genetic characteristics, sexual orientation, gender expression or identity, or any other category protected by federal, state, or local law. Such harassment may include behavior similar to unlawful sexual harassment, such as making threats or racially motivated slurs, epithets, derogatory jokes or commentary, displaying derogatory or offensive posters, photographs, cartoons or drawings, making offensive or racially-motivated gestures, and/or retaliation for reporting harassment or threatening to report harassment.

## Employee Responsibilities

You **must** immediately report, preferably in writing, every instance of perceived discrimination or harassment to your supervisor or Human Resources, regardless of whether you or someone else is the subject of the discrimination or harassment. If you are not comfortable making such a report or complaint to anyone at your location, you **must** report your concerns to the Regional HR Director in the first instance. You should provide as much detail as possible in your complaint or report and include names, dates, descriptions, documents and actual events or statements made so that the Company can perform as thorough an investigation as possible and take appropriate remedial measures where inappropriate conduct has been found to have occurred. The Company will make reasonable efforts to protect the privacy of any employee who makes a complaint or report of discrimination or harassment or who supplies any information pertaining to an allegation of discrimination or harassment, but, due to the Company's obligation to thoroughly investigate all allegations of discrimination or harassment, it cannot guarantee complete confidentiality with respect to any allegation or report of discrimination or harassment.

Employees may also direct any complaints of harassment or discrimination to the California Department of Fair Employment and Housing ("DFEH") or to the Equal Employment Opportunity Commission ("EEOC"). Contact information for the DFEH and the EEOC field office nearest an employee's work location can be found in the telephone directory.

## Supervisor/Manager Responsibilities

Supervisors and managers must deal quickly and fairly with all allegations of discrimination or harassment, whether or not there has been a written or formal complaint. This responsibility requires that a supervisor or manager receiving a complaint or report of discrimination or harassment, or witnessing conduct that may constitute unlawful harassment, to immediately report the fact of the complaint and any supporting information to Human Resources, ensure that an investigation is immediately commenced, and take appropriate corrective action pursuant to guidance provided by Human Resources. Supervisors and managers who tolerate discrimination or harassment and/or who fail to comply with any the responsibilities listed above will be subject to disciplinary action, up to and including termination of employment.

## Investigation

Every good faith complaint of discrimination and harassment will be followed by a fair, complete and timely investigation.  The investigation will be as thorough as possible based on the information provided to the Company. Menzies Aviation will attempt to keep the investigation as confidential as is reasonably possible and will disclose information pertaining to a complaint or report of discrimination or harassment on a strict "need to know" basis, but cannot guarantee complete confidentiality due to its obligation to thoroughly investigate every allegation of discrimination and harassment.  Interference with an investigation into a complaint of alleged harassment or discrimination is prohibited, and will result in disciplinary action up to and including termination of employment.  Likewise, a complaint of harassment or discrimination that is found to have been made in bad faith will subject the complainer to disciplinary action, up to and including termination of employment.  However, where the investigation into a complaint of alleged harassment or discrimination does not reveal a violations of this policy, that does not necessarily mean the complaint was made in bad faith.



**Discipline**

Employees found to have violated the Company's policy of zero tolerance with respect to discrimination and harassment are subject to disciplinary action, up to and including immediate termination of employment.

**Prohibition On Retaliation**

The Company will not tolerate retaliation toward any individual who submits a complaint of discrimination or harassment, who provides any information pertaining to an alleged incident of discrimination or harassment or who participates in an investigation into an alleged incident of discrimination or harassment. Any individual found to have retaliated against anyone for making a complaint or providing information relating to an alleged incident of harassment or discrimination will be disciplined, up to and including discharge from employment.

## 2.6 Reasonable Accommodation

The Company will not discriminate against qualified individuals with disabilities in any aspect of the employment relationship, and will attempt to reasonably accommodate a qualified individual with a known physical or mental disability to enable the employee to perform the essential functions of his or her job, unless doing so would create an undue hardship or pose a direct threat to the employee or others. The Company further will not discriminate against any individual based on his or her sincerely held religious beliefs and practices, and will attempt to reasonably accommodate an individual's sincerely held religious beliefs and practices.

Employees who believe they require or who are requesting an accommodation related to their disability in order to perform the essential functions of the job or an accommodation for their sincerely held religious beliefs and practices should contact both their supervisors and the Human Resources Department and describe the specific accommodation requested or required. The Company will communicate directly with the employee to explore possible accommodations and attempt to work out a mutually agreeable resolution.

