*Exhibit 38*

000051

CHANGES TO TRANSCRIPT OF
RENALDO NAVARRO, 08 / 10 / 2020

CASE NAME Renaldo Navarro v. Menzies Aviation, Inc.

(If Federal case, provide reason for change)

| Page / Line | |
|---|---|
| 17:7 | No, sir. |
| 24:20-22 | No, I worked at Asig since September 2005 and I continuously worked even after it was purchased by Menzies on 2016. |
| 31:24 | Yes, sir. |
| 40:6 | No, sir. |
| 44:25 | Yes, they told me to sign it. |
| 46:20-21 | Maybe, when you're in the right. |
| 47:25 - 48:2 | Because the petition states the wrong things that he was doing to the fuelers. |
| 50:5 | Randy Davies |
| 54:22-23 | Yes, sir. This was the second petition the fuelers made against Andrew Dodge. |
| 55:1-2 | Yes, sir. |
| 60:12 | No, sir. |
| 88:17-19 | All I remember that Tracy told me was that you should not have signed it because you were at the management side. |

Signature of Deponent _Renaldo Navarro_

**000052**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

RENALDO NAVARRO,                     ) **CERTIFIED COPY**
                                     )
            Plaintiff,               )
                                     )
    vs.                              ) Case No.
                                     ) 3:19-cv-08157-VC
MENZIES AVIATION, INC., DOING        )
BUSINESS AS MENZIES; and             )
DOES 1 through 10, inclusive,        )
                                     )
            Defendants.              )
_____)

        Webex deposition of RENALDO NAVARRO, VOLUME I, taken remotely on behalf of the Defendant, beginning at 9:41 a.m. and ending at 4:23 p.m., on Thursday, July 23, 2020, before JOANNA B. BROWN, Certified Shorthand Reporter No. 8570, RPR, CRR, RMR.

2

```
 1   again.
 2           MR. WARD:  Sure.
 3       Q   Is it your belief that if you make legal
 4   claims against a former employer, you are likely to get
 5   a settlement from them regardless of the merit of those
 6   claims?
 7       A   Yes, sir.   [handwritten: NO, SIR]
 8           MR. URIARTE:  Mr. Navarro, are you
 9   understanding the Tagalog interpretation?
10           THE WITNESS:  (Inaudible.)
11           MR. URIARTE:  You have to answer in Tagalog.
12           MR. URIARTE:  Yeah.  I mean, I have --
13           THE INTERPRETER:  Just a second.  Let me
14   interpret that.
15           THE WITNESS:  It seems it's far from my
16   understanding in Tagalog.
17           MR. URIARTE:  I think -- Ms. Carrera, I
18   understand your proficiency and your amazing use of the
19   official, traditional, government-level Tagalog, but
20   it's sure not what usual, normal people in Tagalog
21   would use in the street.  There are two forms of
22   Tagalog.  There's the Tagalog that is normally used
23   around the country by normal people, but when you use
24   words like (speaks Tagalog) -- I went to a university
25   there, and I spoke formal Tagalog; but normal people
```

```
 1     Q    Did I understand you correctly that you worked
 2  for ASIG -- you've had two different periods of time
 3  where you were employed by ASIG?
 4     A    What do you mean two different times?
 5     Q    So let me do it this way:  First you -- first
 6  you started at Service Air; right?
 7     A    Yes, sir.
 8     Q    And did you remain employed by Service Air up
 9  to when Swissport purchased Service Air?
10          THE INTERPRETER:  Please repeat the question.
11          MR. WARD:  Sure.
12          From when he started at Service Air until the
13  purchase by Service Air of Swissport, was he
14  continuously employed by Service Air?
15          THE WITNESS:  Yes, it was continuous.
16  BY MR. WARD:
17     Q    Okay.  And then, when you started your
18  employment with ASIG in approximately 2016, was that
19  the first time you had worked for ASIG?
20     A    What I did was work in 2005 at ASIG up to 2016
21  when Menzies purchased ASIG, and I continuously worked
22  for them.    OK- Changes Immaterial
23     Q    I see.  You were working for both Service Air
24  and ASIG at the same time?
25     A    Yes, sir.  I'm sorry.  Different.  They were
```

24

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

000055

```
 1   involving nonsupervisory employees in personal
 2   grievances?
 3        A    Yes, sir.
 4        Q    As a supervisor, should you avoid pressuring
 5   employees to get involved in personal grievances?
 6        A    Will you please repeat the question again.
 7        Q    Sure.  As a supervisor, is it important to
 8   avoid pressuring employees, nonsupervisory employees,
 9   to get involved in personal grievances?
10             MR. URIARTE:  Before you answer that question,
11   Mr. Navarro, remember the instruction earlier.  If you
12   do not understand the question that is said in Tagalog,
13   indicate that if you are having a problem with the
14   Tagalog interpretation.  Do say that so that we know
15   where the problem is.  I just want to make sure that
16   you do that.  Okay?  Great, Mr. Navarro.
17             THE INTERPRETER:  This is the interpreter
18   speaking.  I would like to have the question, please,
19   repeated.
20             MR. WARD:  Sure.
21        Q    My question is, in your opinion, should a
22   supervisor avoid pressuring nonsupervisory employees to
23   become involved in personal disputes?
24        A    No, sir.  [handwritten: Yes, sir]
25        Q    Why not?
```

