*Exhibit 39*

000066

```
 1                IN THE UNITED STATES DISTRICT COURT

 2          IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3

 4

 5   RENALDO NAVARRO,

 6              Plaintiff,

 7   v.                                      No.  3:19-CV-8157

 8   MENZIES AVIATION, INC.,
     doing business as MENZIES
 9   and DOES 1 through 10,
     inclusive,
10
                Defendants.
11   _____/

12   Zoom Remote Deposition of

13        ANDREW DODGE

14    Tuesday, July 28, 2020

15
         CERTIFIED COPY
16

17

18

19

20   REPORTED BY:  CINDY TUGAW, CSR #4805

21

22

23           NOGARA REPORTING SERVICE
             5 Third Street, Suite 415
24        San Francisco, California 94103
                 (415) 398-1889
25
```

1    A.  No, more like two hours.
2    Q.  Okay.  Sounds good.  All right.
3        Can you tell me the highest level of education
4    that you achieved.
5    A.  I have some college.
6    Q.  Did you graduate from college?
7    A.  No, I did not.
8    Q.  And when you say college, what college did you
9    go to?
10   A.  I attended DeAnza Community College.
11   Q.  Did you get an AA?
12   A.  No.  I was going for my AA.
13   Q.  And when was the last time you actually
14   participated in a class at DeAnza?  Like what year?
15   A.  I want to say like 2015, 2016.
16   Q.  And what were you trying -- what AA were you
17   trying to graduate?
18   A.  Criminal justice.
19   Q.  And when did you start with Menzies?  What
20   year?
21   A.  February of 2016.
22   Q.  So February of 2016, is that with Menzies
23   already?
24   A.  That was when we were ASIG.
25   Q.  So that's still ASIG.

1    A.   Yeah.

2    Q.   And then shortly thereafter -- shortly

3 thereafter, Menzies came in, is that correct?

4    A.   Yeah, Menzies came in, like, 2018, or

5 something like that, or in 2000 -- or like in the

6 middle of 2018, I want to say.

7    Q.   All right.  What was the position you had when

8 you started with ASIG?

9    A.   When I first started at ASIG, I was a fueler.

10   Q.   How long were you a fueler for before becoming

11 a supervisor?

12   A.   I want to say about a year.

13   Q.   And who approved your promotion to supervisor

14 from a fueler?

15   A.   Renil Lal, the general manager at the time.

16   Q.   The termination of Mr. Navarro is about August

17 of 2018.  Do you remember that?

18   A.   Yeah, I remember him not being there anymore.

19   Q.   And in August of 2018, you were a supervisor,

20 correct?

21   A.   Yes.

22   Q.   And your shift was -- can you tell me, what

23 was your shift?

24   A.   During the time -- like, your question is,

25 like -- like, now or in the past?

1  there put fuelers on a schedule for, hey, you're going
2  to go from this flight to this flight.
3        And also, after that, it was to drive on the
4  airport and just monitor the fuelers, if they needed
5  help with something, or also monitor their safety.  So
6  making sure they're wearing their uniform.  Making sure
7  they're wearing their vest, earplugs, had their boots
8  on.  Make sure -- just come and check on them and make
9  sure their equipment is running properly.
10        And also, if they call me, I would go assist
11 them, or, you know -- and also just change things
12 throughout the operation.  Maybe the guy might call me
13 and be, hey, my flight never showed up, and then I
14 might just change their flights around.
15    Q.  Right.  Were you also in charge of providing
16 breaks for people, like when they can go on --
17    A.  Oh, yes, of course.  So you would -- when you
18 schedule flights, you would -- before their fifth hour,
19 California law, you try to find a break period for 30
20 minutes.  There were days that sometimes the way the
21 flights came in, you know, the guys would be fueling
22 and would go over that because they're still on the
23 aircraft.  You can't just leave the aircraft.  They
24 would have to take their break after they were done
25 fueling the aircraft.

1    Q.  Right.  So the fuelers under your supervision,
2  they depended on you for when they can take their
3  breaks?
4    A.  Yes.  They would take -- some of the guys
5  were, Hey, I need to take a break, or asking ahead of
6  time, Hey, what time am I taking my break?  So
7  everything would be coordinated depending on what's
8  going on on the operation at the time.
9    Q.  And then, like you said, there are times where
10 the fuelers would depend on you to help out with a
11 particular situation.  So you become kind of like an
12 extra hand as well?
13   A.  Say that again.  Like, what do you mean?
14 Sorry.
15   Q.  Like if they're busy or they're shorthanded,
16 you could come in also to help them?
17   A.  Yeah, if there was something going on in the
18 operation, I would report to my duty manager, know
19 what's going on, let him know, Hey, we're short.  Can I
20 get some assistance from your side?  And if we didn't
21 have the manpower, I would help on a flight and hook up
22 and help, you know.
23   Q.  Exactly. Okay.  And then, during the swing
24 shift, how many fuelers did you normally supervise?
25   A.  On a busy day, on a really busy day, I have

