*Exhibit 41*

000091

```
               IN THE UNITED STATES DISTRICT COURT

         IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA



RENALDO NAVARRO,

            Plaintiff,

v.                                            No.  3:19-CV-8157

MENZIES AVIATION, INC.,
doing business as MENZIES
and DOES 1 through 10,
inclusive,

            Defendants.
_____/

Zoom Remote Deposition of

       RAUL VARGAS

 Tuesday, August 25, 2020
```

**CERTIFIED COPY**

```
REPORTED BY:  CINDY TUGAW, CSR #4805


           NOGARA REPORTING SERVICE
         5 Third Street, Suite 415
       San Francisco, California 94103
               (415) 398-1889
```

```
                        I N D E X

                                            Page Number

 3   EXAMINATION BY MR. URIARTE                   4

 4   EXAMINATION BY MR. WU                       73

 5   FURTHER EXAMINATION BY MR. URIARTE          74

                        ---oOo---

                        E X H I B I T S

     Plaintiff's

     Exhibit 1      Plaintiff Renaldo               9
                    Navarro's Amended Notice
                    of Deposition of Raul
                    Vargas

     Exhibit 8      Petition to Menzies            26
                    Management from Menzies
                    Fuelers

     Exhibit 9      Termination notice for         60
                    Renaldo Navarro

     Exhibit 11     Employee Performance           61
                    Development dated
                    8/29/2018

     Exhibit 12     Email chain culminating        66
                    in an email from Raul
                    Vargas to Tracy Aguilera
                    dated August 29, 2018

     Exhibit 19     Letter from Rafael Vasquez     43
                    to whom it may concern
                    dated 11/18/2018 with
                    attached petition

                        ---oOo---
```

```
 1          BE IT REMEMBERED that, pursuant to Notice of
 2   Taking Deposition and on Tuesday, the 25th day of
 3   August, 2020, commencing at the hour of 9:03 o'clock
 4   a.m. thereof, via Zoom videoconference, before me,
 5   CINDY TUGAW, a Certified Shorthand Reporter in the
 6   State of California, personally appeared,
 7                      RAUL VARGAS,
 8   called as a witness by the Plaintiff, having been by me
 9   first duly sworn, was examined and testified as
10   hereinafter set forth.
11                       ---oOo---
12                   APPEARANCES OF COUNSEL
13   For the Plaintiff
           LIBERATION LAW GROUP, P.C.
14         2760 Mission Street
           San Francisco, California 94110
15         BY:  ARLO GARCIA URIARTE, Attorney at Law
           (415) 695-1000
16
17   For the Defendants
           FOLEY & LARDNER, LLP
18         555 California Street, Suite 1700
           San Francisco, California 94104
19         BY:  JASON Y. WU, Attorney at Law
           (415) 984-9848
20
     Also Present:  David Ho, Zoom Host.
21
                         ---oOo---
22
23
24
25
```

1   had with her, it was about somebody from the union
2   contacting her to let her know that somebody was
3   requesting to sign a petition to the employees.
4        Q.   Anything else?
5        A.   Yes.  She mentioned that -- that employees
6   were -- were not agreeing on signing it.
7        Q.   Okay.  Anything else?
8        A.   Nothing else that I can recall.
9        Q.   And then, with regards to the content of the
10  petition, after you read it, did you make any decision
11  related to the contents of the petition?
12       A.   Yes, I talked to Tracy to -- to have the
13  investigation.
14       Q.   What type of investigation?
15       A.   An investigation about the petition and about
16  the -- how the petition was made.
17       Q.   How the petition was --
18       A.   Performed.
19       Q.   Was performed?
20       A.   Yes.
21       Q.   So you mean, when you say "how the petition
22  was performed," you mean how the petition was put
23  together, correct?
24       A.   Yes.
25       Q.   Anything else that you asked Tracy to do in

1   relation to the petition?

2         A.  Nothing else at that time.

3         Q.  Okay.  And so you said to do an investigation

4   about the petition.  What does that mean?  What did you

5   actually tell Tracy to do?

6         A.  To perform an investigation about how --

7   because we received some calls from the union, and also

8   received some information about Andrew, that he

9   received a message from Navarro.  So at that time it

10  was important for me to understand how that petition

11  was created.  How they did it.

12        Q.  All right.  And then you said also about how

13  the petition was put together.  So why was it important

14  for you to know how or who put together the petition?

