Arlo García Uriarte, SBN 231764
Ernesto Sánchez, SBN 278006
Un Kei WU, SBN 270058
Daniel P. Iannitelli, SBN 203388
Elizabeth Lyons, SBN 327742
LIBERATION LAW GROUP, P.C.
2760 Mission Street
San Francisco, CA 94110
Telephone: (415) 695-1000
Facsimile: (415) 695-1006

Attorneys for PLAINTIFF
RENALDO NAVARRO

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENALDO NAVARRO,<br><br><br>Plaintiff,<br><br>vs.<br><br>MENZIES AVIATION, INC., doing business as MENZIES and DOES 1 through 10, inclusive.<br><br>Defendants. | **Case No.: 3:19-cv-08157 VC**<br><br>**PLAINTIFF'S APPENDIX OF SUPPORTING EVIDENCE**<br><br>Date: November 19, 2020<br>Time: 10:00 a.m.<br>Place: video conference link<br><br>Hon. Vince Chhabria<br>San Francisco Courthouse<br>Courtroom 4 – 17th Floor<br><br>Action Removed: December 16, 2019<br>Action Filed: October 23, 2019 |

INDEX OF EXHIBITS

| Exhibit No. | Title | Page No. |
|---|---|---|
| 30 | Declaration of Arlo Uriarte | 1 |
| 31 | Declaration of Renaldo Navarro | 4 |
| 32 | Declaration of Rafael Vasquez | 10 |
| 33 | Declaration of Jezen Canlas | 17 |
| 34 | Declaration of July Macapagal | 23 |
| 35 | Declaration of Modesto Compas | 27 |
| 36 | Declaration of Marc Ilagan | 31 |
| 37 | Deposition of Renaldo Navarro | 36 |
| 38 | Errata Sheet with attached relevant pages changed | 51 |
| 39 | Deposition of Andrew Dodge | 66 |
| 40 | Deposition of Tracy Aguilera | 77 |
| 41 | Deposition of Raul Vargas | 91 |
| 42 | Deposition of John Qually | 109 |
| 43 | Photographs of Andrew Dodge sleeping | 124 |
| 44 | Copies of Acknowledgment Forms in Menzies' document production | 126 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

*Exhibit*

*30*

**000001**

1   UrArlo García Uriarte, SBN 231764
    Ernesto Sánchez, SBN 278006
2   Un Kei WU, SBN 270058
    Daniel P. Iannitelli, SBN 203388
3   Elizabeth Lyons, SBN 327742
4   LIBERATION LAW GROUP, P.C.
    2760 Mission Street
5   San Francisco, CA 94110
    Telephone: (415) 695-1000
6   Facsimile: (415) 695-1006

7
8   Attorneys for PLAINTIFF
    RENALDO NAVARRO

9

10

11                 **UNITED STATES DISTRICT COURT**

12               **NORTHERN DISTRICT OF CALIFORNIA**

13

14   RENALDO NAVARRO,                    **Case No.:  3:19-cv-08157 VC**

15                                       **DECLARATION OF ARLO URIARTE**
                                         **AUTHENTICATING COPIES OF**
16                Plaintiff,             **PLAINTIFF'S SUPPORTING EVIDENCE**

17          vs.

18   MENZIES AVIATION, INC., doing       Date:    November 19, 2020
     business as MENZIES and DOES 1 through   Time:    10:00 a.m.
19   10, inclusive.                      Place:   video conference link

20                                       Hon. Vince Chhabria
21                Defendants.            San Francisco Courthouse
                                         Courtroom 4 – 17th Floor
22
                                         Action Removed:  December 16, 2019
23                                       Action Filed:       October 23, 2019

24

25

26

27

28

I, Arlo Uriarte, declare as follows:

1. I am an attorney admitted to practice before all superior courts in the State of California. I am admitted to practice in the United States District Court for the Northern and Eastern Districts of California. I am admitted to the United States Court of Appeals for the Ninth Circuit.

2. I have personal knowledge of the facts stated in this declaration. If called upon to testify as a witness, I would competently testify as to these facts.

3. Exhibits 31 – 35 are declarations obtained from witnesses and are true and correct copies of the originals signed and executed by each witness.

4. Exhibits 36, 38-41 are copies of deposition transcripts from witnesses deposed in this matter. The pages attached are true and correct copies of the certified transcripts for each witness.

5. Exhibits 37 is a true and correct copy of the Errata sheet downloaded from the deposition depository Sound Deposition Service, from the deposition officer selected by Menzies. The errata sheet has been available since Sept. 2, 2020. The username and passwords for our access is uriarte / uriarte (all lower case).

6. Exhibit 42 is a true and correct copy of a photograph of Andrew Dodge, authenticated by him during his deposition.

7. I reviewed the production of documents by Menzies, no acknowledgment of receipt for the employment handbook nor the Code of Conduct was provided.

    I declare under penalty of perjury under the laws of the United States and in the State of California that the foregoing is true and correct.

Date: 11/2/2020                                              Arlo Uriarte

# Exhibit

# 31

1 | Arlo García Uriarte, SBN 231764
2 | Ernesto Sánchez, SBN 278006
Un Kei WU, SBN 270058
3 | Daniel P. Iannitelli, SBN 203388
Elizabeth Lyons, SBN 327742
4 | LIBERATION LAW GROUP, P.C.
2760 Mission Street
5 | San Francisco, CA 94110
Telephone: (415) 695-1000
6 | Facsimile: (415) 695-1006
7 |
8 | Attorneys for PLAINTIFF
RENALDO NAVARRO
9 |
10 |
11 | ## UNITED STATES DISTRICT COURT
12 | ## NORTHERN DISTRICT OF CALIFORNIA
13 |

RENALDO NAVARRO,

Plaintiff,

vs.

MENZIES AVIATION, INC., doing business as MENZIES and DOES 1 through 10, inclusive.

Defendants.

**Case No.: 3:19-cv-08157 VC**

**DECLARATION OF RENALDO NAVARRO IN SUPPORT OF PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT**

Date:     November 19, 2020
Time:     10:00 a.m.
Place:    video conference link

Hon. Vince Chhabria
San Francisco Courthouse
Courtroom 4 – 17th Floor

Action Removed:  December 16, 2019
Action Filed:       October 23, 2019

I, Renaldo Navarro, have personal knowledge of the matters stated herein and if called upon as a witness, I would competently testify as follows:

1.  I am the Plaintiff in this matter.

2.  I add this declaration to the testimony I have provided during my deposition.

3.  In August 2018, my estimate is that in Mr. Dodge's swing shift as the Fueling Supervisor at Menzies Aviation, he was supervising about 10-12 Fuelers. Of these Fuelers about 7-8 are Filipino. In my shift, I usually supervised his 10-12 Fuelers and from 1:00 a.m. to 6:00 a.m. I supervised 4-5 Fuelers, 2 of which are Filipinos. Between 5:00 a.m. to 6:00 a.m. I then supervised an additional 8 Fuelers, all of whom are Filipinos.

4.  During my tenure both at ASIG and MENZIES, I loved my job. I treated my job with respect and pride. I tried to help people and knew the importance of my role at the airport, as well as with the airlines. This was my way of life and how I contributed to society.

5.  When Andrew Dodge was promoted to supervisor, I tried to assist him just like any other new supervisor before him. We gave him the benefit of our training and experience. We treated him as part of the team.

6.  It was only because of the way he treated other people and how he acted around Filipino fuelers that the workplace began to deteriorate. Mr. Dodge kept missing flights, and the health and safety of the Fuelers was of concern of mine. They were working hard and they were missing breaks.

7.  I tried to work with Mr. Dodge before I had to raise the concern with upper management. We tried to communicate with him as to how his work and attitude was affecting others. I was in constant communication with John Qually about the performance and attitude of Mr. Dodge. Somehow, Mr. Qually kept ignoring the issue.

8.  He would use the flashlight and the truck lighting against Filipino fuelers acting as if he was an ICE agent at the airport.

9.  Often when the Filipino fuelers were already over worked, he would force additional flights on them even when the fuelers were already over booked. He would punish the fuelers if they did not agree with him. He did not do such to Fuelers who were of Caucasian or

African American descent.

10. Several times between 2017 and 2018, fuelers would come to me as the shift supervisor telling me that Mr. Dodge acted unprofessionally with them, bullying them or acting as if he would physically intimated them.  For example, Dodge once bullied Lodrino Samonte (Filipino fueler) forcing him to engage in an operation that Mr. Samonte was not certified for. Mr. Samonte was afraid and told by Mr. Dodge that he would lose his job.  Mr. Samonte was advised that he needed to follow Mr. Dodge despite the fact that he was not certified.

11. Until my separation from Menzies, I never received the employment handbook, nor the Code of Conduct.

12. I believe that Mr. Dodge was promoted too soon. He only had one year of service as a fueler.  Other Filipino fuelers with more years of service were available for that position. Jezen Canlas, July Macapagal, Marc Ilagan, Primo de la Cruz and Ryan Quinsao are some examples.

13. When I complained to Renil Lal and John Qually about Mr. Dodge, between 2017 and 2018, I would complain about the way Mr. Dodge treated Filipino fuelers.  It got to the point that the fuelers were very upset with Mr. Dodge.  I was trying to appease the fuelers and was asking for help from management. I was clear to management that the Filipino fuelers were feeling like they were being harassed and treated differently by Mr. Dodge. Such treatment resulted in them being overworked, humiliated, unhealthy working conditions and safety concerns.  I did not understand why management was ignoring my communications and complaint.

14.  I signed petition but did not force others to sign.  I was asked to deliver the petition to management.  Of the 26 people who signed, 17 are Filipinos.

15. After giving the petition to Raul Vargas at about 4 to 5 p.m. on or about August 22, 2018, the next morning at about 5 a.m., I was told by John Qually to wait for Raul Vargas. About an hour later, Mr. Vargas arrived and told me that I was being suspended pending an investigation.

1    16. Kevin Blumberg was also present that morning.  Raul Vargas explained to me that

2  signing the petition and siding with the fuelers was not appropriate.  Mr. Blumberg added that I

3  need to make a statement conceding that I will not do this again.

4    17. Mr. Vargas and Mr. Blumberg did not allow me explain the situation.  They did

5  not ask many questions.  They were just there to let me know that I was suspended.  They did not

6  ask to hear my side or what the fuelers were complaining of.  The whole meeting lasted about 3-

7  5 minutes.  Aside from this interaction, there were no other meetings, phones calls nor interviews

8  about the petition or the working conditions created by Dodge.

9    18. With regards to the text that I sent to Mr. Dodge, my attorney has shown me again,

10  what is MENZIES 000088, my intention on that August 13, 2018, text is to tell Dodge that I have

11  the petition and had been giving him time to change, that I have not submitted the petition yet.

12  He was complaining in a previous text as to me being a bad supervisor for calling in sick.  That

13  was my response.

14    19. About one week later, August 30, 2018, Tracy Aguilera asked me to go to her

15  office where she informed me that I was terminated.  Thirteen years of service came to an end. It

16  pained me so much and caused me so much anxiety.

17    20.  Since I was fired from Menzies I have really pondered long and hard what mistake

18  I have committed.  I cannot think of any.   I have offered nothing but loyalty and hard work; the

19  company that had been part of my life and lifestyle.  Signing the petition that, in my mind, will

20  help Menzies appreciate and understand what was going on in the field.  The injustices that the

21  employees were suffering from Dodge.  I signed the petition not to fight Menzies but to bring to

22  Menzies attention to Dodge's wrongdoings and to protect Menzies, the Company I have learned

23  to love and hope to retire from.

24    21. Since I was fired, I suffered mental anguish, anxiety, pondering what I did wrong

25  to the Company.  I could not sleep and eat because of what had happened to me.  I cannot stop

26  thinking about it.  I was kicking myself for signing the petition.  However, I felt that my team was

27  suffering injustice and were being maltreated by Dodge, and it hurt me to my core.

28    22. As a result of the anxiety and stress, I have to see a Doctor to help me overcome

the stress and the anxiety.    I was over 40 years old when I was fired and kept thinking where to look and how to find a job.  I was anxious and stressed thinking about the bills, the house rent, how to pay bills and how to support my family. I was very anxious and did not know what to do. I experienced more than a year of hardship.  After over a year, I found some odd jobs at the airport.

23. Until now it still enters my mind why I was fired especially now with the pandemic and I just rely from unemployment. Until now I still think about what Menzies has done to me. Until now, I still ask myself if signing that petition was worth it.  I told them even back then that if that is what they believe I should do, I won't do it again.  I thought I was doing the company a good thing by bring up the bad that Dodge was doing to the company.

I declare under penalty of perjury under the laws of the United States and in the State of California that the foregoing is true and correct.


_____          11-2-20
Renaldo Navarro                                    Date

*Exhibit*

*32*

000010

1  Arlo García Uriarte, SBN 231764
2  Ernesto Sánchez, SBN 278006
   Un Kei WU, SBN 270058
3  Daniel P. Iannitelli, SBN 203388
   LIBERATION LAW GROUP, P.C.
4  2760 Mission Street
   San Francisco, CA 94110
5  Telephone: (415) 695-1000
6  Facsimile: (415) 695-1006

7  Attorneys for PLAINTIFF
   RENALDO NAVARRO
8

9

10                    UNITED STATES DISTRICT COURT

11                   NORTHERN DISTRICT OF CALIFORNIA

12

13
   RENALDO NAVARRO,                    Case No.:  3:19-cv-08157 VC
14
                                        DECLARATION OF RAFAEL VAZQUEZ
15                                      IN SUPPORT OF PLAINTIFF'S
              Plaintiff,                 OPPOSITION TO SUMMARY JUDGMENT
16
17      vs.

18  MENZIES AVIATION, INC., doing       Date:    November 19, 2020
    business as MENZIES and DOES 1 through  Time:    10:00 a.m.
19  10, inclusive.                       Place:   video conference link

20                                       Hon. Vince Chhabria
              Defendants.                San Francisco Courthouse
21                                       Courtroom 4 – 17th Floor

22                                       Action Removed:  December 16, 2019
                                         Action Filed:      October 23, 2019
23

24

25

26

27

28

I, Rafael Vasquez, have personal knowledge of the matters stated herein and if called upon as a witness, I would competently testify as follows:

1. I am an employee of Menzies Aviation, Inc. ("Defendant"). I started working for Defendant in 2017 as an aircraft fueler. I am a union steward for SEIU Airports Division ("Union"). It was in this capacity that I became aware of the complaints made by many of my fellow aircraft fuelers (also employed by Defendant hereinafter "Fuelers") regarding Andrew Dodge and their working conditions.

2. I know Mr. Renaldo Navarro as the supervisor of many of Defendant's fuelers during the 11:00 p.m. to 7:00 a.m. shift. He is well respected. He respects fuelers and is not abusive. Fuelers listened to him and he was not intimidating. He is known to be even handed and someone you can talk to. During my time as a union steward there we no complaints made to the Union about Mr. Navarro. On the contrary, we often talked to Mr. Navarro – pleading that he help us talk to management and make them understand our complaints against Mr. Dodge.

3. Before August 2018, between 2017 and 2018, the Fuelers made multiple complaints to the Union regarding an abusive supervisor by the name of Andrew Dodge. The complaints included verbal abuse, threats, and even physical confrontations with some of the fuelers. These complaints were communicated to management for over a year. We would have meetings with management every week to two weeks. The complaints were communicated during these meetings. The shop stewards would communicate these to management attendees: Renil Lal, John Qually, Nicco, Raul Vargas would often attend. They knew that especially the Filipino fuelers were being harassed and discriminated by Mr. Dodge.

4. Mr. Dodge is a strange individual. Please remember that this time frame – 2016, when Mr. Dodge was hired, 2017 when I came on board, through 2018, was when Trump had just gotten elected. Mr. Dodge, as a white man, and most likely anti-immigrant, would engage in really strange behaviour towards the Filipino fuelers. One time, before August 2018, I witnessed as Dodge lit up the fuelers with truck lights- very strong lights – as they were exiting the

1  workplace.  He was pretending that he was an ICE agent, inspecting the fuelers as they walked
2  by.  We communicated this incident to management but nothing was done.

3     5.  It is my sincere belief that management looked the other way regarding Mr. Dodge
4  because he is a white man.  Ms. Aguilera is also a white person.  Mr. Qually as well.  They
5  "needed" a white supervisor for appearance purposes, and given the political situation then, these
6  white folks bonded together.

7     6.  Fuelers also accused Mr. Dodge of sleeping while on duty.  This was common
8  knowledge and dangerous in my opinion.  There are pictures of Mr. Dodge sleeping in the truck,
9  a company truck that was in the tarmac.  This is dangerous.  I do not believe that a Filipino
10  supervisor who slept on the job would be given any accommodation, it is dangerous.

11     7.  I was personally told by several fuelers then that Mr. Dodge's poor supervision
12  and deficient performance led to flights being delayed and the Fuelers not getting their meal and
13  rest periods as they should have.  As far as I know he was not reprimanded for this.  If Filipino
14  supervisors did that, they would be treated differently, reprimanded, even suspended.

15     8.  Due to Defendant's inactions, the work environment of the Fuelers became hostile
16  as Mr. Dodge continued his abusive behavior towards the Fuelers.  I could not believe how
17  Defendant could allow Mr. Dodge to continue harassing the Fuelers and setting them up for failure
18  as the Union continued to receive complaints.  When we receive these complaints, we
19  communicated these to management in our weekly meetings and when we saw them.

