*Exhibit 40*

```
                IN THE UNITED STATES DISTRICT COURT

         IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA




RENALDO NAVARRO,

            Plaintiff,

v.                                         No.  3:19-CV-8157

MENZIES AVIATION, INC.,
doing business as MENZIES
and DOES 1 through 10,
inclusive,

            Defendants.
_____/

Zoom Remote Deposition of

     TRACY AGUILERA

 Tuesday, August 25, 2020


        CERTIFIED COPY





REPORTED BY:  CINDY TUGAW, CSR #4805



          NOGARA REPORTING SERVICE
          5 Third Street, Suite 415
       San Francisco, California 94103
               (415) 398-1889
```

1   A. The corporate office.

2   Q. So I would imagine that the corporate office
3   would have kind of like the same materials they would
4   have for the other Menzies departments, other
5   Menzies --

6   A. I'm sorry?

7   Q. I would imagine that the Menzies corporation
8   would be using the same employment handbooks as they
9   were using for the other services that Menzies was
10  already doing at SFO, right?  Those would be the same
11  handbooks?

12  A. Well, yes, they have a California Menzies
13  handbook, yes.

14  Q. So that's the part I don't understand too
15  much. Why did it take a little bit of time to package
16  them for the Menzies fuelers?

17      Did you hear the question?

18  A. No, I didn't hear your question.

19  Q. Okay. So the question is if there's a
20  California employment handbook -- by July of 2017,
21  Menzies was already at San Francisco Airport, correct?
22  Ms. Aguilera?

23  A. Yes, I believe it was around July.

24  Q. No, what I mean is by July of 2017, there were
25  already operations in San Francisco?

1      A.   Yes.

2      Q.   Other services, correct?

3      A.   Yes.

4      Q.   So those services already had an employment

5  handbook for California, correct?

6      A.   Yes.

7      Q.   So wasn't that the same handbook that was

8  going to be used for Menzies fuelers?

9      A.   I can't answer that because I know they were

10 revising our handbook.

11     Q.   I see.  Okay.  And then, but we don't know the

12 exact date that the handbook was distributed to the

13 Menzies fuelers?

14     A.   No.

15     Q.   And I took a look at the documents that were

16 produced to us by your attorneys, and I didn't see any

17 type of acknowledgment paperwork with regards to Mr.

18 Navarro or acknowledging receipt of corporate policies.

19     A.   Hmm.

20     Q.   So do you know anything about that, whether

21 you've seen one or anything like that?

22     A.   No, I actually didn't look, but I do know that

23 a package was put together for all of the ASIG

24 employees for them to sign.

25     Q.   Right.  Because that's the normal procedure,

1  right, you give it to the employees and then they
2  acknowledge receipt of it, correct?
3      A.  Yes.
4      Q.  And they acknowledge that they have been given
5  one, isn't that the practice?
6          So the practice, Ms. Aguilera, is that once
7  the handbooks become available, you provide the
8  handbook to the employee and then they sign an
9  acknowledgment for receipt of them, is that correct?
10     A.  Yes.
11     Q.  And then are you familiar with the Menzies
12 code of conduct?
13     A.  Yes.
14     Q.  And that's another kind of set of policies or
15 paperwork that's given to each employee, is that
16 correct?
17     A.  It's in the handbook, yes.
18     Q.  Oh, so it's part of the handbook?
19     A.  Yes, it is.
20     Q.  Is there a separate acknowledgment of receipt
21 for the code of conduct or it's all just one?
22     A.  It's all just one.
23     Q.  Was there ever a training with regards to the
24 Menzies California handbook and code of conduct?  Was
25 there any kind of training like that?

1   A. There was, when the employees came in to sign
2   all the documents, we went over the documents with
3   them.
4   Q. So how did that go? You called some of the
5   employees one by one or like a seminar? How did that
6   go?
7   A. They would come in according to their
8   schedule, if they didn't have flights, they would come
9   into the HR department. We would -- I would arrange it
10  with their manager.
11  Q. Like how many people would come in at one
12  time?
13  A. A couple at a time.
14  Q. And then when you said you would go over it
15  with them, you actually went through some of the pages
16  and --
17  A. What they were signing, yes.
18  Q. What they signed.
19  A. Either myself or my clerk.
20  Q. I see. Do you have an independent
21  recollection of doing something like that with
22  Mr. Renaldo Navarro?
23  A. No, I can't say that I do. I didn't do a lot
24  of them. My clerk did a lot of them, most of them.
25  Q. In July or August of 2018, who was your clerk?

