1  CHRISTOPHER WARD, CA Bar No. 238777
        cward@foley.com
2  **FOLEY & LARDNER LLP**
   555 SOUTH FLOWER STREET, SUITE 3500
3  LOS ANGELES, CA 90071-2411
   TELEPHONE:  213.972.4500
4  FACSIMILE:   213.486.0065

5  JASON WU, CA Bar No. 313368
        jwu@foley.com
6  SARA ALEXIS LEVINE ABARBANEL, CA Bar No. 324045
        sabarbanel@foley.com
7  **FOLEY & LARDNER LLP**
   555 CALIFORNIA STREET, SUITE 1700
8  SAN FRANCISCO, CA 94104-1520
   TELEPHONE:  415.434.4484
9  FACSIMILE:   415.434.4507

10

11  Attorneys for Defendant MENZIES
    AVIATION, INC.

12

13              **UNITED STATES DISTRICT COURT**

14            **NORTHERN DISTRICT OF CALIFORNIA**

15

16  Renaldo Navarro,                    )  Case No. 3:19-cv-8157
                                        )
17                        Plaintiff,    )  **DEFENDANT MENZIES AVIATION,**
                                        )  **INC.'S SUPPLEMENTAL APPENDIX OF**
18             vs.                      )  **SUPPORTING EVIDENCE IN SUPPORT OF**
                                        )  **ITS MOTION AND MOTION FOR**
19  Menzies Aviation, Inc., DOING BUSINESS AS )  **SUMMARY JUDGMENT, OR IN THE**
    MENZIES; and DOES 1 through 10, inclusive, )  **ALTERNATIVE, PARTIAL SUMMARY**
20                                      )  **JUDGMENT**
                        Defendants.     )
21                                      )
                                        )
22                                      )
                                        )  State Court Action Filed:  10/23/19
23                                      )
                                        )  Action Removed:  December 16, 2019
24                                      )

25

26

27

28

4817-8823-7777.1

Consistent with and pursuant to Northern District of California Local Rule 7-3(c), Defendant Menzies Aviation, Inc. hereby submits this Supplemental Appendix of Supporting Evidence ("SAOE") with true and correct copies of the exhibits referenced below and attached hereto with its Reply brief in support of its Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment.

| Exhibit | Description |
|---|---|
| 45. | Supplemental Declaration of Christopher Ward |
| 46. | Plaintiff's Fed. R. Civ. P. 26(a)(1) Initial Disclosures (authenticated in Supplemental Ward Declaration at p 3, ¶ 2) [Exhibit 45 to SAOE]) |
| 47. | Volume I of the Condensed Transcript of the Deposition of John Qually taken on July 27, 2020 (authenticated in Supplemental Ward Declaration at p. 2, ¶ 3 [Exhibit 45 to SAOE]) |
| 48. | Volume II of the Condensed Transcript of the Deposition of John Qually taken on July 28, 2020 (authenticated in Supplemental Ward Declaration at p. 2, ¶ 3 [Exhibit 45 to SAOE]) |
| 49. | Condensed Transcript of the Deposition of Tracy Aguilera taken on August 25, 2020 (authenticated in Supplemental Ward Declaration at pp. 2-3, ¶ 4 [Exhibit 45 to SAOE]) |
| 50. | Condensed Transcript of the Deposition of Raul Vargas taken on August 25, 2020 (authenticated in Supplemental Ward Declaration at p. 3, ¶ 5 [Exhibit 45 to SAOE]) |
| 51. | Condensed Transcript of the Deposition of Andrew Dodge taken on July 28, 2020 (authenticated in Supplemental Ward Declaration at p. 3, ¶ 6 [Exhibit 45 to SAOE]) |
| 52. | Condensed Transcript of the Deposition of Randall Davies taken on July 28, 2020 (authenticated in Supplemental Ward Declaration at p. 3, ¶ 7 [Exhibit 45 to SAOE]) |

DATED:  November 5, 2020

**FOLEY & LARDNER LLP**
Christopher Ward
Jason Wu
Sara Alexis Levine Abarbanel


_____*/s/ Christopher Ward*_____
CHRISTOPHER WARD
Attorneys for Defendant MENZIES AVIATION, INC.

4817-8823-7777.1

# EXHIBIT 45

CHRISTOPHER WARD, CA Bar No. 238777
cward@foley.com
**FOLEY & LARDNER LLP**
555 SOUTH FLOWER STREET, SUITE 3500
LOS ANGELES, CA 90071-2411
TELEPHONE:  213.972.4500
FACSIMILE:   213.486.0065

JASON WU, CA Bar No. 313368
jwu@foley.com
SARA ALEXIS LEVINE ABARBANEL, CA Bar No. 324045
sabarbanel@foley.com
**FOLEY & LARDNER LLP**
555 CALIFORNIA STREET, SUITE 1700
SAN FRANCISCO, CA 94104-1520
TELEPHONE:  415.434.4484
FACSIMILE:   415.434.4507

Attorneys for Defendant MENZIES
AVIATION, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Renaldo Navarro, | Case No. 3:19-cv-8157 |
| Plaintiff, | **SUPPLEMENTAL DECLARATION OF CHRISTOPHER WARD** |
| vs. | |
| Menzies Aviation, Inc., DOING BUSINESS AS MENZIES; and DOES 1 through 10, inclusive, | |
| Defendants. | State Court Action Filed:  10/23/19 |
| | Action Removed:  December 16, 2019 |

4840-7026-6833.1

## SUPPLEMENTAL DECLARATION OF CHRISTOPHER WARD

I, Christopher Ward, declare as follows:

1.      I am an attorney admitted to practice before all state and federal courts in the State of California, including the United States District Court for the Northern District of California, and a partner at Foley & Lardner LLP, counsel of record for Defendant Menzies Aviation, Inc.  I have personal knowledge of the facts contained in this declaration, and if called upon as a witness, I could and would competently testify thereto.

2.      On March 17, 2020, Plaintiff's counsel served on me Plaintiff's Fed. R. Civ. P. 26(a)(1) Initial Disclosures.  A true and correct copy of Plaintiff's Initial Disclosures produced to me by Plaintiff's counsel is attached hereto as **Exhibit 46**.

3.      On July 27, 2020, Plaintiff's counsel deposed Menzies' Duty Manager John Qualley for a first time, and on July 28, 2020, Plaintiff's counsel completed the deposition of Mr. Qually.  Following those depositions, in addition to receiving certified copies of the transcripts of both depositions, I received condensed copies of the transcripts of both depositions, and I have read, reviewed and maintained a copy of those transcripts in connection with this matter.  A true and correct copy of Volume I of the condensed transcript of Mr. Qually's deposition is attached hereto as **Exhibit 47**, and a true and correct copy of Volume II of the condensed transcript of Mr. Qually's deposition is attached hereto as **Exhibit 48**.  Because Exhibits 47 and 48 are offered in their entirety to show Plaintiff's counsel never inquired about certain allegations made by Plaintiff regarding Andrew Dodge, making the entire deposition transcripts relevant, I am providing the condensed transcripts to reduce the amount of material filed with the Court.

4.      On August 25, 2020, Plaintiff's counsel deposed Menzies' Human Resources Manager Tracy Aguilera.  Following that deposition, in addition to receiving a certified copy of the transcript of that deposition, I received a condensed copy of the transcript of the deposition, and I have read, reviewed and maintained a copy of those transcripts in connection with this matter.  A true and correct copy of the condensed transcript of Ms. Aguilera's deposition is attached hereto as **Exhibit 49**.  Because Exhibit 49 is offered in its entirety to show Plaintiff's counsel never inquired about certain allegations made by Plaintiff regarding Andrew Dodge, making the entire deposition transcript relevant, I am

providing the condensed transcript to reduce the amount of material filed with the Court.

5.     On August 25, 2020, Plaintiff's counsel deposed Menzies' former SFO Director of Operations Raul Vargas.  Following that deposition, in addition to receiving a certified copy of the transcript of that deposition, I received a condensed copy of the transcript of the deposition, and I have read, reviewed and maintained a copy of those transcripts in connection with this matter.  A true and correct copy of the condensed transcript of Mr. Vargas's deposition is attached hereto as **Exhibit 50**. Because Exhibit 50 is offered in its entirety to show Plaintiff's counsel never inquired about certain allegations made by Plaintiff regarding Andrew Dodge, making the entire deposition transcript relevant, I am providing the condensed transcript to reduce the amount of material filed with the Court.

6.     On July 28, 2020, Plaintiff's counsel deposed Menzies' Fueling Supervisor Andrew Dodge.  Following that deposition, in addition to receiving a certified copy of the transcript of that deposition, I received a condensed copy of the transcript of the deposition, and I have read, reviewed and maintained a copy of those transcripts in connection with this matter.  A true and correct copy of the condensed transcript from Mr. Dodge's deposition is attached hereto as **Exhibit 51**.  Because Exhibit 51 is offered in its entirety to show Plaintiff's counsel never inquired about certain allegations made by Plaintiff regarding Andrew Dodge, making the entire deposition transcript relevant, I am providing the condensed transcript to reduce the amount of material filed with the Court.

7.     On July 28, 2020, Plaintiff's counsel deposed Menzies' Senior Vice President of U.S. Fuel Consortiums Randall Davies.  Following that deposition, in addition to receiving a certified copy of the transcript of that deposition, I received a condensed copy of the transcript of the deposition, and I have read, reviewed and maintained a copy of those transcripts in connection with this matter.  A true and correct copy of the condensed transcript from Mr. Davies' deposition is attached hereto as **Exhibit 52**.  Because Exhibit 52 is offered in its entirety to show Plaintiff's counsel never inquired about certain allegations made by Plaintiff regarding Andrew Dodge, making the entire deposition transcript relevant, I am providing the condensed transcript to reduce the amount of material filed with the Court.

///

///

///

I declare under penalty of perjury under the laws of the States of California and Illinois, and the laws of the United States, that the foregoing is true and correct.

Executed on November 5, 2020 at Chicago, Illinois.


/s/ Christopher Ward
Christopher Ward

# EXHIBIT 46

Arlo Garcia Uriarte, SBN 231764
LIBERATION LAW GROUP, P.C.
2760 Mission Street
San Francisco, CA 94110
Telephone: (415) 695-1000
Facsimile: (415) 695-1006
**Attorney for Plaintiff Renaldo Navarro**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENALDO NAVARRO,<br><br>                     Plaintiff,<br><br>    vs.<br><br>MENZIES AVIATION, INC., DOING BUSINESS AS MENZIES; and DOES 1 through 10, inclusive,<br><br>                    Defendants. | Case No. 3:19-cv-08157-VC<br><br>**PLAINTIFF'S INITIAL DISCLOSURES PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(a)(1)**<br><br>State Court Action Filed:  10/23/19<br>Action Removed:  12/16/19<br><br>**Judge:  Hon. Vince Chhabria** |

Plaintiff Renaldo Navarro (hereinafter "Plaintiff") makes the following initial disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure:

    A.    **Rule 26(a)(1)(A)(i) Individuals.** Plaintiff believes the following individuals are likely to have discoverable information that Plaintiff may use to support his claims:

        1.   Renaldo Navarro, may be contacted through counsel;

        2.   Jezen Canlas, 650-452-3810;

        3.   Rafael Vasquez, 510-715-0014;

        4.   Lorvino Samonte, 650-451-8701;

        5.   July Macapagal, phone number unknown;

        6.   Andrew Dodge, phone number unknown;

        7.   William Rodriguez, phone number unknown;

8.   Anastacio Manuel, phone number unknown;

9.   Ricardo Almelda, phone number unknown;

10. Patrick Moran, phone number unknown;

11. Rex Tosan, phone number unknown;

12. Wesley Faatalale, phone number unknown.

The individuals listed above, aside from Plaintiff, are Plaintiff's former co-workers, managers, and/or supervisors. They are likely to have discoverable information concerning the allegations made by Plaintiff in his complaint, including but not limited to matters related to: Plaintiff's termination, Plaintiff's emotional distress due to his termination, and Plaintiff's general day-to-day working conditions.

Without assuming any duty to supplement these disclosures beyond that imposed by Rule 26(e) of the Federal Rules of Civil Procedure, Plaintiff reserves the right to identify and/or call as witnesses such other individuals with knowledge of relevant facts as may be discovered or subsequently identified in the course of this litigation, including any individuals listed in Defendant's initial disclosures or subsequent discovery responses.

B.   **Rule 26(a)(1)(A)(ii) Documents.** The following categories of documents, data compilations, and tangible things are in the possession, custody, or control of Plaintiff and may be used to support their claims:

1.   The records produced by Defendant as part of its response to Plaintiff's records request per California Labor Code § 226;

2.   The documents produced concurrently with these initial disclosures, Batestamped "RenaldoNavarro 000001-000014."

Without assuming any duty to supplement these disclosures beyond that imposed by Rule 26(e) of the Federal Rules of Civil Procedure, Plaintiff reserves the right to produce, disclose, or introduce additional documents that may be discovered later during this litigation or that may be otherwise subsequently identified.

1       C. **Rule 26(a)(1)(A)(iii) Damages.** Plaintiff's computation of damages will include: (1)

2 wage loss damages due to his termination; (2) emotional distress damages due to his termination;

3 (3) interest; (4) attorney's fees and costs; and (5) any other damages deemed appropriate by the

4 Court or relevant law. An exact damage estimate or number is not known at this time. Plaintiff

5 will supplement this answer at a later date.

6       D. **Rule 26(a)(1)(A)(iv) Insurance.** Plaintiff is not aware of any relevant insurance

7 agreement.

8

9 DATED: March 17, 2020                    LIBERATION LAW GROUP, P.C.

10

11

12                                         _____

13                                         Arlo Garcia Uriarte
                                        Attorney for PLAINTIFF

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 47

**DEPOSITION OF JOHN QUALLY - 07/27/2020**

**RENALDO NAVARRO vs. MENZIES AVIATION, INC.**

CONDENSED TRANSCRIPT AND CONCORDANCE

**PREPARED BY:**

**NOGARA REPORTING SERVICE**
**5 Third Street, Suite 415**
**San Francisco, CA  94103**
**Phone:  (415) 398-1889**
**FAX:  (415) 398-0611**



**Page 1**

(1)　　　IN THE UNITED STATES DISTRICT COURT

(2)　　IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

(3)

(4)

(5) RENALDO NAVARRO,

(6)　　　　　Plaintiff,

(7) v.　　　　　　　　　No. 3:19-CV-8157

(8) MENZIES AVIATION, INC.,

　　doing business as MENZIES

(9) and DOES 1 through 10,

　　inclusive,

(10)

　　　　　Defendants.

(11) _____/

(12) Zoom Remote Deposition of

(13)　JOHN QUALLY

(14)　Monday, July 27, 2020

(15)　　Volume I

(16)　(Pages 1 through 32)

(17)

(18)

(19)

(20)

(21) REPORTED BY: CINDY TUGAW, CSR #4805

(22)

(23)

　　　　NOGARA REPORTING SERVICE

(24)　　5 Third Street, Suite 415

　　　San Francisco, California 94103

(25)　　　(415) 398-1889

**Page 2**

(1)　　　　I N D E X

(2)　　　　　　　　Page Number

(3) EXAMINATION BY MR. URIARTE　　　4

(4)　　　　---o0o---

(5)　　　E X H I B I T S

(6) Plaintiff's

(7) Exhibit 1　Plaintiff Renaldo　　9

　　　　　Navarro's Notice of

(8)　　　　Deposition of John

　　　　　Qually

(9)

　　Exhibit 2　Missed Punch Form　　28

(10)

(11)　　　　---o0o---

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

**Page 3**

(1)　BE IT REMEMBERED that, pursuant to Notice of

(2) Taking Deposition and on Monday, the 27th day of July,

(3) 2020, commencing at the hour of 8:58 o'clock a.m.

(4) thereof, via Zoom videoconference, before me, CINDY

(5) TUGAW, a Certified Shorthand Reporter in the State of

(6) California, personally appeared,

(7)　　　　JOHN QUALLY,

(8) Called as a witness by the Plaintiff, having been by me

(9) first duly sworn, was examined and testified as

(10) hereinafter set forth.

(11)　　　　---o0o---

(12)　　　APPEARANCES OF COUNSEL

(13) For the Plaintiff

　　　LIBERATION LAW GROUP, P.C.

(14)　2760 Mission Street

　　　San Francisco, California 94110

(15)　BY: ARLO GARCIA URIARTE, Attorney at Law

　　　(415) 695-1000

(16)

(17) For the Defendants

　　　FOLEY & LARDNER, LLP

(18)　555 California Street, Suite 1700

　　　San Francisco, California 94104

(19)　BY: JASON Y. WU, Attorney at Law

　　　(415) 984-9848

(20)

　　Also Present: David Ho, Zoom Host.

(21)

　　　　　---o0o---

(22)

(23)

(24)

(25)

**Page 4**

(1)　　THE REPORTER: At this time, I will ask counsel to

(2) stipulate on the record that there is no objection to

(3) this deposition officer administering a binding oath to

(4) the witness via Zoom, starting with the noticing

(5) attorney.

(6)　MR. URIARTE: So stipulated.

(7)　THE REPORTER: Mr. Wu?

(8)　MR. WU: So stipulated on behalf of defendant,

(9) Menzies Aviation.

(10)　　　EXAMINATION BY MR. URIARTE

(11)　MR. URIARTE: Q. Good morning, Mr. Qually. My

(12) name is Arlo Uriarte. I am attorney for Renaldo

(13) Navarro. Do you understand that?

(14)　A. Yes.

(15)　Q. And you are aware that Mr. Navarro has an

(16) action against Menzies for his termination?

(17)　A. I heard, yes.

(18)　Q. And you know that you are here for your

(19) deposition as a witness?

(20)　A. Yes.

(21)　MR. URIARTE: David, can we have Exhibit 1 brought

(22) up, please.

(23)　ZOOM HOST: Give me one second. I'm bringing it

(24) up right now. Hold on.

(25)　MR. URIARTE: Okay.

**Page 5**

(1)  Q. So, Mr. Qually, could you please state your

(2) name, your full name, for the record?

(3)  A. John David Qually.

(4)  Q. And your last name is Q-u-a-l-l-y, is that

(5) correct?

(6)  A. Yes.

(7)  Q. And what's your current position at Menzies?

(8)  A. Duty manager.

(9)  Q. Have you had your deposition taken before?

(10)  A. No.

(11)  Q. Okay. Let me just kind of give you some idea

(12) of what we're doing here today and some of the ground

(13) rules with regards to depositions.

(14)     So we have a court reporter, as you noticed.

(15) The court reporter, Cindy, she is taking down

(16) everything that we are saying, so it's very important

(17) that only one person speak at a time. Usually I'll be

(18) doing the questions, and we will be waiting for you to

(19) give us some answers. Sometimes your attorney may

(20) object.

(21)     Do allow your attorney to finish his objection

(22) before you answer. Normally you will answer after his

(23) objection unless your attorney tells you not to answer.

(24) But do give him some time to finish his objection, that

(25) way the court reporter can have that on the record.

**Page 6**

(1)     Do you understand that?

(2)  A. Okay. Yes.

(3)  Q. It's very important that you understand the

(4) question that's before you before you answer. Do you

(5) understand that?

(6)  A. Yes.

(7)  Q. Okay. The reason being is that, although we

(8) are in an informal setting here and we are, you know,

(9) not together, and we definitely are not in a courtroom,

(10) your testimony, because it's under oath before a court

(11) reporter, has the same force and effect as if you were

(12) testifying in court.

(13)     Do you understand that?

(14)  A. Yes.

(15)  Q. If you don't understand the question somehow,

(16) you know, because of the way I put the words together,

(17) or just because of the question that's before you and

(18) you don't understand, just ask for me to rephrase it or

(19) say that you don't understand it, and we'll attempt to

(20) make sure that you understand the question. Okay?

(21)  A. Okay.

(22)  Q. If you need a break, we can take a break.

(23) Just let me know. Usually I'll ask you to answer the

(24) question before we can take a break. If for any reason

(25) you need to talk to your attorney, we can always go off

**Page 7**

(1) the record to give you some time to talk to your

(2) attorney, but just let me know. If for any reason,

(3) because some sort of electronic or communication break

(4) here happens, we'll just kind of work through that.

(5) Okay?

(6)  A. Okay.

(7)  Q. Find a way to work through that.

(8)     If for any reason the communication lines

(9) break up so that the question is not clear, do let us

(10) know about that, okay, if there is some sort of

(11) transmission error or something like that.

(12)  A. Okay.

(13)  Q. We will be bringing up -- I see that it seems

(14) like you're in some sort of office setting. Are you

(15) using a laptop or desktop computer?

(16)  A. No, I'm actually on my phone.

(17)  Q. On your phone. So we'll give you some time

(18) because sometimes we'll show you some documents, and

(19) that might look a little bit small on your phone, so

(20) you might have to make it bigger and all that. There's

(21) not a lot of documents, but we will be showing you some

(22) documents. So don't be shy or hesitate to ask for more

(23) time looking at the documents before you answer

(24) questions concerning those documents. Okay?

(25)  A. Okay.

**Page 8**

(1)  Q. Is there any reason why you can't give your

(2) best testimony here today?

(3)  A. No.

(4)  Q. Are you sleep deprived at all? Did you work

(5) last night?

(6)  A. No.

(7)  Q. Okay. Are you under any type of medication or

(8) any substance that might affect your ability to express

(9) yourself, enunciate or to remember?

(10)  A. No.

(11)  Q. Okay. So when did you become a Menzies

(12) employee?

(13)  A. I forget the date in actuality, but I was part

(14) of ASIG, which rolled into Menzies, in 2005.

(15)  Q. All right. So in 2005 you were an ASIG

(16) employee, is that what it is?

(17)  A. Yes. And then recently they've merged into

(18) Menzies and it just carried over.

(19)  Q. Right. So I think that was like 2016 or

(20) sometime around there, correct?

(21)  A. Yeah, sounds about right.

(22)  Q. Yeah. Okay.

(23)  MR. URIARTE: David, are you ready to show us

(24) Exhibit 1?

(25)  ZOOM HOST: Yes, I will bring it up on the screen.

**Page 9**

(1) Since he's using the phone, I will bring it up on the
(2) share screen.
(3)    MR. URIARTE: Oh, okay. So share screen is better
(4) if it's by phone?
(5)    ZOOM HOST: Yes, or he could click on the link
(6) that I sent to him if he's comfortable using the phone.
(7)    MR. URIARTE: How do you send the link? Oh,
(8) through the Chat.
(9)    ZOOM HOST: Yes, just click on the link that's on
(10) the Chat window.
(11)    MR. URIARTE: Gotcha. I'm doing that right now.
(12) Oh, good. Awesome. That is nice. So then this
(13) document, each one of us can control the document, is
(14) that correct?
(15)    ZOOM HOST: You could download it and view it,
(16) correct, each individual.
(17)    MR. URIARTE: Okay. Gotcha. Gotcha.
(18)    ZOOM HOST: But if the witness is having trouble
(19) seeing it on the phone, I can bring it up on the share
(20) screen if you'd like.
(21)    MR. URIARTE: Let's see what Mr. Qually is able to
(22) do.
(23)    (Plaintiff's Exhibit 1 marked for
(24)    identification.)
(25)    MR. URIARTE: Q. Do you see the document, Mr.

**Page 10**

(1) Qually?
(2)    A. I do not.
(3)    Q. I think, if you want to look at it through the
(4) Chat, it's under the Chat window, but I guess -- yeah,
(5) can we do a share screen on that, then?
(6)    ZOOM HOST: Okay. I will bring it up through a
(7) share screen. Coming.
(8)    MR. URIARTE: Q. There you go. Do you see that
(9) now, Mr. Qually?
(10)    A. Let me go back to that. Somehow -- let's see.
(11) I got it. I got it. Yes.
(12)    Q. So Exhibit 1 we will mark into the record.
(13) And it is a notice of deposition of John Qually. Do
(14) you see that?
(15)    A. Yes.
(16)    Q. Okay. Were you able to -- did you receive
(17) this document before today? This is a notice for you
(18) to appear for today, essentially.
(19)    A. Yes.
(20)    Q. Did you do anything to prepare for today's
(21) deposition?
(22)    A. Just had a meeting with the Menzies lawyer.
(23)    Q. Okay. And I don't want to hear anything with
(24) regard to what you guys spoke about, you and your
(25) lawyers. Aside from meeting with your lawyers, did you

**Page 11**

(1) talk to anybody else?
(2)    A. No.
(3)    Q. Did you maybe review some documents in order
(4) to prepare for today's deposition?
(5)    A. I reviewed the documents that were sent to me.
(6)    Q. Okay. Do you remember any of those documents
(7) at all?
(8)    A. I remember only one of them.
(9)    Q. Okay. What is that?
(10)    A. That was the initial of the statement by --
(11) let's see, how am I going to put this? It was a letter
(12) that I typed up in regards to Mr. Navarro.
(13)    Q. Was that the letter regarding when he was
(14) suspended and the notice of suspension, is that what
(15) you're talking about?
(16)    A. Yes.
(17)    Q. Okay. Aside from that, do you remember any of
(18) the documents that you reviewed for today's deposition?
(19)    A. No.
(20)    Q. Did you talk to Mr. Dodge at all to prepare
(21) for today's deposition?
(22)    A. No.
(23)    Q. Any of the higher-ups? Any of your
(24) co-workers?
(25)    A. No.

**Page 12**

(1)    Q. Okay. All right. So let's see. So you
(2) said -- when you started with ASIG -- and is that the
(3) right way to call it, ASIG, by the way, A-S-I-G, ASIG?
(4) Do you guys say that, ASIG?
(5)    A. Yes.
(6)    Q. When you started with ASIG, what was your
(7) position with them?
(8)    A. Supervisor.
(9)    Q. Can you tell me what the duties of a
(10) supervisor would be?
(11)    A. The duties are basically overseeing of the --
(12) overseeing and assigning the flights to the fuelers and
(13) making communication with the airlines on -- as we go
(14) through the day.
(15)    Q. And by 2018, how many fuelers were assigned to
(16) a supervisor? Do you remember?
(17)    A. It could -- I guess it varies by shift.
(18)    Q. I see. What would be the range, like would
(19) you say between three and ten, or was there like a
(20) range?
(21)    A. I guess it depends on the shift. Some shifts
(22) had upwards of 12 to 15. Some shifts had anywhere from
(23) three to four.
(24)    Q. Gotcha. And the interesting -- or the date
(25) most interesting for us is August of 2018 because

DEPOSITION OF JOHN QUALLY - 07/27/2020

BSA    Case 3:19-cv-08157-VC RENALDO NAVARRO vs. MENZIES AVIATION INC. Document 34 Filed 09/03/20   Page 18 of 92    XMAX(4/4)

**Page 13**

(1) that's the date that Mr. Navarro was terminated. Do
(2) you remember that?
(3)     **A.** I don't remember the exact date, no.
(4)     **Q.** Okay. And so a lot of my questions will refer
(5) to what the state of the employment was during those --
(6) in 2018, because there might have been changes since
(7) 2018 or changes before 2018. And that's why we'll
(8) focus on August of 2018 a lot.
(9)     So in or around August of 2018, how many
(10) supervisors did Menzies have at that time?
(11)     **A.** We had I believe -- I'm trying to remember --
(12) around six to eight, I believe.
(13)     **Q.** And as a duty manager, what were your duties
(14) in relation to the supervisors?
(15)     **A.** Basically I was their superior. I was -- you
(16) know, interacted with them to help them accomplish what
(17) tasks they needed and make sure they had all the
(18) support that they need for their job.
(19)     **Q.** Gotcha. Okay. So can we go through that a
(20) little bit, kind of like the organizational structure
(21) that Menzies had in or around August of 2018.
(22)     So you said earlier there were about, did you
(23) say, six supervisors?
(24)     **A.** I believe six to about eight, yes.
(25)     **Q.** And so above the supervisors are the duty

**Page 14**

(1) managers, is that what it was?
(2)     **A.** Yes.
(3)     **Q.** And how many duty managers were there at that
(4) time?
(5)     **A.** Four.
(6)     **Q.** Four duty managers. And then with regards to
(7) you, were the supervisors assigned to specific duty
(8) managers or was it just who the duty manager was on
(9) that day?
(10)     **A.** It was basically the manager who was on duty
(11) that day.
(12)     **Q.** So then if you were working on a shift wherein
(13) Mr. Navarro was there, then you would be supervising
(14) Mr. Navarro. That's how it worked?
(15)     **A.** Yes.
(16)     **Q.** Gotcha. And then, so it's the supervisors,
(17) then the duty managers, and then who else above the
(18) duty managers?
(19)     **A.** It would be the general manager.
(20)     **Q.** And then anybody above the general manager?
(21)     **A.** Now we have a director.
(22)     **Q.** So there is a director on-site now?
(23)     **A.** Yes.
(24)     **Q.** But in 2018, no?
(25)     **A.** Not that I recall, no.

**Page 15**

(1)     **Q.** Okay. And who was the general manager in
(2) August of 2018, if you know?
(3)     **A.** I believe the general manager -- the acting
(4) general manager around that time was Renil, R-e-n-i-l.
(5)     **Q.** And then what's the last name?
(6)     **A.** Lal, L-a-l.
(7)     **Q.** L-a-l?
(8)     **A.** Yes.
(9)     **Q.** And then, aside from yourself, who else were
(10) the duty managers?
(11)     **A.** I believe -- there's been some changes since
(12) then, but Simon Casey was one of them. I can't
(13) remember the rest of them.
(14)     **Q.** Okay. So you remember Simon Casey. And
(15) that's C-a-s-s-e-y?
(16)     **A.** C-a-s-e-y.
(17)     **Q.** C-a-s-e-y. Okay. And then yourself, and then
(18) two other duty managers?
(19)     **A.** Yeah.
(20)     **Q.** Okay. All right. And then before ASIG, where
(21) did you work?
(22)     **A.** United Airlines.
(23)     **Q.** And what was your job?
(24)     **A.** Lead ramp service.
(25)     **Q.** Lead?

**Page 16**

(1)     **A.** Yeah.
(2)     **Q.** What was the next?
(3)     **A.** Ramp service.
(4)     **Q.** Lead ramp services. Okay. And how long were
(5) you with United?
(6)     **A.** Eight and a half years.
(7)     **Q.** So when did you become a duty manager for ASIG
(8) or Menzies?
(9)     **A.** It was back -- honestly, I don't remember the
(10) exact date, but it's been -- I've been a duty manager
(11) for roughly four years.
(12)     **Q.** Four years now?
(13)     **A.** Yeah.
(14)     **Q.** Okay. So like 2016, around that time?
(15)     **A.** Around that time.
(16)     **Q.** Were you a duty manager by the time Menzies
(17) came in?
(18)     **A.** Around that time, yes.
(19)     **Q.** Like close, yeah. I guess the key question is
(20) when Menzies took over ASIG, were you already a duty
(21) manager or you became a duty manager after Menzies came
(22) in?
(23)     **A.** I was already.
(24)     **Q.** Okay. Gotcha. All right.
(25)     So we were talking about the role of

**Page 17**

(1)  supervisors with regards to how they work with fuelers,
(2)  right?  You said earlier that you would -- one of the
(3)  duties would be to assign flights to the fuelers for
(4)  the shift, right?
(5)      **A.**  Yes.
(6)      **Q.**  That's one of the duties.  What other duties
(7)  do supervisors have?
(8)      **A.**  They -- besides assigning the flights, they
(9)  are obviously in communication with airlines as needed.
(10) They're overseeing the safety of the operation, making
(11) sure that, you know, everything is going safely.
(12)     **Q.**  Okay.  So is it the supervisor that's actually
(13) on the headphone with the plane during the fueling
(14) operation, or with the airline?
(15)     **A.**  No.
(16)     **Q.**  No?  That could be any of the fuelers?
(17)     **A.**  Well, the fuelers don't communicate with the
(18) flight crew.  They communicate with the airline
(19) representative.
(20)     **Q.**  Gotcha.  Okay.  And who is that?  Is that the
(21) fueler or is that the supervisor?
(22)     **A.**  Sometimes both.  But, in general, when you're
(23) actually fueling, it would be more so the fueler than
(24) the supervisor.
(25)     **Q.**  Okay.  Are supervisors sometimes -- like do

**Page 18**

(1)  they sometimes help with the fueling operation, like
(2)  they go to the actual airplane and help with the
(3)  fueling of the airplane?  Do they sometimes do that?
(4)      **A.**  They sometimes, yes.
(5)      **Q.**  And earlier you said they make sure -- they
(6)  ensure the safety of the operation.  How are
(7)  supervisors keyed to that?  How are supervisors
(8)  important in the safety of the operation?
(9)          Do you understand the question, Mr. Qually?
(10)     **A.**  Yeah.  No, they're just -- they're there to,
(11) you know, ensure the fuelers are working safely.  If
(12) there's any safety concerns, they do what they can to
(13) resolve them, whether it be on the fueler's end or the
(14) equipment end, you know.  They help do whatever needs
(15) to be done to keep everything safe.
(16)     **Q.**  Gotcha.  And what kinds of situations
(17) sometimes come up when it comes to the safety?  Can you
(18) give us an example of safety concerns that sometimes
(19) come up?
(20)     **A.**  Sometimes a fueler is not following proper
(21) procedures on the fueler's end, equipment not working
(22) right.  So they may have an issue with the equipment.
(23)     **Q.**  So is it safe to say then that the supervisors
(24) are kind of overseeing each one of these fueling
(25) operations with regards to the airplane?

**Page 19**

(1)      **A.**  Yes.
(2)      **Q.**  Okay.  And then what other duties do
(3)  supervisors have with regards to the fuelers?
(4)      **A.**  Basically, you know, for operational purposes,
(5)  it's making sure that the flights are getting done, the
(6)  fuelers are getting to the flights when they're
(7)  supposed to, you know, addressing whatever issues may
(8)  come up.
(9)      **Q.**  What about giving breaks, for example, like
(10) timing the breaks, when people can go for meal periods,
(11) when people can go for their ten-minute breaks, is that
(12) the supervisor's duties?
(13)     **A.**  Yes.
(14)     **MR. WU:**  Objection.  Relevance.
(15)     **MR. URIARTE:  Q.**  And then what about clocking in
(16) and clocking out, do the supervisors have any duties
(17) with regards to that?
(18)     **MR. WU:**  Same objection.
(19)     **THE WITNESS:**  No.
(20)     **MR. URIARTE:  Q.**  Like if there are issues with
(21) regards to they forgot to clock out or, oh, they forgot
(22) to clock in, something like that, is that the
(23) supervisor's duty or is that somebody else's?
(24)     **MR. WU:**  Same objection.
(25)     **MR. URIARTE:  Q.**  Mr. Qually?

**Page 20**

(1)      **A.**  No.
(2)      **Q.**  So who's responsible for like fixing clock-ins
(3)  and clock-outs?
(4)      **MR. WU:**  Same objection.
(5)      **THE WITNESS:**  The fueler.
(6)      **MR. URIARTE:  Q.**  I'm sorry?
(7)      **A.**  The fueler.
(8)      **Q.**  The fueler?
(9)      **A.**  Whoever did not clock in or out.
(10)     **Q.**  And then who does the fueler have to talk to
(11) with regards to that?
(12)     **A.**  They would usually come to us as the manager
(13) or go straight to payroll.
(14)     **Q.**  Gotcha.
(15)     **MR. WU:**  And, Arlo, can we assume I'm asserting
(16) the same objections for this line of questioning just
(17) to keep things flowing?
(18)     **MR. URIARTE:**  Sure.
(19)     **MR. WU:**  Thank you.
(20)     **MR. URIARTE:  Q.**  How does the supervisor avoid
(21) causing delays in these fuelings -- delays to the
(22) airlines, right?  I hear that sometimes the fueling
(23) operation is what causes the delay, right?  Can that
(24) happen, Mr. Qually?
(25)     **A.**  It can.

**Page 21**

(1)    Q. And what happens? Why are delays caused by
(2) the fueling operation? Why does that happen?
(3)    A. Many different factors involved. It could be
(4) the way the flights were set up for the fueler. It
(5) could be an equipment issue. It varies depending on
(6) the situation. I mean, there's no set reason for that.
(7)    Q. Is that something that the supervisors try to
(8) avoid as part of their duties, they try to avoid any
(9) delays?
(10)    A. Yes.
(11)    Q. And I guess they try to avoid delays by having
(12) like the proper number of fuelers working there, right?
(13) I mean, you have to be properly staffed in order to
(14) avoid delay, correct?
(15)    A. That's one, yes.
(16)    Q. And then you have to make sure that they have
(17) the right equipment, that they're doing things
(18) correctly?
(19)    It looks like we lost -- are you still there?
(20)    A. Yeah, hold on just a moment.
(21)    What was your question again?
(22)    Q. Yeah, I guess that goes into what we were
(23) talking about earlier, that the supervisors have to
(24) make sure that the fuelers are using the right
(25) equipment, they're using the right procedures and all

**Page 22**

(1) of those kind of things, like assist in avoiding
(2) delays. Is that correct?
(3)    MR. WU: Objection. Compound.
(4)    MR. URIARTE: Q. Mr. Qually?
(5)    A. Yes.
(6)    Q. All right.
(7)    (Discussion off the record.)
(8)    MR. URIARTE: Q. So you had a working
(9) relationship with plaintiff Renaldo Navarro, right? Is
(10) that correct, Mr. Qually?
(11)    A. Yes.
(12)    Q. Were you social with Mr. Navarro at all? Did
(13) you guys like go to baptisms or Christmases or
(14) whatever?
(15)    A. No.
(16)    Q. Okay. So you knew him from work only, is that
(17) correct?
(18)    A. Yes.
(19)    Q. You didn't have some sort of social or
(20) family-related kind of relationship, right? Is that
(21) correct?
(22)    A. No.
(23)    Q. And you supervised Mr. Navarro when you were
(24) the duty manager and he was the supervisor, is that
(25) correct?

