```
 1      A    The first one was the first one that you
 2  showed with my signing, and I think this is the second.
 3      Q    Okay.  Did you ever sign this second petition?
 4      A    I was not -- no longer able to sign it because
 5  they already terminated me at that time.
 6      Q    I see.  So this, Exhibit 9, you first saw it
 7  after your termination?
 8      A    When they terminated me and the people signed
 9  that petition, I was given a copy by Rafael.
10      Q    I just want to be clear though.  The copy of
11  this, Exhibit 9 that you received from Rafael, did you
12  receive that before or after your termination?
13      A    I was already terminated.
14      Q    Okay.  Did you ever have any text-message
15  communication with Mr. Dodge about the petition against
16  him?
17      A    No, sir.
18           MR. WARD:  I'm going to mark this as
19  Exhibit 10, and this is Bates-numbered -88.
20           (Deposition Exhibit 10 was marked for
21           identification by the reporter, a
22           copy of which is attached hereto.)
23  BY MR. WARD:
24      Q    On the lower half of the page, Mr. Navarro, it
25  looks like a screen capture of some text messages.
```

55

```
 1    Have you ever seen those messages before?

 2        A     Yes.

 3              MR. WARD:  I'm sorry.  The reporter, can you

 4    repeat my question, please, the last one I just asked.

 5              (The record was read as follows:  "On

 6              the lower half of the page, Mr. Navarro,

 7              it looks like a screen capture of some

 8              text messages.  Have you ever seen those

 9              messages before?")

10    BY MR. WARD:

11        Q     Where have you seen this before today,

12    Mr. Navarro?

13        A     It's here.

14        Q     So wait.  Is your testimony that this is the

15    first time you've ever seen what appears to be text

16    messages?

17        A     I already saw that on the cell phone of the

18    supervisor.

19        Q     All right.  When you say "on the cell phone of

20    the supervisor," what supervisor?

21        A     The cell phone that we were using.

22        Q     Okay.  So is it fair to state -- where it says

23    "Ray Navarro" on this screen capture and then there's

24    some messages below there, did you write that?

25        A     Yes, sir.
```

56

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

1    Q    At the very bottom there, where it says

2    "...remember all people sign to that petition agains

3    you but i never submit it yet," what did you mean when

4    you wrote "i never submit it yet"?

5    A    What I meant there is because the petition

6    letter was given to me to be submitted to Raul Vargas,

7    I did not submit it; but the people told me that I

8    should submit the petition so that they would know what

9    Andrew was doing.

10   Q    Who specifically told you that you should be

11   the one to submit the petition?

12   A    Because, at that meeting, Raul Vargas was

13   there.  He was our director.  He said that we -- that I

14   submit it --

15          THE INTERPRETER:  Just a second.

16          THE WITNESS:  It's just, in that meeting, I

17   was told "Please give this to Raul Vargas."

18   BY MR. WARD:

19   Q    And my question is who is the specific person

20   who told you to give it to Raul Vargas?

21   A    I was just given the petition -- the petition

22   letter.  I don't remember the person anymore.  That's

23   why I just gave it to Raul.

24   Q    Why did you delay in submitting the petition

25   after you were asked to do so?

57

1    statement, or what purports to be a statement, provided

2    by Christopher Lawrence, stating that Renaldo Navarro

3    had you sign the papers without fully explaining to me

4    what it was for.

5            Do you have any idea what Mr. Lawrence might

6    be referring to there?

7            THE INTERPRETER:  What's the last name, sir,

8    again?

9            MR. WARD:  Lawrence.

10           THE WITNESS:  I do not know what he's saying

11   because I was not the one who asked him to sign.  So I

12   do not know what he wrote here.

13   BY MR. WARD:

14       Q    Did you ever provide any type of papers to

15   Mr. Lawrence and ask him to sign them?

16       A    No, sir.

17       Q    Do you have any personal knowledge whether

18   Mr. Lawrence provided this statement to Menzies?

19       A    I do not know any.

20       Q    Do you have any reason to dispute whether

21   other fuelers provided statements to Menzies regarding

22   their disagreement with the petition against Mr. Dodge?

