# EXHIBIT 12

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| RENALDO NAVARRO, | ) | **CERTIFIED COPY** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | 3:19-cv-08157-VC |
| MENZIES AVIATION, INC., DOING | ) | |
| BUSINESS AS MENZIES; and | ) | |
| DOES 1 through 10, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Webex deposition of RENALDO NAVARRO, VOLUME I, taken remotely on behalf of the Defendant, beginning at 9:41 a.m. and ending at 4:23 p.m., on Thursday, July 23, 2020, before JOANNA B. BROWN, Certified Shorthand Reporter No. 8570, RPR, CRR, RMR.

2

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFF RENALDO NAVARRO:
 3           LIBERATION LAW GROUP, P.C.
             BY:  ARLO GARCIA URIARTE, ESQ.
 4           2760 Mission Street
             San Francisco, California 94110
 5           (415) 695-1000
             (415) 695-1006 Fax
 6           arlo@liberationlawgroup.com
 7   FOR DEFENDANT MENZIES AVIATION, INC., dba MENZIES:
 8           FOLEY & LARDNER LLP
             BY:  CHRISTOPHER G. WARD, ESQ.
 9           555 South Flower Street, Suite 3300
             Los Angeles, California 90071-2411
10           (213) 972-4500
             (213) 486-0065 Fax
11           cward@foley.com
12   ALSO PRESENT:
13           CAROLINE CARRERA, TAGALOG INTERPRETER #301298
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
 1                    I N D E X
 2    EXAMINATION OF:                        PAGE
 3    RENALDO NAVARRO
 4
 5            BY MR. WARD                        7
 6            BY MR. URIARTE                   115
 7
 8            E X H I B I T S
 9    DEFENDANT'S                            PAGE
10    Exhibit 1   Aircraft Service International
                  Group "Incident Report" dated
11                March 18, 2007, Bates
                  No. MENZIES_000146 (1 page)     34
12
      Exhibit 2   Aircraft Service International
13                Group "Notice to Employees as to
                  Change in Relationship," Bates
14                Nos. MENZIES_000143 and
                  MENZIES_000144 (2 pages)        35
15
      Exhibit 3   Aircraft Service International
16                Group "Incident Report" dated
                  March 30, 2009, Bates
17                No. MENZIES_000140 (1 page)     38
18    Exhibit 4   "Employee Coaching Document"
                  for a May 30, 2009, warning,
19                Bates No. MENZIES_000139 (1 page)  39
20    Exhibit 5   "Employee Coaching Document"
                  for a May 18, 2010, warning,
21                Bates Nos. MENZIES_000135 and
                  MENZIES_000136 (2 pages)        40
22
      Exhibit 6   "Employee Coaching Document"
23                for a May 3, 2012, warning,
                  Bates No. MENZIES_000126 (1 page)  41
24
      Exhibit 7   June 30, 2013, warning document,
25                Bates No. MENZIES_000127 (1 page)  42
```

4

