# EXHIBIT 14

```
 1                  IN THE UNITED STATES DISTRICT COURT

 2           IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3

 4

 5    RENALDO NAVARRO,

 6              Plaintiff,

 7    v.                                      No.  3:19-CV-8157

 8    MENZIES AVIATION, INC.,
      doing business as MENZIES
 9    and DOES 1 through 10,
      inclusive,
10
                Defendants.
11    _____/

12    Zoom Remote Deposition of

13         JOHN QUALLY

14     Tuesday, July 28, 2020

15          Volume II

16      (Pages 33 through 58)

17
         CERTIFIED COPY
18

19

20

21

22    REPORTED BY:  CINDY TUGAW, CSR #4805

23

                      NOGARA REPORTING SERVICE
24                   5 Third Street, Suite 415
                   San Francisco, California 94103
25                        (415) 398-1889
```

```
 1                      I N D E X

 2                                            Page Number

 3    EXAMINATION BY MR. URIARTE                  36

 4                      ---o0o---

 5                    E X H I B I T S

 6    Plaintiff's

 7    Exhibit 6      Employee Performance         46
                     Development dated
 8                   8/20/18

 9               PREVIOUSLY MARKED EXHIBITS

10    Exhibit 10     Statement by Rafael          53
                     Vasquez dated 11/18/18
11
                        ---o0o---
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1     BE IT REMEMBERED that, pursuant to Notice of
2  Taking Deposition and on Tuesday, the 28th day of July,
3  2020, commencing at the hour of 2:07 o'clock p.m.
4  thereof, via Zoom videoconference, before me, CINDY
5  TUGAW, a Certified Shorthand Reporter in the State of
6  California, personally appeared,
7                      JOHN QUALLY,
8  called as a witness by the Plaintiff, having been by me
9  previously duly sworn, was examined and testified
10 further as hereinafter set forth.
11                       ---o0o---
12                  APPEARANCES OF COUNSEL
13 For the Plaintiff
        LIBERATION LAW GROUP, P.C.
14      2760 Mission Street
        San Francisco, California 94110
15      BY:  ARLO GARCIA URIARTE, Attorney at Law
        (415) 695-1000
16
17 For the Defendants
        FOLEY & LARDNER, LLP
18      555 California Street, Suite 1700
        San Francisco, California 94104
19      BY:  JASON Y. WU, Attorney at Law
        (415) 984-9848
20
   Also Present:  David Ho, Zoom Host.
21
                         ---o0o---
22

23

24

25

```
1                EXAMINATION BY MR. URIARTE
2        MR. URIARTE:  Let's get back on the record.
3        Q.  Mr. Qually, how are you?  Thank you for coming
4   back today.
5            Off the record we had a little bit of a
6   clarification discussion with your counsel.  And I just
7   wanted you to confirm that, in preparation for your
8   deposition, that aside from your counsel, you also
9   spoke with Tracy from HR, Andrew Dodge, and also Ran --
10       A.  Randy Davies.
11       Q.  -- Randy Davies, correct?
12       A.  Correct.
13       Q.  And then, aside from those people, did you
14  talk to anybody else in preparation --
15       A.  No.
16       Q.  -- for your deposition?
17       A.  No.
18       Q.  That's a no?
19       A.  No.
20       Q.  Great.  So let's just jump right in here.
21  Yesterday you were having a little bit of a difficulty
22  trying to remember the different supervisors and
23  different managers that were at Menzies Aviation office
24  in 2018.  And I've got a list of names here.  I wanted
25  to throw it by you.  In August of 2018, Nico, N-i-c-o,
```

1    Q.  And I read your note, and I think I've got to
2    piece it together a little bit, and let me see if this
3    is correct.  What happened was, after the suspension
4    meeting, they asked you to deliver the suspension
5    notice, and then Ray Navarro -- a couple of days later,
6    and then Ray Navarro would not sign it.  Is that how it
7    happened?
8        A.  He, as I remember, trying to serve him with a
9    suspension document, and he did refuse to sign.
10       Q.  But that was -- when did you try to serve --
11   when did you try to serve it to Ray Navarro?  Did that
12   happen after the meeting, same day?
13       A.  I believe it must have -- I can't remember a
14   hundred percent, but it must have been before the
15   meeting.
16       Q.  Okay.
17       A.  But like I say, I don't have -- not knowing
18   when Tracy had the meeting, but, you know, so my guess
19   would be -- like I say, it's a guess, but it was
20   probably before the meeting with them.
21       Q.  So because it's a guess, you don't actually
22   know whether it was before the meeting or after the
23   meeting?
24       A.  Correct.
25       Q.  You don't remember.

1  at all?

2  MR. WU: I'm going to object here on grounds of

3  attorney-client privilege and instruct the witness to

4  answer only as to whether he's seen the document

5  outside of any confidential or communications with his

6  attorneys.

7  MR. URIARTE: Q. That's correct, Mr. Qually, yes.

8  So my question really is whether you've ever seen the

9  -- either of the petitions, either of the two petitions

10 that were circulated, and not because your attorney

11 showed it to you but because of other events.

12     A. As I said, no.

13     Q. Would it be accurate to state that as a duty

14 manager, that Andrew Dodge is an employee that you

15 would have been supervising?

16     A. At some point, yes.

17     Q. And so it wasn't like an interest of yours to

18 figure out what it is that the fuelers were complaining

19 about against Dodge? That wasn't an interest of yours?

20     MR. WU: Objection. Vague.

21     You can answer if you understand the question.

22     THE WITNESS: I did not hear complaints directly

23 from the fuelers.

24     MR. URIARTE: Q. Okay. So you're saying none of

25 the fuelers ever came up to you and said, hey, these

1  negatives things are happening?  You never heard that?
2      A.  No.
3      Q.  What about the video, did you ever see that
4  video where they put together a video of Mr. Dodge
5  sleeping and all that?  Did you see that one?
6      A.  No.
7      Q.  You knew that a petition was going around
8  against Mr. Dodge?  Did you know that, as it was
9  happening?
10     A.  I have heard through -- that, yes, there was.
11     Q.  And did you see the note that Andrew Dodge
12 wrote, the statement he wrote around the same time that
13 the petition was going around, was that something that
14 you saw?
15     A.  I did not.
16     Q.  Do you know one way or the other if Menzies
17 Aviation ever did an investigation with regards to the
18 facts that are contained within those petitions?
19     A.  No.
20     Q.  You don't know?
21     A.  I don't know if -- what was done with all the
22 information.
23     Q.  I see.  Were you made aware at some point that
24 Mr. Dodge was suffering from sleep apnea?
25     A.  Yes.

