# EXHIBIT 15

1        IN THE UNITED STATES DISTRICT COURT

2     IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5   RENALDO NAVARRO,

6              Plaintiff,

7   v.                                No.  3:19-CV-8157

8   MENZIES AVIATION, INC.,
    doing business as MENZIES
9   and DOES 1 through 10,
    inclusive,
10
               Defendants.
11   _____/

12   Zoom Remote Deposition of

13       TRACY AGUILERA

14    Tuesday, August 25, 2020

15

          **CERTIFIED COPY**
16

17

18

19

20

21   REPORTED BY:  CINDY TUGAW, CSR #4805

22

23

          NOGARA REPORTING SERVICE
24         5 Third Street, Suite 415
        San Francisco, California 94103
25             (415) 398-1889

1                         I N D E X

2                                    Page Number

3     EXAMINATION BY MR. URIARTE              5

4     EXAMINATION BY MR. WU                  48

5     FURTHER EXAMINATION BY MR. URIARTE     53

6                    ---o0o---

7                  E X H I B I T S

8     Plaintiff's

9     Exhibit 8      Petition to Menzies        26
                     Management from Menzies
10                   Fuelers

11    Exhibit 9      Termination notice for     48
                     Renaldo Navarro
12

13    Exhibit 11     Employee Performance       35
                     Development dated
      Exhibit 11     8/29/2018
14

      Exhibit 12     Email chain culminating    31
15                   in an email from Raul
                     Vargas to Tracy Aguilera
16                   dated August 29, 2018

17    Exhibit 13     Menzies Aviation Code of   18
                     Conduct
18

      Exhibit 14     Menzies Aviation Employee  21
19                   Handbook California - 2017

20    Exhibit 15     Menzies Aviation Applicant 23
                     Declaration Form
21

      Exhibit 17     Employee Performance       43
22                   Development Steps to
                     Progressive Discipline
23

      Exhibit 18     Job Description, Fueling   54
24                   Supervisor (North America)

