# EXHIBIT 16

Case 3:19-cv-08157-VC Document 23-1 Filed 01/15/2020 Page 2 of 32

1          IN THE UNITED STATES DISTRICT COURT

2      IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5   RENALDO NAVARRO,

6                  Plaintiff,

7   v.                              No.  3:19-CV-8157

8   MENZIES AVIATION, INC.,
    doing business as MENZIES
9   and DOES 1 through 10,
    inclusive,
10
                   Defendants.
11   _____/

12   Zoom Remote Deposition of

13       RAUL VARGAS

14    Tuesday, August 25, 2020

15      **CERTIFIED COPY**

16

17

18

19

20

21   REPORTED BY:  CINDY TUGAW, CSR #4805

22

23

24             NOGARA REPORTING SERVICE
              5 Third Street, Suite 415
25         San Francisco, California 94103
                (415) 398-1889

Case 3:19-cv-08157-VC   Document 23-1   Filed 11/18/20   Page 3 of 25

```
1                         I N D E X

2                                    Page Number

3    EXAMINATION BY MR. URIARTE                  4

4    EXAMINATION BY MR. WU                        73

5    FURTHER EXAMINATION BY MR. URIARTE          74

6                        ---o0o---

7                  E X H I B I T S

8    Plaintiff's

9    Exhibit 1      Plaintiff Renaldo            9
                    Navarro's Amended Notice
10                  of Deposition of Raul
                    Vargas
11
     Exhibit 8      Petition to Menzies         26
12                  Management from Menzies
                    Fuelers
13
     Exhibit 9      Termination notice for      60
14                  Renaldo Navarro

15   Exhibit 11     Employee Performance        61
                    Development dated
16                  8/29/2018

17   Exhibit 12     Email chain culminating     66
                    in an email from Raul
18                  Vargas to Tracy Aguilera
                    dated August 29, 2018
19
     Exhibit 19     Letter from Rafael Vasquez  43
20                  to whom it may concern
                    dated 11/18/2018 with
21                  attached petition

22                        ---o0o---

23

24

25
```

Case 3:19-cv-08157-VC Document 28-1 Filed 11/18/20 Page 4 of 23

```
 1          BE IT REMEMBERED that, pursuant to Notice of

 2   Taking Deposition and on Tuesday, the 25th day of

 3   August, 2020, commencing at the hour of 9:03 o'clock

 4   a.m. thereof, via Zoom videoconference, before me,

 5   CINDY TUGAW, a Certified Shorthand Reporter in the

 6   State of California, personally appeared,

 7                        RAUL VARGAS,

 8   called as a witness by the Plaintiff, having been by me

 9   first duly sworn, was examined and testified as

10   hereinafter set forth.

11                       ---o0o---

12               APPEARANCES OF COUNSEL

13   For the Plaintiff
          LIBERATION LAW GROUP, P.C.
14        2760 Mission Street
          San Francisco, California 94110
15        BY:  ARLO GARCIA URIARTE, Attorney at Law
          (415) 695-1000
16

17   For the Defendants
          FOLEY & LARDNER, LLP
18        555 California Street, Suite 1700
          San Francisco, California 94104
19        BY:  JASON Y. WU, Attorney at Law
          (415) 984-9848
20

21   Also Present:  David Ho, Zoom Host.

22                       ---o0o---
```

Case 3:19-cv-08157-VC  Document 23-1  Filed 01/15/20  Page 5 of 25

1          THE REPORTER:  Good morning.  At this time, I will

2     ask counsel to stipulate on the record that there is no

3     objection to this deposition officer administering a

4     binding oath to the witness via Zoom, starting with the

5     noticing attorney.

6          MR. URIARTE:  No objection.

7          MR. WU:  And no objections on behalf of Menzies

8     Aviation.

9               (Whereupon, the Witness was duly sworn by the

10              Reporter.)

11                   EXAMINATION BY MR. URIARTE

12         MR. URIARTE:  Good morning, Mr. Vargas.

13         A.   Good morning.

14         Q.   Could you please state and spell your name for

15    the record.

16         A.   Yes, so my name is Raul Vargas, R-a-u-l, last

17    name V, as in Victor, a-r-g-a-s.

18         Q.   Okay.  And if I ask you what your formal name

19    is, like, for example, what's on your passport or

20    something like that, what would you say?

21         A.   Raul Herman Vargas Aroca.

22         Q.   And so, Herman, Herman is H-e-r-m-a-n, is that

23    what it is?  Herman, did you hear me?