## 2.7 Open Door Policy

The Company strives to maintain a positive work environment for all of its employees, and therefore maintains an open door policy and encourages employees to feel free to bring forward and discuss openly any work related concerns. No employee will be retaliated against for bringing forward any work-related concerns pursuant to this open door policy.

## 2.8 Safety Policy

Employee safety is the Company's top priority. Employees must comply with all safety regulations, whether established by the Company or by federal, state, or local law. Employees must report any/all safety hazards to their direct supervisors or the safety department.

The Company maintains a comprehensive Safety Manual that is regularly updated to ensure employees are aware of the most up-to-date safety standards. Employees are responsible for being familiar with the standards and protocols contained in that Safety Manual. However, due to the critical importance of safety in all that the Company does, highlights of the Safety Program are also repeated in this Handbook.

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF



# SECTION 4 – PERFORMANCE STANDARDS

## 4.1 Code of Conduct

Employee conduct is governed by certain rules and policies that are intended to ensure orderly operations and protect the interests and safety of all individuals. It is not possible to list all the forms of behavior that are considered unacceptable in the workplace.  However, the following are examples of conduct that may result in disciplinary action, up to and including immediate termination of employment:

- Possession, distribution, consumption, or being under the influence of alcohol or illicit and/or illegal drugs (including non-prescription use of legal drugs) during working hours and/or while on Company or customer premises;
- Unauthorized possession, removal, theft, misappropriation or use of Company funds or property belonging to any employee, passenger or client, or to the Company;
- Falsification of employment records (including recording the work time of another employee or allowing any other employee to record your work time), employment information, or other records;
- Willful damage or destruction of property of another, which includes negligence or improper conduct leading to damage of said property;
- The possession or use of any firearm or weapon on the job, or on Company or customer premises, unless expressly permitted by law;
- Failure to effectively perform job duties;
- Insubordination, including but not limited to failure or refusal to obey reasonable work-related orders or instructions of a supervisor or manager, failure to follow any work guidelines or Company policies, and the use of abusive, malicious and/or threatening language or conduct toward any coworker, customer, passenger, or client of the Company that causes or tends to cause a threatening, hostile or intimidating work environment;
- Failure to properly follow notification rules when unable to report to work;
- Failure to observe working schedules, including any scheduled or required break periods;
- Unauthorized or excessive absenteeism or tardiness;
- Sleeping on the job and while on working time;
- Working overtime without authorization or refusing to work assigned overtime;
- Gross misconduct while on Company property, or while conducting Company business, including: attempting bodily injury, fighting or threatening violence, boisterous or disruptive activity that interferes with your job duties, others' job duties, or passenger service;
- Sexual, racial, religious, ethnic, or any other unlawful harassment or discrimination;
- Violation of any safety or any security rule;
- Unauthorized disclosure of confidential financial data (not including information about your personal wages, benefits or terms and conditions of employment), or other non-public proprietary information of the Company, its business partners, or customers;
- Unauthorized use of airport identification badge or identification;
- Failure to report any employee injury or damage to Company or customer equipment;
- Wagering, betting, gambling, or encouraging such behavior on Company property; and
- Concealment or working time use of any video camera equipment, tape recorder, CD player, radio or other audio visual device, or the failure to report the concealment or use of these devices without supervisory approval.



EXCELLENCE FROM TOUCHDOWN TO TAKEOFF

Nothing in the foregoing Standards of Conduct modifies in any way the at-will nature of employment with the Company.

## 4.2 Progressive Discipline

The Company enforces work rules through discipline as necessary in order for the Company to maintain order, promote safety, and ensure quality work. The Company's progressive discipline policy is intended to correct misconduct or improper behavior with the goal of eliminating future occurrences of inappropriate conduct, though in certain circumstances immediate termination of employment may be deemed by the Company, in its sole discretion, to be necessary.

Depending on the nature of and severity of the inappropriate conduct, the Company may discipline employees through any of the below disciplinary steps. Repeated instances of inappropriate conduct will generally result in progression through the following disciplinary steps toward termination of employment. However, progressive discipline is not a "one size fits all" approach, and the Company may in its sole discretion skip one or more disciplinary steps. Furthermore, nothing in the Company's progressive discipline policy creates any expectation of continued employment or in any way alters the at-will nature of employment with Menzies Aviation.