31

```
 1   BY MR. WARD:
 2        Q    Do you recall receiving this document?
 3        A    No, sir.
 4        Q    Do you recall calling in sick in March of 2009
 5   before your days off?
 6        A    Yes, sir.                    [handwritten "NO" circled over line 6]
 7             MR. URIARTE:  You have to get your
 8   questions -- you can't talk to me.  You have to get
 9   your questions from him.  If you need a break, you just
10   ask for a break.
11             THE WITNESS:  No, sir.
12             MR. WARD:  All right.  We are going to mark
13   this as Exhibit 5.
14             (Deposition Exhibit 5 was marked for
15              identification by the reporter, a
16              copy of which is attached hereto.)
17   BY MR. WARD:
18        Q    This is a two-page document as well.  So
19   please let me know when you've had a chance to see the
20   first page, and I'll move to the second one.
21        A    Yes, sir.
22             THE INTERPRETER:  Mr. Navarro said yes.
23   BY MR. WARD:
24        Q    All right.  Let me know when you've had a
25   chance to review this page as well.
```

40

```
 1   BY MR. WARD:
 2       Q    How did you first learn about that petition?
 3       A    They passed it to me when they were -- after
 4   they signed, they were passing that petition.
 5            MR. URIARTE:  Wait.  I have to object on the
 6   interpretation there.  You might want to ask the
 7   witness to state his response again because that's
 8   definitely -- I think your English portion of that
 9   interpretation is erroneous.
10            (Interpreted.)
11            THE WITNESS:  Yes, sir.
12            MR. URIARTE:  You have to -- can you provide
13   the answer again.
14            THE WITNESS:  Please repeat your question.
15   BY MR. WARD:
16       Q    My question was how did you first learn about
17   that petition?
18       A    I learned from the people that they were
19   passing a petition against Andrew.
20       Q    When you say the "people," who specifically
21   are you referring to?
22       A    The fuelers, those who put the gasoline.
23       Q    Okay.  And when you learned that it was being
24   passed around, did somebody ask you to sign it?
25       A    Yes, they told me to sign it. They told me.
```

*[Handwritten annotation in yellow highlight on line 25: "Yes, to sign it," inserted with arrow; original typed text reads "They told me. They told me."]*

44

```
 1   BY MR. WARD:
 2       Q    Anybody else you can identify by name who
 3   asked you to sign the petition?
 4       A    I forgot the others, but it was Jezen and
 5   Rafael.
 6       Q    Did you sign the petition?
 7       A    Yes, sir.
 8       Q    Did you think it was appropriate to get
 9   involved in a petition against another supervisor?
10            MR. URIARTE:  Objection.  Vague and calls for
11   a legal conclusion.
12            You can answer, Mr. Navarro.  You can answer
13   after my objection.
14            THE WITNESS:  Please repeat the question.
15   BY MR. WARD:
16       Q    The question was did you think it was
17   appropriate to sign a petition against another
18   supervisor?
19            MR. URIARTE:  Same objection.
20            THE WITNESS:  Maybe, because, you know -- just
21   on the right, you know.  when you're in the right
22   BY MR. WARD:
23       Q    I don't understand your answer, Mr. Navarro.
24       A    If we know that what they are fighting for
25   against Andrew Dodge is right, so why not help them and
```

46

```
 1    also help the company also --
 2       Q    Do you think --
 3       A    -- to correct the wrong things that
 4    Andrew Dodge did.
 5       Q    And do you think signing a petition about
 6    Andrew Dodge might undermine Andrew Dodge's authority
 7    with nonsupervisory employees?
 8       A    They are the ones who are signing that.  They
 9    know the bad things that Andrew Dodge was doing to me;
10    and, also, the things he was doing against the fueler,
11    that was not good.
12       Q    My question is different.  My question is did
13    you think signing a petition against Andrew Dodge might
14    undermine Andrew Dodge's authority?
15            MR. URIARTE:  Objection.  Vague and ambiguous.
16            THE WITNESS:  Maybe not, sir.
17    BY MR. WARD:
18       Q    Maybe not or no?
19       A    No, no (In English).
20            THE INTERPRETER:  This is the interpreter.  I
21    interpreted "not" and "no" the same word.
22            THE WITNESS:  No, sir.
23    BY MR. WARD:
24       Q    Why not?
25       A    ~~If what's being said is the ones that is~~
```