1      Can you tell me, by August of 2018, how long
2  you had been working with Renaldo Navarro at that time?
3      A.  Good question.  Do you mean like how long had
4  I been working with him as a co-worker, as like a --
5  how do you say -- as a -- supervisors together or as,
6  in general, a fueler and a supervisor?
7      Q.  Yes.  In general.
8      A.  Since I began working for ASIG in 2016, I was
9  his night fueler.  So I began working with him as a
10 night fueler, and then once I got promoted, I became a
11 swing supervisor, so I would transfer my information to
12 him.
13     And then while -- our schedules changed, and
14 then I would cover the days he was off as a swing -- I
15 mean, as a graveyard.  And then there -- if someone
16 called off, and I would see him from the night shift or
17 into the morning shift, or I would cover his sick day.
18 So, yeah, I worked with him a lot.
19     Q.  Gotcha.  And what was your general opinion
20 with regards to Ray Navarro and how he did his job?
21     A.  Oh, Ray's a great supervisor.  There's no
22 questions asked.  He was there for a long time, and,
23 you know, he's -- he did his job.
24     Q.  And you and Ray -- at some point you and Ray
25 started to have, like, difference of opinion with

```
 1  you having problems with him, Mr. Dodge?
 2       A.  Rafael didn't work with me on my side of the
 3  airport.
 4       Q.  Oh, I see.  I see.  So he's on another side of
 5  the airport?
 6       A.  Yes.
 7       Q.  Gotcha.  Okay.  So it looks like, from this
 8  statement that he signed, that says that he was asked
 9  by Menzies Aviation fuelers to write a petition on
10  behalf of the fuelers on the 130 side.
11           Did you know that they -- that these fuelers
12  submitted two petitions?  Did you know that?
13       A.  No, I did not.
14       Q.  Okay.  So, based on your responses, is it fair
15  to say that nobody from Menzies Aviation ever sat you
16  down to discuss one or two petitions that were written
17  out against you at that time while it was happening?
18       A.  No.  I'm the one that brought it up to Renil,
19  saying that there was a petition going around, because
20  one of the fuelers had called me about it.
21       Q.  So you knew that a petition was going around,
22  but nobody from Menzies Aviation management ever kind
23  of, like, sat down with you or talked to you about it,
24  right?  Is that correct?
25       A.  No, I don't -- I never, no.
```

1    Q.  And you found out that there was a petition
2  going around against you, but you never read the actual
3  petition.  Is that how it was?
4    A.  Yeah, I never got to see it, no.
5    Q.  And you're saying that the first time you saw
6  it was actually a part of this litigation.  Is that
7  what you're saying?
8    A.  Yes.
9    MR. URIARTE:  Let's put up Exhibit 5, please.
10   VIDEO OPERATOR:  Okay.  Coming up shortly.
11   MR. URIARTE:  Thank you.
12         (Plaintiff's Exhibit 5 marked for
13         identification.)
14   MR. URIARTE:  It's not a very good copy, so I
15 guess Exhibit 5, Mr. Dodge, if we can just make it
16 smaller so he sees the whole thing.  There you go.
17   A.  Yeah.
18   Q.  Is this the letter that you wrote after you
19 found out that a petition was being turned in against
20 you?
21   A.  I can't read what I wrote, but I think this is
22 the one I wrote after I found out there was a petition.
23 One of the fuelers called me.
24   Q.  Correct.  Correct.  If you go to the bottom of
25 it, I think this is your signature, right?

```
 1         A.  Yeah.
 2         Q.  That one there?
 3         A.  Yes.
 4         Q.  Okay.  And did you have a meeting with Menzies
 5   management about this letter at all?
 6         A.  I do not recall -- I don't remember from when
 7   I wrote it.  I think I wrote it during my shift, and I
 8   turned it in or -- I either wrote it in the office with
 9   Raul at the time or -- I just don't remember.
10         Q.  I see.  I see.  So it's possible that you
11   wrote it with the assistance of Raul.  Is that what
12   you're saying?
13         A.  Yeah, it was Raul or Renil that told me to
14   write -- write a statement.
15         Q.  And why did they tell you to write a
16   statement?  Do you know?
17         A.  Just to have it on file that they were going
18   to look into it.
19         Q.  Okay.  But how did that meeting start?  Was
20   that -- like, why did you kind of arrive at that
21   meeting?
22         A.  Like, why did I -- are you saying, like, why
23   did I write it or --
24         Q.  No.  Well, you said that you had a meeting
25   with Raul or Renil --
```

```
 1  STATE OF CALIFORNIA     )
                            )
 2  COUNTY OF SAN FRANCISCO )

 3          I, CINDY TUGAW, a Certified Shorthand Reporter
 4  of the State of California, duly authorized to
 5  administer oaths pursuant to Section 8211 of the
 6  California Code of Civil Procedure, do hereby certify
 7  that
 8                    ANDREW DODGE,
 9  the witness in the foregoing deposition, was by me duly
10  sworn to testify the truth, the whole truth and nothing
11  but the truth in the within-entitled cause; that said
12  testimony of said witness was reported by me, a
13  disinterested person, and was thereafter transcribed
14  under my direction into typewriting and is a true and
15  correct transcription of said proceedings.
16          I further certify that I am not of counsel or
17  attorney for either or any of the parties in the
18  foregoing deposition and caption named, nor in any way
19  interested in the outcome of the cause named in said
20  caption.
21          Dated the 7th day of August, 2020.
22
23
24
                    CINDY TUGAW
25                  CSR No. 4805 (California)
```