15        A.  Because of the feedback that I received from

16  Tracy, from HR.

17        Q.  And what's that information that you received

18  from HR?

19        A.  As I said before, she told me that somebody

20  from the union contact her telling her that there was a

21  person asking for sign a petition, who was forcing the

22  employees to do it.

23        Q.  And did you ever find out who actually put

24  together the petition?

25        A.  Yes, we did.

1       MR. URIARTE:  Q.  Mr. Vargas?
2       A.  Well, I think that when you receive a message
3   from -- I don't know where -- somebody in relation to a
4   petition, that is an alert.
5       Q.  Is what?
6       A.  Is an alert.
7       Q.  Okay.  But I guess my question is how does
8   that text message lead you to conclude that Mr. Navarro
9   wrote the petition?
10      A.  That was not the one that drove me to
11  understand that Mr. Navarro did the petition.
12      Q.  What did make you understand that Mr. Navarro
13  wrote it?
14      A.  Well, because the investigation from the
15  safety department.
16      Q.  Okay.  So the investigation from the safety
17  department actually has a report?
18      A.  They have statements from employees.
19      Q.  Statements from employees.  Okay.  Anything
20  else?
21      A.  They had a statement from employees and their
22  final outcome out of the investigation.
23      Q.  Are you talking about the final outcome as
24  they wrote it in the email?
25      A.  Yes.

1   Q. Okay. So aside from the final outcome that
2 they wrote in the email, is there another document that
3 they put together or that was it?
4   A. No.
5   Q. That was it?
6   A. That was it.
7   Q. Okay. And then the statement from the
8 employees, from that you conclude that Mr. Navarro
9 wrote it?
10   A. Yes.
11   Q. Okay. So if I read those statements,
12 somewhere in those statements it would say Mr. Navarro
13 wrote the petition?
14   A. I think that -- no, it doesn't say about Mr.
15 Navarro writing the petition. It's says about Mr.
16 Navarro forcing the employees to sign the petition
17 which is -- this isn't about writing the petition.
18 It's about creating harassment environment in the
19 workplace.
20   Q. Okay. I understand that. I understand that.
21 Your attorneys have kind of said that to me many times,
22 so I understand that. But I'm still kind of like
23 before that, right? I'm still trying to get to the
24 point of trying to understand how you got to the
25 conclusion in your head that, hey, Mr. Navarro wrote

1    Q.  Okay.  So forcing employees to sign the
2 petition.  What's wrong with that?
3    A.  Well, I think that when you have -- you take
4 advantage of your rank, that is harassment because of
5 how the other people feel.
6    Q.  Anything else that's wrong with that?
7    A.  Yes.  So when they use this rank, people feel
8 scared of having this confrontation with the
9 supervisor, so they prefer to sign the petition without
10 understanding what the petition was for.
11    Q.  So are you saying that the safety department
12 talked to everybody that signed that petition and
13 verified whether they actually signed it or not?
14    A.  I cannot guarantee that they talked to hundred
15 percent of the employees.
16    Q.  Okay.  But do you know how many people they
17 talked to?
18    A.  I don't know exactly how many people they
19 talked to.
20    Q.  And then you used the word "harassment."  How
21 are you using that word "harassment"?  What do you mean
22 by that?
23    A.  Well, for me, harassment is pretty much --
24 it's to force or intimidate people.  So, in this case,
25 when he's taking his rank as a supervisor, telling