20     9.  I found out around August 2018, that the Fuelers decided to write a petition against
21  Mr. Dodge.  I signed this petition.  Along with many fuelers and two supervisors, including Mr.
22  Navarro.

23     10. I am aware that the Union office was aware we were getting signatures from
24  fuelers in a petition against a supervisor, Mr. Dodge.  The union officer I spoke about the petitions
25  was Charles Owinche.  I know that Mr. Owinche knows Mr. Navarro.  It does not make sense to
26  me that Mr. Owinche would be upset that Mr. Navarro or any supervisor would be lending support
27  to the fuelers and making people sign the petition.  I, Mark Ilagan, Jezen Canlas, union stewards,
28  were asking people to sign the petition.  Mr. Navarro played a minor role, by signing the petition
   and lending support.  He also helped us deliver the first petition to management.

11. The attorneys for Mr. Navarro explained to me that supposedly Mr. Owinche called Ms. Aguilera to complain that fuelers were being pressured to sign a petition. But this does not make sense. We are the union stewards, me, Jezen Canlas, and Mark Ilagan. It was us who were asking people to sign the petition. Why would we complain, including Mr. Charles Owinche, that a supervisor would be pressuring others to sign the petition? We wanted people, fuelers and supervisors, to sign the petition. That was not the subject of our concern then, nor that of Mr. Owinche.

12. I was informed by others that Mr. Owinche has now moved to the East Coast and is no longer with the Union. I believe he left his job with the Union in late 2018.

13. After the first petition was going around the workplace in July and/or August 2018, fuelers complained to me that Andrew Dodge was stopping them from signing the petition. He told fuelers that it was illegal to engage in such conduct in the workplace. I then talked to Charles about this matter and he instructed me to tell the fuelers that as long as the signing of the petition did not interfere with their job functions, and it occurred in the break room or outside the premises, after or before the shift hours, then union members can sign the petition. I informed the fuelers about this, but the complaints that Andrew Dodge engaged in illegal anti-union activities continued. I believe that it was at this point that Mr. Owinche may have called Ms. Aguilera.

14. Instead of taking the complaints and the petition seriously, Defendant did not do anything to discipline or retrain Mr. Dodge. We were instead "put in our place" when Mr. Dodge not only did not get in trouble, it was Mr. Navarro who was terminated. The Union reported the Fuelers' complaints to Defendant.

15. Several months after the first petition, I took it upon myself to write a second petition. Again, this second petition was not acted on. I took this petition to Raul Vargas and gave him the petition myself. No investigation was ever done.

16. The reason I took it upon myself to write this petition is because management needed to do something for the Filipino fuelers who were getting harassed and subjected to abusive behavior by Andrew Dodge. It had been going on for over a year already.

17. I personally witnessed how Mr. Dodge spoke and treated Filipinos, Latinos and South Asians differently compared to white employees. Mr. Dodge was demeaning and degrading to nonwhites. It was obvious that Mr. Dodge feels racially superior to nonwhites.

18. My opinion is that because Mr. Dodge is Caucasian and a supervisor, management wanted to side with him because of his race. Mr. Navarro is Filipino and a supervisor. Management discriminated against him. That is my opinion.

19. I know that John Qually, Renil Lal, Raul Vargas, Nicco were all aware of these issues of discrimination, harassment and abusive behavior but ignored it.

20. I wrote the November 18, 2018, letter and gave that to Mr. Navarro.

21. I spoke to Raul Vargas three times about Mr. Dodge. I spoke to him about the abusive behavior of Mr. Dodge, his harassment and his discriminatory attitude towards the fuelers. Mr. Vargas nor anyone from management did not address our concerns. I remember giving Raul Vargas the second petition myself. Another time, I told Mr. Vargas that Mr. Dodge's harassing and abusive behavior had not changed. These conversations happened between August and November 2018.

22. When Menzies took over the ASIG operations, they did not give us handbooks to sign or any code of conduct documents. I know this because for the longest time we were still using forms from ASIG. I do not remember getting handbooks specifically from Menzies.

I declare under penalty of perjury under the laws of the United States and in the State of California that the foregoing is true and correct.

*Rafael cano vasquez*

_____
Rafael Vasquez

Oct 31, 2020

_____
Date

**SignRequest**

# Signing Log

Document ID: W6J5JLP5

**Liberation Law Group P.C. (signrequest@liberationlawgroup.com)**

| | |
|---|---|
| Document name: | Declaration of Vasquez 10312020 Navarro v Menzies v2.pdf |
| | SHA256 security hash: |
| | b0b2321d7195968346086e13b4b0f2a3088573607774702b664c2b7b190a9d74 |
| Sent on: | Nov. 1, 2020, 4:01 a.m. (UTC) |
| From: | SignRequest <no-reply@signrequest.com> on behalf of (signrequest@liberationlawgroup.com) |
| To: | falocanovasquez@msn.com |
| Subject: | Liberation Law Group P.C. (signrequest@liberationlawgroup.com) has sent you a SignRequest |
| Message: | |

    Hello Rafael,
    Please sign the declaration per Arlo Uriarte's request.
    Thank you.

| | |
|---|---|
| IP address: | 73.92.8.235 |
| User agent: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/86.0.4240.111 Safari/537.36 |

**signrequest@liberationlawgroup.com**

| | |
|---|---|
| Email address verification: | Verified by SignRequest |

**falocanovasquez@msn.com**

| | |
|---|---|
| Email address verification: | Verified by SignRequest |
| Text added, page 5: | Oct 31, 2020 |
| Signature added, page 5: | |

*Rafael cano vasquez*

| | |
|---|---|
| IP address: | 172.56.39.58 |
| User agent: | Mozilla/5.0 (iPhone; CPU iPhone OS 13_6_1 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/13.1.2 Mobile/15E148 Safari/604.1 |
| Document signed: | Nov. 1, 2020, 4:39 a.m. (UTC) |

*Exhibit*

*33*

000017

1  Arlo García Uriarte, SBN 231764
2  Ernesto Sánchez, SBN 278006
   Un Kei WU, SBN 270058
3  Daniel P. Iannitelli, SBN 203388
   LIBERATION LAW GROUP, P.C.
4  2760 Mission Street
   San Francisco, CA 94110
5  Telephone: (415) 695-1000
   Facsimile: (415) 695-1006
6
7  Attorneys for PLAINTIFF
   RENALDO NAVARRO
8
9
10              UNITED STATES DISTRICT COURT
11             NORTHEN DISTRICT OF CALIFORNIA
12
13
14  RENALDO NAVARRO,                    Case No.:  3:10-cv-08157 VC

15                                      DECLARATION OF JEZEN B. CANLAS
                                        IN SUPPORT OF PLAINTIFF'S
16              Plaintiff,              OPPOSITION TO SUMMARY JUDGMENT

17       vs.

18  MENZIES AVIATION, INC., doing       Date:    November 19, 2020
    business as MENZIES and DOES 1 through   Time:    10:00 a.m.
19  10, inclusive.                      Place:   video conference link

20              Defendants.             Hon. Vince Chhabria
                                        San Francisco Courthouse
21                                      Courtroom 4 – 17th Floor

22                                      Action Removed:  December 16, 2019
                                        Action Filed:     October 23, 2019
23
24
25
26
27
28

I, Jezen B. Canlas, have personal knowledge of the matters stated herein and if called upon as a witness, I would competently testify as follows:

1.    I started working at ASIG since July of 2002, as a fueler, until the company was bought by Menzies Aviation, Inc. ("Defendant"). I continued to work for Defendant, until I left the company in 2020.

2.    In 2017 and 2018 I was a fueler who was helping the Union.

3.    In 2017 Andrew Dodge became a supervisor. He was only a fueler for one year.

4.    Me, along with other fuelers believed that Mr. Dodge was less qualified in the job of supervisor than many other Filipino fuelers who had been with the company for many years. For example, I know of at least three fuelers who were all fuelers that had more seniority than Andrew Dodge. These fuelers were better equipped to be supervisors.

5.    Not long after Andrew Dodge became a supervisor, problems with the way he ran his shifts happened. He also had many problems working with Filipino fuelers. Andrew Dodge is white. I know that fuelers complained to management that they believe they were being discriminated by Dodge in the years 2017 and 2018.

6.    For example, often he would act as if he was a security force watching over the Filipino fuelers, using his flash light.

7.    Management, especially, Renil and John Qually treated Andrew Dodge with favoritism. First of all, they did not even open the position of supervisor to everyone, and he got the job as a supervisor. Also, when there were issues in Andrew Dodge shifts, John and Renil, who are his managers did not get mad at him. But if us fuelers make mistakes, or if the supervisors that are Filipino makes mistakes, I know that John and Renil would get mad at them. I remember that Andrew Dodge caused a lot of delays to airlines schedules, because of fueling delays but he was not reprimanded.

8.    In or around July and August 2018, we fuelers started to talk to one another, started a petition because we wanted our voices heard about the problems and concerns, we had about one of Defendant's supervisor: Andrew Dodge.

9.    We started the petition because when we complained to Defendant's management, nothing was done. We, the fuelers, met and discussed what was the best thing to do. Our objective

000019

was to let Defendant know and to take our concerns seriously about Mr. Dodge, who was not really doing his job and not helping the company at all.

10.    I collected all the concerns of the fuelers and started to write the petition letter on behalf of the fuelers. The letter was passed around the fuelers.  Those who agreed and believed in what we are fighting for, signed the petition. Nobody was forced to sign the petition.

11.    Mr. Navarro also signed the petition because he believed and understood what we were fighting.  Then, we asked Mr. Navarro the favor of handing over the letter to Defendant.

12.    Mr. Navarro was not involved in any way in the organization of the petition.

13.    Mr. Navarro did not ask anybody to sign the petition.

14.    I want to be clear that it was me who organized the petition and Mr. Navarro did not participate in the writing and asking fuelers to sign the petition.  Mr. Navarro, being the supervisor of the fuelers, did us the favor of submitting the petition to Defendant.  That was the extent of his involvement in the petition.

15.    Between 2017 and 2018, management was aware that there were numerous complaints against Mr. Dodge.  There were complaints of meal breaks being missed, there were complaints of harassment of fuelers, there were complaints of abuse of his authority.  I personally got complaints from fuelers about Dodge.

16.    We were really surprised that instead of investigating Mr. Dodge, they fired Mr. Navarro.  I believe this way their way of making an example of the Filipinos for complaining.

17.    Unlike Mr. Dodge, Mr. Navarro was well known for keeping flight schedules and maintaining good harmonious relationships with fuelers.  He did not abuse his authority and was well like by fuelers of all races.  He loved Menzies and was loyal.

000020

18.    When Menzies took over ASIG, between 2017 to 2018, we had not gotten any employment handbooks, nor code of conduct documents.  We were still using ASIG forms.  The handbook and code of conduct came later, after Mr. Navarro was already out of the company.

I declare under penalty of perjury under the laws of the United States and in the State of California that the foregoing is true and correct.

*Jezen B canlas*

Oct 31, 2020

_____                         _____

Jezen B. Canlas                                                    Date

 **SignRequest**

# Signing Log

Document ID: 92K7K8YX

---

**Liberation Law Group P.C. (signrequest@liberationlawgroup.com)**

| | |
|---|---|
| Document name: | Declaration of Jezen B Canlas (3).pdf |
| | SHA256 security hash: |
| | 9ddd7683277021fe8295a7779886299af4e511fe955fb1cd6db611d70b21c82d |
| Sent on: | Nov. 1, 2020, 1:52 a.m. (UTC) |
| From: | SignRequest <no-reply@signrequest.com> on behalf of (signrequest@liberationlawgroup.com) |
| To: | cjezen@att.net |
| Subject: | Liberation Law Group P.C. (signrequest@liberationlawgroup.com) has sent you a SignRequest |

Message:

> Hi Jezen,
> Please sign the declaration per Arlo Uriarte's request.
> Thank you.

| | |
|---|---|
| IP address: | 73.92.8.235 |
| User agent: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/86.0.4240.111 Safari/537.36 |

---

**signrequest@liberationlawgroup.com**

| | |
|---|---|
| Email address verification: | Verified by SignRequest |

---

**cjezen@att.net**

| | |
|---|---|
| Email address verification: | Verified by SignRequest |
| Text added, page 4: | Oct 31, 2020 |
| Signature added, page 4: | |

*Jezen B canlas*

| | |
|---|---|
| IP address: | 98.234.142.217 |
| User agent: | Mozilla/5.0 (iPhone; CPU iPhone OS 14_1 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/14.0 Mobile/15E148 Safari/604.1 |
| Document signed: | Nov. 1, 2020, 2:09 a.m. (UTC) |

000022

*Exhibit*

*34*

000023

1  Arlo García Uriarte, SBN 231764
   Ernesto Sánchez, SBN 278006
2  Un Kei WU, SBN 270058
   Daniel P. Iannitelli, SBN 203388
3  LIBERATION LAW GROUP, P.C.
   2760 Mission Street
4  San Francisco, CA 94110
   Telephone: (415) 695-1000
5  Facsimile: (415) 695-1006
6
7  Attorneys for PLAINTIFF
   RENALDO NAVARRO
8
9
10           UNITED STATES DISTRICT COURT
11          NORTHEN DISTRICT OF CALIFORNIA
12
13
14  RENALDO NAVARRO,                    Case No.:  3:10-cv-08157 VC

15                                      DECLARATION OF JULY MACAPAGAL
                                        IN SUPPORT OF PLAINTIFF'S
16           Plaintiff,                 OPPOSITION TO SUMMARY JUDGMENT

17      vs.

18  MENZIES AVIATION, INC., doing       Date:     November 19, 2020
    business as MENZIES and DOES 1 through    Time:     10:00 a.m.
19  10, inclusive.                      Place:    video conference link

20           Defendants.               Hon. Vince Chhabria
                                        San Francisco Courthouse
21                                      Courtroom 4 – 17th Floor

22                                      Action Removed:  December 16, 2019
                                        Action Filed:      October 23, 2019
23
24
25
26
27
28

I, July Macapagal, have personal knowledge of the matters stated herein and if called upon as a witness, I would competently testify as follows:

1.    I want to add the following to the declaration I signed for Menzies.

2.    Mr. Navarro is a good supervisor.  I was not agreeable to him being terminated. He was well liked by fuelers and well respected.

3.    The petition was so that management would investigate Mr. Dodge.  I do not understand how Mr. Navarro ended up being terminated.  He should not have been.

4.    Many fuelers had complaints against Dodge in 2017 and 2018.  Some of the complaints I know of is that he caused people to miss their meal breaks.  We communicated this to the union and to management.  Nothing was done.  I believe that is why the petition was put together.

5.    This is serious because missing meal breaks sometimes becomes a safety concern, because people are tired.

6.    When I signed the petition, as a supervisor, I did not think that is a problem.  It was the truth.  No one from management ever investigated me about me signing the petition.

7.     Also, in 2017 and 2018 we had not yet received Menzies handbooks or code of conduct documents.  We have yet to receive these documents until today.

I declare under penalty of perjury under the laws of the United States and in the State of California that the foregoing is true and correct.


*July J Macapagal Jr*
_____              Oct 31, 2020
July Macapagal                                      _____
                                                                  Date

 **SignRequest**

# Signing Log

Document ID: WX1Z16JV

---

**Liberation Law Group P.C. (signrequest@liberationlawgroup.com)**

| | |
|---|---|
| Document name: | Declaration of July Macapagal .pdf |
| | SHA256 security hash: |
| | 779463b4a52f7d222179d0e7de08d8b0ba2475c8b21306614cfb5ecf7e985664 |
| Sent on: | Nov. 1, 2020, 1:50 a.m. (UTC) |
| From: | SignRequest <no-reply@signrequest.com> on behalf of |
| | (signrequest@liberationlawgroup.com) |
| To: | hulyomacapagal@yahoo.com |
| Subject: | Liberation Law Group P.C. |
| | (signrequest@liberationlawgroup.com) has sent you a |
| | SignRequest |

Message:

> Hi July,
> Please sign the declaration per Arlo Uriarte's request.
> Thank you.

| | |
|---|---|
| IP address: | 73.92.8.235 |
| User agent: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/ |
| | 537.36 (KHTML, like Gecko) Chrome/86.0.4240.111 Safari/ |
| | 537.36 |

---

**signrequest@liberationlawgroup.com**

| | |
|---|---|
| Email address verification: | Verified by SignRequest |

---

**hulyomacapagal@yahoo.com**

| | |
|---|---|
| Email address verification: | Verified by SignRequest |
| Text added, page 2: | Oct 31, 2020 |
| Signature added, page 2: | |

*July J Macapagal Jr*

| | |
|---|---|
| IP address: | 174.194.142.106 |
| User agent: | Mozilla/5.0 (iPhone; CPU iPhone OS 14_1 like Mac OS X) |
| | AppleWebKit/605.1.15 (KHTML, like Gecko) Version/14.0 |
| | Mobile/15E148 Safari/604.1 |
| Document signed: | Nov. 1, 2020, 2:14 a.m. (UTC) |

**000026**

*Exhibit*

*35*

1  Arlo García Uriarte, SBN 231764
2  Ernesto Sánchez, SBN 278006
   Un Kei WU, SBN 270058
3  Daniel P. Iannitelli, SBN 203388
   LIBERATION LAW GROUP, P.C.
4  2760 Mission Street
   San Francisco, CA 94110
5  Telephone: (415) 695-1000
6  Facsimile: (415) 695-1006

7  Attorneys for PLAINTIFF
   RENALDO NAVARRO
8

9

10              UNITED STATES DISTRICT COURT

11            NORTHEN DISTRICT OF CALIFORNIA

12

13

14  RENALDO NAVARRO,                    **Case No.: 3:10-cv-08157 VC**

15                                      **DECLARATION OF MODESTO COMPAS**
                                        **IN SUPPORT OF PLAINTIFF'S**
16              Plaintiff,              **OPPOSITION TO SUMMARY JUDGMENT**

17       vs.