1   memory is that they had the handbook at that point
2   already, is that correct?
3       A.  Yes.
4       Q.  And who would know for certain whether that's
5   true or not?
6       A.  The documents should be in the files.
7       Q.  Yeah, well, I guess what I can represent to
8   you is that -- and I should show you that -- let's look
9   at Exhibit 15, please.
10              (Plaintiff's Exhibit 15 marked for
11              identification.)
12      MR. URIARTE:  Q.  So here is one of those
13  documents that lists the signature.  If we look below,
14  it's got a blank, no employee name, no employee
15  signature.  This was produced to us by your attorneys.
16              And so I have yet -- I mean, I guess, if you
17  get back to your office and you see some sort of
18  acknowledgment form that has Mr. Navarro's signature on
19  it, I think that would be helpful, but we have yet to
20  see that.
21              Okay, Ms. Aguilera?  Did you understand my
22  request?
23      A.  Yes.
24      Q.  All right.  How did you first find out that
25  there was a petition circulating about Andrew Dodge?

1    A.  The union notified me.

2    Q.  And how did they notify you?

3    A.  They called me.  It wasn't "they."  Charles
4 called me, the man named Charles that worked in the
5 union office.

6    Q.  And what did Charles say to you?

7    A.  He said, "Tracy, are you aware that there's a
8 petition being circulated?  Our members -- several
9 members have called and complained that they were being
10 forced to sign a petition."

11   Q.  Okay.  And then anything else that Charles
12 said to you?

13   A.  No.

14   Q.  And so, in response to that, what did you do?

15   A.  Well, I asked him if he had a copy of the
16 petition and who was being forced, but he never got
17 back to me on that.  With that being said, I made
18 contact with the acting general manager at the time,
19 and his name was Renil Lal, and I told him that I
20 received the call from the union.

21   Q.  Okay.  And did Renil get you a copy of the
22 petition?

23   A.  Not right away.  I don't believe -- no, he did
24 not.

25   Q.  Do you know how long before you actually got a

1  copy of it?
2      A.  I got it -- actually, I got it from Raul
3  Vargas.  I'd seen it.
4      Q.  I see.  Okay.  And did you read the petition
5  itself?
6      A.  I've seen the names on there, yes, but I
7  didn't go through each one.  I'm sorry.
8      Q.  What about the topic that the petition was
9  talking about, did you read that part?
10     A.  No, I -- I gave everything to Kevin Blumberg
11 to open up an investigation.
12     Q.  And what was the investigation for?
13     A.  Well, to find out what was going on.
14     Q.  What do you mean, "to find out what was going
15 on"?
16     A.  With the petition, why it was being
17 circulated.
18     Q.  Okay.  And then what was the conclusion of
19 Kevin, the security person?
20     A.  The conclusion?
21     Q.  Yes.
22     A.  It was that Rey Navarro was forcing employees
23 to sign a petition to have Andrew Dodge removed.
24     Q.  Okay.  And that's what is contained in the
25 email, right, is that what you're talking about, where