**Page 23**

(1)    A. Partially, yes.
(2)    Q. And why do you say "partially"?
(3)    A. Because when Mr. Navarro was the graveyard
(4) supervisor, I was the morning manager, so we would just
(5) see each other on passing in the morning.
(6)    Q. Gotcha. So it wasn't often or did that not
(7) ever happen where you guys shared the majority of your
(8) shift?
(9)    MR. WU: Objection. Vague.
(10)    THE WITNESS: No, we never shared --
(11)    MR. WU: You can answer if you understand the
(12) question.
(13)    MR. URIARTE: Yeah.
(14)    THE WITNESS: No, I did not overlap on a shift
(15) outside of maybe an hour or two.
(16)    MR. URIARTE: Q. And that's because Mr. Navarro
(17) did graveyard, is that correct?
(18)    A. Yes.
(19)    Q. Which is -- in 2018, graveyard for Mr.
(20) Navarro, what was that? Like 10:00 to 7:00, is that
(21) what it was?
(22)    A. About that, yes.
(23)    Q. And then your morning shift was what?
(24)    A. I started at 5:00 a.m.
(25)    Q. Gotcha. Mr. Navarro, from a fueler, became a

**Page 24**

(1) supervisor, is that correct?
(2)    A. I had no -- that would be my guess. I don't
(3) know -- I don't have any knowledge on where he started,
(4) but that's my understanding.
(5)    MR. WU: I don't want you to guess.
(6)    MR. URIARTE: Q. Yeah, no guessing.
(7)    I guess what I was leading to was whether you
(8) had any part in recommending or having Mr. Navarro be
(9) promoted from fueler to supervisor. Do you remember
(10) anything like that?
(11)    A. No.
(12)    Q. So you weren't part of that process at all?
(13)    A. No.
(14)    Q. Did you and Mr. Navarro get along at all? Was
(15) your relationship cordial or was it combative? How
(16) would you characterize your relationship with Mr.
(17) Navarro?
(18)    A. Working relationship was okay. No, you know,
(19) just -- it was okay.
(20)    Q. Did Mr. Navarro ever bring up any complaints
(21) to you?
(22)    A. From time to time, yes.
(23)    Q. And what would be the nature of those
(24) complaints?
(25)    A. Varies. Could be airline issue, staffing

**Page 25**

(1) issue. It just depends on the day and what he felt to
(2) complain about.
(3)     **Q.** And before his termination, did he ever bring
(4) up complaints against Andrew Dodge to you?
(5)     **A.** Yes.
(6)     **Q.** And what was the nature of those complaints?
(7)     **A.** It wasn't many. Let's see if I can remember,
(8) because it's been a while. But there was probably
(9) one -- I can remember at least one where Andrew might
(10) have been caught seen sleeping on the job.
(11)     **Q.** And he brought that up to you?
(12)     **A.** Yes.
(13)     **Q.** So was Andrew also a graveyard shift
(14) supervisor?
(15)     **A.** Yes. At that time.
(16)     **Q.** Okay. So you're coming in to work, and Mr.
(17) Navarro is mentioning to you that maybe Andrew Dodge
(18) was sleeping on the job. And so what would you, as a
(19) duty manager, do about that?
(20)     **A.** Well, there were different shifts, so they
(21) weren't working together.
(22)     **Q.** Okay.
(23)     **A.** So when the complaints came, I addressed the
(24) complaints with Andrew.
(25)     **Q.** Okay.

**Page 26**

(1)     **A.** And it was brought up to the higher-ups.
(2)     **Q.** And who were the higher-ups at that time?
(3)     **A.** Let's see. Who was it? Renil was one of
(4) them.
(5)     **Q.** Who?
(6)     **A.** Renil Lal. Because he was the acting GM at
(7) the time, so --
(8)     **Q.** Okay. Anybody else, do you remember?
(9)     **A.** No.
(10)     **Q.** Did anything happen because of the complaints
(11) that Andrew Dodge was sleeping? Do you know what
(12) happened to Andrew Dodge? Was he reprimanded? Was he
(13) written up?
(14)         Did anything happen because of that?
(15)     **A.** Not that I know of.
(16)     **Q.** Did Mr. Dodge explain to you what happened or
(17) did he admit it or anything like that?
(18)     **A.** He did. He had sleep depravation -- or sleep
(19) apnea, sorry.
(20)     **Q.** So he had sleep apnea, and so --
(21)     **A.** According to what I heard, what the
(22) explanation was, at times it's easy for a person to
(23) fall asleep.
(24)     **Q.** Aside from his -- aside from Mr. Navarro
(25) mentioning that Mr. Dodge was sleeping, any other

**Page 27**

(1) complaints that you -- before his termination, any
(2) complaints that Mr. Navarro brought up to you?
(3)     **A.** No.
(4)     **Q.** So that was the main thing that he brought up
(5) to you?
(6)     **A.** Yes.
(7)     **Q.** In your memory, do you remember if you were
(8) part of any kind of reprimand or disciplinary action
(9) against Mr. Navarro? Were you part of any of those?
(10)     **A.** No.
(11)     **Q.** What's your -- can you give us your sense as
(12) to how Mr. Navarro was as a supervisor? Was he a good
(13) supervisor? Was he an effective supervisor?
(14)         Do you have any sense for his abilities as a
(15) supervisor at Menzies at that time?
(16)     **MR. WU:** Objection. Vague. Compound.
(17)     **THE WITNESS:** Let's see. Without having worked
(18) with him a lot, but he -- he got the job done. He was
(19) okay. He was an okay supervisor.
(20)     **MR. URIARTE: Q.** Do you remember any complaints
(21) from airlines or delays or anything like that? Do you
(22) remember any of that?
(23)     **A.** No, not that I recall.
(24)     **Q.** What about with Mr. Dodge? Were there any
(25) complaints against airlines, or delays that Mr. Dodge

**Page 28**

(1) may have caused, or anything like that, around the time
(2) of August 2018 and before that?
(3)     **A.** Not that I know of.
(4)     **MR. URIARTE:** David, can we have Exhibit 2 brought
(5) up, please.
(6)     **ZOOM HOST:** Coming up shortly.
(7)     **MR. URIARTE:** Thank you.
(8)         (Plaintiff's Exhibit 2 marked for
(9)         identification.)
(10)     **MR. URIARTE: Q.** Exhibit 2. Do you see Exhibit 2
(11) at all, Mr. Qually?
(12)     **A.** Yes.
(13)     **Q.** Is that your signature on this page?
(14)     **A.** Yes, it is.
(15)     **Q.** Okay. I wasn't really sure. Okay. I'll give
(16) you a moment to take a look at it. I don't know if you
(17) remember this at all. Do you remember this document at
(18) all, Mr. Qually?
(19)     **A.** I remember -- obviously I signed it, so, yeah.
(20)     **Q.** Yeah, you could have signed it, but it doesn't
(21) mean you remember it today.
(22)     **A.** Well, I mean, I don't remember a lot from back
(23) then, but --
(24)     **Q.** Yeah. Well, let me ask you this. Do you
(25) remember having a discussion with Mr. Dodge about a

**Page 29**

(1) missed punch in about August of 2018?

(2)     **A.** Not that I recall.

(3)     Can I take a five-minute break?

(4)     **Q.** Sure. You need a break, you said?

(5)     **A.** Yes, just for a couple of minutes.

(6)     **MR. URIARTE:** Yes, let's get off the record.

(7) Yeah, go ahead.

(8)     (Recess taken from 9:36 to 10:38 a.m.)

(9)     **MR. URIARTE:** Let's get back on the record. So

(10) the witness had asked for a break, but it's been an

(11) extended break now. I don't know even how long it's

(12) been. I know it's been --

(13)     **MR. WU:** It's been about 40 minutes.

(14)     **MR. URIARTE:** Yeah, like 40 minutes. We were able

(15) to reach the witness. His attorney, Jason Wu, was able

(16) to reach the witness, and the witness has agreed to

(17) reappear today at 3:00 o'clock to continue the

(18) deposition.

(19)     **MR. WU:** That's our understanding as well.

(20)     **MR. URIARTE:** Great. Thank you. All right, guys.

(21) Thank you very much. I'll see you at 3:00.

(22)     (Whereupon, the recessed

(23)     at 10:39 o'clock a.m.)

(24)     ---o0o---

(25)

**Page 30**

(1)     CERTIFICATE OF WITNESS

(2)     ---o0o---

(3)

(4)     I, JOHN QUALLY, hereby declare under

(5) penalty of perjury that I have read the foregoing

(6) deposition testimony; and that the same is a true

(7) and correct transcription of my said testimony

(8) except as corrected pursuant to my rights under

(9) Rule 30(e) of the Federal Rules of Civil

(10) Procedure.

(11)

(12)     _____

(13)     Signature

(14)     _____

(15)     Date

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

**Page 31**

(1) STATE OF CALIFORNIA     )

    )

(2) COUNTY OF SAN FRANCISCO )

(3)     I, CINDY TUGAW, a Certified Shorthand Reporter

(4) of the State of California, duly authorized to

(5) administer oaths pursuant to Section 8211 of the

(6) California Code of Civil Procedure, do hereby certify

(7) that

(8)     JOHN QUALLY,

(9) the witness in the foregoing deposition, was by me duly

(10) sworn to testify the truth, the whole truth and nothing

(11) but the truth in the within-entitled cause; that said

(12) testimony of said witness was reported by me, a

(13) disinterested person, and was thereafter transcribed

(14) under my direction into typewriting and is a true and

(15) correct transcription of said proceedings.

(16)     I further certify that I am not of counsel or

(17) attorney for either or any of the parties in the

(18) foregoing deposition and caption named, nor in any way

(19) interested in the outcome of the cause named in said

(20) caption.

(21)     Dated the 7th day of August, 2020.

(22)

(23)

(24)

    CINDY TUGAW

(25)     CSR No. 4805 (California)

**Page 32**

(1) John Qually

    c/o Foley & Lardner

(2) 555 California Street, Suite 1700

    San Francisco, CA 94104

(3) Attn: Jason Y. Wu, Esq.

(4) Date: August 7th, 2020

    Re: Navarro vs. Menzies

(5) Deposition Date: Monday, July 27, 2020

(6) Dear Mr. Qually,

(7)     Please be advised the original transcript of

    your deposition is ready for your review.

(8)     Pursuant to FRCP Rule 30(e), you have

    30 days following the date of this notice to read,

    correct if necessary, and sign your transcript unless

    the attending parties and the deponent agree on the

(10) record or otherwise in writing to a longer or shorter

    time period. The deponent may change the form or the

(11) substance of the answer to a question, and may either

    approve the transcript of the deposition by signing it,

(12) or refuse to approve the transcript by not signing it.

    You are not required by law to read and sign your

(13) deposition transcript. All parties will be informed of

    the corrections. The original transcript will then be

(14) sealed and sent to the examining attorney pursuant to

    the applicable law.

(15)     You may either come to our office to read and

    sign the original transcript, or you may contact your

(16) attorney or the attorney who arranged for you to be

    present at your deposition. If they have ordered a

(17) copy of the transcript, you may review their copy and

    make corrections by submitting, signing and returning

(18) the attached form. If you choose to review your

    transcript at our office, please call first to make an

(19) appointment. Should you have any question regarding

    these instructions, please call.

(20)

(21) Sincerely,

(22)

(23) NOGARA REPORTING SERVICE

    5 Third Street, Suite 415

    San Francisco, California 94103

(24) (415) 398-1889

(25) cc: All counsel, original deposition

# EXHIBIT 48

**DEPOSITION OF JOHN QUALLY, VOLUME II - 07/28/2020**

**RENALDO NAVARRO vs. MENZIES AVIATION, INC.**

CONDENSED TRANSCRIPT AND CONCORDANCE

**PREPARED BY:**

**NOGARA REPORTING SERVICE**
**5 Third Street, Suite 415**
**San Francisco, CA  94103**
**Phone:  (415) 398-1889**
**FAX:  (415) 398-0611**



**Page 33**

(1)　　　　IN THE UNITED STATES DISTRICT COURT

(2)　　IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

(3)

(4)

(5) RENALDO NAVARRO,

(6)　　　　　　Plaintiff,

(7) v.　　　　　　　　　No.　3:19-CV-8157

(8) MENZIES AVIATION, INC.,

　　　doing business as MENZIES

(9) and DOES 1 through 10,

　　　inclusive,

(10)

　　　　　　　Defendants.

(11) _____/

(12) Zoom Remote Deposition of

(13)　　　JOHN QUALLY

(14)　Tuesday, July 28, 2020

(15)　　　Volume II

(16)　(Pages 33 through 58)

(17)

(18)

(19)

(20)

(21)

(22) REPORTED BY:　CINDY TUGAW, CSR #4805

(23)

(24)　　　　NOGARA REPORTING SERVICE

　　　　　5 Third Street, Suite 415

(24)　　San Francisco, California 94103

(25)　　　　　(415) 398-1889

---

**Page 34**

(1)　　　　I N D E X

(2)　　　　　　　　　Page Number

(3) EXAMINATION BY MR. URIARTE　　　　36

(4)　　　　　---o0o---

(5)　　　E X H I B I T S

(6) Plaintiff's

(7) Exhibit 6　　Employee Performance　　46

　　　　　　　Development dated

(8)　　　　　8/20/18

(9)　　　PREVIOUSLY MARKED EXHIBITS

(10) Exhibit 10　Statement by Rafael　　53

　　　　　　　Vasquez dated 11/18/18

(11)

　　　　　　　---o0o---

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

---

**Page 35**

(1)　　　　BE IT REMEMBERED that, pursuant to Notice of

(2) Taking Deposition and on Tuesday, the 28th day of July,

(3) 2020, commencing at the hour of 2:07 o'clock p.m.

(4) thereof, via Zoom videoconference, before me, CINDY

(5) TUGAW, a Certified Shorthand Reporter in the State of

(6) California, personally appeared,

(7)　　　　JOHN QUALLY,

(8) called as a witness by the Plaintiff, having been by me

(9) previously duly sworn, was examined and testified

(10) further as hereinafter set forth.

(11)　　　　---o0o---

(12)　　　APPEARANCES OF COUNSEL

(13) For the Plaintiff

　　　LIBERATION LAW GROUP, P.C.

(14)　2760 Mission Street

　　　San Francisco, California 94110

(15)　BY: ARLO GARCIA URIARTE, Attorney at Law

　　　(415) 695-1000

(16)

(17) For the Defendants

　　　FOLEY & LARDNER, LLP

(18)　555 California Street, Suite 1700

　　　San Francisco, California 94104

(19)　BY:　JASON Y. WU, Attorney at Law

　　　(415) 984-9848

(20)

　　　Also Present:　David Ho, Zoom Host.

(21)

　　　　　　　---o0o---

(22)

(23)

(24)

(25)

---

**Page 36**

(1)　　　EXAMINATION BY MR. URIARTE

(2)　　**MR. URIARTE:**　Let's get back on the record.

(3)　　**Q.**　Mr. Qually, how are you?　Thank you for coming

(4) back today.

(5)　　　Off the record we had a little bit of a

(6) clarification discussion with your counsel.　And I just

(7) wanted you to confirm that, in preparation for your

(8) deposition, that aside from your counsel, you also

(9) spoke with Tracy from HR, Andrew Dodge, and also Ran --

(10)　　**A.**　Randy Davies.

(11)　　**Q.**　-- Randy Davies, correct?

(12)　　**A.**　Correct.

(13)　　**Q.**　And then, aside from those people, did you

(14) talk to anybody else in preparation --

(15)　　**A.**　No.

(16)　　**Q.**　-- for your deposition?

(17)　　**A.**　No.

(18)　　**Q.**　That's a no?

(19)　　**A.**　No.

(20)　　**Q.**　Great.　So let's just jump right in here.

(21) Yesterday you were having a little bit of a difficulty

(22) trying to remember the different supervisors and

(23) different managers that were at Menzies Aviation office

(24) in 2018.　And I've got a list of names here.　I wanted

(25) to throw it by you.　In August of 2018, Nico, N-i-c-o,

**Page 37**

(1) was a supervisor?

(2) **A.** He -- actually, I was doing a little research
(3) after that question. Nico was the nighttime duty
(4) manager.

(5) **Q.** There you go. And then you have Renil Lal,
(6) right?

(7) **A.** Yes.

(8) **Q.** And do you remember what his position was in
(9) August 2018?

(10) **A.** To the best of my knowledge, he was the
(11) temporary GM.

(12) **Q.** Okay. And then you have Randy Davies, is that
(13) correct?

(14) **A.** Yes, the regional vice president, yes.

(15) **Q.** And then we just went through that, that he's
(16) actually regional vice president of another division.

(17) **A.** Right.

(18) **Q.** But do you remember who the regional vice
(19) president that was for the Menzies fueling operation at
(20) all?

(21) **A.** As far as what?

(22) **Q.** I think his name is Kevin something, does that
(23) ring a bell?

(24) **A.** There was a Kevin Bloomberg, but he was the
(25) safety and security manager, I guess you could say.

**Page 38**

(1) **Q.** Okay. And then you have Tracy who was at the
(2) human resources department, correct?

(3) **A.** Correct.

(4) **Q.** Do you remember any other supervisors during
(5) that time aside from Andrew Dodge?

(6) **A.** Tuvita Tokotaha.

(7) **Q.** Tuvita, T-u-v-i-t-a, correct?

(8) **A.** Yes. July was also one.

(9) **Q.** Who else?

(10) **A.** Edsel Patawran.

(11) **Q.** Anybody else?

(12) **A.** I think Mark Iligan, but he's kind of part
(13) supervisor, part fueler.

(14) **Q.** Okay. And his name is Mark?

(15) **A.** Yes.

(16) **Q.** All right. Anybody else that you remember as
(17) a supervisor?

(18) **A.** Ray Santana.

(19) **Q.** Ray Santana?

(20) **A.** Yeah.

(21) **Q.** Okay. Anybody else? And that's in August of
(22) 2018, right?

(23) **A.** Yes.

(24) **Q.** Okay. Anybody else?

(25) **A.** That's all I can remember off the top of my

**Page 39**

(1) head at this time.

(2) **Q.** Okay. Great. Thank you very much.

(3) And then there was a person by the name of
(4) Jeff who was from Seattle who was helping out. Do you
(5) remember that?

(6) **A.** Jeff Stevenson, yes.

(7) **Q.** And what was his role, do you remember?

(8) **A.** To the best of my knowledge, he was in town
(9) helping out the new managers, you know, director and
(10) GM, get into the station, to the best of my knowledge.
(11) But I never -- you know, he had multi different tasks
(12) in this station, but what his actual role was, I don't
(13) know.

(14) **Q.** Okay. Sounds good. Were you involved in the
(15) decision-making with regards to the suspension for Ray
(16) Navarro?

(17) **A.** No.

(18) **Q.** So you were not asked by any of the managers,
(19) "Hey, what's your opinion on this, do you think it's
(20) correct for us to suspend Mr. Navarro?"

(21) **A.** No.

(22) **Q.** No, okay. Were you at the meeting where Ray
(23) Navarro was -- where it was communicated to Ray Navarro
(24) that he was going to be suspended?

(25) **A.** No. If you -- no.

**Page 40**

(1) **Q.** And I read your note, and I think I've got to
(2) piece it together a little bit, and let me see if this
(3) is correct. What happened was, after the suspension
(4) meeting, they asked you to deliver the suspension
(5) notice, and then Ray Navarro -- a couple of days later,
(6) and then Ray Navarro would not sign it. Is that how it
(7) happened?

(8) **A.** He, as I remember, trying to serve him with a
(9) suspension document, and he did refuse to sign.

(10) **Q.** But that was -- when did you try to serve --
(11) when did you try to serve it to Ray Navarro? Did that
(12) happen after the meeting, same day?

(13) **A.** I believe it must have -- I can't remember a
(14) hundred percent, but it must have been before the
(15) meeting.

(16) **Q.** Okay.

(17) **A.** But like I say, I don't have -- not knowing
(18) when Tracy had the meeting, but, you know, so my guess
(19) would be -- like I say, it's a guess, but it was
(20) probably before the meeting with them.

(21) **Q.** So because it's a guess, you don't actually
(22) know whether it was before the meeting or after the
(23) meeting?

(24) **A.** Correct.

(25) **Q.** You don't remember.

**Page 41**

(1)     MR. WU:  And, John, we don't want you to guess

(2) today.  It's a forbidden word that makes attorneys'

(3) ears perk up a little bit.

(4)     THE WITNESS:  Yeah.

(5)     MR. WU:  If you have an idea, please let us know,

(6) but, otherwise, don't guess.

(7)     THE WITNESS:  Okay.

(8)     MR. URIARTE:  Q.  What about with regards to the

(9) termination?  Were you involved at all in the

(10) decision-making behind the decision to terminate Ray

(11) Navarro?

(12)     A.  No.

(13)     Q.  So nobody asked for your opinion?  You never

(14) gave your opinion?

(15)     A.  No.

(16)     Q.  Did you do any investigation or ask around,

(17) anything like that?

(18)     A.  No.

(19)     (Discussion off the record.)

(20)     MR. URIARTE:  Q.  Do you remember seeing the

(21) petition that was going around against Andrew Dodge

(22) before Mr. Navarro was terminated?

(23)     A.  No.

(24)     Q.  So what about today, like, have you seen that

(25) petition today?  Have you seen it since his termination

**Page 42**

(1) at all?

(2)     MR. WU:  I'm going to object here on grounds of

(3) attorney-client privilege and instruct the witness to

(4) answer only as to whether he's seen the document

(5) outside of any confidential or communications with his

(6) attorneys.

(7)     MR. URIARTE:  Q.  That's correct, Mr. Qually, yes.

(8) So my question really is whether you've ever seen the

(9) -- either of the petitions, either of the two petitions

(10) that were circulated, not because your attorney

(11) showed it to you but because of other events.

(12)     A.  As I said, no.

(13)     Q.  Would it be accurate to state that as a duty

(14) manager, that Andrew Dodge is an employee that you

(15) would have been supervising?

(16)     A.  At some point, yes.

(17)     Q.  And so it wasn't like an interest of yours to

(18) figure out what it is that the fuelers were complaining

(19) about against Dodge?  That wasn't an interest of yours?

(20)     MR. WU:  Objection.  Vague.

(21)     You can answer if you understand the question.

(22)     THE WITNESS:  I did not hear complaints directly

(23) from the fuelers.

(24)     MR. URIARTE:  Q.  Okay.  So you're saying none of

(25) the fuelers ever came up to you and said, hey, these

**Page 43**

(1) negatives things are happening?  You never heard that?

(2)     A.  No.

(3)     Q.  What about the video, did you ever see that

(4) video where they put together a video of Mr. Dodge

(5) sleeping and all that?  Did you see that one?

(6)     A.  No.

(7)     Q.  You knew that a petition was going around

(8) against Mr. Dodge?  Did you know that, as it was

(9) happening?

(10)     A.  I have heard through -- that, yes, there was.

(11)     Q.  And did you see the note that Andrew Dodge

(12) wrote, the statement he wrote around the same time that

(13) the petition was going around, was that something that

(14) you saw?

(15)     A.  I did not.

(16)     Q.  Do you know one way or the other if Menzies

(17) Aviation ever did an investigation with regards to the

(18) facts that are contained within those petitions?

(19)     A.  No.

(20)     Q.  You don't know?

(21)     A.  I don't know if -- what was done with all the

(22) information.

(23)     Q.  I see.  Were you made aware at some point that

(24) Mr. Dodge was suffering from sleep apnea?

(25)     A.  Yes.

**Page 44**

(1)     Q.  And how were you made aware of that?

(2)     A.  He brought it to our attention.

(3)     Q.  Do you know when that was?

(4)     A.  No, I don't have the exact date.

(5)     Q.  Was it before or after the termination of Ray

(6) Navarro?

(7)     A.  Before.

(8)     Q.  A lot of time before?  I think Mr. Dodge came

(9) in in 2016.  And then Ray Navarro was August of 2018.

(10) So that's kind of like the time frame there.  I don't

(11) know if that assists you, but do you know when

(12) Mr. Dodge let you know of his condition?

(13)     A.  I don't have the exact date, no.

(14)     Q.  And did you see any kind of medical note or a

(15) medical slip or anything like that written by a doctor?

(16)     A.  Personally, no.

(17)     Q.  Did somebody tell you that he had one?

(18)     A.  He told me he gave it to the general manager

(19) at the time, Renil.

(20)     Q.  Renil Lal?

(21)     A.  Yes.

(22)     Q.  Did Mr. Lal ever talk to you about the note,

(23) the medical note?

(24)     A.  No.

(25)     Q.  Was there some sort of accommodation or a game

**Page 45**

(1) plan with regards to how to deal with the sleep apnea,
(2) anything like that?
(3)      **A.** Nothing directed to me.
(4)      **Q.** Did you think that maybe the sleep apnea
(5) condition was interfering with his job?
(6)      **A.** No.
(7)      **Q.** You didn't think that it's of concern?
(8)      **A.** There's always a concern, but I don't believe
(9) it interfered with his job.
(10)      **Q.** And why is that?
(11)      **A.** Because most of the time, as I heard, it was
(12) already, like, early in the morning, like, 1:00, 2:00,
(13) 3:00 o'clock in the morning when there's nothing on the
(14) airport. When he's actually on the airport, he was not
(15) sleeping. He was actually doing his job.
(16)      **Q.** Did you see that one picture of him where he's
(17) inside the truck and he's sleeping? Did you see that
(18) one?
(19)      **A.** I've seen one, yes.
(20)      **Q.** And that's not a concern at all for Menzies?
(21)      **A.** For me personally or Menzies? Me, personally,
(22) the time frame, no. Whether the company did, I can't
(23) say.
(24)      **Q.** So I guess you weren't part of some sort of
(25) discussion as to whether his condition interfered with

**Page 46**

(1) him being able to correctly perform his job functions,
(2) right? You weren't purview to that type of discussion?
(3)      **A.** Correct.
(4)      **Q.** Have you seen the termination notice of
(5) Renaldo Navarro?
(6)      **A.** No.
(7)      **Q.** So you saw only the suspension notice, right?
(8)      **A.** Correct.
(9)      **Q.** And then you actually -- did you write that?
(10) Did you actually -- were you the one who wrote it?
(11)      **A.** The one that basically saying that he -- that
(12) I attempted to serve him the suspension notice and he
(13) refused to sign?
(14)      **Q.** No, no, let me put it up, that way we're
(15) talking about the same thing. I'm talking about the
(16) actual notice itself.
(17)      So it's Exhibit 6, please, David.
(18)      (Plaintiff's Exhibit 6 marked for
(19)      identification.)
(20)      **MR. URIARTE: Q.** Do you see that, Mr. Qually?
(21)      **A.** Oh, that one. Okay. Yes, I did -- that was
(22) the one -- that was the -- okay, yes. That was a
(23) suspension document that was tried to serve to
(24) Mr. Navarro that he refused to sign.
(25)      **Q.** Correct. So my question first is did you type

**Page 47**

(1) this up?
(2)      **A.** Yes.
(3)      **Q.** So you typed it up, is that right?
(4)      **A.** You know what, hold on a minute. No, I did
(5) not type that.
(6)      **Q.** Okay. So somebody gave this to you to -- for
(7) example, it seems like somebody filled out the field
(8) "Employee Name: Renaldo Navarro," "Today's Date,"
(9) "Airport/Location," "Clock #," "Department." Somebody
(10) put that information in there.
(11)      Were you the one who put that in there?
(12)      **A.** Negative, no.
(13)      **Q.** Do you know who did that?
(14)      **A.** Do I remember, no. There's only --
(15)      **Q.** Who asked you to serve the document?
(16)      **A.** I believe it was HR.
(17)      **Q.** Meaning Tracy?
(18)      **A.** Tracy.
(19)      **Q.** Okay. So this might refresh your recollection
(20) with regards to before or after the meeting. So it
(21) says "Today's Date" on the top there, and it says
(22) August 20, 2018. Do you see that?
(23)      **A.** Okay.
(24)      **Q.** And then, if you scroll down and you see your
(25) signature, it's a different date. Your signature has a

**Page 48**

(1) date of August 23. Do you see that?
(2)      **A.** Yes.
(3)      **Q.** Does that help you or refresh your
(4) recollection at all with regards to when you served
(5) this?
(6)      **A.** When he refused to sign, I dated it on the
(7) 23rd because that's when I tried to serve it to him.
(8)      **Q.** I see. So that's when your encounter with him
(9) actually happened, is that correct?
(10)      **A.** Correct.
(11)      **Q.** So you only had one encounter with him, one
(12) attempt?
(13)      **A.** Correct.
(14)      **Q.** And because he was not -- he wasn't working at
(15) that point, correct?
(16)      **MR. WU:** Objection. Vague.
(17)      **THE WITNESS:** I can't remember --
(18)      **MR. WU:** You can answer if you understand the
(19) question.
(20)      **THE WITNESS:** I understand the question. I don't
(21) remember if that was his scheduled shift. I don't
(22) remember if that was his scheduled day or not.
(23)      **MR. URIARTE: Q.** I understand you're a little
(24) confused. By the time you were trying to serve him,
(25) was he already serving the suspension or he had not

**Page 49**

(1) started serving the suspension? Do you see what I'm
(2) saying?
(3)     **A.** He -- best of my knowledge, he had not served
(4) his suspension.
(5)     **Q.** So he didn't start serving the suspension
(6) until you tried to serve him the suspension notice, is
(7) that correct?
(8)     **A.** To the best of my knowledge, yes.
(9)     **Q.** Okay. Did you leave him with a copy?
(10)     **A.** He had a copy, yes.
(11)     **Q.** When you say he had a copy, was the copy --
(12) the copy that he had, that came from you or --
(13)     **A.** He took a picture of it with his phone.
(14)     **Q.** I see. Okay. So, okay. All right. And then
(15) let me just read under goal and the expectation part
(16) there, it says, "It is expected that employees will
(17) follow all policies and procedures. Failure to follow
(18) Company policies and procedures will result in further
(19) disciplinary action up to and including termination."
(20)     Do you read that?
(21)     **A.** Yes.
(22)     **Q.** Are you knowledgeable at all with regards to
(23) the policies and procedures that this notice was
(24) talking about?
(25)     **A.** Directly, no.

**Page 50**

(1)     **Q.** It says "Failure to follow Company policies
(2) and procedures..." Do you know what company policies
(3) and procedures that he failed to follow?
(4)     **A.** Let's see. I can't remember off my head, no.
(5)     **Q.** Do you have an opinion as to why he was
(6) suspended or terminated from Menzies, like, do you know
(7) the specific violation he may have violated?
(8)     Do you have any kind of memory as to that, or
(9) what's your memory with regards to that?
(10)     **MR. WU:** Objection. Compound. Lack of
(11) foundation.
(12)     You can answer if you understand the question.
(13)     **THE WITNESS:** Can you repeat it.
(14)     **MR. URIARTE: Q.** Yeah. So sitting here today and
(15) looking back at the suspension and the termination, we
(16) know that Menzies -- Menzies' position is he violated
(17) certain policies and procedures, right?
(18)     So just kind of talking about that, do you
(19) have a memory or an understanding in your head what it
(20) is that Mr. Navarro actually violated to justify his
(21) termination?
(22)     **MR. WU:** Same objection.
(23)     **THE WITNESS:** To justify, looking back now?
(24)     **MR. URIARTE: Q.** Yes.
(25)     **A.** I can't think of it off my head, no. I can't,

**Page 51**

(1) no.
(2)     **Q.** Did you -- like either part of the petition or
(3) part of what was happening, or anything like that, did
(4) you ever have a discussion with Mr. Dodge with regards
(5) to his fuelers and his fuelers maybe not being able to
(6) take breaks? Did you ever engage in such a discussion
(7) with him?
(8)     **A.** It probably came up once or twice, yes.
(9)     **Q.** And was this once or twice before the
(10) termination of Mr. Navarro?
(11)     **A.** Likely, yes.
(12)     **Q.** And can you tell us what your memory is of
(13) that, like, what that discussion was about?
(14)     **A.** Basically fuelers not being able to take a
(15) break just by the fact that they were shorthanded or
(16) just lots of flights. Nothing I can remember in
(17) general, but those are usually the only things that
(18) would prevent that.
(19)     **Q.** Okay. And what brought up the need to talk to
(20) Mr. Andrew Dodge about the breaks and his fuelers?
(21) What brought it up to you? What kind of triggered
(22) that?
(23)     **MR. WU:** Objection. Assumes facts not in
(24) evidence.
(25)     **THE WITNESS:** Sometimes a fueler would complain to

**Page 52**

(1) me, but that's it.
(2)     **MR. URIARTE: Q.** And did Mr. Dodge have any
(3) opinion or did he kind of have his position as to why
(4) these breaks were short -- I mean, the breaks weren't
(5) happening, or the breaks were late, or anything like
(6) that?
(7)     Did Andrew Dodge try to explain himself as to
(8) why those things were happening?
(9)     **MR. WU:** Objection. Assumes facts not in
(10) evidence.
(11)     **THE WITNESS:** Yes.
(12)     **MR. URIARTE: Q.** And what would he say in those
(13) discussions?
(14)     **A.** He gave me the explanation of what happened
(15) during the night and why some fuelers weren't able to
(16) get a longer break than they did or any break at all.
(17) And that's it, you know.
(18)     We -- there is a policy where, if they don't
(19) get a break, they get a missed meal penalty. So they
(20) get paid for their lunch.
(21)     **Q.** Did you ever have a discussion with a Rafael
(22) Vasquez about Andrew Dodge?
(23)     **A.** I might have at one point. I don't recall.
(24)     **Q.** And what do you remember as to that
(25) discussion?

**Page 53**

(1)     MR. WU:  Objection.  Lack of foundation.

(2)     THE WITNESS:  I don't recall what was talked about

(3)  in that conversation.

(4)     MR. URIARTE:  Q.  So -- okay.  So let's just kind

(5)  of clarify.  Are you saying maybe you had a discussion

(6)  with him about Andrew Dodge and maybe not?  Or you may

(7)  recall a particular discussion, you just don't remember

(8)  the contents of it?  Is that -- yeah, can you just

(9)  clarify the nature of your memory?

(10)     A.  We probably had a conversation, but what we

(11)  talked about, I don't recall.

(12)     Q.  Let me show you Exhibit 10.  So Exhibit 10 is

(13)  a statement from Rafael Vasquez, I guess, about his

(14)  efforts to talk to Raul Vargas about something about

(15)  Andrew Dodge.  If you see the date below, it says

(16)  November 2018.  Do you see that?

(17)     A.  Yes.

(18)     Q.  Does this refresh your recollection as to

(19)  about when you may have talked to Rafael Vasquez about

(20)  Andrew Dodge?

(21)     A.  No.  And, for the record, I have not seen this

(22)  before.

(23)     Q.  Okay.  Maybe another way of putting it is did

(24)  you talk to Rafael Vasquez before Mr. Navarro was

(25)  terminated or after his termination?  Do you remember

**Page 54**

(1)  that at all?

(2)     A.  If I talked to Rafael, it would have been

(3)  before.

(4)     Q.  So here he says something about "I have spoken

(5)  to The Menzies Aviation Fueling Director Raul Vargas on

(6)  three separate occasions regarding Mr. Andrew Dodge,

(7)  who continues to abuse his authority and at times

(8)  harass Fuelers under his charge."

(9)     Do you have any information or knowledge with

(10)  regards to that allegation, "continues to abuse his

(11)  authority and at times harass Fuelers under his

(12)  charge"?

(13)     Does that ring a bell at all, Mr. Qually?

(14)     A.  No.

(15)     Q.  And in the complaint that you received against

(16)  Andrew Dodge, was there any type of language along

(17)  these lines or actions along these lines, like

(18)  harassing, abusing authority?

(19)     Was that the types of complaints that you

(20)  received?

(21)     A.  No.

(22)     Q.  So you received complaints about meal breaks

(23)  and rest breaks, but nothing about harassing fuelers,

(24)  right?  You never heard that type of complaint?

(25)     A.  Correct.

**Page 55**

(1)     Q.  Aside from breaks, what other types of

(2)  complaints did you receive from fuelers about Andrew

(3)  Dodge?

(4)     A.  I mean, there could be many different ways,

(5)  but usually the only complaints were, you know, working

(6)  too much or working too hard or too many flights, stuff

(7)  like that.  That's pretty much it.

(8)     Q.  And that's a function of scheduling, right?

(9)  Is that what that is?

(10)     A.  Correct.

(11)     MR. URIARTE:  Okay.  I have no further questions

(12)  for Mr. Qually.

(13)     MR. WU:  No further questions on my end, either.

(14)     MR. URIARTE:  Great.  Thank you, Mr. Qually.

(15)  Thanks for being patient with us.  I think we're done

(16)  with your deposition, and have a nice rest of the day.

(17)     THE WITNESS:  Okay.  Thank you.

(18)     (Whereupon, the deposition concluded at 2:37

(19)  o'clock p.m.)

(20)     ---o0o---

(21)

(22)

(23)

(24)

(25)

**Page 56**

(1)     CERTIFICATE OF WITNESS

(2)     ---o0o---

(3)

(4)     I, JOHN QUALLY, hereby declare under

(5)  penalty of perjury that I have read the foregoing

(6)  deposition testimony; and that the same is a true

(7)  and correct transcription of my said testimony

(8)  except as corrected pursuant to my rights under

(9)  Rule 30(e) of the Federal Rules of Civil

(10)  Procedure.

(11)

(12)  _____

(13)     Signature

(14)  _____

(15)     Date

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

**Page 57**

(1)  STATE OF CALIFORNIA      )
                             )
(2)  COUNTY OF SAN FRANCISCO )

(3)        I, CINDY TUGAW, a Certified Shorthand Reporter

(4)  of the State of California, duly authorized to

(5)  administer oaths pursuant to Section 8211 of the

(6)  California Code of Civil Procedure, do hereby certify

(7)  that

(8)                    JOHN QUALLY,

(9)  the witness in the foregoing deposition, was by me duly

(10) sworn to testify the truth, the whole truth and nothing

(11) but the truth in the within-entitled cause; that said

(12) testimony of said witness was reported by me, a

(13) disinterested person, and was thereafter transcribed

(14) under my direction into typewriting and is a true and

(15) correct transcription of said proceedings.

(16)        I further certify that I am not of counsel or

(17) attorney for either or any of the parties in the

(18) foregoing deposition and caption named, nor in any way

(19) interested in the outcome of the cause named in said

(20) caption.

(21)        Dated the 7th day of August, 2020.