23           MR. URIARTE:  Objection.  Vague and ambiguous.

24           THE WITNESS:  I do not know any of that.

25   ///

65

```
 1   BY MR. WARD:

 2        Q    Are you aware that Mr. Dodge made a complaint

 3   to Menzies about you?

 4        A    I do not know.

 5             MR. WARD:  I'm going to mark as Exhibit 12

 6   what is Bates No. -89.

 7             (Deposition Exhibit 12 was marked for

 8             identification by the reporter, a

 9             copy of which is attached hereto.)

10             MR. URIARTE:  What was the Bates number?

11             MR. WARD:  This is -89.

12             MR. URIARTE:  Thank you.

13   BY MR. WARD:

14        Q    Let me know when you've had a chance to review

15   this, Mr. Navarro.

16        A    Yes, I've read it already.

17        Q    Have you ever seen this document before today?

18        A    That's right.

19             MR. URIARTE:  Okay.  Mr. Navarro, I want you

20   to read the whole document word for word -- okay? --

21   not that you've seen it, but I think the question is --

22   he wants you to read it, Mr. Navarro.

23             MR. WARD:  I think the question I asked was

24   had Mr. Navarro ever seen this document prior to today.

25             THE WITNESS:  No, sir.
```

66

1      BY MR. WARD:

2         Q      Okay.  I'll represent to you that this is a

3      statement provided to Menzies by Andrew Dodge.  I want

4      you to note in the second line there where it says

5      "Ray Navarro, he has been very rude to me by telling me

6      that the company don't need me."

7                Do you see that?

8         A      Yes, sir.

9         Q      And did you ever tell Mr. Dodge that the

10     company doesn't need him?

11        A      I did not say anything like that.

12        Q      Do you see the next line where Mr. Dodge

13     represents that you told him he's a bad supervisor?

14        A      I said that due to the complaints of the

15     people about their breaks and not able to take their

16     breaks, their lunch break, and the amount of work that

17     was being given to them by him.

18        Q      So those are things that you said directly to

19     Mr. Dodge?

20        A      He knows about that because he knew himself

21     that there were a lot of complaints about him.  He

22     knows about what the fuelers were saying about him.

23        Q      My question is different though.  It's did you

24     tell those things to Mr. Dodge directly yourself?

25        A      No, sir.

67

```
1        Q     Did you ever tell him that you were a bad

2   super- -- that he's a bad supervisor?

3        A     No, sir.

4        Q     Did you ever tell Mr. Dodge that he causes

5   delays?

6        A     Please repeat that.

7        Q     Sure.  Did you tell Mr. Dodge that he -- that

8   all he does is cause delays?

9        A     I said that because the shift of Dodge was

10  2:00 to 6:00 and my shift was 12:00 to 6:00 and then --

11  the shift of Dodge is 2:00 to 10:00.  Those who are

12  going to work at 1:50, when I get them, 5:00 to 1:00 --

13  those who start at 5:00 to 1:00, they told me the

14  problems.

15       Q     So is that a yes?  You told Mr. Dodge that he

16  causes delays?

17       A     Are you referring to a flight -- delayed

18  flights?

19       Q     I'm referring to what you said directly to

20  Mr. Dodge about these various complaints.

21             Did you communicate any of these employee

22  complaints about him to him yourself?

23       A     The people themselves were the ones that --

24  the people told me about it, and I told him also what

25  the people feel about him.
```

68

1     Q   So it's true that you told Mr. Dodge directly

2  about these various complaints that employees purported

3  to have about him; correct?

4     A   Yes, sir.

5     Q   Where Mr. Dodge writes below that that you

6  follow him around and love to make a big scene in front

7  of other workers, did you ever try -- did you ever

8  confront Mr. Dodge about what these employees said,

9  these other employees?

10    A   No, sir.

11    Q   Did you ever talk to Mr. Dodge at all about

12  these various complaints in front of nonsupervisory

13  employees?

14    A   No, sir.  When Dodge and I speak to each

15  other, we are just by ourselves.

16    Q   Do you see where Mr. Dodge wrote that you

17  would follow him around and make hand gestures at him?

18    A   Ever since, I do not follow Dodge around

19  because we are different shifts.  I'm coming in.  He's

20  leaving.

21    Q   So you deny ever making hand gestures or

22  following Mr. Dodge around?