```
 1                  E X H I B I T S
 2   DEFENDANT'S                                    PAGE
 3   Exhibit 8    Letter to "Menzies Management"
                  from Menzies fueler, Bates
 4                Nos. MENZIES_000152 -
                  MENZIES_000154 (3 pages)            54
 5
     Exhibit 9    Second petition against
 6                Andrew Dodge, Bates
                  No. MENZIES_000150 (1 page)         54
 7
     Exhibit 10   Text-message exchange, Bates
 8                No. MENZIES_000088 (1 page)         56
 9   Exhibit 11   Handwritten statement by
                  Christopher Lawrence, Bates
10                No. MENZIES_000086 (1 page)         64
11   Exhibit 12   Handwritten statement by
                  Andrew Dodge August 16, 2018,
12                Bates No. MENZIES_000089
                  (1 page)                            66
13
     Exhibit 13   "Employee Performance Development,"
14                Bates No. MENZIES_000099 (1 page)   79
15   Exhibit 14   Typed statement by John Qually,
                  Bates No. MENZIES_000084 (1 page)   82
16
     Exhibit 15   Set of documents produced, Bates
17                Nos. RenaldoNavarro 000001 -
                  RenaldoNavarro 000014 (14 pages)    95
18
     Exhibit 16   Plaintiff's Initial Disclosures
19                Pursuant to Federal Rule of
                  Civil Procedure 26(a)(1)
20                (3 pages)                          105
21
22                  UNANSWERED QUESTIONS
23                    PAGE    LINE
24                     14      10
25
```

5

1                    Remotely; Thursday, July 23, 2020

2                              9:41 a.m.

3

4                      CAROLINE CARRERA,

5          having been duly sworn, translated English into

6            Tagalog and Tagalog into English as follows:

7

8                      RENALDO NAVARRO,

9              having been duly sworn, was examined

10                  and testified as follows:

11

12          THE REPORTER:  Good morning.  My name is

13    Joanna Brown.  I am a California certified stenographic

14    reporter.  Due to the current national emergency of the

15    COVID-19 virus, this deposition is being handled via

16    remote means.

17          Today's date is Thursday, July 23, 2020, and

18    the time is approximately 9:41 a.m.  This is the

19    deposition of Renaldo Navarro in the matter of

20    Renaldo Navarro v. Menzies Aviation, Inc.  This is

21    venued in the United States District Court, Northern

22    District of California.  The case number is

23    3:19-cv-08157-VC.

24          At this time, I will ask counsel to identify

25    yourselves, state who you represent, and agree on the

                                                                6

1    bit earlier, is that the only time you've been a party

2    to a lawsuit?

3         A    Yes, sir.

4         Q    Have you ever made any type of legal claim

5    against a former employer other than Menzies?

6         A    There was, sir.

7         Q    What was that?

8         A    At Swissport.  It's the name of the company,

9    Swissport.

10        Q    And specifically what type of legal claim did

11   you make against Swissport, if it was not a lawsuit?

12             MR. URIARTE:  I'm going to -- I'm just going

13   to instruct the witness not to answer right now.

14             Chris, can we, like, just meet and confer for

15   a second here?

16             He has a settlement agreement with Swissport,

17   and it has a confidentiality clause.  So we cannot --

18   I guess what we could say is that they were

19   employment-related claims with regards to his

20   employment at Swissport.

21             MR. WARD:  Okay.  May I -- did he -- what I'd

22   like to know is if Mr. Navarro made any type of

23   administrative claim against Swissport or if it was

24   purely a private settlement prior to any type of formal

25   action.

14

```
 1              MR. URIARTE:  It was a private settlement.
 2    Yeah.
 3              MR. WARD:  Okay.  We are going to need to come
 4    back to that, but I'll move on at the moment.
 5         Q    Let me ask, what is the approximate date of
 6    that settlement agreement?
 7         A    What's that for?  Swissport?
 8         Q    Yes.  What is the date of that settlement
 9    agreement, approximately?
10         A    I no longer -- I'm no longer sure about 2013
11    or '14.  I no longer remember, 2014, 2013, 2015, like
12    that.
13         Q    Is it your belief that -- well, strike that
14    question.  Were you --
15              Was your employment with Swissport terminated
16    involuntarily?
17              MR. URIARTE:  Yeah.  I mean, Chris, I don't
18    want to make this process difficult.  I'm just not
19    certain as we sit here whether he'd be violating his
20    confidentiality agreement if he answered that, you
21    know.  I'm not certain with regards to that.  Look, if
22    I can send to you a copy of the settlement agreement, I
23    would, but I'm just not -- I think we have a notice
24    requirement with regard to that.  We would have to
25    notify Swissport before we divulge.
```

15