```
 1      Q.  And how were you made aware of that?
 2      A.  He brought it to our attention.
 3      Q.  Do you know when that was?
 4      A.  No, I don't have the exact date.
 5      Q.  Was it before or after the termination of Ray
 6   Navarro?
 7      A.  Before.
 8      Q.  A lot of time before?  I think Mr. Dodge came
 9   in in 2016.  And then Ray Navarro was August of 2018.
10   So that's kind of like the time frame there.  I don't
11   know if that assists you, but do you know about when
12   Mr. Dodge let you know of his condition?
13      A.  I don't have the exact date, no.
14      Q.  And did you see any kind of medical note or a
15   medical slip or anything like that written by a doctor?
16      A.  Personally, no.
17      Q.  Did somebody tell you that he had one?
18      A.  He told me he gave it to the general manager
19   at the time, Renil.
20      Q.  Renil Lal?
21      A.  Yes.
22      Q.  Did Mr. Lal ever talk to you about the note,
23   the medical note?
24      A.  No.
25      Q.  Was there some sort of accommodation or a game
```

```
 1   plan with regards to how to deal with the sleep apnea,
 2   anything like that?
 3       A.   Nothing directed to me.
 4       Q.   Did you think that maybe the sleep apnea
 5   condition was interfering with his job?
 6       A.   No.
 7       Q.   You didn't think that it's of concern?
 8       A.   There's always a concern, but I don't believe
 9   it interfered with his job.
10       Q.   And why is that?
11       A.   Because most of the time, as I heard, it was
12   already, like, early in the morning, like, 1:00, 2:00,
13   3:00 o'clock in the morning when there's nothing on the
14   airport.  When he's actually on the airport, he was not
15   sleeping.  He was actually doing his job.
16       Q.   Did you see that one picture of him where he's
17   inside the truck and he's sleeping?  Did you see that
18   one?
19       A.   I've seen one, yes.
20       Q.   And that's not a concern at all for Menzies?
21       A.   For me personally or Menzies?  Me, personally,
22   the time frame, no.  Whether the company did, I can't
23   say.
24       Q.   So I guess you weren't part of some sort of
25   discussion as to whether his condition interfered with
```

1  him being able to correctly perform his job functions,
2  right?  You weren't purview to that type of discussion?
3       A.  Correct.
4       Q.  Have you seen the termination notice of
5  Renaldo Navarro?
6       A.  No.
7       Q.  So you saw only the suspension notice, right?
8       A.  Correct.
9       Q.  And then you actually -- did you write that?
10 Did you actually -- were you the one who wrote it?
11      A.  The one that basically saying that he -- that
12 I attempted to serve him the suspension notice and he
13 refused to sign?
14      Q.  No, no, let me put it up, that way we're
15 talking about the same thing.  I'm talking about the
16 actual notice itself.
17              So it's Exhibit 6, please, David.
18              (Plaintiff's Exhibit 6 marked for
19              identification.)
20      MR. URIARTE:  Q.  Do you see that, Mr. Qually?
21      A.  Oh, that one.  Okay.  Yes, I did -- that was
22 the one -- that was the -- okay, yes.  That was a
23 suspension document that was tried to serve to
24 Mr. Navarro that he refused to sign.
25      Q.  Correct.  So my question first is did you type

1  this up?
2      A.  Yes.
3      Q.  So you typed it up, is that right?
4      A.  You know what, hold on a minute.  No, I did
5  not type that.
6      Q.  Okay.  So somebody gave this to you to -- for
7  example, it seems like somebody filled out the field
8  "Employee Name:  Renaldo Navarro," "Today's Date,"
9  "Airport/Location," "Clock #," "Department."  Somebody
10 put that information in there.
11         Were you the one who put that in there?
12     A.  Negative, no.
13     Q.  Do you know who did that?
14     A.  Do I remember, no.  There's only --
15     Q.  Who asked you to serve the document?
16     A.  I believe it was HR.
17     Q.  Meaning Tracy?
18     A.  Tracy.
19     Q.  Okay.  So this might refresh your recollection
20 with regards to before or after the meeting.  So it
21 says "Today's Date" on the top there, and it says
22 August 20, 2018.  Do you see that?
23     A.  Okay.
24     Q.  And then, if you scroll down and you see your
25 signature, it's a different date.  Your signature has a

1  date of August 23.  Do you see that?
2     A.  Yes.
3     Q.  Does that help you or refresh your
4  recollection at all with regards to when you served
5  this?
6     A.  When he refused to sign, I dated it on the
7  23rd because that's when I tried to serve it to him.
8     Q.  I see.  So that's when your encounter with him
9  actually happened, is that correct?
10    A.  Correct.
11    Q.  So you only had one encounter with him, one
12 attempt?