25

```
1                              I N D E X

2                            (Continued)

3      Plaintiff's                         Page Number
```

```
4      Exhibit 19     Letter from Rafael Vasquez        41
                      to whom it may concern
5                     dated 11/18/2018 with
                      attached petition
6
       Exhibit 20     Menzies Aviation Employee          44
7                     Handbook California - 2018
```

```
8                          ---o0o---

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 3:19-cv-08157-VC   Document 32-1   Filed 05/15/2020   Page 5 of 34

1        BE IT REMEMBERED that, pursuant to Notice of

2   Taking Deposition and on Tuesday, the 25th day of

3   August, 2020, commencing at the hour of 1:04 o'clock

4   p.m. thereof, via Zoom videoconference, before me,

5   CINDY TUGAW, a Certified Shorthand Reporter in the

6   State of California, personally appeared,

7                    TRACY AGUILERA,

8   called as a witness by the Plaintiff, having been by me

9   first duly sworn, was examined and testified as

10  hereinafter set forth.

11               ---o0o---

12            APPEARANCES OF COUNSEL

13  For the Plaintiff
         LIBERATION LAW GROUP, P.C.
14       2760 Mission Street
         San Francisco, California 94110
15       BY:  ARLO GARCIA URIARTE, Attorney at Law
         (415) 695-1000
16

17  For the Defendants
         FOLEY & LARDNER, LLP
18       555 California Street, Suite 1700
         San Francisco, California 94104
19       BY:  JASON Y. WU, Attorney at Law
         (415) 984-9848
20

21  Also Present:  David Ho, Zoom Host.

22               ---o0o---

23

24

25

Case 3:19-cv-08157-VC   Document 23-11   Filed 05/15/2020   Page 6 of 34

1    THE REPORTER:  At this time, I will ask counsel to

2    stipulate on the record that there is no objection to

3    this deposition officer administering a binding oath to

4    the witness via Zoom, starting with the noticing

5    attorney.

6    MR. URIARTE:  No objection from plaintiff.

7    MR. WU:  And no objections for defendant, Menzies

8    Aviation.

9         (Whereupon, the Witness was duly sworn by the

10        Reporter.)

11                EXAMINATION BY MR. URIARTE

12    MR. URIARTE:  Q.  Good afternoon, Ms. Aguilera.

13    A.  Good afternoon.

14    Q.  Could you please state and spell your full

15    legal name for the record.

16    A.  Tracy T r-a-c-y, Marie, M-a-r-i-e, Aguilera,

17    A-g-u-i-l-e-r-a.

18    Q.  Thank you.  Have you had your deposition taken

19    before?

20    A.  Yes.

21    Q.  And how many times?

22    A.  Two or three.  A couple times.

23    Q.  And are these like as part of your duties as

24    an HR professional?

25    A.  Yes.

Case 3:19-cv-08157-VC  Document 28-11  Filed 10/15/2020  Page 8 of 32

1    A.  Yes.

2    Q.  And you know who Renaldo Navarro is?

3    A.  Yes.

4    Q.  How long did you actually work with Mr.

5    Navarro?

6    A.  When Menzies Aviation purchased ASIG, so it

7    would be around 2017.

8    Q.  So Menzies arrived -- do you remember what

9    part of the year Menzies actually started their

10   operation in SFO --

11   A.  Yeah --

12   Q.  -- for ASIG?

13   A.  Oh, for ASIG.  Could have been June or July.

14   Q.  So about June or July 2017?

15   A.  Yes.

16   Q.  And then were you already at SFO doing other

17   parts of airport services for Menzies?

18   A.  Yes.

19   Q.  And then how long has Menzies been in San

20   Francisco Airport?

21   A.  I can't give you an exact date.

22   Q.  Yeah, what about yourself, about how long --

23   A.  I've been at SFO since 1997.

24   Q.  All for Menzies?

25   A.  No.

Case 3:19-cv-08157-VC  Document 23211  Filed 01/31/2020  Page 8 of 34

1    that you're using for today's testimony?

2         A.   No.

3         Q.   What's the highest level of education that you

4    finished with?

5         A.   High school.

6         Q.   And then any kind of HR-related classes that

7    you've taken in the last five years?

8         A.   No.

9         Q.   Any wage and hour related seminars or classes

10   that you've taken in the last five years?

11        A.   I'm sorry, I can't hear you.  I didn't.

12        Q.   Any kind of wage and hour seminars or

13   compliance classes or anything like that?

14        A.   No.

15        Q.   And then how long have you been an HR manager

16   for Menzies at SFO airport?

17        A.   Ten years.

18        Q.   When Menzies took over ASIG, did Menzies bring

19   with it its own employment policies and handbook?

20        A.   They had one, yes.

21        Q.   Were those distributed to the employees that

22   they took over in July of 2017?

23        A.   I'm sorry, can you repeat the question.

24        Q.   Sure.  When Menzies took over ASIG in July of

25   2017, did they distribute the Menzies employment

Case 3:19-cv-08157-VC  Document 23-11  Filed 05/15/2020  Page 9 of 32

1    handbooks and policies --

2        A.   Not right at the time, no.

3        Q.   When were those eventually distributed?

4        A.   I don't have an exact date.  I do know that we

5    posted the notice stating that they would be following