24         A.   Yes, it's H-e-r-m-a-n.

25         Q.   And then I missed your mother's maiden name.

Case 3:19-cv-08157-VC Document 23-1 Filed 01/15/2020 Page 6 of 25

1    around in the workplace?

2         A.  I don't recall that.

3         Q.  Would you say that it was going around for a

4    month already and then his termination happened?

5         A.  I don't recall it.

6         Q.  Can you give me your best estimate, like a

7    week, or do you have a time frame in your head at all?

8         A.  I don't have a time frame in my head right

9    now.

10        Q.  So you don't remember kind of like whether it

11   was days or weeks?

12        A.  I don't remember when this was brought to my

13   attention.

14        Q.  And "this" being the petition, correct?

15        A.  In relation to the petition.

16        Q.  I think, Mr. Vargas, we need you to speak up a

17   little bit or maybe get closer to the microphone.

18        A.  Yes.

19        Q.  Thank you.  So what about this:  Do you

20   remember who brought the petition to your attention?

21        A.  Tracy Aguilera.

22        Q.  So it was HR who actually let you know that,

23   hey, there's this petition going around?

24        A.  HR.

25        Q.  Aside from Tracy, did anybody else talk to you

Case 3:19-cv-08157-VC Document 23-1 Filed 01/13/2020 Page 37 of 33

1   about the petition?

2       A.   Nobody else talked to me.   She was the first

3   person who talked to me about the petition.

4       Q.   Okay.   And then when you say she's the first

5   person, was she also the only person that talked to you

6   about the petition?

7       A.   No.

8       Q.   Did anybody else talk to you about the

9   petition before Mr. Navarro's termination?

10      A.   Yes.

11      Q.   Who else?

12      A.   Our operation manager for fuel.

13      Q.   Who was that?

14      A.   I don't recall his last name.   Renil.

15      Q.   Renil?

16      A.   Renil.

17      Q.   R-e-n-i-l?

18      A.   That is, yes.

19      Q.   I believe he's not with the company anymore,

20  correct?

21      A.   He's not.

22      Q.   Do you know where he is right now?

23      A.   I do not know.

24      Q.   All right.   Aside from Renil, did anybody else

25  talk to you about the petition?

Case 3:19-cv-08157-VC   Document 28-1   Filed 11/18/20   Page 9 of 32

1      A.   Nobody else.

2      Q.   Okay.  What did Renil tell you about the

3  petition?

4      A.   That there was a petition going around to

5  terminate Andrew.

6      Q.   To terminate Andrew.  Anything else?

7      A.   Nothing else that I can recall.

8      Q.   Okay.  Did you actually read the petition?

9      A.   I read the petition, yes, I did.

10      Q.   And you read the petition before the

11  termination?

12      A.   Yes, I did.

13      Q.   And when you read it, that's what it said, to

14  terminate Andrew?

15      A.   I don't recall exactly what it says, but it

16  was about Andrew's performance, and it was about

17  removing Andrew from the position.

18      Q.   And then, aside from saying that to you,

19  anything else Renil told you about the petition?

20      A.   Nothing else -- nothing else that I can

21  recall.

22      Q.   Okay.  What about Tracy, what did she talk to

23  you about the petition?

24      A.   Well, Tracy told me about everything that she

25  was getting information from.  The first conversation I

Case 3:19-cv-08157-VC Document 28-1 Filed 01/15/2020 Page 9 of 25

1    had with her, it was about somebody from the union

2    contacting her to let her know that somebody was

3    requesting to sign a petition to the employees.

4         Q.  Anything else?

5         A.  Yes.  She mentioned that -- that employees

6    were -- were not agreeing on signing it.

7         Q.  Okay.  Anything else?

8         A.  Nothing else that I can recall.

9         Q.  And then, with regards to the content of the

10   petition, after you read it, did you make any decision

11   related to the contents of the petition?

12        A.  Yes, I talked to Tracy to -- to have the

13   investigation.

14        Q.  What type of investigation?

15        A.  An investigation about the petition and about

16   the -- how the petition was made.

17        Q.  How the petition was --

18        A.  Performed.

19        Q.  Was performed?

20        A.  Yes.

21        Q.  So you mean, when you say "how the petition

22   was performed," you mean how the petition was put

23   together, correct?