**Formal Or Informal Counseling**
A supervisor or manager will meet with the employee, explain the unsatisfactory behavior and establish that the employee understands what is expected. The fact of the formal or informal counseling will be documented by the supervisor or manager and placed in the employee's personnel file.

**Coaching**
As with counseling, a supervisor or manager meets with the employee to discuss the unsatisfactory behavior and establish what is expected of the employee, notifying the employee that he or she has received a verbal warning. The supervisor or manager will document the discussion and a follow-up counseling date to determine whether or not the performance or conduct issue has been corrected. The verbal counseling documentation is placed in the employee's personnel file.

**Written Warning**
A written warning is the result of a more serious violation or a second violation addressed in a prior counseling session or verbal warning. A memo or reprimand is given to the employee and a copy is placed in his or her personnel file. Written warnings may take the form of a "final" warning indicating that subsequent unsatisfactory behavior will result in termination of employment.

**Suspension**
The employee is sent home without pay for a defined period of time depending on the seriousness of the offense and prior disciplinary action taken. During the suspension, the Company will assess the severity of inappropriate conduct and may decide to terminate the individual's employment upon return from suspension. Employees who are not terminated at the conclusion of a suspension are deemed to be on "final" warning.



**Discharge**

Termination of employment may either be the result of continuous and uncorrected behavior that has been addressed through previous disciplinary steps or the result of a single instance of inappropriate conduct depending on the nature of infraction.

## 4.3 Attendance

In any organization such as ours, where the flow of work depends upon the cooperation, coordination and teamwork of a number of people, the absence or tardiness of one person can delay and interfere with the work of others.  As part of the expectation that employees conduct themselves in a professional manner, the Company requires employees to report to work as scheduled, on time and ready to start their job duties.  The Company also requires employees to remain at work for the duration of their entire shift, except for any meal or break periods, or where otherwise excused from work by a supervisor.

The Company maintains a formal and separate attendance policy with which you are expected be familiar.  Generally speaking, under that policy, failure to comply with attendance requirements will result in disciplinary action for unexcused tardiness, unauthorized absence, or no-call/no-show absence.   Three (3) consecutive no-call/no-shows is considered job abandonment and will result in immediate termination of employment.   Other attendance violations will normally be addressed through the disciplinary steps set forth in the separate written attendance policy, though the Company may in its sole discretion address employee attendance concerns in a manner different from the separate written attendance policy.

Under some circumstances, absence or tardiness on your part may be excused, but only if you give proper notice as described in the attendance policy of such a problem before the start of your shift so that other arrangements can be made to cover your absence, if necessary.

## 4.4 Alcohol and Drug Abuse

The Company is committed to providing employees, customers, and the general public with a safe, comfortable, and productive work environment. As part of our effort to provide a drug-free work environment, new employees must undergo a pre-employment drug test. As a condition of employment, employees must agree, in writing, that drug test results may be furnished and used by the Company. Refusal by an applicant or employee to submit to a drug or alcohol test administered in accordance with this policy, or refusal to permit the test results from being furnished to the Company will result in the employee's termination for violation of this policy. Applicants and employees who are subject to Department of Transportation regulations may be subject to separate testing requirements.

The Company does not discriminate against employees with drug or alcohol addictions on the basis of that addiction, but does reserve the right to discipline employees who violate this policy.

Employees who are prescribed medical marijuana must also comply with this policy.  The Company does not discriminate against employees for engaging in lawful activities outside the workplace during non-working hours, so long as such lawful activity does not violate this policy or otherwise inhibit an employee from performing his or her job duties.



EXCELLENCE FROM TOUCHDOWN TO TAKEOFF

# EXHIBIT 20



John Menzies plc 

# Code of Conduct

MENZIES_000332

**Welcome** to the new Code
John Menzies plc. This is ou
right thing, at the right time
Our Code provides a set o
to guide us all in our decis
the behaviour expected o

Our Code applies to ever
every level within our bus
it underpins is fundamen
the Group. It is critical that
to understand and comply
the Group's policies more
everyone to conduct busi
integrity and refrain from
could harm our reputatio
Failure to do so puts our

We operate in over 35 cour
conflict with this Code. If t
local practices that violate
concerns about someone

No code of conduct can
unsure about a decision
Compliance.