Because the petition states the wrong things that he was doing to the fuelers

47

```
 1   BY MR. WARD:
 2       Q   Okay.  And when did you make these complaints
 3   yourself about Andrew Dodge?
 4       A   I no longer remember the date, but I told
 5   Randy Davis.
 6       Q   Anyone other than Randy?
 7           THE INTERPRETER:  I'm sorry.  I didn't hear
 8   that.
 9   BY MR. WARD:
10       Q   Anyone other than Randy?
11       A   There were Nico, John Qually, and also Renil
12   and Tracy.
13           MR. URIARTE:  Did you say Nicole?
14           THE WITNESS:  Nico.  Nico.
15           MR. URIARTE:  Can you spell that.
16           THE WITNESS:  Nico, N-i-c-o (In English).
17           THE INTERPRETER:  This is the interpreter.
18   It's not Nicole but Nico, N-i-c-o.
19   BY MR. WARD:
20       Q   All right.  Other than Randy, Nico, Tracy, and
21   Renil, is there anyone else at Menzies/ASIG that you
22   told?
23           MR. URIARTE:  I think, Chris, you are
24   misstating John Qually, and then the interpreter missed
25   saying Renil.
```

50

```
 1            The reporter just clarified for me that
 2   documents Bates No. -152 to -154 I had marked as
 3   Exhibit 7, but it should actually be 8; is that right?
 4            THE REPORTER:  Yes.
 5            MR. WARD:  So then this document I have up
 6   right now, Bates No. -150, is actually going to be
 7   Exhibit 9.
 8            (Deposition Exhibits 8 and 9 were marked
 9             for identification by the reporter,
10             copies of which are attached hereto.)
11   BY MR. WARD:
12      Q     Have you had a chance to look at Exhibit 9
13   here?
14      A     I already read it, sir.
15      Q     Prior to today, have you ever seen this
16   Exhibit 9?
17      A     They gave me a copy.
18      Q     When you say "they," who is "they"?
19      A     The shop steward gave it to me, Rafael.
20      Q     Did Rafael give this to you after you had
21   signed the petition?
22      A     I think this is the second petition, that this
23   is the second petition they made against Andrew Dodge.
24      Q     So is it your testimony that there were two
25   petitions against Andrew Dodge?
```

Handwritten annotation on line 22: "Yes sir, This was the fuelers"

54

```
 1    A    The first one was the first one that you
 2    showed with my signing, and I think this is the second.
```
*[Lines 1-2 circled with handwritten annotation "Yes sir"]*

```
 3    Q    Okay.  Did you ever sign this second petition?
 4    A    I was not -- no longer able to sign it because
 5    they already terminated me at that time.
 6    Q    I see.  So this, Exhibit 9, you first saw it
 7    after your termination?
 8    A    When they terminated me and the people signed
 9    that petition, I was given a copy by Rafael.
10    Q    I just want to be clear though.  The copy of
11    this, Exhibit 9 that you received from Rafael, did you
12    receive that before or after your termination?
13    A    I was already terminated.
14    Q    Okay.  Did you ever have any text-message
15    communication with Mr. Dodge about the petition against
16    him?
17    A    No, sir.
18         MR. WARD:  I'm going to mark this as
19    Exhibit 10, and this is Bates-numbered -88.
20         (Deposition Exhibit 10 was marked for
21          identification by the reporter, a
22          copy of which is attached hereto.)
23    BY MR. WARD:
24    Q    On the lower half of the page, Mr. Navarro, it
25    looks like a screen capture of some text messages.
```

55

```
 1   BY MR. WARD:
 2       Q    And the nonsupervisory employees gave
 3   Exhibit 9 to the union shop steward, to your
 4   understanding; correct?
 5       A    No.  My understanding is the shop steward who
 6   prepared the letter, and then the union submitted it to
 7   the company.  That's what I know.
 8       Q    And what is the name of the shop steward?
 9       A    Rafael.
10       Q    And is this the same Raul whose last name you
11   do not remember?
12       A    Yes, sir.  [handwritten: No]
13       Q    Do you currently possess a cell phone,
14   Mr. Navarro?
15       A    Yes, sir.
16       Q    And did you possess a cell phone in 2018 while
17   you were employed by Menzies?
18       A    Yes, sir.
19       Q    And is the cell phone that you currently
20   possess the same cell phone that you used in 2018 while
21   you were employed by Menzies?
22       A    Yes, sir.
23       Q    Are you still using the same device today that
24   you used in 2018?
25       A    Yes, sir.
```

60

```
 1      Q    Is that a yes?
 2           That's when you learned you had been
 3   terminated, when you met with Tracy?
 4      A    Yes, sir.
 5      Q    Was anybody else present at the time that you
 6   met with Tracy other than yourself and Tracy?
 7      A    She was with a female there.
 8      Q    Was she another Menzies employer, that female?
 9      A    Maybe, sir.
10      Q    You don't know who she was, in other words?
11      A    No, sir.
12      Q    So other than Tracy and this unidentified
13   female, nobody else was present; is that true?
14      A    Yes, sir.
15      Q    What did Menzies tell you was the reason they
16   were terminating your employment?
17      A    All I remember that Tracy told me was that you
18   should not have signed it because you were at
19   management site. [side]
20      Q    And when she said you should not have signed
21   it, she was referring to the petition, to your
22   understanding?
23      A    Yes, sir.
24      Q    Were you told that there was any reason for
25   your termination other than signing the petition?
```

88