1  people to sign a petition that they don't know what
2  it's for, that for me is intimidation.  And that's how
3  they -- the employees felt.
4        Q.   How many employees are we talking about --
5        A.   Well --
6        Q.   -- that felt like that?
7        A.   I'm sorry?
8        Q.   How many employees felt like that?
9        A.   I cannot tell you exactly the number of, but I
10 can tell you in terms of the -- the statements we
11 received.  There were around three employees.
12       Q.   And then there were over 20 people who signed
13 the petition, right?
14       A.   Yeah.
15       Q.   So out of the more than 20 people who signed
16 the petition, three people felt like, oh, maybe I
17 didn't read it and then I signed it and maybe I --
18       MR. WU:  Objection.  Objection.  Lack of
19 foundation.  Calls for speculation.  Misstates prior
20 testimony.
21       MR. URIARTE:  Q.  So, Mr. Vargas, when your
22 attorney objects, we allow him to finish his objection
23 so that it's written into the record.  Please allow him
24 to finish, and then you can answer afterwards unless
25 your attorney tells you not to answer.  Okay?

```
1    from, if the document is signed by people who felt
2    harassment.  So what's the validation of that document?
3         Q.  But we also have other people who didn't feel
4    that way, right?
5         A.  We don't know.
6         MR. WU:  Objection.  Lack of foundation.
7    Misstates prior testimony.
8         MR. URIARTE:  Q.  So I guess my question is this:
9    So the document itself, the petition itself, talks
10   about things that they're not happy about, correct?
11   Would you agree with that?
12        A.  I disagree with it.
13        Q.  Okay.
14        A.  I don't agree with it because you're saying
15   "they," and at this point, when I see there's employees
16   forced to sign it, it means that there is somebody, one
17   person, that is pretty much complaining for that, not
18   the whole thing.
19        Q.  I see what you're saying.  You're saying
20   because you believe that there's one person forcing
21   people to sign, that you don't believe the petition
22   anymore.
23        A.  I don't -- I don't -- I don't have the same
24   validity of the petition anymore.
25        Q.  Validity?
```

1    A.   ==Validity, I'm sorry.==

2    Q.   No problem.  I talk the same way, so I totally

3 understand you.

4         Okay.  I get that.  I guess, from your mind, I

5 could see how you could think that way.  But that might

6 not make sense when you take into consideration a

7 second petition after the termination of Mr. Navarro.

8 What about that?

9    A.   The second petition, it was not brought after.

10   Q.   It was.  It was.  It was brought after.

11   MR. WU:  Objection.  Assumes facts.  Lack of

12 foundation.

13   MR. URIARTE:  I'll show it to you so we can put

14 that to rest.  I'll show that to you, don't worry.

15        So here's -- can we have Exhibit 8 up, please,

16 David.  Thank you.

17        (Plaintiff's Exhibit 8 marked for

18        identification.)

19   MR. URIARTE:  Q.  So, Mr. Vargas, do you see this

20 one --

21   A.   Yes.

22   Q.   -- which we've been calling the first

23 petition?

24        Is this the one -- do we agree this is the one

25 that you saw initially when you say that you talked to

1  Tracy and Renil? Does that make sense?

2      A. I cannot confirm a hundred percent that this

3  was the one.

4      Q. Okay. So if we go down a little bit, yeah,

5  you'll see Mr. Navarro's signature on this one.

6      A. Yes.

7      Q. And this document actually comes from your

8  company, if you see the Menzies number there, Menzies

9  153. And so line 24 there on the second page -- I'm

10 sorry, line 16 of the second page has Mr. Navarro's

11 signature. Do you see that?

12     A. Yes.

13     Q. All right. So, again, going back to your

14 conclusion earlier, you're saying, if you think that

15 Mr. Navarro was forcing all of these people to sign the

16 petition, you believe the petition is now without

17 validity, is that correct?

18     A. Well, I don't think that it has the same

19 validity, definitely. Now, what is most important to

20 bring out is that I had a conversation with HR about

21 Andrew, because they were -- in the letter I believe

22 they complained also about him falling asleep on the

23 operation.

24     So I had this conversation with HR. And they

25 explained to me and they addressed that issue before I

1   started working at Menzies.  Because, again, I started

2   June 2018.  And this was happening -- this happened in

3   August.

4       Q.  Yes.  Right.  So you started in June of 2018,

5   and this was happening in August.  So you didn't have

6   that much kind of context with regard to what was

7   happening from the last year, is that correct?

8       A.  (Indicates affirmatively.)

9       Q.  Mr. Vargas?

10      A.  Yes.

11      MR. WU:  Arlo, I'm sorry to interrupt.  Can we

12  take a quick break in the next five minutes?  Whatever

13  is a good stopping point for now.

14      MR. URIARTE:  That's fine.  We can take a break

15  now.  No problem.

16      MR. WU:  Thanks a lot, Arlo.  Let's go off the

17  record.

18      MR. URIARTE:  No problem.

19          (Brief recess.)

20      MR. URIARTE:  Q.  So we were talking about Exhibit

21  8, Mr. Vargas.  My question is with regards to the

22  actual things that the fuelers were complaining about.