18  MENZIES AVIATION, INC., doing       Date:    November 19, 2020
    business as MENZIES and DOES 1 through   Time:    10:00 a.m.
19  10, inclusive.                      Place:   video conference link

20              Defendants.             Hon. Vince Chhabria
                                        San Francisco Courthouse
21                                      Courtroom 4 – 17th Floor

22                                      Action Removed:  December 16, 2019
                                        Action Filed:    October 23, 2019
23

24

25

26

27

28

**000028**

I, Modesto Compas, have personal knowledge of the matters stated herein and if called upon as a witness, I would competently testify as follows:

1.      I started working at ASIG since 2015, as a fueler, until the company was bought by Menzies Aviation, Inc. ("Defendant'). I continue to work for Defendant.

2.      I signed the petition against Andrew Dodge because I believe he is not doing a good job at Menzies. I still can't believe that instead of demoting Mr. Dodge the company fired Mr. Navarro. It was the union stewards, Jenzen, Mark and others who were the ones working to put together the petition. I remember they were working on it for some time until they started getting signatures.

3.      I never saw Mr. Navarro pressure others, nor ask others to sign the petition.

4.      Mr. Navarro is a good employee. Loyal to the company with the company's interest in mind. He only wanted what was good for the fuelers and the company. Harmonious work.

5.      Almost all of the fuelers signed the petition and yet they still did not do anything to Mr. Dodge. I truly believe that had a Filipino supervisor was subject to even just 5 people complaining, the company would fire the Filipino supervisor. Mr. Dodge is favored in the company over the Filipinos because he is white. This is my opinion.

6.      I have seen Filipinos getting reprimands for far less than what Mr. Dodge does at the job. I have seen him sleeping at the job. I have seen him sleeping in the tarmac. Management knows this. It is common knowledge. It is embarrassing to the other companies and airlines. This is dangerous. Yet, nothing happens to him.

7.      I know that fuelers kept telling the union stewards in 2017 and 2018 that Mr. Dodge was causing meal breaks being missed, delays in schedules and plane delays. Nothing happened. This is why we asked for help from Mr. Navarro.

I declare under penalty of perjury under the laws of the United States and in the State of California that the foregoing is true and correct.

*Modesto Compas*            10/31/2020
Modesto Compas                    Date

000029

 SignRequest

# Registro de Firma

Document ID: W6J5J3KL

---

**andrea@liberationlawgroup.com**

| | |
|---|---|
| Nombre del documento: | Declaration of Modesto Compas.pdf |
| | Función hash de seguridad SHA256: |
| | 9cfd6134d95f991276dd26437f46a6ab4e4bb1a7d07d8e7f0864631a58e8042a |
| Enviado el: | 31 de Octubre de 2020 a las 22:17 (UTC) |
| De: | SignRequest <no-reply@signrequest.com> on behalf of (andrea@liberationlawgroup.com) |
| A: | mcompas97@gmail.com |
| Sujeto: | andrea@liberationlawgroup.com le ha enviado una solicitud de firma SignRequest |

Mensaje:

> Dear Mr. Compas:
>
> Please sign and date where indicated. Should you have questions or concerns, please contact me at andrea@liberationlawgroup.com. Thank you.
>
> Sincerely,
>
> Andrea Ortiz

| | |
|---|---|
| Dirección IP: | 71.202.210.109 |
| Agente de usuario: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/86.0.4240.111 Safari/537.36 |

---

**andrea@liberationlawgroup.com**

| | |
|---|---|
| Verificación por correo electrónico: | Verificado por SignRequest |

**mcompas97@gmail.com**

| | |
|---|---|
| Verificación por correo electrónico: | Verificado por SignRequest |
| Texto añadido, página 2: | 10/31/2020 |
| Firma añadida, página 2: | |

*Modesto Compas*

| | |
|---|---|
| Dirección IP: | 107.77.211.31 |
| Agente de usuario: | Mozilla/5.0 (iPhone; CPU iPhone OS 14_0_1 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/14.0 Mobile/15E148 Safari/604.1 |
| Documento firmado: | 31 de Octubre de 2020 a las 22:51 (UTC) |

**000030**

*Exhibit*

*36*

000031

1  Arlo García Uriarte, SBN 231764
2  Ernesto Sánchez, SBN 278006
   Un Kei WU, SBN 270058
3  Daniel P. Iannitelli, SBN 203388
   LIBERATION LAW GROUP, P.C.
4  2760 Mission Street
   San Francisco, CA 94110
5  Telephone: (415) 695-1000
   Facsimile: (415) 695-1006
6
7  Attorneys for PLAINTIFF
   RENALDO NAVARRO
8
9
10              UNITED STATES DISTRICT COURT
11              NORTHEN DISTRICT OF CALIFORNIA
12
13
14  RENALDO NAVARRO,                    Case No.: 3:10-cv-08157 VC

15                                      DECLARATION OF MARC ILAGAN
                                        IN SUPPORT OF PLAINTIFF'S
16            Plaintiff,                OPPOSITION TO SUMMARY JUDGMENT

17       vs.

18  MENZIES AVIATION, INC., doing       Date:    November 19, 2020
    business as MENZIES and DOES 1 through  Time:    10:00 a.m.
19  10, inclusive.                      Place:   video conference link

20            Defendants.               Hon. Vince Chhabria
                                        San Francisco Courthouse
21                                      Courtroom 4 – 17th Floor

22                                      Action Removed:  December 16, 2019
                                        Action Filed:    October 23, 2019
23
24
25
26
27
28

I, Marc Ilagan, have personal knowledge of the matters stated herein and if called upon as a witness, I would competently testify as follows:

1.      I started working at ASIG as a fueler, until the company was bought by Menzies Aviation, Inc. ("Defendant").  I continued to work for Defendant, until I left the company in February 2020.  I became a supervisor after Mr. Navarro left in September 2018.

2.      I am Filipino American.  My national origin is the Philippines.  My race is Filipino.

3.      In 2018, I was a shop steward – for the Union.  It was part of my job to communicate to supervisors and managers problems or complaints fuelers had that happened while working.

4.      In 2017 Andrew Dodge became a supervisor.

5.      Many fuelers had complaints against Dodge in 2017 and 2018.  Some of the complaints I received from fuelers were that they missed their meal breaks.  I heard that Mr. Dodge would use flashlights against fuelers, acting like he was a security force.

6.      It was well known that Dodge slept in the truck, even when the company truck was in the tarmac.  This is dangerous but there was no action done with Dodge.  Even the general manager knew about this but there was no action.

7.      One time, he harassed me as well.  He was abusing his authority and tried to get me in trouble because of my use of the company truck.  He did this just to power trip over me.  He did this to many Filipino fuelers just because he can.

8.      I spoke to Ray Navarro about this incident because he was the supervisor during that graveyard shift.  Ray assisted me and calmed things down. Ray said he would talk to management.

9.      It was only when management was not listening to us that we decided to put together a petition.  The first petition, it was Jezen Canlas and myself who worked on it.  Rafael Vasquez helped us as well.  We got signatures from most of the fuelers.

10.     Mr. Navarro also signed the petition but I did not see him ask others to sign, or to pressure others to sign.  The truth of the matter, it was easy to have fuelers sign the petition.  Most understood that Mr. Dodge was bad for the company.

11.     During the union meetings with management that I attended, we complained about

Dodge.  No action was taken by management.

I declare under penalty of perjury under the laws of the United States and in the State of California that the foregoing is true and correct.

marc ilagan
_____          Oct. 31, 2020
Marc Ilagan                                      Date

# SignRequest

# Registro de Firma

Document ID: 9VY4Y152

---

**andrea@liberationlawgroup.com**

Nombre del documento:

Declaration of Marc Ilagan.pdf
Función hash de seguridad SHA256:
f1eb93b496666f31b5e16a2d7db277f4871220064c78e5e4c23d1997f8c29768

Enviado el:                                31 de Octubre de 2020 a las 23:34 (UTC)

De:                                        SignRequest <no-reply@signrequest.com> on behalf of
                                           (andrea@liberationlawgroup.com)

A:                                         marc_ilagan@yahoo.com

Sujeto:                                    andrea@liberationlawgroup.com le ha enviado una solicitud
                                           de firma SignRequest

Mensaje:

> Dear Mr. Ilagan:
>
> Good afternoon. Please sign where indicated. Should you have questions, please email me at
> andrea@liberationlawgroup.com. Thank you.
>
> Sincerely,
>
> Andrea Ortiz

Dirección IP:                              71.202.210.109

Agente de usuario:                         Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/
                                           537.36 (KHTML, like Gecko) Chrome/86.0.4240.111 Safari/
                                           537.36

---

**andrea@liberationlawgroup.com**

Verificación por correo electrónico:       Verificado por SignRequest

---

**marc_ilagan@yahoo.com**

Verificación por correo electrónico:       Verificado por SignRequest

Texto añadido, página 3:                    Oct. 31, 2020

Firma añadida, página 3:

*marc ilagan*

Dirección IP:                              12.251.123.98

Agente de usuario:                         Mozilla/5.0 (Windows NT 6.1; Win64; x64) AppleWebKit/537.36
                                           (KHTML, like Gecko) Chrome/86.0.4240.111 Safari/537.36

Documento firmado:                         31 de Octubre de 2020 a las 23:57 (UTC)

**000035**

*Exhibit*

*37*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RENALDO NAVARRO,　　　　　　　) **CERTIFIED COPY**
　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　)
　　　　　　　　　　　　　　　)
　　　vs.　　　　　　　　　　 ) Case No.
　　　　　　　　　　　　　　　) 3:19-cv-08157-VC
MENZIES AVIATION, INC., DOING )
BUSINESS AS MENZIES; and　　 )
DOES 1 through 10, inclusive, )
　　　　　　　　　　　　　　　)
　　　　　　　Defendants.　　 )
_____)


　　　　　Webex deposition of RENALDO NAVARRO, VOLUME I,
taken remotely on behalf of the Defendant, beginning at
9:41 a.m. and ending at 4:23 p.m., on Thursday,
July 23, 2020, before JOANNA B. BROWN, Certified
Shorthand Reporter No. 8570, RPR, CRR, RMR.

2

```
 1        Q     And did you graduate?

 2        A     Are you asking how long?  How long, sir?

 3        Q     Yes.

 4        A     Yes, sir.

 5        Q     Did you attend any type of college or

 6   university in the Philippines?

 7        A     Yes, sir.

 8        Q     Where was that?

 9        A     Philippine College of Criminology, but I did

10   not finish it.

11        Q     Any other type of schooling in the Philippines

12   other than high school and what you just mentioned

13   prior to moving to the United States?

14        A     No more, sir.

15        Q     Can you please identify for me all of your

16   employers prior to Menzies Aviation since you

17   arrived -- well, let me start over.

18              After you moved to the United States, can you

19   please list all of your employers up to Menzies.

20        A     In 2005, when I got here, I worked at

21   Service Fair part-time -- oh, Service Air part-time.

22   2005, in September, I started at ASIG Aviation.  In

23   2005, where I worked for, it was purchased by

24   Swissport.  It was purchased in 2015 by Swissport, and

25   in 2016, ASIG was purchased by Menzies.
```

23

1    different.

2        Q    Okay.  Did you ever have any type of

3    supervisory job at Service Air?

4            THE INTERPRETER:  Please repeat the question.

5            MR. WARD:  Sure.

6        Q    At Service Air, did you have any type of

7    supervisory responsibilities?

8        A    No, sir.

9        Q    The only supervisory job you've had was at

10   ASIG and Menzies; right?

11       A    Yes, sir.

12       Q    Have you ever declared bankruptcy?

13       A    No, sir.

14       Q    Have you ever been convicted of a felony in

15   the United States?

16       A    No, sir.

17       Q    And you understand that Menzies purchased ASIG

18   at some point a couple of years ago; correct?

19       A    2016, sir.

20       Q    While you were employed by ASIG, you were

21   promoted to supervisor; right?

22       A    Yes, sir.

23       Q    And at that time, were you given additional

24   job responsibilities as a supervisor?

25       A    Yes, sir.

25

1    Q    What did you understand those additional

2    responsibilities to include?

3    A    First of all, with people.  Before you were

4    with people and then you had to handle people, and

5    then -- and also, with the flight, you should be able

6    to distribute it to the people equally.

7    Q    And when you say "distribute," are you talking

8    about distributing the amount of work across the people

9    you supervise equally?

10    A    Yes, sir.

11    Q    The supervisory job that you received at ASIG,

12    was it fuel?

13    THE INTERPRETER:  I'm sorry.  Was it what?

14    Hello?

15    MR. URIARTE:  There's an audio issue.

16    THE INTERPRETER:  I didn't get the complete

17    question.

18    MR. URIARTE:  Chris, your screen -- Chris,

19    your screen shows a muted icon again.

20    MR. WARD:  I just lost sound in here again.

21    Can you -- I cannot hear anything that anybody is

22    saying, but I think you can all hear me.  Can somebody

23    nod their head yes.

24    MR. URIARTE:  Yes.

25    THE INTERPRETER:  Yes, yes.

26

1  BY MR. WARD:

2      Q    How did you first learn about that petition?

3      A    They passed it to me when they were -- after

4  they signed, they were passing that petition.

5           MR. URIARTE:  Wait.  I have to object on the

6  interpretation there.  You might want to ask the

7  witness to state his response again because that's

8  definitely -- I think your English portion of that

9  interpretation is erroneous.

10          (Interpreted.)

11          THE WITNESS:  Yes, sir.

12          MR. URIARTE:  You have to -- can you provide

13 the answer again.

14          THE WITNESS:  Please repeat your question.

15 BY MR. WARD:

16     Q    My question was how did you first learn about

17 that petition?

18     A    I learned from the people that they were

19 passing a petition against Andrew.

20     Q    When you say the "people," who specifically

21 are you referring to?

22     A    The fuelers, those who put the gasoline.

23     Q    Okay.  And when you learned that it was being

24 passed around, did somebody ask you to sign it?

25     A    They told me.  They told me.

44

1      Q      They told you what?

2      A      If I would like to sign it.

3      Q      Okay.  And who is the specific individual who

4   asked if you would like to sign it?

5      A      I forgot the name of the person.  There were

6   many people who approached me to sign it, but I already

7   forgot.

8      Q      Can you identify any one fueler who approached

9   you by name?

10     A      There were so many who approached me.

11     Q      My question is different though.

12            Can you name one person who approached you and

13   asked you to sign the petition?

14     A      Jezen Canlas.

15     Q      Anybody else?

16     A      There's two who are Rafael.

17     Q      I'm sorry.  Two individuals named Rafael?

18     A      No.  One, a steward, the name is Rafael.

19     Q      What is Rafael's last name?

20     A      I do not remember the last name, just Rafael.

21     Q      Is there anybody else that you can identify

22   who asked you to sign the petition?

23            THE INTERPRETER:  I'm sorry.  Can you repeat

24   the question.

25   ///

45

1    BY MR. WARD:

2        Q    Anybody else you can identify by name who

3    asked you to sign the petition?

4        A    I forgot the others, but it was Jezen and

5    Rafael.

6        Q    Did you sign the petition?

7        A    Yes, sir.

8        Q    Did you think it was appropriate to get

9    involved in a petition against another supervisor?

10            MR. URIARTE:  Objection.  Vague and calls for

11   a legal conclusion.

12            You can answer, Mr. Navarro.  You can answer

13   after my objection.

14            THE WITNESS:  Please repeat the question.

15   BY MR. WARD:

16       Q    The question was did you think it was

17   appropriate to sign a petition against another

18   supervisor?

19            MR. URIARTE:  Same objection.

20            THE WITNESS:  Maybe because, you know -- just

21   on the right, you know.

22   BY MR. WARD:

23       Q    I don't understand your answer, Mr. Navarro.

24       A    If we know that what they are fighting for

25   against Andrew Dodge is right, so why not help them and

46

```
 1       A    Yes, sir.

 2       Q    If Andrew Dodge had complained to

 3  nonsupervisory employees about you, do you think that

 4  would have been appropriate for him to do so?

 5            THE INTERPRETER:  Please repeat that question.

 6            MR. WARD:  Sure.

 7       Q    If Andrew Dodge had complained to

 8  nonsupervisory employees about you, do you think

 9  Andrew Dodge would be acting appropriately?

10            MR. URIARTE:  Objection.  Lacks foundation.

11  Vague and incomplete hypothetical.

12            THE WITNESS:  It depends on him.  I do not

13  know what he is thinking of.

14  BY MR. WARD:

15       Q    Now, prior to signing this petition, you had

16  previously submitted complaints about Mr. Dodge;

17  correct?

18       A    Yes, sir.

19       Q    When was that?

20            THE INTERPRETER:  The interpreter would like

21  to inquire.

22            THE WITNESS:  I no longer remember.  The

23  people told me what Andrew was doing.  So I had that --

24  I had that reported to the superiors.

25  ///
```

49

1  BY MR. WARD:

2      Q    Okay.   And when did you make these complaints

3  yourself about Andrew Dodge?