1   **Mr. Blumberg actually sent an email to you with the**
2   **result of his investigation?**
3   **A. Yes.**
4   Q. Okay. So that's with regards to the inquiry
5   as to Mr. Navarro's involvement in the petition itself,
6   right? But what about the part of, like, what the
7   fuelers were complaining about? Was that ever
8   investigated?
9   A. I'm sorry, can you repeat that.
10  Q. Sure. What about the part, that section of
11  the petition where the fuelers are asking for certain
12  relief or what they're complaining about, right, in the
13  petition, was that part of the petition ever
14  investigated?
15  A. What part are you talking about?
16  MR. URIARTE: Okay. Let me show you. So let's
17  bring up Exhibit 8.
18      (Plaintiff's Exhibit 8 marked for
19      identification.)
20  MR. URIARTE: Q. Can you see Exhibit 8,
21  Ms. Aguilera?
22  A. Yes.
23  Q. Do you remember this to be the petition that
24  we're talking about?
25  A. This is the one that I believe was given to

```
 1   Dodge.  The way he supervised is very unprofessional
 2   when he run the operation or supervised, people are not
 3   [taking] their breaks it's because the way he set up
 4   the flights" -- okay?  -- "and he always blaming the
 5   people there's a delay or always saying lack of
 6   manpower and trucks issues."
 7           Okay.  So let's just stop there.  That part of
 8   the petition, was that ever investigated?
 9       A.  The whole scenario was investigated by Kevin
10   Blumberg.
11       Q.  Aside from the email that contains some of
12   Mr. Blumberg's conclusion, is there another document
13   that addresses these concerns?
14       A.  I don't have them.
15       Q.  So if there is an investigation, it would be
16   part of what Mr. Blumberg engaged in, correct?  Is that
17   correct?
18       A.  Yes.
19       Q.  Okay.  Let's go on to the next one.  "The
20   truth is he doesn't know how to run the show, we also
21   addressed the problem to the higher position managers
22   (Nicco, John and Renil) as usual nothing happened,
23   looks like they always covering his mistake or maybe
24   these managers don't know anything about fueling also
25   like Andrew Dodge lack of experience about fueling."
```

1   Raul Vargas?  And really what I first want to put my
2   attention to -- or put your attention to, it says,
3   "Could you also open an investigation for July" --
4   which should be Macapagal.  Do you see that,
5   Ms. Aguilera?
6       MR. WU:  Tracy, I think you are on mute.
7       THE WITNESS:  I'm sorry.  To answer your question,
8   yes, I see it.
9       MR. WU:  Thank you.
10      MR. URIARTE:  Q.  Was an investigation ever opened
11  for July Macapagal?
12      A.  It was turned over to Kevin Blumberg.
13      Q.  Was there any result of that investigation
14  that was put on paper?
15      A.  Not that I've seen, no.
16      Q.  Did Mr. Blumberg let you know the result of
17  that investigation?
18      A.  No.
19      Q.  And then let's go down on the second page.
20  Here is the email from Mr. Blumberg.  And I just want
21  to make sure, when we were talking about the results of
22  the investigation of Mr. Blumberg, are we talking about
23  this email here, August 29, 2018 at 3:58 p.m.?
24      A.  I see it, yes.
25      Q.  So aside from this, there's no other written

1  document that writes or has further conclusions
2  regarding his investigation?  Ms. Aguilera?
3       A.  No, I don't have a copy of it.
4       Q.  Okay.  I guess my question is more -- when we
5  see Mr. Blumberg's product or result of his
6  investigation into the petition, this is what we're
7  looking at right here, the email that he wrote to you
8  with his conclusions, is that correct?
9       A.  This says a statement, yes.
10      Q.  Aside from this statement, is there any other
11 written document?
12      A.  Not that I have.
13      Q.  And here his conclusion really is
14 "unprofessional behavior by a supervisor."  Do you see
15 that?
16      A.  Yes, I see it.
17      Q.  Just taking that kind of like in its
18 isolation, "unprofessional behavior by a supervisor,"
19 would that result in a termination?  Is that something
20 that would normally result in a termination?
21      A.  It depends on the caliber of the -- what he's
22 done.
23      Q.  And your recommendation actually was not to
24 terminate, correct?
25      A.  Myself and our directors, yes -- my director,

```
1   STATE OF CALIFORNIA    )
                           )
2   COUNTY OF SAN FRANCISCO )

3           I, CINDY TUGAW, a Certified Shorthand Reporter
4   of the State of California, duly authorized to
5   administer oaths pursuant to Section 8211 of the
6   California Code of Civil Procedure, do hereby certify
7   that
8                       TRACY AGUILERA,
9   the witness in the foregoing deposition, was by me duly
10  sworn to testify the truth, the whole truth and nothing
11  but the truth in the within-entitled cause; that said
12  testimony of said witness was reported by me, a
13  disinterested person, and was thereafter transcribed
14  under my direction into typewriting and is a true and
15  correct transcription of said proceedings.
16          I further certify that I am not of counsel or
17  attorney for either or any of the parties in the
18  foregoing deposition and caption named, nor in any way
19  interested in the outcome of the cause named in said
20  caption.
21          Dated the 10th day of September, 2020.
22
23                      [signature: Cindy Tugaw]
24
25                      CINDY TUGAW
                        CSR No. 4805 (California)
```