(22)

(23)

(24)

                    CINDY TUGAW

(25)                CSR No. 4805 (California)

**Page 58**

(1)  John Qually
     c/o Foley & Lardner
(2)  555 California Street, Suite 1700
     San Francisco, CA 94104
(3)  Attn:  Jason Y. Wu, Esq.
(4)  Date:  August 7th, 2020
     Re:  Navarro vs. Menzies
(5)  Deposition Date:  Tuesday, July 28, 2020
(6)  Dear Mr. Qually,
(7)        Please be advised the original transcript of
     your deposition is ready for your review.
(8)        Pursuant to FRCP Rule 30(e), you have
     30 days following the date of this notice to read,
(9)  correct if necessary, and sign your transcript unless
     the attending parties and the deponent agree on the
(10) record or otherwise in writing to a longer or shorter
     time period.  The deponent may change the form or the
(11) substance of the answer to a question, and may either
     approve the transcript of the deposition by signing it,
(12) or refuse to approve the transcript by not signing it.
     You are not required by law to read and sign your
(13) deposition transcript.  All parties will be informed of
     the corrections.  The original transcript will then be
(14) sealed and sent to the examining attorney pursuant to
     the applicable law.
(15)       You may either come to our office to read and
     sign the original transcript, or you may contact your
(16) attorney or the attorney who arranged for you to be
     present at your deposition.  If they have ordered a
(17) copy of the transcript, you may review their copy and
     make corrections by submitting, signing and returning
(18) the attached form.  If you choose to review your
     transcript at our office, please call first to make an
(19) appointment.  Should you have any question regarding
     these instructions, please call.
(20)
     Sincerely,
(21)
(22)
     NOGARA REPORTING SERVICE
(23) 5 Third Street, Suite 415
     San Francisco, California 94103
(24) (415) 398-1889
(25) cc:  All counsel, original deposition

# EXHIBIT 49

**DEPOSITION OF TRACY AGUILERA - 08/25/2020**

**RENALDO NAVARRO vs. MENZIES AVIATION, INC.**

CONDENSED TRANSCRIPT AND CONCORDANCE

**PREPARED BY:**

**NOGARA REPORTING SERVICE**
**5 Third Street, Suite 415**
**San Francisco, CA  94103**
**Phone:  (415) 398-1889**
**FAX:  (415) 398-0611**



## Page 1

(1)          IN THE UNITED STATES DISTRICT COURT

(2)       IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

(3)

(4)

(5) RENALDO NAVARRO,

(6)          Plaintiff,

(7) v.                        No.  3:19-CV-8157

(8) MENZIES AVIATION, INC.,

    doing business as MENZIES

(9) and DOES 1 through 10,

    inclusive,

(10)

           Defendants.

(11) _____/

(12) Zoom Remote Deposition of

(13)     TRACY AGUILERA

(14)  Tuesday, August 25, 2020

(15)

(16)

(17)

(18)

(19)

(20)

(21) REPORTED BY:  CINDY TUGAW, CSR #4805

(22)

(23)

            NOGARA REPORTING SERVICE

(24)        5 Third Street, Suite 415

          San Francisco, California 94103

(25)           (415) 398-1889

## Page 2

(1)              I N D E X

(2)                              Page Number
(3) EXAMINATION BY MR. URIARTE              5
(4) EXAMINATION BY MR. WU                  48
(5) FURTHER EXAMINATION BY MR. URIARTE     53
(6)              ---o0o---
(7)           E X H I B I T S
(8) Plaintiff's

(9) Exhibit 8      Petition to Menzies        26
                   Management from Menzies
(10)               Fuelers
(11) Exhibit 9     Termination notice for     48
                   Renaldo Navarro
(12)
     Exhibit 11    Employee Performance       35
(13)               Development dated
                   8/29/2018
(14)
     Exhibit 12    Email chain culminating    31
(15)               in an email from Raul
                   Vargas to Tracy Aguilera
(16)               dated August 29, 2018
(17) Exhibit 13    Menzies Aviation Code of   18
                   Conduct
(18)
     Exhibit 14    Menzies Aviation Employee  21
(19)               Handbook California - 2017
(20) Exhibit 15    Menzies Aviation Applicant 23
                   Declaration Form
(21)
     Exhibit 17    Employee Performance       43
(22)               Development Steps to
                   Progressive Discipline
(23)
     Exhibit 18    Job Description, Fueling   54
(24)               Supervisor (North America)
(25)

## Page 3

(1)              I N D E X

(2)            (Continued)

(3) Plaintiff's                   Page Number

(4) Exhibit 19    Letter from Rafael Vasquez  41
                   to whom it may concern
(5)               dated 11/18/2018 with
                   attached petition
(6)
     Exhibit 20    Menzies Aviation Employee  44
(7)               Handbook California - 2018
(8)              ---o0o---

(9)

(10)

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

## Page 4

(1)          BE IT REMEMBERED that, pursuant to Notice of

(2) Taking Deposition and on Tuesday, the 25th day of

(3) August, 2020, commencing at the hour of 1:04 o'clock

(4) p.m. thereof, via Zoom videoconference, before me,

(5) CINDY TUGAW, a Certified Shorthand Reporter in the

(6) State of California, personally appeared,

(7)          TRACY AGUILERA,

(8) called as a witness by the Plaintiff, having been by me

(9) first duly sworn, was examined and testified as

(10) hereinafter set forth.

(11)          ---o0o---

(12)     APPEARANCES OF COUNSEL

(13) For the Plaintiff

     LIBERATION LAW GROUP, P.C.

(14)     2760 Mission Street

        San Francisco, California 94110

(15)     BY:  ARLO GARCIA URIARTE, Attorney at Law

        (415) 695-1000

(16)

(17) For the Defendants

     FOLEY & LARDNER, LLP

(18)     555 California Street, Suite 1700

        San Francisco, California 94104

(19)     BY:  JASON Y. WU, Attorney at Law

        (415) 984-9848

(20)

(21)  Also Present:  David Ho, Zoom Host.

(22)          ---o0o---

(23)

(24)

(25)

**Page 5**

(1)     THE REPORTER:  At this time, I will ask counsel to
(2) stipulate on the record that there is no objection to
(3) this deposition officer administering a binding oath to
(4) the witness via Zoom, starting with the noticing
(5) attorney.
(6)     MR. URIARTE:  No objection from plaintiff.
(7)     MR. WU:  And no objections for defendant, Menzies
(8) Aviation.
(9)     (Whereupon, the Witness was duly sworn by the
(10)     Reporter.)
(11)     EXAMINATION BY MR. URIARTE
(12)     MR. URIARTE:  Q.  Good afternoon, Ms. Aguilera.
(13)     A.  Good afternoon.
(14)     Q.  Could you please state and spell your full
(15) legal name for the record.
(16)     A.  Tracy T r-a-c-y, Marie, M-a-r-i-e, Aguilera,
(17) A-g-u-i-l-e-r-a.
(18)     Q.  Thank you.  Have you had your deposition taken
(19) before?
(20)     A.  Yes.
(21)     Q.  And how many times?
(22)     A.  Two or three.  A couple times.
(23)     Q.  And are these like as part of your duties as
(24) an HR professional?
(25)     A.  Yes.

**Page 6**

(1)     Q.  All of them?  All of these depos where you
(2) testified you testified as an HR professional?
(3)     A.  Yes.
(4)     Q.  And were they all for Menzies?
(5)     A.  Yes.
(6)     Q.  When was the last one?
(7)     A.  It's been a while.  It's been a while.  I
(8) can't give you an exact time.
(9)     Q.  Yeah, we don't need -- we sometimes don't
(10) expect them.  Like maybe within the last five years or
(11) more than five years?
(12)     A.  Yes.
(13)     Q.  Has it been more than a year ago?
(14)     A.  I believe so.
(15)     Q.  So within the last one and five years,
(16) essentially, is that correct?
(17)     A.  Yes.
(18)     Q.  Have all two or three of them occurred within
(19) the last one and five years or some were older than
(20) that?
(21)     A.  No, I believe they were within one to five
(22) years.
(23)     Q.  So my name is Arlo Uriarte.  I am the attorney
(24) for plaintiff Navarro.  And you're aware that
(25) Mr. Navarro has an action against Menzies, correct?

**Page 7**

(1)     A.  Yes.
(2)     Q.  And you know who Renaldo Navarro is?
(3)     A.  Yes.
(4)     Q.  How long did you actually work with Mr.
(5) Navarro?
(6)     A.  When Menzies Aviation purchased ASIG, so it
(7) would be around 2017.
(8)     Q.  So Menzies arrived -- do you remember what
(9) part of the year Menzies actually started their
(10) operation in SFO --
(11)     A.  Yeah --
(12)     Q.  -- for ASIG?
(13)     A.  Oh, for ASIG.  Could have been June or July.
(14)     Q.  So about June or July 2017?
(15)     A.  Yes.
(16)     Q.  And then were you already at SFO doing other
(17) parts of airport services for Menzies?
(18)     A.  Yes.
(19)     Q.  And then how long has Menzies been in San
(20) Francisco Airport?
(21)     A.  I can't give you an exact date.
(22)     Q.  Yeah, what about yourself, about how long --
(23)     A.  I've been at SFO since 1997.
(24)     Q.  All for Menzies?
(25)     A.  No.

**Page 8**

(1)     Q.  And so in 1997 who did you work for?
(2)     A.  I started with Ogden Aviation, then I went to
(3) Aeroground.  And then due to the purchase of Aeroground
(4) by Menzies, I'm now with Menzies Aviation, however,
(5) Menzies does own Ogden.
(6)     Q.  Gotcha.  But when Aeroground -- when did they
(7) get purchased by Menzies?
(8)     A.  I believe around 2005.
(9)     Q.  And what was your position in 2005 when you
(10) started with Menzies?
(11)     A.  I was an HR coordinator/manager.
(12)     Q.  By the time in 2017 when Menzies purchased
(13) ASIG, what was your title?
(14)     A.  Human resource manager.
(15)     Q.  And within the human resources department in
(16) SFO, did you have other people working in the
(17) department?
(18)     A.  Yes.
(19)     Q.  How many people did you supervise?
(20)     A.  Two directly and one indirectly.
(21)     Q.  And how do you differentiate the indirectly?
(22)     A.  Two were -- reported directly to me and the
(23) third was in my office, however, she works for the
(24) recruiting department.
(25)     Q.  Gotcha.  Okay.  So I think you've been doing a

Page 9

(1) really good job answering my basic questions there. So
(2) as you can tell, although we're in an informal setting,
(3) you have been giving testimony that the court reporter
(4) is taking down. And she will come up with a booklet
(5) that you will be able to review and make changes to.
(6) Are you aware of that?
(7)     A. Yes.
(8)     Q. And I should tell you that if you do make
(9) changes to that booklet, later on, for purposes of
(10) trial, somebody like me or another person might
(11) question you as to why you made changes. Okay?
(12)         Do you understand that?
(13)     A. Yes, I understand.
(14)     Q. And that's why we should try to make sure that
(15) you understand the question and that you provide your
(16) best testimony here today. Okay? Understood?
(17)     A. Understood.
(18)     Q. And you also understand that you're under
(19) oath, correct?
(20)     A. Yes.
(21)     Q. And you understand that oath?
(22)     A. Yes.
(23)     Q. Is there any reason why you cannot provide
(24) your best testimony here today?
(25)     A. No.

Page 10

(1)     Q. Are you under any type of medication or
(2) substance that affects your memory?
(3)     A. No.
(4)     Q. Did you do anything to prepare for today's
(5) deposition?
(6)     A. No.
(7)     Q. Did you talk to anybody, aside from your
(8) attorney, did you talk to anybody to prepare for
(9) today's deposition?
(10)     A. No, just my counsel.
(11)     Q. And then did you review any documents?
(12)     A. Just what my counsel has shown me.
(13)     Q. And what documents were those?
(14)     MR. WU: Objection. Attorney-client privilege.
(15) I'm going to instruct the witness not to answer.
(16)     MR. URIARTE: With regards to documents that were
(17) reviewed for today's deposition? I think we're
(18) entitled to know what she reviewed.
(19)     MR. WU: I think she already testified that she
(20) only reviewed what was shown to her by counsel.
(21)     MR. URIARTE: All right. Aside from the
(22) documents that your counsel showed you, did you review
(23) any other documents?
(24)     A. No.
(25)     Q. Do you have notes or anything in front of you

Page 11

(1) that you're using for today's testimony?
(2)     A. No.
(3)     Q. What's the highest level of education that you
(4) finished with?
(5)     A. High school.
(6)     Q. And then any kind of HR-related classes that
(7) you've taken in the last five years?
(8)     A. No.
(9)     Q. Any wage and hour related seminars or classes
(10) that you've taken in the last five years?
(11)     A. I'm sorry, I can't hear you. I didn't.
(12)     Q. Any kind of wage and hour seminars or
(13) compliance classes or anything like that?
(14)     A. No.
(15)     Q. And then how long have you been an HR manager
(16) for Menzies at SFO airport?
(17)     A. Ten years.
(18)     Q. When Menzies took over ASIG, did Menzies bring
(19) with it its own employment policies and handbook?
(20)     A. They had one, yes.
(21)     Q. Were those distributed to the employees that
(22) they took over in July of 2017?
(23)     A. I'm sorry, can you repeat the question.
(24)     Q. Sure. When Menzies took over ASIG in July of
(25) 2017, did they distribute the Menzies employment

Page 12

(1) handbooks and policies --
(2)     A. Not right at the time, no.
(3)     Q. When were those eventually distributed?
(4)     A. I don't have an exact date. I do know that we
(5) posted the notice stating that they would be following
(6) the Menzies Aviation policies.
(7)     Q. Okay. And where was that notice posted?
(8)     A. It was posted in the employee bulletin board.
(9)     Q. And then where would -- like if somebody
(10) wanted to see them, where would they see them?
(11)     A. They would see them in the HR department. We
(12) were preparing a package for them.
(13)     Q. If somebody needed to see them, you said they
(14) could see it in the HR department, is that correct?
(15)     A. Yes, once we put them all together.
(16)     Q. By August of 2018, had you put them all
(17) together?
(18)     A. I believe they did have a package for them.
(19)     Q. For each one of them?
(20)     A. Yes.
(21)     Q. Are you certain of that or are you guessing on
(22) that?
(23)     A. No, I believe they did have a package put
(24) together.
(25)     Q. And when you say "they," who's "they"?

DEPOSITION OF TRACY AGUILERA - 08/25/2020

BSA Case 3:19-cv-08157-VC RENALDO NAVARRO vs. MENZIES AVIATION, INC. XMAX(4/4)

Page 37 of 92

## Page 13

(1)  **A.** The corporate office.

(2)  **Q.** So I would imagine that the corporate office

(3) would have kind of like the same materials they would

(4) have for the other Menzies departments, other

(5) Menzies --

(6)  **A.** I'm sorry?

(7)  **Q.** I would imagine that the Menzies corporation

(8) would be using the same employment handbooks as they

(9) were using for the other services that Menzies was

(10) already doing at SFO, right? Those would be the same

(11) handbooks?

(12)  **A.** Well, yes, they have a California Menzies

(13) handbook, yes.

(14)  **Q.** So that's the part I don't understand too

(15) much. Why did it take a little bit of time to package

(16) them for the Menzies fuelers?

(17)   Did you hear the question?

(18)  **A.** No, I didn't hear your question.

(19)  **Q.** Okay. So the question is if there's a

(20) California employment handbook -- by July of 2017,

(21) Menzies was already at San Francisco Airport, correct?

(22) Ms. Aguilera?

(23)  **A.** Yes, I believe it was around July.

(24)  **Q.** No, what I mean is by July of 2017, there were

(25) already operations in San Francisco?

## Page 14

(1)  **A.** Yes.

(2)  **Q.** Other services, correct?

(3)  **A.** Yes.

(4)  **Q.** So those services already had an employment

(5) handbook for California, correct?

(6)  **A.** Yes.

(7)  **Q.** So wasn't that the same handbook that was

(8) going to be used for Menzies fuelers?

(9)  **A.** I can't answer that because I know they were

(10) revising our handbook.

(11)  **Q.** I see. Okay. And then, but we don't know the

(12) exact date that the handbook was distributed to the

(13) Menzies fuelers?

(14)  **A.** No.

(15)  **Q.** And I took a look at the documents that were

(16) produced to us by your attorneys, and I didn't see any

(17) type of acknowledgment paperwork with regards to Mr.

(18) Navarro or acknowledging receipt of corporate policies.

(19)  **A.** Hmm.

(20)  **Q.** So do you know anything about that, whether

(21) you've seen one or anything like that?

(22)  **A.** No, I actually didn't look, but I do know that

(23) a package was put together for all of the ASIG

(24) employees for them to sign.

(25)  **Q.** Right. Because that's the normal procedure,

## Page 15

(1) right, you give it to the employees and then they

(2) acknowledge receipt of it, correct?

(3)  **A.** Yes.

(4)  **Q.** And they acknowledge that they have been given

(5) one, isn't that the practice?

(6)   So the practice, Ms. Aguilera, is that once

(7) the handbooks become available, you provide the

(8) handbook to the employee and then they sign an

(9) acknowledgment for receipt of them, is that correct?

(10)  **A.** Yes.

(11)  **Q.** And then are you familiar with the Menzies

(12) code of conduct?

(13)  **A.** Yes.

(14)  **Q.** And that's another kind of set of policies or

(15) paperwork that's given to each employee, is that

(16) correct?

(17)  **A.** It's in the handbook, yes.

(18)  **Q.** Oh, so it's part of the handbook?

(19)  **A.** Yes, it is.

(20)  **Q.** Is there a separate acknowledgment of receipt

(21) for the code of conduct or it's all just one?

(22)  **A.** It's all just one.

(23)  **Q.** Was there ever a training with regards to the

(24) Menzies California handbook and code of conduct? Was

(25) there any kind of training like that?

## Page 16

(1)  **A.** There was, when the employees came in to sign

(2) all the documents, we went over the documents with

(3) them.

(4)  **Q.** So how did that go? You called some of the

(5) employees one by one or like a seminar? How did that

(6) go?

(7)  **A.** They would come in according to their

(8) schedule, if they didn't have flights, they would come

(9) into the HR department. We would -- I would arrange it

(10) with their manager.

(11)  **Q.** Like how many people would come in at one

(12) time?

(13)  **A.** A couple at a time.

(14)  **Q.** And then when you said you would go over it

(15) with them, you actually went through some of the pages

(16) and --

(17)  **A.** What they were signing, yes.

(18)  **Q.** What they signed.

(19)  **A.** Either myself or my clerk.

(20)  **Q.** I see. Do you have an independent

(21) recollection of doing something like that with

(22) Mr. Renaldo Navarro?

(23)  **A.** No, I can't say that I do. I didn't do a lot

(24) of them. My clerk did a lot of them, most of them.

(25)  **Q.** In July or August of 2018, who was your clerk?

**Page 17**

(1)    **A.** I believe it was Loretta Katoa.

(2)    **Q.** We're going to need a spelling for the last

(3) name.

(4)    **A.** K-a-t-o-a.

(5)    **Q.** Was there another clerk or was it just

(6) Loretta?

(7)    **A.** No, I had Loretta and I had another clerk, her

(8) name was Precious.

(9)    **Q.** Do you remember her last name?

(10)    **A.** Sagaga.

(11)    **Q.** Do you know the spelling of that?

(12)    **A.** I believe it's S-a-g-a-g-a.

(13)    **Q.** What is your understanding as to why Menzies

(14) terminated Mr. Navarro?

(15)    **A.** For harassment.

(16)    **Q.** And as you know, harassment is a bit of a term

(17) of art in employment circles. So what type of

(18) harassment are we talking about? When you say

(19) harassment in this circumstance, what kind of

(20) harassment?

(21)    **A.** Unprofessional conduct, forcing employees

(22) to -- pressuring employees.

(23)    **Q.** Pressuring employees to sign the petition, is

(24) that what you mean?

(25)    **A.** Yes.

**Page 18**

(1)    **Q.** Any other reason?

(2)    **A.** No.

(3)    **Q.** Is it your understanding that -- is it your

(4) understanding that somehow in the code of conduct

(5) there's something there that addresses the concern that

(6) you're not supposed to force employees to sign a

(7) petition?

(8)    **A.** Yes.

(9)    **Q.** And do you remember seeing something like that

(10) in the code of conduct?

(11)    **A.** Yes.

(12)    **MR. URIARTE:** So, David, can we get Exhibit 13,

(13) please.

(14)    (Plaintiff's Exhibit 13 marked for

(15)    identification.)

(16)    **ZOOM HOST:** I sent a Chat to Tracy, and she should

(17) be able to open that link, and she has a laptop, so she

(18) can see the whole document.

(19)    **MR. URIARTE:** Okay. Very good. So you're not

(20) going to open it over here or --

(21)    **ZOOM HOST:** If you like, I can do that. It's up

(22) to you.

(23)    **MR. URIARTE:** Yeah, can we do that?

(24)    **ZOOM HOST:** Okay. Sure. Coming back up.

(25)    **MR. URIARTE:** I think Jason and I are kind of used

**Page 19**

(1) to that by now. Okay.

(2)    **Q.** So, Ms. Aguilera, I think what my

(3) understanding is that you -- in your laptop you also

(4) have a copy of Exhibit 13, but on your screen right now

(5) what is showing is also Exhibit 13. So if you could

(6) just let me know what part of the code of conduct I can

(7) look at with regard to forcing employees to sign the

(8) petition.

(9)    **A.** I'm having trouble seeing your -- I'll look at

(10) my handbook. It would fall under "Gross Misconduct."

(11)    **Q.** Okay. Can you give me a page number?

(12)    **A.** Page 15.

(13)    **Q.** Is that the handbook or the code of conduct?

(14)    **A.** I'm looking under the code of conduct in the

(15) handbook.

(16)    **Q.** Okay. You said gross -- I'm sorry.

(17)    **A.** It's under Section 4, "Performance Standards,"

(18) 4.1, "Code of Conduct."

(19)    **Q.** All right. Are we looking at the same

(20) document when you see the document on your screen now?

(21) Because we don't have Roman numerals on our copies that

(22) were produced by your attorneys. I guess that's all we

(23) have for the code of conduct.

(24)    Are you looking at a different document,

(25) Ms. Aguilera?

**Page 20**

(1)    **A.** I've just opened up the company handbook so I

(2) could see it better.

(3)    **Q.** I see. And you're saying in the company

(4) handbook you see it as where?

(5)    **A.** On page 15. "Performance Standards," "Code of

(6) Conduct, "Gross misconduct while on company property or

(7) while conducting company business, including attempting

(8) bodily injury, fighting or threatening violence,

(9) boisterous or disruptive activity that interferes with

(10) your job duties, others' job duties or passenger

(11) service."

(12)    **Q.** And can you tell me maybe at the bottom of the

(13) page what it says as to the date of that document?

(14)    **A.** Menzies Aviation 2017.

(15)    **MR. URIARTE:** I see. So maybe, Jason, is there a

(16) way, like if we take a break later on, for us to get a

(17) copy of what Ms. Aguilera is referring to?

(18)    **MR. WU:** Yeah, we can talk about that when we go

(19) off the record.

(20)    **MR. URIARTE:** Sounds good. I'll put that aside.

(21)    **Q.** And you said page 15, Section 4, right?

(22)    **A.** Yes.

(23)    **ZOOM HOST:** Arlo, I think I found it on the

(24) employee handbook, if you want me to bring that up

(25) or --

**Page 21**

(1)    MR. URIARTE:  Yes, please.

(2)    ZOOM HOST:  Hold on.

(3)    MR. URIARTE:  Exhibit 14.

(4)    ZOOM HOST:  Correct.  Let me bring that up.

(5)    MR. URIARTE:  Thank you.

(6)        (Plaintiff's Exhibit 14 marked for

(7)        identification.)

(8)    MR. URIARTE:  David, I don't think it's there

(9)  because I think we're looking for "Gross Misconduct" as

(10)  a header.

(11)    THE WITNESS:  It's under Section 4, "Performance

(12)  Standards," and then 4.1, "Code of Conduct, and then in

(13)  that body at the bottom there's "Gross Misconduct."

(14)    MR. URIARTE:  Q.  Okay.  Let me take a look at

(15)  4.1.  We only have copies of whatever your attorneys

(16)  provided us.

(17)    MR. WU:  Arlo, I'm looking at this right now.

(18)    MR. URIARTE:  Okay.

(19)    MR. WU:  If you look very closely at the bottom of

(20)  each page, it looks like, for whatever reason, only the

(21)  odd numbered pages got copied.

(22)    MR. URIARTE:  Oh, I see what you mean.

(23)    MR. WU:  1, 3, 5, 7.

(24)    MR. URIARTE:  Yeah, yeah.  Okay.  I'll fix that up

(25)  during a break.  Let's just go to the next topic.  Very

**Page 22**

(1)  good.  Thank you for that.  It looks like that's

(2)  exactly what happened.

(3)    Q.  So then I think, Ms. Aguilera, you were the

(4)  one who put together the termination paperwork, the

(5)  notice of change in status of the employee?

(6)    A.  Yes.

(7)    Q.  And then you were the one who put the words

(8)  "Code of Conduct" in that form, is that correct?

(9)    A.  Yes.

(10)    Q.  And so when you said -- when you put those

(11)  words "Code of Conduct," that's what you were referring

(12)  to?

(13)    A.  Yes.

(14)    MR. URIARTE:  Give me a second.

(15)        (Discussion off the record.)

(16)    MR. URIARTE:  Q.  Okay.  Was that something --

(17)  with regards to the code of conduct in August of 2018,

(18)  how are we going to figure out whether that policy had

(19)  been communicated to the employees at that point?

(20)    A.  At that point, all employees should have had a

(21)  copy of the handbook.

(22)    Q.  So that would have been like almost a year,

(23)  maybe a year into Menzies entering SFO fuelers, right?

(24)    A.  I can't give you an exact date.

(25)    Q.  So you're saying that at that point, your

**Page 23**

(1)  memory is that they had the handbook at that point

(2)  already, is that correct?

(3)    A.  Yes.

(4)    Q.  And who would know for certain whether that's

(5)  true or not?

(6)    A.  The documents should be in the files.

(7)    Q.  Yeah, well, I guess what I can represent to

(8)  you is that -- and I should show you that -- let's look

(9)  at Exhibit 15, please.

(10)        (Plaintiff's Exhibit 15 marked for

(11)        identification.)

(12)    MR. URIARTE:  Q.  So here is one of those

(13)  documents that lists the signature.  If we look below,

(14)  it's got a blank, no employee name, no employee

(15)  signature.  This was produced to us by your attorneys.

(16)    And so I have yet -- I mean, I guess, if you

(17)  get back to your office and you see some sort of

(18)  acknowledgment form that has Mr. Navarro's signature on

(19)  it, I think that would be helpful, but we have yet to

(20)  see that.

(21)    Okay, Ms. Aguilera?  Did you understand my

(22)  request?

(23)    A.  Yes.

(24)    Q.  All right.  How did you first find out that

(25)  there was a petition circulating about Andrew Dodge?

**Page 24**

(1)    A.  The union notified me.

(2)    Q.  And how did they notify you?

(3)    A.  They called me.  It wasn't "they."  Charles

(4)  called me, the man named Charles that worked in the

(5)  union office.

(6)    Q.  And what did Charles say to you?

(7)    A.  He said, "Tracy, are you aware that there's a

(8)  petition being circulated?  Our members -- several

(9)  members have called and complained that they were being

(10)  forced to sign a petition."

(11)    Q.  Okay.  And then anything else that Charles

(12)  said to you?

(13)    A.  No.

(14)    Q.  And so, in response to that, what did you do?

(15)    A.  Well, I asked him if he had a copy of the

(16)  petition and who was being forced, but he never got

(17)  back to me on that.  With that being said, I made

(18)  contact with the acting general manager at the time,

(19)  and his name was Renil Lal, and I told him that I

(20)  received the call from the union.

(21)    Q.  Okay.  And did Renil get you a copy of the

(22)  petition?

(23)    A.  Not right away.  I don't believe -- no, he did

(24)  not.

(25)    Q.  Do you know how long before you actually got a

**Page 25**

(1) copy of it?

(2) A. I got it -- actually, I got it from Raul

(3) Vargas. I'd seen it.

(4) Q. I see. Okay. And did you read the petition

(5) itself?

(6) A. I've seen the names on there, yes, but I

(7) didn't go through each one. I'm sorry.

(8) Q. What about the topic that the petition was

(9) talking about, did you read that part?

(10) A. No, I -- I gave everything to Kevin Blumberg

(11) to open up an investigation.

(12) Q. And what was the investigation for?

(13) A. Well, to find out what was going on.

(14) Q. What do you mean, "to find out what was going

(15) on"?

(16) A. With the petition, why it was being

(17) circulated.

(18) Q. Okay. And then what was the conclusion of

(19) Kevin, the security person?

(20) A. The conclusion?

(21) Q. Yes.

(22) A. It was that Rey Navarro was forcing employees

(23) to sign a petition to have Andrew Dodge removed.

(24) Q. Okay. And that's what is contained in the

(25) email, right, is that what you're talking about, where

**Page 26**

(1) Mr. Blumberg actually sent an email to you with the

(2) result of his investigation?

(3) A. Yes.

(4) Q. Okay. So that's with regards to the inquiry

(5) as to Mr. Navarro's involvement in the petition itself,

(6) right? But what about the part of, like, what the

(7) fuelers were complaining about? Was that ever

(8) investigated?

(9) A. I'm sorry, can you repeat that.

(10) Q. Sure. What about the part, that section of

(11) the petition where the fuelers are asking for certain

(12) relief or what they're complaining about, right, in the

(13) petition, was that part of the petition ever

(14) investigated?

(15) A. What part are you talking about?

(16) MR. URIARTE: Okay. Let me show you. So let's

(17) bring up Exhibit 8.

(18) (Plaintiff's Exhibit 8 marked for

(19) identification.)

(20) MR. URIARTE: Q. Can you see Exhibit 8,

(21) Ms. Aguilera?

(22) A. Yes.

(23) Q. Do you remember this to be the petition that

(24) we're talking about?

(25) A. This is the one that I believe was given to

**Page 27**

(1) Raul Vargas.

(2) Q. Okay. Let's scroll to page 2 just to make

(3) sure Ms. Aguilera sees the whole document. It's a

(4) three-page document.

(5) And this is the one that has Renaldo Navarro's

(6) signature on line 16, as you see there. Do you see

(7) that, Ms. Aguilera?

(8) A. Yes.

(9) Q. Okay. And then it also has the signature of

(10) the other supervisor, July Macapagal. Do you see that?

(11) A. Yes.

(12) Q. Okay. So we've been calling this the first

(13) petition. So if we scroll back to page 1 -- and I

(14) understand that you've said that you asked the security

(15) department or Raul Vargas asked the security department

(16) to investigate the role of Mr. Navarro. I understand

(17) that part.

(18) What I'm now distinguishing with you is with

(19) regards to the subject matter of this petition. And

(20) I'll let you read it, or if you want, I can read it for

(21) you.

(22) Are you able to read it fine, Ms. Aguilera?

(23) A. Yes, I know how to read, yes.

(24) Q. Okay. So it says, "We the fuelers on Menzies

(25) 130 side would like to make a petition against Andrew

**Page 28**

(1) Dodge. The way he supervised is very unprofessional

(2) when he run the operation or supervised, people are not

(3) [taking] their breaks it's because the way he set up

(4) the flights" -- okay? -- "and he always blaming the

(5) people there's a delay or always saying lack of

(6) manpower and trucks issues."

(7) Okay. So let's just stop there. That part of

(8) the petition, was that ever investigated?

(9) A. The whole scenario was investigated by Kevin

(10) Blumberg.

(11) Q. Aside from the email that contains some of

(12) Mr. Blumberg's conclusion, is there another document

(13) that addresses these concerns?

(14) A. I don't have them.

(15) Q. So if there is an investigation, it would be

(16) part of what Mr. Blumberg engaged in, correct? Is that

(17) correct?

(18) A. Yes.

(19) Q. Okay. Let's go on to the next one. "The

(20) truth is he doesn't know how to run the show, we also

(21) addressed the problem to the higher position managers

(22) (Nicco, John and Renil) as usual nothing happened,

(23) looks like they always covering his mistake or maybe

(24) these managers don't know anything about fueling also

(25) like Andrew Dodge lack of experience about fueling."

DEPOSITION OF TRACY AGUILERA - 08/25/2020
BSA RENALDO NAVARRO, et al. vs. MENZIES AVIATION, INC. XMAX(8/8)
Case 3:19-cv-08157-VC Document 34 Filed 01/08/20 Page 41 of 92

**Page 29**

(1)      Did you read this part of the petition? And
(2) pertaining to July, August of 2018, did you read this
(3) part of the petition?
(4)      A. I believe I did.
(5)      Q. And as an HR or human resources professional,
(6) when you read this part of the petition, does that put
(7) you in any type of concern?
(8)      A. Disciplinary action and -- disciplinary
(9) action -- let me back up here.
(10)      This was given to Raul. In HR I had no issues
(11) regarding Andrew's performance. This was given to Raul
(12) and we had Kevin Blumberg investigate it.
(13)      Q. Okay. Does the part about "looks like they
(14) are always covering his mistake," referring to Nicco,
(15) John and Renil, does that raise any red flags of
(16) concern for you as the HR manager?
(17)      A. No.
(18)      Q. You were around when Mr. Dodge was promoted to
(19) supervisor, correct?
(20)      A. I believe so.
(21)      Q. Meaning that he was a fueler for about a year,
(22) then he received a promotion as a supervisor, is that
(23) correct?
(24)      A. Yes.
(25)      Q. And for that promotion, were there other

**Page 30**

(1) people vying for that promotion?
(2)      A. I don't know. I don't remember.
(3)      Q. Given that Mr. Dodge had only one year of
(4) experience, do you remember any of the old-timers,
(5) old-timer fuelers, also wanting to be a supervisor?
(6) Does that refresh your recollection at all?
(7)      A. Can you repeat the question.
(8)      Q. Sure. Mr. Dodge received a promotion to
(9) supervisor after only one year of being a fueler. At
(10) that point there were many fuelers who had worked there
(11) as fuelers for many, many years who also wanted to be a
(12) supervisor. Do you remember any of those --
(13)      A. No, we post the position, they would apply for
(14) the position, they would be reviewed by the manager,
(15) and the person best qualified for the position would be
(16) granted the promotion.
(17)      Q. And for fueling supervisor, who would be the
(18) manager that decides that?
(19)      A. It would have been the -- between the general
(20) manager and the director.
(21)      Q. So it would have been Renil and John Qually or
(22) Renil and the operations manager?
(23)      A. It would have been Renil.
(24)      Q. It would have been Renil.
(25)      A. Uh-huh.

**Page 31**

(1)      Q. And do you know where Renil is today?
(2)      A. I don't -- I know he's at the airport. I
(3) don't know where he works.
(4)      Q. Would you agree that when fuelers have an
(5) issue, they're supposed to bring their issue up to a
(6) supervisor, that's the way the chain of command works?
(7)      A. Usually, yes.
(8)      Q. And then supervisors, as part of their duties,
(9) job responsibilities, they're supposed to try to work
(10) with these issues and try to bring that up to upper
(11) management if they can't resolve it, isn't that right?
(12)      A. Yes.
(13)      MR. URIARTE: I think we're going to need to take
(14) a five-minute break, Jason. Can we get off the record,
(15) please, Cindy.
(16)      THE REPORTER: Yes.
(17)      MR. URIARTE: Thank you.
(18)      (Brief recess.)
(19)      MR. URIARTE: Let's get back on the record. All
(20) right. So why don't we take a look at Exhibit 12.
(21)      (Plaintiff's Exhibit 12 marked for
(22)      identification.)
(23)      MR. URIARTE: Q. The first one I wanted to -- I
(24) guess we can stay here. Ms. Aguilera, do you see the
(25) section of the August 29, 2018, 5:01 p.m. email from

**Page 32**

(1) Raul Vargas? And really what I first want to put my
(2) attention to -- or put your attention to, it says,
(3) "Could you also open an investigation for July" --
(4) which should be Macapagal. Do you see that,
(5) Ms. Aguilera?
(6)      MR. WU: Tracy, I think you are on mute.
(7)      THE WITNESS: I'm sorry. To answer your question,
(8) yes, I see it.
(9)      MR. WU: Thank you.
(10)      MR. URIARTE: Q. Was an investigation ever opened
(11) for July Macapagal?
(12)      A. It was turned over to Kevin Blumberg.
(13)      Q. Was there any result of that investigation
(14) that was put on paper?
(15)      A. Not that I've seen, no.
(16)      Q. Did Mr. Blumberg let you know the result of
(17) that investigation?
(18)      A. No.
(19)      Q. And then let's go down on the second page.
(20) Here is the email from Mr. Blumberg. And I just want
(21) to make sure, when we were talking about the results of
(22) the investigation of Mr. Blumberg, are we talking about
(23) this email here, August 29, 2018 at 3:58 p.m.?
(24)      A. I see it, yes.
(25)      Q. So aside from this, there's no other written

**Page 33**

(1) document that writes or has further conclusions
(2) regarding his investigation? Ms. Aguilera?
(3)      A. No, I don't have a copy of it.
(4)      Q. Okay. I guess my question is more -- when we
(5) see Mr. Blumberg's product or result of his
(6) investigation into the petition, this is what we're
(7) looking at right here, the email that he wrote to you
(8) with his conclusions, is that correct?
(9)      A. This says a statement, yes.
(10)      Q. Aside from this statement, is there any other
(11) written document?
(12)      A. Not that I have.
(13)      Q. And here his conclusion really is
(14) "unprofessional behavior by a supervisor." Do you see
(15) that?
(16)      A. Yes, I see it.
(17)      Q. Just taking that kind of like in its
(18) isolation, "unprofessional behavior by a supervisor,"
(19) would that result in a termination? Is that something
(20) that would normally result in a termination?
(21)      A. It depends on the caliber of the -- what he's
(22) done.
(23)      Q. And your recommendation actually was not to
(24) terminate, correct?
(25)      A. Myself and our directors, yes -- my director,

**Page 34**

(1) yes. Talin.
(2)      Q. Correct. So Talin and yourself had a
(3) discussion, and your recommendation to Mr. Vargas was
(4) not to terminate but instead issue a final warning, is
(5) that correct?
(6)      A. It was not to terminate, yes.
(7)      Q. Did you recommend the final warning to
(8) Mr. Vargas?
(9)      A. I was going to. Oh, to Mr. Vargas, no. Let
(10) me back up, I'm sorry.
(11)      Q. Go ahead.
(12)      A. Yes, I did write up the document, but it
(13) was -- and my recommendation was made.
(14)      Q. Did you actually send that document to
(15) Mr. Vargas?
(16)      A. I don't believe so.
(17)      Q. Now, was there ever a discussion between you
(18) and Mr. Vargas about, hey, there's an option here of
(19) issuing a final warning; was that discussion made?
(20)      A. No. I gave my recommendation.
(21)      Q. So you gave your recommendation of not
(22) terminating, but you didn't communicate an option to
(23) Mr. Vargas. Is that an accurate way of characterizing
(24) it?
(25)      A. Not via email. After I made my

**Page 35**

(1) recommendation, and he came up to my office and we
(2) discussed it, and that's when Kevin came up and said --
(3) and gave me the details of the investigation.
(4)      Q. And so Raul Vargas went to your office, you
(5) had a discussion about it, and in that discussion the
(6) final warning option was discussed?
(7)      A. He asked me why I came to that conclusion of
(8) not to terminate, and I told him based on Renaldo's
(9) tenure and what was in his personnel file.
(10)      Q. Okay. And what's your opinion as to why
(11) Mr. Vargas did not follow that recommendation?
(12)      A. After speaking with Mr. Vargas and Kevin in my
(13) office and them going into detail about harassment, my
(14) opinion changed, and I reviewed it with my director,
(15) and we were in agreement to terminate him.
(16)      Q. And then I guess I understand all of that.
(17) But I think the only kind of unclear portion of that is
(18) the -- and maybe let's pull it up.
(19)      MR. URIARTE: If we could pull up Exhibit 11. I
(20) wanted to kind of focus on the issue of the issuance of
(21) the final warning and what Mr. Vargas knew about that.
(22)      (Plaintiff's Exhibit 11 marked for
(23)      identification.)
(24)      MR. URIARTE: Q. And issuance is not the right
(25) word, right? You drafted a document of final warning.