23    A   I don't know anything about that.  I do not do

24  that.

25    Q   Do you see where Mr. Dodge wrote that you told

69

1    him that you would turn a petition in against him?

2        A    I told that to him on text.

3        Q    Okay.  So that at least is something of a true

4    statement; right?

5        A    How is that?

6        Q    Well, you said in the text message that you

7    have a petition that you haven't turned in; right?

8        A    Yes, sir.  That's the one.

9        Q    At some point, did you ever learn that Menzies

10   was investigating you based on Mr. Dodge's complaint?

11       A    I do not know.  I do not know anything about

12   that.

13       Q    At some point, you learned you were being

14   suspended, though; correct?

15            THE INTERPRETER:  I'm sorry.  Repeat that,

16   Mr. Ward.

17   BY MR. WARD:

18       Q    At some point after you signed the petition,

19   you learned that you were being suspended; correct?

20       A    When --

21            THE INTERPRETER:  This is the interpreter.  I

22   would like to inquire.

23            THE WITNESS:  When we had the meeting, I

24   submitted the petition after.  That day, I was on duty,

25   graveyard shift, and John called me, arrived.  He told

1    me to wait for Raul Vargas, and then that was the time

2    Raul Vargas suspended me.

3    BY MR. WARD:

4        Q    And prior to that meeting, you had not

5    submitted this petition; is that true?

6        A    No, sir, because -- only at that meeting

7    because I have no time to go there to submit the

8    petition because I was working.  I was working assigned

9    jobs.

10        Q    Okay.  So you were called into a meeting;

11    right?

12        A    Yes, sir.  Yes, sir.

13        Q    And that was the meeting with Raul and

14    John Qually that you just mentioned; right?

15        A    He was not there.  It was just Renil, Nico,

16    and the other manager who was, like, a Chinese.  And

17    John Qually was just on the phone.  He was just on the

18    phone.

19        Q    At the time that meeting started, you had not

20    submitted the petition; correct?

21        A    Yes, sir.

22        Q    And then did you submit the petition during

23    that meeting?

24        A    Also the same location after the meeting.

25        Q    What were you told was the reason for the

71

1      Q     What were you told was the reason for your

2   suspension?

3      A     What Raul told me was that I should not have

4   signed the petition because I am with management -- I

5   was with management.

6      Q     Were you given any other reasons for why you

7   were being suspended?

8      A     No other reason was given, just that.

9      Q     Were you presented with any type of

10  documentation or disciplinary notice regarding your

11  suspension at that meeting?

12     A     They did not give any.

13     Q     At any point, did you have a meeting or a

14  conversation with John Qually regarding your

15  suspension?

16     A     No, sir.  After Raul suspended me, I left.

17     Q     So it's your testimony that at no point was

18  Mr. Qualley involved in any conversations or

19  communications with you about your suspension; true?

20     A     I don't know any.  All I know is Qually told

21  me that Raul will talk to me, to wait for Raul.

22     Q     And other than Qually telling you to wait for

23  Raul, did Qually have any other involvement in the

24  communications to you about your suspension or about

25  your signature of the petition?

77

1    Andrew Dodge when you provided it to Raul?

2        A    No, sir.

3        Q    When did, to your understanding, Mr. Menzies

4    first hear about that petition?

5        A    Menzies learned about the petition on that day

6    that I gave it to them.

7        Q    Okay.  So, in other words, to your

8    understanding, Menzies learned about the petition from

9    you; correct?

10       A    When I gave it to Raul, that's when Menzies

11   learned about it.

12       Q    At the time that you learned -- I'm sorry.

13   After you learned that you were being suspended, did

14   you provide anything to Menzies in response to that

15   suspension?

16       A    They had me make a letter if I would like to

17   repeat that again.

18       Q    And when you say "they," is that either Kevin

19   or Raul that asked you to provide that letter?

20       A    Raul told me to make a letter.  Raul told me

21   to make the letter, and then Kevin told me what kind of

22   letter it's going to be.  Kevin told me to tell them

23   what happened and that he will not meddle with the

24   people anymore -- that I will not meddle with the

25   people anymore.