```
 1              MR. WARD:  All right.
 2      Q    Mr. Navarro, is it your belief that if you
 3  make legal claims against a former employer, that you
 4  are likely to get a settlement from them?
 5              MR. URIARTE:  Objection.  Vague and ambiguous.
 6  Calls for a legal conclusion.
 7              THE INTERPRETER:  Sorry.  Vague and ambiguous
 8  and what?  What's the other one?
 9              MR. URIARTE:  Calls for a legal conclusion.
10              You can answer, Mr. Navarro, if you
11  understand.
12              THE WITNESS:  Yes.  Please repeat.
13  BY MR. WARD:
14      Q    My question is, is it your belief that if you
15  make legal claims against a former employer, you are
16  likely to get a settlement?
17      A    Yes, sir.
18      Q    Is that what you are doing in this lawsuit?
19      A    Yes, sir.
20      Q    Is it your belief that employers are likely to
21  give you a settlement if you make claims against them
22  regardless of the merit of those claims?
23              MR. URIARTE:  Objection.  Calls for a legal
24  conclusion.  Vague and ambiguous.
25              THE WITNESS:  Please repeat the question
```

16

1      again.

2              MR. WARD:  Sure.

3       Q      Is it your belief that if you make legal

4      claims against a former employer, you are likely to get

5      a settlement from them regardless of the merit of those

6      claims?

7       A      Yes, sir.

8              MR. URIARTE:  Mr. Navarro, are you

9      understanding the Tagalog interpretation?

10             THE WITNESS:  (Inaudible.)

11             MR. URIARTE:  You have to answer in Tagalog.

12             MR. URIARTE:  Yeah.  I mean, I have --

13             THE INTERPRETER:  Just a second.  Let me

14     interpret that.

15             THE WITNESS:  It seems it's far from my

16     understanding in Tagalog.

17             MR. URIARTE:  I think -- Ms. Carrera, I

18     understand your proficiency and your amazing use of the

19     official, traditional, government-level Tagalog, but

20     it's sure not what usual, normal people in Tagalog

21     would use in the street.  There are two forms of

22     Tagalog.  There's the Tagalog that is normally used

23     around the country by normal people, but when you use

24     words like (speaks Tagalog) -- I went to a university

25     there, and I spoke formal Tagalog; but normal people

17

```
 1      Q     And did you graduate?

 2      A     Are you asking how long?  How long, sir?

 3      Q     Yes.

 4      A     Yes, sir.

 5      Q     Did you attend any type of college or

 6  university in the Philippines?

 7      A     Yes, sir.

 8      Q     Where was that?

 9      A     Philippine College of Criminology, but I did

10  not finish it.

11      Q     Any other type of schooling in the Philippines

12  other than high school and what you just mentioned

13  prior to moving to the United States?

14      A     No more, sir.

15      Q     Can you please identify for me all of your

16  employers prior to Menzies Aviation since you

17  arrived -- well, let me start over.

18            After you moved to the United States, can you

19  please list all of your employers up to Menzies.

20      A     In 2005, when I got here, I worked at

21  Service Fair part-time -- oh, Service Air part-time.

22  2005, in September, I started at ASIG Aviation.  In

23  2005, where I worked for, it was purchased by

24  Swissport.  It was purchased in 2015 by Swissport, and

25  in 2016, ASIG was purchased by Menzies.
```

23

1      Q    Did I understand you correctly that you worked

2    for ASIG -- you've had two different periods of time

3    where you were employed by ASIG?

4      A    What do you mean two different times?

5      Q    So let me do it this way:  First you -- first

6    you started at Service Air; right?

7      A    Yes, sir.

8      Q    And did you remain employed by Service Air up

9    to when Swissport purchased Service Air?

10          THE INTERPRETER:  Please repeat the question.

11          MR. WARD:  Sure.

12          From when he started at Service Air until the

13    purchase by Service Air of Swissport, was he

14    continuously employed by Service Air?

15          THE WITNESS:  Yes, it was continuous.

16    BY MR. WARD:

17      Q    Okay.  And then, when you started your

18    employment with ASIG in approximately 2016, was that

19    the first time you had worked for ASIG?

20      A    What I did was work in 2005 at ASIG up to 2016

21    when Menzies purchased ASIG, and I continuously worked

22    for them.

23      Q    I see.  You were working for both Service Air

24    and ASIG at the same time?

25      A    Yes, sir.  I'm sorry.  Different.  They were

24

```
 1    different.
 2         Q    Okay.  Did you ever have any type of
 3    supervisory job at Service Air?
 4              THE INTERPRETER:  Please repeat the question.
 5              MR. WARD:  Sure.
 6         Q    At Service Air, did you have any type of
 7    supervisory responsibilities?
 8         A    No, sir.
 9         Q    The only supervisory job you've had was at
10    ASIG and Menzies; right?
11         A    Yes, sir.
12         Q    Have you ever declared bankruptcy?
13         A    No, sir.
14         Q    Have you ever been convicted of a felony in
15    the United States?
16         A    No, sir.
17         Q    And you understand that Menzies purchased ASIG
18    at some point a couple of years ago; correct?
19         A    2016, sir.
20         Q    While you were employed by ASIG, you were
21    promoted to supervisor; right?
22         A    Yes, sir.
23         Q    And at that time, were you given additional
24    job responsibilities as a supervisor?
25         A    Yes, sir.
```

25