13    A.  Correct.
14    Q.  And because he was not -- he wasn't working at
15 that point, correct?
16    MR. WU:  Objection.  Vague.
17    THE WITNESS:  I can't remember --
18    MR. WU:  You can answer if you understand the
19 question.
20    THE WITNESS:  I understand the question.  I don't
21 remember if that was his scheduled shift.  I don't
22 remember if that was his scheduled day or not.
23    MR. URIARTE:  Q.  I understand you're a little
24 confused.  By the time you were trying to serve him,
25 was he already serving the suspension or he had not

```
1    started serving the suspension?  Do you see what I'm
2    saying?
3        A.   He -- best of my knowledge, he had not served
4    his suspension.
5        Q.   So he didn't start serving the suspension
6    until you tried to serve him the suspension notice, is
7    that correct?
8        A.   To the best of my knowledge, yes.
9        Q.   Okay.  Did you leave him with a copy?
10       A.   He had a copy, yes.
11       Q.   When you say he had a copy, was the copy --
12   the copy that he had, that came from you or --
13       A.   He took a picture of it with his phone.
14       Q.   I see.  Okay.  So, okay.  All right.  And then
15   let me just read under goal and the expectation part
16   there, it says, "It is expected that employees will
17   follow all policies and procedures.  Failure to follow
18   Company policies and procedures will result in further
19   disciplinary action up to and including termination."
20            Do you read that?
21       A.   Yes.
22       Q.   Are you knowledgeable at all with regards to
23   the policies and procedures that this notice was
24   talking about?
25       A.   Directly, no.
```

1 no.

2 Q. Did you -- like either part of the petition or
3 part of what was happening, or anything like that, did
4 you ever have a discussion with Mr. Dodge with regards
5 to his fuelers and his fuelers maybe not being able to
6 take breaks? Did you ever engage in such a discussion
7 with him?

8 A. It probably came up once or twice, yes.

9 Q. And was this once or twice before the
10 termination of Mr. Navarro?

11 A. Likely, yes.

12 Q. And can you tell us what your memory is of
13 that, like, what was that discussion about?

14 A. Basically fuelers not being able to take a
15 break just by the fact that they were shorthanded or
16 just lots of flights. Nothing I can remember in
17 general, but those are usually the only things that
18 would prevent that.

19 Q. Okay. And what brought up the need to talk to
20 Mr. Andrew Dodge about the breaks and his fuelers?
21 What brought it up to you? What kind of triggered
22 that?

23 MR. WU: Objection. Assumes facts not in
24 evidence.

25 THE WITNESS: Sometimes a fueler would complain to

1  me, but that's it.
2        MR. URIARTE:  Q.  And did Mr. Dodge have any
3  opinion or did he kind of have his position as to why
4  these breaks were short -- I mean, the breaks weren't
5  happening, or the breaks were late, or anything like
6  that?
7        Did Andrew Dodge try to explain himself as to
8  why those things were happening?
9        MR. WU:  Objection.  Assumes facts not in
10 evidence.
11       THE WITNESS:  Yes.
12       MR. URIARTE:  Q.  And what would he say in those
13 discussions?
14       A.  He gave me the explanation of what happened
15 during the night and why some fuelers weren't able to
16 get a longer break than they did or any break at all.
17 And that's it, you know.
18       We -- there is a policy where, if they don't
19 get a break, they get a missed meal penalty.  So they
20 get paid for their lunch.
21       Q.  Did you ever have a discussion with a Rafael
22 Vasquez about Andrew Dodge?
23       A.  I might have at one point.  I don't recall.
24       Q.  And what do you remember as to that
25 discussion?

1  that at all?
2      A.  If I talked to Rafael, it would have been
3  before.
4      Q.  So here he says something about "I have spoken
5  to The Menzies Aviation Fueling Director Raul Vargas on
6  three separate occasions regarding Mr. Andrew Dodge,
7  who continues to abuse his authority and at times
8  harass Fuelers under his charge."
9          Do you have any information or knowledge with
10 regards to that allegation, "continues to abuse his
11 authority and at times harass Fuelers under his
12 charge"?
13         Does that ring a bell at all, Mr. Qually?
14     A.  No.
15     Q.  And in the complaint that you received against
16 Andrew Dodge, was there any type of language along
17 these lines or actions along these lines, like
18 harassing, abusing authority?
19         Was that the types of complaints that you
20 received?
21     A.  No.
22     Q.  So you received complaints about meal breaks
23 and rest breaks, but nothing about harassing fuelers,
24 right?  You never heard that type of complaint?
25     A.  Correct.