6    the Menzies Aviation policies.

7        Q.   Okay.  And where was that notice posted?

8        A.   It was posted in the employee bulletin board.

9        Q.   And then where would -- like if somebody

10   wanted to see them, where would they see them?

11       A.   They would see them in the HR department.  We

12   were preparing a package for them.

13       Q.   If somebody needed to see them, you said they

14   could see it in the HR department, is that correct?

15       A.   Yes, once we put them all together.

16       Q.   By August of 2018, had you put them all

17   together?

18       A.   I believe they did have a package for them.

19       Q.   For each one of them?

20       A.   Yes.

21       Q.   Are you certain of that or are you guessing on

22   that?

23       A.   No, I believe they did have a package put

24   together.

25       Q.   And when you say "they," who's "they"?

Case 3:19-cv-01157-WC   Document 28-1   Filed 01/15/20   Page 10 of 34

1  right, you give it to the employees and then they

2  acknowledge receipt of it, correct?

3       A.  Yes.

4       Q.  And they acknowledge that they have been given

5  one, isn't that the practice?

6            So the practice, Ms. Aguilera, is that once

7  the handbooks become available, you provide the

8  handbook to the employee and then they sign an

9  acknowledgment for receipt of them, is that correct?

10      A.  Yes.

11      Q.  And then are you familiar with the Menzies

12  code of conduct?

13      A.  Yes.

14      Q.  And that's another kind of set of policies or

15  paperwork that's given to each employee, is that

16  correct?

17      A.  It's in the handbook, yes.

18      Q.  Oh, so it's part of the handbook?

19      A.  Yes, it is.

20      Q.  Is there a separate acknowledgment of receipt

21  for the code of conduct or it's all just one?

22      A.  It's all just one.

23      Q.  Was there ever a training with regards to the

24  Menzies California handbook and code of conduct?  Was

25  there any kind of training like that?

<< NOGARA REPORTING SERVICE >>                15

Case 3:19-cv-01157-WC Document 24-1 Filed 11/15/20 Page 11 of 34

1     A.   There was, when the employees came in to sign

2  all the documents, we went over the documents with

3  them.

4     Q.   So how did that go?  You called some of the

5  employees one by one or like a seminar?  How did that

6  go?

7     A.   They would come in according to their

8  schedule, if they didn't have flights, they would come

9  into the HR department.  We would -- I would arrange it

10 with their manager.

11    Q.   Like how many people would come in at one

12 time?

13    A.   A couple at a time.

14    Q.   And then when you said you would go over it

15 with them, you actually went through some of the pages

16 and --

17    A.   What they were signing, yes.

18    Q.   What they signed.

19    A.   Either myself or my clerk.

20    Q.   I see.  Do you have an independent

21 recollection of doing something like that with

22 Mr. Renaldo Navarro?

23    A.   No, I can't say that I do.  I didn't do a lot

24 of them.  My clerk did a lot of them, most of them.

25    Q.   In July or August of 2018, who was your clerk?

1    A.  I believe it was Loretta Katoa.

2    Q.  We're going to need a spelling for the last

3    name.

4    A.  K-a-t-o-a.

5    Q.  Was there another clerk or was it just

6    Loretta?

7    A.  No, I had Loretta and I had another clerk, her

8    name was Precious.

9    Q.  Do you remember her last name?

10   A.  Sagaga.

11   Q.  Do you know the spelling of that?

12   A.  I believe it's S-a-g-a-g-a.

13   Q.  What is your understanding as to why Menzies

14   terminated Mr. Navarro?

15   A.  For harassment.

16   Q.  And as you know, harassment is a bit of a term

17   of art in employment circles.  So what type of

18   harassment are we talking about?  When you say

19   harassment in this circumstance, what kind of

20   harassment?

21   A.  Unprofessional conduct, forcing employees

22   to -- pressuring employees.

23   Q.  Pressuring employees to sign the petition, is

24   that what you mean?

25   A.  Yes.

Case 3:19-cv-01857-WC   Document 32-1   Filed 11/5/20   Page 13 of 34

1        Q.  Any other reason?

2        A.  No.

3        Q.  Is it your understanding that -- is it your

4    understanding that somehow in the code of conduct

5    there's something there that addresses the concern that

6    you're not supposed to force employees to sign a

7    petition?

8        A.  Yes.

9        Q.  And do you remember seeing something like that

10   in the code of conduct?

11       A.  Yes.

12       MR. URIARTE:  So, David, can we get Exhibit 13,

13   please.

14            (Plaintiff's Exhibit 13 marked for

15            identification.)

16       ZOOM HOST:  I sent a Chat to Tracy, and she should

17   be able to open that link, and she has a laptop, so she

18   can see the whole document.

19       MR. URIARTE:  Okay.  Very good.  So you're not

20   going to open it over here or --

21       ZOOM HOST:  If you like, I can do that.  It's up

22   to you.

23       MR. URIARTE:  Yeah, can we do that?