24        A.  Yes.

25        Q.  Anything else that you asked Tracy to do in

Case 3:19-cv-01157-VC   Document 74-1   Filed 01/15/2021   Page 10 of 25

```
 1   relation to the petition?

 2        A.  Nothing else at that time.

 3        Q.  Okay.  And so you said to do an investigation

 4   about the petition.  What does that mean?  What did you

 5   actually tell Tracy to do?

 6        A.  To perform an investigation about how --

 7   because we received some calls from the union, and also

 8   received some information about Andrew, that he

 9   received a message from Navarro.  So at that time it

10   was important for me to understand how that petition

11   was created.  How they did it.

12        Q.  All right.  And then you said also about how

13   the petition was put together.  So why was it important

14   for you to know how or who put together the petition?

15        A.  Because of the feedback that I received from

16   Tracy, from HR.

17        Q.  And what's that information that you received

18   from HR?

19        A.  As I said before, she told me that somebody

20   from the union contact her telling her that there was a

21   person asking for sign a petition, who was forcing the

22   employees to do it.

23        Q.  And did you ever find out who actually put

24   together the petition?

25        A.  Yes, we did.
```

Case 3:19-cv-08157-VC  Document 73-1  Filed 01/15/20  Page 11 of 25

1    Q.  And who was it?

2    A.  Mr. Navarro.

3    Q.  I'm sorry?

4    A.  Mr. Navarro.

5    Q.  And how did you reach -- how was that

6    conclusion reached?  Like how did you guys reach the

7    conclusion that Mr. Navarro wrote the petition?

8    A.  There was an investigation done, performed by

9    the safety department.

10   Q.  So the safety department person actually said

11   Mr. Navarro wrote the petition, is that your

12   understanding?

13   A.  Yes.  And also because of the messages that

14   Andrew received from Mr. Navarro.

15   Q.  Right.  But that message said, "I'm holding on

16   to the petition.  I haven't submitted it."  It doesn't

17   say, "I wrote the petition that I'm going to give."  Do

18   you know what I'm saying?  It says, "I'm holding on to

19   the petition and I haven't submitted it."

20        So I don't know how that text message kind of

21   leads to the conclusion that he wrote it.  Can you

22   explain it to me?

23   MR. WU:  Objection.  Assumes facts not in

24   evidence.

25        You can answer if you understand the question.

Case 3:19-cv-03357-VC   Document 73-1   Filed 01/15/21   Page 12 of 25

1    MR. URIARTE:  Q.  Mr. Vargas?

2    A.  Well, I think that when you receive a message

3    from -- I don't know where -- somebody in relation to a

4    petition, that is an alert.

5    Q.  Is what?

6    A.  Is an alert.

7    Q.  Okay.  But I guess my question is how does

8    that text message lead you to conclude that Mr. Navarro

9    wrote the petition?

10   A.  That was not the one that drove me to

11   understand that Mr. Navarro did the petition.

12   Q.  What did make you understand that Mr. Navarro

13   wrote it?

14   A.  Well, because the investigation from the

15   safety department.

16   Q.  Okay.  So the investigation from the safety

17   department actually has a report?

18   A.  They have statements from employees.

19   Q.  Statements from employees.  Okay.  Anything

20   else?

21   A.  They had a statement from employees and their

22   final outcome out of the investigation.

23   Q.  Are you talking about the final outcome as

24   they wrote it in the email?

25   A.  Yes.

1   this petition.

2       A.  Well, and if I can go back --

3       Q.  Yes.

4       A.  -- I never asked to investigate on who wrote

5   the petition.

6       Q.  So for you that wasn't important?

7       A.  No.

8       Q.  So when you finally concluded that termination

9   was the proper discipline, that wasn't part of the --

10  for you, that's not the important part, right?

11      A.  About who wrote the petition, no, no, not at

12  all.

13      Q.  For you it was, hey, you've got this guy

14  forcing employees to sign the petition.  That's what it

15  was, right?

16      A.  Yes.

17      Q.  I got it.  Okay.  So that leads to the

18  question of when -- so let's say August 29 is

19  eventually the time that he gets terminated.  Do you

20  remember about when you concluded in your head, hey, I

21  need to terminate Mr. Navarro?  Do you remember when?

22      A.  The specific date, no, but it should be around

23  that time.