Please have the courage
may, breach our Code. Yo
against anyone raising co

Thank you for your co-op

John Geddes



# CONTENTS

**Our Code**                                    4

**Everyone, Everywhere**                        5

**Key Principles**                              6

**Our People**                                  8

**Our Integrity**                              12

**Our Assets**                                 18

**HSSE & Risk Management**                     24

**What Should I Do?**                          28

**Reporting A Violation Of Our Code**          30

**Guidance For Managers**                      32

MENZIES_000333

# EVERYONE,

Our Group operates in over ~
bound together by shared

Our Code applies to every
Group companies (includi
interest). There are no exp

You have a responsibility f

# OUR CODE

Our Code of Conduct details the values, ethics and behaviours we expect and promote to help guide our People make the correct choices in a consistent and ethical manner, whatever we do and wherever we do it.

This Code is our roadmap and compass for doing business the right way.

Whether you are new to the Group or have been with us for many years, it is important you become familiar with this Code, understand it, and apply it in all that you do.

**Board** – The Board of Directors of the Company is ultimately responsible to the Company's stakeholders for all policies and activities of the Group and the approval of the Board is required prior to the adoption of any material policy or the taking of any significant action. Any changes to the divisional or legal structure of the Group must also be approved by the Board.

Details of the Board and its Committees can be found on our website at: http://www.johnmenziesplc.com/investor-centre/corporate-governance/our-committees/.

**HELPFUL RESOURCES**

MENZIES_000334



# OUR PEOPLE

## OUR PRINCIPLES

Our People are our most highly-valued resource: our operational performance and delivery of shareholder value are dependent upon attracting and retaining a highly-skilled, motivated and talented employee base. We are committed to having a diverse workforce and creating a workplace that promotes mutual trust and respect. Everyone should feel they are treated with dignity and empowered to reach their full potential.

Employees with any concerns or issues are encouraged to discuss these with their Line Manager or an HR representative to ensure prompt resolution.

## OUR EXPECTATIONS

### A WORKPLACE FREE FROM HARASSMENT AND INTIMIDATION

We all have a right to work free from intimidation and harassment and in an environment where we feel safe and comfortable. Any form of abuse or harassment is strictly forbidden and this includes actions that might reasonably be considered to be offensive or discriminatory.

We expect all employees to treat each other with courtesy, dignity and respect.

> Help create a work environment free from harassment and intimidation.
Report any incidents to your Line Manager or HR representative.

### DIVERSITY AND INCLUSION

We actively promote tolerance and diversity at every level of our business. As a global organisation, we aim for a workforce that is representative of the societies in which we operate.

As such, we are committed to providing equal opportunities and avoiding any form of unfair discrimination in the workplace. We seek to create an environment of inclusion and acceptance.

### EQUAL OPPORTUNITIES

Our policies and procedures for recruitment, training, promotion and reward promote equality of opportunity, regardless of background and personal circumstances.

> All work-related decisions are based on merit, not on race, colour, national origin, religion, gender, age, sexual orientation, gender identity, marital status, disability or any other characteristic protected by applicable laws.
> Offensive remarks, messages or jokes and inappropriate behaviour are never acceptable and will not be tolerated.

MENZIES_000336







## How to contact us:

If, having read this Code of Conduct, you require further information, you should contact:

Group Compliance
John Menzies plc
2 Lochside Avenue
Edinburgh
EH12 9DJ

+44 (0)131 225 8555

compliance@johnmenziesplc.com

MENZIES_000350

# EXHIBIT 21

It has been Very hard latley to work with Co-worker
Ray Navarow he dhas been very rude to me by telling me that
the company dont need me, that Im a bad Supervisor, and all I do
IS Cause delays. I try to Igrore him but he follows me
around & loves to make a big Scene in front of other workers,
then that's were I get upset and tell him to Stop and go
do his Job. but he keers following me making hand gestures
but also saying he will turn in a petition against me.
One more thing he Says I steal time when I'm on AoA
Working making Sure the transition goes Well I'm off at
11 but sometimes $ Stuff heppens on the AoA before So I
Stay to help & Solve, Ray shows up at 5:30 or 9 pm when
Renil told him not to come early anymore to Come in
Jeff    at his time.