23  And I just want to clarify something.

24          Was there ever an investigation by Menzies

25  with regard to the context or the content of their

1  outcome of that conversation with HR.
2      Q.  Okay.  Mr. Vargas, let me put it directly
3  here.  If it's true, just theoretically, if it's true
4  that Nicco, John and Renil are covering up for the
5  mistakes of Andrew Dodge, would that be something that
6  maybe Nicco, John and Renil should be terminated for?
7      A.  I think that it would be important to make an
8  investigation before we take into consideration.
9      Q.  But that's a serious allegation, right?
10     A.  I'm sorry?
11     Q.  That's a serious allegation.
12     MR. WU:  Objection.  Improper hypothetical.
13         You can answer the question.
14     MR. URIARTE:  Q.  That's a serious allegation.
15     A.  And as I said before, for me, anything that
16 affect the environment of our employees is valid.
17     Q.  Yeah, it's valid, definitely.  But my question
18 was that would be serious, wouldn't you agree, as a
19 manager, if somebody --
20     A.  Again, it all depends on the investigation.
21 So I cannot tell you, because the letter says that,
22 but --
23     Q.  Sure.
24     A.  -- we did an investigation as we did with
25 Navarro.

```
 1                    CERTIFICATE OF WITNESS
 2                           ---o0o---
 3
 4         I, RAUL VARGAS, hereby declare under
 5   penalty of perjury that I have read the foregoing
 6   deposition testimony; and that the same is a true
 7   and correct transcription of my said testimony
 8   except as corrected pursuant to my rights under
 9   Rule 30(e) of the Federal Rules of Civil
10   Procedure.
11
12                       _____
                                      Signature
13
14                       _____
                                        Date
15
16
17
18
19
20
21
22
23
24
25
```

```
1   STATE OF CALIFORNIA      )
                             )
2   COUNTY OF SAN FRANCISCO  )
```

3       I, CINDY TUGAW, a Certified Shorthand Reporter
4   of the State of California, duly authorized to
5   administer oaths pursuant to Section 8211 of the
6   California Code of Civil Procedure, do hereby certify
7   that

8                   RAUL VARGAS,
9   the witness in the foregoing deposition, was by me duly
10  sworn to testify the truth, the whole truth and nothing
11  but the truth in the within-entitled cause; that said
12  testimony of said witness was reported by me, a
13  disinterested person, and was thereafter transcribed
14  under my direction into typewriting and is a true and
15  correct transcription of said proceedings.

16      I further certify that I am not of counsel or
17  attorney for either or any of the parties in the
18  foregoing deposition and caption named, nor in any way
19  interested in the outcome of the cause named in said
20  caption.

21      Dated the 10th day of September, 2020.

                    [Signature: Cindy Tugaw]

                    CINDY TUGAW
                    CSR No. 4805 (California)

```
 1   Raul Vargas
     c/o Foley & Lardner
 2   555 California Street, Suite 1700
     San Francisco, CA 94104
 3   Attn: Jason Y. Wu, Esq.

 4   Date: September 10, 2020
     Re:  Navarro vs. Menzies
 5   Deposition Date: Tuesday, August 25, 2020

 6   Dear Mr. Vargas,

 7          Please be advised the original transcript of
     your deposition is ready for your review.
 8          Pursuant to FRCP Rule 30(e), you have 30 days
     following the date of this notice to read, correct if
 9   necessary, and sign your transcript unless the
     attending parties and the deponent agree on the record
10   or otherwise in writing to a longer or shorter time
     period.  The deponent may change the form or the
11   substance of the answer to a question, and may either
     approve the transcript of the deposition by signing it,
12   or refuse to approve the transcript by not signing it.
     You are not required by law to read and sign your
13   deposition transcript.  All parties will be informed of
     the corrections.  The original transcript will then be
14   sealed and sent to the examining attorney pursuant to
     the applicable law.
15          You may either come to our office to read and
     sign the original transcript, or you may contact your
16   attorney or the attorney who arranged for you to be
     present at your deposition.  If they have ordered a
17   copy of the transcript, you may review their copy and
     make corrections by submitting, signing and returning
18   the attached form.  If you choose to review your
     transcript at our office, please call first to make an
19   appointment.  Should you have any question regarding
     these instructions, please call.
20
     Sincerely,
21


22
     NOGARA REPORTING SERVICE
23   5 Third Street, Suite 415
     San Francisco, California 94103
24   (415) 398-1889

25   cc:  All counsel, original deposition
```