4      A    I no longer remember the date, but I told

5  Randy Davis.

6      Q    Anyone other than Randy?

7           THE INTERPRETER:  I'm sorry.  I didn't hear

8  that.

9  BY MR. WARD:

10     Q    Anyone other than Randy?

11     A    There were Nico, John Qually, and also Renil

12  and Tracy.

13          MR. URIARTE:  Did you say Nicole?

14          THE WITNESS:  Nico.  Nico.

15          MR. URIARTE:  Can you spell that.

16          THE WITNESS:  Nico, N-i-c-o (In English).

17          THE INTERPRETER:  This is the interpreter.

18  It's not Nicole but Nico, N-i-c-o.

19  BY MR. WARD:

20     Q    All right.  Other than Randy, Nico, Tracy, and

21  Renil, is there anyone else at Menzies/ASIG that you

22  told?

23          MR. URIARTE:  I think, Chris, you are

24  misstating John Qually, and then the interpreter missed

25  saying Renil.

50

```
1              THE INTERPRETER:  Yeah.  I stand corrected.  I
2    omitted Renil.
3              MR. WARD:  Let's strike that question.  I'll
4    ask it again.
5        Q    So other than Randy Davies, Nico, Tracy,
6    Renil, and John Qually, is there anybody else who you
7    communicated complaints about Andrew Dodge to?
8        A    No more.
9        Q    How much time passed, approximately, between
10   when you communicated these complaints and when you
11   signed the petition?
12       A    Maybe those are years.  Years.
13       Q    And in between when you communicated the
14   complaints and when you signed the petition, did you
15   make, yourself, any other complaints involving
16   Andrew Dodge?
17       A    No more -- no, sir.
18             MR. URIARTE:  Is this a good time for lunch?
19   We have lunch being delivered.  So --
20             MR. WARD:  We can go maybe for another 10 or
21   15 minutes first, if that's all right.
22             MR. URIARTE:  That's okay.  Yeah.  Maybe --
23   yeah, closer to 10 hopefully.
24             MR. WARD:  All right.  I am going to mark
25   as Exhibit 7 a document which has the Bates Nos. -152
```

51

1      Q    At the very bottom there, where it says

2    "...remember all people sign to that petition agains

3    you but i never submit it yet," what did you mean when

4    you wrote "i never submit it yet"?

5      A    What I meant there is because the petition

6    letter was given to me to be submitted to Raul Vargas,

7    I did not submit it; but the people told me that I

8    should submit the petition so that they would know what

9    Andrew was doing.

10     Q    Who specifically told you that you should be

11   the one to submit the petition?

12     A    Because, at that meeting, Raul Vargas was

13   there.  He was our director.  He said that we -- that I

14   submit it --

15          THE INTERPRETER:  Just a second.

16          THE WITNESS:  It's just, in that meeting, I

17   was told "Please give this to Raul Vargas."

18   BY MR. WARD:

19     Q    And my question is who is the specific person

20   who told you to give it to Raul Vargas?

21     A    I was just given the petition -- the petition

22   letter.  I don't remember the person anymore.  That's

23   why I just gave it to Raul.

24     Q    Why did you delay in submitting the petition

25   after you were asked to do so?

57

1       A    For myself, I pitied Andrew.  For myself, I

2    thought about him, that he could still change.

3       Q    Did you ever submit the petition after you

4    were asked to do so?

5            THE INTERPRETER:  This is the interpreter.  He

6    wants me to repeat.

7            THE WITNESS:  After our meeting.  After a few

8    days.

9    BY MR. WARD:

10      Q    So, yes, you submitted this petition to

11   somebody at Menzies?

12      A    Yes.  To the director -- director of Menzies.

13      Q    What was that person's name?

14      A    Raul Vargas.

15      Q    If you pitied Andrew, what made you decide to

16   then submit the petition?

17           THE INTERPRETER:  Please repeat that,

18   Mr. Ward.

19           MR. WARD:  Sure.

20      Q    If you delayed in submitting the petition

21   because you pitied Andrew, why did you then decide to

22   submit it a few days later?

23      A    I was told by the people to give the petition.

24   I was told by them to give the petition.

25      Q    And these are nonsupervisory employees telling

58

```
 1              DEPOSITION OFFICER'S CERTIFICATE
 2   STATE OF CALIFORNIA )
                         ) ss.
 3   COUNTY OF ORANGE    )
 4
 5          I, Joanna B. Brown, hereby certify:
 6          I am a duly qualified Certified Shorthand
 7   Reporter in the State of California, holder of
 8   Certificate Number CSR 8570 issued by the Court
 9   Reporters Board of California and which is in full
10   force and effect. (Fed. R. Civ. P. 28(a)).
11          I am authorized to administer oaths or
12   affirmations pursuant to California Code of Civil
13   Procedure, Section 2093(b) and prior to being examined,
14   the witness was first duly sworn by me.
15   (Fed R. Civ. P. 28(a), 30(f)(1)).
16          I am not a relative or employee or attorney or
17   counsel of any of the parties, nor am I a relative or
18   employee of such attorney or counsel, nor am I
19   financially interested in this action.
20   (Fed R. Civ. P. 28).
21          I am the deposition officer that
22   stenographically recorded the testimony in the
23   foregoing deposition, and the foregoing transcript is a
24   true record of the testimony given by the witness.
25   (Fed. R. Civ. P. 30(f)(1)).
```

119

**000049**

1          Before completion of the deposition, review of

2     the transcript [XX] was [ ] was not requested.  If

3     requested, any changes made by the deponent (and

4     provided to the reporter) during the period allowed,

5     are appended hereto. (Fed. R. Civ. P. 30(e)).

6

7

8     Dated: August 4, 2020

9

10

11     _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

120

*Exhibit*

*38*

000051

**CHANGES TO TRANSCRIPT OF**

RENALDO NAVARRO _____, 08 / 10 / 2020

CASE NAME Renaldo Navarro _____ v. Menzies Aviation, Inc.

(If Federal case, provide reason for change)

| Page / Line | |
| --- | --- |
| 17:7 | No, sir. |
| 24:20-22 | No, I worked at Asig since September 2005 and I continuously worked |
| | even after it was purchased by Menzies on 2016. |
| 31:24 | Yes, sir. |
| 40:6 | No, sir. |
| 44:25 | Yes, they told me to sign it. |
| 46:20-21 | Maybe, when you're in the right. |
| 47:25 - 48:2 | Because the petition states the wrong things that he was doing to the fuelers. |
| 50:5 | Randy Davies |
| 54:22-23 | Yes, sir. This was the second petition the fuelers made against Andrew Dodge. |
| 55:1-2 | Yes, sir. |
| 60:12 | No, sir. |
| 88:17-19 | All I remember that Tracy told me was that you should not have signed it |
| | because you were at the management side. |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Signature of Deponent _Renaldo Navarro_____

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RENALDO NAVARRO,                    )   **CERTIFIED COPY**
                                    )
              Plaintiff,            )
                                    )
         vs.                        )   Case No.
                                    )   3:19-cv-08157-VC
MENZIES AVIATION, INC., DOING       )
BUSINESS AS MENZIES; and            )
DOES 1 through 10, inclusive,       )
                                    )
              Defendants.           )
_____     )

          Webex deposition of RENALDO NAVARRO, VOLUME I,
taken remotely on behalf of the Defendant, beginning at
9:41 a.m. and ending at 4:23 p.m., on Thursday,
July 23, 2020, before JOANNA B. BROWN, Certified
Shorthand Reporter No. 8570, RPR, CRR, RMR.

2

000053

1    again.

2              MR. WARD:  Sure.

3        Q    Is it your belief that if you make legal

4    claims against a former employer, you are likely to get

5    a settlement from them regardless of the merit of those

6    claims?

7        A    Yes, sir.  ~~~~~~~  *NO, SIR*

8              MR. URIARTE:  Mr. Navarro, are you

9    understanding the Tagalog interpretation?

10             THE WITNESS:  (Inaudible.)

11             MR. URIARTE:  You have to answer in Tagalog.

12             MR. URIARTE:  Yeah.  I mean, I have --

13             THE INTERPRETER:  Just a second.  Let me

14   interpret that.

15             THE WITNESS:  It seems it's far from my

16   understanding in Tagalog.

17             MR. URIARTE:  I think -- Ms. Carrera, I

18   understand your proficiency and your amazing use of the

19   official, traditional, government-level Tagalog, but

20   it's sure not what usual, normal people in Tagalog

21   would use in the street.  There are two forms of

22   Tagalog.  There's the Tagalog that is normally used

23   around the country by normal people, but when you use

24   words like (speaks Tagalog) -- I went to a university

25   there, and I spoke formal Tagalog; but normal people

17

000054

```
 1        Q    Did I understand you correctly that you worked

 2   for ASIG -- you've had two different periods of time

 3   where you were employed by ASIG?

 4        A    What do you mean two different times?

 5        Q    So let me do it this way:  First you -- first

 6   you started at Service Air; right?

 7        A    Yes, sir.

 8        Q    And did you remain employed by Service Air up

 9   to when Swissport purchased Service Air?

10             THE INTERPRETER:  Please repeat the question.

11             MR. WARD:  Sure.

12             From when he started at Service Air until the

13   purchase by Service Air of Swissport, was he

14   continuously employed by Service Air?

15             THE WITNESS:  Yes, it was continuous.

16   BY MR. WARD:

17        Q    Okay.  And then, when you started your

18   employment with ASIG in approximately 2016, was that

19   the first time you had worked for ASIG?

20        A    What I did was work in 2005 at ASIG up to 2016

21   when Menzies purchased ASIG, and I continuously worked

22   for them.     OK- Changes Immaterial

23        Q    I see.  You were working for both Service Air

24   and ASIG at the same time?

25        A    Yes, sir.  I'm sorry.  Different.  They were
```

24

000055

1    involving nonsupervisory employees in personal

2    grievances?

3        A    Yes, sir.

4        Q    As a supervisor, should you avoid pressuring

5    employees to get involved in personal grievances?

6        A    Will you please repeat the question again.

7        Q    Sure.  As a supervisor, is it important to

8    avoid pressuring employees, nonsupervisory employees,

9    to get involved in personal grievances?

10           MR. URIARTE:  Before you answer that question,

11   Mr. Navarro, remember the instruction earlier.  If you

12   do not understand the question that is said in Tagalog,

13   indicate that if you are having a problem with the

14   Tagalog interpretation.  Do say that so that we know

15   where the problem is.  I just want to make sure that

16   you do that.  Okay?  Great, Mr. Navarro.

17           THE INTERPRETER:  This is the interpreter

18   speaking.  I would like to have the question, please,

19   repeated.

20           MR. WARD:  Sure.

21       Q    My question is, in your opinion, should a

22   supervisor avoid pressuring nonsupervisory employees to

23   become involved in personal disputes?

24       A    No, sir.  Yes, sir

25       Q    Why not?

31

```
 1   BY MR. WARD:

 2       Q    Do you recall receiving this document?

 3       A    No, sir.

 4       Q    Do you recall calling in sick in March of 2009

 5   before your days off?

 6       A    Yes, sir.     NO

 7            MR. URIARTE:  You have to get your

 8   questions -- you can't talk to me.  You have to get

 9   your questions from him.  If you need a break, you just

10   ask for a break.

11            THE WITNESS:  No, sir.

12            MR. WARD:  All right.  We are going to mark

13   this as Exhibit 5.

14            (Deposition Exhibit 5 was marked for

15            identification by the reporter, a

16            copy of which is attached hereto.)

17   BY MR. WARD:

18       Q    This is a two-page document as well.  So

19   please let me know when you've had a chance to see the

20   first page, and I'll move to the second one.

21       A    Yes, sir.

22            THE INTERPRETER:  Mr. Navarro said yes.

23   BY MR. WARD:

24       Q    All right.  Let me know when you've had a

25   chance to review this page as well.
```

                                                              40

1    BY MR. WARD:

2        Q    How did you first learn about that petition?

3        A    They passed it to me when they were -- after

4    they signed, they were passing that petition.

5            MR. URIARTE:  Wait.  I have to object on the

6    interpretation there.  You might want to ask the

7    witness to state his response again because that's

8    definitely -- I think your English portion of that

9    interpretation is erroneous.

10           (Interpreted.)

11           THE WITNESS:  Yes, sir.

12           MR. URIARTE:  You have to -- can you provide

13   the answer again.

14           THE WITNESS:  Please repeat your question.

15   BY MR. WARD:

16       Q    My question was how did you first learn about

17   that petition?

18       A    I learned from the people that they were

19   passing a petition against Andrew.

20       Q    When you say the "people," who specifically

21   are you referring to?

22       A    The fuelers, those who put the gasoline.

23       Q    Okay.  And when you learned that it was being

24   passed around, did somebody ask you to sign it?

25       A    They told me.  They told me.

Yes, to sign it,

44

000058

```
1    BY MR. WARD:

2        Q    Anybody else you can identify by name who

3    asked you to sign the petition?

4        A    I forgot the others, but it was Jezen and

5    Rafael.

6        Q    Did you sign the petition?

7        A    Yes, sir.

8        Q    Did you think it was appropriate to get

9    involved in a petition against another supervisor?

10           MR. URIARTE:  Objection.  Vague and calls for

11   a legal conclusion.

12           You can answer, Mr. Navarro.  You can answer

13   after my objection.

14           THE WITNESS:  Please repeat the question.

15   BY MR. WARD:

16       Q    The question was did you think it was

17   appropriate to sign a petition against another

18   supervisor?

19           MR. URIARTE:  Same objection.

20           THE WITNESS:  Maybe, because, you know -- just

21   on the right, you know.  when you're in the right

22   BY MR. WARD:

23       Q    I don't understand your answer, Mr. Navarro.

24       A    If we know that what they are fighting for

25   against Andrew Dodge is right, so why not help them and
```

46

000059

```
1    also help the company also --

2        Q    Do you think --

3        A    -- to correct the wrong things that

4    Andrew Dodge did.

5        Q    And do you think signing a petition about

6    Andrew Dodge might undermine Andrew Dodge's authority

7    with nonsupervisory employees?

8        A    They are the ones who are signing that.  They

9    know the bad things that Andrew Dodge was doing to me;

10   and, also, the things he was doing against the fueler,

11   that was not good.

12       Q    My question is different.  My question is did

13   you think signing a petition against Andrew Dodge might

14   undermine Andrew Dodge's authority?

15           MR. URIARTE:  Objection.  Vague and ambiguous.

16           THE WITNESS:  Maybe not, sir.

17   BY MR. WARD:

18       Q    Maybe not or no?

19       A    No, no (In English).

20           THE INTERPRETER:  This is the interpreter.  I

21   interpreted "not" and "no" the same word.

22           THE WITNESS:  No, sir.

23   BY MR. WARD:

24       Q    Why not?

25       A    If what's being said is the ones that is
```

Because the petition states the wrong things that he was doing to the fuelers

47

```
 1   BY MR. WARD:

 2       Q    Okay.  And when did you make these complaints

 3   yourself about Andrew Dodge?

 4       A    I no longer remember the date, but I told

 5   Randy Davis.

 6       Q    Anyone other than Randy?

 7            THE INTERPRETER:  I'm sorry.  I didn't hear

 8   that.

 9   BY MR. WARD:

10       Q    Anyone other than Randy?

11       A    There were Nico, John Qually, and also Renil

12   and Tracy.

13            MR. URIARTE:  Did you say Nicole?

14            THE WITNESS:  Nico.  Nico.

15            MR. URIARTE:  Can you spell that.

16            THE WITNESS:  Nico, N-i-c-o (In English).

17            THE INTERPRETER:  This is the interpreter.

18   It's not Nicole but Nico, N-i-c-o.

19   BY MR. WARD:

20       Q    All right.  Other than Randy, Nico, Tracy, and

21   Renil, is there anyone else at Menzies/ASIG that you

22   told?

23            MR. URIARTE:  I think, Chris, you are

24   misstating John Qually, and then the interpreter missed

25   saying Renil.
```

1          The reporter just clarified for me that

2    documents Bates No. -152 to -154 I had marked as

3    Exhibit 7, but it should actually be 8; is that right?

4          THE REPORTER:  Yes.

5          MR. WARD:  So then this document I have up

6    right now, Bates No. -150, is actually going to be

7    Exhibit 9.

8               (Deposition Exhibits 8 and 9 were marked

9               for identification by the reporter,

10              copies of which are attached hereto.)

11   BY MR. WARD:

12        Q    Have you had a chance to look at Exhibit 9

13   here?

14        A    I already read it, sir.

15        Q    Prior to today, have you ever seen this

16   Exhibit 9?

17        A    They gave me a copy.

18        Q    When you say "they," who is "they"?

19        A    The shop steward gave it to me, Rafael.

20        Q    Did Rafael give this to you after you had

21   signed the petition?

22        A    I think this is the second petition, that this

23   is the second petition they made against Andrew Dodge.

24        Q    So is it your testimony that there were two

25   petitions against Andrew Dodge?

54

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

000062

*Yes sir*

1    A    The first one was the first one that you

2    showed with my signing, and I think this is the second.

3    Q    Okay.  Did you ever sign this second petition?

4    A    I was not -- no longer able to sign it because

5    they already terminated me at that time.