**Page 36**

(1)      A. I lost you.
(2)      Q. Here we go. Do you see the final warning
(3) there, Ms. Aguilera?
(4)      A. There it is. Yes, I do.
(5)      Q. So I want to kind of get into the
(6) circumstances of -- so you wrote this up as an option,
(7) right? Do you see that, "Today's date: August 29"?
(8) Did you ever show this to Mr. Vargas?
(9)      A. I can't say that I showed this to him.
(10)      Q. Did you discuss it as an option with him?
(11)      A. I can't remember word for word that was said
(12) in the meeting.
(13)      Q. But I guess my question is do you remember
(14) any -- do you have any memory as to a discussion about
(15) a final warning being an option?
(16)      A. There could have been. I can't tell -- I
(17) can't give you the details.
(18)      Q. All right. Then let's go back to Exhibit 12,
(19) please. With regards to Mr. Blumberg's investigation,
(20) did you find out whether or not Mr. Blumberg spoke to
(21) Mr. Navarro?
(22)      A. I don't know the details.
(23)      Q. Do you know if Mr. Blumberg spoke to the
(24) fuelers that signed the petition?
(25)      A. I don't know the details.

**Page 37**

(1)    MR. URIARTE:  All right.  Let's go to the last, I
(2)  guess -- if we can go to Menzies 200, which is on the
(3)  bottom, David, a little bit more, like two pages down.
(4)  All right.  Go up a little bit, please.  Let's see the
(5)  date stamp.  There we go.
(6)    Q.  So, Ms. Aguilera, this string of emails, did
(7)  you provide this to your attorney?  Is this something
(8)  you printed out and provided to your attorney?
(9)    A.  I sent this to my manager.  I sent it to
(10)  Talin.
(11)    Q.  Gotcha.  All right.  So you see here it says,
(12)  "On August 27, 2018, at 5:11 PM Tracy Aguilera wrote."
(13)  Do you see that?
(14)    A.  Yes.
(15)    Q.  And then it says "Talin," and then it has
(16)  different points.  Do you see that?
(17)    A.  Yes.
(18)    Q.  Okay.  And then if we go down a little bit --
(19)  a little bit down, please, David -- here's the question
(20)  I have.  It says, "Now today, 10/27/2018 Raul Vargas
(21)  receives the same petition from Rafael Martinez, no
(22)  signature just wanting Andrew removed - I did not
(23)  attach it to this email."
(24)    Do you see that?
(25)    A.  Yes, I do, and that's a typo with the date.

**Page 38**

(1)    Q.  That's a typo with the date?
(2)    A.  Yeah, it shouldn't have been October.
(3)    Q.  Okay.  So it should have been October 27,
(4)  2018?
(5)    A.  No, I believe --
(6)    Q.  I mean -- yeah.
(7)    A.  I believe it should have been August 27th.
(8)    Q.  Okay.  So you believe that to be a typo?
(9)    A.  I believe so.
(10)    Q.  All right.  So are you saying that two days
(11)  before Mr. Navarro was terminated, Mr. Rafael Martinez
(12)  also gave Raul Vargas a petition asking Andrew to be
(13)  removed?
(14)    A.  Yes.
(15)    Q.  With regards to the suspension on August 20,
(16)  who recommended and approved the suspension?
(17)    A.  Raul Vargas and Kevin Blumberg.
(18)    Q.  Before the issue with the petition, did you
(19)  receive any complaints or did you hear about complaints
(20)  from fuelers against Andrew Dodge?
(21)    A.  Only from Rey.
(22)    Q.  Did you see the pictures that were circulating
(23)  of Mr. Andrew Dodge sleeping on the job?  Was that
(24)  something that you saw?
(25)    A.  Yes, I did see one.

**Page 39**

(1)    Q.  And that was before the petition, correct?
(2)    A.  Yes.
(3)    Q.  And Rey complaining about Andrew Dodge,
(4)  wouldn't you say that that could have been part of his
(5)  duties as a supervisor?
(6)    A.  Yes.
(7)    Q.  Aside from Rey, you did not hear from fuelers
(8)  complaining about Andrew Dodge?
(9)    A.  No.
(10)    Q.  At that time, in July or August of 2018, aside
(11)  from Mr. Dodge, was there any other white supervisor
(12)  working for the fueling department?
(13)    A.  I -- I really don't know.  I can't -- I don't
(14)  know.
(15)    Q.  It could be that Mr. Dodge was the only white
(16)  supervisor?
(17)    A.  Could be.
(18)    Q.  Did you ever have a discussion with Renil with
(19)  regards to Rey Navarro's complaints against Andrew
(20)  Dodge?
(21)    A.  Yes.
(22)    Q.  And how many times do you think Renaldo
(23)  Navarro complained to Renil about Andrew Dodge?  Do you
(24)  remember any of that?
(25)    A.  No.

**Page 40**

(1)    Q.  Was it more than two times?
(2)    A.  Possibly.
(3)    Q.  Less than five and more than two, maybe?
(4)    A.  Possibly.
(5)    Q.  And with regards to -- and this happened
(6)  before the petition, correct?
(7)    A.  Him showing me the picture, yes.
(8)    Q.  And then did you see the video, the kind of
(9)  comical video that the fuelers made?
(10)    A.  No.
(11)    Q.  What about Renil and you discussing complaints
(12)  against Andrew Dodge, how many times did you guys
(13)  discuss that?
(14)    A.  I spoke to Renil a couple of times and told
(15)  him Rey's concerns.
(16)    Q.  Okay.  And what did Renil say?
(17)    A.  He would check into it.
(18)    Q.  Any result from it or any kind of follow-up
(19)  from it from Renil?
(20)    A.  No, he said he would -- well, he told me that
(21)  he would talk to Andrew, and that's it.  Rey didn't
(22)  come in and make formal complaints.  He would just --
(23)  he showed me the picture and the picture was Andrew
(24)  Dodge sitting in his car outside after -- sleeping in
(25)  his truck after he was off work.

**Page 41**

(1)    **Q.** Wasn't there another picture where he was kind
(2) of like in a Menzies vehicle as well?

(3)    **A.** That's the one I'm talking about. He was in
(4) the Menzies truck sitting outside.

(5)    **Q.** And do you remember any kind of concern about
(6) Andrew Dodge like causing delays to flights? Was that
(7) something that was discussed?

(8)    **A.** No, it wasn't discussed with me.

(9)    **Q.** What about Andrew Dodge causing fuelers to
(10) miss breaks?

(11)    **A.** No.

(12)    **Q.** Did Andrew Dodge ever get some sort of
(13) reprimand as a result of the petition?

(14)    **A.** No.

(15)    **Q.** Sitting here today, do you remember if any
(16) kind of reprimand was ever issued -- has been issued to
(17) Andrew Dodge?

(18)    **A.** No.

(19)    **MR. URIARTE:** Can we have Exhibit 19, please,
(20) David.

(21)    (Plaintiff's Exhibit 19 marked for
(22)    identification.)

(23)    **MR. URIARTE: Q.** So Exhibit 19 starts with a
(24) statement by Mr. Rafael Vasquez. Do you see the
(25) document, Ms. Aguilera?

**Page 42**

(1)    **A.** Yes.

(2)    **Q.** It says that, quote, "On September 6th, 2018"
(3) -- it's about nine days after the termination of
(4) Mr. Navarro -- "I was asked by Menzies fuelers to write
(5) a Petition on behalf of the Fuelers on 130 side vs.
(6) Andrew Dodge. The petition was written out and signed
(7) by the Fuelers" and then turned over to the union. In
(8) addition, it was also given to Raul Vargas.

(9)    Were you made aware of this particular
(10) petition?

(11)    **A.** After it was given to Raul Vargas and given to
(12) Kevin Blumberg.

(13)    **Q.** So, and just to make sure we're speaking of
(14) the same thing, so there was a first petition, and this
(15) seems to be the second petition. And this is a
(16) separate petition, you understand that?

(17)    **A.** Yes.

(18)    **Q.** What came out of this second petition, if
(19) anything?

(20)    **A.** Nothing on the HR side. There was no union
(21) grievance, there was no complaint by the union except
(22) for the original phone call I received.

(23)    **Q.** And so you said it was given to Mr. Blumberg.
(24) Was an investigation actually done because of this
(25) second petition?

**Page 43**

(1)    **A.** If I'm not mistaken, this is for the same
(2) issue.

(3)    **Q.** So no additional investigation was done?

(4)    **A.** Not to my knowledge.

(5)    **MR. URIARTE:** Now, let's go to Exhibit 17, please.

(6)    (Plaintiff's Exhibit 17 marked for
(7)    identification.)

(8)    **MR. URIARTE: Q.** Okay. You see Exhibit 17, I
(9) believe it's Employee Performance Development and Steps
(10) to Progressive Discipline.

(11)    If you could go down a little bit, David, that
(12) would be better.

(13)    This is a reverse pyramid here. And you're
(14) familiar with this, Ms. Aguilera?

(15)    **A.** Yes, I am.

(16)    **Q.** My question here really is how come
(17) progressive discipline was not instituted?

(18)    **A.** Harassment has zero tolerance.

(19)    **Q.** And was it discussed as an option?

(20)    **A.** I'm sorry?

(21)    **Q.** Was it discussed as an option?

(22)    **A.** Progressive discipline for harassment?

(23)    **Q.** Yes.

(24)    **A.** No.

(25)    **Q.** Is that written somewhere where harassment,

**Page 44**

(1) the type Mr. Navarro was accused of, has zero
(2) tolerance?

(3)    **A.** Any type of harassment.

(4)    **Q.** If we go back to Exhibit 19, at the bottom
(5) here it says, "I have spoken to Menzies Aviation
(6) Fueling Director Raul Vargas on three separate
(7) occasions regarding Andrew Dodge, who [continues] to
(8) abuse his authority and at times harass Fuelers under
(9) his charge."

(10)    Was that type of harassment investigated?

(11)    **A.** I can't tell you -- I didn't see the
(12) investigation, but this was turned over to Kevin
(13) Blumberg.

(14)    **MR. URIARTE:** Okay. Aside from the employee
(15) handbook, Jason, I have no further questions.

(16)    **MR. WU:** Arlo, can we go off the record for a
(17) second?

(18)    **MR. URIARTE:** Sure.

(19)    (Brief recess.)

(20)    (Plaintiff's Exhibit 20 marked for
(21)    identification.)

(22)    **MR. WU:** Can we go back on the record now?

(23)    **THE REPORTER:** Yes.

(24)    **MR. WU:** Earlier in the deposition, Mr. Uriarte
(25) asked Ms. Aguilera about a document that was described

**Page 45**

(1) as the Menzies employee handbook. That document was
(2) marked as Exhibit 14. It appears on its face that the
(3) document seems to have been missing some pages. So in
(4) the meantime, we have been able to locate what appears
(5) to be a complete version of that document, at least
(6) that was saved on our Foley system.
(7)     We haven't had a chance to confer with the
(8) client about whether it's a true and accurate copy of
(9) the employee handbook. We haven't been able to confer
(10) with our client about whether it's an accurate or
(11) authentic copy of the handbook or whether it would be
(12) responsive to any of the discovery requests that have
(13) been propounded in this case thus far.
(14)     That said, we did send a copy of that document
(15) to Mr. Uriarte as well as to the vendor handling this
(16) deposition just so that it can be used as an exhibit
(17) and for that sole purpose. That isn't a formal
(18) production, and we sent it subject to any objections
(19) that are stated in our original discovery responses.
(20)     And Mr. Uriarte is, of course, welcome to try
(21) and lay foundation for that document himself through
(22) this witness if he can.
(23)     MR. URIARTE: Okay. Great. Thank you, Jason.
(24)     Q. Ms. Aguilera, I think the first thing -- and,
(25) Jason, maybe you can help us with this -- the bottom of

**Page 46**

(1) this document has some dates on the bottom right side.
(2) The screen -- there you go. So here we have a Menzies
(3) Aviation 2018 version, and I believe the witness
(4) earlier said she was looking at a 2017 version. But
(5) let's just go through the section itself to see if
(6) maybe they are identical anyway.
(7)     So, Ms. Aguilera, could you just remind us --
(8) so the question area was concerning what part of the
(9) code of conduct did you use in order to indicate a
(10) violation that Mr. Navarro was terminated for, and then
(11) you identified the section as Section 4.1, which is
(12) found in the employee handbook. Is that correct,
(13) Ms. Aguilera?
(14)     A. Correct.
(15)     Q. Okay. And so I just want to make a
(16) distinction. So when you say -- when you say "code of
(17) conduct," not that it's a code of conduct separate
(18) handout as part of the handbook, but code of conduct,
(19) Section 4.1 of performance standards in the employment
(20) handbook, correct?
(21)     A. Yes.
(22)     Q. Okay. And then could you just take a look at
(23) Section 4.1 just to make sure that your -- because you
(24) were reading from a 2017 version. Can we at least
(25) establish whether the version you were reading or

**Page 47**

(1) reviewing is the same as what we have now which is a
(2) 2018 version.
(3)     A. Yes.
(4)     Q. Do you believe them to be the same?
(5)     A. Yes.
(6)     Q. Okay. And then could you just point to us
(7) where you were reading from earlier.
(8)     A. Can you go down some more? Let's see. I
(9) can't get it to go down, I don't know why.
(10)     Q. I think --
(11)     A. Where it says, "Gross misconduct while on
(12) Company property."
(13)     Q. Gotcha. So there's a bullet point that says,
(14) "Gross misconduct while on Company property or while
(15) conducting Company business, including: attempting
(16) bodily injury, fighting or threatening violence,
(17) boisterous or disruptive activity that interferes with
(18) your job duties, other's job duties, or passenger
(19) service." Is that the section?
(20)     A. Correct.
(21)     Q. So, again, when you wrote "code of conduct" in
(22) the termination documents, that's what you were
(23) referring to, is that correct?
(24)     A. Correct.
(25)     Q. And so let's just pull up Exhibit 9 just to be

**Page 48**

(1) on the sure side here.
(2)     (Plaintiff's Exhibit 9 marked for
(3)     Identification.)
(4)     MR. URIARTE: Q. Here we have Exhibit 9 which on
(5) the bottom of the page has your signature. Let me just
(6) have you identify that. Is that your signature,
(7) Ms. Aguilera?
(8)     A. Yes.
(9)     Q. And this is a document that you gave to Mr.
(10) Navarro?
(11)     A. Yes.
(12)     Q. And, again, here's where it says, "Comments:
(13) Code of Conduct." And that's the reason for his
(14) termination, correct?
(15)     A. Correct.
(16)     MR. URIARTE: So I've got no further questions,
(17) Jason.
(18)     MR. WU: Okay. Just a few questions from my end.
(19)     David, could we please pull up Exhibit 8.
(20)     ZOOM HOST: Give me one second. I need to close
(21) some of the tabs. One moment.
(22)     EXAMINATION BY MR. WU
(23)     MR. WU: Q. Okay, Ms. Aguilera, do you remember
(24) looking at this document earlier while Mr. Uriarte was
(25) asking you questions about this?

**Page 49**

(1)   **A.** Yes.

(2)   **Q.** And do you remember Mr. Uriarte asking you

(3) about the sentence that begins in the middle of that

(4) first paragraph, "The truth is he doesn't know how to

(5) run the show, we also addressed the problem to the

(6) higher position managers (Nicco, John and Renil) as

(7) usual nothing happened, looks like they always covering

(8) his mistake or maybe these managers don't know anything

(9) about fueling also like Andrew Dodge lack of experience

(10) about fueling."

(11)   Do you remember Mr. Uriarte reading that

(12) sentence to you?

(13)   **A.** Yes.

(14)   **Q.** Earlier I believe he asked you whether that

(15) sentence raised any red flags or concerns for you, and

(16) I believe your response was no. Do you remember

(17) testifying to that?

(18)   **A.** Yes.

(19)   **Q.** Why does that sentence not raise red flags or

(20) concerns for you?

(21)   **A.** Because the managers, in the positions they're

(22) in, they do know how to run an operation. Andrew, I've

(23) had no complaints about his work performance. And

(24) they've all been trained in fueling.

(25)   **Q.** And Mr. Uriarte also asked you some questions

**Page 50**

(1) later on about the extent to which you had discussions

(2) regarding Andrew Dodge's work performance. If there

(3) were issues with Andrew Dodge's work performance, would

(4) those typically be brought to your attention or to

(5) someone else's attention?

(6)   **A.** Usually it would go to the manager, if there

(7) were issues, it would go to -- it's a protocol. It

(8) would go to the supervisor, the supervisor would go to

(9) the general manager, the general manager would go to

(10) the director.

(11)   Usually if there's -- I usually get involved

(12) if it comes down to a final warning or a suspension

(13) pending termination.

(14)   **Q.** Okay. But in terms of everyday work

(15) performance, that's something that you're not usually

(16) involved with?

(17)   **A.** No.

(18)   **MR. WU:** David, we can take off Exhibit 8. Thank

(19) you.

(20)   **Q.** Mr. Uriarte also asked you about some pictures

(21) of Andrew Dodge that you had seen.

(22)   **A.** Yes.

(23)   **Q.** I think I lost count. How many photos have

(24) you seen?

(25)   **A.** One or two. I believe I can really remember

**Page 51**

(1) one.

(2)   **Q.** And in that -- I'm sorry, I didn't mean to

(3) interrupt.

(4)   **A.** Possibly two. I'm trying to think. There was

(5) one sitting -- oh, there was one sitting in the truck,

(6) but he was off duty. And he had a habit of just

(7) sitting in his truck after he got off work, and he

(8) would sleep in front of the parking lot in his truck,

(9) take a quick nap.

(10)   And I know he'd be off work because I come to

(11) work at 8:30, and he'd get off work -- I think his

(12) schedule ended, like, 6:00 or 7:00. But I would go up

(13) and sometimes I'd knock on the window and say, "Are you

(14) okay?"

(15)   "Oh, yeah, I'm just taking a nap before I

(16) drive home."

(17)   "Okay." So I knew he was off the clock.

(18)   **Q.** Okay. And do you remember anything about the

(19) other photo that you might have seen?

(20)   **A.** I believe I seen one of him sitting in the

(21) supervisor chair, but, again, he was off duty.

(22)   **Q.** And how were you able -- I'm sorry, I didn't

(23) mean to interrupt.

(24)   **A.** I was going to say I knew he was off duty

(25) because his shift ended at, again, 6:00 or 7:00. I

**Page 52**

(1) come in at 8:30. And it was -- like the picture

(2) outside, it was, you know, after 8:30, it was light

(3) out, and I actually seen him. But the one in the

(4) office I only know because, you know, even Rey would

(5) say, "This is what I took this morning," and Rey would

(6) come in later.

(7)   **Q.** Okay. So just to make sure I understood that

(8) all correctly, the photo where Andrew was sleeping in

(9) his truck, you could tell he was off duty because there

(10) was light out in the photo?

(11)   **A.** Yes, it was light, because I come in at 8:30

(12) in the morning, and he's off work by then.

(13)   **Q.** And the second photo with Andrew sleeping in

(14) the supervisor's office, you knew that he was off duty

(15) because Rey mentioned that it was a photo he took in

(16) the morning?

(17)   **A.** Yeah, exactly, yes.

(18)   **Q.** And Andrew would be off duty in the morning?

(19)   **A.** Yes, because he worked graveyard.

(20)   **Q.** Do you remember Mr. Uriarte asking you whether

(21) Mr. Navarro complaining about any issues with Andrew

(22) Dodge would be part of Mr. Navarro's duties as a

(23) supervisor?

(24)   **A.** Yes.

(25)   **Q.** And do you remember answering yes to that

**Page 53**

(1) question?

(2)   **A.** Yes.

(3)   **Q.** Okay. Would it be part of Mr. Navarro's

(4) duties as a supervisor to pressure or coerce

(5) lower-level employees into signing a petition against a

(6) fellow supervisor?

(7)   **A.** No, that's not part of his duties.

(8)   **MR. WU:** I think that's all the questions on my

(9) end.

(10)   **MR. URIARTE:** Okay.

(11)      FURTHER EXAMINATION BY MR. URIARTE

(12)   **MR. URIARTE: Q.** Ms. Aguilera, you make a point

(13) of saying that Mr. Dodge was off duty. If Mr. Dodge

(14) was not off duty and was actually on duty sleeping,

(15) that would be a problem?

(16)   **A.** Yes, it would be a problem.

(17)   **Q.** If he was sleeping inside the airport tarmac,

(18) that would be a problem?

(19)   **A.** Yes, it would be a problem that would need to

(20) be addressed.

(21)   **Q.** That would be actually not performing your

(22) essential job functions, right? Almost like an excuse

(23) for even sleep apnea, you're not performing your

(24) essential job functions, right? So that would be a

(25) major problem in a sense, correct?

**Page 54**

(1)   **MR. WU:** Objection. Improper hypothetical.

(2)      But you can answer.

(3)   **MR. URIARTE: Q.** Ms. Aguilera?

(4)   **A.** It -- it could be.

(5)   **Q.** With regards to job duties, I think we have

(6) Exhibit 18. And one of the items there is "Maintaining

(7) harmony among workers and resolving grievances" as part

(8) of the primary accountabilities and duties of a fueling

(9) supervisor. Does that make sense to you?

(10)   **A.** I'm sorry, I couldn't hear you.

(11)   **MR. URIARTE:** I'm sorry. So we're pulling up

(12) Exhibit 18.

(13)      (Plaintiff's Exhibit 18 marked for

(14)      identification.)

(15)   **MR. URIARTE: Q.** But "Maintaining harmony among

(16) workers and resolving grievances" as part of the

(17) primary accountabilities and duties of a fueling

(18) supervisor. Do you see that?

(19)   **A.** I don't see where --

(20)   **Q.** I think it's eight -- yeah, it's the eighth

(21) bullet point under "Primary Accountabilities" -- right

(22) there.

(23)   **A.** Yes, I see that.

(24)   **Q.** That's part of the duties of a fueling

(25) supervisor, correct?

**Page 55**

(1)   **A.** Yes, it's in the job description.

(2)   **MR. URIARTE:** Okay. No further questions.

(3)   **MR. WU:** Nothing else from me.

(4)   **MR. URIARTE:** Thank you, Ms. Aguilera. Thank you

(5) very much.

(6)   **MR. WU:** Thanks so much for your time, Tracy.

(7)   **THE WITNESS:** Thank you.

(8)      (Whereupon, the concluded at 2:51

(9)      o'clock p.m.)

(10)         ---o0o---

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

**Page 56**

(1)         CERTIFICATE OF WITNESS

(2)            ---o0o---

(3)

(4)      I, TRACY AGUILERA, hereby declare under

(5) penalty of perjury that I have read the foregoing

(6) deposition testimony; and that the same is a true

(7) and correct transcription of my said testimony

(8) except as corrected pursuant to my rights under

(9) Rule 30(e) of the Federal Rules of Civil

(10) Procedure.

(11)

(12)   _____

(13)            Signature

(14)   _____

(15)            Date

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

**Page 57**

(1) STATE OF CALIFORNIA      )
                             )
(2) COUNTY OF SAN FRANCISCO )

(3)          I, CINDY TUGAW, a Certified Shorthand Reporter

(4) of the State of California, duly authorized to

(5) administer oaths pursuant to Section 8211 of the

(6) California Code of Civil Procedure, do hereby certify

(7) that

(8)                TRACY AGUILERA,

(9) the witness in the foregoing deposition, was by me duly

(10) sworn to testify the truth, the whole truth and nothing

(11) but the truth in the within-entitled cause; that said

(12) testimony of said witness was reported by me, a

(13) disinterested person, and was thereafter transcribed

(14) under my direction into typewriting and is a true and

(15) correct transcription of said proceedings.

(16)          I further certify that I am not of counsel or

(17) attorney for either or any of the parties in the

(18) foregoing deposition and caption named, nor in any way

(19) interested in the outcome of the cause named in said

(20) caption.

(21)          Dated the 10th day of September, 2020.

(22)

(23)

(24)

                   CINDY TUGAW

(25)               CSR No. 4805 (California)

---

**Page 58**

(1) Tracy Aguilera
    c/o Foley & Lardner
(2) 555 California Street, Suite 1700
    San Francisco, CA 94104
(3) Attn:  Jason Y. Wu, Esq.
(4) Date:  September 10, 2020
    Re:  Navarro vs. Menzies
(5) Deposition Date:  Tuesday, August 25, 2020
(6) Dear Ms. Aguilera,
(7)          Please be advised the original transcript of
    your deposition is ready for your review.
(8)          Pursuant to FRCP Rule 30(e), you have 30 days
    following the date of this notice to read, correct if
(9) necessary, and sign your transcript unless the
    attending parties and the deponent agree on the record
(10) or otherwise in writing to a longer or shorter time
    period.  The deponent may change the form or the
(11) substance of the answer to a question, and may either
    approve the transcript of the deposition by signing it,
(12) or refuse to approve the transcript by not signing it.
    You are not required by law to read and sign your
(13) deposition transcript.  All parties will be informed of
    the corrections.  The original transcript will then be
(14) sealed and sent to the examining attorney pursuant to
    the applicable law.
(15)          You may either come to our office to read and
    sign the original transcript, or you may contact your
(16) attorney or the attorney who arranged for you to be
    present at your deposition.  If they have ordered a
(17) copy of the transcript, you may review their copy and
    make corrections by submitting, signing and returning
(18) the attached form.  If you choose to review your
    transcript at our office, please call first to make an
(19) appointment.  Should you have any question regarding
    these instructions, please call.
(20)
    Sincerely,
(21)
(22)
    NOGARA REPORTING SERVICE
(23) 5 Third Street, Suite 415
    San Francisco, California 94103
(24) (415) 398-1889
(25) cc:  All counsel, original deposition

# EXHIBIT 50

**DEPOSITION OF RAUL VARGAS - 08/25/2020**

**RENALDO NAVARRO vs. MENZIES AVIATION, INC.**

CONDENSED TRANSCRIPT AND CONCORDANCE

**PREPARED BY:**

**NOGARA REPORTING SERVICE**
**5 Third Street, Suite 415**
**San Francisco, CA  94103**
**Phone:  (415) 398-1889**
**FAX:  (415) 398-0611**



**Page 1**

(1)          IN THE UNITED STATES DISTRICT COURT

(2)      IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

(3)

(4)

(5) RENALDO NAVARRO,

(6)              Plaintiff,

(7) v.                          No.  3:19-CV-8157

(8) MENZIES AVIATION, INC.,

     doing business as MENZIES

(9) and DOES 1 through 10,

     inclusive,

(10)

            Defendants.

(11) _____/

(12) Zoom Remote Deposition of

(13)     RAUL VARGAS

(14)  Tuesday, August 25, 2020

(15)

(16)

(17)

(18)

(19)

(20)

(21) REPORTED BY:  CINDY TUGAW, CSR #4805

(22)

(23)

           NOGARA REPORTING SERVICE

(24)      5 Third Street, Suite 415

        San Francisco, California 94103

(25)          (415) 398-1889

**Page 2**

(1)              I N D E X

(2)                          Page Number

(3) EXAMINATION BY MR. URIARTE          4

(4) EXAMINATION BY MR. WU               73

(5) FURTHER EXAMINATION BY MR. URIARTE  74

(6)            ---o0o---

(7)          E X H I B I T S

(8) Plaintiff's

(9) Exhibit 1    Plaintiff Renaldo       9

               Navarro's Amended Notice

(10)             of Deposition of Raul

               Vargas

(11)

     Exhibit 8    Petition to Menzies    26

(12)             Management from Menzies

               Fuelers

(13)

     Exhibit 9    Termination notice for 60

(14)             Renaldo Navarro

(15) Exhibit 11   Employee Performance   61

               Development dated

(16)             8/29/2018

(17) Exhibit 12   Email chain culminating 66

               in an email from Raul

(18)             Vargas to Tracy Aguilera

               dated August 29, 2018

(19)

     Exhibit 19   Letter from Rafael Vasquez 43

(20)             to whom it may concern

               dated 11/18/2018 with

(21)             attached petition

(22)            ---o0o---

(23)

(24)

(25)

**Page 3**

(1)          BE IT REMEMBERED that, pursuant to Notice of

(2) Taking Deposition and on Tuesday, the 25th day of

(3) August, 2020, commencing at the hour of 9:03 o'clock

(4) a.m. thereof, via Zoom videoconference, before me,

(5) CINDY TUGAW, a Certified Shorthand Reporter in the

(6) State of California, personally appeared,

(7)              RAUL VARGAS,

(8) called as a witness by the Plaintiff, having been by me

(9) first duly sworn, was examined and testified as

(10) hereinafter set forth.

(11)            ---o0o---

(12)      APPEARANCES OF COUNSEL

(13) For the Plaintiff

     LIBERATION LAW GROUP, P.C.

(14)  2760 Mission Street

     San Francisco, California 94110

(15)  BY:  ARLO GARCIA URIARTE, Attorney at Law

     (415) 695-1000

(16)

(17) For the Defendants

     FOLEY & LARDNER, LLP

(18)  555 California Street, Suite 1700

     San Francisco, California 94104

(19)  BY:  JASON Y. WU, Attorney at Law

     (415) 984-9848

(20)

     Also Present:  David Ho, Zoom Host.

(21)

            ---o0o---

(22)

(23)

(24)

(25)

**Page 4**

(1)      **THE REPORTER:**  Good morning.  At this time, I will

(2) ask counsel to stipulate on the record that there is no

(3) objection to this deposition officer administering a

(4) binding oath to the witness via Zoom, starting with the

(5) noticing attorney.

(6)      **MR. URIARTE:**  No objection.

(7)      **MR. WU:**  And no objections on behalf of Menzies

(8) Aviation.

(9)          (Whereupon, the Witness was duly sworn by the

(10) Reporter.)

(11)          EXAMINATION BY MR. URIARTE

(12)      **MR. URIARTE:**  Good morning, Mr. Vargas.

(13)      **A.**  Good morning.

(14)      **Q.**  Could you please state and spell your name for

(15) the record.

(16)      **A.**  Yes, so my name is Raul Vargas, R-a-u-l, last

(17) name V, as in Victor, a-r-g-a-s.

(18)      **Q.**  Okay.  And if I ask you what your formal name

(19) is, like, for example, what's on your passport or

(20) something like that, what would you say?

(21)      **A.**  Raul Herman Vargas Aroca.

(22)      **Q.**  And so, Herman, Herman is H-e-r-m-a-n, is that

(23) what it is?  Herman, did you hear me?

(24)      **A.**  Yes, it's H-e-r-m-a-n.

(25)      **Q.**  And then I missed your mother's maiden name.

DEPOSITION OF RAUL VARGAS - 08/25/2020

BSA    Case 3:19-cv-08157-VC   RENALDO NAVARRO vs. MENZIES AVIATION INC.   Page 52 of 92    XMAX(2/2)

**Page 5**

(1)   **A.** It's A-r-o-c-a.

(2)   **Q.** A-r-o-c-a?

(3)   **A.** Yes.

(4)   **Q.** Thank you. Okay. My name is Arlo Uriarte. I

(5) am the attorney for Renaldo Navarro. And are you aware

(6) that Mr. Navarro has an action against Menzies?

(7)   **A.** Yes, I am.

(8)   **Q.** And could you please tell me what your current

(9) position is with Menzies.

(10)   **A.** I'm director of operations assigned in Los

(11) Angeles Airport.

(12)   **Q.** And then in August of 2018, what was your

(13) position?

(14)   **A.** I was the director of operation for San

(15) Francisco Airport.

(16)   **Q.** Would you say being the director of operation

(17) to Los Angeles is a promotion?

(18)   **A.** It was a promotion for me.

(19)   **Q.** When did you become director of operation for

(20) Los Angeles?

(21)   **A.** September 1st -- yes, September 1st.

(22)   **Q.** Of last year?

(23)   **A.** Yes.

(24)   **Q.** Have you had your deposition taken before?

(25)   **A.** No.

**Page 6**

(1)   **Q.** So let me just kind of go through some ground

(2) rules of what we're doing here today. First of all, we

(3) have the court reporter, Cindy. She is taking down

(4) everything that we are saying, including your attorney.

(5) And so we try to make it as easy for her as possible

(6) with regard to not talking over one another. Is that

(7) okay?

(8)   **A.** Perfect.

(9)   **Q.** Okay. And then we also need to make verbal

(10) responses, you know, because this is on video,

(11) sometimes you shake your head or you make some sort of

(12) gesture, but none of that is written onto the record

(13) unless you actually verbalize the response. Okay?

(14)   **A.** Okay.

(15)   **Q.** You have been placed under oath. Do you

(16) understand that?

(17)   **A.** I understand that.

(18)   **Q.** And do you understand what that oath means?

(19)   **A.** No.

(20)   **Q.** So what that oath means is that you have sworn

(21) to tell the truth. Okay?

(22)   **A.** Yes.

(23)   **Q.** And in swearing to tell the truth, you're also

(24) saying that you're declaring under penalty of perjury

(25) that you will tell the truth. Do you understand that

**Page 7**

(1) portion of it?

(2)   **A.** Yes, I do.

(3)   **Q.** Okay. While we are in a video deposition and

(4) while we seem to be informal and not in court, what you

(5) say and the testimony that you provide here today

(6) actually has the same weight and effect as if you were

(7) testifying in court in front of a judge, in front of a

(8) jury, in front of attorneys. It would be just the

(9) same. Do you understand that?

(10)   **A.** I do understand.

(11)   **Q.** And that makes it quite important that

(12) whatever you say here today is your best testimony,

(13) your best memory, your best recollection. Okay?

(14)   **A.** Yes.

(15)   **Q.** And if you have to -- it would be a good idea

(16) for you to qualify your response if you're not sure of

(17) the response. Do you understand that?

(18)   **A.** Yes, I do.

(19)   **Q.** If you make a response, for example, if you

(20) say "red" and then the court reporter actually writes

(21) down the word "red," we will assume that you meant red.

(22) Okay?

(23)   **A.** I do understand that.

(24)   **Q.** And later on, after you have been given the

(25) chance to actually review your testimony, sometimes

**Page 8**

(1) witnesses will change whatever they said during a

(2) deposition. But I must advise you that if you do

(3) change your testimony in a later court proceeding or in

(4) changing it in the deposition transcript, that somebody

(5) like me or another attorney or even sometimes the judge

(6) will cross-examine you or question you or doubt your

(7) credibility with regard to the changes you make to

(8) today's testimony.

(9)   Is that understandable?

(10)   **A.** I do understand that, sir.

(11)   **Q.** Thank you. Is there any reason why you cannot

(12) give your best testimony here today?

(13)   **A.** There is no reason.

(14)   **Q.** Okay. Aside from telling me what you and your

(15) attorneys have discussed, what did you do in order to

(16) prepare for today's deposition?

(17)   **A.** Well, I have my notes. And I had a meeting

(18) with Jason where he explained to me about the

(19) deposition. I've never been in one before.

(20)   **Q.** Okay. Don't tell me anything about what you

(21) talked about with Jason. When you say you have your

(22) notes, what do you mean by that?

(23)   **A.** My notes in terms of emails that I sent during

(24) that time.

(25)   **Q.** Okay. You have that in front of you?

DEPOSITION OF RAUL VARGAS - 08/25/2020

BSA     Case 3:19-cv-08157-VC RONALDO NAVARRO vs. MENZIES AVIATION, INC./04/06/20     Page 53 of 92     XMAX(3/3)

**Page 9**

(1)   **A.** I have it with me, yes.

(2)   **Q.** I guess, maybe during the break, maybe if you

(3) could make a copy of those notes and then send them to

(4) your attorney by email, or something like that, because

(5) we would want a copy of your notes.

(6)   **A.** Okay.

(7)   **Q.** Is that okay?

(8)   **A.** Yes. Sure.

(9)   **Q.** Okay. And then, aside from the emails that

(10) you say and your notes, anything else that you

(11) reviewed?

(12)   **A.** Anything else -- nothing else, sorry.

(13)   **Q.** Okay. Did you talk to anyone to prepare for

(14) today's deposition aside from your attorney?

(15)   **A.** I didn't talk to anybody in relation to this.

(16)   **Q.** Because of the video transmission or the data

(17) transmission, I didn't hear that totally clear, but

(18) what I assume what you said was that you have not

(19) talked to anyone in relation to -- with regards to

(20) preparing for today. Is that what you said?

(21)   **A.** Yes.

(22)   **MR. URIARTE:** So we will mark as Exhibit 1 the

(23) deposition notice. David, could you have Exhibit 1 on

(24) the screen, please. Thank you.

(25)   (Plaintiff's Exhibit 1 marked for

**Page 10**

(1)   identification.)

(2)   **MR. URIARTE: Q.** Okay. So this is always a good

(3) way of testing the technology. Mr. Vargas, do you see

(4) what's been marked as Exhibit 1 on your screen?

(5)   **A.** Yes.

(6)   **Q.** Are you using a laptop or a phone?

(7)   **A.** I'm using a laptop.

(8)   **Q.** Oh, great. That's better. Okay.

(9)   Have you seen this document before?

(10)   **A.** Yes.

(11)   **Q.** Great. Very good. All right.

(12)   Mr. Vargas, our information is that Mr.

(13) Navarro was terminated August 29, 2018. Do you

(14) remember that about the right time frame?

(15)   **A.** I don't remember the right time.

(16)   **Q.** Okay. Do you remember the circumstances

(17) around his termination?

(18)   **A.** Yes, I do.

(19)   **Q.** In relation to his termination, before

(20) deciding to terminate Mr. Navarro, did you actually

(21) hear about the petition going around in the workplace

(22) first?

(23)   **A.** Yes, I did.

(24)   **Q.** And how long would you say before his

(25) termination did you hear about the petition going

**Page 11**

(1) around in the workplace?

(2)   **A.** I don't recall that.

(3)   **Q.** Would you say that it was going around for a

(4) month already and then his termination happened?

(5)   **A.** I don't recall it.

(6)   **Q.** Can you give me your best estimate, like a

(7) week, or do you have a time frame in your head at all?

(8)   **A.** I don't have a time frame in my head right

(9) now.

(10)   **Q.** So you don't remember kind of like whether it

(11) was days or weeks?

(12)   **A.** I don't remember when this was brought to my

(13) attention.

(14)   **Q.** And "this" being the petition, correct?

(15)   **A.** In relation to the petition.