85

```
 1        Q    That was something you were instructed to put
 2   in the letter?
 3        A    That's what Kevin told me to put in the
 4   letter, to tell them that I will not be meddling with
 5   the people anymore like that.
 6        Q    And then what, to your understanding, was
 7   meant by "not meddling with the people anymore"?
 8        A    Maybe with regard to the petition like that.
 9        Q    What do you mean by that answer?
10             THE INTERPRETER:  This is the interpreter.  I
11   would like him to repeat.
12             THE WITNESS:  I think what he wants me to say
13   is if, next time, they wanted to sign a petition, do
14   not sign that anymore.
15   BY MR. WARD:
16        Q    After you were suspended, did you ever work
17   another shift at Menzies?
18        A    In other words, because I could no longer go
19   back to the same one because of the stress that
20   happened to me.
21        Q    I'm sorry.  The question I asked was after you
22   learned you were suspended, you never worked another
23   shift at Menzies; correct?
24        A    Are you referring to Menzies, sir?
25        Q    Yes.
```

86

```
 1      A    Not anymore.

 2      Q    Okay.  But once you started your suspension --

 3   right? -- the next thing that happened was you were

 4   terminated.  You never came back to work; right?

 5      A    After my suspension, I was handed a

 6   termination letter.

 7      Q    Okay.  And in between when you started your

 8   suspension and then when you were provided that

 9   termination letter, you never worked another shift at

10   Menzies; right?

11      A    Yes, sir.

12      Q    How much time passed between when you learned

13   you had been suspended and when you learned you had

14   been terminated?

15           THE INTERPRETER:  Please repeat that, sir.

16           MR. WARD:  Sure.

17      Q    How much time passed between when you learned

18   of your suspension from Menzies and your termination of

19   employment from Menzies?

20      A    After I was suspended, three days after, Tracy

21   called me to go to her office because she was going to

22   tell me something.

23      Q    Is that when you learned you had been

24   terminated, when you went to Tracy's office?

25      A    She gave me the paper, the termination letter.
```

87

1      Q    Is that a yes?

2         That's when you learned you had been

3  terminated, when you met with Tracy?

4      A    Yes, sir.

5      Q    Was anybody else present at the time that you

6  met with Tracy other than yourself and Tracy?

7      A    She was with a female there.

8      Q    Was she another Menzies employer, that female?

9      A    Maybe, sir.

10     Q    You don't know who she was, in other words?

11     A    No, sir.

12     Q    So other than Tracy and this unidentified

13  female, nobody else was present; is that true?

14     A    Yes, sir.

15     Q    What did Menzies tell you was the reason they

16  were terminating your employment?

17     A    All I remember that Tracy told me was that you

18  should not have signed it because you were at

19  management site.

20     Q    And when she said you should not have signed

21  it, she was referring to the petition, to your

22  understanding?

23     A    Yes, sir.

24     Q    Were you told that there was any reason for

25  your termination other than signing the petition?

88

```
 1        A     No more, sir.

 2        Q     Are you aware of any documents that would

 3   indicate that there was a reason for your termination

 4   other than you signing the petition?

 5        A     No, sir.  What's written on the termination

 6   was just code of conduct.

 7        Q     Okay.  What about with respect to the decision

 8   to suspend your employment?

 9              Were you given any explanation other than you

10   signing the petition?

11        A     She did not say anything -- any more.

12        Q     Are you aware of any documents that would

13   indicate there was a reason for your suspension other

14   than your signing the petition?

15        A     I no longer know any.

16        Q     At the time that you were informed you were

17   being suspended, did anybody mention anything about

18   your race?

19        A     The other employees, sir.

20        Q     How about anybody in Menzies management?

21              Did anybody say anything about your race being

22   a factor in the decision to suspend you?

23        A     Nothing was said like that by them.

24        Q     Other than with respect to your termination,

25   did anyone say anything -- did anyone in Menzies
```