```
 1        Q     What did you understand those additional
 2   responsibilities to include?
 3        A     First of all, with people.  Before you were
 4   with people and then you had to handle people, and
 5   then -- and also, with the flight, you should be able
 6   to distribute it to the people equally.
 7        Q     And when you say "distribute," are you talking
 8   about distributing the amount of work across the people
 9   you supervise equally?
10        A     Yes, sir.
11        Q     The supervisory job that you received at ASIG,
12   was it fuel?
13             THE INTERPRETER:  I'm sorry.  Was it what?
14   Hello?
15             MR. URIARTE:  There's an audio issue.
16             THE INTERPRETER:  I didn't get the complete
17   question.
18             MR. URIARTE:  Chris, your screen -- Chris,
19   your screen shows a muted icon again.
20             MR. WARD:  I just lost sound in here again.
21   Can you -- I cannot hear anything that anybody is
22   saying, but I think you can all hear me.  Can somebody
23   nod their head yes.
24             MR. URIARTE:  Yes.
25             THE INTERPRETER:  Yes, yes.
```

26

```
 1              MR. URIARTE:  Can we get off the record?

 2              MR. WARD:  Off the record again, please.

 3              (Off the record.)

 4              MR. WARD:  Are we back on the record?

 5              THE INTERPRETER:  Yes, I'm here.

 6              MR. WARD:  All right.  Can you read off the

 7     last question that I asked as well as the response.  I

 8     missed all of that.

 9              (The record was read as follows:  "The

10              supervisory job that you received at ASIG,

11              was it fuel?")

12              MR. WARD:  All right.  I couldn't hear that,

13     and there's all kinds of background noise.  Can you

14     read the question and answer again, please.

15              (The record was read as follows:  "The

16              supervisory job that you received at ASIG,

17              was it fuel?")

18     BY MR. WARD:

19         Q    All right.  So the question, Mr. Navarro, the

20     supervisory job that you had at ASIG, was it fueling

21     supervisor?

22         A    Yes, sir.  Yes, sir.

23         Q    And is that the same job you held until your

24     termination of employment?

25         A    Yes, sir.
```

27

1      Q     Do you consider the fueling-supervisor

2   position to be part of company management?

3      A     Yes, sir.  Yes, sir.

4      Q     Do you consider that fueling-supervisory

5   position to be a leadership role?

6      A     Yes, sir.

7      Q     In your opinion, is it important for

8   supervisors to be at work when they are expected to be

9   there?

10          THE INTERPRETER:  I didn't get the first part

11   of the question.  Please repeat that.

12          MR. WARD:  Sure.

13      Q     In your opinion, is it important for

14   supervisors to be at work when they are expected to be

15   there?

16          THE INTERPRETER:  I'd ask that to be repeated.

17   Sorry.  There are some breaks in the words.

18   BY MR. WARD:

19      Q     In your opinion, Mr. Navarro, is it important

20   for supervisors to be at work when they are expected to

21   be at work?

22      A     Yes, sir.

23      Q     In your opinion, is it important for

24   supervisors to be honest in their communications with

25   their employer?

28

```
1        A      Yes, sir.

2        Q      In your opinion, is it important for

3   supervisors to follow company policy?

4        A      Yes, sir.

5        Q      In your opinion, is it important for

6   supervisors to set a positive example for

7   nonsupervisory employees?

8               MR. URIARTE:   Objection.   Vague and ambiguous.

9               You can answer, Mr. Navarro.

10               THE WITNESS:   Yes, sir.

11   BY MR. WARD:

12        Q      In your opinion, is it important for a

13   supervisor to support the other members of company

14   management?

15        A      Yes, sir.

16        Q      In your opinion, is it important for

17   supervisors to work effectively with other company

18   supervisors?

19        A      Are you referring to another company, sir?

20        Q      I'm just referring to, in a supervisory

21   capacity, is it important -- is it important, in your

22   opinion, to work effectively with other supervisors?