```
 1                  CERTIFICATE OF WITNESS
 2                         ---o0o---
 3
 4        I, JOHN QUALLY, hereby declare under
 5   penalty of perjury that I have read the foregoing
 6   deposition testimony; and that the same is a true
 7   and correct transcription of my said testimony
 8   except as corrected pursuant to my rights under
 9   Rule 30(e) of the Federal Rules of Civil
10   Procedure.
11
12                       _____
                                    Signature
13
14                       _____
                                      Date
15
16
17
18
19
20
21
22
23
24
25
```

```
 1   STATE OF CALIFORNIA    )
                            )
 2   COUNTY OF SAN FRANCISCO )
```

 3             I, CINDY TUGAW, a Certified Shorthand Reporter

 4   of the State of California, duly authorized to

 5   administer oaths pursuant to Section 8211 of the

 6   California Code of Civil Procedure, do hereby certify

 7   that

 8                       JOHN QUALLY,

 9   the witness in the foregoing deposition, was by me duly

10   sworn to testify the truth, the whole truth and nothing

11   but the truth in the within-entitled cause; that said

12   testimony of said witness was reported by me, a

13   disinterested person, and was thereafter transcribed

14   under my direction into typewriting and is a true and

15   correct transcription of said proceedings.

16             I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   caption.

21             Dated the 7th day of August, 2020.

22

23                       *[signature: Cindy Tugaw]*

24

25                       CINDY TUGAW
                         CSR No. 4805 (California)

```
 1   John Qually
     c/o Foley & Lardner
 2   555 California Street, Suite 1700
     San Francisco, CA 94104
 3   Attn:  Jason Y. Wu, Esq.

 4   Date:  August 7th, 2020
     Re:  Navarro vs. Menzies
 5   Deposition Date:  Tuesday, July 28, 2020

 6   Dear Mr. Qually,

 7           Please be advised the original transcript of
     your deposition is ready for your review.
 8           Pursuant to FRCP Rule 30(e), you have
     30 days following the date of this notice to read,
 9   correct if necessary, and sign your transcript unless
     the attending parties and the deponent agree on the
10   record or otherwise in writing to a longer or shorter
     time period.  The deponent may change the form or the
11   substance of the answer to a question, and may either
     approve the transcript of the deposition by signing it,
12   or refuse to approve the transcript by not signing it.
     You are not required by law to read and sign your
13   deposition transcript.  All parties will be informed of
     the corrections.  The original transcript will then be
14   sealed and sent to the examining attorney pursuant to
     the applicable law.
15           You may either come to our office to read and
     sign the original transcript, or you may contact your
16   attorney or the attorney who arranged for you to be
     present at your deposition.  If they have ordered a
17   copy of the transcript, you may review their copy and
     make corrections by submitting, signing and returning
18   the attached form.  If you choose to review your
     transcript at our office, please call first to make an
19   appointment.  Should you have any question regarding
     these instructions, please call.
20
     Sincerely,
21

22

     NOGARA REPORTING SERVICE
23   5 Third Street, Suite 415
     San Francisco, California 94103
24   (415) 398-1889

25   cc:  All counsel, original deposition
```