24       ZOOM HOST:  Okay.  Sure.  Coming back up.

25       MR. URIARTE:  I think Jason and I are kind of used

Case 3:19-cv-01127-WC Document 24-1 Filed 01/15/20 Page 14 of 34

1    memory is that they had the handbook at that point

2    already, is that correct?

3        A.  Yes.

4        Q.  And who would know for certain whether that's

5    true or not?

6        A.  The documents should be in the files.

7        Q.  Yeah, well, I guess what I can represent to

8    you is that -- and I should show you that -- let's look

9    at Exhibit 15, please.

10            (Plaintiff's Exhibit 15 marked for

11            identification.)

12        MR. URIARTE:  Q.  So here is one of those

13    documents that lists the signature.  If we look below,

14    it's got a blank, no employee name, no employee

15    signature.  This was produced to us by your attorneys.

16            And so I have yet -- I mean, I guess, if you

17    get back to your office and you see some sort of

18    acknowledgment form that has Mr. Navarro's signature on

19    it, I think that would be helpful, but we have yet to

20    see that.

21            Okay, Ms. Aguilera?  Did you understand my

22    request?

23        A.  Yes.

24        Q.  All right.  How did you first find out that

25    there was a petition circulating about Andrew Dodge?

1    A.  The union notified me.

2    Q.  And how did they notify you?

3    A.  They called me.  It wasn't "they."  Charles

4    called me, the man named Charles that worked in the

5    union office.

6    Q.  And what did Charles say to you?

7    A.  He said, "Tracy, are you aware that there's a

8    petition being circulated?  Our members -- several

9    members have called and complained that they were being

10   forced to sign a petition."

11   Q.  Okay.  And then anything else that Charles

12   said to you?

13   A.  No.

14   Q.  And so, in response to that, what did you do?

15   A.  Well, I asked him if he had a copy of the

16   petition and who was being forced, but he never got

17   back to me on that.  With that being said, I made

18   contact with the acting general manager at the time,

19   and his name was Renil Lal, and I told him that I

20   received the call from the union.

21   Q.  Okay.  And did Renil get you a copy of the

22   petition?

23   A.  Not right away.  I don't believe -- no, he did

24   not.

25   Q.  Do you know how long before you actually got a

Case 3:19-cv-01457-WC   Document 22-1   Filed 01/15/20   Page 16 of 34

1    copy of it?

2        A.  I got it -- actually, I got it from Raul

3    Vargas.  I'd seen it.

4        Q.  I see.  Okay.  And did you read the petition

5    itself?

6        A.  I've seen the names on there, yes, but I

7    didn't go through each one.  I'm sorry.

8        Q.  What about the topic that the petition was

9    talking about, did you read that part?

10       A.  No, I -- I gave everything to Kevin Blumberg

11   to open up an investigation.

12       Q.  And what was the investigation for?

13       A.  Well, to find out what was going on.

14       Q.  What do you mean, "to find out what was going

15   on"?

16       A.  With the petition, why it was being

17   circulated.

18       Q.  Okay.  And then what was the conclusion of

19   Kevin, the security person?

20       A.  The conclusion?

21       Q.  Yes.

22       A.  It was that Rey Navarro was forcing employees

23   to sign a petition to have Andrew Dodge removed.

24       Q.  Okay.  And that's what is contained in the

25   email, right, is that what you're talking about, where

1    Mr. Blumberg actually sent an email to you with the

2    result of his investigation?

3         A.  Yes.

4         Q.  Okay.  So that's with regards to the inquiry

5    as to Mr. Navarro's involvement in the petition itself,

6    right?  But what about the part of, like, what the

7    fuelers were complaining about?  Was that ever

8    investigated?

9         A.  I'm sorry, can you repeat that.

10        Q.  Sure.  What about the part, that section of

11   the petition where the fuelers are asking for certain

12   relief or what they're complaining about, right, in the

13   petition, was that part of the petition ever

14   investigated?

15        A.  What part are you talking about?

16        MR. URIARTE:  Okay.  Let me show you.  So let's

17   bring up Exhibit 8.

18             (Plaintiff's Exhibit 8 marked for

19             identification.)

20        MR. URIARTE:  Q.  Can you see Exhibit 8,

21   Ms. Aguilera?

22        A.  Yes.

23        Q.  Do you remember this to be the petition that

24   we're talking about?

25        A.  This is the one that I believe was given to

1  Raul Vargas.

2      Q.  Okay.  Let's scroll to page 2 just to make

3  sure Ms. Aguilera sees the whole document.  It's a

4  three-page document.

5          And this is the one that has Renaldo Navarro's

6  signature on line 16, as you see there.  Do you see

7  that, Ms. Aguilera?

8      A.  Yes.

9      Q.  Okay.  And then it also has the signature of

10  the other supervisor, July Macapagal.  Do you see that?

11     A.  Yes.

12     Q.  Okay.  So we've been calling this the first