24      Q.  Like within days of it or within a week or --

25      A.  I cannot tell.  I don't -- I don't recall it.

Case 3:19-cv-03157-VC   Document 73-1   Filed 03/15/21   Page 14 of 25

1      A.  I don't recall the date.

2      Q.  Okay.  So, but before concluding that Navarro

3  actually forced employees to sign the petition, I kind

4  of want to make sure that I get all of the steps that

5  you took to be satisfied that your conclusion was

6  correct.  All right?

7      A.  Yes.

8      Q.  So I saw the investigation statement.  I saw

9  the letters from the employees.  That's understandable.

10  But other than that -- and then you talked to Tracy as

11  well, right?  You had email communication with Tracy.

12  Other than those steps, did you do any other steps?

13      A.  No.  Well, actually I was waiting for the

14  final outcome from the investigation.  And it was not

15  just the feedback that I received from the safety

16  department.  Also the conversations I had with Tracy in

17  relation to this case.

18      Q.  Okay.  But did you ever ask the safety

19  department, hey, did you guys talk to the fuelers?

20      A.  Yes, I did.

21      Q.  And what did they say?

22      A.  They told me that they -- he was -- so the

23  safety department told me that Mr. Navarro was forcing

24  employees to sign the petition, and he was creating --

25  he was harassing people to have this petition signed.

1    Q.  Okay.  So forcing employees to sign the

2    petition.  What's wrong with that?

3    A.  Well, I think that when you have -- you take

4    advantage of your rank, that is harassment because of

5    how the other people feel.

6    Q.  Anything else that's wrong with that?

7    A.  Yes.  So when they use this rank, people feel

8    scared of having this confrontation with the

9    supervisor, so they prefer to sign the petition without

10   understanding what the petition was for.

11   Q.  So are you saying that the safety department

12   talked to everybody that signed that petition and

13   verified whether they actually signed it or not?

14   A.  I cannot guarantee that they talked to hundred

15   percent of the employees.

16   Q.  Okay.  But do you know how many people they

17   talked to?

18   A.  I don't know exactly how many people they

19   talked to.

20   Q.  And then you used the word "harassment."  How

21   are you using that word "harassment"?  What do you mean

22   by that?

23   A.  Well, for me, harassment is pretty much --

24   it's to force or intimidate people.  So, in this case,

25   when he's taking his rank as a supervisor, telling

Case 3:19-cv-08157-VC   Document 78-1   Filed 01/15/21   Page 16 of 25

1   people to sign a petition that they don't know what

2   it's for, that for me is intimidation.  And that's how

3   they -- the employees felt.

4        Q.  How many employees are we talking about --

5        A.  Well --

6        Q.  -- that felt like that?

7        A.  I'm sorry?

8        Q.  How many employees felt like that?

9        A.  I cannot tell you exactly the number of, but I

10  can tell you in terms of the -- the statements we

11  received.  There were around three employees.

12       Q.  And then there were over 20 people who signed

13  the petition, right?

14       A.  Yeah.

15       Q.  So out of the more than 20 people who signed

16  the petition, three people felt like, oh, maybe I

17  didn't read it and then I signed it and maybe I --

18       MR. WU:  Objection.  Objection.  Lack of

19  foundation.  Calls for speculation.  Misstates prior

20  testimony.

21       MR. URIARTE:  Q.  So, Mr. Vargas, when your

22  attorney objects, we allow him to finish his objection

23  so that it's written into the record.  Please allow him

24  to finish, and then you can answer afterwards unless

25  your attorney tells you not to answer.  Okay?

Case 3:19-cv-03157-VC   Document 75-1   Filed 11/15/21   Page 17 of 25

1  A.  So, for me, if we have people that feel that

2  way, it's really important to ensure that we have the

3  right environment for our employees.  Harassment is a

4  really important matter in our environment in a

5  business.

6  Q.  I got that.  I got that.  So you've got three

7  people complaining about the way that the harassment --

8  A.  We have -- remember -- sorry, can I --

9  Q.  Please, please.

10  Q.  So, remember, we had those three guys, but

11  also we had some feedback from the union saying that

12  this person was harassing people to sign the petition.

13  Q.  Okay.  But what about the subject matter of

14  the petition itself?  Weren't they doing the same thing

15  as well?  You said it's very important for you that

16  people work in a proper environment, right?

17  A.  Yes.

18  Q.  But the nature of the petition itself kind of

19  complains about the environment, right?