                    Andrew Dodge 8-16-18

MENZIES_000089

Mon, Aug 13, 2:24 PM

Here it is again about the petition but this time it's from his own words about it he causing a lot of issues with the guys again

 calling out

Ray Navarro

 Im not feeling well

Who is the bad supervisor maybe you because everytime you are the supervisor more people call in see right now 4 guys call in and remenber all people sign to that petition agains you but i never submit it yet

All the delay to your

# EXHIBIT 22

To     :     Menzies Management

Sir/ madam,

We the fuelers on Menzies 130 side would like to make a petition against Andrew Dodge. The way he supervised is very unprofessional when he run the operation or supervised, people are not taken their breaks it's because the way he set up the flights, and he always blaming the people there's a delay or always saying lack of man power and trucks issues. The truth is he doesn't know how to run the show, we also addressed the problem to the higher position managers (Nicco, John and renil) as usauls nothing happened, looks like they always covering his mistake or maybe these managers don't know anything about fueling also like Andrew Dodge lack of experience about fueling.

We think this is the right time to broadcast the problem in this company. We are hoping this problem will be address.

Sincerely Yours,

Menzies fueler

| # | Name | Signature |
|---|------|-----------|
| 1 | MARIO CABALLERO | |
| 2 | Jerey Canlas | |
| 3 | LORONIO SAMONTE | |
| 4 | WILLIAM RODRIGUEZ | |
| 5 | Marc Hagan | |
| 6 | Juan Torres-cruz | |
| 7 | Antonia Williams | |
| 8 | malik wilson | |
| 9 | Ryan A Harris | |
| 10 | RPANGALILINGAN | Th Yub |
| 11 | MARY CENTENO | |
| 12 | FROKAS ISPROM | |
| 13 | Modesto Compas | |
| 14 | | |
| 15 | Ricardo Almeida | |
| 16 | RONALDO NAVARRO | |
| 17 | Jayson Manalang | |
| 18 | Christopher Lawrence | |
| 19 | ROY TOSCO | |
| 20 | Arnold Salm | |
| 21 | | |
| 22 | DELOS REYES | |
| 23 | A. VERMS | |
| 24 | RCMANALO | |
| 25 | Wesley fasfalele | |

MENZIES_000153

| name | signature |
|------|-----------|
| 1  JULY MACAPAGAL | *(signature)* |
| 2  | |
| 3  | |
| 4  | |
| 5  | |
| 6  | |
| 7  | |
| 8  | |
| 9  | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

MENZIES_000154

# EXHIBIT 23

On 8/23/2018 I John Qually served the suspension document to Reynaldo Navarro. He looked it over for a few minutes and then I asked him if he was going to sign it.  He said he would not. At that time, I put refused to sign and I signed the document. Later after Tevita Tokataha arrived and working on his set up Ray was complaining why he was being suspended instead of Andrew. He showed me a picture of Andrew sleeping in the truck and said that long time back Andrew was stealing time or sleeping on the job and nothing was done with that. As far as the petition he said that all the guys that signed it are all adults and can read what it's all about before signing it and making it sound like they did so of their own free will. Just before he left he was saying that he hopes that he does get terminated so he can go to his Lawyer and file a suit against the company for being biased or harassment and get 2 years pay like he did with Swissport.

John Qually

# EXHIBIT 24

Some people working in Mensis as a fueller on 130 sides have always complained to Andrew. They often call him but he does not reply to the cellphone. if there is a problem, we keep calling him and he is sleeping. so everyone is reporting to me and there is one hour of them looking at andrew he is asleep as to why the fueller took a picture of him and send it to me.if andrews hours of duty they always have a delay and the fueller ask him about the airline complain that they always ask who is the supervisor. The fueller said it's Andrew and they just shaking their head and they said thats why its delay again.if the fueller tell Andrew he said dont worry about it. I'm just wondering why you suspended me because of helping the people and my concern in this company .If this is the benefits for the sake of my concern .I will not intervene again just do and focus my job

# EXHIBIT 25

On the morning of 08/17/2018, I signed a piece of paper to which I was not fully aware of the contents listed there within. My normal state of mind when arriving to work, is not always fully aware of all things out side of work related issues. In regards to Menzies aviation personal, I wish to remain courteous and respectfully. I do not fill entirely comfortable with my signature on the afore mentioned paper work, after learning the full discorse of it's contents. Rest assured, I will take all steps neccessary to make sure that such a situation involving myself will not occore again.    xxxx

ISIAH BANKS

Renaldo Navarro had me
Sign the papers with out fully
explaining to me what it was for
and I feel really uncomfortable
for beins put in that position and
I disagree 100% with what
I was told to sign on.