6    Q    I see.  So this, Exhibit 9, you first saw it

7    after your termination?

8    A    When they terminated me and the people signed

9    that petition, I was given a copy by Rafael.

10    Q    I just want to be clear though.  The copy of

11    this, Exhibit 9 that you received from Rafael, did you

12    receive that before or after your termination?

13    A    I was already terminated.

14    Q    Okay.  Did you ever have any text-message

15    communication with Mr. Dodge about the petition against

16    him?

17    A    No, sir.

18         MR. WARD:  I'm going to mark this as

19    Exhibit 10, and this is Bates-numbered -88.

20         (Deposition Exhibit 10 was marked for

21         identification by the reporter, a

22         copy of which is attached hereto.)

23    BY MR. WARD:

24    Q    On the lower half of the page, Mr. Navarro, it

25    looks like a screen capture of some text messages.

55

```
1    BY MR. WARD:

2        Q    And the nonsupervisory employees gave

3    Exhibit 9 to the union shop steward, to your

4    understanding; correct?

5        A    No.  My understanding is the shop steward who

6    prepared the letter, and then the union submitted it to

7    the company.  That's what I know.

8        Q    And what is the name of the shop steward?

9        A    Rafael.

10       Q    And is this the same Raul whose last name you

11   do not remember?

12       A    No Yes, sir.

13       Q    Do you currently possess a cell phone,

14   Mr. Navarro?

15       A    Yes, sir.

16       Q    And did you possess a cell phone in 2018 while

17   you were employed by Menzies?

18       A    Yes, sir.

19       Q    And is the cell phone that you currently

20   possess the same cell phone that you used in 2018 while

21   you were employed by Menzies?

22       A    Yes, sir.

23       Q    Are you still using the same device today that

24   you used in 2018?

25       A    Yes, sir.
```

                                                              60

1        Q    Is that a yes?

2             That's when you learned you had been

3    terminated, when you met with Tracy?

4        A    Yes, sir.

5        Q    Was anybody else present at the time that you

6    met with Tracy other than yourself and Tracy?

7        A    She was with a female there.

8        Q    Was she another Menzies employer, that female?

9        A    Maybe, sir.

10       Q    You don't know who she was, in other words?

11       A    No, sir.

12       Q    So other than Tracy and this unidentified

13   female, nobody else was present; is that true?

14       A    Yes, sir.

15       Q    What did Menzies tell you was the reason they

16   were terminating your employment?

17       A    All I remember that Tracy told me was that you

18   should not have signed it because you were at

19   management ~~site~~. *side*

20       Q    And when she said you should not have signed

21   it, she was referring to the petition, to your

22   understanding?

23       A    Yes, sir.

24       Q    Were you told that there was any reason for

25   your termination other than signing the petition?

88

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

**000065**

*Exhibit*

*39*

1      IN THE UNITED STATES DISTRICT COURT

2    IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5   RENALDO NAVARRO,

6            Plaintiff,

7   v.                          No.  3:19-CV-8157

8   MENZIES AVIATION, INC.,
    doing business as MENZIES
9   and DOES 1 through 10,
    inclusive,
10
             Defendants.
11   _____/

12   Zoom Remote Deposition of

13       ANDREW DODGE

14    Tuesday, July 28, 2020

15     **CERTIFIED COPY**

16

17

18

19

20   REPORTED BY:  CINDY TUGAW, CSR #4805

21

22

23         NOGARA REPORTING SERVICE
         5 Third Street, Suite 415
24       San Francisco, California 94103
            (415) 398-1889

25

000067

Case 3:19-cv-08157-VC   Document 32   Filed 11/02/20   Page 70 of 134

1     A.  No, more like two hours.

2     Q.  Okay.  Sounds good.  All right.

3         Can you tell me the highest level of education

4     that you achieved.

5     A.  I have some college.

6     Q.  Did you graduate from college?

7     A.  No, I did not.

8     Q.  And when you say college, what college did you

9     go to?

10    A.  I attended DeAnza Community College.

11    Q.  Did you get an AA?

12    A.  No.  I was going for my AA.

13    Q.  And when was the last time you actually

14    participated in a class at DeAnza?  Like what year?

15    A.  I want to say like 2015, 2016.

16    Q.  And what were you trying -- what AA were you

17    trying to graduate?

18    A.  Criminal justice.

19    Q.  And when did you start with Menzies?  What

20    year?

21    A.  February of 2016.

22    Q.  So February of 2016, is that with Menzies

23    already?

24    A.  That was when we were ASIG.

25    Q.  So that's still ASIG.

000068

Case 3:19-cv-08157-VC    Document 32    Filed 11/02/20    Page 71 of 134

1    A.  Yeah.

2    Q.  And then shortly thereafter -- shortly

3    thereafter, Menzies came in, is that correct?

4    A.  Yeah, Menzies came in, like, 2018, or

5    something like that, or in 2000 -- or like in the

6    middle of 2018, I want to say.

7    Q.  All right.  What was the position you had when

8    you started with ASIG?

9    A.  When I first started at ASIG, I was a fueler.

10    Q.  How long were you a fueler for before becoming

11    a supervisor?

12    A.  I want to say about a year.

13    Q.  And who approved your promotion to supervisor

14    from a fueler?

15    A.  Renil Lal, the general manager at the time.

16    Q.  The termination of Mr. Navarro is about August

17    of 2018.  Do you remember that?

18    A.  Yeah, I remember him not being there anymore.

19    Q.  And in August of 2018, you were a supervisor,

20    correct?

21    A.  Yes.

22    Q.  And your shift was -- can you tell me, what

23    was your shift?

24    A.  During the time -- like, your question is,

25    like -- like, now or in the past?

000069

1    there put fuelers on a schedule for, hey, you're going

2    to go from this flight to this flight.

3            And also, after that, it was to drive on the

4    airport and just monitor the fuelers, if they needed

5    help with something, or also monitor their safety.  So

6    making sure they're wearing their uniform.  Making sure

7    they're wearing their vest, earplugs, had their boots

8    on.  Make sure -- just come and check on them and make

9    sure their equipment is running properly.

10            And also, if they call me, I would go assist

11    them, or, you know -- and also just change things

12    throughout the operation.  Maybe the guy might call me

13    and be, hey, my flight never showed up, and then I

14    might just change their flights around.

15    Q.  Right.  Were you also in charge of providing

16    breaks for people, like when they can go on --

17    A.  Oh, yes, of course.  So you would -- when you

18    schedule flights, you would -- before their fifth hour,

19    California law, you try to find a break period for 30

20    minutes.  There were days that sometimes the way the

21    flights came in, you know, the guys would be fueling

22    and would go over that because they're still on the

23    aircraft.  You can't just leave the aircraft.  They

24    would have to take their break after they were done

25    fueling the aircraft.

000070

1    Q.  Right.  So the fuelers under your supervision,

2    they depended on you for when they can take their

3    breaks?

4    A.  Yes.  They would take -- some of the guys

5    were, Hey, I need to take a break, or asking ahead of

6    time, Hey, what time am I taking my break?  So

7    everything would be coordinated depending on what's

8    going on on the operation at the time.

9    Q.  And then, like you said, there are times where

10   the fuelers would depend on you to help out with a

11   particular situation.  So you become kind of like an

12   extra hand as well?

13   A.  Say that again.  Like, what do you mean?

14   Sorry.

15   Q.  Like if they're busy or they're shorthanded,

16   you could come in also to help them?

17   A.  Yeah, if there was something going on in the

18   operation, I would report to my duty manager, know

19   what's going on, let him know, Hey, we're short.  Can I

20   get some assistance from your side?  And if we didn't

21   have the manpower, I would help on a flight and hook up

22   and help, you know.

23   Q.  Exactly.  Okay.  And then, during the swing

24   shift, how many fuelers did you normally supervise?

25   A.  On a busy day, on a really busy day, I have

1        Can you tell me, by August of 2018, how long

2   you had been working with Renaldo Navarro at that time?

3        A.  Good question.  Do you mean like how long had

4   I been working with him as a co-worker, as like a --

5   how do you say -- as a -- supervisors together or as,

6   in general, a fueler and a supervisor?

7        Q.  Yes.  In general.

8        A.  Since I began working for ASIG in 2016, I was

9   his night fueler.  So I began working with him as a

10   night fueler, and then once I got promoted, I became a

11   swing supervisor, so I would transfer my information to

12   him.

13        And then while -- our schedules changed, and

14   then I would cover the days he was off as a swing -- I

15   mean, as a graveyard.  And then there -- if someone

16   called off, and I would see him from the night shift or

17   into the morning shift, or I would cover his sick day.

18   So, yeah, I worked with him a lot.

19        Q.  Gotcha.  And what was your general opinion

20   with regards to Ray Navarro and how he did his job?

21        A.  Oh, Ray's a great supervisor.  There's no

22   questions asked.  He was there for a long time, and,

23   you know, he's -- he did his job.

24        Q.  And you and Ray -- at some point you and Ray

25   started to have, like, difference of opinion with

000072

1    you having problems with him, Mr. Dodge?

2        A.   Rafael didn't work with me on my side of the

3    airport.

4        Q.   Oh, I see.  I see.  So he's on another side of

5    the airport?

6        A.   Yes.

7        Q.   Gotcha.  Okay.  So it looks like, from this

8    statement that he signed, that says that he was asked

9    by Menzies Aviation fuelers to write a petition on

10   behalf of the fuelers on the 130 side.

11       Did you know that they -- that these fuelers

12   submitted two petitions?  Did you know that?

13       A.   No, I did not.

14       Q.   Okay.  So, based on your responses, is it fair

15   to say that nobody from Menzies Aviation ever sat you

16   down to discuss one or two petitions that were written

17   out against you at that time while it was happening?

18       A.   No.  I'm the one that brought it up to Renil,

19   saying that there was a petition going around, because

20   one of the fuelers had called me about it.

21       Q.   So you knew that a petition was going around,

22   but nobody from Menzies Aviation management ever kind

23   of, like, sat down with you or talked to you about it,

24   right?  Is that correct?

25       A.   No, I don't -- I never, no.

000073

1      Q.  And you found out that there was a petition

2  going around against you, but you never read the actual

3  petition.  Is that how it was?

4      A.  Yeah, I never got to see it, no.

5      Q.  And you're saying that the first time you saw

6  it was actually a part of this litigation.  Is that

7  what you're saying?

8      A.  Yes.

9      MR. URIARTE:  Let's put up Exhibit 5, please.

10      VIDEO OPERATOR:  Okay.  Coming up shortly.

11      MR. URIARTE:  Thank you.

12          (Plaintiff's Exhibit 5 marked for

13          identification.)

14      MR. URIARTE:  It's not a very good copy, so I

15  guess Exhibit 5, Mr. Dodge, if we can just make it

16  smaller so he sees the whole thing.  There you go.

17      A.  Yeah.

18      Q.  Is this the letter that you wrote after you

19  found out that a petition was being turned in against

20  you?

21      A.  I can't read what I wrote, but I think this is

22  the one I wrote after I found out there was a petition.

23  One of the fuelers called me.

24      Q.  Correct.  Correct.  If you go to the bottom of

25  it, I think this is your signature, right?

000074

1    A.  Yeah.

2    Q.  That one there?

3    A.  Yes.

4    Q.  Okay.  And did you have a meeting with Menzies

5    management about this letter at all?

6    A.  I do not recall -- I don't remember from when

7    I wrote it.  I think I wrote it during my shift, and I

8    turned it in or -- I either wrote it in the office with

9    Raul at the time or -- I just don't remember.

10   Q.  I see.  I see.  So it's possible that you

11   wrote it with the assistance of Raul.  Is that what

12   you're saying?

13   A.  Yeah, it was Raul or Renil that told me to

14   write -- write a statement.

15   Q.  And why did they tell you to write a

16   statement?  Do you know?

17   A.  Just to have it on file that they were going

18   to look into it.

19   Q.  Okay.  But how did that meeting start?  Was

20   that -- like, why did you kind of arrive at that

21   meeting?

22   A.  Like, why did I -- are you saying, like, why

23   did I write it or --

24   Q.  No.  Well, you said that you had a meeting

25   with Raul or Renil --

1   STATE OF CALIFORNIA     )
                            )
2   COUNTY OF SAN FRANCISCO )

3        I, CINDY TUGAW, a Certified Shorthand Reporter

4   of the State of California, duly authorized to

5   administer oaths pursuant to Section 8211 of the

6   California Code of Civil Procedure, do hereby certify

7   that

8                    ANDREW DODGE,

9   the witness in the foregoing deposition, was by me duly

10  sworn to testify the truth, the whole truth and nothing

11  but the truth in the within-entitled cause; that said

12  testimony of said witness was reported by me, a

13  disinterested person, and was thereafter transcribed

14  under my direction into typewriting and is a true and

15  correct transcription of said proceedings.

16       I further certify that I am not of counsel or

17  attorney for either or any of the parties in the

18  foregoing deposition and caption named, nor in any way

19  interested in the outcome of the cause named in said

20  caption.

21       Dated the 7th day of August, 2020.

22

23

24

                    CINDY TUGAW
25                  CSR No. 4805 (California)

000076

*Exhibit*

*40*

000077

1         IN THE UNITED STATES DISTRICT COURT

2     IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5  RENALDO NAVARRO,

6          Plaintiff,

7  v.                  No.  3:19-CV-8157

8  MENZIES AVIATION, INC.,
    doing business as MENZIES

9  and DOES 1 through 10,
    inclusive,

10

11         Defendants.
   _____/

12  Zoom Remote Deposition of

13     TRACY AGUILERA

14   Tuesday, August 25, 2020

15

16      **CERTIFIED COPY**

17

18

19

20

21  REPORTED BY:  CINDY TUGAW, CSR #4805

22

23

24       NOGARA REPORTING SERVICE
        5 Third Street, Suite 415

25     San Francisco, California 94103
         (415) 398-1889

1     A.  The corporate office.

2     Q.  So I would imagine that the corporate office

3  would have kind of like the same materials they would

4  have for the other Menzies departments, other

5  Menzies --

6     A.  I'm sorry?

7     Q.  I would imagine that the Menzies corporation

8  would be using the same employment handbooks as they

9  were using for the other services that Menzies was

10 already doing at SFO, right?  Those would be the same

11 handbooks?

12    A.  Well, yes, they have a California Menzies

13 handbook, yes.

14    Q.  So that's the part I don't understand too

15 much.  Why did it take a little bit of time to package

16 them for the Menzies fuelers?

17        Did you hear the question?

18    A.  No, I didn't hear your question.

19    Q.  Okay.  So the question is if there's a

20 California employment handbook -- by July of 2017,

21 Menzies was already at San Francisco Airport, correct?

22 Ms. Aguilera?

23    A.  Yes, I believe it was around July.

24    Q.  No, what I mean is by July of 2017, there were

25 already operations in San Francisco?

000079

1    A.  Yes.

2    Q.  Other services, correct?

3    A.  Yes.

4    Q.  So those services already had an employment

5    handbook for California, correct?

6    A.  Yes.

7    Q.  So wasn't that the same handbook that was

8    going to be used for Menzies fuelers?

9    A.  I can't answer that because I know they were

10   revising our handbook.

11   Q.  I see.  Okay.  And then, but we don't know the

12   exact date that the handbook was distributed to the

13   Menzies fuelers?

14   A.  No.

15   Q.  And I took a look at the documents that were

16   produced to us by your attorneys, and I didn't see any

17   type of acknowledgment paperwork with regards to Mr.

18   Navarro or acknowledging receipt of corporate policies.

19   A.  Hmm.

20   Q.  So do you know anything about that, whether

21   you've seen one or anything like that?

22   A.  No, I actually didn't look, but I do know that

23   a package was put together for all of the ASIG

24   employees for them to sign.

25   Q.  Right.  Because that's the normal procedure,

1  right, you give it to the employees and then they

2  acknowledge receipt of it, correct?

3      A.  Yes.

4      Q.  And they acknowledge that they have been given

5  one, isn't that the practice?

6          So the practice, Ms. Aguilera, is that once

7  the handbooks become available, you provide the

8  handbook to the employee and then they sign an

9  acknowledgment for receipt of them, is that correct?

10     A.  Yes.

11     Q.  And then are you familiar with the Menzies

12  code of conduct?

13     A.  Yes.

14     Q.  And that's another kind of set of policies or

15  paperwork that's given to each employee, is that

16  correct?

17     A.  It's in the handbook, yes.

18     Q.  Oh, so it's part of the handbook?

19     A.  Yes, it is.

20     Q.  Is there a separate acknowledgment of receipt

21  for the code of conduct or it's all just one?

22     A.  It's all just one.

23     Q.  Was there ever a training with regards to the

24  Menzies California handbook and code of conduct?  Was

25  there any kind of training like that?

Case 3:19-cv-08157-VC   Document 32   Filed 11/02/20   Page 84 of 134

1   A.   There was, when the employees came in to sign

2   all the documents, we went over the documents with

3   them.

4   Q.   So how did that go?  You called some of the

5   employees one by one or like a seminar?  How did that

6   go?

7   A.   They would come in according to their

8   schedule, if they didn't have flights, they would come

9   into the HR department.  We would -- I would arrange it

10   with their manager.

11   Q.   Like how many people would come in at one

12   time?