(16)   **Q.** I think, Mr. Vargas, we need you to speak up a

(17) little bit or maybe get closer to the microphone.

(18)   **A.** Yes.

(19)   **Q.** Thank you. So what about this: Do you

(20) remember who brought the petition to your attention?

(21)   **A.** Tracy Aguilera.

(22)   **Q.** So it was HR who actually let you know that,

(23) hey, there's this petition going around?

(24)   **A.** HR.

(25)   **Q.** Aside from Tracy, did anybody else talk to you

**Page 12**

(1) about the petition?

(2)   **A.** Nobody else talked to me. She was the first

(3) person who talked to me about the petition.

(4)   **Q.** Okay. And then when you say she's the first

(5) person, was she also the only person that talked to you

(6) about the petition?

(7)   **A.** No.

(8)   **Q.** Did anybody else talk to you about the

(9) petition before Mr. Navarro's termination?

(10)   **A.** Yes.

(11)   **Q.** Who else?

(12)   **A.** Our operation manager for fuel.

(13)   **Q.** Who was that?

(14)   **A.** I don't recall his last name. Renil.

(15)   **Q.** Renil?

(16)   **A.** Renil.

(17)   **Q.** R-e-n-i-l?

(18)   **A.** That is, yes.

(19)   **Q.** I believe he's not with the company anymore,

(20) correct?

(21)   **A.** He's not.

(22)   **Q.** Do you know where he is right now?

(23)   **A.** I do not know.

(24)   **Q.** All right. Aside from Renil, did anybody else

(25) talk to you about the petition?

DEPOSITION OF RAUL VARGAS - 08/25/2020

BSA    Case 3:19-cv-08157-VC RENALDO NAVARRO vs. MENZIES AVIATION, INC.    Page 54 of 92    XMAX(4/4)

**Page 13**

(1)   A. Nobody else.

(2)   Q. Okay. What did Renil tell you about the

(3) petition?

(4)   A. That there was a petition going around to

(5) terminate Andrew.

(6)   Q. To terminate Andrew. Anything else?

(7)   A. Nothing else that I can recall.

(8)   Q. Okay. Did you actually read the petition?

(9)   A. I read the petition, yes, I did.

(10)   Q. And you read the petition before the

(11) termination?

(12)   A. Yes, I did.

(13)   Q. And when you read it, that's what it said, to

(14) terminate Andrew?

(15)   A. I don't recall exactly what it says, but it

(16) was about Andrew's performance, and it was about

(17) removing Andrew from the position.

(18)   Q. And then, aside from saying that to you,

(19) anything else Renil told you about the petition?

(20)   A. Nothing else -- nothing else that I can

(21) recall.

(22)   Q. Okay. What about Tracy, what did she talk to

(23) you about the petition?

(24)   A. Well, Tracy told me about everything that she

(25) was getting information from. The first conversation I

**Page 14**

(1) had with her, it was about somebody from the union

(2) contacting her to let her know that somebody was

(3) requesting a petition to the employees.

(4)   Q. Anything else?

(5)   A. Yes. She mentioned that -- that employees

(6) were -- were not agreeing on signing it.

(7)   Q. Okay. Anything else?

(8)   A. Nothing else that I can recall.

(9)   Q. And then, with regards to the content of the

(10) petition, after you read it, did you make any decision

(11) related to the contents of the petition?

(12)   A. Yes, I talked to Tracy to -- to have the

(13) investigation.

(14)   Q. What type of investigation?

(15)   A. An investigation about the petition and about

(16) the -- how the petition was made.

(17)   Q. How the petition was --

(18)   A. Performed.

(19)   Q. Was performed?

(20)   A. Yes.

(21)   Q. So you mean, when you say "how the petition

(22) was performed," you mean how the petition was put

(23) together, correct?

(24)   A. Yes.

(25)   Q. Anything else that you asked Tracy to do in

**Page 15**

(1) relation to the petition?

(2)   A. Nothing else at that time.

(3)   Q. Okay. And so you said to do an investigation

(4) about the petition. What does that mean? What did you

(5) actually tell Tracy to do?

(6)   A. To perform an investigation about how --

(7) because we received some calls from the union, and also

(8) received some information about Andrew, that he

(9) received a message from Navarro. So at that time it

(10) was important for me to understand how that petition

(11) was created. How they did it.

(12)   Q. All right. And then you said also about how

(13) the petition was put together. So why was it important

(14) for you to know how or who put together the petition?

(15)   A. Because of the feedback that I received from

(16) Tracy, from HR.

(17)   Q. And what's that information that you received

(18) from HR?

(19)   A. As I said before, she told me that somebody

(20) from the union contact her telling her that there was a

(21) person asking for sign a petition, who was forcing the

(22) employees to do it.

(23)   Q. And did you ever find out who actually put

(24) together the petition?

(25)   A. Yes, we did.

**Page 16**

(1)   Q. And who was it?

(2)   A. Mr. Navarro.

(3)   Q. I'm sorry?

(4)   A. Mr. Navarro.

(5)   Q. And how did you reach -- how was that

(6) conclusion reached? Like how did you guys reach the

(7) conclusion that Mr. Navarro wrote the petition?

(8)   A. There was an investigation done, performed by

(9) the safety department.

(10)   Q. So the safety department person actually said

(11) Mr. Navarro wrote the petition, is that your

(12) understanding?

(13)   A. Yes. And also because of the messages that

(14) Andrew received from Mr. Navarro.

(15)   Q. Right. But that message said, "I'm holding on

(16) to the petition. I haven't submitted it." It doesn't

(17) say, "I wrote the petition that I'm going to give." Do

(18) you know what I'm saying? It says, "I'm holding on to

(19) the petition and I haven't submitted it."

(20)    So I don't know how that text message kind of

(21) leads to the conclusion that he wrote it. Can you

(22) explain it to me?

(23)   MR. WU: Objection. Assumes facts not in

(24) evidence.

(25)    You can answer if you understand the question.

**Page 17**

(1)    **MR. URIARTE: Q.** Mr. Vargas?

(2)    **A.** Well, I think that when you receive a message

(3)   from -- I don't know where -- somebody in relation to a

(4)   petition, that is a alert.

(5)    **Q.** Is what?

(6)    **A.** Is an alert.

(7)    **Q.** Okay. But I guess my question is how does

(8)   that text message lead you to conclude that Mr. Navarro

(9)   wrote the petition?

(10)    **A.** That was not the one that drove me to

(11)   understand that Mr. Navarro did the petition.

(12)    **Q.** What did make you understand that Mr. Navarro

(13)   wrote it?

(14)    **A.** Well, because the investigation from the

(15)   safety department.

(16)    **Q.** Okay. So the investigation from the safety

(17)   department actually has a report?

(18)    **A.** They have statements from employees.

(19)    **Q.** Statements from employees. Okay. Anything

(20)   else?

(21)    **A.** They had a statement from employees and their

(22)   final outcome out of the investigation.

(23)    **Q.** Are you talking about the final outcome as

(24)   they wrote it in the email?

(25)    **A.** Yes.

**Page 18**

(1)    **Q.** Okay. So aside from the final outcome that

(2)   they wrote in the email, is there another document that

(3)   they put together or that was it?

(4)    **A.** No.

(5)    **Q.** That was it?

(6)    **A.** That was it.

(7)    **Q.** Okay. And then the statement from the

(8)   employees, from that you conclude that Mr. Navarro

(9)   wrote it?

(10)    **A.** Yes.

(11)    **Q.** Okay. So if I read those statements,

(12)   somewhere in those statements it would say Mr. Navarro

(13)   wrote the petition?

(14)    **A.** I think that -- no, it doesn't say about Mr.

(15)   Navarro writing the petition. It's says about Mr.

(16)   Navarro forcing the employees to sign the petition

(17)   which is -- this isn't about writing the petition.

(18)   It's about creating harassment environment in the

(19)   workplace.

(20)    **Q.** Okay. I understand that. I understand that.

(21)   Your attorneys have kind of said that to me many times,

(22)   so I understand that. But I'm still kind of like

(23)   before that, right? I'm still trying to get to the

(24)   point of trying to understand how you got to the

(25)   conclusion in your head that, hey, Mr. Navarro wrote

**Page 19**

(1)   this petition.

(2)    **A.** Well, and if I can go back --

(3)    **Q.** Yes.

(4)    **A.** -- I never asked to investigate on who wrote

(5)   the petition.

(6)    **Q.** So for you that wasn't important?

(7)    **A.** No.

(8)    **Q.** So when you finally concluded that termination

(9)   was the proper discipline, that wasn't part of the --

(10)   for you, that's not the important part, right?

(11)    **A.** About who wrote the petition, no, no, not at

(12)   all.

(13)    **Q.** For you it was, hey, you've got this guy

(14)   forcing employees to sign the petition. That's what it

(15)   was, right?

(16)    **A.** Yes.

(17)    **Q.** I got it. Okay. So that leads to the

(18)   question of when -- so let's say August 29 is

(19)   eventually the time that he gets terminated. Do you

(20)   remember about when you concluded in your head, hey, I

(21)   need to terminate Mr. Navarro? Do you remember when?

(22)    **A.** The specific date, no, but it should be around

(23)   that time.

(24)    **Q.** Like within days of it or within a week or --

(25)    **A.** I cannot tell. I don't -- I don't recall it.

**Page 20**

(1)    **Q.** Okay. And then with regards to forcing

(2)   employees to sign the petition, I saw those letters

(3)   from different employees, them saying whatever they're

(4)   saying, and then I saw the one from Andrew as well. I

(5)   see that.

(6)    But did the investigation, or did you, ever

(7)   ask to talk to the fuelers?

(8)    **A.** No.

(9)    **Q.** Okay. Did you ever ask to talk to the union

(10)   representative?

(11)    **A.** Well, the union representative, he brought a

(12)   letter for me -- for me, too.

(13)    **Q.** Right. You mean like an additional petition,

(14)   is that what you're saying?

(15)    **A.** It was a different letter.

(16)    **Q.** What letter was that?

(17)    **A.** It was pretty much the same as the petition.

(18)    **Q.** Right. But I think that -- I don't want to

(19)   confuse you. We should probably maybe clear this up.

(20)   That second petition by Rafael Vasquez or Rafael

(21)   Martinez, right, is that what you're talking about?

(22)    **A.** Yes.

(23)    **MR. WU:** Objection. Lack of foundation.

(24)    **MR. URIARTE: Q.** That second petition, that was

(25)   like already in October, wasn't it?

**Page 21**

(1)    **A.** I don't recall the date.

(2)    **Q.** Okay. So, but before concluding that Navarro

(3) actually forced employees to sign the petition, I kind

(4) of want to make sure that I get all of the steps that

(5) you took to be satisfied that your conclusion was

(6) correct. All right?

(7)    **A.** Yes.

(8)    **Q.** So I saw the investigation statement. I saw

(9) the letters from the employees. That's understandable.

(10) But other than that -- and then you talked to Tracy as

(11) well, right? You had email communication with Tracy.

(12) Other than those steps, did you do any other steps?

(13)    **A.** No. Well, actually I was waiting for the

(14) final outcome from the investigation. And it was not

(15) just the feedback that I received from the safety

(16) department. Also the conversations I had with Tracy in

(17) relation to this case.

(18)    **Q.** Okay. But did you ever ask the safety

(19) department, hey, did you guys talk to the fuelers?

(20)    **A.** Yes, I did.

(21)    **Q.** And what did they say?

(22)    **A.** They told me that they -- he was -- so the

(23) safety department told me that Mr. Navarro was forcing

(24) employees to sign the petition, and he was creating --

(25) he was harassing people to have this petition signed.

**Page 22**

(1)    **Q.** Okay. So forcing employees to sign the

(2) petition. What's wrong with that?

(3)    **A.** Well, I think that when you have -- you take

(4) advantage of your rank, that is harassment because of

(5) how the other people feel.

(6)    **Q.** Anything else that's wrong with that?

(7)    **A.** Yes. So when they use this rank, people feel

(8) scared of having this confrontation with the

(9) supervisor, so they prefer to sign the petition without

(10) understanding what the petition was for.

(11)    **Q.** So are you saying that the safety department

(12) talked to everybody that signed that petition and

(13) verified whether they actually signed it or not?

(14)    **A.** I cannot guarantee that they talked to hundred

(15) percent of the employees.

(16)    **Q.** Okay. But do you know how many people they

(17) talked to?

(18)    **A.** I don't know exactly how many people they

(19) talked to.

(20)    **Q.** And then you used the word "harassment." How

(21) are you using that word "harassment"? What do you mean

(22) by that?

(23)    **A.** Well, for me, harassment is pretty much --

(24) it's to force or intimidate people. So, in this case,

(25) when he's taking his rank as a supervisor, telling

**Page 23**

(1) people to sign a petition that they don't know what

(2) it's for, that for me is intimidation. And that's how

(3) they -- the employees felt.

(4)    **Q.** How many employees are we talking about --

(5)    **A.** Well --

(6)    **Q.** -- that felt like that?

(7)    **A.** I'm sorry?

(8)    **Q.** How many employees felt like that?

(9)    **A.** I cannot tell you exactly the number of, but I

(10) can tell you in terms of the -- the statements we

(11) received. There were around three employees.

(12)    **Q.** And then there were over 20 people who signed

(13) the petition, right?

(14)    **A.** Yeah.

(15)    **Q.** So out of the more than 20 people who signed

(16) the petition, three people felt like, oh, maybe I

(17) didn't read it and then I signed it and maybe I --

(18)    **MR. WU:** Objection. Objection. Lack of

(19) foundation. Calls for speculation. Misstates prior

(20) testimony.

(21)    **MR. URIARTE: Q.** So, Mr. Vargas, when your

(22) attorney objects, we allow him to finish his objection

(23) so that it's written into the record. Please allow him

(24) to finish, and then you can answer afterwards unless

(25) your attorney tells you not to answer. Okay?

**Page 24**

(1)    **A.** So, for me, if we have people that feel that

(2) way, it's really important to ensure that we have the

(3) right environment for our employees. Harassment is a

(4) really important matter in our environment in a

(5) business.

(6)    **Q.** I got that. I got that. So you've got three

(7) people complaining about the way that the harassment --

(8)    **A.** We have -- remember -- sorry, can I --

(9)    **Q.** Please, please.

(10)    **A.** So, remember, we had those three guys, but

(11) also we had some feedback from the union saying that

(12) this person was harassing people to sign the petition.

(13)    **Q.** Okay. But what about the subject matter of

(14) the petition itself? Weren't they doing the same thing

(15) as well? You said it's very important for you that

(16) people work in a proper environment, right?

(17)    **A.** Yes.

(18)    **Q.** But the nature of the petition itself kind of

(19) complains about the environment, right?

(20)    **A.** Yes.

(21)    **Q.** Okay. So isn't that also a valid concern?

(22)    **A.** It is. Definitely it is.

(23)    **Q.** Okay. And what was done about that?

(24)    **A.** Well, I think that it's important from the

(25) extent of the document, where the document is coming

**Page 25**

(1) from, if the document is signed by people who felt
(2) harassment. So what's the validation of that document?
(3)     **Q.** But we also have other people who didn't feel
(4) that way, right?
(5)     **A.** We don't know.
(6)     **MR. WU:** Objection. Lack of foundation.
(7) Misstates prior testimony.
(8)     **MR. URIARTE: Q.** So I guess my question is this:
(9) So the document itself, the petition itself, talks
(10) about things that they're not happy about, correct?
(11) Would you agree with that?
(12)     **A.** I disagree with it.
(13)     **Q.** Okay.
(14)     **A.** I don't agree with it because you're saying
(15) "they," and at this point, when I see there's employees
(16) forced to sign it, it means that there is somebody, one
(17) person, that is pretty much complaining for that, not
(18) the whole thing.
(19)     **Q.** I see what you're saying. You're saying
(20) because you believe that there's one person forcing
(21) people to sign, that you don't believe the petition
(22) anymore.
(23)     **A.** I don't -- I don't -- I don't have the same
(24) validity of the petition anymore.
(25)     **Q.** Validity?

**Page 26**

(1)     **A.** Validity, I'm sorry.
(2)     **Q.** No problem. I talk the same way, so I totally
(3) understand you.
(4)     Okay. I get that. I guess, from your mind, I
(5) could see how you could think that way. But that might
(6) not make sense when you take into consideration a
(7) second petition after the termination of Mr. Navarro.
(8) What about that?
(9)     **A.** The second petition, it was not brought after.
(10)     **Q.** It was. It was. It was brought after.
(11)     **MR. WU:** Objection. Assumes facts. Lack of
(12) foundation.
(13)     **MR. URIARTE:** I'll show it to you so we can put
(14) that to rest. I'll show that to you, don't worry.
(15)     So here's -- can we have Exhibit 8 up, please,
(16) David. Thank you.
(17)     (Plaintiff's Exhibit 8 marked for
(18)     identification.)
(19)     **MR. URIARTE: Q.** So, Mr. Vargas, do you see this
(20) one --
(21)     **A.** Yes.
(22)     **Q.** -- which we've been calling the first
(23) petition?
(24)     Is this the one -- do we agree this is the one
(25) that you saw initially when you say that you talked to

**Page 27**

(1) Tracy and Renil? Does that make sense?
(2)     **A.** I cannot confirm a hundred percent that this
(3) was the one.
(4)     **Q.** Okay. So if we go down a little bit, yeah,
(5) you'll see Mr. Navarro's signature on this one.
(6)     **A.** Yes.
(7)     **Q.** And this document actually comes from your
(8) company, if you see the Menzies number there, Menzies
(9) 153. And so line 24 there on the second page -- I'm
(10) sorry, line 16 of the second page has Mr. Navarro's
(11) signature. Do you see that?
(12)     **A.** Yes.
(13)     **Q.** All right. So, again, going back to your
(14) conclusion earlier, you're saying, if you think that
(15) Mr. Navarro was forcing all of these people to sign the
(16) petition, you believe the petition is now without
(17) validity, is that correct?
(18)     **A.** Well, I don't think that it has the same
(19) validity, definitely. Now, what is most important to
(20) bring out is that I had a conversation with HR about
(21) Andrew, because they were -- in the letter I believe
(22) they complained also about him falling asleep on the
(23) operation.
(24)     So I had this conversation with HR. And they
(25) explained to me and they addressed that issue before I

**Page 28**

(1) started working at Menzies. Because, again, I started
(2) June 2018. And this was happening -- this happened in
(3) August.
(4)     **Q.** Yes. Right. So you started in June of 2018,
(5) and this was happening in August. So you didn't have
(6) that much kind of context with regard to what was
(7) happening from the last year, is that correct?
(8)     **A.** (Indicates affirmatively.)
(9)     **Q.** Mr. Vargas?
(10)     **A.** Yes.
(11)     **MR. WU:** Arlo, I'm sorry to interrupt. Can we
(12) take a quick break in the next five minutes? Whatever
(13) is a good stopping point for now.
(14)     **MR. URIARTE:** That's fine. We can take a break
(15) now. No problem.
(16)     **MR. WU:** Thanks a lot, Arlo. Let's go off the
(17) record.
(18)     **MR. URIARTE:** No problem.
(19)     (Brief recess.)
(20)     **MR. URIARTE: Q.** So we were talking about Exhibit
(21) 8, Mr. Vargas. My question is with regards to the
(22) actual things that the fuelers were complaining about.
(23) And I just want to clarify something.
(24)     Was there ever an investigation by Menzies
(25) with regard to the context or the content of their

**Page 29**

(1) petition, the subject matter of their petition?

(2)     A. Well, there was an investigation before in

(3) terms of what they were complaining about, that this

(4) was happening at the company. And that was the

(5) conversation that I had with Tracy, with HR, in

(6) relation to this petition, what they were saying.

(7)     Q. And what was the result of that investigation?

(8)     A. Well, that Andrew pretty much falls asleep

(9) because he has sleep onea [sic].

(10)     Q. You're talking about sleep apnea?

(11)     A. Yes.

(12)     Q. Anything else?

(13)     A. And -- no, nothing else.

(14)     Q. What about the complaint that rest breaks or

(15) breaks were being -- were being missed or not taken?

(16)     A. I don't recall about that.

(17)     Q. What about like delays that were being caused

(18) by Andrew, was that ever investigated?

(19)     A. No, no, not brought to my attention.

(20)     Q. So when you read this petition, I guess the

(21) focus became Mr. Navarro asking people to sign the

(22) petition. That was your focus, right?

(23)     A. Yeah. The environment that he create by doing

(24) that.

(25)     Q. Okay. And you didn't really put focus on the

**Page 30**

(1) environment that Mr. Dodge was creating as alleged by

(2) this petition?

(3)     A. Well, I did when I asked HR about that

(4) petition, about those things that happened before I got

(5) there, and that was what I received from HR.

(6)     Q. So what I heard you say, they already --

(7)     A. That they already took action on it.

(8)     Q. And that's with regard to the sleep apnea?

(9)     A. That is regard of everything.

(10)     Q. Okay. So you're saying you did ask Tracy

(11) about what the fuelers were talking about in the

(12) petition, correct?

(13)     A. (Indicates affirmatively.)

(14)     Q. Okay. And that involved what was happening to

(15) Andrew Dodge before, and something about sleep apnea

(16) and sleeping and him falling asleep, correct?

(17)     A. Yes.

(18)     Q. Anything else, aside from that, that came as a

(19) result of your inquiry with regards to the petition?

(20)     A. Also that, for me, nothing else for me to take

(21) action for.

(22)     MR. WU: And, Raul, if you could just give a brief

(23) pause between the end of Arlo's question and the

(24) beginning of your answer. I think sometimes, when

(25) there's a bit of overlap, is when we're getting that

**Page 31**

(1) feedback and it's becoming a little unclear.

(2)     THE WITNESS: Okay.

(3)     MR. URIARTE: Q. Did you ever have a discussion

(4) with Mr. Navarro, before this whole petition started,

(5) did you ever have a discussion with Mr. Navarro about

(6) Andrew Dodge?

(7)     A. Not that I recall.

(8)     Q. So you don't remember him going up to you and

(9) trying to talk to you about concerns about Andrew

(10) Dodge?

(11)     A. No, I don't recall that.

(12)     Q. Aside from the petition and maybe Mr. Navarro,

(13) did you ever get complaints against -- or about Andrew

(14) Dodge in those -- June, July, August, the time you were

(15) there?

(16)     A. No, I did not.

(17)     Q. And so you were not involved in the promotion

(18) of Mr. Dodge, correct?

(19)     A. No, I was not.

(20)     Q. And before being at Menzies at the San

(21) Francisco Airport, where were you working?

(22)     A. I was working for TAS.

(23)     Q. What does that mean?

(24)     A. TAS, Total Airport Services. I worked there

(25) as a general manager in San Francisco.

**Page 32**

(1)     Q. And how long were you working for TAS?

(2)     A. Four months.

(3)     Q. So before TAS, who did you work for?

(4)     A. I worked before that as operation manager for

(5) a company called Emser Tile for a year.

(6)     Q. Can you spell that?

(7)     A. Emser is E-m, as in Mike, s, as in Sierra,

(8) e-r, as in royal, Tile, T-i-l-e.

(9)     Q. So that's a nonairport job?

(10)     A. It was a nonairport job. And before that I

(11) worked for 16 years for the LATAM Airlines. LATAM,

(12) it's L, as in Lima, A-T, tango, A-M, as in Mike,

(13) Airlines.

(14)     Q. Where is that, LATAM Airlines?

(15)     A. It's South America.

(16)     Q. What country in South America?

(17)     A. It's the biggest network airline in South

(18) America.

(19)     Q. I thought Avianca was the biggest.

(20)     A. No, no.

(21)     Q. They're not?

(22)     A. They're the oldest.

(23)     Q. So in your job as the director of operations

(24) in San Francisco, can you just give me a list of your

(25) responsibilities there, especially when it comes to,

**Page 33**

(1) like, June to August of 2018. What were your duties
(2) and responsibilities?
(3)     **A.** Pretty much whatever -- as US director of
(4) operation, I'm looking for different -- different
(5) elements. So I have four different elements. The
(6) first one is financial. I look for all the financials
(7) of the station, all the four business lines that we
(8) have there at that moment, which it was the fueling
(9) business, the ramp business, the cargo business and the
(10) GSC business. GSC is ground service equipment. So we
(11) provide service to all the equipment that pretty much
(12) you see on the runway.
(13)     So I look also in terms of customer service,
(14) all the retention or attraction of new customers,
(15) interactions. I also look into the safety, ensuring
(16) that we run a smooth operation in a safe basis, putting
(17) all the safety processes in place to reduce every kind
(18) of risk out there on the ramp or in the different
(19) departments.
(20)     And I also look into the people. What I mean
(21) by the people, well, I make sure that environments, the
(22) retention, the attraction of new employees, and how can
(23) we retain employees in the long-term.
(24)     **Q.** Okay. Thank you for that. Being that you
(25) were new to the San Francisco Airport operation, before

**Page 34**

(1) pulling the trigger and actually recommending the
(2) termination of Mr. Navarro, did you talk to anyone with
(3) regards to that decision?
(4)     **A.** Yes. I talked to HR.
(5)     **Q.** Who else?
(6)     **A.** I talked to HR and nobody else about that
(7) decision.
(8)     **Q.** So you didn't talk to Renil and say, "Renil, I
(9) know you've been here a while. What do you think about
(10) this?"
(11)     **A.** I don't recall it, talking to Renil.
(12)     **Q.** How much did you know about Mr. Navarro at the
(13) time that you terminated him?
(14)     **A.** I didn't know that much about Mr. Navarro.
(15)     **Q.** Okay. Did you know that he had been working
(16) for Menzies a long time at that point?
(17)     **A.** Yes, I did.
(18)     **Q.** And then what were you trying to accomplish by
(19) choosing to terminate Mr. Navarro?
(20)     **A.** Well, I think that, as I said before, my job
(21) there is to ensure that we can retain employees. And
(22) the only way to retain employees is to ensure an
(23) environment where they work is a good environment. So
(24) when you have one person, just one person, complaining
(25) about supervisor harassment, then you need to take

**Page 35**

(1) actions.
(2)     **Q.** So your belief is that it was all Mr. Navarro
(3) complaining, it was just him?
(4)     **A.** I think that, based on the statements we
(5) received, they were focused on that -- on him.
(6)     **Q.** Okay. But what about all those other people
(7) that signed the petition?
(8)     **A.** Well, as I said before, we need to ensure that
(9) environment is good. So, for me, just one person
(10) complaining about harassment, it's an issue.
(11)     **Q.** Okay.
(12)     **A.** More than one, then you have a petition signed
(13) by people. So we have a person, and more than one
(14) person being harassed to sign a petition, that is a
(15) huge issue for me.
(16)     **MR. URIARTE:** Okay. All right. Can we take a
(17) look at Exhibit 8 again, please.
(18)     David, are you there?
(19)     **ZOOM HOST:** Yes, coming up shortly.
(20)     **MR. URIARTE:** Thank you.
(21)     **ZOOM HOST:** Give me one second. It's not coming
(22) up.
(23)     **MR. URIARTE:** No problem. Thank you, David.
(24)     **Q.** Let's go to the top part of Exhibit 8, please.
(25) So it says, "To: Menzies Management. Sir/madam."

**Page 36**

(1)     Do you read that, Mr. Vargas?
(2)     **A.** Yes, I do.
(3)     **Q.** All right. Could you read where it starts
(4) "We" for us, please.
(5)     **A.** "We the fuelers on Menzies 130 side would like
(6) to make a petition against Andrew Dodge." Let me --
(7)     **Q.** You'll have to move --
(8)     **A.** There it is. Thank you. I'll start again.
(9)     It says, "We the fuelers on Menzies 130 side
(10) would like to make a petition against Andrew Dodge.
(11) The way he supervised is very unprofessional when he
(12) run the operation or supervised, people are not taken
(13) their breaks because the way he set up the
(14) flights, and he always blaming the people there's a
(15) delay or always saying lack of manpower and trucks
(16) issues. The truth is he doesn't know how to run the
(17) show, we also addressed the problem to the higher
(18) position managers (Nicco, John and Renil) as usual
(19) nothing happened, looks like they always covering his
(20) mistake or maybe these managers don't know anything
(21) about fueling also like Andrew Dodge lack of experience
(22) about fueling."
(23)     **Q.** Okay.
(24)     **A.** "We think" --
(25)     **Q.** Go ahead.

**Page 37**

(1)    A. "We think this is the right time to broadcast
(2) the problem in this company. We are hoping this
(3) problem will be addressed."
(4)    Q. Okay. Was this problem ever addressed,
(5) Mr. Vargas?
(6)    A. It was addressed at the moment, but I was not
(7) there.
(8)    Q. I'm sorry?
(9)    A. It was addressed at the moment because this is
(10) old case, but I was not there when that happened.
(11)    Q. Okay. When did you go to Los Angeles?
(12)    A. September.
(13)    Q. Of?
(14)    A. September -- September 1st, 2019.
(15)    Q. So that was a year later, right?
(16)    A. Yes.
(17)    Q. So within -- from August to -- August 2018 to
(18) September 2019, was there anything done about what was
(19) written here?
(20)    A. No, as I said before, the conversation with
(21) HR, because I was not aware of all this that was
(22) happening with Andrew, I had a conversation with HR
(23) where they -- where HR told me about what happened and
(24) what the final outcome of that investigation was.
(25)    Q. With regards to the investigation on the sleep

**Page 38**

(1) apnea, is that correct?
(2)    A. In regards to the issues that they were
(3) having -- that they are complaining about Andrew.
(4)    Q. Okay. So it says, "the way he supervised is
(5) very unprofessional when he run the operation or
(6) supervised." Anything that was done about that?
(7)    A. At the moment that I get there, I hadn't had
(8) any problem with Andrew. And I didn't get any
(9) complaint from any fueler in relation to Andrew.
(10)    Q. Did you talk to any of the fuelers about the
(11) way he supervises is very unprofessional and run the
(12) operation or supervise?
(13)    A. I'm sorry, no, I did not talk to any fuelers
(14) about the way he supervise.
(15)    Q. Do you know if Tracy or HR did that?
(16)    A. In the conversations we had, it wasn't
(17) specific about his performance in terms of OTP, which
(18) is operational -- on time performance, I'm sorry.
(19)    Q. And then it says -- okay. I'm sorry, I think
(20) we missed the last part. Did you say something there?
(21)    A. No.
(22)    Q. Okay. "People are not taking their breaks
(23) it's because the way he set up the flights." That one,
(24) did you ask about that? Was that something that was
(25) taken care of?

**Page 39**

(1)    A. Well, I didn't receive no complaints about
(2) people not taking the breaks. And I want to -- can
(3) I -- the policy that I have, when I manage people, is
(4) really open. And what I do is I always invite people,
(5) when they have issues, to talk about the problems they
(6) have. The moment that I raised all those points with
(7) people, I never would receive no complaints from no
(8) fueler in relation to Andrew's performance.
(9)    Q. Okay. But if you see the second page there of
(10) this petition, they did. They did come forward, right?
(11) Because you have 25, 26 people signing.
(12)    If you have an open-door policy about letting
(13) you know about the complaint, wasn't this what these
(14) people are doing? I don't see how --
(15)    MR. WU: Objection. Lack of foundation.
(16) Misstates prior testimony.
(17)    You can answer if you understand the question.
(18)    THE WITNESS: I think that that question I already
(19) answered.
(20)    MR. URIARTE: Q. Which is you don't believe that
(21) these people were really complaining?
(22)    A. We have people feel harassed to sign this
(23) petition.
(24)    Q. So you feel every one of these people were
(25) harassed to sign this petition, is that correct?

**Page 40**

(1)    A. No what I believe. It's what I know. What I
(2) know is there's people that felt harassed to sign this
(3) petition.
(4)    Q. All right. But you didn't actually talk to
(5) the people, you just --
(6)    A. No, I did not. I'm sorry. I did not. I
(7) received all the documentation and find out outcome of
(8) the investigation.
(9)    Q. All right. Can we go back to the first page,
(10) please. It talks about "looks like they are always
(11) covering his mistake." Do you see that?
(12)    A. Yes, I see that.
(13)    Q. Okay. So what do you understand from that
(14) phrase?
(15)    A. From that phrase, that the duty managers are
(16) covering their mistakes.
(17)    Q. That Nicco, John and Renil is covering the
(18) mistakes of Andrew Dodge. Is that how you understand
(19) that?
(20)    A. Yes. Sorry.
(21)    Q. Did you inquire as to that? Did you do
(22) anything with regards to that statement?
(23)    A. Again, I didn't do anything about this
(24) statement other than talk to HR to understand where
(25) this was coming from. We already talked about the

**Page 41**

(1) outcome of that conversation with HR.

(2) **Q.** Okay. Mr. Vargas, let me put it directly
(3) here. If it's true, just theoretically, if it's true
(4) that Nicco, John and Renil are covering up for the
(5) mistakes of Andrew Dodge, would that be something that
(6) maybe Nicco, John and Renil should be terminated for?

(7) **A.** I think that it would be important to make an
(8) investigation before we take into consideration.

(9) **Q.** But that's a serious allegation, right?

(10) **A.** I'm sorry?

(11) **Q.** That's a serious allegation.

(12) **MR. WU:** Objection. Improper hypothetical.
(13) You can answer the question.

(14) **MR. URIARTE: Q.** That's a serious allegation.

(15) **A.** And as I said before, for me, anything that
(16) affect the environment of our employees is valid.

(17) **Q.** Yeah, it's valid, definitely. But my question
(18) was that would be serious, wouldn't you agree, as a
(19) manager, if somebody --

(20) **A.** Again, it all depends on the investigation.
(21) So I cannot tell you, because the letter says that,
(22) but --

(23) **Q.** Sure.

(24) **A.** -- we did an investigation as we did with
(25) Navarro.

**Page 42**

(1) **Q.** I agree. But that's not what I'm asking. I'm
(2) asking a more simple question, which is, if that
(3) allegation by itself, right, alleging that Nicco, John
(4) and Renil are covering up for the mistake of Andrew
(5) Dodge, just that allegation itself, standing on its
(6) own, would you characterize that as a serious
(7) allegation?

(8) **MR. WU:** Objection. Improper hypothetical.

(9) **MR. URIARTE:** You can answer.

(10) **THE WITNESS:** I already did.

(11) **MR. URIARTE: Q.** And what was your answer?

(12) **A.** That I will have to perform an investigation
(13) to understand exactly.

(14) **Q.** That would be the result, right? That would
(15) be the result, the conclusion. I'm not talking about
(16) the result or the conclusion. I'm just talking about
(17) how you would characterize an allegation such as that.

(18) **A.** Well, and as I said, if I see something like
(19) that, I will perform an investigation. So if I perform
(20) an investigation, it means that it is important.

(21) **Q.** Okay. And did you perform the investigation?

(22) **A.** No, I did not. As I said, I talked to HR
(23) about this case, specific case. Based on the fact that
(24) there were people harassed to sign this petition, I did
(25) not perform that investigation.

**Page 43**

(1) **MR. URIARTE:** Okay. Let's look at Exhibit 19,
(2) please.

(3) **ZOOM HOST:** One second, coming up.

(4) **MR. URIARTE: Q.** Actually, Mr. Vargas, did you
(5) have a conversation with Renil about how many times Mr.
(6) Navarro or other people had gone up to Renil with
(7) regards to Andrew Dodge?

(8) **A.** No, I did not. I don't recall it.

(9) **MR. URIARTE:** Okay. So can we have Exhibit 19,
(10) please.

(11) (Plaintiff's Exhibit 19 marked for
(12) identification.)

(13) **MR. URIARTE:** Thank you.

(14) **Q.** So Exhibit 19 starts with a statement by
(15) Mr. Vasquez. You know Mr. Vasquez, right? I think you
(16) called him Rafael Martinez or something like that. It
(17) might be Vasquez Martinez, actually. But he was the
(18) shop steward for Menzies, is that correct?

(19) **A.** Yes.

(20) **Q.** Okay. And here, if you go to page 2, please.
(21) Just to kind of make sure, this refers to you -- here's
(22) the petition Mr. Vasquez kind of wrote up. Does this
(23) look familiar to you?

(24) **MR. WU:** Objection. Assumes facts not in
(25) evidence.

**Page 44**

(1) **MR. URIARTE: Q.** Mr. Vargas?

(2) **A.** I don't recall it.

(3) **Q.** Okay. If you go to the bottom of the page,
(4) and, again, this is a document that we received from
(5) your company lawyers. Do you see the handwriting that
(6) "Raul Vargas received" -- I can't read anything more
(7) than that. Do you see that, "Raul Vargas"?

(8) **A.** Well, "Raul Vargas," yes, I see that.

(9) **Q.** Did you write that or somebody else wrote
(10) that?

(11) **A.** That's not my writing.

(12) **Q.** So let's go back to page 1. It says here, "On
(13) September 6th, 2018 I was asked by Menzies on the 130
(14) side to write up a Petition on behalf of the Fuelers on
(15) the 130 side versus Andrew Dodge. The petition was
(16) written out and signed by the Fuelers on 130 side of
(17) the SFO Team." Do you see that?

(18) **A.** Yes.

(19) **Q.** And just to assist you with regards to
(20) context, September 6th, 2018, Mr. Navarro was not
(21) working for Menzies anymore, correct?

(22) **A.** I believe so. I don't recall the date, but --

(23) **Q.** I think your attorney and I would agree that
(24) the termination documents say August 29, 2018. Okay?

(25) **MR. WU:** And I would just say that the witness can

**Page 45**

(1) only testify to what he knows. So I'm not going to
(2) agree or disagree with that statement.
(3) **MR. URIARTE:** Okay. I'll represent to you,
(4) Mr. Vargas, that by September 6th, 2018, Mr. Navarro
(5) was not your employee anymore.
(6) **Q.** So then he goes on to talk about you. "The
(7) petition was then officially turned in to the SEIU. In
(8) addition, the Petition was also turned over to Raul
(9) Vargas." Do you remember that?
(10) **A.** I don't recall it. I don't recall having that
(11) petition, to tell you the truth.
(12) **Q.** So you don't remember Mr. Vasquez getting
(13) close to you and giving you some pieces of paper?
(14) **A.** I do not.
(15) **Q.** "There have been two separate Petitions turned
(16) in to Menzies Aviation Fueling Department Director Raul
(17) Vargas." Do you remember that?
(18) **A.** Well, I believe the first one was the one that
(19) they signed.
(20) **Q.** Okay. And then the second one, do you
(21) remember receiving a second one?
(22) **A.** I don't recall it.
(23) **Q.** Okay. All right. "I have spoken to Menzies
(24) Aviation Fueling Director Raul Vargas on three separate
(25) occasions regarding Mr. Andrew Dodge." Do you remember

**Page 46**

(1) that?
(2) **A.** No, I do not.
(3) **Q.** When I say "Rafael Vasquez," does a face go
(4) into your mind?
(5) **A.** Yes, I do remember Rafael who was the steward
(6) that was on leave of absence during the time that I was
(7) over there.
(8) **Q.** He was on leave of absence during the time?
(9) **A.** Yeah. I don't recall if he was during the
(10) time that this petition was made or not, but I recall
(11) him being on leave of absence for most of the time.
(12) **Q.** But do you remember talking to him?
(13) **A.** Yes, I do remember talking to him about
(14) operational things.
(15) **Q.** Do you remember talking to him about Andrew
(16) Dodge?
(17) **A.** I don't recall it.
(18) **Q.** Do you remember talking to him three times
(19) about the same topic?
(20) **A.** About what?
(21) **Q.** I'm sorry?
(22) **A.** About what? Three times about what?
(23) **Q.** Three times about any topic but it's the same
(24) topic?
(25) **A.** I do -- I do remember that.