89

```
 1    management, rather, say anything about your race having

 2    (Inaudible) in that termination?

 3              THE INTERPRETER:  I'm sorry.  I didn't get

 4    your whole question, sir.

 5              MR. WARD:  Sure.

 6       Q    With respect to termination of your

 7    employment, did anyone at Menzies management say that

 8    race was a factor in that termination?

 9       A    I do not know, sir.

10       Q    How about with respect to your suspension?

11              Did anybody say your national origin was a

12    factor in the decision to suspend you?

13       A    I do not know that also.

14       Q    What about with respect to the decision to

15    terminate your employment?

16              Did anybody at Menzies say that your national

17    origin was a factor in that decision?

18       A    Please repeat that, sir.

19       Q    Sure.  With respect to the decision to

20    terminate your employment, did anybody in Menzies

21    management indicate that your national origin was a

22    factor in that decision?

23       A    I do not know, sir.

24       Q    Is it your belief that your race played any

25    role in the decision to suspend you?
```

90

```
1        A      Yes, sir.

2        Q      What is that belief based on?

3        A      Maybe because I'm an Asian and he is white.

4        Q      And when you say "maybe," are you just

5   speculating?

6        A      No, sir.

7        Q      Do you have any evidence that supports the

8   belief that your race played a role in your suspension?

9               MR. URIARTE:  Objection.  Calls for a legal

10  conclusion.

11              THE WITNESS:  Please repeat.  Please repeat

12  the question.

13              MR. WARD:  Sure.

14       Q      Do you have any evidence that supports your

15  belief that your race played a role in your

16  termination?

17       A      Yes, sir.

18       Q      What evidence is that?

19       A      First of all, I'm Asian.  He's white.  Second,

20  all the problems, we have brought it up to management.

21  And then why is it that myself, who is taking action in

22  behalf of the others, I am the one being terminated and

23  not himself?

24              I am the one taking care also of this effect

25  on management, on the company too.
```

91

```
 1        Q      Nobody ever told you, from Menzies, that your
 2   race was a factor; true?
 3        A      No, sir.
 4        Q      Who told you that your race was a factor?
 5        A      Yes, I've seen it because how come that --
 6   even if we tell the company about this person, nothing
 7   is being done to reform, to suspend or to terminate
 8   him.  He has delays up to 20 flights a day.  With us,
 9   just one delay, and we hear from them.  With him, there
10   would be five or six delays, but nothing is done about
11   it.
12        Q      That doesn't answer my question, Mr. Navarro.
13               My question is who told you that your race was
14   a factor in either the termination or suspension
15   decision?
16        A      I see what they did to me.
17        Q      You are not answering my question,
18   Mr. Navarro.  The question is who told you?
19               Not what you think or what you feel or what
20   you believe, but who told you?
21        A      I have a lot of Asian coworkers that, when
22   they commit a mistake, they are already terminated.
23        Q      Okay.  And you are still not answering the
24   question, sir.
25               The question is who told you that your race
```

                                                                92

1  was a factor in the decision to either terminate or

2  suspend you?

3          MR. URIARTE:  Maybe if you quantified the

4  universal "who," then maybe he could more possibly --

5          MR. WARD:  I don't need to qualify it.  He can

6  either tell me who did it, or he can say, no, he

7  didn't.  I need an answer to the question I asked.

8          MR. URIARTE:  That would be great.  We have,

9  like, great easy cases.  It's like management told the

10  terminated employee "Hey, I terminated you because I'm

11  discriminating against you."  It's, like, a great

12  question there, Chris.  But other than that,

13  (inaudible).

14          MR. WARD:  I'm entitled to an answer to it,

15  sir.

16          MR. URIARTE:  Yeah, but the question is --

17          (Simultaneous speaking.)

18          MR. WARD:  No.  You and I can debate the

19  merits of the legal system later.  I want an answer

20  from the witness -- who told him this? -- because he

21  testified someone did.

22          THE WITNESS:  No one was telling me, but

23  that's what I feel from what happened.

24  BY MR. WARD:

25      Q    And is it true that you cannot identify any

93

1    documents that say your race was a factor in the

2    decision to terminate or suspend you?

3           MR. URIARTE:  Objection.  Calls for a legal

4    conclusion.

5           THE WITNESS:  Please repeat again.

6           MR. WARD:  Sure.

7       Q    Is it true that you cannot identify any

8    document that indicates your race was a factor in the

9    decision to terminate or suspend you?

10          MR. URIARTE:  Calls for a legal conclusion.

11          THE WITNESS:  I do not know.

12   BY MR. WARD:

13      Q    You do not know whether any such document

14   exists; is that your testimony?