23        A      Yes, sir.

24        Q      In your opinion as a supervisor, is it

25   important to avoid undermining the authority of other
```

29

1    supervisors?

2              THE INTERPRETER:  This is the interpreter.  I

3    would like to consult a word first.

4              MR. WARD:  Sure.

5              THE WITNESS:  Please repeat that, sir.

6              MR. WARD:  Sure.

7        Q    As a supervisor, in your opinion, is it

8    important not to undermine the authority of other

9    supervisors?

10       A    Yes, sir.

11       Q    As a supervisor, is it appropriate, in your

12   opinion, to involve nonsupervisory employees in

13   personal disputes?

14             MR. URIARTE:  Objection.  Vague and ambiguous.

15   Chris, did you say other supervisors or other

16   nonsupervisors?

17             MR. WARD:  I will have the reporter repeat my

18   question, please.

19             (The record was read as follows:  "As a

20             supervisor, is it appropriate, in your

21             opinion, to involve nonsupervisory

22             employees in personal disputes?")

23             THE WITNESS:  Yes, sir.  That's correct.

24   BY MR. WARD:

25       Q    And as a supervisor, should you avoid

30

```
 1    involving nonsupervisory employees in personal

 2    grievances?

 3        A    Yes, sir.

 4        Q    As a supervisor, should you avoid pressuring

 5    employees to get involved in personal grievances?

 6        A    Will you please repeat the question again.

 7        Q    Sure.  As a supervisor, is it important to

 8    avoid pressuring employees, nonsupervisory employees,

 9    to get involved in personal grievances?

10             MR. URIARTE:  Before you answer that question,

11    Mr. Navarro, remember the instruction earlier.  If you

12    do not understand the question that is said in Tagalog,

13    indicate that if you are having a problem with the

14    Tagalog interpretation.  Do say that so that we know

15    where the problem is.  I just want to make sure that

16    you do that.  Okay?  Great, Mr. Navarro.

17             THE INTERPRETER:  This is the interpreter

18    speaking.  I would like to have the question, please,

19    repeated.

20             MR. WARD:  Sure.

21        Q    My question is, in your opinion, should a

22    supervisor avoid pressuring nonsupervisory employees to

23    become involved in personal disputes?

24        A    No, sir.

25        Q    Why not?
```

31

```
 1      A      For example, it's my own problem.  Why should
 2   I involve them in my own problem?
 3      Q      And if you had a conflict with another
 4   supervisor, in your opinion, should non- -- scratch
 5   that.  Start over.
 6              As a supervisor, if you have a conflict with
 7   another supervisor, is it your understanding that
 8   nonsupervisory employees should not be brought into
 9   that problem?
10              THE INTERPRETER:  Should that be -- I'm sorry.
11   Chris, should not be what?
12              MR. WARD:  I'll just ask a different question
13   again.
14              THE INTERPRETER:  Okay.
15   BY MR. WARD:
16      Q      As a supervisor, is it your understanding that
17   you should not bring nonsupervisory employees into
18   conflicts you have with another supervisor?
19      A      That's correct, sir.
20      Q      As a supervisor, if you ask a nonsupervisory
21   employee to sign something, do you think you should
22   first explain to the employee what you are asking them
23   to sign?
24              THE INTERPRETER:  Just a second.  I have to
25   translate this again.
```

32

1          THE WITNESS:  That's correct, sir.

2     BY MR. WARD:

3          Q    In your opinion, if a company has an opinion

4     that a supervisor has been pressuring nonsupervisory

5     employees --

6          THE INTERPRETER:  This is the interpreter.

7     It's breaking up.

8          MR. WARD:  I'll try again.

9          THE INTERPRETER:  Go ahead.

10    BY MR. WARD:

11         Q    In your opinion, if a company has a good-faith

12    belief that a supervisor has been intimidating

13    nonsupervisory employees, would that be a valid basis

14    for termination of the supervisor?

15         MR. URIARTE:  Objection.  Calls for a legal

16    conclusion.  Vague and ambiguous.

17         THE WITNESS:  I think it depends, sir.

18    BY MR. WARD:

19         Q    What would it depend upon?

20         A    It depends on what the employee wants to tell

21    them on what intimidation the employee is talking

22    about.

23         Q    In your opinion, is it important for employees

24    to take responsibility for their errors?

25         THE INTERPRETER:  Please repeat that.

33

```
 1              MR. WARD:  Sure.
 2       Q     In your opinion, is it important for employees
 3    to take responsibility for their errors?
 4       A     Yes, sir.
 5       Q     Okay.  I'm going to do my best to see if we
 6    can make this work.  I am sharing a document that I am
 7    going to mark as Exhibit 1 to your deposition.
 8              Are you able to see that?
 9       A     Yes, sir.
10       Q     Are you able to see the full exhibit -- the
11    full page?
12       A     No, sir.  Just the date of incident, sir.
13       Q     How about now?
14       A     Yes, sir.
15              (Deposition Exhibit 1 was marked for
16              identification, a copy of which is
17              attached hereto.)
18    BY MR. WARD:
19       Q     Have you ever seen Exhibit 1 before?
20       A     No, sir.
21       Q     To your knowledge, in March of 2007, were you
22    ever spoken to by a supervisor about not following
23    instructions?
24       A     I don't remember anything (inaudible), what
25    they were instructing me.
```

34

```
 1              MR. WARD:  We are off the record.