13  petition.  So if we scroll back to page 1 -- and I

14  understand that you've said that you asked the security

15  department or Raul Vargas asked the security department

16  to investigate the role of Mr. Navarro.  I understand

17  that part.

18          What I'm now distinguishing with you is with

19  regards to the subject matter of this petition.  And

20  I'll let you read it, or if you want, I can read it for

21  you.

22          Are you able to read it fine, Ms. Aguilera?

23     A.  Yes, I know how to read, yes.

24     Q.  Okay.  So it says, "We the fuelers on Menzies

25  130 side would like to make a petition against Andrew

1  Dodge.  The way he supervised is very unprofessional

2  when he run the operation or supervised, people are not

3  [taking] their breaks it's because the way he set up

4  the flights" -- okay?  -- "and he always blaming the

5  people there's a delay or always saying lack of

6  manpower and trucks issues."

7       Okay.  So let's just stop there.  That part of

8  the petition, was that ever investigated?

9       A.  The whole scenario was investigated by Kevin

10  Blumberg.

11       Q.  Aside from the email that contains some of

12  Mr. Blumberg's conclusion, is there another document

13  that addresses these concerns?

14       A.  I don't have them.

15       Q.  So if there is an investigation, it would be

16  part of what Mr. Blumberg engaged in, correct?  Is that

17  correct?

18       A.  Yes.

19       Q.  Okay.  Let's go on to the next one.  "The

20  truth is he doesn't know how to run the show, we also

21  addressed the problem to the higher position managers

22  (Nicco, John and Renil) as usual nothing happened,

23  looks like they always covering his mistake or maybe

24  these managers don't know anything about fueling also

25  like Andrew Dodge lack of experience about fueling."

1    document that writes or has further conclusions

2    regarding his investigation?  Ms. Aguilera?

3        A.  No, I don't have a copy of it.

4        Q.  Okay.  I guess my question is more -- when we

5    see Mr. Blumberg's product or result of his

6    investigation into the petition, this is what we're

7    looking at right here, the email that he wrote to you

8    with his conclusions, is that correct?

9        A.  This says a statement, yes.

10       Q.  Aside from this statement, is there any other

11   written document?

12       A.  Not that I have.

13       Q.  And here his conclusion really is

14   "unprofessional behavior by a supervisor."  Do you see

15   that?

16       A.  Yes, I see it.

17       Q.  Just taking that kind of like in its

18   isolation, "unprofessional behavior by a supervisor,"

19   would that result in a termination?  Is that something

20   that would normally result in a termination?

21       A.  It depends on the caliber of the -- what he's

22   done.

23       Q.  And your recommendation actually was not to

24   terminate, correct?

25       A.  Myself and our directors, yes -- my director,

1   yes.  Talin.

2       Q.  Correct.  So Talin and yourself had a

3   discussion, and your recommendation to Mr. Vargas was

4   not to terminate but instead issue a final warning, is

5   that correct?

6       A.  It was not to terminate, yes.

7       Q.  Did you recommend the final warning to

8   Mr. Vargas?

9       A.  I was going to.  Oh, to Mr. Vargas, no.  Let

10  me back up, I'm sorry.

11      Q.  Go ahead.

12      A.  Yes, I did write up the document, but it

13  was -- and my recommendation was made.

14      Q.  Did you actually send that document to

15  Mr. Vargas?

16      A.  I don't believe so.

17      Q.  Now, was there ever a discussion between you

18  and Mr. Vargas about, hey, there's an option here of

19  issuing a final warning; was that discussion made?

20      A.  No.  I gave my recommendation.

21      Q.  So you gave your recommendation of not

22  terminating, but you didn't communicate an option to

23  Mr. Vargas.  Is that an accurate way of characterizing

24  it?

25      A.  Not via email.  After I made my

1    recommendation, and he came up to my office and we

2    discussed it, and that's when Kevin came up and said --

3    and gave me the details of the investigation.

4        Q.  And so Raul Vargas went to your office, you

5    had a discussion about it, and in that discussion the

6    final warning option was discussed?

7        A.  He asked me why I came to that conclusion of

8    not to terminate, and I told him based on Renaldo's

9    tenure and what was in his personnel file.

10       Q.  Okay.  And what's your opinion as to why

11   Mr. Vargas did not follow that recommendation?

12       A.  After speaking with Mr. Vargas and Kevin in my

13   office and them going into detail about harassment, my

14   opinion changed, and I reviewed it with my director,

15   and we were in agreement to terminate him.

16       Q.  And then I guess I understand all of that.

17   But I think the only kind of unclear portion of that is

18   the -- and maybe let's pull it up.

19       MR. URIARTE:  If we could pull up Exhibit 11.  I

20   wanted to kind of focus on the issue of the issuance of