20  A.  Yes.

21  Q.  Okay.  So isn't that also a valid concern?

22  A.  It is.  Definitely it is.

23  Q.  Okay.  And what was done about that?

24  A.  Well, I think that it's important from the

25  extent of the document, where the document is coming

Case 3:19-cv-03157-VC   Document 73-1   Filed 01/15/21   Page 18 of 25

1    Tracy and Renil?  Does that make sense?

2        A.  I cannot confirm a hundred percent that this

3    was the one.

4        Q.  Okay.  So if we go down a little bit, yeah,

5    you'll see Mr. Navarro's signature on this one.

6        A.  Yes.

7        Q.  And this document actually comes from your

8    company, if you see the Menzies number there, Menzies

9    153.  And so line 24 there on the second page -- I'm

10   sorry, line 16 of the second page has Mr. Navarro's

11   signature.  Do you see that?

12       A.  Yes.

13       Q.  All right.  So, again, going back to your

14   conclusion earlier, you're saying, if you think that

15   Mr. Navarro was forcing all of these people to sign the

16   petition, you believe the petition is now without

17   validity, is that correct?

18       A.  Well, I don't think that it has the same

19   validity, definitely.  Now, what is most important to

20   bring out is that I had a conversation with HR about

21   Andrew, because they were -- in the letter I believe

22   they complained also about him falling asleep on the

23   operation.

24            So I had this conversation with HR.  And they

25   explained to me and they addressed that issue before I

1   started working at Menzies.  Because, again, I started

2   June 2018.  And this was happening -- this happened in

3   August.

4          Q.  Yes.  Right.  So you started in June of 2018,

5   and this was happening in August.  So you didn't have

6   that much kind of context with regard to what was

7   happening from the last year, is that correct?

8          A.  (Indicates affirmatively.)

9          Q.  Mr. Vargas?

10         A.  Yes.

11         MR. WU:  Arlo, I'm sorry to interrupt.  Can we

12  take a quick break in the next five minutes?  Whatever

13  is a good stopping point for now.

14         MR. URIARTE:  That's fine.  We can take a break

15  now.  No problem.

16         MR. WU:  Thanks a lot, Arlo.  Let's go off the

17  record.

18         MR. URIARTE:  No problem.

19             (Brief recess.)

20         MR. URIARTE:  Q.  So we were talking about Exhibit

21  8, Mr. Vargas.  My question is with regards to the

22  actual things that the fuelers were complaining about.

23  And I just want to clarify something.

24             Was there ever an investigation by Menzies

25  with regard to the context or the content of their

1  petition, the subject matter of their petition?

2      A.  Well, there was an investigation before in

3  terms of what they were complaining about, that this

4  was happening at the company.  And that was the

5  conversation that I had with Tracy, with HR, in

6  relation to this petition, what they were saying.

7      Q.  And what was the result of that investigation?

8      A.  Well, that Andrew pretty much falls asleep

9  because he has sleep onea [sic].

10     Q.  You're talking about sleep apnea?

11     A.  Yes.

12     Q.  Anything else?

13     A.  And -- no, nothing else.

14     Q.  What about the complaint that rest breaks or

15  breaks were being -- were being missed or not taken?

16     A.  I don't recall about that.

17     Q.  What about like delays that were being caused

18  by Andrew, was that ever investigated?

19     A.  No, no, not brought to my attention.

20     Q.  So when you read this petition, I guess the

21  focus became Mr. Navarro asking people to sign the

22  petition.  That was your focus, right?

23     A.  Yeah.  The environment that he create by doing

24  that.

25     Q.  Okay.  And you didn't really put focus on the

1   environment that Mr. Dodge was creating as alleged by

2   this petition?

3       A.   Well, I did when I asked HR about that

4   petition, about those things that happened before I got

5   there, and that was what I received from HR.

6       Q.   So what I heard you say, they already --

7       A.   That they already took action on it.

8       Q.   And that's with regard to the sleep apnea?

9       A.   That is regard of everything.

10      Q.   Okay.  So you're saying you did ask Tracy

11  about what the fuelers were talking about in the

12  petition, correct?

13      A.   (Indicates affirmatively.)

14      Q.   Okay.  And that involved what was happening to

15  Andrew Dodge before, and something about sleep apnea

16  and sleeping and him falling asleep, correct?

17      A.   Yes.

18      Q.   Anything else, aside from that, that came as a

19  result of your inquiry with regards to the petition?

20      A.   Also that, for me, nothing else for me to take

21  action for.

22      MR. WU:  And, Raul, if you could just give a brief

23  pause between the end of Arlo's question and the

24  beginning of your answer.  I think sometimes, when

25  there's a bit of overlap, is when we're getting that

1    feedback and it's becoming a little unclear.