CHRISTOPHER LAWRENCE

MENZIES_000086

Hi, on August 17 I signed a list.
I did not know this list is a
petition to remove Supervisor Andrew
Dodge from his position. I do not
want Supervisor Andrew Dodge to
loose his position. Please remove
my name from that list. Also,
I think that petition is illegal
and that it goes against Menzies
Companie Policy.

Thank you

MARio CABALLERO Salazar

MENZIES_000100

# EXHIBIT 26

**Tracy Aguilera**

| | |
|---|---|
| **From:** | Raul Vargas |
| **Sent:** | Wednesday, August 29, 2018 5:01 PM |
| **To:** | Tracy Aguilera |
| **Cc:** | Talin Bazerkania; Kevin Brown |
| **Subject:** | RE: Reynaldo Navarro |

Hello Tracy,

Based in your email bellow, where you mention that Raynaldo Navarro, as a member of the management team, was soliciting signatures and intimidating Employees to sign a petition. Please proceed with the termination of Reynaldo Navarro.

We cannot allow our management team to harass our people in any way.

There is another supervisor involved in this petition letter. Could you also open an investigation for July Magapagal.

Best Regards


Raul Vargas
Director | Operations | San Francisco | Menzies Aviation

M +1 415 290 4060 | www.menziesaviation.com




-----Original Message-----
From: Tracy Aguilera
Sent: Wednesday, August 29, 2018 4:04 PM
To: Raul Vargas <Raul.Vargas@menziesaviation.com>
Cc: Talin Bazerkania <talin.bazerkania@menziesaviation.com>; Kevin Blumberg <kevin.blumberg@menziesaviation.com>
Subject: Reynaldo Navarro

Raul,

Please see My documented findings below that I originally sent and Kevin statement. I have also attached the statements from the Employees and the petition.

I can only make a recommendation, the final decision is yours.

I cannot have the meeting with Rey at 4:30 today without a decision.

Kind Regards,

Tracy

Tracy M. Aguilera
Human Resource Manager | Menzies Aviation Inc. I San Francisco

MENZIES_000197

1601 Bayshore Highway | Suite 159 | Burlingame, CA 94010 | USA
M: (650) 697-7260  F:  (650) 697-7229
Tracy.aguilera@menziesaviation.com

NOTICE: This E-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 USC §§2510-2521, is confidential and may be legally privileged. If you are not the intended recipient, you are hereby notified that any retention, dissemination, distribution, or copying of this communication is strictly prohibited. Please reply to the sender that you have received the message in error, then delete it

-----Original Message-----
From: Kevin Blumberg
Sent: Wednesday, August 29, 2018 3:58 PM
To: Tracy Aguilera <tracy.aguilera@menziesaviation.com>
Subject: RE: Reynaldo Navarro

Tracy,

Based on the information provided via statement and conversation with employee Reynaldo Navarro, it has been found that there was unprofessional behavior by a supervisor.  The supervisor (Reynaldo Navarro) was actively soliciting signatures from employees in an effort to petition against having Andrew Dodge as a Supervisor.  Several employees indicated in statements that they were told to sign a document but were not advised what the document was.  Employees followed the instructions of their supervisor to avoid confrontation.

Kevin Blumberg
Safety and Security Manager | Menzies Aviation | San Francisco

M: +1 650 490 0040 | www.menziesaviation.com

NOTICE: This E-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 USC §§2510-2521, is confidential and may be legally privileged. If you are not the intended recipient, you are hereby notified that any retention, dissemination, distribution, or copying of this communication is strictly prohibited. Please reply to the sender that you have received the message in error, then delete it

-----Original Message-----
From: Raul Vargas
Sent: Wednesday, August 29, 2018 2:30 PM
To: Tracy Aguilera
Subject: RE: Reynaldo Navarro

Hello Tracy,
Could you please explain this recommendation.