13   A.   A couple at a time.

14   Q.   And then when you said you would go over it

15   with them, you actually went through some of the pages

16   and --

17   A.   What they were signing, yes.

18   Q.   What they signed.

19   A.   Either myself or my clerk.

20   Q.   I see.  Do you have an independent

21   recollection of doing something like that with

22   Mr. Renaldo Navarro?

23   A.   No, I can't say that I do.  I didn't do a lot

24   of them.  My clerk did a lot of them, most of them.

25   Q.   In July or August of 2018, who was your clerk?

000082

Case 3:19-cv-08157-VC   Document 32   Filed 11/02/20   Page 85 of 134

1    memory is that they had the handbook at that point

2    already, is that correct?

3        A.   Yes.

4        Q.   And who would know for certain whether that's

5    true or not?

6        A.   The documents should be in the files.

7        Q.   Yeah, well, I guess what I can represent to

8    you is that -- and I should show you that -- let's look

9    at Exhibit 15, please.

10            (Plaintiff's Exhibit 15 marked for

11            identification.)

12       MR. URIARTE:  Q.  So here is one of those

13   documents that lists the signature.  If we look below,

14   it's got a blank, no employee name, no employee

15   signature.  This was produced to us by your attorneys.

16            And so I have yet -- I mean, I guess, if you

17   get back to your office and you see some sort of

18   acknowledgment form that has Mr. Navarro's signature on

19   it, I think that would be helpful, but we have yet to

20   see that.

21            Okay, Ms. Aguilera?  Did you understand my

22   request?

23       A.   Yes.

24       Q.   All right.  How did you first find out that

25   there was a petition circulating about Andrew Dodge?

000083

1    A.  The union notified me.

2    Q.  And how did they notify you?

3    A.  They called me.  It wasn't "they."  Charles

4  called me, the man named Charles that worked in the

5  union office.

6    Q.  And what did Charles say to you?

7    A.  He said, "Tracy, are you aware that there's a

8  petition being circulated?  Our members -- several

9  members have called and complained that they were being

10  forced to sign a petition."

11    Q.  Okay.  And then anything else that Charles

12  said to you?

13    A.  No.

14    Q.  And so, in response to that, what did you do?

15    A.  Well, I asked him if he had a copy of the

16  petition and who was being forced, but he never got

17  back to me on that.  With that being said, I made

18  contact with the acting general manager at the time,

19  and his name was Renil Lal, and I told him that I

20  received the call from the union.

21    Q.  Okay.  And did Renil get you a copy of the

22  petition?

23    A.  Not right away.  I don't believe -- no, he did

24  not.

25    Q.  Do you know how long before you actually got a

000084

Case 3:19-cv-08157-VC   Document 32   Filed 11/02/20   Page 87 of 134

1    copy of it?

2        A.  I got it -- actually, I got it from Raul

3    Vargas.  I'd seen it.

4        Q.  I see.  Okay.  And did you read the petition

5    itself?

6        A.  I've seen the names on there, yes, but I

7    didn't go through each one.  I'm sorry.

8        Q.  What about the topic that the petition was

9    talking about, did you read that part?

10       A.  No, I -- I gave everything to Kevin Blumberg

11   to open up an investigation.

12       Q.  And what was the investigation for?

13       A.  Well, to find out what was going on.

14       Q.  What do you mean, "to find out what was going

15   on"?

16       A.  With the petition, why it was being

17   circulated.

18       Q.  Okay.  And then what was the conclusion of

19   Kevin, the security person?

20       A.  The conclusion?

21       Q.  Yes.

22       A.  It was that Rey Navarro was forcing employees

23   to sign a petition to have Andrew Dodge removed.

24       Q.  Okay.  And that's what is contained in the

25   email, right, is that what you're talking about, where

000085

Case 3:19-cv-08157-VC    Document 32    Filed 11/02/20    Page 88 of 134

1    Mr. Blumberg actually sent an email to you with the

2    result of his investigation?

3        A.  Yes.

4        Q.  Okay.  So that's with regards to the inquiry

5    as to Mr. Navarro's involvement in the petition itself,

6    right?  But what about the part of, like, what the

7    fuelers were complaining about?  Was that ever

8    investigated?

9        A.  I'm sorry, can you repeat that.

10       Q.  Sure.  What about the part, that section of

11   the petition where the fuelers are asking for certain

12   relief or what they're complaining about, right, in the

13   petition, was that part of the petition ever

14   investigated?

15       A.  What part are you talking about?

16       MR. URIARTE:  Okay.  Let me show you.  So let's

17   bring up Exhibit 8.

18            (Plaintiff's Exhibit 8 marked for

19            identification.)

20       MR. URIARTE:  Q.  Can you see Exhibit 8,

21   Ms. Aguilera?

22       A.  Yes.

23       Q.  Do you remember this to be the petition that

24   we're talking about?

25       A.  This is the one that I believe was given to

000086

Case 3:19-cv-08157-VC   Document 32   Filed 11/02/20   Page 89 of 134

1   Dodge.  The way he supervised is very unprofessional

2   when he run the operation or supervised, people are not

3   [taking] their breaks it's because the way he set up

4   the flights" -- okay?  -- "and he always blaming the

5   people there's a delay or always saying lack of

6   manpower and trucks issues."

7          Okay.  So let's just stop there.  That part of

8   the petition, was that ever investigated?

9       A.  The whole scenario was investigated by Kevin

10  Blumberg.

11      Q.  Aside from the email that contains some of

12  Mr. Blumberg's conclusion, is there another document

13  that addresses these concerns?

14      A.  I don't have them.

15      Q.  So if there is an investigation, it would be

16  part of what Mr. Blumberg engaged in, correct?  Is that

17  correct?

18      A.  Yes.

19      Q.  Okay.  Let's go on to the next one.  "The

20  truth is he doesn't know how to run the show, we also

21  addressed the problem to the higher position managers

22  (Nicco, John and Renil) as usual nothing happened,

23  looks like they always covering his mistake or maybe

24  these managers don't know anything about fueling also

25  like Andrew Dodge lack of experience about fueling."

000087

1   Raul Vargas?  And really what I first want to put my

2   attention to -- or put your attention to, it says,

3   "Could you also open an investigation for July" --

4   which should be Macapagal.  Do you see that,

5   Ms. Aguilera?

6         MR. WU:  Tracy, I think you are on mute.

7         THE WITNESS:  I'm sorry.  To answer your question,

8   yes, I see it.

9         MR. WU:  Thank you.

10        MR. URIARTE:  Q.  Was an investigation ever opened

11  for July Macapagal?

12        A.  It was turned over to Kevin Blumberg.

13        Q.  Was there any result of that investigation

14  that was put on paper?

15        A.  Not that I've seen, no.

16        Q.  Did Mr. Blumberg let you know the result of

17  that investigation?

18        A.  No.

19        Q.  And then let's go down on the second page.

20  Here is the email from Mr. Blumberg.  And I just want

21  to make sure, when we were talking about the results of

22  the investigation of Mr. Blumberg, are we talking about

23  this email here, August 29, 2018 at 3:58 p.m.?

24        A.  I see it, yes.

25        Q.  So aside from this, there's no other written

1   document that writes or has further conclusions

2   regarding his investigation?  Ms. Aguilera?

3        A.  No, I don't have a copy of it.

4        Q.  Okay.  I guess my question is more -- when we

5   see Mr. Blumberg's product or result of his

6   investigation into the petition, this is what we're

7   looking at right here, the email that he wrote to you

8   with his conclusions, is that correct?

9        A.  This says a statement, yes.

10       Q.  Aside from this statement, is there any other

11  written document?

12       A.  Not that I have.

13       Q.  And here his conclusion really is

14  "unprofessional behavior by a supervisor."  Do you see

15  that?

16       A.  Yes, I see it.

17       Q.  Just taking that kind of like in its

18  isolation, "unprofessional behavior by a supervisor,"

19  would that result in a termination?  Is that something

20  that would normally result in a termination?

21       A.  It depends on the caliber of the -- what he's

22  done.

23       Q.  And your recommendation actually was not to

24  terminate, correct?

25       A.  Myself and our directors, yes -- my director,

000089

Case 3:19-cv-08157-VC   Document 32   Filed 11/02/20   Page 92 of 134

1   STATE OF CALIFORNIA      )
                             )
2   COUNTY OF SAN FRANCISCO )

3          I, CINDY TUGAW, a Certified Shorthand Reporter

4   of the State of California, duly authorized to

5   administer oaths pursuant to Section 8211 of the

6   California Code of Civil Procedure, do hereby certify

7   that

8                    TRACY AGUILERA,

9   the witness in the foregoing deposition, was by me duly

10  sworn to testify the truth, the whole truth and nothing

11  but the truth in the within-entitled cause; that said

12  testimony of said witness was reported by me, a

13  disinterested person, and was thereafter transcribed

14  under my direction into typewriting and is a true and

15  correct transcription of said proceedings.

16         I further certify that I am not of counsel or

17  attorney for either or any of the parties in the

18  foregoing deposition and caption named, nor in any way

19  interested in the outcome of the cause named in said

20  caption.

21         Dated the 10th day of September, 2020.

22

23

24

           CINDY TUGAW
25         CSR No. 4805 (California)

000090

*Exhibit*

*41*

000091

1              IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5   RENALDO NAVARRO,

6                    Plaintiff,

7   v.                                  No.  3:19-CV-8157

8   MENZIES AVIATION, INC.,
    doing business as MENZIES
9   and DOES 1 through 10,
    inclusive,

10

                     Defendants.
11   _____/

12   Zoom Remote Deposition of

13         RAUL VARGAS

14    Tuesday, August 25, 2020

15      **CERTIFIED COPY**

16

17

18

19

20

21   REPORTED BY:  CINDY TUGAW, CSR #4805

22

23

                NOGARA REPORTING SERVICE
24              5 Third Street, Suite 415
             San Francisco, California 94103
25                 (415) 398-1889

1                          I N D E X

2                                        Page Number

3     EXAMINATION BY MR. URIARTE                    4

4     EXAMINATION BY MR. WU                        73

5     FURTHER EXAMINATION BY MR. URIARTE           74

6                          ---o0o---

7                       E X H I B I T S

8     Plaintiff's

9     Exhibit 1      Plaintiff Renaldo              9
                     Navarro's Amended Notice
10                   of Deposition of Raul
                     Vargas
11
       Exhibit 8      Petition to Menzies           26
12                   Management from Menzies
                     Fuelers
13
       Exhibit 9      Termination notice for        60
14                   Renaldo Navarro

15     Exhibit 11     Employee Performance          61
                     Development dated
16                   8/29/2018

17     Exhibit 12     Email chain culminating       66
                     in an email from Raul
18                   Vargas to Tracy Aguilera
                     dated August 29, 2018
19
       Exhibit 19     Letter from Rafael Vasquez    43
20                   to whom it may concern
                     dated 11/18/2018 with
21                   attached petition

22                         ---o0o---

23

24

25

1      BE IT REMEMBERED that, pursuant to Notice of

2   Taking Deposition and on Tuesday, the 25th day of

3   August, 2020, commencing at the hour of 9:03 o'clock

4   a.m. thereof, via Zoom videoconference, before me,

5   CINDY TUGAW, a Certified Shorthand Reporter in the

6   State of California, personally appeared,

7                    RAUL VARGAS,

8   called as a witness by the Plaintiff, having been by me

9   first duly sworn, was examined and testified as

10   hereinafter set forth.

11                    ---o0o---

12              APPEARANCES OF COUNSEL

13   For the Plaintiff
          LIBERATION LAW GROUP, P.C.
14        2760 Mission Street
          San Francisco, California 94110
15        BY:  ARLO GARCIA URIARTE, Attorney at Law
          (415) 695-1000
16

17   For the Defendants
          FOLEY & LARDNER, LLP
18        555 California Street, Suite 1700
          San Francisco, California 94104
19        BY:  JASON Y. WU, Attorney at Law
          (415) 984-9848
20

     Also Present:  David Ho, Zoom Host.
21
                    ---o0o---
22

23

24

25

1     had with her, it was about somebody from the union

2     contacting her to let her know that somebody was

3     requesting to sign a petition to the employees.

4          Q.  Anything else?

5          A.  Yes.  She mentioned that -- that employees

6     were -- were not agreeing on signing it.

7          Q.  Okay.  Anything else?

8          A.  Nothing else that I can recall.

9          Q.  And then, with regards to the content of the

10    petition, after you read it, did you make any decision

11    related to the contents of the petition?

12         A.  Yes, I talked to Tracy to -- to have the

13    investigation.

14         Q.  What type of investigation?

15         A.  An investigation about the petition and about

16    the -- how the petition was made.

17         Q.  How the petition was --

18         A.  Performed.

19         Q.  Was performed?

20         A.  Yes.

21         Q.  So you mean, when you say "how the petition

22    was performed," you mean how the petition was put

23    together, correct?

24         A.  Yes.

25         Q.  Anything else that you asked Tracy to do in

000095

1   relation to the petition?

2       A.  Nothing else at that time.

3       Q.  Okay.  And so you said to do an investigation

4   about the petition.  What does that mean?  What did you

5   actually tell Tracy to do?

6       A.  To perform an investigation about how --

7   because we received some calls from the union, and also

8   received some information about Andrew, that he

9   received a message from Navarro.  So at that time it

10  was important for me to understand how that petition

11  was created.  How they did it.

12      Q.  All right.  And then you said also about how

13  the petition was put together.  So why was it important

14  for you to know how or who put together the petition?

15      A.  Because of the feedback that I received from

16  Tracy, from HR.

17      Q.  And what's that information that you received

18  from HR?

19      A.  As I said before, she told me that somebody

20  from the union contact her telling her that there was a

21  person asking for sign a petition, who was forcing the

22  employees to do it.

23      Q.  And did you ever find out who actually put

24  together the petition?

25      A.  Yes, we did.

Case 3:19-cv-08157-VC   Document 32   Filed 11/02/20   Page 99 of 134

1      MR. URIARTE:  Q.  Mr. Vargas?

2      A.  Well, I think that when you receive a message

3  from -- I don't know where -- somebody in relation to a

4  petition, that is an alert.

5      Q.  Is what?

6      A.  Is an alert.

7      Q.  Okay.  But I guess my question is how does

8  that text message lead you to conclude that Mr. Navarro

9  wrote the petition?

10      A.  That was not the one that drove me to

11  understand that Mr. Navarro did the petition.

12      Q.  What did make you understand that Mr. Navarro

13  wrote it?

14      A.  Well, because the investigation from the

15  safety department.

16      Q.  Okay.  So the investigation from the safety

17  department actually has a report?

18      A.  They have statements from employees.

19      Q.  Statements from employees.  Okay.  Anything

20  else?

21      A.  They had a statement from employees and their

22  final outcome out of the investigation.

23      Q.  Are you talking about the final outcome as

24  they wrote it in the email?

25      A.  Yes.

000097

Case 3:19-cv-08157-VC   Document 32   Filed 11/02/20   Page 100 of 134

1   Q.  Okay.  So aside from the final outcome that

2   they wrote in the email, is there another document that

3   they put together or that was it?

4   A.  No.

5   Q.  That was it?

6   A.  That was it.

7   Q.  Okay.  And then the statement from the

8   employees, from that you conclude that Mr. Navarro

9   wrote it?

10   A.  Yes.

11   Q.  Okay.  So if I read those statements,

12   somewhere in those statements it would say Mr. Navarro

13   wrote the petition?

14   A.  I think that -- no, it doesn't say about Mr.

15   Navarro writing the petition.  It's says about Mr.

16   Navarro forcing the employees to sign the petition

17   which is -- this isn't about writing the petition.

18   It's about creating harassment environment in the

19   workplace.

20   Q.  Okay.  I understand that.  I understand that.

21   Your attorneys have kind of said that to me many times,

22   so I understand that.  But I'm still kind of like

23   before that, right?  I'm still trying to get to the

24   point of trying to understand how you got to the

25   conclusion in your head that, hey, Mr. Navarro wrote

000098

Case 3:19-cv-08157-VC   Document 32   Filed 11/02/20   Page 101 of 134

1      Q.  Okay.  So forcing employees to sign the

2   petition.  What's wrong with that?

3      A.  Well, I think that when you have -- you take

4   advantage of your rank, that is harassment because of

5   how the other people feel.

6      Q.  Anything else that's wrong with that?

7      A.  Yes.  So when they use this rank, people feel

8   scared of having this confrontation with the

9   supervisor, so they prefer to sign the petition without

10   understanding what the petition was for.

11      Q.  So are you saying that the safety department

12   talked to everybody that signed that petition and

13   verified whether they actually signed it or not?

14      A.  I cannot guarantee that they talked to hundred

15   percent of the employees.

16      Q.  Okay.  But do you know how many people they

17   talked to?

18      A.  I don't know exactly how many people they

19   talked to.

20      Q.  And then you used the word "harassment."  How

21   are you using that word "harassment"?  What do you mean

22   by that?

23      A.  Well, for me, harassment is pretty much --

24   it's to force or intimidate people.  So, in this case,

25   when he's taking his rank as a supervisor, telling

000099

1  people to sign a petition that they don't know what

2  it's for, that for me is intimidation.  And that's how

3  they -- the employees felt.

4      Q.  How many employees are we talking about --

5      A.  Well --

6      Q.  -- that felt like that?

7      A.  I'm sorry?

8      Q.  How many employees felt like that?

9      A.  I cannot tell you exactly the number of, but I

10  can tell you in terms of the -- the statements we

11  received.  There were around three employees.