**Page 47**

(1) **Q.** So you remember him going to you on several
(2) occasions talking to you about the same topic?
(3) **A.** About topics, about operational things.
(4) **Q.** Okay. And what kinds of operational things
(5) would he talk to you about?
(6) **A.** Talk about issues on -- on the operation.
(7) **Q.** Like give me an example.
(8) **A.** Talk about attendance issues. Talking about
(9) safety issues. We used to have -- we used to have
(10) meetings with the union every two weeks, if I remember
(11) correctly, to talk about operational issues.
(12) **Q.** Okay. And that when you say these meetings
(13) with the union every two weeks, that was Mr. Vasquez?
(14) **A.** Some of the meetings Mr. Vasquez was in there.
(15) **Q.** Was he the one leading the discussion for the
(16) union?
(17) **A.** No.
(18) **Q.** Did you say "yes" or "no"?
(19) **A.** I said no.
(20) **Q.** Okay. So for the union somebody else talked,
(21) right, not Mr. Vasquez?
(22) **A.** Well, he was talking, too, but the lead of the
(23) union was another person that I don't recall right now.
(24) **Q.** In those meetings, do you remember them
(25) talking about Andrew Dodge at all?

**Page 48**

(1) **A.** No, no, I don't.
(2) **Q.** Okay. And here he says "on three separate
(3) occasions regarding Mr. Andrew Dodge, who continues to
(4) abuse his authority and at times harass Fuelers under
(5) his charge." Did you ever talk to Mr. Vasquez about
(6) that?
(7) **A.** I don't recall it.
(8) **Q.** Okay. So it could have happened or might not
(9) have happened, what's your memory like?
(10) **A.** I can't recall it.
(11) **Q.** Okay. All right. So if we just scroll down
(12) more pages, please, second page. Second page of
(13) Exhibit 19. So the second page of Exhibit 19 looks
(14) like the petition that Mr. Vasquez gave to you
(15) according to him. Okay?
(16) **MR. WU:** Assumes facts.
(17) **MR. URIARTE: Q.** I'll kind of give you a moment
(18) here to read it. Let me know when you finish reading
(19) it.
(20) **A.** Looks like kind of the same as the letter they
(21) brought me when they signed the petition. It's the
(22) same as the petition.
(23) **Q.** You mean the first one?
(24) **A.** I mean -- I don't know if this -- this letter.
(25) Yeah.

DEPOSITION OF RAUL VARGAS - 08/25/2020

BSA    Case 3:19-cv-08157-VC   RENALDO NAVARRO vs. MENZIES AVIATION, INC.    Page 63 of 92    XMAX(13/13)

**Page 49**

(1)    **Q.** Okay. And then are you done reading it,
(2) Mr. Vargas? I mean -- go ahead.
(3)    **A.** Do you want me to read the entire --
(4)    **Q.** Yes, please.
(5)    **A.** Give me a couple of minutes.
(6)    **Q.** Yeah, yeah, please, take your time. I just
(7) want to make sure that your -- maybe it will refresh
(8) your recollection.
(9)    **A.** Okay. (Witness reviews document.)
(10)      Good.
(11)    **Q.** Very good. Thank you. Does that refresh your
(12) recollection at all with regards to Mr. Vasquez giving
(13) you this piece of paper?
(14)    **A.** I don't -- I don't recall it. I mean, it
(15) looks like the same letter that the -- the fuelers
(16) signed.
(17)    **Q.** Well, if you go down a little bit, if we go to
(18) the next page, you'll see these signatures. This is
(19) the actual petition here. But, again, this is a
(20) different set of signatures. And it has Mr. Vasquez at
(21) the end there. But this is definitely a different set
(22) of signatures from Exhibit 8 which we saw earlier,
(23) which was what we're calling the first petition.
(24)    **A.** Can you move a little bit up?
(25)    **Q.** Sure.

**Page 50**

(1)    **A.** A little bit more.
(2)    **Q.** David? Yeah.
(3)    **A.** Thank you. Okay.
(4)    **Q.** Okay?
(5)    **A.** What is the first name there? Sorry.
(6)    **Q.** Yeah, I wasn't given a better copy. I don't
(7) know. Okay. So do you remember seeing these
(8) signatures at all?
(9)    **A.** I don't recall it.
(10)    **Q.** Not at all, okay. So is it safe then to say
(11) that you're not sure whether you received this second
(12) petition or not from Mr. Vasquez?
(13)    **A.** Yes.
(14)    **Q.** So you could have received it and you may not
(15) have received it. Is that like your best memory?
(16)    **A.** My best memory is that not receiving this
(17) paper.
(18)    **Q.** I'm sorry, your best memory is that you did
(19) not receive this paper?
(20)    **A.** That I don't remember receiving this paper.
(21)    **Q.** All right. So let's agree for a second that
(22) you received this paper in September. Correct? Would
(23) you have done something about it if you had received
(24) this paper in September?
(25)    **MR. WU:** Objection. Improper hypothetical. Lacks

**Page 51**

(1) foundation.
(2)      You can answer.
(3)    **THE WITNESS:** If I get that, I will -- I will want
(4) to look at it and perform an investigation.
(5)    **MR. URIARTE: Q.** But as far as you know, no
(6) investigation happened as a result of Exhibit 19,
(7) correct?
(8)    **MR. WU:** Objection. Lacks foundation.
(9)    **THE WITNESS:** Can I respond?
(10)    **MR. WU:** Yes, you can answer. You can answer
(11) unless I instruct you specifically not to.
(12)    **THE WITNESS:** All right. Can you repeat the
(13) question.
(14)    **MR. URIARTE: Q.** Sure. As far as you know, based
(15) on this petition, this second petition that we called
(16) it, as far as you know, no investigation happened
(17) because of it?
(18)    **A.** As far as I know, no investigation happened
(19) because of it.
(20)    **Q.** Is that correct?
(21)    **A.** That is correct, as far as I know.
(22)    **Q.** Very good. Were you involved in the decision
(23) to suspend Mr. Navarro while the investigation was
(24) going on?
(25)    **A.** I don't recall it.

**Page 52**

(1)    **Q.** And then did HR give you recommendation with
(2) regards to other options available aside from
(3) termination?
(4)    **A.** Well, the recommendation -- the recommendation
(5) from HR was not to terminate him.
(6)    **Q.** And you didn't follow that?
(7)    **A.** No, actually, I asked why those
(8) recommendations, which I think it's normal procedure.
(9)    **Q.** So you're saying you asked the recommendation
(10) from HR, and then what did HR say?
(11)    **A.** That based on the -- on the recommendation and
(12) the conversation they had with the director, they're
(13) recommending not to terminate, but it was just -- I'm
(14) sorry, that it was just a recommendation, I'm sorry.
(15)    **Q.** Okay. So HR's recommendation is not to
(16) terminate, right?
(17)    **A.** Yes.
(18)    **Q.** But you did not follow that, right?
(19)    **A.** No, because I -- I needed to see the final
(20) outcome of the investigation to take the right
(21) decision.
(22)    **Q.** And what did you see in the final outcome that
(23) made you conclude that termination was the right
(24) action?
(25)    **A.** I get the final outcome from safety department

**Page 53**

(1) with the statements, plus the messages from Navarro to
(2) Andrew, plus, well, the letter with the petition, the
(3) call from the union in that there is somebody
(4) instigating the people to sign this petition.
(5)    Q.  Okay.  Weren't there other options available?
(6)    MR. WU:  Objection.  Vague.
(7)       You can answer.
(8)    THE WITNESS:  There are always different options.
(9)    MR. URIARTE:  Q.  Did you consider those options?
(10)    A.  I think the harassment for me is -- is very
(11) important.  I need to look into the environment for all
(12) the employees and not just one.
(13)    Q.  Okay.
(14)    A.  And I think that is important that this person
(15) was supervisor.
(16)    Q.  So you're saying the harassment is so
(17) important that that was like a very big part of why you
(18) decided to terminate.  That's what you're saying?
(19)    A.  Yes.
(20)    Q.  So what did you learn -- what if you learned
(21) that harassment was also going on between Andrew Dodge
(22) and the fuelers, would that be enough to terminate
(23) Andrew Dodge?
(24)    MR. WU:  Objection.  Improper hypothetical.  Lacks
(25) foundation.

**Page 54**

(1)       You can answer.
(2)    THE WITNESS:  We investigated everything.
(3) Everything -- we need to investigate everything to look
(4) into how that is affecting the employees.
(5)    MR. URIARTE:  Q.  Right.  I know you have to
(6) investigate.  I guess my hypothetical is more, if you
(7) learned that harassment was actually going on between
(8) Andrew Dodge and his fuelers, then it would lead to the
(9) conclusion that he should be terminated, too, right?
(10)    MR. WU:  Same objection.
(11)    MR. URIARTE:  Q.  Is that correct, Mr. Vargas?
(12)    A.  It is.  I protect the team.
(13)    Q.  I was looking at some of your corporate
(14) documents with regards to handbooks and HR materials
(15) and all that.  And there's this thing called
(16) progressive discipline.  Were you aware of that?
(17)    A.  Yes, I am.
(18)    Q.  Okay.  And why is it that you did not use
(19) progressive discipline in this situation?
(20)    A.  Because there are cases that they're severe,
(21) and then that's one of the outcome of the
(22) investigation.
(23)    Q.  So it's like serious enough to terminate?
(24)    A.  Yes.
(25)    Q.  Is that a yes?

**Page 55**

(1)    A.  Yes, it is a yes.
(2)    Q.  Okay.  And then did you ask or were you
(3) curious, maybe you should have had a conversation with
(4) Mr. Navarro?
(5)    A.  I don't participate in the investigations.
(6)    Q.  Maybe like a phone call to Mr. Navarro to get
(7) his side of the story?
(8)    A.  No, I do not.  I do not participate in any
(9) investigation.
(10)    Q.  And do you know whether or not they actually
(11) talked to Mr. Navarro and got his side of the story?
(12)    A.  I just get the final outcome.
(13)    Q.  You just get the final decision?
(14)    A.  The final outcome for -- from the
(15) investigation.
(16)    Q.  My question is different.  My question is when
(17) you were looking at all the different elements to
(18) decide whether to terminate or not, did you try to find
(19) out whether somebody talked to Mr. Navarro to get his
(20) side of the story?
(21)    A.  No, I did not.  I did not try to find out.
(22)    Q.  Would you say that's kind of like basic
(23) investigation right there?
(24)    MR. WU:  Objection.  Lack of foundation.  Improper
(25) hypothetical.

**Page 56**

(1)       You can answer if you know.
(2)    THE WITNESS:  I won't say that is -- it all
(3) depends on the kind of investigation they're running.
(4)    MR. URIARTE:  Q.  They -- what's the last word?
(5)    A.  They are running.
(6)    Q.  That they are running.  Okay.  But you didn't
(7) look into what kind of investigation they were running?
(8)    A.  I just look into the final outcome of the
(9) investigation.
(10)    Q.  And you never, like, got into your head and
(11) said, what does Mr. Navarro say about all of this?
(12) That's not something that you ever asked yourself?
(13)    A.  No, I do not.  I do not because I just look
(14) into the final outcome of the investigation.  So I
(15) think that that question is for the people who perform
(16) the investigation.
(17)    Q.  So you said earlier that the goal of
(18) terminating Mr. Navarro was to protect the employees
(19) from the harassment, right?  The environment of
(20) harassment, correct?
(21)    A.  Yes.
(22)    Q.  How is it different, in achieving that goal,
(23) how is termination different from, let's say, a
(24) suspension?
(25)    A.  Well, I think that is important, too, if you

**Page 57**

(1) find out that there is a harassment in the -- in the
(2) crew and in the environment, then the only way for you
(3) to ensure that we remove that harassment from the
(4) environment is to remove the person who is doing the
(5) harassment. In that every case is different, but when
(6) you have three people complaining about it, and at the
(7) same time you have a petition involving another
(8) employee which you're trying to achieve by harassing
(9) people is -- is not good.
(10)      Q. Okay. But the part about that that needs a
(11) little bit of explanation is you have this -- you say
(12) at the same time you have this petition, but what about
(13) the people that actually wrote the petition, right? So
(14) they have a concern, right? So --
(15)      A. Well, we go back to the same -- to the same
(16) conversations we had before, of the petition, when you
(17) have somebody that is pushing somebody to sign a paper
(18) that they don't even know what it's for.
(19)      Q. Right. For those three people, right?
(20)      A. Could be one, two, three, I don't know.
(21)      Q. Now, in your emails, you mentioned July or
(22) Julie Macapagal, it M-a-c-a-p-a-g-a-l. Actually, the
(23) name of an old Filipino president. July Macapagal.
(24) Does that name sound familiar to you?
(25)      A. He's also part of a supervisor crew.

**Page 58**

(1)      Q. Was an investigation ever conducted?
(2)      A. Well, I investigate. I saw the name of the
(3) person that it was on that list. And I request to open
(4) an investigation about that person.
(5)      Q. Was an investigation opened?
(6)      A. Yeah, but because I needed to know if this
(7) supervisor was also -- was also harassed to sign
(8) this -- this petition.
(9)      Q. Okay. And what was the result of the
(10) investigation?
(11)      A. That he was.
(12)      Q. I'm sorry?
(13)      A. That he was. He was also intimidated to sign
(14) the paper.
(15)      Q. I'm unclear about that. What is that --
(16) that's a person, a guy, right? A male?
(17)      A. Yes.
(18)      Q. He's a guy.
(19)      A. Yes.
(20)      Q. So what was -- what was Mr. Macapagal -- what
(21) did Mr. Macapagal do?
(22)      A. He's a supervisor.
(23)      Q. Yeah, and he signed the petition, correct?
(24)      A. The petition, yes.
(25)      Q. And then what was the result of the

**Page 59**

(1) investigation on Mr. Macapagal?
(2)      A. That he was forced to sign that paper.
(3)      Q. That he was forced to sign the paper, is that
(4) correct?
(5)      A. Yes.
(6)      Q. You talked to Mr. Macapagal?
(7)      A. No, I did not.
(8)      Q. Okay. So who gave you the results of the
(9) investigation?
(10)      A. Safety department. It was a conversation we
(11) had.
(12)      Q. Over the telephone?
(13)      A. No, person to person.
(14)      Q. Who in the safety department?
(15)      A. Kevin Blumberg.
(16)      MR. URIARTE: Let me get you, before we forget, so
(17) it's Kevin Blumberg, B-l-u-m-b-e-r-g. All right.
(18)      Q. So he told you that Mr. Macapagal told him
(19) that he was forced to sign the petition, is that
(20) correct?
(21)      A. Yes.
(22)      Q. Did you review the termination notice before
(23) it was issued?
(24)      A. No, I did not.
(25)      MR. URIARTE: I just want to make sure we're clear

**Page 60**

(1) on this. Exhibit 9, please, David. Thank you.
(2)      (Plaintiff's Exhibit 9 marked for
(3)      identification.)
(4)      MR. URIARTE: So if you could just scroll all the
(5) way, David, so Mr. Vargas can see the whole document.
(6) So this will be Exhibit 9. This is "Notice to
(7) Employees as to Change in Relationship" dated August
(8) 29, 2018. I'm good with my word with regard to the
(9) date there, even though Jason did not want to go with
(10) me on it.
(11)      Q. So do you see that, Mr. Vargas?
(12)      A. Yes, I see that.
(13)      Q. Okay. So you didn't see this document before
(14) it was issued?
(15)      A. I don't recall it, but it looks like the first
(16) time that I see this document.
(17)      Q. No problem. And then when it says "Code of
(18) Conduct," does that mean anything to you?
(19)      A. Yeah.
(20)      Q. What does that mean to you?
(21)      A. It means that the person was not conducting
(22) correctly.
(23)      Q. Okay. And specifically what was he not
(24) conducting correctly?
(25)      A. He was forcing people to sign a petition.

**Page 61**

(1)   Q. Okay. Anything else that he wasn't doing
(2) correctly?
(3)   A. I think that is enough for me.
(4)   Q. I'm just trying to complete things, so I'm
(5) sorry I keep saying, "Anything else? Anything else?"
(6) I'm just making sure it's complete.
(7)     So aside from him forcing people to sign the
(8) petition, anything else that might have caused him to
(9) violate code of conduct, or was that it?
(10)   A. I think that -- I think that -- well, no,
(11) nothing -- well, but the reason why we terminate --
(12)   Q. Yeah.
(13)   A. -- because of forcing people to sign a
(14) petition.
(15)   MR. URIARTE: Gotcha. Okay.
(16)     And then could we have Exhibit 11, please.
(17)     (Plaintiff's Exhibit 11 marked for
(18)     identification.)
(19)   MR. URIARTE: Q. So here's Exhibit 11. This one
(20) was given to us by your lawyers as well. It's Menzies
(21) 95, if you look on the bottom.
(22)   A. Can you repeat that.
(23)   Q. I'm sorry?
(24)   A. Can you repeat it, please.
(25)   Q. Sure. So this is Exhibit 11. This is a

**Page 62**

(1) document we received from your lawyers as well. It's
(2) Bates stamped Menzies 095. You see on the bottom of
(3) the document there? Based on this track on the left
(4) side there, it seems like it came from Ms. Aguilera's
(5) computer.
(6)     So then, if we go up on the top part of this
(7) document, this document seems to be an employee
(8) performance development, Renaldo Navarro, August 29.
(9) Do you see that?
(10)   A. Yes, I see it.
(11)   Q. Okay. Did you see this document before today?
(12)   A. No.
(13)   Q. You have not? Okay.
(14)   A. I don't recall it.
(15)   Q. Okay. You don't recall it. Do you recall a
(16) discussion with Tracy, Ms. Aguilera, with regard to
(17) final warning and what could be written in the final
(18) warning, anything like that?
(19)   A. I think -- well, there was a conversation
(20) about it in relation to the different options we had
(21) with Mr. Navarro.
(22)   Q. Okay. But did you discuss the use of a final
(23) warning for Mr. Navarro? Did you discuss that with
(24) Ms. Aguilera?
(25)   A. I don't recall it.

**Page 63**

(1)   Q. All right. And here it says this option, I
(2) guess, would have placed Mr. Navarro on final warning
(3) for unprofessional conduct of a supervisor, right? Do
(4) you see that?
(5)   A. Yes.
(6)   Q. And it says "distributing a petition and
(7) disruption of the workforce." Do you see that?
(8)   A. Yes, I do see it.
(9)   Q. And then it says, "You are being placed on a
(10) Final Warning which is your last and final opportunity
(11) to" -- we don't know. I'm thinking it's like "change
(12) your behavior," maybe. I don't know. We don't know
(13) that. And then, "Any infraction, no matter how minor
(14) in any of the 4 categories of Attendance, Conduct,
(15) Safety or Work Performance, may result in your
(16) immediate discharge." Do you see that?
(17)   A. Yes, I see that.
(18)   Q. And then the Final Warning box is marked.
(19)   A. Uh-huh. Yes.
(20)   Q. Okay. And then if you see a little bit down,
(21) just to make sure, there's no signature because it was
(22) not used, presumably, correct? So my question about
(23) this document is what's wrong with this option,
(24) Mr. Vargas?
(25)   MR. WU: Objection. Improper hypothetical. Lacks

**Page 64**

(1) foundation.
(2)   THE WITNESS: I think that, based on the
(3) investigation we come up with, this was not the option,
(4) the right option for me at that moment.
(5)   MR. URIARTE: Q. Thinking about it now and
(6) knowing a little bit more about the situation?
(7)   A. I already had final outcome of the
(8) investigation. Make sure I need to have the right -- I
(9) need to take the right decision.
(10)   Q. You still think it's the right decision then,
(11) Mr. Vargas?
(12)   A. I do believe that it was the right decision,
(13) and that's why I took it. And you can tell when I
(14) asked Tracy on -- in terms of her recommendation,
(15) because I needed to ensure that we had all information
(16) available to take the right decision moving forward.
(17)   Q. Okay. I guess I would have to ask, though,
(18) don't you think that a final warning, one more little
(19) mistake, may have resulted in the same outcome for you
(20) in your goal of eliminating harassment? Because your
(21) goal is to eliminate harassment.
(22)   A. Yes.
(23)   Q. And a final warning like this --
(24)   MR. WU: Improper -- sorry, I didn't know if you
(25) were done with your question. I don't mean to cut off

**Page 65**

(1) your question, Arlo.

(2) MR. URIARTE: It's okay, Jason. Go ahead with

(3) your objection.

(4) MR. WU: The objection is improper hypothetical

(5) and lack of foundation.

(6) MR. URIARTE: Q. Mr. Vargas?

(7) A. I'm sorry, but I don't know. That's the

(8) reason why I'm thinking about risk, I need to ensure

(9) that we can reduce the risk as much as we can. So

(10) since I don't know what's going to happen with a

(11) warning, the way for me to reduce the risk is

(12) terminating the person.

(13) Q. Go ahead.

(14) A. With enough documentation to support that

(15) decision.

(16) Q. Right. And for you the documentation is the

(17) conclusion of the security people, right? And then the

(18) statement of the three people that you're talking

(19) about.

(20) A. Do you want me to go through it?

(21) Q. No, no, we've gone through it. Don't worry

(22) about it. But that's your position, you felt like you

(23) had enough documentation to do a termination?

(24) A. Yes.

(25) Q. And you're avoiding the risk. Now, the risk

**Page 66**

(1) that you're talking about is the risk that Mr. Navarro

(2) will continue to harass, correct?

(3) A. Yes.

(4) MR. URIARTE: So let's go to Exhibit 12, please.

(5) (Plaintiff's Exhibit 12 marked for

(6) identification.)

(7) MR. URIARTE: Q. Okay. Have you seen Exhibit 12

(8) before, Mr. Vargas?

(9) A. Yes, I did.

(10) Q. Did you review it for today's deposition?

(11) A. Yes.

(12) Q. I have a couple of questions. If we go to

(13) page 2 -- all right. So, actually, I guess we need to

(14) go to page 3. We are on the day before, August 28, at

(15) 4:27 p.m. It looks like Tracy sends you an email that

(16) says, "After reviewing the case with my HR Director."

(17) And do you know who that HR director is?

(18) A. Talin. It's the person who's listening to us

(19) or participating today.

(20) Q. So "After reviewing the case with my HR

(21) Director, our recommendation is not to terminate the

(22) employee at this time." Do you see that?

(23) A. Yes, I see that.

(24) Q. Okay. And at this point you're two months

(25) into your job. Two months into being in the San

**Page 67**

(1) Francisco Menzies fueling operation, is that correct?

(2) June, July -- oh, maybe three months.

(3) A. Maybe three months, yes.

(4) Q. Maybe three months, is that correct?

(5) A. Yes.

(6) Q. And then you know that Tracy and Talin have

(7) both been in the company a longer time than you at this

(8) point in time, correct?

(9) A. Yes.

(10) Q. You knew that?

(11) A. Yes, I did.

(12) Q. Okay. So then we go up a little bit. I guess

(13) your response to this is on page 2, actually. The

(14) bottom of page 2. And then you -- in the bottom,

(15) please, one more. No, a little bit more, David.

(16) Bottom of this page. Yeah, keep going.

(17) MR. WU: David, it looks like you're on page 3,

(18) not page 2.

(19) MR. URIARTE: Oh, that's why, yeah. Bottom of

(20) page 2. There you go.

(21) Q. So I guess your response to that was to say,

(22) "Hello Tracy, Could you please explain this

(23) recommendation." Is that correct?

(24) A. That is correct.

(25) Q. And then, so we go up, and we have here a --

**Page 68**

(1) what do you call this -- the statement with regard to

(2) Kevin Blumberg, the safety and security manager, do you

(3) see that?

(4) A. Yes.

(5) Q. And this is the security conclusion that you

(6) spoke of, correct?

(7) A. Yes.

(8) Q. And then if we go up a little bit more, and I

(9) believe on page 1, Tracy kind of tells you, look at the

(10) statement below, look at the attachments, and the

(11) petition. I mean, you say to Tracy, right? Do you see

(12) that?

(13) A. This is my final --

(14) Q. I think we need to go down a little bit.

(15) Before that, Tracy actually responds to your email with

(16) regards to getting an explanation to their

(17) recommendation, right?

(18) A. Yes.

(19) Q. Okay. And she kind of lists all her reasons

(20) why she makes that recommendation after talking to

(21) Talin. Do you see that?

(22) A. I don't.

(23) Q. I'm sorry?

(24) A. I don't see that.

(25) Q. Well, where she says, "Please see my

DEPOSITION OF RAUL VARGAS - 08/25/2020

BSA    Case 3:19-cv-08157-VC   RENALDO NAVARRO vs. MENZIES AVIATION, INC.   Document 34   Filed 04/06/20    Page 68 of 92    XMAX(18/18)

**Page 69**

(1) documented findings below that I originally sent."

(2)    A. Right.

(3)    Q. I guess below might be -- yeah, do you see

(4) that? "And Kevin statement," the security person. "I

(5) have also attached the statements from the Employees

(6) and the petition." Do you see that?

(7)    Stop, David, go down a little bit. We're on

(8) the right place.

(9)    Do you see that?

(10)    A. Yes.

(11)    Q. And then she goes, "I can only make a

(12) recommendation. The final decision is yours."

(13)    A. Yes. Go ahead.

(14)    Q. No, go ahead.

(15)    A. She's not telling me anything. She's just

(16) telling me that the recommendation, this is my

(17) recommendation, but she's not, as HR, thinking about

(18) all the statements and documentation she got.

(19)    Q. Correct. Would you agree that what she said

(20) to you is she's giving you the bases of why she

(21) recommends that, right?

(22)    A. She's just giving me -- she's just giving me

(23) the recommendation.

(24)    Q. Okay. And then she's telling you, "I cannot

(25) have the meeting with Rey at 4:30 today without a

**Page 70**

(1) decision." Do you see that?

(2)    A. Yes.

(3)    Q. Okay. Does that line kind of refresh your

(4) recollection about anything?

(5)    A. Yes.

(6)    Q. Okay. What does it refresh your recollection

(7) about?

(8)    A. I'm sorry, but what -- I'm not -- can you

(9) repeat that question.

(10)    Q. Yes. So "I cannot have the meeting with Rey

(11) at 4:30 today without a decision."

(12)    When I read that, if I was reading that, I'm

(13) like, oh, man, somebody's like rushing me, something

(14) like that. So I'm thinking that maybe in your head it

(15) refreshes your recollection with regard to how it was

(16) for you, right? Because somebody has to make a final

(17) decision, right?

(18)    What was happening at that point?

(19)    A. Well, but it's important to also mention that

(20) that 4:30 doesn't mean we need to have that -- that

(21) decision before that. We can move the meeting with Rey

(22) Navarro easily later on to ensure that we take the

(23) right decisions on that. That's pretty much normal

(24) process we have, if we don't have the decision, we need

(25) to investigate more.

**Page 71**

(1)    Q. Okay. So at this point did you think that you

(2) needed to investigate more?

(3)    A. Yes, definitely, because she was not answering

(4) my question on that -- at that point.

(5)    Q. Okay. Very good. All right. And then if we

(6) go up a little bit. So here is your response, I guess,

(7) August 29 at 5:01 p.m. And you kind of made the

(8) decision to terminate Mr. Navarro, correct?

(9)    A. Yes.

(10)    Q. So in the hour between 4:04 p.m. and 5:01

(11) p.m., what additional investigation occurred?

(12)    A. Well, we had a -- we had a conversation with

(13) HR also, and I reviewed all the documentation in terms

(14) of what the outcome of the investigation was. And at

(15) that point I took the decision to terminate Mr.

(16) Navarro.

(17)    Q. Okay. Anything else that you did in that

(18) hour?

(19)    A. Well, we talked -- as I say, we talked with

(20) HR, talked about the case. We collected all the

(21) documentation, put all the documentation together. And

(22) then we took the right -- the last decision, and that's

(23) why I send that email to HR.

(24)    Q. At this point you were not provided a document

(25) with regard to the final warning, right? You didn't

**Page 72**

(1) review that at this point?

(2)    A. No, I did not. That's HR. And I think that

(3) is also important to remember -- it's important to

(4) remark that HR take decisions -- decisions in terms

(5) of --

(6)    Q. In terms of?

(7)    A. The person.

(8)    Q. HR made decisions in terms of the person, you

(9) said?

(10)    A. Of the person, exactly.

(11)    Q. And what do you mean by that?

(12)    A. Because they look into everything that you're

(13) saying, or they take a look to the seniority of the

(14) person, that this person is being 15 years at the

(15) company, so they look on the -- on the recommendation

(16) of the document, warnings and all that, and then, based

(17) on that, they gave a recommendation.

(18)    Now, we, as directors, we look into the more

(19) open situation of -- in terms of the whole operation,

(20) how this will affect the rest of the employees. And

(21) during that -- during that meeting, of course, we

(22) agreed on -- on a final termination for Mr. Navarro.

(23)    Q. And when you say "agreed," who actually agreed

(24) with you?

(25)    A. HR.

**Page 73**

(1)    **Q.** Meaning Talin and Tracy?

(2)    **A.** Yes. So then Tracy agreed because she had a

(3) conversation with Talin, so we all agreed on -- on this

(4) termination.

(5)    **MR. URIARTE:** Okay. Why don't we take a

(6) five-minute break and then we'll be right back. Thank

(7) you.

(8)    **MR. WU:** All right.

(9)    (Brief recess.)

(10)    **MR. URIARTE:** Okay, Mr. Vargas, it looks like I

(11) have no further questions for you today.

(12)    **THE WITNESS:** Okay.

(13)    **MR. WU:** And I have just a few questions for you,

(14) Raul.

(15)    EXAMINATION BY MR. WU

(16)    **MR. WU: Q.** So, Raul, during the time you were

(17) the director of operations at SFO, aside from the

(18) petition, did you hear of any complaints that Andrew

(19) Dodge was harassing employees?

(20)    **A.** No, I did not.

(21)    **Q.** During the time you were the director of

(22) operations at SFO, aside from the petition, did you

(23) hear of any complaints that Andrew Dodge wasn't giving

(24) fuelers breaks?

(25)    **A.** No, I did not.

**Page 74**

(1)    **Q.** During the time you were the director of

(2) operations at SFO, aside from the petition that we've

(3) already been discussing, did you hear any complaints

(4) that Andrew Dodge wasn't running the operation

(5) smoothly?

(6)    **A.** I did not.

(7)    **Q.** During the time you were director of

(8) operations at SFO, aside from the petition, have you

(9) heard any complaints about Andrew's job performance?

(10)    **A.** No, I did not.

(11)    **Q.** During the time you were the director of

(12) operations at SFO, did you ever hear of any grievance

(13) filed by the union against Andrew Dodge?

(14)    **A.** There is nothing on Andrew Dodge.

(15)    **MR. WU:** Okay. I think that's all the questions I

(16) have on my end, Arlo, unless you have any further

(17) questions.

(18)    **MR. URIARTE:** Yeah, let me just follow up with

(19) what you just said.

(20)    FURTHER EXAMINATION BY MR. URIARTE

(21)    **MR. URIARTE: Q.** Mr. Vargas, you said there was

(22) nothing on Andrew Dodge, right? One, two, three, four,

(23) five items there. You never heard anybody complaining

(24) about harassing him, you never heard that he was not

(25) giving breaks, you never heard that he was not running

**Page 75**

(1) operations smoothly, you never heard complaints about

(2) his job performance, you never heard of grievances

(3) against Andrew Dodge, right?

(4)    **A.** I don't recall having any -- any of those

(5) conversations to nobody.

(6)    **Q.** Okay. So now you don't recall those kinds of

(7) conversations, that's correct, right?

(8)    **A.** Yes.

(9)    **Q.** Okay. But did you ever ask Renil about it,

(10) about these items?

(11)    **A.** We talked with Renil about those -- the items

(12) when -- when -- no, I don't recall, I'm sorry. No.

(13)    **Q.** Okay. So you don't recall whether you talked

(14) to Renil or not, is that correct?

(15)    **A.** No, not about that -- not about that specific

(16) topic.

(17)    **Q.** Okay. So let me just clarify this because

(18) it's a little bit unclear. You do not recall or the

(19) way you remember it is that you did not talk to Renil

(20) about it?

(21)    **A.** In relation to Renil, I do not recall talking

(22) to Renil about Andrew's performance.

(23)    **Q.** You do not recall talking to Renil about all

(24) these different items, correct?

(25)    **A.** Correct.

**Page 76**

(1)    **Q.** And when you say you do not recall, does that

(2) mean it could have happened or does that mean you

(3) didn't do it?

(4)    **A.** It means that I don't have anything documented

(5) that's important, and I don't recall having a

(6) conversation.

(7)    **Q.** Okay. What about with Tracy or with HR? Do

(8) you recall talking to them about all these different

(9) items?

(10)    **A.** We had a conversation, as I said, in terms of

(11) the investigation and in terms of what the letter --

(12) letter said about Andrew, as I explained it before, and

(13) nothing else on that.

(14)    **MR. URIARTE:** Okay. All right. Thank you.

(15)    **THE WITNESS:** Thank you.

(16)    **MR. URIARTE:** Thank you, Mr. Vargas.

(17)    **MR. WU:** Thank you very much for your time, Raul.

(18) We appreciate it.

(19)    **THE WITNESS:** Thank you very much.

(20)    **MR. URIARTE:** We'll stop the record.

(21)    (Whereupon, the concluded at 11:15

(22) o'clock a.m.)

(23)    ---o0o---

(24)

(25)

DEPOSITION OF RAUL VARGAS - 08/25/2020

BSA    Case 3:19-cv-08157-VC RONALDO NAVARRO vs. MENZIES AVIATION, INC Filed 11/16/20    Page 70 of 92    XMAX(20/20)

**Page 77**

(1)           CERTIFICATE OF WITNESS

(2)              ---o0o---

(3)

(4)       I, RAUL VARGAS, hereby declare under

(5) penalty of perjury that I have read the foregoing

(6) deposition testimony; and that the same is a true

(7) and correct transcription of my said testimony

(8) except as corrected pursuant to my rights under

(9) Rule 30(e) of the Federal Rules of Civil

(10) Procedure.

(11)

(12)        _____

(13)                 Signature

(14)        _____

                  Date

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

**Page 78**

(1) STATE OF CALIFORNIA      )

                      )

(2) COUNTY OF SAN FRANCISCO )

(3)       I, CINDY TUGAW, a Certified Shorthand Reporter

(4) of the State of California, duly authorized to

(5) administer oaths pursuant to Section 8211 of the

(6) California Code of Civil Procedure, do hereby certify

(7) that

(8)                RAUL VARGAS,

(9) the witness in the foregoing deposition, was by me duly

(10) sworn to testify the truth, the whole truth and nothing

(11) but the truth in the within-entitled cause; that said

(12) testimony of said witness was reported by me, a

(13) disinterested person, and was thereafter transcribed

(14) under my direction into typewriting and is a true and

(15) correct transcription of said proceedings.

(16)       I further certify that I am not of counsel or

(17) attorney for either or any of the parties in the

(18) foregoing deposition and caption named, nor in any way

(19) interested in the outcome of the cause named in said

(20) caption.

(21)       Dated the 10th day of September, 2020.

(22)

(23)

(24)

               CINDY TUGAW

(25)                CSR No. 4805 (California)

**Page 79**

(1) Raul Vargas

    c/o Foley & Lardner

(2) 555 California Street, Suite 1700

    San Francisco, CA 94104

(3) Attn:  Jason Y. Wu, Esq.

(4) Date:  September 10, 2020

    Re:  Navarro vs. Menzies

(5) Deposition Date:  Tuesday, August 25, 2020

(6) Dear Mr. Vargas,

(7)       Please be advised the original transcript of

    your deposition is ready for your review.

(8)       Pursuant to FRCP Rule 30(e), you have 30 days

    following the date of this notice to read, correct if

(9) necessary, and sign your transcript unless the

    attending parties and the deponent agree on the record

(10) or otherwise in writing to a longer or shorter time

    period.  The deponent may change the form or the

(11) substance of the answer to a question, and may either

    approve the transcript of the deposition by signing it,

(12) or refuse to approve the transcript by not signing it.

    You are not required by law to read and sign your

(13) deposition transcript.  All parties will be informed of

    the corrections.  The original transcript will then be

(14) sealed and sent to the examining attorney pursuant to

    the applicable law.

(15)       You may either come to our office to read and

    sign the original transcript, or you may contact your

(16) attorney or the attorney who arranged for you to be

    present at your deposition.  If they have ordered a

(17) copy of the transcript, you may review their copy and

    make corrections by submitting, signing and returning

(18) the attached form.  If you choose to review your

    transcript at our office, please call first to make an

(19) appointment.  Should you have any question regarding

    these instructions, please call.

(20)     Sincerely,

(21)

(22)

    NOGARA REPORTING SERVICE

(23) 5 Third Street, Suite 415

    San Francisco, California 94103

(24) (415) 398-1889

(25) cc:  All counsel, original deposition

# EXHIBIT 51

**DEPOSITION OF ANDREW DODGE - 07/28/2020**

**RENALDO NAVARRO vs. MENZIES AVIATION, INC.**

CONDENSED TRANSCRIPT AND CONCORDANCE

**PREPARED BY:**

**NOGARA REPORTING SERVICE**
**5 Third Street, Suite 415**
**San Francisco, CA  94103**
**Phone:  (415) 398-1889**
**FAX:  (415) 398-0611**



**Page 1**

(1)         IN THE UNITED STATES DISTRICT COURT

(2)     IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

(3)

(4)

(5) RENALDO NAVARRO,

(6)             Plaintiff,

(7) v.                      No.  3:19-CV-8157

(8) MENZIES AVIATION, INC.,

    doing business as MENZIES

(9) and DOES 1 through 10,

    inclusive,

(10)

            Defendants.