15      A    Yes, sir.

16      Q    And has anybody ever told you that your

17   national origin was a factor in Menzies' decision to

18   suspend or terminate you?

19      A    No, sir, but that's what I feel.

20      Q    And is it true that you are not aware of any

21   documents that indicate your national origin was a

22   factor in (inaudible)?

23          THE INTERPRETER:  I'm sorry.  A factor in

24   what?

25   ///

94

1    BY MR. WARD:

2        Q    Is it true that you are not aware of any

3    documents that indicate your national origin was a

4    factor in the suspension or termination decision?

5            MR. URIARTE:  Objection.  Calls for a legal

6    conclusion.

7            THE WITNESS:  I do not know, sir.

8    BY MR. WARD:

9        Q    The letter that you are asked to provide, did

10    you provide such a letter?

11            THE INTERPRETER:  I'm sorry.  The letter he

12    was asked to provide?

13            MR. WARD:  Right.  At the time he was -- at

14    the time he was notified he was being suspended, he was

15    asked to provide a letter, and my question is did he

16    provide such a letter?

17            THE WITNESS:  Yes.  I gave it to Kevin.

18            MR. WARD:  All right.  I am going to mark as

19    Exhibit 15, if I can find it here -- sorry -- a set of

20    documents that were produced to us in the Bates

21    No. RenaldoNavarro -1 to -14.

22            (Deposition Exhibit 15 was marked for

23            identification by the reporter, a

24            copy of which is attached hereto.)

25    ///

95

BY MR. WARD:

    Q    All right.  Let me get to the right page
here.  So looking at this first page of Exhibit 15,
Mr. Navarro, do you recognize this document?

    A    Yes, sir.

    Q    What is this document?

    A    I did not know who made this, but I saw that.

    Q    Is it your testimony that you did not write
this Navarro Exhibit 1?

         THE INTERPRETER:  Again, repeat that.  There
is breaking up in the audio.

BY MR. WARD:

    Q    Are you saying, Mr. Navarro, that you are not
the person who wrote this document that we are looking
at right now?

         MR. URIARTE:  Do you want me to make it
bigger, Mr. Navarro?

         THE WITNESS:  Yes.

         Please repeat the question, sir.

         MR. WARD:  Sure.

    Q    Let me just ask this:  Are you the one who
wrote this, what's marked here as Navarro No. 1?

    A    All I remember is the one at the last part.
All I remember is what's written here on the last part.
If this is the benefits for the sake of my job, I will

1   not intervene again, just do and focus on my job.  But

2   I do not remember the things about it, the words

3   written above it.  If you could show what I wrote down,

4   I would know where it came from, but this one, the

5   stuff above it, I do not know.

6        Q    So is it your testimony that you did not write

7   all of the content on this page?

8        A    If you give me the letter that I wrote, I

9   would remember all of that, but with this one,

10  especially the last one, that was what Kevin told me to

11  say.  But with regard to the stuff above it, I do not

12  remember this.

13       Q    So am I understanding correctly, you did not

14  write everything on this page?  Yes or no?

15       A    Maybe I wrote all of this, maybe.

16       Q    As you sit here today, you just can't say one

17  way or another; is that true?

18       A    Which is it?  Which is it?  Are you referring

19  that I could not say one way or the other?

20       Q    The entire document, did you write this entire

21  document, or did somebody else write it?

22       A    I'm the one who made this.

23       Q    Okay.  You just told me you are the one who

24  made the entire letter -- or I'm sorry -- the entire

25  document.

97

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

```
 1      A    Yes.  I was told to write that by Raul Vargas
 2  and Kevin.
 3      Q    Is this the letter that you provided in
 4  response to the request from Kevin and Raul?
 5           THE INTERPRETER:  I'm sorry.  Please repeat
 6  that.
 7  BY MR. WARD:
 8      Q    Is this the letter that you provided in
 9  response to the request from Kevin and Raul?
10      A    Yes, sir.
11      Q    How did you transmit this to Kevin?
12           THE INTERPRETER:  I'm sorry.  How did he --
13           MR. WARD:  How did he transmit this?  How did
14  he give it to Kevin?  Did he give it to him by hand?
15  Did he email it?
16           THE WITNESS:  When they suspended me, Kevin
17  told me to make a letter.  So I went to my car and made
18  that, and then, before I left, I gave it to Kevin.
19  BY MR. WARD:
20      Q    You wrote this document that we are looking at
21  right now, the first page of Exhibit 15, in your car?
22      A    Yes, sir.
23      Q    Did you keep a computer in your car?
24      A    I did not have a computer.  I hand-wrote it.
25  That's why, what I say right now, I hand-wrote it.  But
```