 2              (Off the record.)

 3              MR. WARD:  Let's go back on the record.

 4         Q    Mr. Navarro, are you familiar with an

 5    individual by the name of Andrew Dodge?

 6         A    Yes, sir.

 7         Q    And at the time that you were employed by

 8    Menzies, was Mr. Dodge also a supervisor?

 9         A    Yes, sir.

10         Q    And he was also a fueling supervisor; correct?

11         A    Yes, sir.

12         Q    So the same position you held; correct?

13         A    Yes, sir.

14         Q    Do you recall that there was some type of

15    petition that was circulated, complaining about

16    Andrew Dodge?

17              THE INTERPRETER:  I'm sorry.  Complaining

18    about what?

19    BY MR. WARD:

20         Q    Complaining about Andrew Dodge?

21         A    Yes, sir.

22         Q    And how did you first learn about that

23    petition?

24              THE INTERPRETER:  I'm sorry.  Please repeat

25    that.
```

43

```
 1   BY MR. WARD:
 2        Q    Anybody else you can identify by name who
 3   asked you to sign the petition?
 4        A    I forgot the others, but it was Jezen and
 5   Rafael.
 6        Q    Did you sign the petition?
 7        A    Yes, sir.
 8        Q    Did you think it was appropriate to get
 9   involved in a petition against another supervisor?
10             MR. URIARTE:  Objection.  Vague and calls for
11   a legal conclusion.
12             You can answer, Mr. Navarro.  You can answer
13   after my objection.
14             THE WITNESS:  Please repeat the question.
15   BY MR. WARD:
16        Q    The question was did you think it was
17   appropriate to sign a petition against another
18   supervisor?
19             MR. URIARTE:  Same objection.
20             THE WITNESS:  Maybe because, you know -- just
21   on the right, you know.
22   BY MR. WARD:
23        Q    I don't understand your answer, Mr. Navarro.
24        A    If we know that what they are fighting for
25   against Andrew Dodge is right, so why not help them and
```

46

1    also help the company also --

2        Q    Do you think --

3        A    -- to correct the wrong things that

4    Andrew Dodge did.

5        Q    And do you think signing a petition about

6    Andrew Dodge might undermine Andrew Dodge's authority

7    with nonsupervisory employees?

8        A    They are the ones who are signing that.  They

9    know the bad things that Andrew Dodge was doing to me;

10   and, also, the things he was doing against the fueler,

11   that was not good.

12       Q    My question is different.  My question is did

13   you think signing a petition against Andrew Dodge might

14   undermine Andrew Dodge's authority?

15           MR. URIARTE:  Objection.  Vague and ambiguous.

16           THE WITNESS:  Maybe not, sir.

17   BY MR. WARD:

18       Q    Maybe not or no?

19       A    No, no (In English).

20           THE INTERPRETER:  This is the interpreter.  I

21   interpreted "not" and "no" the same word.

22           THE WITNESS:  No, sir.

23   BY MR. WARD:

24       Q    Why not?

25       A    If what's being said is the ones that is

47

```
 1      A      Yes, sir.

 2      Q      If Andrew Dodge had complained to

 3   nonsupervisory employees about you, do you think that

 4   would have been appropriate for him to do so?

 5             THE INTERPRETER:  Please repeat that question.

 6             MR. WARD:  Sure.

 7      Q      If Andrew Dodge had complained to

 8   nonsupervisory employees about you, do you think

 9   Andrew Dodge would be acting appropriately?

10             MR. URIARTE:  Objection.  Lacks foundation.

11   Vague and incomplete hypothetical.

12             THE WITNESS:  It depends on him.  I do not

13   know what he is thinking of.

14   BY MR. WARD:

15      Q      Now, prior to signing this petition, you had

16   previously submitted complaints about Mr. Dodge;

17   correct?