21   the final warning and what Mr. Vargas knew about that.

22           (Plaintiff's Exhibit 11 marked for

23           identification.)

24       MR. URIARTE:  Q.  And issuance is not the right

25   word, right?  You drafted a document of final warning.

Case 3:19-cv-08157-WC Document 32-1 Filed 11/15/20 Page 23 of 34

1    Q.   That's a typo with the date?

2    A.   Yeah, it shouldn't have been October.

3    Q.   Okay.  So it should have been October 27,

4    2018?

5    A.   No, I believe --

6    Q.   I mean -- yeah.

7    A.   I believe it should have been August 27th.

8    Q.   Okay.  So you believe that to be a typo?

9    A.   I believe so.

10   Q.   All right.  So are you saying that two days

11   before Mr. Navarro was terminated, Mr. Rafael Martinez

12   also gave Raul Vargas a petition asking Andrew to be

13   removed?

14   A.   Yes.

15   Q.   With regards to the suspension on August 20,

16   who recommended and approved the suspension?

17   A.   Raul Vargas and Kevin Blumberg.

18   Q.   Before the issue with the petition, did you

19   receive any complaints or did you hear about complaints

20   from fuelers against Andrew Dodge?

21   A.   Only from Rey.

22   Q.   Did you see the pictures that were circulating

23   of Mr. Andrew Dodge sleeping on the job?  Was that

24   something that you saw?

25   A.   Yes, I did see one.

Case 3:19-cv-01157-WC   Document 24-1   Filed 01/15/20   Page 24 of 34

1     Q.  And that was before the petition, correct?

2     A.  Yes.

3     Q.  And Rey complaining about Andrew Dodge,

4  wouldn't you say that that could have been part of his

5  duties as a supervisor?

6     A.  Yes.

7     Q.  Aside from Rey, you did not hear from fuelers

8  complaining about Andrew Dodge?

9     A.  No.

10    Q.  At that time, in July or August of 2018, aside

11  from Mr. Dodge, was there any other white supervisor

12  working for the fueling department?

13    A.  I -- I really don't know.  I can't -- I don't

14  know.

15    Q.  It could be that Mr. Dodge was the only white

16  supervisor?

17    A.  Could be.

18    Q.  Did you ever have a discussion with Renil with

19  regards to Rey Navarro's complaints against Andrew

20  Dodge?

21    A.  Yes.

22    Q.  And how many times do you think Renaldo

23  Navarro complained to Renil about Andrew Dodge?  Do you

24  remember any of that?

25    A.  No.

Case 3:19-cv-01157-WC Document 28-1 Filed 01/15/20 Page 25 of 34

1     Q.  Was it more than two times?

2     A.  Possibly.

3     Q.  Less than five and more than two, maybe?

4     A.  Possibly.

5     Q.  And with regards to -- and this happened

6  before the petition, correct?

7     A.  Him showing me the picture, yes.

8     Q.  And then did you see the video, the kind of

9  comical video that the fuelers made?

10     A.  No.

11     Q.  What about Renil and you discussing complaints

12  against Andrew Dodge, how many times did you guys

13  discuss that?

14     A.  I spoke to Renil a couple of times and told

15  him Rey's concerns.

16     Q.  Okay.  And what did Renil say?

17     A.  He would check into it.

18     Q.  Any result from it or any kind of follow-up

19  from it from Renil?

20     A.  No, he said he would -- well, he told me that

21  he would talk to Andrew, and that's it.  Rey didn't

22  come in and make formal complaints.  He would just --

23  he showed me the picture and the picture was Andrew

24  Dodge sitting in his car outside after -- sleeping in

25  his truck after he was off work.

Case 3:19-cv-04157-WC   Document 32-1   Filed 01/15/22   Page 26 of 34

1      A.  Yes.

2      Q.  It says that, quote, "On September 6th, 2018"

3  -- it's about nine days after the termination of

4  Mr. Navarro -- "I was asked by Menzies fuelers to write

5  a Petition on behalf of the Fuelers on 130 side vs.

6  Andrew Dodge.  The petition was written out and signed

7  by the Fuelers" and then turned over to the union.  In

8  addition, it was also given to Raul Vargas.

9           Were you made aware of this particular

10 petition?

11     A.  After it was given to Raul Vargas and given to

12 Kevin Blumberg.

13     Q.  So, and just to make sure we're speaking of

14 the same thing, so there was a first petition, and this

15 seems to be the second petition.  And this is a

16 separate petition, you understand that?

17     A.  Yes.

18     Q.  What came out of this second petition, if

19 anything?

20     A.  Nothing on the HR side.  There was no union

21 grievance, there was no complaint by the union except

22 for the original phone call I received.

23     Q.  And so you said it was given to Mr. Blumberg.

24 Was an investigation actually done because of this

25 second petition?

1      A.  If I'm not mistaken, this is for the same

2   issue.

3      Q.  So no additional investigation was done?

4      A.  Not to my knowledge.

5      MR. URIARTE:  Now, let's go to Exhibit 17, please.

6          (Plaintiff's Exhibit 17 marked for

7          identification.)

8      MR. URIARTE:  Q.  Okay.  You see Exhibit 17, I

9   believe it's Employee Performance Development and Steps

10  to Progressive Discipline.

11          If you could go down a little bit, David, that