2         THE WITNESS:  Okay.

3         MR. URIARTE:  Q.  Did you ever have a discussion

4    with Mr. Navarro, before this whole petition started,

5    did you ever have a discussion with Mr. Navarro about

6    Andrew Dodge?

7         A.  Not that I recall.

8         Q.  So you don't remember him going up to you and

9    trying to talk to you about concerns about Andrew

10   Dodge?

11        A.  No, I don't recall that.

12        Q.  Aside from the petition and maybe Mr. Navarro,

13   did you ever get complaints against -- or about Andrew

14   Dodge in those -- June, July, August, the time you were

15   there?

16        A.  No, I did not.

17        Q.  And so you were not involved in the promotion

18   of Mr. Dodge, correct?

19        A.  No, I was not.

20        Q.  And before being at Menzies at the San

21   Francisco Airport, where were you working?

22        A.  I was working for TAS.

23        Q.  What does that mean?

24        A.  TAS, Total Airport Services.  I worked there

25   as a general manager in San Francisco.

1    like, June to August of 2018.  What were your duties

2    and responsibilities?

3        A.  Pretty much whatever -- as US director of

4    operation, I'm looking for different -- different

5    elements.  So I have four different elements.  The

6    first one is financial.  I look for all the financials

7    of the station, all the four business lines that we

8    have there at that moment, which it was the fueling

9    business, the ramp business, the cargo business and the

10   GSC business.  GSC is ground service equipment.  So we

11   provide service to all the equipment that pretty much

12   you see on the runway.

13        So I look also in terms of customer service,

14   all the retention or attraction of new customers,

15   interactions.  I also look into the safety, ensuring

16   that we run a smooth operation in a safe basis, putting

17   all the safety processes in place to reduce every kind

18   of risk out there on the ramp or in the different

19   departments.

20        And I also look into the people.  What I mean

21   by the people, well, I make sure that environments, the

22   retention, the attraction of new employees, and how can

23   we retain employees in the long-term.

24        Q.  Okay.  Thank you for that.  Being that you

25   were new to the San Francisco Airport operation, before

1    pulling the trigger and actually recommending the

2    termination of Mr. Navarro, did you talk to anyone with

3    regards to that decision?

4         A.   Yes.   I talked to HR.

5         Q.   Who else?

6         A.   I talked to HR and nobody else about that

7    decision.

8         Q.   So you didn't talk to Renil and say, "Renil, I

9    know you've been here a while.   What do you think about

10   this?"

11        A.   I don't recall it, talking to Renil.

12        Q.   How much did you know about Mr. Navarro at the

13   time that you terminated him?

14        A.   I didn't know that much about Mr. Navarro.

15        Q.   Okay.   Did you know that he had been working

16   for Menzies a long time at that point?

17        A.   Yes, I did.

18        Q.   And then what were you trying to accomplish by

19   choosing to terminate Mr. Navarro?

20        A.   Well, I think that, as I said before, my job

21   there is to ensure that we can retain employees.   And

22   the only way to retain employees is to ensure an

23   environment where they work is a good environment.   So

24   when you have one person, just one person, complaining

25   about supervisor harassment, then you need to take

Case 3:19-cv-03157-VC   Document 74-1   Filed 11/15/20   Page 25 of 25

1    actions.

2         Q.   So your belief is that it was all Mr. Navarro

3    complaining, it was just him?

4         A.   I think that, based on the statements we

5    received, they were focused on that -- on him.

6         Q.   Okay.   But what about all those other people

7    that signed the petition?

8         A.   Well, as I said before, we need to ensure that

9    environment is good.   So, for me, just one person

10   complaining about harassment, it's an issue.

11        Q.   Okay.

12        A.   More than one, then you have a petition signed

13   by people.   So we have a person, and more than one

14   person being harassed to sign a petition, that is a

15   huge issue for me.

16        MR. URIARTE:   Okay.   All right.   Can we take a

17   look at Exhibit 8 again, please.

18             David, are you there?

19        ZOOM HOST:   Yes, coming up shortly.

20        MR. URIARTE:   Thank you.

21        ZOOM HOST:   Give me one second.   It's not coming

22   up.

23        MR. URIARTE:   No problem.   Thank you, David.

24        Q.   Let's go to the top part of Exhibit 8, please.

25   So it says, "To:  Menzies Management.   Sir/madam."