Regards

Raul Vargas

MENZIES_000198

Director | Operations | San Francisco | Menzies Aviation

M +1 415 290 4060 | www.menziesaviation.com

-----Original Message-----
From: Tracy Aguilera
Sent: Tuesday, August 28, 2018 4:27 PM
To: Raul Vargas <Raul.Vargas@menziesaviation.com>
Subject: Reynaldo Navarro

Raul,

After reviewing the case with my HR Director, our recommendation is not to terminate the employee at this time. However, since this is just a recommendation, please advise if you still would like to move forward with the termination

Kind Regards,

Tracy

Tracy M. Aguilera
Human Resource Manager | Menzies Aviation Inc. l San Francisco
1601 Bayshore Highway | Suite 159 | Burlingame, CA 94010 | USA
M: (650) 697-7260  F: (650) 697-7229
Tracy.aguilera@menziesaviation.com

NOTICE: This E-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 USC §§2510-2521, is confidential and may be legally privileged. If you are not the intended recipient, you are hereby notified that any retention, dissemination, distribution, or copying of this communication is strictly prohibited. Please reply to the sender that you have received the message in error, then delete it

He is the Fueling Supervisor going around and having Employee's sign a petition to have another Supervisor , Andrew Dodge removed from the Operation.  I had heard about this from  Employee but no one could tell me who generated it until I seen the text message Rey sent to Andrew.

Then Charles from the Union called and said Management was trying to get their Members to sign a petition and make statements.

Kind Regards,

Tracy

Tracy M. Aguilera
Human Resource Manager | Menzies Aviation Inc. l San Francisco
1601 Bayshore Highway | Suite 159 | Burlingame, CA 94010 | USA

3

MENZIES_000199

M: (650) 697-7260  F: (650) 697-7229
Tracy.aguilera@menziesaviation.com

> On Aug 27, 2018, at 5:11 PM, Tracy Aguilera <tracy.aguilera@menziesaviation.com> wrote:
>
> Talin,
>
> I have attached documents from the investigation of Reynaldo Navarro(Fuel Supervisor non-Union):
>
> 8/23/2018 John Qually, Operations Manager Fueling, statement when suspending Reynaldo for "Code of Conduct"..
However, before Reynaldo walked out of the meeting, he specifically said, to terminate him, so he could go to his lawyer
and win 2 years of pay like he did with Swissport.
>
> 8/20/2018 10:00 AM Reynaldo did not show up for the meeting in HR
>
> Copy of the Petition that Reynaldo was having Union Fuelers sign, trying to get Andrew Dodge removed (2 Supervisors
signed it, Reynaldo Navarro & July Magpantay.)
>
> Written complaint from Andrew Dodge
>
> Copy of Text Message from Rey to Andrew trying to hold the petition over Andrew
>
> Copy of two statements from Fuelers, Isiah Banks & Christopher Lawrence stating they did not feel comfortable signing
the petition, but did
>
> Approx. 2 weeks prior, I received a call from Charles, Union Rep. stating that someone was forcing the Fuelers to sign a
petition.  I asked him who and for a copy, however he has not called back
>
> Now today, 10/27/2018 Raul Vargas receives the same petition from Rafael Martinez, no signature just wanting Andrew
removed- I did not attached it to this email
>
> It is not appropriate for a member of the Management team to solicited signatures or try and intimidate Employees to
sign a petition.
>
> ADR on File & Signed.
>
> Please advise as Reynaldo will be in tomorrow at 10:00AM.
>
> Kind Regards,
>
> Tracy
>
> Tracy M. Aguilera
> Human Resource Manager | Menzies Aviation Inc. l San Francisco
> 1601 Bayshore Highway | Suite 159 | Burlingame, CA 94010 | USA
> M: (650) 697-7260  F: (650) 697-7229
> Tracy.aguilera@menziesaviation.com
>

MENZIES_000200

> [cid:image002.jpg@01D21B33.80386FB0]<http://www.menziesaviation.com/>
>
>
> NOTICE: This E-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 USC §§2510-2521, is confidential and may be legally privileged. If you are not the intended recipient, you are hereby notified that any retention, dissemination, distribution, or copying of this communication is strictly prohibited. Please reply to the sender that you have received the message in error, then delete it
>
>
> <2018_08_27_16_19_20.pdf>
> <image001.jpg>

MENZIES_000201

# EXHIBIT 27

We the fuelers on Menzies 130 side would like to make a petition against Andrew Dodge.

The way he supervises is very unprofessional. When Andrew is in charge of running the operation or supervises people, he will not provide people with their rest and lunch breaks, due to a poor flight set up.

Andrew always blames the people if there is a delay and lies and places blame on lack of man power or hydrant truck issues. The truth is that Andrew does not know how to run the operation.

We have tried to address these issues with upper management, but this issue has never been addressed by management and it continues.