12      Q.  And then there were over 20 people who signed

13  the petition, right?

14      A.  Yeah.

15      Q.  So out of the more than 20 people who signed

16  the petition, three people felt like, oh, maybe I

17  didn't read it and then I signed it and maybe I --

18      MR. WU:  Objection.  Objection.  Lack of

19  foundation.  Calls for speculation.  Misstates prior

20  testimony.

21      MR. URIARTE:  Q.  So, Mr. Vargas, when your

22  attorney objects, we allow him to finish his objection

23  so that it's written into the record.  Please allow him

24  to finish, and then you can answer afterwards unless

25  your attorney tells you not to answer.  Okay?

000100

1    from, if the document is signed by people who felt

2    harassment.  So what's the validation of that document?

3        Q.  But we also have other people who didn't feel

4    that way, right?

5        A.  We don't know.

6        MR. WU:  Objection.  Lack of foundation.

7    Misstates prior testimony.

8        MR. URIARTE:  Q.  So I guess my question is this:

9    So the document itself, the petition itself, talks

10   about things that they're not happy about, correct?

11   Would you agree with that?

12       A.  I disagree with it.

13       Q.  Okay.

14       A.  I don't agree with it because you're saying

15   "they," and at this point, when I see there's employees

16   forced to sign it, it means that there is somebody, one

17   person, that is pretty much complaining for that, not

18   the whole thing.

19       Q.  I see what you're saying.  You're saying

20   because you believe that there's one person forcing

21   people to sign, that you don't believe the petition

22   anymore.

23       A.  I don't -- I don't -- I don't have the same

24   validity of the petition anymore.

25       Q.  Validity?

1      A.  Validity, I'm sorry.

2      Q.  No problem.  I talk the same way, so I totally

3  understand you.

4          Okay.  I get that.  I guess, from your mind, I

5  could see how you could think that way.  But that might

6  not make sense when you take into consideration a

7  second petition after the termination of Mr. Navarro.

8  What about that?

9      A.  The second petition, it was not brought after.

10     Q.  It was.  It was.  It was brought after.

11     MR. WU:  Objection.  Assumes facts.  Lack of

12  foundation.

13     MR. URIARTE:  I'll show it to you so we can put

14  that to rest.  I'll show that to you, don't worry.

15         So here's -- can we have Exhibit 8 up, please,

16  David.  Thank you.

17         (Plaintiff's Exhibit 8 marked for

18         identification.)

19     MR. URIARTE:  Q.  So, Mr. Vargas, do you see this

20  one --

21     A.  Yes.

22     Q.  -- which we've been calling the first

23  petition?

24         Is this the one -- do we agree this is the one

25  that you saw initially when you say that you talked to

000102

Case 3:19-cv-08157-VC   Document 32   Filed 11/02/20   Page 105 of 134

1    Tracy and Renil?  Does that make sense?

2         A.  I cannot confirm a hundred percent that this

3    was the one.

4         Q.  Okay.  So if we go down a little bit, yeah,

5    you'll see Mr. Navarro's signature on this one.

6         A.  Yes.

7         Q.  And this document actually comes from your

8    company, if you see the Menzies number there, Menzies

9    153.  And so line 24 there on the second page -- I'm

10   sorry, line 16 of the second page has Mr. Navarro's

11   signature.  Do you see that?

12        A.  Yes.

13        Q.  All right.  So, again, going back to your

14   conclusion earlier, you're saying, if you think that

15   Mr. Navarro was forcing all of these people to sign the

16   petition, you believe the petition is now without

17   validity, is that correct?

18        A.  Well, I don't think that it has the same

19   validity, definitely.  Now, what is most important to

20   bring out is that I had a conversation with HR about

21   Andrew, because they were -- in the letter I believe

22   they complained also about him falling asleep on the

23   operation.

24        So I had this conversation with HR.  And they

25   explained to me and they addressed that issue before I

000103

1   started working at Menzies.  Because, again, I started

2   June 2018.  And this was happening -- this happened in

3   August.

4        Q.  Yes.  Right.  So you started in June of 2018,

5   and this was happening in August.  So you didn't have

6   that much kind of context with regard to what was

7   happening from the last year, is that correct?

8        A.  (Indicates affirmatively.)

9        Q.  Mr. Vargas?

10       A.  Yes.

11       MR. WU:  Arlo, I'm sorry to interrupt.  Can we

12   take a quick break in the next five minutes?  Whatever

13   is a good stopping point for now.

14       MR. URIARTE:  That's fine.  We can take a break

15   now.  No problem.

16       MR. WU:  Thanks a lot, Arlo.  Let's go off the

17   record.

18       MR. URIARTE:  No problem.

19          (Brief recess.)

20       MR. URIARTE:  Q.  So we were talking about Exhibit

21   8, Mr. Vargas.  My question is with regards to the

22   actual things that the fuelers were complaining about.

23   And I just want to clarify something.

24          Was there ever an investigation by Menzies

25   with regard to the context or the content of their

1    outcome of that conversation with HR.

2        Q.  Okay.  Mr. Vargas, let me put it directly

3    here.  If it's true, just theoretically, if it's true

4    that Nicco, John and Renil are covering up for the

5    mistakes of Andrew Dodge, would that be something that

6    maybe Nicco, John and Renil should be terminated for?

7        A.  I think that it would be important to make an

8    investigation before we take into consideration.

9        Q.  But that's a serious allegation, right?

10       A.  I'm sorry?

11       Q.  That's a serious allegation.

12   MR. WU:  Objection.  Improper hypothetical.

13       You can answer the question.

14   MR. URIARTE:  Q.  That's a serious allegation.

15       A.  And as I said before, for me, anything that

16   affect the environment of our employees is valid.

17       Q.  Yeah, it's valid, definitely.  But my question

18   was that would be serious, wouldn't you agree, as a

19   manager, if somebody --

20       A.  Again, it all depends on the investigation.

21   So I cannot tell you, because the letter says that,

22   but --

23       Q.  Sure.

24       A.  -- we did an investigation as we did with

25   Navarro.

000105

Case 3:19-cv-08157-VC   Document 32   Filed 11/02/20   Page 108 of 134

1          CERTIFICATE OF WITNESS

2               ---o0o---

3

4          I, RAUL VARGAS, hereby declare under

5    penalty of perjury that I have read the foregoing

6    deposition testimony; and that the same is a true

7    and correct transcription of my said testimony

8    except as corrected pursuant to my rights under

9    Rule 30(e) of the Federal Rules of Civil

10   Procedure.

11

12          _____

13                    Signature

14          _____

15                    Date

16

17

18

19

20

21

22

23

24

25

000106

1   STATE OF CALIFORNIA      )
                             )
2   COUNTY OF SAN FRANCISCO )

3          I, CINDY TUGAW, a Certified Shorthand Reporter

4   of the State of California, duly authorized to

5   administer oaths pursuant to Section 8211 of the

6   California Code of Civil Procedure, do hereby certify

7   that

8                    RAUL VARGAS,

9   the witness in the foregoing deposition, was by me duly

10  sworn to testify the truth, the whole truth and nothing

11  but the truth in the within-entitled cause; that said

12  testimony of said witness was reported by me, a

13  disinterested person, and was thereafter transcribed

14  under my direction into typewriting and is a true and

15  correct transcription of said proceedings.

16         I further certify that I am not of counsel or

17  attorney for either or any of the parties in the

18  foregoing deposition and caption named, nor in any way

19  interested in the outcome of the cause named in said

20  caption.

21         Dated the 10th day of September, 2020.

22

23

24

            CINDY TUGAW
25          CSR No. 4805 (California)

000107

```
 1   Raul Vargas
     c/o Foley & Lardner
 2   555 California Street, Suite 1700
     San Francisco, CA 94104
 3   Attn:  Jason Y. Wu, Esq.

 4   Date:  September 10, 2020
     Re:  Navarro vs. Menzies
 5   Deposition Date:  Tuesday, August 25, 2020

 6   Dear Mr. Vargas,

 7        Please be advised the original transcript of
     your deposition is ready for your review.
 8        Pursuant to FRCP Rule 30(e), you have 30 days
     following the date of this notice to read, correct if
 9   necessary, and sign your transcript unless the
     attending parties and the deponent agree on the record
10   or otherwise in writing to a longer or shorter time
     period.  The deponent may change the form or the
11   substance of the answer to a question, and may either
     approve the transcript of the deposition by signing it,
12   or refuse to approve the transcript by not signing it.
     You are not required by law to read and sign your
13   deposition transcript.  All parties will be informed of
     the corrections.  The original transcript will then be
14   sealed and sent to the examining attorney pursuant to
     the applicable law.
15        You may either come to our office to read and
     sign the original transcript, or you may contact your
16   attorney or the attorney who arranged for you to be
     present at your deposition.  If they have ordered a
17   copy of the transcript, you may review their copy and
     make corrections by submitting, signing and returning
18   the attached form.  If you choose to review your
     transcript at our office, please call first to make an
19   appointment.  Should you have any question regarding
     these instructions, please call.
20
     Sincerely,
21

22

     NOGARA REPORTING SERVICE
23   5 Third Street, Suite 415
     San Francisco, California 94103
24   (415) 398-1889

25   cc:  All counsel, original deposition
```

*Exhibit*

*42*

**000109**

1          IN THE UNITED STATES DISTRICT COURT

2       IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5   RENALDO NAVARRO,

6               Plaintiff,

7   v.                          No.  3:19-CV-8157

8   MENZIES AVIATION, INC.,
    doing business as MENZIES
9   and DOES 1 through 10,
    inclusive,
10
                Defendants.
11   _____/

12   Zoom Remote Deposition of

13       JOHN QUALLY

14    Monday, July 27, 2020

15          Volume I

16    (Pages 1 through 32)

17     **CERTIFIED COPY**

18

19

20

21   REPORTED BY:  CINDY TUGAW, CSR #4805

22

23

24            NOGARA REPORTING SERVICE
             5 Third Street, Suite 415
          San Francisco, California 94103
25              (415) 398-1889

Case 3:19-cv-08157-VC   Document 32   Filed 11/02/20   Page 113 of 134

1    Q.  Okay.  All right.  So let's see.  So you

2    said -- when you started with ASIG -- and is that the

3    right way to call it, ASIG, by the way, A-S-I-G, ASIG?

4    Do you guys say that, ASIG?

5    A.  Yes.

6    Q.  When you started with ASIG, what was your

7    position with them?

8    A.  Supervisor.

9    Q.  Can you tell me what the duties of a

10   supervisor would be?

11   A.  The duties are basically overseeing of the --

12   overseeing and assigning the flights to the fuelers and

13   making communication with the airlines on -- as we go

14   through the day.

15   Q.  And by 2018, how many fuelers were assigned to

16   a supervisor?  Do you remember?

17   A.  It could -- I guess it varies by shift.

18   Q.  I see.  What would be the range, like would

19   you say between three and ten, or was there like a

20   range?

21   A.  I guess it depends on the shift.  Some shifts

22   had upwards of 12 to 15.  Some shifts had anywhere from

23   three to four.

24   Q.  Gotcha.  And the interesting -- or the date

25   most interesting for us is August of 2018 because

000111

Case 3:19-cv-08157-VC    Document 32    Filed 11/02/20    Page 117 of 134

1  supervisors with regards to how they work with fuelers,

2  right?  You said earlier that you would -- one of the

3  duties would be to assign flights to the fuelers for

4  the shift, right?

5      A.  Yes.

6      Q.  That's one of the duties.  What other duties

7  do supervisors have?

8      A.  They -- besides assigning the flights, they

9  are obviously in communication with airlines as needed.

10  They're overseeing the safety of the operation, making

11  sure that, you know, everything is going safely.

12      Q.  Okay.  So is it the supervisor that's actually

13  on the headphone with the plane during the fueling

14  operation, or with the airline?

15      A.  No.

16      Q.  No?  That could be any of the fuelers?

17      A.  Well, the fuelers don't communicate with the

18  flight crew.  They communicate with the airline

19  representative.

20      Q.  Gotcha.  Okay.  And who is that?  Is that the

21  fueler or is that the supervisor?

22      A.  Sometimes both.  But, in general, when you're

23  actually fueling, it would be more so the fueler than

24  the supervisor.

25      Q.  Okay.  Are supervisors sometimes -- like do

000112

Case 3:19-cv-08157-VC   Document 32   Filed 11/02/20   Page 115 of 134

1    they sometimes help with the fueling operation, like

2    they go to the actual airplane and help with the

3    fueling of the airplane?  Do they sometimes do that?

4         A.  They sometimes, yes.

5         Q.  And earlier you said they make sure -- they

6    ensure the safety of the operation.  How are

7    supervisors keyed to that?  How are supervisors

8    important in the safety of the operation?

9              Do you understand the question, Mr. Qually?

10        A.  Yeah.  No, they're just -- they're there to,

11   you know, ensure the fuelers are working safely.  If

12   there's any safety concerns, they do what they can to

13   resolve them, whether it be on the fueler's end or the

14   equipment end, you know.  They help do whatever needs

15   to be done to keep everything safe.

16        Q.  Gotcha.  And what kinds of situations

17   sometimes come up when it comes to the safety?  Can you

18   give us an example of safety concerns that sometimes

19   come up?

20        A.  Sometimes a fueler is not following proper

21   procedures on the fueler's end, equipment not working

22   right.  So they may have an issue with the equipment.

23        Q.  So is it safe to say then that the supervisors

24   are kind of overseeing each one of these fueling

25   operations with regards to the airplane?

000113

1    A.   Yes.

2    Q.   Okay.   And then what other duties do

3   supervisors have with regards to the fuelers?

4    A.   Basically, you know, for operational purposes,

5   it's making sure that the flights are getting done, the

6   fuelers are getting to the flights when they're

7   supposed to, you know, addressing whatever issues may

8   come up.

9    Q.   What about giving breaks, for example, like

10   timing the breaks, when people can go for meal periods,

11   when people can go for their ten-minute breaks, is that

12   the supervisor's duties?

13    A.   Yes.

14    MR. WU:   Objection.   Relevance.

15    MR. URIARTE:   Q.   And then what about clocking in

16   and clocking out, do the supervisors have any duties

17   with regards to that?

18    MR. WU:   Same objection.

19    THE WITNESS:   No.

20    MR. URIARTE:   Q.   Like if there are issues with

21   regards to they forgot to clock out or, oh, they forgot

22   to clock in, something like that, is that the

23   supervisor's duty or is that somebody else's?

24    MR. WU:   Same objection.

25    MR. URIARTE:   Q.   Mr. Qually?

1      A.  No.

2      Q.  So who's responsible for like fixing clock-ins

3  and clock-outs?

4      MR. WU:  Same objection.

5      THE WITNESS:  The fueler.

6      MR. URIARTE:  Q.  I'm sorry?

7      A.  The fueler.

8      Q.  The fueler?

9      A.  Whoever did not clock in or out.

10      Q.  And then who does the fueler have to talk to

11  with regards to that?

12      A.  They would usually come to us as the manager

13  or go straight to payroll.

14      Q.  Gotcha.

15      MR. WU:  And, Arlo, can we assume I'm asserting

16  the same objections for this line of questioning just

17  to keep things flowing?

18      MR. URIARTE:  Sure.

19      MR. WU:  Thank you.

20      MR. URIARTE:  Q.  How does the supervisor avoid

21  causing delays in these fuelings -- delays to the

22  airlines, right?  I hear that sometimes the fueling

23  operation is what causes the delay, right?  Can that

24  happen, Mr. Qually?

25      A.  It can.

Case 3:19-cv-08157-VC   Document 32   Filed 11/02/20   Page 118 of 134

1    Q.  And what happens?  Why are delays caused by

2    the fueling operation?  Why does that happen?

3    A.  Many different factors involved.  It could be

4    the way the flights were set up for the fueler.  It

5    could be an equipment issue.  It varies depending on

6    the situation.  I mean, there's no set reason for that.

7    Q.  Is that something that the supervisors try to

8    avoid as part of their duties, they try to avoid any

9    delays?

10    A.  Yes.

11    Q.  And I guess they try to avoid delays by having

12    like the proper number of fuelers working there, right?

13    I mean, you have to be properly staffed in order to

14    avoid delay, correct?

15    A.  That's one, yes.

16    Q.  And then you have to make sure that they have

17    the right equipment, that they're doing things

18    correctly?

19    It looks like we lost -- are you still there?

20    A.  Yeah, hold on just a moment.

21    What was your question again?

22    Q.  Yeah, I guess that goes into what we were

23    talking about earlier, that the supervisors have to

24    make sure that the fuelers are using the right

25    equipment, they're using the right procedures and all

000116

1    of those kind of things, like assist in avoiding

2    delays.  Is that correct?

3         MR. WU:  Objection.  Compound.

4         MR. URIARTE:  Q.  Mr. Qually?

5         A.  Yes.

6         Q.  All right.

7              (Discussion off the record.)

8         MR. URIARTE:  Q.  So you had a working

9    relationship with plaintiff Renaldo Navarro, right?  Is

10   that correct, Mr. Qually?

11        A.  Yes.

12        Q.  Were you social with Mr. Navarro at all?  Did

13   you guys like go to baptisms or Christmases or

14   whatever?

15        A.  No.

16        Q.  Okay.  So you knew him from work only, is that

17   correct?

18        A.  Yes.

19        Q.  You didn't have some sort of social or

20   family-related kind of relationship, right?  Is that

21   correct?