(11) _____/

(12) Zoom Remote Deposition of

(13)     ANDREW DODGE

(14)  Tuesday, July 28, 2020

(15)

(16)

(17)

(18)

(19)

(20) REPORTED BY:  CINDY TUGAW, CSR #4805

(21)

(22)

(23)         NOGARA REPORTING SERVICE

            5 Third Street, Suite 415

        San Francisco, California 94103

(24)           (415) 398-1889

(25)

**Page 2**

(1)              I N D E X

(2)                          Page Number

(3) EXAMINATION BY MR. URIARTE           4

(4)            ---o0o---

(5)        E X H I B I T S

(6) Plaintiff's

(7) Exhibit 3   Copy of two photographs    26

(8) Exhibit 5   Statement by Andrew Dodge  42

            dated 8-16-18

(9)

    Exhibit 8   Petition from Menzies      33

(10)            fuelers to Menzies

            Management

(11)

    Exhibit 10  Statement by Rafael        40

(12)            Vasquez dated 11/18/18

(13)            ---o0o---

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

**Page 3**

(1)         BE IT REMEMBERED that, pursuant to Notice of

(2) Taking Deposition and on Tuesday, the 28th day of July,

(3) 2020, commencing at the hour of 9:00 o'clock a.m.

(4) thereof, via Zoom videoconference, before me, CINDY

(5) TUGAW, a Certified Shorthand Reporter in the State of

(6) California, personally appeared,

(7)             ANDREW DODGE,

(8) Called as a witness by the Plaintiff, having been by me

(9) first duly sworn, was examined and testified as

(10) hereinafter set forth.

(11)            ---o0o---

(12)       APPEARANCES OF COUNSEL

(13) For the Plaintiff

        LIBERATION LAW GROUP, P.C.

(14)    2760 Mission Street

        San Francisco, California 94110

(15)    BY: ARLO GARCIA URIARTE, Attorney at Law

        (415) 695-1000

(16)

(17) For the Defendants

        FOLEY & LARDNER, LLP

(18)    555 California Street, Suite 1700

        San Francisco, California 94104

(19)    BY:  JASON Y. WU, Attorney at Law

        (415) 984-9848

(20)

    Also Present:  David Ho, Zoom Host.

(21)

            ---o0o---

(22)

(23)

(24)

(25)

**Page 4**

(1)     **ZOOM HOST:**  Good morning.  I am David Ho and I

(2) will be the Zoom host.  I am going to be -- as soon as

(3) the deposition gets going, I'll be off screen and I'll

(4) mute myself.  The only time you will hear my voice if

(5) there are any exhibits that you need to bring up.  And

(6) so, Cindy, take it away.

(7)     **THE REPORTER:**  At this time, I will ask counsel to

(8) stipulate on the record that there is no objection to

(9) this deposition officer administering a binding oath to

(10) the witness via Zoom, starting with the noticing

(11) attorney.

(12)     **MR. URIARTE:**  No objection.

(13)     **MR. WU:**  No objections for defendant Menzies

(14) Aviation.

(15)     (Whereupon, the Witness was duly sworn by the

(16)     Reporter.)

(17)       EXAMINATION BY MR. URIARTE

(18)     **MR. URIARTE:  Q.**  Good morning, Mr. Dodge.  My

(19) name is Arlo Uriarte.  I am attorney for Renaldo

(20) Navarro in this matter of Mr. Navarro against Menzies.

(21)     Are you aware of that?

(22)     **A.**  Yes.

(23)     **Q.**  Okay.  Would you please state and then spell

(24) your full name for the record, please.

(25)     **A.**  Yeah.  Andrew Dodge, A-n-d-r-e-w, and then

**Page 5**

(1) D-o-d-g-e.

(2) **Q.** Okay. And, Mr. Dodge, what's your current

(3) position with Menzies?

(4) **A.** I am a supervisor here at Menzies.

(5) **Q.** Have you had your deposition taken before?

(6) **A.** Yes.

(7) **Q.** And in what context?

(8) **A.** Can you, like, rephrase the question?

(9) **Q.** Yeah. Why was your deposition -- why did you

(10) provide a deposition?

(11) **A.** I had an incident on the -- on the airport.

(12) **Q.** Okay. So it was your case or was it somebody

(13) else's case?

(14) **A.** It was somebody else's versus Menzies.

(15) **Q.** Gotcha. And do you remember the name of that

(16) person?

(17) **A.** The first name. It was a police officer named

(18) Robert.

(19) **Q.** Okay. So it was a police officer who filed a

(20) lawsuit against Menzies, and you were a witness?

(21) **MR. WU:** I'm just going to object, relevance, to

(22) this line of questioning.

(23) But you can answer.

(24) **THE WITNESS:** It was something against Menzies

(25) Aviation because I was a part of it.

**Page 6**

(1) **MR. URIARTE: Q.** Okay. Was it a personal injury

(2) action? Was it -- can you give me -- do you know?

(3) **A.** It was just a -- it was a dispute of him

(4) saying that I hit him from the butt -- hit him from --

(5) his vehicle from behind.

(6) **Q.** Gotcha. And when did you provide that

(7) deposition? What year?

(8) **A.** Actually, it was 2020. I think it was January

(9) or February of 2020.

(10) **Q.** Okay. And you were driving a Menzies vehicle?

(11) **A.** Yes. I was driving a Menzies fueling

(12) equipment, yes. A Menzies fueling truck.

(13) **Q.** So I'll give you some instructions for today.

(14) Most important I think is the fact that we do have a

(15) court reporter here, Cindy, who's taking down

(16) everything that we are saying, that you will be saying,

(17) that your counsel will be saying.

(18) At the end, although we are in an informal

(19) setting and we're doing this through Zoom, your

(20) testimony, the words that you provide, the answers that

(21) you provide here today, will have the same force and

(22) effect as if you were testifying in court.

(23) Do you understand that?

(24) **A.** Yup.

(25) **Q.** You have to say yes or no as opposed to, like,

**Page 7**

(1) yup or --

(2) **A.** Yes, I understand.

(3) **Q.** Okay. Instead of nodding your head or --

(4) **A.** Yeah, I gotcha. I gotcha.

(5) **Q.** And then it's very important that you

(6) understand the question before you answer. A booklet

(7) will come out of this deposition. You'll be able to

(8) review it. But if you make any changes, attorneys like

(9) myself or another attorney or the court might question

(10) you or might question your credibility because you

(11) changed your answer. Okay?

(12) Do you understand that?

(13) **A.** Yes.

(14) **Q.** Are you able to provide your best testimony

(15) here today?

(16) **A.** Yes.

(17) **Q.** There's nothing precluding you from being able

(18) to articulate or remember things from the past?

(19) **A.** I mean, it's been a while. It's been a while

(20) since -- since I've seen Ray or seen -- had an incident

(21) with Ray, so --

(22) **Q.** Aside from the passage of time, are you under

(23) some sort of medication or substance that can affect

(24) your ability to remember?

(25) **A.** No, no substance, no.

**Page 8**

(1) **Q.** All right. Yeah, so we will -- of course, all

(2) we are entitled to here, Mr. Dodge, is your best memory

(3) and your best recollection. So if you have to qualify

(4) your memory, that's totally fine. If you don't

(5) remember, that's totally fine. I will test your

(6) memory, but we don't want you to guess. Your attorney

(7) doesn't want you guess. I don't want you to guess.

(8) Nobody wants you to guess. Okay?

(9) **A.** Okay.

(10) **Q.** I will ask for a range or an estimate, and

(11) that's very different from a guess. But let's go --

(12) when we're in those questions, let's test our memory

(13) and let's see how good your memory is with regards to

(14) those. Okay? But you can qualify. Okay?

(15) Do you understand that?

(16) **A.** Yes, I understand.

(17) **Q.** If there's any kind of technical issues that

(18) occur, if you don't hear or you're not understanding

(19) the questions, let us know. Okay? We'll work through

(20) that.

(21) **A.** Okay.

(22) **Q.** It looks like -- are you using your phone?

(23) **A.** Yeah, my cell phone. I don't have my laptop

(24) with me. Sorry.

(25) **Q.** That's fine. Are you in the office right now?

**DEPOSITION OF ANDREW DODGE - 07/28/2020**

BSA    Case 3:19-cv-08157-VC RENALDO NAVARRO vs. MENZIES AVIATION INC. 08/06/20    Page 75 of 92    XMAX(3/3)

**Page 9**

(1)  **A.** Yeah. I'm just -- I'm in one of the offices,
(2)  but I'm just going to close the door.
(3)  **Q.** Okay.
(4)  **A.** Sorry. Okay.
(5)  **Q.** Are you working right now? Are you on your
(6)  shift or something?
(7)  **A.** No, no. No, I'm not working right now, no.
(8)  **Q.** All right. You got notice of this deposition
(9)  some time ago, some weeks ago, is that correct?
(10)  **A.** Yes, I -- yeah.
(11)  **Q.** And in preparation for today's deposition, did
(12)  you talk to anybody? Aside from your attorneys, did
(13)  you talk to anybody?
(14)  **A.** No.
(15)  **Q.** Did you review any documents to prepare for
(16)  today?
(17)  **A.** With my attorney-client.
(18)  **Q.** So you reviewed some documents with your
(19)  attorney. Do you remember what documents you reviewed
(20)  to prepare for today's deposition?
(21)  **A.** Just some of the -- how do you say? What do
(22)  you call the document numbers that shows you, like,
(23)  different things? I don't know what you guys call
(24)  them.
(25)  **Q.** Are you talking about the complaint?

**Page 10**

(1)  **A.** No. I can't think of the name. Just marked
(2)  with numbers, like -- I can't think of the name.
(3)  **Q.** If it comes back to you, let me know. Are
(4)  they like -- are they documents that you prepared in
(5)  the past?
(6)  **A.** Documents I prepared?
(7)  **Q.** Yes.
(8)  **A.** It was like -- one was something that I wrote
(9)  in the past.
(10)  **Q.** Right. There's one letter that you wrote to
(11)  management about Ray, is that correct? That one the
(12)  you --
(13)  **A.** Yeah.
(14)  **Q.** Did you review the petition written against
(15)  you at all?
(16)  **A.** I don't recall the petition, no.
(17)  **Q.** All right. Well, if you remember -- if you
(18)  remember what that -- are you talking about a
(19)  legal-looking document? Is that what you reviewed?
(20)  **A.** I don't recall.
(21)  **Q.** Okay. All right. So --
(22)  **MR. WU:** Arlo?
(23)  **MR. URIARTE:** Yes.
(24)  **MR. WU:** I'm sorry for the interruption. Could we
(25)  go off the record and could I have a breakout room with

**Page 11**

(1)  Mr. Dodge for just a minute?
(2)  **MR. URIARTE:** Sure. David? Are you there?
(3)  **VIDEO OPERATOR:** Yes. Mr. Wu, we do not have a
(4)  breakout room for this particular -- if we can off go
(5)  of the record and have him call you, and then he can
(6)  reconnect.
(7)  **MR. URIARTE:** Or I can leave, if you want, or you
(8)  guys can talk on the phone. I think you should
(9)  probably mute and then talk on the phone or something.
(10)  **MR. WU:** You know, honestly -- are we off the
(11)  record?
(12)  **MR. URIARTE:** Yes, let's go off the record, Cindy.
(13)       (Brief recess.)
(14)  **MR. URIARTE:** Let's get back on the record. We
(15)  are back on the record.
(16)  **Q.** So, Mr. Dodge, off the record we kind of had a
(17)  discussion to try to refresh your recollection in
(18)  regards to preparing for today's deposition. So can
(19)  you just state for the record the people that you spoke
(20)  with as well in preparation for today's deposition.
(21)  **A.** Yeah. John Qually, Randy Davies, and also
(22)  Tracy Aguilera as well.
(23)  **Q.** And how long was that conversation for?
(24)  **A.** Like a couple hours.
(25)  **Q.** More like two hours or more like five hours?

**Page 12**

(1)  **A.** No, more like two hours.
(2)  **Q.** Okay. Sounds good. All right.
(3)       Can you tell me the highest level of education
(4)  that you achieved.
(5)  **A.** I have some college.
(6)  **Q.** Did you graduate from college?
(7)  **A.** No, I did not.
(8)  **Q.** And when you say college, what college did you
(9)  go to?
(10)  **A.** I attended DeAnza Community College.
(11)  **Q.** Did you get an AA?
(12)  **A.** No. I was going for my AA.
(13)  **Q.** And when was the last time you actually
(14)  participated in a class at DeAnza? Like what year?
(15)  **A.** I want to say like 2015, 2016.
(16)  **Q.** And what were you trying -- what AA were you
(17)  trying to graduate?
(18)  **A.** Criminal justice.
(19)  **Q.** And when did you start with Menzies? What
(20)  year?
(21)  **A.** February of 2016.
(22)  **Q.** So February of 2016, is that with Menzies
(23)  already?
(24)  **A.** That was when we were ASIG.
(25)  **Q.** So that's still ASIG.

**Page 13**

(1)    **A.** Yeah.

(2)    **Q.** And then shortly thereafter -- shortly

(3) thereafter, Menzies came in, is that correct?

(4)    **A.** Yeah, Menzies came in, like, 2018, or

(5) something like that, or in 2000 -- or like in the

(6) middle of 2018, I want to say.

(7)    **Q.** All right. What was the position you had when

(8) you started with ASIG?

(9)    **A.** When I first started at ASIG, I was a fueler.

(10)    **Q.** How long were you a fueler for before becoming

(11) a supervisor?

(12)    **A.** I want to say about a year.

(13)    **Q.** And who approved your promotion to supervisor

(14) from a fueler?

(15)    **A.** Renil Lal, the general manager at the time.

(16)    **Q.** The termination of Mr. Navarro is about August

(17) of 2018. Do you remember that?

(18)    **A.** Yeah, I remember him not being there anymore.

(19)    **Q.** And in August of 2018, you were a supervisor,

(20) correct?

(21)    **A.** Yes.

(22)    **Q.** And your shift was -- can you tell me, what

(23) was your shift?

(24)    **A.** During the time -- like, your question is,

(25) like -- like, now or in the past?

**Page 14**

(1)    **Q.** In August of 2018.

(2)    **A.** I was -- I was doing swing shift and -- which

(3) would start -- swing shift. It would probably start

(4) around, what, 2:00 or 3:00 in the afternoon until about

(5) 11:00 p.m. at night. And then I would also cover

(6) graveyard at the time, which started around 11:00 p.m.

(7) to about 7:00 a.m., if someone called off work. I also

(8) covered people's call sicks as well.

(9)    **Q.** Gotcha. Okay. So if you had your regular

(10) shift, which was the swing shift, of 2:00 to 3:00 until

(11) 11:00 p.m., you sometimes overlapped with the beginning

(12) of Renaldo Navarro's shift, is that correct, graveyard?

(13)    **A.** So I would see -- I would see Ray and give him

(14) an update on the shift on what's going on and what

(15) needs to be done, who's here, who called out. And

(16) sometimes you go a little past that because operation

(17) can be a little bit busy, but we never overlapped by no

(18) more than 30 minutes or 20 minutes.

(19)    **Q.** So it would be kind of like a handoff?

(20)    **A.** Yeah. It's always a handoff to the next

(21) supervisor. You give them the cell phone and just talk

(22) about what happened on the operation, and stuff that

(23) needs to be done, or flights that come in, or flights

(24) that were delayed, or anything about what's going on

(25) with the fuelers, or anything about the equipment, you

**Page 15**

(1) know, stuff like that.

(2)    **Q.** Gotcha. And then, aside from yourself, so you

(3) have Andrew Dodge, you have Renaldo Navarro, a

(4) supervisor. Who else were supervisors at that time, in

(5) August of 2018?

(6)    **A.** Just a quick question. When you mean

(7) supervisors, are you talking about supervisors as,

(8) like, in general all the supervisors, or are you

(9) talking about supervisors that I just worked with on my

(10) side of the airport?

(11)    **Q.** No, I'm talking about the same level as you,

(12) so, like, fueling --

(13)    **A.** So on my operation on my side of the airport,

(14) it was me, Ray Navarro, July -- I can't pronounce his

(15) last name. July, Edsel and Tevita.

(16)    **Q.** What was the last one? I'm sorry.

(17)    **A.** Tevita.

(18)    **Q.** How do you spell that?

(19)    **A.** T-e-v-i-t-a.

(20)    **Q.** Okay. And when you say your side, is that the

(21) 103? Is what you guys called it?

(22)    **A.** The one at the time, yes, it was is 130 side.

(23) The 1-3-0 side.

(24)    **Q.** I mean 130.

(25)    **A.** Yes.

**Page 16**

(1)    **Q.** How many sides were there?

(2)    **A.** We had the 130 side, the 135 side, and we had

(3) another side -- like about three -- three or four

(4) sides.

(5)    **Q.** Gotcha. And then above the supervisors were

(6) duty managers, correct?

(7)    **A.** Yes.

(8)    **Q.** And at that time, in August of 2018, who do

(9) you remember the duty managers to be?

(10)    **A.** At the time, the duty managers were John

(11) Qually and Nico.

(12)    **Q.** That was working the 130 side?

(13)    **A.** Working -- duty managers were actually just

(14) the whole operation.

(15)    **Q.** So you remember John Qually. You remember

(16) Nico. Right?

(17)    **A.** Yes.

(18)    **Q.** Just a second. And then Renil was the general

(19) manager, correct?

(20)    **A.** Yes.

(21)    **Q.** And then Randy Davies was the vice president,

(22) but he's in Texas, is that correct?

(23)    **A.** Yeah, he was -- he was gone the beginning of

(24) 2018, though, so --

(25)    **Q.** I see. All right. Very good.

DEPOSITION OF ANDREW DODGE - 07/28/2020

BSA    Case 3:19-cv-08157-VC RENALDO NAVARRO vs. MENZIES AVIATION, INC.    Page 77 of 92    XMAX(5/5)

**Page 17**

(1)    Why don't you give me -- have your duties --
(2) have your duties as a supervisor changed from August
(3) 2018 to today?
(4)    A. Well, up until the Corona virus in March it
(5) was the same, but now I just got back from furlough, so
(6) I'm kind of just doing training as of right now, going
(7) back.
(8)    Q. Gotcha. Yeah, I mean, I think everybody is
(9) hoping that things kind of go back to normal hopefully
(10) soon, but it doesn't look that way.
(11)    Okay. So let's just talk about your duties.
(12) And I really want to focus on your duties and
(13) responsibilities with regards to August of 2018 as a
(14) supervisor.
(15)    A. Yeah.
(16)    Q. Can you tell me what you remember to be your
(17) duties and responsibilities.
(18)    A. So as a supervisor at the time -- at the time
(19) was to -- when you first come in, was to get the other
(20) supervisor's information: Get the cell phone, find out
(21) who's on the operation, who called out sick. After
(22) that it was to schedule the flights.
(23)    So I would set up -- find out what flight are
(24) coming in during my shift, what time the plane was
(25) coming in, what time the plane was leaving, and from

**Page 18**

(1) there put fuelers on a schedule for, hey, you're going
(2) to go from this flight to this flight.
(3)    And also, after that, it was to drive on the
(4) airport and just monitor the fuelers, if they needed
(5) help with something, or also monitor their safety. So
(6) making sure they're wearing their uniform. Make sure
(7) they're wearing their vest, earplugs, had their boots
(8) on. Make sure -- just come and check on them and make
(9) sure their equipment is running properly.
(10)    And also, if they call me, I would go assist
(11) them, or, you know -- and also just change things
(12) throughout the operation. Maybe the guy might call me
(13) and be, hey, my flight never showed up, and then I
(14) might just change their flights around.
(15)    Q. Right. Were you also in charge of providing
(16) breaks for people, like when they can go on --
(17)    A. Oh, yes, of course. So you would -- when you
(18) schedule flights, you would -- before their fifth hour,
(19) California law, you try to find a break period for 30
(20) minutes. There were days that sometimes the way the
(21) flights came in, you know, the guys would be fueling
(22) and would go over that because they're still on the
(23) aircraft. You can't just leave the aircraft. They
(24) would have to take their break after they were done
(25) fueling the aircraft.

**Page 19**

(1)    Q. Right. So the fuelers under your supervision,
(2) they depended on you for when they can take their
(3) breaks?
(4)    A. Yes. They would take -- some of the guys
(5) were, Hey, I need to take a break, or asking ahead of
(6) time, Hey, what time am I taking my break? So
(7) everything would be coordinated depending on what's
(8) going on on the operation at the time.
(9)    Q. And then, like you said, there are times where
(10) the fuelers would depend on you to help out with a
(11) particular situation. So you become kind of like an
(12) extra hand as well?
(13)    A. Say that again. Like, what do you mean?
(14) Sorry.
(15)    Q. Like if they're busy or they're shorthanded,
(16) you could come in also to help them?
(17)    A. Yeah, if there was something going on in the
(18) operation, I would report to my duty manager, know
(19) what's going on, let him know, Hey, we're short. Can I
(20) get some assistance from your side? And if we didn't
(21) have the manpower, I would help on a flight and hook up
(22) and help, you know.
(23)    Q. Exactly. Okay. And then, during the swing
(24) shift, how many fuelers did you normally supervise?
(25)    A. On a busy day, on a really busy day, I have

**Page 20**

(1) between maybe eight to ten guys on a really busy day,
(2) with full staff.
(3)    Q. Gotcha. And then if it's slow or not too
(4) busy --
(5)    A. There's some nonbusy days. Probably --
(6)    MR. WU: Andrew, make sure you hear Arlo's entire
(7) question before you start.
(8)    THE WITNESS: Sorry.
(9)    MR. URIARTE: Q. Yeah, because, Andrew, sometimes
(10) it gets hard for the court reporter, for Cindy, to
(11) actually kind of write down what we're saying if we're
(12) talking on top of each other. So let's give each
(13) other -- let's try give each other like a pause in
(14) between.
(15)    A. Okay.
(16)    Q. Thank you. So you said -- we were talking
(17) about, like, maybe on a slow or a normal day, how many
(18) people would you supervise?
(19)    A. About maybe five or six guys.
(20)    Q. Okay. In August of 2018, did you have some
(21) sort of accommodation or medical condition that where
(22) you actually asked the employer for an accommodation in
(23) the workplace?
(24)    A. I had given Renil Lal a doctor's note at the
(25) time, like in 2017, from my doctor, having sleep apnea.

**Page 21**

(1)     Q.  And did you and the company or Renil kind of
(2) go through how to deal with the condition, the medical
(3) condition, with regards to your job and, you know, what
(4) type of -- was there any type of accommodation worked
(5) out?
(6)     A.  I don't recall any conversation with Renil.  I
(7) just don't remember the conversations we had in the
(8) past.
(9)     Q.  Okay.
(10)     A.  I don't remember.
(11)     Q.  Did you have some sort of official or in place
(12) disability accommodation that kind of changed your
(13) normal workday that the company had to accommodate?
(14)     Was something like that in place?
(15)     A.  Well, they tried, like I said -- I mean, how
(16) you say, like it was -- I remember trying to stay doing
(17) things, stay -- like stay on top of doing things, try
(18) not to just, you know, sit in one place.  Just move
(19) around.
(20)     Q.  Right.  I guess I'm asking more from like a
(21) formal perspective.  Usually different companies deal
(22) with this in different ways, but usually, when an
(23) employee goes to an employer and says, hey, I have this
(24) medical condition that affects my workday, usually
(25) something is worked out, and then some things written

**Page 22**

(1) down saying, okay, well, here's what we're going to do.
(2)     A.  Well, see --
(3)     Q.  Something like that.  Did you guys do
(4) something like that?
(5)     A.  See, with the doctor's note and what they
(6) were -- what they were reading was is that -- I don't
(7) know how to describe it.  Sleep apnea is something --
(8) is a disease that you just -- I don't know how to
(9) describe it.  It's just a disease that you have, and
(10) it's something hard to work with, you know, for
(11) accommodations.  Do you know what I mean?
(12)     Q.  Yeah, yeah.
(13)     A.  It just happens.
(14)     Q.  I'm familiar with sleep apnea personally.  I'm
(15) also familiar with it because we've represented people
(16) with sleep apnea, so I know it very well.  Right, I
(17) understand.
(18)     My understanding is sometimes the difficulty
(19) with you, probably, would be like if you become
(20) stationary, not moving or something, then you click and
(21) you fall asleep or whatever, right?
(22)     A.  Yes, you're right.
(23)     Q.  I understand that.  But I guess my question
(24) more is almost like on a formal, written, you know -- I
(25) just wanted to know what procedure you went through,

**Page 23**

(1) what was in place, whether there was something --
(2)     A.  Yes.
(3)     Q.  -- in writing, or was it more informal, and
(4) you just told them the condition and nothing else.
(5)     A.  Well, like, even with a piece of paper from
(6) the doctor stating, because, like I said, in the past
(7) people were saying, like, I was just sleeping, but I
(8) provided a doctor's note showing what I had.  I didn't,
(9) you know -- I didn't know about it either until I had
(10) to go see the doctor, and that's when I provided them
(11) with a note what I had because I had to go to sleep
(12) tests and all that, and they finally diagnosed me with
(13) that.  And I had to show proof why it was happening,
(14) you know.
(15)     Q.  Okay.  So then who did you actually give that
(16) doctor's note to?
(17)     A.  Renil.
(18)     Q.  To Renil.  And then did Renil talk to you
(19) about it?
(20)     A.  I don't remember the -- we sat down.  I just
(21) don't remember the conversation.
(22)     Q.  Okay.  Did you guys work something out?  Was
(23) there some sort of game plan or --
(24)     A.  I don't remember, to be honest.
(25)     Q.  Okay.

**Page 24**

(1)     A.  I don't remember.
(2)     Q.  And was there like a piece of paper that came
(3) out of your meeting or anything like that?
(4)     A.  I honestly don't remember.
(5)     Q.  No problem.  Aside from Renil, who else did
(6) you talk to about your sleep apnea?
(7)     A.  John Qually.
(8)     Q.  And what did you talk to John Qually about?
(9)     A.  I just let him know that I gave Renil a piece
(10) of paper stating that, hey, what the condition that I
(11) have.
(12)     Q.  Okay.  And then -- I'm sorry.  Did you and
(13) John Qually work something out or some sort of
(14) agreement or game plan, anything like that?
(15)     A.  I don't remember any -- I don't remember a
(16) conversation like that.  I just don't remember.  Too
(17) long ago.
(18)     Q.  So how many conversations did you have with
(19) John Qually about your sleep apnea?
(20)     A.  When I -- the day -- the day I gave Renil that
(21) note back in, like, 2017, or something like that, I had
(22) let John know and Nico know at the time.
(23)     Q.  So just one time?  Just one conversation?
(24)     A.  Yeah.  And then sometimes, like if I was -- if
(25) I was, like, nodding off, John would kind of wake me

**Page 25**

(1) up, and "Sorry, man." And he'd understand. He'd say,
(2) "Oh, I remember."
(3)    **Q.** Gotcha. Did you ever tell your staff -- not
(4) your staff -- the fuelers about your condition?
(5)    **A.** A lot of them actually knew about it just
(6) because some of my fuelers actually have it, so the
(7) other guys kind of knew right away.
(8)    **Q.** Gotcha.
(9)    **A.** Yeah.
(10)    **MR. URIARTE:** I've got to do something. Let's
(11) take a five-minute break and go off the record for five
(12) minutes.
(13)    **MR. WU:** No problem. That's fine.
(14)    **MR. URIARTE:** Thank you.
(15)    (Brief recess.)
(16)    **MR. URIARTE:** Back on the record, Cindy?
(17)    **THE REPORTER:** Yes, go ahead.
(18)    **MR. URIARTE:** Let me show you what we'll mark as
(19) Exhibit 3.
(20)    David, do you have Exhibit 3, please?
(21)    **VIDEO OPERATOR:** Yes. I will bring that up
(22) shortly.
(23)    **MR. URIARTE:** I think we'll need a screen share
(24) for Mr. Dodge.
(25)    (Plaintiff's Exhibit 3 marked for

**Page 26**

(1)    identification.)
(2)    **MR. URIARTE: Q.** Mr. Dodge, do you know if
(3) clicking on the Chat box -- there you go. We have a
(4) screen share. Do you see it?
(5)    **A.** Yes.
(6)    **Q.** Great. So when we were talking about
(7) sleeping, I guess these pictures were taken of you. So
(8) you're saying that when you were falling asleep in the
(9) office or in the vehicle like that, that was part of
(10) your sleep apnea condition?
(11)    **MR. WU:** Objection.
(12)    **THE WITNESS:** Yeah.
(13)    **MR. WU:** Objection. Assumes facts not in evidence
(14) that these are photos of him.
(15)    **MR. URIARTE:** So, Mr. Dodge, just let your
(16) attorney finish his objection, and then you can answer
(17) after if you understand the question.
(18)    **THE WITNESS:** Sorry. Can you repeat the question
(19) one more time? Sorry.
(20)    **MR. URIARTE: Q.** Yes. So in these photographs,
(21) that's you, right, in the photograph?
(22)    **A.** Yeah, that's me, yes.
(23)    **Q.** And are you saying that when you fall asleep
(24) like this, that you -- that these events right here
(25) were part of your sleep apnea condition?

**Page 27**

(1)    **A.** I can tell you that in the photo, the one with
(2) the truck, yes. The one in the office, that was at the
(3) end -- I was done with my shift already.
(4)    **Q.** Gotcha. And do you remember if the one in the
(5) office was after a graveyard shift? Is that what that
(6) was?
(7)    **A.** I can't remember the dates. It's in the
(8) office. I don't remember. But I remember this -- I
(9) remember this photo.
(10)    **Q.** Gotcha. So you're saying the one in the
(11) office you were already done with your shift, and you
(12) went to the office to just nod off, is that correct?
(13)    **A.** I was done. I had transferred all my
(14) information. I went to the office and, yeah, fell
(15) asleep.
(16)    **Q.** And then the vehicle, is this -- the vehicle
(17) is a vehicle located in the tarmac? Is that where it
(18) is?
(19)    **A.** It's black and white, so I can't -- yeah.
(20)    **Q.** Okay. But you remember that the vehicle --
(21) when you were sleeping in the vehicle in this
(22) photograph, that was because of sleep apnea, is that
(23) correct?
(24)    **A.** Yeah, yes.
(25)    **Q.** Okay. So we're done with Exhibit 3.

**Page 28**

(1)    Can you tell me, by August of 2018, how long
(2) you had been working with Renaldo Navarro at that time?
(3)    **A.** Good question. Do you mean like how long had
(4) I been working with him as a co-worker, as like a --
(5) how do you say -- as a -- supervisors together or as,
(6) in general, a fueler and a supervisor?
(7)    **Q.** Yes. In general.
(8)    **A.** Since I began working for ASIG in 2016, I was
(9) his night fueler. So I began working with him as a
(10) night fueler, and then once I got promoted, I became a
(11) swing supervisor, so I would transfer my information to
(12) him.
(13)    And then while -- our schedules changed, and
(14) then I would cover the days he was off as a swing -- I
(15) mean, as a graveyard. And then there -- if someone
(16) called off, and I would see him from the night shift or
(17) into the morning shift, or I would cover his sick day.
(18) So, yeah, I worked with him a lot.
(19)    **Q.** Gotcha. And what was your general opinion
(20) with regards to Ray Navarro and how he did his job?
(21)    **A.** Oh, Ray's a great supervisor. There's no
(22) questions asked. He was there for a long time, and,
(23) you know, he's -- he did his job.
(24)    **Q.** And you and Ray -- at some point you and Ray
(25) started to have, like, difference of opinion with

DEPOSITION OF ANDREW DODGE - 07/28/2020

BSA    Case 3:19-cv-08157-VC   RENALDO NAVARRO vs. MENZIES AVIATION, INC   Page 80 of 92    XMAX(8/8)

**Page 29**

(1) regards to mainly your work performance.

(2)    Is that like a good way of putting it?

(3)    A.  Yeah, yes.  We bumped -- started bumping heads

(4) after my promotion.  There was just a lot of

(5) disagreements after my promotion.  After my promotion,

(6) that's when we started to bump heads.

(7)    Q.  Yeah.  And what was coming up as an issue?

(8) Why were you guys bumping heads?

(9)    A.  It was more just agreement on how we saw

(10) things, you know.  The reason I say that is because he

(11) ran his shift one way, I'd run my shift a different

(12) way, and another supervisor runs their shift a

(13) different way.  So he just never liked the way I did

(14) my -- the way I ran things because, also, he had more

(15) experience, and I'm the new supervisor.

(16)    Q.  Gotcha.  Would it be fair to say that some of

(17) the fuelers would go to Ray and complain about you?

(18)    A.  I honestly do not know what fuelers spoke, you

(19) know, unless they spoke to me.  I don't know what other

(20) people would say behind my back.

(21)    Q.  Right.  But I guess what I'm saying is, was it

(22) possible that some of the fuelers that you were

(23) supervisor -- you were supervising were complaining to

(24) him, and then he was kind of, like, bringing that

(25) complaint over to you and criticizing you because of

**Page 30**

(1) what he heard from the fuelers you're supervising?

(2)    MR. WU:  Objection.  Vague.  Calls for

(3) speculation.

(4)    You can answer if you know.

(5)    THE WITNESS:  Yeah, I don't know.  I mean, he

(6) brings stuff up, but I don't know if that was just him

(7) or the fuelers.  I don't know.

(8)    MR. URIARTE:  Q.  Before Ray being terminated, can

(9) you maybe quantify how many times Ray complained about

(10) you or talked to you and told you that you weren't

(11) doing your job properly?

(12)    Do you remember how many times that happened?

(13)    A.  We had a lot of confrontations, and he had a

(14) lot of complaints against him -- him and I when we were

(15) just having issues.  I can't say a number of times, but

(16) it was lot.

(17)    Q.  Would you say that more than ten times?  That

(18) many?

(19)    A.  Yeah, I would say more than ten times.

(20)    Q.  And you and him, did you guys ever talk to a

(21) duty manager or the general manager to try to, you

(22) know, figure things out, and, you know, any of the duty

(23) managers talk to you about this situation?

(24)    A.  Oh, yeah, yes.  I did speak to John about the

(25) situation going on.  I spoke to Nico about the

**Page 31**

(1) situation going on.  I spoke to Renil about the

(2) situation going on.

(3)    Q.  Okay.  And, well, did they provide any kind of

(4) solution or any kind of course of action?

(5)    A.  Yes.  Renil brought -- a couple times brought

(6) us in to try to solve the -- try to solve what's going

(7) on.

(8)    Q.  Yes.

(9)    A.  But when Renil was speaking on a way to

(10) resolve, Ray would always kind of interrupt Renil, you

(11) know, interrupt him, wouldn't let him finish, or didn't

(12) like what he would say.  So there was just a lot of

(13) things that Renil would try to fix, and then we'd come

(14) to an agreement, and then for maybe a good while it

(15) worked, and then it just -- again, we'd bump heads

(16) again.

(17)    Q.  Gotcha.

(18)    A.  And it was always about different things.

(19) There's a lot of different things that happened.

(20) Different subjects, though.

(21)    Q.  Yeah, yeah.  What are those subjects that you

(22) would remember?  Like what --

(23)    A.  Scheduling.  It was always about how I

(24) scheduled things.  It would come down to something

(25) about breaks, something about all the people don't like

**Page 32**

(1) you.  Him saying I shouldn't be a supervisor.  Stuff

(2) like that.

(3)    Q.  Yeah.  And when you say scheduling, you're

(4) talking about how you're scheduling the fuelers with

(5) regards to their workday and them being able to take

(6) breaks?  Is that what it is?

(7)    A.  Yeah, scheduling meaning how I schedule my

(8) flights to my crew.

(9)    Q.  And then breaks, what were the complaints

(10) about breaks?

(11)    A.  He was saying that I was giving the breaks

(12) late or not giving their breaks at all.  Stuff like

(13) that.

(14)    Q.  Did you ever inquire, you or Renil, with

(15) regard to, like, where he was getting his information?

(16) Because he wasn't working with you, so how did he know

(17) about the breaks and the scheduling and all of that?

(18)    A.  Renil would -- Renil would investigate, find

(19) out what was going on from fuelers and ask what was

(20) going on.  And, if anything, Renil -- if anything was

(21) questioned, Renil would ask me.  But the main question,

(22) Renil would ask me if I am giving the fuelers breaks.

(23) He never said fuelers are complaining.  It would be

(24) more like, Andrew, what did you -- can I see what you

(25) did, or can I see your text messages, stuff like that,

**Page 33**

(1) to see what I was doing. But he never said, hey,
(2) Andrew, so and so said they didn't get their break.
(3) You know what I mean?
(4)     Q. Okay. And did Renil ever suggest to you a
(5) better what way of doing things? Was there anything
(6) like that?
(7)     A. No, because -- no, because Renil knew how the
(8) operation was as well. Him being a general manager,
(9) he's been in that position knowing how the schedules
(10) work as well. He sees that.
(11)     Q. Okay. And Renil thought that you were
(12) providing the breaks properly?
(13)     A. Yeah.
(14)     MR. URIARTE: Okay. Let me show you Exhibit 8.
(15)     VIDEO OPERATOR: Okay. I will bring that up
(16) shortly.
(17)     MR. URIARTE: Okay.
(18)     (Plaintiff's Exhibit 8 marked for
(19)     identification.)
(20)     MR. URIARTE: Are you doing a screen share on
(21) that, David?
(22)     THE WITNESS: I see it now.
(23)     MR. URIARTE: Great. Okay. Do you know what
(24) Exhibit 8 is? I'll give you some time to take a look
(25) at that. Do you see that at all?

**Page 34**

(1)     A. Yes, I see it.
(2)     MR. WU: I'm going to object on the ground of
(3) attorney-client privilege.
(4)     If you've seen this document before, you can
(5) certainly talk about that. If you've only seen it
(6) during discussions with your attorney, I'd instruct the
(7) witness not to divulge the content of any of those
(8) discussions.
(9)     MR. URIARTE: Sure. Definitely, yeah. There's no
(10) question like that pending.
(11)     Q. But, yeah, Mr. Dodge, don't tell me the
(12) conversation that you had with your attorney with
(13) regards to this document. What I need to inquire about
(14) is what you know about this document and your memory,
(15) events related to this document. Okay?
(16)     A. Okay.
(17)     Q. So, yeah. So are you able to actually see
(18) this -- well, I'm not able to -- there you go.
(19)     MR. URIARTE: Actually, David, can you make it --
(20) because I'm not able to control it, can you make it so
(21) that -- there you go. That's good.
(22)     Q. So have you seen this document before,
(23) Mr. Dodge? Aside from maybe looking it over with your
(24) attorney, aside from that event, before that, like in
(25) 2018, did you see this document before?