98

```
 1    prepared this.

 2        Q    But your testimony is that somebody gave you

 3    this document; right?

 4        A    Yes.  It may be Kevin who gave this to me, who

 5    typed this in his computer and gave me a copy because I

 6    have no computer.

 7        Q    I don't want you to speculate, though,

 8    Mr. Navarro.  I want you to tell me what you know

 9    happened.

10            Did Kevin type this up and give it to you, or

11    are you guessing that might be what happened?

12        A    I am the one who wrote this down, but who

13    typed it in the computer, I no longer remember.

14        Q    Okay.  But it's your testimony that it wasn't

15    you who typed it; is that true?

16        A    Yes, sir.

17        Q    It's the same thing today?

18            You have no memory of how you came to be in

19    possession of this typed version; is that true?

20        A    I no longer remember, but what I remember is

21    the letter that the attorney had me prepare, this is

22    the one.

23        Q    All right.  This is now page 2 of Exhibit 15.

24    I want to ask you, do you recognize this typed version?

25            Have you seen it before?
```

101

```
 1      A    I have a copy of this.  I have a copy that I
 2   gave to my attorney.
 3      Q    Are you the one who created this typed
 4   version?
 5      A    It's not myself.
 6      Q    Where did you get it from?
 7      A    The people gave it to me.
 8      Q    Who?
 9      A    I no longer remember.  All the documents that
10   I think we need, I gave them all to my attorney.  So
11   all of the documents are with my attorney.
12      Q    But as you sit here today, looking at this
13   document stamped RenaldoNavarro -2, you don't remember
14   who gave that to you; is that true?
15           THE INTERPRETER:  I did not get the question.
16   BY MR. WARD:
17      Q    Just looking at page 2 of Exhibit 15, is it
18   true that you do not recall who gave this page to you?
19      A    Yes, sir.
20           MR. WARD:  All right.  I'm showing the
21   witness, still on Exhibit 15, the page Bates-marked
22   Navarro No. 11.
23      Q    Do you recognize what this screen capture
24   appears to show, Mr. Navarro?
25      A    Yes, sir.  Yes, sir.
```

102

1      Q      Is this a text message that you have on your
2  phone?
3      A      Yes, sir.
4      Q      And do you still have this text-message chain
5  on your device?
6      A      It's still there, sir.
7      Q      Don't delete it, please.
8             What about this page that is -- I think it's
9  RenaldoNavarro -12.  What is that?
10     A      This was by the supervisor.  I was no longer
11  there, but this was just texted to me.  This was --
12  this text was sent to me saying "Sorry.  Andrew fell
13  asleep, but his hours were already running."
14     Q      Okay.  This appears to be -- so is this a
15  message somebody named Mark sent to you?
16     A      Yes, sir.
17     Q      Okay.  Which side of this text-message chain
18  is yours?  Is it the left side with the image or the
19  right side where it says "Date 11-7-18"?
20     A      This date.
21     Q      Who is Mark?  Who is the Mark that's referred
22  to in this message?
23     A      This was the person, also a supervisor --
24  Andrew was supposed to replace him.
25     Q      So, in other words, this was another

103

```
 1   supervisor at Menzies?

 2        A    When I was no longer there.  He was the

 3   supervisor when I was no longer at Menzies.

 4        Q    Okay.  And is this a screen capture of a text

 5   message you had with -- or a text capture you had with

 6   this individual, Mark?

 7        A    He just sent a text to me.

 8        Q    Okay.  Do you still have those texts on your

 9   device?

10        A    Yes, sir.

11        Q    Don't delete them, please.  How about this

12   next page?  It looks like it's -- or next two pages,

13   13 and 14?  Are these also text messages that you

14   received?

15        A    Yes, sir.

16        Q    Do you still have them on your device?

17        A    It's still there, sir.

18        Q    Okay.  Don't delete that, please.

19             MR. URIARTE:  Chris, can we take a five-minute

20   break to rest?

21             MR. WARD:  Sure.  That's fine.  It's 3:37.  Do

22   you want to reconvene at 3:45?

23             MR. URIARTE:  Sounds good.

24             MR. WARD:  Thank you.  We are off the record.

25             (Off the record.)
```