18      A      Yes, sir.

19      Q      When was that?

20             THE INTERPRETER:  The interpreter would like

21   to inquire.

22             THE WITNESS:  I no longer remember.  The

23   people told me what Andrew was doing.  So I had that --

24   I had that reported to the superiors.

25   ///
```

49

```
 1            THE INTERPRETER:  Yeah.  I stand corrected.  I
 2    omitted Renil.
 3            MR. WARD:  Let's strike that question.  I'll
 4    ask it again.
 5       Q    So other than Randy Davies, Nico, Tracy,
 6    Renil, and John Qually, is there anybody else who you
 7    communicated complaints about Andrew Dodge to?
 8       A    No more.
 9       Q    How much time passed, approximately, between
10    when you communicated these complaints and when you
11    signed the petition?
12       A    Maybe those are years.  Years.
13       Q    And in between when you communicated the
14    complaints and when you signed the petition, did you
15    make, yourself, any other complaints involving
16    Andrew Dodge?
17       A    No more -- no, sir.
18            MR. URIARTE:  Is this a good time for lunch?
19    We have lunch being delivered.  So --
20            MR. WARD:  We can go maybe for another 10 or
21    15 minutes first, if that's all right.
22            MR. URIARTE:  That's okay.  Yeah.  Maybe --
23    yeah, closer to 10 hopefully.
24            MR. WARD:  All right.  I am going to mark
25    as Exhibit 7 a document which has the Bates Nos. -152
```

51

1    to -154.

2         Q    Mr. Navarro, this is a three-page document.

3    So let me know when you've reviewed the first page, and

4    then I'll move to the next one.

5         A    Yes, sir.

6         Q    Okay.  Can I flip to the next page?

7              MR. URIARTE:  I'm trying to magnify it because

8    it's really small.  Is that okay, Mr. Navarro?

9              THE WITNESS:  Okay.

10   BY MR. WARD:

11        Q    All right.  Have you had a chance to look at

12   this first page?

13        A    Yes, sir.

14        Q    Let me know when you've had a chance to look

15   at this second page.

16        A    Yes, sir.

17        Q    And how about this third page?  Have you seen

18   this?

19        A    Yes.  The supervisor also.

20        Q    All right.  Do you recognize this document

21   I've marked as Exhibit 7?

22        A    Yes, sir.

23        Q    And is this the petition that was presented to

24   you for signature?

25        A    Yes, sir.

52

1      Q    This first page that I have up right now, is

2  that what the petition looked like when it was

3  presented to you?

4           THE INTERPRETER:  Please repeat the question.

5  The audio is breaking up.

6  BY MR. WARD:

7      Q    For this first page that I have up in front of

8  you right now marked as -152, is that what the petition

9  looked like when it was presented to you?

10     A    Yes, sir.

11     Q    And is that your signature on line 16 there on

12  the second page of this exhibit?

13     A    Yes, sir.

14     Q    And you are the one who placed your signature

15  there?

16     A    Yes, sir.

17          MR. WARD:  All right.  I'm going to mark this

18  Exhibit 8.  It's Bates No. -150.

19     Q    Mr. Navarro, let me know when you've had a

20  chance to review this.

21          THE REPORTER:  Mr. Ward, can we go off the

22  record one moment?

23          MR. WARD:  Sure.

24          (Off the record.)

25          MR. WARD:  We are back on the record.

53

```
 1              The reporter just clarified for me that
 2     documents Bates No. -152 to -154 I had marked as
 3     Exhibit 7, but it should actually be 8; is that right?
 4              THE REPORTER:  Yes.
 5              MR. WARD:  So then this document I have up
 6     right now, Bates No. -150, is actually going to be
 7     Exhibit 9.
 8                   (Deposition Exhibits 8 and 9 were marked
 9                   for identification by the reporter,
10                   copies of which are attached hereto.)
11     BY MR. WARD:
12          Q    Have you had a chance to look at Exhibit 9
13     here?
14          A    I already read it, sir.
15          Q    Prior to today, have you ever seen this
16     Exhibit 9?
17          A    They gave me a copy.
18          Q    When you say "they," who is "they"?
19          A    The shop steward gave it to me, Rafael.
20          Q    Did Rafael give this to you after you had
21     signed the petition?
22          A    I think this is the second petition, that this
23     is the second petition they made against Andrew Dodge.
24          Q    So is it your testimony that there were two
25     petitions against Andrew Dodge?
```

54