12  would be better.

13          This is a reverse pyramid here.  And you're

14  familiar with this, Ms. Aguilera?

15     A.  Yes, I am.

16     Q.  My question here really is how come

17  progressive discipline was not instituted?

18     A.  Harassment has zero tolerance.

19     Q.  And was it discussed as an option?

20     A.  I'm sorry?

21     Q.  Was it discussed as an option?

22     A.  Progressive discipline for harassment?

23     Q.  Yes.

24     A.  No.

25     Q.  Is that written somewhere where harassment,

1   later on about the extent to which you had discussions

2   regarding Andrew Dodge's work performance.  If there

3   were issues with Andrew Dodge's work performance, would

4   those typically be brought to your attention or to

5   someone else's attention?

6       A.  Usually it would go to the manager, if there

7   were issues, it would go to -- it's a protocol.  It

8   would go to the supervisor, the supervisor would go to

9   the general manager, the general manager would go to

10  the director.

11          Usually if there's -- I usually get involved

12  if it comes down to a final warning or a suspension

13  pending termination.

14      Q.  Okay.  But in terms of everyday work

15  performance, that's something that you're not usually

16  involved with?

17      A.  No.

18      MR. WU:  David, we can take off Exhibit 8.  Thank

19  you.

20      Q.  Mr. Uriarte also asked you about some pictures

21  of Andrew Dodge that you had seen.

22      A.  Yes.

23      Q.  I think I lost count.  How many photos have

24  you seen?

25      A.  One or two.  I believe I can really remember

1   one.

2        Q.   And in that -- I'm sorry, I didn't mean to

3   interrupt.

4        A.   Possibly two.  I'm trying to think.  There was

5   one sitting -- oh, there was one sitting in the truck,

6   but he was off duty.  And he had a habit of just

7   sitting in his truck after he got off work, and he

8   would sleep in front of the parking lot in his truck,

9   take a quick nap.

10           And I know he'd be off work because I come to

11  work at 8:30, and he'd get off work -- I think his

12  schedule ended, like, 6:00 or 7:00.  But I would go up

13  and sometimes I'd knock on the window and say, "Are you

14  okay?"

15           "Oh, yeah, I'm just taking a nap before I

16  drive home."

17           "Okay."  So I knew he was off the clock.

18       Q.   Okay.  And do you remember anything about the

19  other photo that you might have seen?

20       A.   I believe I seen one of him sitting in the

21  supervisor chair, but, again, he was off duty.

22       Q.   And how were you able -- I'm sorry, I didn't

23  mean to interrupt.

24       A.   I was going to say I knew he was off duty

25  because his shift ended at, again, 6:00 or 7:00.  I

1    come in at 8:30.  And it was -- like the picture

2    outside, it was, you know, after 8:30, it was light

3    out, and I actually seen him.  But the one in the

4    office I only know because, you know, even Rey would

5    say, "This is what I took this morning," and Rey would

6    come in later.

7        Q.  Okay.  So just to make sure I understood that

8    all correctly, the photo where Andrew was sleeping in

9    his truck, you could tell he was off duty because there

10   was light out in the photo?

11       A.  Yes, it was light, because I come in at 8:30

12   in the morning, and he's off work by then.

13       Q.  And the second photo with Andrew sleeping in

14   the supervisor's office, you knew that he was off duty

15   because Rey mentioned that it was a photo he took in

16   the morning?

17       A.  Yeah, exactly, yes.

18       Q.  And Andrew would be off duty in the morning?

19       A.  Yes, because he worked graveyard.

20       Q.  Do you remember Mr. Uriarte asking you whether

21   Mr. Navarro complaining about any issues with Andrew

22   Dodge would be part of Mr. Navarro's duties as a

23   supervisor?

24       A.  Yes.

25       Q.  And do you remember answering yes to that

Case 3:19-cv-03157-WC Document 22-1 Filed 11/5/20 Page 31 of 34

1     A.  Yes, it's in the job description.

2     MR. URIARTE:  Okay.  No further questions.

3     MR. WU:  Nothing else from me.

4     MR. URIARTE:  Thank you, Ms. Aguilera.  Thank you

5  very much.

6     MR. WU:  Thanks so much for your time, Tracy.

7     THE WITNESS:  Thank you.

8         (Whereupon, the concluded at 2:51

9         o'clock p.m.)

10                    ---o0o---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:19-cv-08157-WC   Document 22-1   Filed 01/15/20   Page 32 of 34

CERTIFICATE OF WITNESS

---o0o---

1
2
3
4       I, TRACY AGUILERA, hereby declare under
5   penalty of perjury that I have read the foregoing
6   deposition testimony; and that the same is a true
7   and correct transcription of my said testimony
8   except as corrected pursuant to my rights under
9   Rule 30(e) of the Federal Rules of Civil
10  Procedure.
11
12      _____
13                  Signature
14      _____
15                  Date
16
17
18
19
20
21
22
23
24
25

Case 3:19-cv-08157-WC   Document 24-1   Filed 11/05/20   Page 33 of 34