Andrews lack of knowledge and experience of the fueling operation  on the 130 continues to hurt both the employees and the company Menzies Aviation. We are asking that the company management resolve this issue.
We the fuelers would like Andrew Dodge demoted from supervisor at the 130 side or removed from the 130 operation side.

| | NAME | SIGNATURE |
|---|---|---|
| 1 | | |
| 2 | M. Compos | |
| 3 | J Chin | |
| 4 | A. Vepaud | |
| 5 | j Manalang | |
| 6 | Anonymous | XXX |
| 7 | Jose Meta | |
| 8 | R CMANALO | |
| 9 | L'SIMONTE | |
| 10 | J. CANLAS | |
| 11 | Rohit Kumar | |
| 12 | Wesley Faatalale | |
| 13 | Macial wilson | M wilson |
| 14 | WILLIAM RODRIGUEZ | |
| 15 | ANASTACIO MANUEL | |
| 16 | Quan Brass | |
| 17 | Idoub Contin | |
| 18 | RAMON VENTAS | |
| 19 | Ricardo Almelda | |
| 20 | REX TOSON | |
| 21 | Patrick Moran | |

| 22 | RPANGALILINGAN | |
| 23 | E. DELOS REYES | |
| 24 | Marc Ilagan | |
| 25 | Matthew Sage | |
| 26 | ALDO DELA CRUZ | |
| 27 | | |
| 28 | RAFAEL VASQUEZ | |
| 29 | | |
| 30 | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# EXHIBIT 28

To whom it may concern,

My name is Rafael Vasquez I am an SEIU Union Shop Steward for Menzies Aviation at SFO International Airport

On September the 6, 2018
I was asked by the Menzies Aviation  Fuelers on 130 side to write up a Petition on behalf of the Fuelers on 130 side vs Andrew Dodge.

The petition was written out and signed by the Fuelers on 130 side of the SFO Team.

The petition was then officially turned into the SEIU Union Hall.
In Addition a copy of the Petition against Supervisor Andrew Dodge was also turned into the Menzies Aviation Fueling Director Raul Vargas.

There have been two separate Petitions turned into Menzies Aviation Fueling Department Director Raul Vargas.

To date there has been no action taken by the Menzies Aviation Management Team to address the Petitions to have Mr. Andrew Dodge demoted from his Supervisory role at the 130 side.

I have spoken to The Menzies Aviation  Fueling Director Raul Vargas on three separate occasions regarding Mr. Andrew Dodge, who continuous to abuse his authority and at times harass  Fuelers under his charge.

If there is any further information that I may be able to provide please feel free to contact me at (510) 715-0014 .

Thank you,

Rafael Vasquez

11/18/2018

# EXHIBIT 29

 Phone  📞 11:10 AM  66% 🔋



Rafael ›

To whom it may concern,

My name is Rafael Vasquez I am an SEIU Union Shop Steward for Menzies Aviation at SFO International Airport

On September the 6, 2018 I was asked by the Menzies Aviation Fuelers on 130 side to write up a Petition on behalf of the Fuelers on 130 side vs Andrew Dodge.

The petition was written out and signed by the Fuelers on 130 side of the SFO Team.

The petition was then officially turned into the SEIU Union Hall. In Addition a copy of the Petition against Supervisor Andrew Dodge was also turned

iMessage

  

    Renaldo Ivan Trujillo 2013   



Rafael >

Andrew Dodge was also turned into the Menzies Aviation Fueling Director Raul Vargas.

There have been two separate Petitions turned into Menzies Aviation Fueling Department Director Raul Vargas.

To date there has been no action taken by the Menzies Aviation Management Team to address the Petitions to have Mr. Andrew Dodge demoted from his Supervisory role at the 130 side.

I have spoken to The Menzies Aviation  Fueling Director Raul Vargas on three separate occasions regarding Mr. Andrew Dodge, who continuous to abuse his authority and at times

iMessage



**11:13 AM**

64% ◼



Rafael >

address the Petitions to have Mr. Andrew Dodge demoted from his Supervisory role at the 130 side.

I have spoken to The Menzies Aviation  Fueling Director Raul Vargas on three separate occasions regarding Mr. Andrew Dodge, who continuous to abuse his authority and at times harass  Fuelers under his charge.

If there is any further information that I may be able to provide please feel free to contact me at (510) 715-0014 .

Thank you,

Rafael Vasquez

    iMessage  

            

RenaldoNavarro 000011