22        A.  No.

23        Q.  And you supervised Mr. Navarro when you were

24   the duty manager and he was the supervisor, is that

25   correct?

1    A.  And it was brought up to the higher-ups.

2    Q.  And who were the higher-ups at that time?

3    A.  Let's see.  Who was it?  Renil was one of

4    them.

5    Q.  Who?

6    A.  Renil Lal.  Because he was the acting GM at

7    the time, so --

8    Q.  Okay.  Anybody else, do you remember?

9    A.  No.

10   Q.  Did anything happen because of the complaints

11   that Andrew Dodge was sleeping?  Do you know what

12   happened to Andrew Dodge?  Was he reprimanded?  Was he

13   written up?

14       Did anything happen because of that?

15   A.  Not that I know of.

16   Q.  Did Mr. Dodge explain to you what happened or

17   did he admit it or anything like that?

18   A.  He did.  He had sleep depravation -- or sleep

19   apnea, sorry.

20   Q.  So he had sleep apnea, and so --

21   A.  According to what I heard, what the

22   explanation was, at times it's easy for a person to

23   fall asleep.

24   Q.  Aside from his -- aside from Mr. Navarro

25   mentioning that Mr. Dodge was sleeping, any other

```
 1    STATE OF CALIFORNIA      )
                               )
 2    COUNTY OF SAN FRANCISCO  )

 3           I, CINDY TUGAW, a Certified Shorthand Reporter

 4    of the State of California, duly authorized to

 5    administer oaths pursuant to Section 8211 of the

 6    California Code of Civil Procedure, do hereby certify

 7    that

 8                      JOHN QUALLY,

 9    the witness in the foregoing deposition, was by me duly

10    sworn to testify the truth, the whole truth and nothing

11    but the truth in the within-entitled cause; that said

12    testimony of said witness was reported by me, a

13    disinterested person, and was thereafter transcribed

14    under my direction into typewriting and is a true and

15    correct transcription of said proceedings.

16           I further certify that I am not of counsel or

17    attorney for either or any of the parties in the

18    foregoing deposition and caption named, nor in any way

19    interested in the outcome of the cause named in said

20    caption.

21           Dated the 7th day of August, 2020.

22

23

24

              CINDY TUGAW
25            CSR No. 4805 (California)
```

000119

1                IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5     RENALDO NAVARRO,

6                     Plaintiff,

7     v.                                No.  3:19-CV-8157

8     MENZIES AVIATION, INC.,
      doing business as MENZIES
9     and DOES 1 through 10,
      inclusive,
10
                      Defendants.
11     _____/

12     Zoom Remote Deposition of

13          JOHN QUALLY

14      Tuesday, July 28, 2020

15          Volume II

16      (Pages 33 through 58)

17       **CERTIFIED COPY**

18

19

20

21

22     REPORTED BY:  CINDY TUGAW, CSR #4805

23
                  NOGARA REPORTING SERVICE
24               5 Third Street, Suite 415
              San Francisco, California 94103
25                   (415) 398-1889

1  no.

2      Q.  Did you -- like either part of the petition or

3  part of what was happening, or anything like that, did

4  you ever have a discussion with Mr. Dodge with regards

5  to his fuelers and his fuelers maybe not being able to

6  take breaks?  Did you ever engage in such a discussion

7  with him?

8      A.  It probably came up once or twice, yes.

9      Q.  And was this once or twice before the

10 termination of Mr. Navarro?

11     A.  Likely, yes.

12     Q.  And can you tell us what your memory is of

13 that, like, what was that discussion about?

14     A.  Basically fuelers not being able to take a

15 break just by the fact that they were shorthanded or

16 just lots of flights.  Nothing I can remember in

17 general, but those are usually the only things that

18 would prevent that.

19     Q.  Okay.  And what brought up the need to talk to

20 Mr. Andrew Dodge about the breaks and his fuelers?

21 What brought it up to you?  What kind of triggered

22 that?

23     MR. WU:  Objection.  Assumes facts not in

24 evidence.

25     THE WITNESS:  Sometimes a fueler would complain to

1   me, but that's it.

2       MR. URIARTE:  Q.  And did Mr. Dodge have any

3   opinion or did he kind of have his position as to why

4   these breaks were short -- I mean, the breaks weren't

5   happening, or the breaks were late, or anything like

6   that?

7       Did Andrew Dodge try to explain himself as to

8   why those things were happening?

9       MR. WU:  Objection.  Assumes facts not in

10  evidence.

11      THE WITNESS:  Yes.

12      MR. URIARTE:  Q.  And what would he say in those

13  discussions?

14      A.  He gave me the explanation of what happened

15  during the night and why some fuelers weren't able to

16  get a longer break than they did or any break at all.

17  And that's it, you know.

18      We -- there is a policy where, if they don't

19  get a break, they get a missed meal penalty.  So they

20  get paid for their lunch.

21      Q.  Did you ever have a discussion with a Rafael

22  Vasquez about Andrew Dodge?

23      A.  I might have at one point.  I don't recall.

24      Q.  And what do you remember as to that

25  discussion?

1    STATE OF CALIFORNIA      )
                             )
2    COUNTY OF SAN FRANCISCO )

3         I, CINDY TUGAW, a Certified Shorthand Reporter

4    of the State of California, duly authorized to

5    administer oaths pursuant to Section 8211 of the

6    California Code of Civil Procedure, do hereby certify

7    that

8                    JOHN QUALLY,

9    the witness in the foregoing deposition, was by me duly

10   sworn to testify the truth, the whole truth and nothing

11   but the truth in the within-entitled cause; that said

12   testimony of said witness was reported by me, a

13   disinterested person, and was thereafter transcribed

14   under my direction into typewriting and is a true and

15   correct transcription of said proceedings.

16        I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   caption.

21        Dated the 7th day of August, 2020.

22

23

24

                  CINDY TUGAW
25                CSR No. 4805 (California)

000123

*Exhibit*

*43*

**000124**




RenaldoNavarro 000008

*Exhibit*

*44*

**000126**



**MENZIES
AVIATION**

Incorporating **Simplicity USA** and **ASIG**

## APPLICANT DECLARATION FORM

This declaration form is applicable to Menzies Aviation and/or any of its subsidiaries (hereinafter referred to as "The Company").

Please read the below carefully and initial each paragraph.

**Electronic...** I hereby certify that I have not knowingly withheld any information that might adversely affect my chances for employment and that the answers given by me are true and correct to the best of my knowledge. I further certify that I, the undersigned applicant, have personally completed this application. I understand that any omission or misstatement of material fact on this application or on any document used to secure employment with the Company shall be grounds for rejection of this application or for immediate discharge if I am employed, regardless of the time elapsed before discovery.

**Electronic...** I hereby authorize the Company to thoroughly investigate my references, work record, education, and other matters related to my suitability for employment and, further, authorize the references I have listed to disclose to the company any and all letters, reports, and other information related to my work records, without giving me prior notice of such disclosure. In addition, to the extent permitted by applicable law, I hereby release the Company, my former employers and all other persons, corporations, partnerships, and associations from any and all claims, demands or liabilities arising out of or in any way related to such investigation or disclosure.

**Electronic...** I understand that the Company requires the successful completion of a urinalysis for drug testing purposes and / or a blood alcohol test as a condition of employment. By submitting this application for Employment, I hereby consent to either or both of said tests, at the Company's discretion.

**Electronic...** I understand that nothing contained in this application, or conveyed during any interview that may be granted, or during my employment, if hired, is intended to create an employment contract between the Company and me. In addition, I understand and agree that if I am employed, unless subject to a collective bargaining agreement, my employment is for no definite or determinable period and may be terminated at any time, with or without prior notice, at the option of either myself or the Company and that no promises or representations contrary to the foregoing are binding on the Company unless made in writing and signed by me and the Company's designated representative.

**Electronic...** If, employed by the Company, I agree to abide by my supervisor's reasonable instructions, the work rules and code of conduct, and any other rules and regulations relating to the performance of my job, which I understand is subject to change. The Company and designated representative(s) shall have the maximum discretion permitted by law, in administering, discontinuing, or enhancing any policy, procedure, or benefit plan.

**Electronic...** I either have a current driver's license that is not restricted or suspended in any way, or I have fully disclosed to the Company any limitations or restrictions on my driving privileges.

I acknowledge that I have read and understand the above statements and hereby grant permission to confirm the information supplies on the application by me.

It is the policy of the Company to afford equal opportunity to all employees and applicants for employment without regard to age, race, religion, colour, sex, national origin, marital status or pregnancy, and to afford equal opportunities to disabled veterans, veterans of the Vietnam era, and individuals with a disability, and any other characteristics protected by Federal, State, and local law.

Silvano Campos

I, _____, acknowledge that I have read the above policy.


_____          _____          _____
Employee Signature                Employee Name (Printed)            Date

MENZIES_000237

EXCELLENCE FROM TOUCHDOWN TO TAKE000127

will remain in effect for **12 months.** Once expired, it will be retained in the employee file as a documented coaching.

d) **Final Warning –** Is issued when the employee has not demonstrated their ability to correct the behavior. This level will remain in effect for **18 months.** Once an employee has been on a final warning they have been allowed ample opportunity to correct their behavior and clearly have not done so. This is their last and final opportunity for them to comply with all policies and procedures in all four categories. Any infraction no matter how minor while on an active Final Warning may result in termination. Once expired, it will be retained in the employee file as a documented coaching.

Exceptions or deviations from the normal process may occur whenever the Company deems that circumstances warrant that one or more steps in the process be skipped.

I have read and understand the Employee Performance Development Process above, and hereby agree to abide by this policy.

_____
Date

_____          _____
Employee Signature                      Employee Name (Printed)

MENZIES_000219

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF **000128**



MENZIES
AVIATION

## EMPLOYEE ACKNOWLEDGEMENT OF HANDBOOK

This form is applicable to Menzies Aviation and/or any of its subsidiaries (hereinafter referred to as "The Company").

I _____ hereby acknowledge my understanding that a copy of the employee handbook was made available to me for download during the onboarding process. I also have been notified of where to view a copy of the employee handbook. I understand that it is important for me to review the employee handbook because it provides guidelines on the policies, procedures, and programs affecting my employment with this organization. I understand that the Company can, at its sole discretion, modify, eliminate, revise or deviate from the guidelines and information in this handbook as circumstances or situations warrant.

I also understand that any changes by the Company with respect to its policies, procedures, or programs can supersede, modify or eliminate any of the policies, procedures or programs outlined in this handbook. I accept responsibility for familiarizing myself with the information in this handbook and will seek verification or clarification of its terms or guidance where necessary

Furthermore, I acknowledge that this handbook is neither a contract of employment nor a legal document and nothing in the handbook creates an express or implied contract of employment. I understand that I should consult my supervisor or a representative of the Human Resources department if I have any questions that are not answered in this handbook.

I also understand that, unless subject to a collective bargaining agreement, my employment is at-will and can be terminated by me or by the Company for any or no reason, with or without cause or without notice, or the use of progressive discipline, at any time. This at-will relationship cannot be changed except by a written agreement signed by me and the Executive Vice President, Americas.

_____
Date

_____
Employee Signature

_____
Employee Name (Printed)

## EEO-1 Self-Identification Form

The employer is subject to certain governmental recordkeeping and reporting requirements for the administration of civil rights laws and regulations. In order to comply with these laws, the employer invites employees to voluntarily self-identify their race and ethnicity. Submission of this information is voluntary and refusal to provide it will not subject you to any adverse treatment. The information will be kept confidential and will only be used in accordance with the provisions of applicable laws, executive orders, and regulations, including those that require the information to be summarized and reported to the federal government for civil rights enforcement. When reported, data will not identify any specific individual.

As a sub-contractor, we also comply with government regulations including but not limited to affirmative action responsibilities as required under Executive Order 11246, Section 503 of the Rehabilitation Act of 1973, section 4212 of the Vietnam Era Veterans Readjustment Act of 1974 and Veterans Employment Opportunities Act (VEOA) of 1998.

This data is for periodic government reporting and will be kept in a *Confidential File* separate from the Application for Employment.

(PLEASE PRINT)

Date:_____

Name _____
       FIRST              MIDDLE              LAST            _____

Phone _____        Position: _____

Address_____
NUMBER          STREET              CITY              STATE              ZIP CODE

**EEO-1 Survey - If you wish to be identified, please sign below and complete the survey or if you wish not to be identified, sign and check the field below**

Signature:_____

OR

____ I decline / do not wish to disclose and sign below.

## Continue with EEO-1 Survey:

**Gender Check one:**

_____ Male        _____ Female

**Ethnicity:**
Are you Hispanic or Latino?
_____ No, I am not Hispanic or Latino.

_____ Yes, I am **Hispanic or Latino:** A person of Cuban, Mexican, Puerto Rican, Central or South American, or other Spanish culture or origin, regardless of race.

*Race – IMPORTANT - Only complete this section if you checked "No, I am not Hispanic or Latino" in the Ethnicity section above:*

MENZIES_000295



*A Public Service Agency*

EMPLOYER PULL NOTICE PROGRAM

AUTHORIZATION FOR
RELEASE OF DRIVER RECORD INFORMATION

I, _____, California Driver License Number, _____
hereby authorize the California Department of Motor Vehicles (DMV) to disclose or otherwise make available, my driving
record, to my employer, _____
                                              COMPANY NAME

I understand that my employer may enroll me in the Employer Pull Notice (EPN) program to receive a driver record report at
least once every twelve (12) months or when any subsequent conviction, failure to appear, accident, driver's license suspension,
revocation, or any other action is taken against my driving privilege during my employment.

I am not driving in a capacity that requires mandatory enrollment in the EPN program pursuant to California Vehicle Code
(CVC) Section 1808.1(k). I understand that enrollment in the EPN program is in an effort to promote driver safety, and that my
driver license report will be released to my employer to determine my eligibility as a licensed driver for my employment.

| EXECUTED AT CITY | COUNTY | STATE |
|---|---|---|
| DATE | SIGNATURE OF EMPLOYEE X | |

I, _____, of _____
          AUTHORIZED REPRESENTATIVE                              COMPANY NAME

do hereby certify under penalty of perjury under the laws in the State of California, that I am an authorized representative of
this company, that the information entered on this document is true and correct, to the best of my knowledge and that I am
requesting driver record information on the above individual to verify the information as provided by said individual. This
record is to be used by this employer in the normal course of business and as a legitimate business need to verify information
relating to a driving position not mandated pursuant to CVC Section 1808.1. The information received will not be used for any
unlawful purpose. I understand that if I have provided false information, I may be subject to prosecution for perjury (Penal
Code Section 118) and false representation (CVC Section 1808.45). These are punishable by a fine not exceeding five
thousand dollars ($5,000) or by imprisonment in the county jail not exceeding one year, or both fine and imprisonment. I
understand and acknowledge that any failure to maintain confidentiality is both civilly and criminally punishable pursuant to
CVC Sections 1808.45 and 1808.46.

| EXECUTED AT CITY | COUNTY | STATE |
|---|---|---|
| DATE | SIGNATURE AND TITLE OF AUTHORIZED REPRESENTATIVE X | |

To obtain a driver record on a prospective employee you may submit an INF 1119 form. To add this driver to the EPN Program
you must submit the applicable forms: INF 1100, INF 1102, INF 1103, INF 1103A form. You may obtain forms at our website
at www.dmv.ca.gov/otherservices, or by calling 916-657-6346.

THIS FORM MUST BE COMPLETED AND RETAINED AT THE EMPLOYER'S PRINCIPAL PLACE OF BUSINESS *AND
MADE AVAILABLE UPON REQUEST TO DMV STAFF.*

DO *NOT* RETURN THIS FORM TO DMV.

INF 1101 ENGLISH (REV. 8/2004) WWW

MENZIES_000296

**000131**



**MENZIES
AVIATION**

Incorporating **Simplicity USA** and **ASIG**

## WORKERS COMPENSATION STATEMENT

This form is applicable to Menzies Aviation and/or any of its subsidiaries (hereinafter referred to as "The Company").

**Workers Compensation**
Menzies Aviation strives to maintain a safe workplace and limit the number of workplace illnesses and injuries. In the event an employee suffers an occupational illness or injury, the employee shall receive compensation in accordance with applicable workers' compensation laws.

**Reporting an Occupational Illness or Injury**
If you become ill or are injured while working on the job, you must report the illness or injury immediately, even if you believe the illness or injury is minor or insignificant. Employees are required to report all illnesses or injuries and will not be subject to any disciplinary actions for reporting. Employees who fail to report an illness or injury may be subject to discipline, which may adversely affect their benefits under the workers compensation laws.
To report an occupational illness or injury, you must do the following:

- Report the illness or injury to your supervisor immediately. Every illness or injury must be reported within 24 hours of occurrence.
- Complete all required incident report forms and submit a written statement.

If an employee suffers a workplace injury, the employee is required to submit to a drug and alcohol test by giving a urine sample within 24 hours of the incident, or immediately if so directed by company management. Employee who refuses to submit to such a test will be subject to termination, which may affect their benefits under workers compensation law.

**Returning to Work**
An employee who is absent due to an occupational illness or injury may not return to work until he or she is physically able to return. Before returning, the employee must present a supervisor with a note signed by his or her treating physician that states the employee may return to work in a full or modified capacity.

I have read and understand the Company's Workers Compensation Statement above.

_____
Date

_____                    _____
Employee Signature                                          Employee Name (Printed)

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF   **000132**