**Page 35**

(1)     A. No, I did not.
(2)     Q. Okay. So you haven't seen this document at
(3) all?
(4)     A. No.
(5)     Q. I see. Okay. So, essentially, like back in
(6) August of 2018, nobody at Menzies, none of the duty
(7) managers, not the general manager, Renil, nobody from
(8) Menzies went through this document with you before?
(9)     A. No, they did not.
(10)     Q. Okay. Can we get to page 2 of Exhibit 8,
(11) please. So this is the -- what we call -- I guess this
(12) would be the first petition. And then I think there's
(13) a third page as well. Can you get the third -- there
(14) you go.
(15)     So I believe July Macapagal is a supervisor,
(16) is that correct, Mr. Dodge?
(17)     A. Yes.
(18)     Q. And then we go to page 2, and here on page 2 I
(19) think is where Mr. Navarro's signature is. If you look
(20) at line 16, he's the only other supervisor, I think,
(21) that also signed this.
(22)     I wanted to see from -- so if you look at No.
(23) 1, the first person who signed it, can you identify to
(24) me fuelers that you've worked with.
(25)     A. Fuelers that were, like, on my shift?

**Page 36**

(1)     Q. Yes.
(2)     A. Or in general worked with?
(3)     Q. People that you supervised as a supervisor.
(4)     A. I supervised all these people.
(5)     Q. Okay. You're sure about that? There's a lot
(6) of names here.
(7)     A. I supervised all these people.
(8)     Q. Okay. Great. All right. That makes that
(9) easy.
(10)     And then let's go to page 1. And then if we
(11) can just make page 1 a little bit bigger for -- there
(12) you go.
(13)     So in the bottom there, the one you don't see
(14) in the screen -- there you go. Perfect. Thank you
(15) very much. So this is page 1. So let me just read it.
(16) It says, "To: Menzies Management. Sir/madam, We the
(17) fuelers on Menzies 130 side would like to make a
(18) petition against Andrew Dodge. The way he supervised
(19) is very unprofessional when he run the operation or
(20) supervised, people are not taken their breaks it's
(21) because the way he set up flights, and he always
(22) blaming the people there's a delay or always saying
(23) lack of man power and trucks issues."
(24)     Okay. So let's kind of stick to that one --
(25) that second sentence there, "The way he supervised is

**Page 37**

(1) very unprofessional when he run the operation...people
(2) are not taken their breaks it's because the way he set
(3) up flights."
(4)      And, again, this is August of 2018.  At that
(5) time, I know that you, Ray and Renil had some
(6) conversations, and then you also had conversations with
(7) Renil with regards to the breaks in your text messages.
(8)      A.  Uh-huh.
(9)      Q.  Aside from that, did Menzies talk to you in
(10) relation to this petition about how people are
(11) complaining about their breaks?  Was that a
(12) conversation that you had?
(13)      A.  No.
(14)      Q.  What's your opinion on that, when you read
(15) your people are not taking their breaks because of the
(16) way he sets up flights --
(17)      A.  So --
(18)      Q.  -- and then you have, you know, 26 people
(19) signing that statement?  Can you tell me what your
(20) opinions is in regards to that or your reaction?
(21)      A.  Yeah.  I mean, like I said, people got their
(22) breaks.  It would just be determined on how the day was
(23) set up, you know, because aircrafts, the way you fuel
(24) aircrafts, sometimes you can be on a flight for two
(25) hours, you know, three hours, you know.  It just

**Page 38**

(1) depends on how long you're waiting for that fuel to be
(2) done, you're waiting for that mechanic to be done.  And
(3) then, you know, we always serve out a break.  You know
(4) what I mean?  They'd get their breaks.
(5)      Q.  Right.  But sometimes they'd just be --
(6)      A.  It just depends on how the flights are coming
(7) in and stuff like that, you know.  That's how -- how we
(8) ran it, you know, and that's how I was trained as well.
(9) You just -- and also, like I said, sometimes you're
(10) short manpower and sometimes you fuel longer a little
(11) bit and then get your break.  It just depends, like I
(12) said, on the schedule.
(13)      Q.  I see.  What about this item here with regards
(14) to "Andrew Dodge lack of experience about fueling"?
(15) What do you think about that?
(16)      A.  To be honest, that's just -- I don't know -- I
(17) don't know what word he used for that, but I became a
(18) supervisor because I know what I was doing.  I was
(19) trained on everything.  I was actually -- at the time,
(20) before Menzies bought us, I was considered a Class A
(21) fueler, which is one of the top fuelers.  Like, having
(22) that title is really high, meaning I know how to do
(23) everything, from fueling, defueling, driving every
(24) piece of equipment on the thing, knowing how to fix
(25) equipment.  It's just the knowledge of fueling in

**Page 39**

(1) general, safety.  I was, like, one of the top people.
(2)      Q.  Okay.  Aside from this petition, did you have
(3) fuelers go up to you and complain to you about their
(4) breaks, like maybe they're late, maybe they're short,
(5) or anything like that?
(6)      Was that something that was happening in or
(7) around August of 2018?
(8)      A.  I actually had people asking me, Hey, when am
(9) I going to get my break?  And, you know, they'll come
(10) up to me, ask me what's going on, or can I see what
(11) you're planning, and I always talk to my fuelers.
(12) That's the main thing about the job, is communication,
(13) communication, talking and finding out, you know,
(14) plans, planning things out.
(15)      Q.  So why do you think these fuelers, you know,
(16) all 26 of them, signed a petition against you?  Why
(17) would that happen?
(18)      A.  Honestly, I don't know -- actually, a lot of
(19) these names on here that I see people call me saying
(20) that, you know, they were forced to sign a petition.
(21) And they would tell me, Hey, I didn't want to sign it,
(22) you know, but they were forced to sign it, or they
(23) didn't read it, or stuff like that.
(24)      Q.  I see.  And they were forced to sign the
(25) petition.  Like, do you know by whom and why they were

**Page 40**

(1) forced to sign the petition?
(2)      A.  A lot of the guys -- a lot of the guys on the
(3) list would call me and say Ray was telling them to sign
(4) the paper to try to get me terminated or -- how do you
(5) say -- demoted from being a supervisor.
(6)      Q.  Gotcha.  And then do you know who Rafael
(7) Vasquez is?
(8)      A.  Yeah.  At the time, he was one -- a fueler and
(9) a union representative.
(10)      Q.  Okay.  Did you know that it was actually
(11) Rafael Vasquez who put together the petition?
(12)      MR. WU:  Objection.  Assumes facts not in
(13) evidence.
(14)      MR. URIARTE:  Q.  Did you know that, Mr. Dodge?
(15)      A.  No, I did not.
(16)      MR. URIARTE:  Let's go ahead and put up Exhibit
(17) 10.
(18)      (Plaintiff's Exhibit 10 marked for
(19)      identification.)
(20)      MR. URIARTE:  Q.  So here we go.  So this one will
(21) be Exhibit 10.  And as you see, it's signed by Rafael
(22) Vasquez.  I think there's a date in the bottom there of
(23) November 18, 2018, when he signed this statement.
(24)      So did you have problems with Rafael Vasquez
(25) at all in or around August or November of 2018?  Were

**DEPOSITION OF ANDREW DODGE - 07/28/2020**

BSA    Case 3:19-cv-08157-VC RENALDO NAVARRO vs. MENZIES AVIATION, INC. Document 34-6 Filed 09/16/20    Page 83 of 92    XMAX(11/11)

**Page 41**

(1) you having problems with him, Mr. Dodge?

(2)    **A.** Rafael didn't work with me on my side of the

(3) airport.

(4)    **Q.** Oh, I see. I see. So he's on another side of

(5) the airport?

(6)    **A.** Yes.

(7)    **Q.** Gotcha. Okay. So it looks like, from this

(8) statement that he signed, that says that he was asked

(9) by Menzies Aviation fuelers to write a petition on

(10) behalf of the fuelers on the 130 side.

(11)    Did you know that they -- that these fuelers

(12) submitted two petitions? Did you know that?

(13)    **A.** No, I did not.

(14)    **Q.** Okay. So, based on your responses, is it fair

(15) to say that nobody from Menzies Aviation ever sat you

(16) down to discuss one or two petitions that were written

(17) out against you at that time while it was happening?

(18)    **A.** No. I'm the one that brought it up to Renil,

(19) saying that there was a petition going around, because

(20) one of the fuelers had called me about it.

(21)    **Q.** So you knew that a petition was going around,

(22) but nobody from Menzies Aviation management ever kind

(23) of, like, sat down with you or talked to you about it,

(24) right? Is that correct?

(25)    **A.** No, I don't -- I never, no.

**Page 42**

(1)    **Q.** And you found out that there was a petition

(2) going around against you, but you never read the actual

(3) petition. Is that how it was?

(4)    **A.** Yeah, I never got to see it, no.

(5)    **Q.** And you're saying that the first time you saw

(6) it was actually a part of this litigation. Is that

(7) what you're saying?

(8)    **A.** Yes.

(9)    **MR. URIARTE:** Let's put up Exhibit 5, please.

(10)    **VIDEO OPERATOR:** Okay. Coming up shortly.

(11)    **MR. URIARTE:** Thank you.

(12)    (Plaintiff's Exhibit 5 marked for

(13)    identification.)

(14)    **MR. URIARTE:** It's not a very good copy, so I

(15) guess Exhibit 5, Mr. Dodge, if we can just make it

(16) smaller so he sees the whole thing. There you go.

(17)    **A.** Yeah.

(18)    **Q.** Is this the letter that you wrote after you

(19) found out that a petition was being turned in against

(20) you?

(21)    **A.** I can't read what I wrote, but I think this is

(22) the one I wrote after I found out there was a petition.

(23) One of the fuelers called me.

(24)    **Q.** Correct. Correct. If you go to the bottom of

(25) it, I think this is your signature, right?

**Page 43**

(1)    **A.** Yeah.

(2)    **Q.** That one there?

(3)    **A.** Yes.

(4)    **Q.** Okay. And did you have a meeting with Menzies

(5) management about this letter at all?

(6)    **A.** I do not recall -- I don't remember from when

(7) I wrote it. I think I wrote it during my shift, and I

(8) turned it in or -- I either wrote it in the office with

(9) Raul at the time or -- I just don't remember.

(10)    **Q.** I see. I see. So it's possible that you

(11) wrote it with the assistance of Raul. Is that what

(12) you're saying?

(13)    **A.** Yeah, it was Raul or Renil that told me to

(14) write -- write a statement.

(15)    **Q.** And why did they tell you to write a

(16) statement? Do you know?

(17)    **A.** Just to have it on file that they were going

(18) to look into it.

(19)    **Q.** Okay. But how did that meeting start? Was

(20) that -- like, why did you kind of arrive at that

(21) meeting?

(22)    **A.** Like, why did I -- are you saying, like, why

(23) did I write it or --

(24)    **Q.** No. Well, you said that you had a meeting

(25) with Raul or Renil --

**Page 44**

(1)    **A.** It wasn't a meeting. It was more like a --

(2) like you walk in, let them know, hey, this is what's

(3) going on on the operation. Like, here's -- like this

(4) is what people are telling me.

(5)    **Q.** Okay.

(6)    **A.** And they tell you, hey, just write statement

(7) down and --

(8)    **Q.** Okay. Okay. So it started with a fueler

(9) calling you and saying, Hey, there's a petition going

(10) around against you. Is that how it started?

(11)    **A.** Yes.

(12)    **Q.** Okay. And then, with that information, you

(13) then go to Renil or Raul. We don't know, right? Renil

(14) or Raul or both of them?

(15)    **A.** Yeah, it was either/or. Yeah, it was

(16) either/or.

(17)    **Q.** So you went to either one of them to tell them

(18) that? What exactly did you tell them?

(19)    **A.** "Oh, hey, I got a phone call from a couple of

(20) fuelers on my personal cell at home saying that

(21) they" -- "there was a petition going around against me

(22) that they didn't want to sign, but they felt forced to

(23) sign it."

(24)    And then when I told them that -- I don't

(25) remember if it was Renil or Raul -- they just told me

**Page 45**

(1) to write a statement down and to turn it in to them and
(2) that they would look into it.
(3)    Q.  All right.  And then when you say -- how much
(4) help did you get from Renil or Raul with regards to
(5) writing the statement?  Like, did you guys --
(6)    A.  I don't know what -- like, from there on, I
(7) don't know what they -- how they did their
(8) investigation or anything like that.  So I just went on
(9) and kept doing my job.
(10)    Q.  I see.  But with regards to writing the
(11) statement, are these words totally yours?
(12)       Like, you sat there and started --
(13)    A.  Yeah, I went to a different office and wrote
(14) this statement.
(15)    Q.  I see.  I see.  Okay.  And then you turned it
(16) in?
(17)    A.  Yes.
(18)    Q.  Would it be not accurate to say that they
(19) helped you with the words that are in this statement?
(20)    A.  Those are all me.  No, they didn't help me
(21) with wording at all.
(22)    Q.  All right.  But when they said -- when they
(23) told you to write this statement, did they tell you
(24) what to write about?
(25)    A.  No.  They just said write -- like, write

**Page 46**

(1) what's going on, like, why -- you know, what you heard.
(2) Stuff like that.
(3)    MR. URIARTE:  All right.  So we're done with
(4) Exhibit 8.  I need like a five-minute break.  Let's see
(5) where we are.  Let's take a five-minute break.  Off the
(6) record.
(7)    MR. WU:  That's fine.  Thank you.
(8)       (Brief recess.)
(9)    MR. URIARTE:  Let's go back on the record.  We
(10) don't have much more, but let me go through a couple
(11) more here.
(12)    Q.  Mr. Dodge, you said that a fueler had called
(13) you that a petition was going around.  Do you remember
(14) who that fueler was?
(15)    A.  Yeah, Mario Caballero -- Caballero.  Mario
(16) Caballero.
(17)    Q.  And you said that he felt like he was forced
(18) to sign the petition or he didn't understand the
(19) petition.  Is that what he said?
(20)    A.  When I -- when I received a phone call from
(21) him, his first words, "Hey, Andrew, just want to let
(22) you know there's a petition going around.  I didn't
(23) want to sign it, but he made me sign it.  I'm just
(24) letting you know.  I don't want to get into trouble or
(25) anything."

**Page 47**

(1)       And then -- and I said -- told him thank you,
(2) and I would -- I said, "Thank you, and I will," you
(3) know, "talk to management."
(4)    Q.  Okay.  And when you say "he made me sign it,"
(5) who's "he"?
(6)    A.  He mentioned Ray Navarro.
(7)    Q.  Okay.  And, then, let's go back to Exhibit 10,
(8) please.
(9)    VIDEO OPERATOR:  Hold on.  I'll bring it up.
(10)    MR. URIARTE:  Thank you.
(11)    THE WITNESS:  Okay.
(12)    MR. URIARTE:  Q.  So I wanted to discuss something
(13) here.  It says, "There have been two separate Petitions
(14) turned into Menzies Aviation Fueling Department
(15) Director Raul Vargas."  Do you see that?
(16)    A.  Yes.
(17)    Q.  Okay.  Did Raul Vargas ever talk to you about
(18) these two petitions?
(19)    A.  Sorry, can you repeat that one more time.  You
(20) broke up.
(21)    Q.  Sure.  Did Raul Vargas ever talk to you about
(22) two petitions being signed against you?
(23)    A.  No, he did not.
(24)    Q.  Did Raul Vargas ever talk to you about how you
(25) give your breaks, and fuelers complaining against you,

**Page 48**

(1) or anything like that?
(2)    A.  No, he did not.
(3)    Q.  Did anybody from Menzies, you know, from John
(4) Qually, the duty mangers, or Renil Lal at that time,
(5) did any one of them kind of, like, talk to you about
(6) maybe, you know, you giving your breaks better or
(7) having some sort of plan of action?
(8)    A.  Like I said before, Renil and I spoke, but he
(9) just wanted -- he reviews my schedules.  I used to turn
(10) in -- we'd turn, like, you know, a shift report in
(11) every night.
(12)    Q.  Okay.
(13)    A.  And, also, I would turn in my schedules to him
(14) so he would see everything written down, so -- from
(15) what I did.  So, basically, for example, with let's say
(16) fueler A, I'd write down his flights, and in the middle
(17) I'll put a "B," stands for break, and what else he did.
(18) You know what I mean?  And then I also -- he could
(19) research the times, you know, because -- with the phone
(20) app or online.
(21)    Q.  Okay.  And you went through -- you went
(22) through meetings with Renil Lal about that in around
(23) August of 2018?
(24)    A.  I -- I don't remember the time or date, any of
(25) that.

**DEPOSITION OF ANDREW DODGE - 07/28/2020**

BSA    Case 3:19-cv-08157-VC RONALD NAVARRO, et al. vs. MENZIES AVIATION, INC./06/20    Page 85 of 92    XMAX(13/13)

Page 49

(1)    **Q.**  Did Mr. Lal ever tell you that he was doing
(2)  that as part of, you know, investigating these
(3)  petitions against you?
(4)    **A.**  No.  He one time mentioned that Ray was
(5)  complaining, so he just wanted to see what I did
(6)  compared -- you know, compared to other supervisors and
(7)  how they were doing their schedules.
(8)    **Q.**  I see.  And -- okay.  And out of those
(9)  meetings, was any kind of -- was there any
(10)  recommendation given to you as to, like, do your job
(11)  better, or was there any comment or anything like that?
(12)    **A.**  I don't recall what he said to me at all.
(13)    **Q.**  Did you have to change the way you were doing
(14)  things in order to give your breaks better or something
(15)  like that?
(16)    **A.**  No.  Up until March, I was doing the same way.
(17)    **Q.**  And you're saying up until March of 2020?
(18)    **A.**  Yeah, until I got furloughed, yes.
(19)    **Q.**  Okay.  Also in Exhibit 10, it says, "I have
(20)  spoken to The Menzies Aviation Fueling Director Raul
(21)  Vargas on three separate occasions regarding Mr. Dodge,
(22)  who continues to abuse his authority and at times
(23)  harass Fuelers under his charge."
(24)        Do you see that?
(25)    **A.**  Yes, I do see that.  Yeah.

Page 50

(1)    **Q.**  What do you think -- what's your opinion on
(2)  that with regard to Rafael Vargas stating that you
(3)  continue to abuse your authority?
(4)        Do you know anything about that?
(5)    **A.**  I mean --
(6)    **MR. WU:**  Objection.  Assumes facts not in
(7)  evidence.
(8)        But you can answer.
(9)    **MR. URIARTE:  Q.**  Mr. Dodge?
(10)    **A.**  Sorry.  Okay.  I -- I mean, from when I see
(11)  that, I can tell you that's just not true.  I mean,
(12)  I've never harassed any of my employees or any of that
(13)  type of circumstance.
(14)    **Q.**  I see.  When you say -- when it says "abuse
(15)  his authority," like how would you be able to abuse
(16)  your authority during your shifts?
(17)    **A.**  Honestly, I don't know how I could abuse my
(18)  authority to this current day.  I'm still a supervisor
(19)  here --
(20)    **Q.**  I see.
(21)    **A.**  -- with the same employees.
(22)    **Q.**  I'm sorry.  What was that?
(23)    **A.**  I said I'm still a supervisor here with the
(24)  same employees.
(25)    **Q.**  Okay.  And have any fuelers gotten a complaint

Page 51

(1)  against you that you were harassing them?
(2)    **A.**  No.
(3)    **Q.**  Have any of the fuelers ever come up to you
(4)  and said, hey, Andrew, you know, you're doing this
(5)  wrong, or, you know, complained to you about not giving
(6)  their breaks, or them working too hard because you're
(7)  not doing your job?  Anything along those lines?
(8)    **A.**  I've had fuelers just come up to me and try
(9)  to, like, give suggestions on how they want to -- how
(10)  they see things -- on how they see things, but, you
(11)  know -- and then I have to explain to them what's going
(12)  on, and I'd show them, and they would understand.
(13)  That's about it.
(14)        But I've never had -- I've had someone coming
(15)  up to me asking when they would get their break, and I
(16)  would explain to them as well, you know, the situation,
(17)  and they would understand.
(18)    **Q.**  I see.  All right.  Can we go back to Exhibit
(19)  5, please.  Okay.  I know it's hard to read, but I was
(20)  going to start with -- well, that first sentence kind
(21)  of ends with "the company don't need me, that I'm a bad
(22)  supervisor, and all I do is cause delays."
(23)        What do you mean by that, "all I do is cause
(24)  delays"?
(25)    **MR. WU:**  Objection.  Objection.  Assumes facts not

Page 52

(1)  in evidence.  The document speaks for itself.  But the
(2)  witness can answer.
(3)    **THE WITNESS:**  So when you say -- I mean, what
(4)  you're saying is -- I'm not saying that I'm causing it.
(5)  What I'm saying is Ray's complaining about that I'm
(6)  causing delays and stuff like that.
(7)    **MR. URIARTE:  Q.**  Correct.  Yeah, that's how I
(8)  understand it as well, Mr. Dodge.  But these are the
(9)  things that Ray is saying that you're doing wrong,
(10)  right?
(11)    **A.**  Yeah.  And to be the honest, that's not true.
(12)  Has there been delays?  Of course there's been delays.
(13)  But that's not just because of the way I ran my shift.
(14)  It's just things happen at the airport.
(15)    **Q.**  So it's your opinion that when delays happen,
(16)  it's not because of your bad work performance.  It's
(17)  just it would happen to any supervisor.  Is that your
(18)  opinion?
(19)    **A.**  Yeah.  Yes, sorry.  I mean, yes, it happens to
(20)  everybody.
(21)    **Q.**  Okay.  And you're not -- not because of lack
(22)  of your abilities or lack of your work, but just like
(23)  if some other supervisor was working that shift, there
(24)  would be the same delays.  Is that how you would put
(25)  it?

**Page 53**

(1)     **A.** Well, that's because every shift is different,
(2) so airplanes don't always have the same schedule on
(3) every supervisor's shift, so things happen differently
(4) to all of us.
(5)     **Q.** Right. But your work performance has some
(6) sort of bearing with regards to delays that are caused
(7) by fueling operations, right? Isn't that what --
(8)     **A.** Delays are caused by either aircrafts delayed
(9) by the operations at the airport, delayed by ground
(10) crew, delayed by, you know -- there's different --
(11) there's different reasons why the plane could be
(12) delayed.
(13)     **Q.** And at least around August of 2018, is it your
(14) opinion that you weren't -- your operation, your
(15) fueling operation, wasn't really the cause of the
(16) delays that were happening? Is that your opinion on
(17) that?
(18)     **A.** Our side -- our side, the 130 side, is a very
(19) good fueling operation. We barely took any delays.
(20)     **Q.** Okay. And then towards the end of this
(21) letter, it says, "Ray shows up at 5:30 or 9:00 p.m.
(22) when Renil and Jeff" -- do you see "Jeff" there? Is
(23) that Jeff Cook?
(24)     **A.** No, that's Jeff. He's a -- a manager out of
(25) Seattle International.

**Page 54**

(1)     **Q.** Oh, okay. So he told Ray not to come early
(2) anymore. Do you see that?
(3)     **A.** Okay, yeah. That's a -- yeah, yeah.
(4)     **Q.** So that would be Jeff Cook or --
(5)     **A.** No, that's Jeff -- I don't remember his last
(6) name. I can get his last name for you, but I just
(7) don't remember his last name.
(8)     **Q.** And that Jeff -- that Jeff, you said, works
(9) for Menzies in Seattle International?
(10)     **A.** Yeah, that's his main station, yes.
(11)     **Q.** I see. So how come he would get involved in
(12) telling Ray not to come in early?
(13)     **A.** So the reason -- we were going through a
(14) transition, you know, from ASIG to Menzies. At the
(15) time, Renil was the acting general manager. Raul
(16) Vargas was the director -- new director we had, so they
(17) were getting things together. So Jeff would come down
(18) and help our station.
(19)     **MR. URIARTE:** Gotcha. Okay. I have no further
(20) questions.
(21)     **MR. WU:** No questions on my end either.
(22)     **MR. URIARTE:** Okay. Thank you, Mr. Dodge. Thank
(23) you for your time today. Thank you for providing this
(24) deposition.
(25)     **THE WITNESS:** You're welcome.

**Page 55**

(1)     (Whereupon, the deposition
(2) concluded at 10:32 o'clock a.m.)
(3)     ---oOo---
(4)
(5)
(6)
(7)
(8)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

**Page 56**

(1)            CERTIFICATE OF WITNESS
(2)             ---oOo---
(3)
(4)     I, ANDREW DODGE, hereby declare under
(5) penalty of perjury that I have read the foregoing
(6) deposition testimony; and that the same is a true
(7) and correct transcription of my said testimony
(8) except as corrected pursuant to my rights under
(9) Rule 30(e) of the Federal Rules of Civil
(10) Procedure.
(11)
(12)     _____
(13)               Signature
(14)     _____
(15)                Date
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

## Page 57

(1) STATE OF CALIFORNIA        )
                               )
(2) COUNTY OF SAN FRANCISCO )

(3)         I, CINDY TUGAW, a Certified Shorthand Reporter

(4) of the State of California, duly authorized to

(5) administer oaths pursuant to Section 8211 of the

(6) California Code of Civil Procedure, do hereby certify

(7) that

(8)                 ANDREW DODGE,

(9) the witness in the foregoing deposition, was by me duly

(10) sworn to testify the truth, the whole truth and nothing

(11) but the truth in the within-entitled cause; that said

(12) testimony of said witness was reported by me, a

(13) disinterested person, and was thereafter transcribed

(14) under my direction into typewriting and is a true and

(15) correct transcription of said proceedings.

(16)         I further certify that I am not of counsel or

(17) attorney for either or any of the parties in the

(18) foregoing deposition and caption named, nor in any way

(19) interested in the outcome of the cause named in said

(20) caption.

(21)         Dated the 7th day of August, 2020.

(22)

(23)

(24)

                    CINDY TUGAW

(25)                CSR No. 4805 (California)

## Page 58

(1) Andrew Dodge
    c/o Foley & Lardner
(2) 555 California Street, Suite 1700
    San Francisco, CA 94104
(3) Attn: Jason Y. Wu, Esq.
(4) Date:  August 7th, 2020
    Re:  Navarro vs. Menzies Aviation
(5) Deposition Date:  Tuesday, July 28, 2020
(6) Dear Mr. Dodge,
(7)         Please be advised the original transcript of
    your deposition is ready for your review.
(8)         Pursuant to FRCP Rule 30(e), you have
    30 days following the date of this notice to read,
(9) correct if necessary, and sign your transcript unless
    the attending parties and the deponent agree on the
(10) record or otherwise in writing to a longer or shorter
    time period.  The deponent may change the form or the
(11) substance of the answer to a question, and may either
    approve the transcript of the deposition by signing it,
(12) or refuse to approve the transcript by not signing it.
    You are not required by law to read and sign your
(13) deposition transcript.  All parties will be informed of
    the corrections.  The original transcript will then be
(14) sealed and sent to the examining attorney pursuant to
    the applicable law.
(15)         You may either come to our office to read and
    sign the original transcript, or you may contact your
(16) attorney or the attorney who arranged for you to be
    present at your deposition.  If they have ordered a
(17) copy of the transcript, you may review their copy and
    make corrections by submitting, signing and returning
(18) the attached form.  If you choose to review your
    transcript at our office, please call first to make an
(19) appointment.  Should you have any question regarding
    these instructions, please call.
(20)
    Sincerely,
(21)

(22)

    NOGARA REPORTING SERVICE
(23) 5 Third Street, Suite 415
    San Francisco, California 94103
(24) (415) 398-1889
    cc:  All counsel, original deposition
(25)

# EXHIBIT 52

**DEPOSITION OF RANDALL DAVIES - 07/28/2020**

**RENALDO NAVARRO vs. MENZIES AVIATION, INC.**

CONDENSED TRANSCRIPT AND CONCORDANCE

**PREPARED BY:**

**NOGARA REPORTING SERVICE**
**5 Third Street, Suite 415**
**San Francisco, CA  94103**
**Phone:  (415) 398-1889**
**FAX:  (415) 398-0611**



## Page 1

(1)          IN THE UNITED STATES DISTRICT COURT

(2)       IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

(3)

(4)

(5) RENALDO NAVARRO,

(6)          Plaintiff,

(7) v.                        No.  3:19-CV-8157

(8) MENZIES AVIATION, INC.,

    doing business as MENZIES

(9) and DOES 1 through 10,

    inclusive,

(10)

             Defendants.

(11) _____/

(12) Zoom Remote Deposition of

(13)    RANDALL DAVIES

(14)  Tuesday, July 28, 2020

(15)

(16)

(17)

(18)

(19)

(20) REPORTED BY:  CINDY TUGAW, CSR #4805

(21)

(22)

(23)          NOGARA REPORTING SERVICE

             5 Third Street, Suite 415

             San Francisco, California 94103

(24)             (415) 398-1889

(25)

## Page 2

(1)              I N D E X

(2)                               Page Number

(3) EXAMINATION BY MR. URIARTE            4

(4)              ---o0o---

(5)            E X H I B I T S

(6) No Exhibits Marked

(7)              ---o0o---

(8)

(9)

(10)

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

## Page 3

(1)       BE IT REMEMBERED that, pursuant to Notice of

(2) Taking Deposition and on Tuesday, the 28th day of July,

(3) 2020, commencing at the hour of 1:02 o'clock p.m.

(4) thereof, via Zoom videoconference, before me, CINDY

(5) TUGAW, a Certified Shorthand Reporter in the State of

(6) California, personally appeared,

(7)          RANDALL DAVIES,

(8) called as a witness by the Plaintiff, having been by me

(9) first duly sworn, was examined and testified as

(10) hereinafter set forth.

(11)          ---o0o---

(12)       APPEARANCES OF COUNSEL

(13) For the Plaintiff

     LIBERATION LAW GROUP, P.C.

(14) 2760 Mission Street

     San Francisco, California 94110

(15) BY:  ARLO GARCIA URIARTE, Attorney at Law

     (415) 695-1000

(16)

(17) For the Defendants

     FOLEY & LARDNER, LLP

(18) 555 California Street, Suite 1700

     San Francisco, California 94104

(19) BY:  JASON Y. WU, Attorney at Law

     (415) 984-9848

(20)

    Also Present:  David Ho, Zoom Host.

(21)

             ---o0o---

(22)

(23)

(24)

(25)

## Page 4

(1)    **THE REPORTER:**  At this time, I will ask counsel to

(2) stipulate on the record that there is no objection to

(3) this deposition officer administering a binding oath to

(4) the witness via Zoom, starting with the noticing

(5) attorney.

(6)    **MR. URIARTE:**  No objection.

(7)    **MR. WU:**  And no objection from defendant, Menzies

(8) Aviation.

(9)       (Whereupon, the Witness was duly sworn by the

(10)    Reporter.)

(11)       EXAMINATION BY MR. URIARTE

(12)    **MR. URIARTE:  Q.**  Good afternoon, Mr. Davies.

(13) Could we ask you to please state and spell your full

(14) legal name for the record.

(15)    **A.**  It is Randall, R-a-n-d-a-l-l, Paul, P-a-u-l,

(16) Davies, D-a-v-i-e-s.

(17)    **Q.**  Thank you, Mr. Davies.  Thank you for being

(18) here.  And I understand that you're here pursuant to a

(19) notice of deposition that you may have seen, is that

(20) correct?

(21)    **A.**  I have not seen a deposition, only what my

(22) lawyer told me.

(23)    **Q.**  Okay.

(24)    **A.**  Be deposed at a deposition.

(25)    **Q.**  Gotcha.  My name is Arlo Uriarte.  I am the

DEPOSITION OF RANDALL DAVIES - 07/28/2020

BSA    Case 3:19-cv-08157-VC   RENALDO NAVARRO vs. MENZIES AVIATION, INC.   Page 91 of 92   XMAX(2/2)

**Page 5**

(1) attorney for Renaldo Navarro in his action against
(2) Menzies Aviation. Do you understand that?
(3)    **A.** Yes.
(4)    **Q.** I think, right off the bat, I wanted to
(5) clarify, were you at all involved, maybe, in the
(6) suspension or termination of Mr. Navarro?
(7)    **A.** No.
(8)    **Q.** Could you state what your position was with
(9) Menzies Aviation in August of 2018.
(10)    **A.** I was the senior vice president of U.S. fuel
(11) consortiums, and that's the position I have today.
(12)    **Q.** Okay. And in that position you had the San
(13) Francisco International Airport fuelers within your
(14) jurisdiction, I would say?
(15)    **A.** No.
(16)    **Q.** Oh, okay. So the San Francisco fuelers were
(17) not within your area of responsibility?
(18)    **A.** No, I only have the fuel farm employees only
(19) at San Francisco Airport.
(20)    **Q.** So would it be safe to say that Renaldo
(21) Navarro, who was a fueling supervisor, was not within
(22) your area of responsibility or one of the employees
(23) within your supervisory kind of role?
(24)    **A.** That's correct.
(25)    **Q.** All right. So do you have any knowledge

**Page 6**

(1) whatsoever with regards to the events and the process
(2) they went through with regards to Renaldo Navarro and
(3) his termination?
(4)    **A.** I'm only aware of what my lawyer told me --
(5) our lawyer told us. Prior to this --
(6)    **Q.** Let me just stop you there. We are not
(7) entitled to any information regarding your conversation
(8) with your attorney, between you and your attorney.
(9)    **A.** Okay.
(10)    **Q.** So I don't want to be purview to that, and I
(11) don't want you to inadvertently waive that privilege.
(12)    **A.** Okay.
(13)    **Q.** I think it's best that you protect that
(14) privilege.
(15)    So you were saying you are only aware of --
(16) maybe I'll paraphrase for you and see if it's better
(17) this way.
(18)    You were only made aware because of this
(19) litigation and your attorney alerting you to it? Is
(20) that a good way of putting it?
(21)    **A.** Yes. Correct.
(22)    **Q.** But as the events were happening, you were not
(23) at all involved in that?
(24)    **A.** Not at all, no.
(25)    **Q.** Okay. Great. That makes for a very short --

**Page 7**

(1) that's why I wanted to make sure. For one reason or
(2) another, you are listed as a witness here. And maybe
(3) that was an error or maybe that is just because we were
(4) not aware of the difference. Maybe you could explain
(5) that to us.
(6)    The San Francisco farm employees as opposed to
(7) the San Francisco International Airport employees, can
(8) you just kind of explain that distinction?
(9)    **A.** Yes, I can. So in San Francisco there's two
(10) operations operated by Menzies. One is the into-plane
(11) fueling operation which reports to another vice
(12) president, okay, and then also is the fuel facility or
(13) fuel farm employees that report directly to me.
(14)    **Q.** Okay.
(15)    **A.** Two operations of the same company, but two
(16) different reporting structures.
(17)    **Q.** Gotcha. Gotcha. And who would be that other
(18) vice president that's involved in the other side of the
(19) operations?
(20)    **A.** At this time, it is Joe Conlon.
(21)    **Q.** And then, in August of 2018, do you know?
(22)    **A.** It would have been Kevin Brown.
(23)    **MR. URIARTE:** Okay. Well, thank you. I mean,
(24) with that, Mr. Davies, I will not pursue any other line
(25) of questioning.

**Page 8**

(1)    I don't know, Mr. Wu, if you have a
(2) different -- if you have other questions.
(3)    **MR. WU:** No questions on my end, Arlo.
(4)    **MR. URIARTE:** Okay. Thank you, Mr. Davies. Sorry
(5) for subjecting you to this process. It looks like we
(6) have the wrong person, the wrong vice president.
(7)    **THE WITNESS:** Okay. No problem. Thank you. Have
(8) a great day.
(9)    **MR. WU:** Thank you very much, Randy.
(10)    (Whereupon, the deposition
(11)    concluded at 1:07 o'clock p.m.)
(12)    ---o0o---
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

**Page 9**



(1)                CERTIFICATE OF WITNESS

(2)                     ---o0o---

(3)

(4)        I, RANDALL DAVIES, hereby declare under

(5)  penalty of perjury that I have read the foregoing

(6)  deposition testimony; and that the same is a true

(7)  and correct transcription of my said testimony

(8)  except as corrected pursuant to my rights under

(9)  Rule 30(e) of the Federal Rules of Civil

(10) Procedure.

(11)

(12)        _____

                        Signature

(13)

(14)        _____

                           Date

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

---

**Page 10**

(1)  STATE OF CALIFORNIA      )
                              )

(2)  COUNTY OF SAN FRANCISCO  )

(3)        I, CINDY TUGAW, a Certified Shorthand Reporter

(4)  of the State of California, duly authorized to

(5)  administer oaths pursuant to Section 8211 of the

(6)  California Code of Civil Procedure, do hereby certify

(7)  that

(8)                  RANDALL DAVIES,

(9)  the witness in the foregoing deposition, was by me duly

(10) sworn to testify the truth, the whole truth and nothing

(11) but the truth in the within-entitled cause; that said

(12) testimony of said witness was reported by me, a

(13) disinterested person, and was thereafter transcribed

(14) under my direction into typewriting and is a true and

(15) correct transcription of said proceedings.

(16)        I further certify that I am not of counsel or

(17) attorney for either or any of the parties in the

(18) foregoing deposition and caption named, nor in any way

(19) interested in the outcome of the cause named in said

(20) caption.

(21)        Dated the 7th day of August, 2020.

(22)

(23)

(24)

                       CINDY TUGAW

(25)                   CSR No. 4805 (California)

---

**Page 11**

(1)  Randall Davies
     c/o Foley & Lardner

(2)  555 California Street, Suite 1700
     San Francisco, CA 94104

(3)  Attn:  Jason Y. Wu, Esq.

(4)  Date:  August 7th, 2020
     Re:  Navarro vs. Menzies Aviation

(5)  Deposition Date:  Tuesday, July 28, 2020

(6)  Dear Mr. Davies,

(7)        Please be advised the original transcript of
     your deposition is ready for your review.

(8)        Pursuant to FRCP Rule 30(e), you have
     30 days following the date of this notice to read,

(9)  correct if necessary, and sign your transcript unless
     the attending parties and the deponent agree on the

(10) record or otherwise in writing to a longer or shorter
     time period.  The deponent may change the form or the

(11) substance of the answer to a question, and may either
     approve the transcript of the deposition by signing it,

(12) or refuse to approve the transcript by not signing it.
     You are not required by law to read and sign your

(13) deposition transcript.  All parties will be informed of
     the corrections.  The original transcript will then be

(14) sealed and sent to the examining attorney pursuant to
     the applicable law.

(15)        You may either come to our office to read and
     sign the original transcript, or you may contact your

(16) attorney or the attorney who arranged for you to be
     present at your deposition.  If they have ordered a

(17) copy of the transcript, you may review their copy and
     make corrections by submitting, signing and returning

(18) the attached form.  If you choose to review your
     transcript at our office, please call first to make an

(19) appointment.  Should you have any question regarding
     these instructions, please call.

(20)

(21) Sincerely,

(22)

(23) NOGARA REPORTING SERVICE
     5 Third Street, Suite 415

(24) San Francisco, California 94103
     (415) 398-1889

(25) cc:  All counsel, original deposition