104

```
 1              THE INTERPRETER:  I'm sorry.  Please repeat

 2    that.

 3    BY MR. URIARTE:

 4         Q    The petition was signed by at least one

 5    supervisor; is that correct?

 6         A    Yes.

 7         Q    Do you know how many signed -- how many

 8    supervisors signed the petition?

 9         A    Two, sir.

10         Q    What are those names?

11         A    July Macapagal.

12         Q    Who else?

13         A    And Renaldo Navarro, myself.

14              MR. URIARTE:  No further questions.

15              MR. WARD:  Give me just a second.

16              All right.  I have no follow-up at this point.

17    Counsel and I agreed off the record that we would not

18    be concluding Mr. Navarro's deposition subject to some

19    questioning about his -- or I should say potential

20    questioning about Mr. Navarro's settlement agreement

21    with Swissport, which we'll meet and confer about as

22    necessary; but, otherwise, we can conclude today's

23    deposition, at least this first and potentially last

24    day of Mr. Navarro's deposition.  And at this point --

25    we don't do any stipulations on the record anymore, at
```

117

```
 1    least in San Francisco.  Some L.A. attorneys still do
 2    it unless there's something that you want to add, Arlo.
 3              MR. URIARTE:  No.
 4              MR. WARD:  All right.  I think we are
 5    concluded, then, for the day.  I appreciate everybody's
 6    time and patience with this process, especially with
 7    the technology glitches on my end.  Off the record.
 8              (Deposition session concluded at 4:23 p.m.)
 9                           -oOo-
10
11
12              I certify (or declare) under penalty of
13    perjury under the laws of the State of California that
14    the foregoing is true and correct.
15
16    Executed at _____ on _____.
                        (Place)              (Date)
17
18         _____
                       (Signature of Deponent)
19
20
21
22
23
24
25
```

                                                              118

```
1                DEPOSITION OFFICER'S CERTIFICATE

2    STATE OF CALIFORNIA )

                         ) ss.

3    COUNTY OF ORANGE    )

4

5            I, Joanna B. Brown, hereby certify:

6            I am a duly qualified Certified Shorthand

7    Reporter in the State of California, holder of

8    Certificate Number CSR 8570 issued by the Court

9    Reporters Board of California and which is in full

10   force and effect. (Fed. R. Civ. P. 28(a)).

11           I am authorized to administer oaths or

12   affirmations pursuant to California Code of Civil

13   Procedure, Section 2093(b) and prior to being examined,

14   the witness was first duly sworn by me.

15   (Fed R. Civ. P. 28(a), 30(f)(1)).

16           I am not a relative or employee or attorney or

17   counsel of any of the parties, nor am I a relative or

18   employee of such attorney or counsel, nor am I

19   financially interested in this action.

20   (Fed R. Civ. P. 28).

21           I am the deposition officer that

22   stenographically recorded the testimony in the

23   foregoing deposition, and the foregoing transcript is a

24   true record of the testimony given by the witness.

25   (Fed. R. Civ. P. 30(f)(1)).
```

119

1        Before completion of the deposition, review of

2   the transcript [XX] was [ ] was not requested.  If

3   requested, any changes made by the deponent (and

4   provided to the reporter) during the period allowed,

5   are appended hereto. (Fed. R. Civ. P. 30(e)).

6

7

8   Dated: August 4, 2020

9

10                          _Joanna B. Brown_

11          _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    120

# ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name:      RENALDO NAVARRO v. MENZIES AVIATION, INC.
Case Number:    3:19-cv-08157-VC
Dep. Date:      August 4, 2020
Deponent:       RENALDO NAVARRO
Place:          Via Zoom

## CORRECTIONS:

| Pg. | Ln. | Now Reads | Should Read | Reasons Therefore |
|-----|-----|-----------|-------------|-------------------|
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |
| ___ | ___ | _____ | _____ | _____ |

_____
Signature of Deponent

_____