```
1    STATE OF CALIFORNIA      )
                              )
2    COUNTY OF SAN FRANCISCO )

3           I, CINDY TUGAW, a Certified Shorthand Reporter

4    of the State of California, duly authorized to

5    administer oaths pursuant to Section 8211 of the

6    California Code of Civil Procedure, do hereby certify

7    that

8                    TRACY AGUILERA,

9    the witness in the foregoing deposition, was by me duly

10   sworn to testify the truth, the whole truth and nothing

11   but the truth in the within-entitled cause; that said

12   testimony of said witness was reported by me, a

13   disinterested person, and was thereafter transcribed

14   under my direction into typewriting and is a true and

15   correct transcription of said proceedings.

16          I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   caption.

21          Dated the 10th day of September, 2020.

22

23

24
             CINDY TUGAW
25           CSR No. 4805 (California)
```

```
 1   Tracy Aguilera
     c/o Foley & Lardner
 2   555 California Street, Suite 1700
     San Francisco, CA 94104
 3   Attn:  Jason Y. Wu, Esq.

 4   Date:  September 10, 2020
     Re:  Navarro vs. Menzies
 5   Deposition Date:  Tuesday, August 25, 2020

 6   Dear Ms. Aguilera,

 7           Please be advised the original transcript of
     your deposition is ready for your review.
 8           Pursuant to FRCP Rule 30(e), you have 30 days
     following the date of this notice to read, correct if
 9   necessary, and sign your transcript unless the
     attending parties and the deponent agree on the record
10   or otherwise in writing to a longer or shorter time
     period.  The deponent may change the form or the
11   substance of the answer to a question, and may either
     approve the transcript of the deposition by signing it,
12   or refuse to approve the transcript by not signing it.
     You are not required by law to read and sign your
13   deposition transcript.  All parties will be informed of
     the corrections.  The original transcript will then be
14   sealed and sent to the examining attorney pursuant to
     the applicable law.
15           You may either come to our office to read and
     sign the original transcript, or you may contact your
16   attorney or the attorney who arranged for you to be
     present at your deposition.  If they have ordered a
17   copy of the transcript, you may review their copy and
     make corrections by submitting, signing and returning
18   the attached form.  If you choose to review your
     transcript at our office, please call first to make an
19   appointment.  Should you have any question regarding
     these instructions, please call.
20
     Sincerely,
21


22
     NOGARA REPORTING SERVICE
23   5 Third Street, Suite 415
     San Francisco, California 94103
24   (415) 398-1889

25   cc:  All counsel, original deposition
```