Case 3:19-cv-08157-VC Document 23-11 Filed 04/15/2020 Page 1 of 22

1    A.  "We think this is the right time to broadcast

2 the problem in this company.  We are hoping this

3 problem will be addressed."

4    Q.  Okay.  Was this problem ever addressed,

5 Mr. Vargas?

6    A.  It was addressed at the moment, but I was not

7 there.

8    Q.  I'm sorry?

9    A.  It was addressed at the moment because this is

10 old case, but I was not there when that happened.

11    Q.  Okay.  When did you go to Los Angeles?

12    A.  September.

13    Q.  Of?

14    A.  September -- September 1st, 2019.

15    Q.  So that was a year later, right?

16    A.  Yes.

17    Q.  So within -- from August to -- August 2018 to

18 September 2019, was there anything done about what was

19 written here?

20    A.  No, as I said before, the conversation with

21 HR, because I was not aware of all this that was

22 happening with Andrew, I had a conversation with HR

23 where they -- where HR told me about what happened and

24 what the final outcome of that investigation was.

25    Q.  With regards to the investigation on the sleep

Case 3:19-cv-08157-VC Document 28-1 Filed 01/15/2020 Page 36 of 311

1    apnea, is that correct?

2        A.  In regards to the issues that they were

3    having -- that they are complaining about Andrew.

4        Q.  Okay.  So it says, "the way he supervised is

5    very unprofessional when he run the operation or

6    supervised."  Anything that was done about that?

7        A.  At the moment that I get there, I hadn't had

8    any problem with Andrew.  And I didn't get any

9    complaint from any fueler in relation to Andrew.

10       Q.  Did you talk to any of the fuelers about the

11   way he supervises is very unprofessional and run the

12   operation or supervise?

13       A.  I'm sorry, no, I did not talk to any fuelers

14   about the way he supervise.

15       Q.  Do you know if Tracy or HR did that?

16       A.  In the conversations we had, it wasn't

17   specific about his performance in terms of OTP, which

18   is operational -- on time performance, I'm sorry.

19       Q.  And then it says -- okay.  I'm sorry, I think

20   we missed the last part.  Did you say something there?

21       A.  No.

22       Q.  Okay.  "People are not taking their breaks

23   it's because the way he set up the flights."  That one,

24   did you ask about that?  Was that something that was

25   taken care of?

Case 3:19-cv-08157-VC   Document 83-1 Filed 01/15/2021   Page 3 of 24

1      A.   Well, I didn't receive no complaints about

2 people not taking the breaks.   And I want to -- can

3 I -- the policy that I have, when I manage people, is

4 really open.   And what I do is I always invite people,

5 when they have issues, to talk about the problems they

6 have.   The moment that I raised all those points with

7 people, I never would receive no complaints from no

8 fueler in relation to Andrew's performance.

9      Q.   Okay.   But if you see the second page there of

10 this petition, they did.   They did come forward, right?

11 Because you have 25, 26 people signing.

12           If you have an open-door policy about letting

13 you know about the complaint, wasn't this what these

14 people are doing?   I don't see how --

15      MR. WU:   Objection.   Lack of foundation.

16 Misstates prior testimony.

17           You can answer if you understand the question.

18      THE WITNESS:   I think that that question I already

19 answered.

20      MR. URIARTE:   Q.   Which is you don't believe that

21 these people were really complaining?

22      A.   We have people feel harassed to sign this

23 petition.

24      Q.   So you feel every one of these people were

25 harassed to sign this petition, is that correct?

Case 3:19-cv-08157-VC Document 23-11 Filed 01/15/2020 Page 5 of 22

1    Q.  And then did HR give you recommendation with

2    regards to other options available aside from

3    termination?

4    A.  Well, the recommendation -- the recommendation

5    from HR was not to terminate him.

6    Q.  And you didn't follow that?

7    A.  No, actually, I asked why those

8    recommendations, which I think it's normal procedure.

9    Q.  So you're saying you asked the recommendation

10   from HR, and then what did HR say?

11   A.  That based on the -- on the recommendation and

12   the conversation they had with the director, they're

13   recommending not to terminate, but it was just -- I'm

14   sorry, that it was just a recommendation, I'm sorry.

15   Q.  Okay.  So HR's recommendation is not to

16   terminate, right?

17   A.  Yes.

18   Q.  But you did not follow that, right?

19   A.  No, because I -- I needed to see the final

20   outcome of the investigation to take the right

21   decision.

22   Q.  And what did you see in the final outcome that

23   made you conclude that termination was the right

24   action?

25   A.  I get the final outcome from safety department

Case 3:19-cv-08157-VC Document 28-1 Filed 01/15/2020 page 51 of 52

1  with the statements, plus the messages from Navarro to

2  Andrew, plus, well, the letter with the petition, the

3  call from the union in that there is somebody

4  instigating the people to sign this petition.

5       Q.  Okay.  Weren't there other options available?

6       MR. WU:  Objection.  Vague.

7            You can answer.

8       THE WITNESS:  There are always different options.

9       MR. URIARTE:  Q.  Did you consider those options?

10      A.  I think the harassment for me is -- is very

11  important.  I need to look into the environment for all

12  the employees and not just one.

13      Q.  Okay.

14      A.  And I think that is important that this person

15  was supervisor.

16      Q.  So you're saying the harassment is so

17  important that that was like a very big part of why you

18  decided to terminate.  That's what you're saying?

19      A.  Yes.

20      Q.  So what did you learn -- what if you learned

21  that harassment was also going on between Andrew Dodge

22  and the fuelers, would that be enough to terminate

23  Andrew Dodge?

24      MR. WU:  Objection.  Improper hypothetical.  Lacks

25  foundation.

1      You can answer.

2      THE WITNESS:  We investigated everything.

3  Everything -- we need to investigate everything to look

4  into how that is affecting the employees.

5      MR. URIARTE:  Q.  Right.  I know you have to

6  investigate.  I guess my hypothetical is more, if you

7  learned that harassment was actually going on between

8  Andrew Dodge and his fuelers, then it would lead to the

9  conclusion that he should be terminated, too, right?

10     MR. WU:  Same objection.

11     MR. URIARTE:  Q.  Is that correct, Mr. Vargas?

12     A.  It is.  I protect the team.

13     Q.  I was looking at some of your corporate

14  documents with regards to handbooks and HR materials

15  and all that.  And there's this thing called

16  progressive discipline.  Were you aware of that?

17     A.  Yes, I am.

18     Q.  Okay.  And why is it that you did not use

19  progressive discipline in this situation?

20     A.  Because there are cases that they're severe,

21  and then that's one of the outcome of the

22  investigation.

23     Q.  So it's like serious enough to terminate?

24     A.  Yes.

25     Q.  Is that a yes?

Case 3:19-cv-08157-VC Document 23-1 Filed 01/15/2021 Page 7 of 24

1    A.  Yes, it is a yes.

2    Q.  Okay.  And then did you ask or were you

3  curious, maybe you should have had a conversation with

4  Mr. Navarro?

5    A.  I don't participate in the investigations.

6    Q.  Maybe like a phone call to Mr. Navarro to get

7  his side of the story?

8    A.  No, I do not.  I do not participate in any

9  investigation.

10    Q.  And do you know whether or not they actually

11  talked to Mr. Navarro and got his side of the story?

12    A.  I just get the final outcome.

13    Q.  You just get the final decision?

14    A.  The final outcome for -- from the

15  investigation.

16    Q.  My question is different.  My question is when

17  you were looking at all the different elements to

18  decide whether to terminate or not, did you try to find

19  out whether somebody talked to Mr. Navarro to get his

20  side of the story?

21    A.  No, I did not.  I did not try to find out.

22    Q.  Would you say that's kind of like basic

23  investigation right there?

24    MR. WU:  Objection.  Lack of foundation.  Improper

25  hypothetical.

Case 3:19-cv-08157-VC   Document 28-1   Filed 01/15/20   Page 8 of 22

1    You can answer if you know.

2    THE WITNESS:  I won't say that is -- it all

3    depends on the kind of investigation they're running.

4    MR. URIARTE:  Q.  They -- what's the last word?

5    A.  They are running.

6    Q.  That they are running.  Okay.  But you didn't

7    look into what kind of investigation they were running?

8    A.  I just look into the final outcome of the

9    investigation.

10    Q.  And you never, like, got into your head and

11    said, what does Mr. Navarro say about all of this?

12    That's not something that you ever asked yourself?

13    A.  No, I do not.  I do not because I just look

14    into the final outcome of the investigation.  So I

15    think that that question is for the people who perform

16    the investigation.

17    Q.  So you said earlier that the goal of

18    terminating Mr. Navarro was to protect the employees

19    from the harassment, right?  The environment of

20    harassment, correct?

21    A.  Yes.

22    Q.  How is it different, in achieving that goal,

23    how is termination different from, let's say, a

24    suspension?

25    A.  Well, I think that is important, too, if you

Case 3:19-cv-08157-YC Document 28-11 Filed 05/18/20 Page 9 of 22

1    find out that there is a harassment in the -- in the

2    crew and in the environment, then the only way for you

3    to ensure that we remove that harassment from the

4    environment is to remove the person who is doing the

5    harassment.  In that every case is different, but when

6    you have three people complaining about it, and at the

7    same time you have a petition involving another

8    employee which you're trying to achieve by harassing

9    people is -- is not good.

10       Q.  Okay.  But the part about that that needs a

11   little bit of explanation is you have this -- you say

12   at the same time you have this petition, but what about

13   the people that actually wrote the petition, right?  So

14   they have a concern, right?  So --

15       A.  Well, we go back to the same -- to the same

16   conversations we had before, of the petition, when you

17   have somebody that is pushing somebody to sign a paper

18   that they don't even know what it's for.

19       Q.  Right.  For those three people, right?

20       A.  Could be one, two, three, I don't know.

21       Q.  Now, in your emails, you mentioned July or

22   Julie Macapagal, it M-a-c-a-p-a-g-a-l.  Actually, the

23   name of an old Filipino president.  July Macapagal.

24   Does that name sound familiar to you?

25       A.  He's also part of a supervisor crew.

1        Q.  Was an investigation ever conducted?

2        A.  Well, I investigate.  I saw the name of the

3 person that it was on that list.  And I request to open

4 an investigation about that person.

5        Q.  Was an investigation opened?

6        A.  Yeah, but because I needed to know if this

7 supervisor was also -- was also harassed to sign

8 this -- this petition.

9        Q.  Okay.  And what was the result of the

10 investigation?

11        A.  That he was.

12        Q.  I'm sorry?

13        A.  That he was.  He was also intimidated to sign

14 the paper.

15        Q.  I'm unclear about that.  What is that --

16 that's a person, a guy, right?  A male?

17        A.  Yes.

18        Q.  He's a guy.

19        A.  Yes.

20        Q.  So what was -- what was Mr. Macapagal -- what

21 did Mr. Macapagal do?

22        A.  He's a supervisor.

23        Q.  Yeah, and he signed the petition, correct?

24        A.  The petition, yes.

25        Q.  And then what was the result of the

1    investigation on Mr. Macapagal?

2        A.  That he was forced to sign that paper.

3        Q.  That he was forced to sign the paper, is that

4    correct?

5        A.  Yes.

6        Q.  You talked to Mr. Macapagal?

7        A.  No, I did not.

8        Q.  Okay.  So who gave you the results of the

9    investigation?

10       A.  Safety department.  It was a conversation we

11   had.

12       Q.  Over the telephone?

13       A.  No, person to person.

14       Q.  Who in the safety department?

15       A.  Kevin Blumberg.

16       MR. URIARTE:  Let me get you, before we forget, so

17   it's Kevin Blumberg, B-l-u-m-b-e-r-g.  All right.

18       Q.  So he told you that Mr. Macapagal told him

19   that he was forced to sign the petition, is that

20   correct?

21       A.  Yes.

22       Q.  Did you review the termination notice before

23   it was issued?

24       A.  No, I did not.

25       MR. URIARTE:  I just want to make sure we're clear

Case 3:19-cv-03157-VC   Document 73-1   Filed 01/15/21   Page 12 of 24

1    on this.  Exhibit 9, please, David.  Thank you.

2              (Plaintiff's Exhibit 9 marked for

3              identification.)

4         MR. URIARTE:  So if you could just scroll all the

5    way, David, so Mr. Vargas can see the whole document.

6    So this will be Exhibit 9.  This is "Notice to

7    Employees as to Change in Relationship" dated August

8    29, 2018.  I'm good with my word with regard to the

9    date there, even though Jason did not want to go with

10   me on it.

11        Q.  So do you see that, Mr. Vargas?

12        A.  Yes, I see that.

13        Q.  Okay.  So you didn't see this document before

14   it was issued?

15        A.  I don't recall it, but it looks like the first

16   time that I see this document.

17        Q.  No problem.  And then when it says "Code of

18   Conduct," does that mean anything to you?

19        A.  Yeah.

20        Q.  What does that mean to you?

21        A.  It means that the person was not conducting

22   correctly.

23        Q.  Okay.  And specifically what was he not

24   conducting correctly?

25        A.  He was forcing people to sign a petition.

Case 3:19-cv-03157-VC   Document 73-1   Filed 01/15/21   Page 13 of 24

```
 1        Q.  Okay.  Anything else that he wasn't doing
 2   correctly?
 3        A.  I think that is enough for me.
 4        Q.  I'm just trying to complete things, so I'm
 5   sorry I keep saying, "Anything else?  Anything else?"
 6   I'm just making sure it's complete.
 7             So aside from him forcing people to sign the
 8   petition, anything else that might have caused him to
 9   violate code of conduct, or was that it?
10        A.  I think that -- I think that -- well, no,
11   nothing -- well, but the reason why we terminate --
12        Q.  Yeah.
13        A.  -- because of forcing people to sign a
14   petition.
15        MR. URIARTE:  Gotcha.  Okay.
16             And then could we have Exhibit 11, please.
17             (Plaintiff's Exhibit 11 marked for
18             identification.)
19        MR. URIARTE:  Q.  So here's Exhibit 11.  This one
20   was given to us by your lawyers as well.  It's Menzies
21   95, if you look on the bottom.
22        A.  Can you repeat that.
23        Q.  I'm sorry?
24        A.  Can you repeat it, please.
25        Q.  Sure.  So this is Exhibit 11.  This is a
```

1    Q.  All right.  And here it says this option, I

2    guess, would have placed Mr. Navarro on final warning

3    for unprofessional conduct of a supervisor, right?  Do

4    you see that?

5    A.  Yes.

6    Q.  And it says "distributing a petition and

7    disruption of the workforce."  Do you see that?

8    A.  Yes, I do see it.

9    Q.  And then it says, "You are being placed on a

10   Final Warning which is your last and final opportunity

11   to" -- we don't know.  I'm thinking it's like "change

12   your behavior," maybe.  I don't know.  We don't know

13   that.  And then, "Any infraction, no matter how minor

14   in any of the 4 categories of Attendance, Conduct,

15   Safety or Work Performance, may result in your

16   immediate discharge."  Do you see that?

17   A.  Yes, I see that.

18   Q.  And then the Final Warning box is marked.

19   A.  Uh-huh.  Yes.

20   Q.  Okay.  And then if you see a little bit down,

21   just to make sure, there's no signature because it was

22   not used, presumably, correct?  So my question about

23   this document is what's wrong with this option,

24   Mr. Vargas?

25   MR. WU:  Objection.  Improper hypothetical.  Lacks

1    foundation.

2         THE WITNESS:  I think that, based on the

3    investigation we come up with, this was not the option,

4    the right option for me at that moment.

5         MR. URIARTE:  Q.  Thinking about it now and

6    knowing a little bit more about the situation?

7         A.  I already had final outcome of the

8    investigation.  Make sure I need to have the right -- I

9    need to take the right decision.

10        Q.  You still think it's the right decision then,

11   Mr. Vargas?

12        A.  I do believe that it was the right decision,

13   and that's why I took it.  And you can tell when I

14   asked Tracy on -- in terms of her recommendation,

15   because I needed to ensure that we had all information

16   available to take the right decision moving forward.

17        Q.  Okay.  I guess I would have to ask, though,

18   don't you think that a final warning, one more little

19   mistake, may have resulted in the same outcome for you

20   in your goal of eliminating harassment?  Because your

21   goal is to eliminate harassment.

22        A.  Yes.

23        Q.  And a final warning like this --

24        MR. WU:  Improper -- sorry, I didn't know if you

25   were done with your question.  I don't mean to cut off

1    your question, Arlo.

2         MR. URIARTE:  It's okay, Jason.  Go ahead with

3    your objection.

4         MR. WU:  The objection is improper hypothetical

5    and lack of foundation.

6         MR. URIARTE:  Q.  Mr. Vargas?

7         A.  I'm sorry, but I don't know.  That's the

8    reason why I'm thinking about risk, I need to ensure

9    that we can reduce the risk as much as we can.  So

10   since I don't know what's going to happen with a

11   warning, the way for me to reduce the risk is

12   terminating the person.

13        Q.  Go ahead.

14        A.  With enough documentation to support that

15   decision.

16        Q.  Right.  And for you the documentation is the

17   conclusion of the security people, right?  And then the

18   statement of the three people that you're talking

19   about.

20        A.  Do you want me to go through it?

21        Q.  No, no, we've gone through it.  Don't worry

22   about it.  But that's your position, you felt like you

23   had enough documentation to do a termination?

24        A.  Yes.

25        Q.  And you're avoiding the risk.  Now, the risk

1      Q.  Okay.  So at this point did you think that you

2  needed to investigate more?

3      A.  Yes, definitely, because she was not answering

4  my question on that -- at that point.

5      Q.  Okay.  Very good.  All right.  And then if we

6  go up a little bit.  So here is your response, I guess,

7  August 29 at 5:01 p.m.  And you kind of made the

8  decision to terminate Mr. Navarro, correct?

9      A.  Yes.

10     Q.  So in the hour between 4:04 p.m. and 5:01

11 p.m., what additional investigation occurred?

12     A.  Well, we had a -- we had a conversation with

13 HR also, and I reviewed all the documentation in terms

14 of what the outcome of the investigation was.  And at

15 that point I took the decision to terminate Mr.

16 Navarro.

17     Q.  Okay.  Anything else that you did in that

18 hour?

19     A.  Well, we talked -- as I say, we talked with

20 HR, talked about the case.  We collected all the

21 documentation, put all the documentation together.  And

22 then we took the right -- the last decision, and that's

23 why I send that email to HR.

24     Q.  At this point you were not provided a document

25 with regard to the final warning, right?  You didn't

1    review that at this point?

2         A.  No, I did not.  That's HR.  And I think that

3    is also important to remember -- it's important to

4    remark that HR take decisions -- decisions in terms

5    of --

6         Q.  In terms of?

7         A.  The person.

8         Q.  HR made decisions in terms of the person, you

9    said?

10        A.  Of the person, exactly.

11        Q.  And what do you mean by that?

12        A.  Because they look into everything that you're

13   saying, or they take a look to the seniority of the

14   person, that this person is being 15 years at the

15   company, so they look on the -- on the recommendation

16   of the document, warnings and all that, and then, based

17   on that, they gave a recommendation.

18             Now, we, as directors, we look into the more

19   open situation of -- in terms of the whole operation,

20   how this will affect the rest of the employees.  And

21   during that -- during that meeting, of course, we

22   agreed on -- on a final termination for Mr. Navarro.

23        Q.  And when you say "agreed," who actually agreed

24   with you?

25        A.  HR.

1       Q.   Meaning Talin and Tracy?

2       A.   Yes.   So then Tracy agreed because she had a

3   conversation with Talin, so we all agreed on -- on this

4   termination.

5       MR. URIARTE:   Okay.   Why don't we take a

6   five-minute break and then we'll be right back.   Thank

7   you.

8       MR. WU:   All right.

9            (Brief recess.)

10      MR. URIARTE:   Okay, Mr. Vargas, it looks like I

11  have no further questions for you today.

12      THE WITNESS:   Okay.

13      MR. WU:   And I have just a few questions for you,

14  Raul.

15                  EXAMINATION BY MR. WU

16      MR. WU:   Q.   So, Raul, during the time you were

17  the director of operations at SFO, aside from the

18  petition, did you hear of any complaints that Andrew

19  Dodge was harassing employees?

20      A.   No, I did not.

21      Q.   During the time you were the director of

22  operations at SFO, aside from the petition, did you

23  hear of any complaints that Andrew Dodge wasn't giving

24  fuelers breaks?

25      A.   No, I did not.

1     Q.  During the time you were the director of

2  operations at SFO, aside from the petition that we've

3  already been discussing, did you hear any complaints

4  that Andrew Dodge wasn't running the operation

5  smoothly?

6     A.  I did not.

7     Q.  During the time you were director of

8  operations at SFO, aside from the petition, have you

9  heard any complaints about Andrew's job performance?

10     A.  No, I did not.

11     Q.  During the time you were the director of

12  operations at SFO, did you ever hear of any grievance

13  filed by the union against Andrew Dodge?

14     A.  There is nothing on Andrew Dodge.

15     MR. WU:  Okay.  I think that's all the questions I

16  have on my end, Arlo, unless you have any further

17  questions.

18     MR. URIARTE:  Yeah, let me just follow up with

19  what you just said.

20          FURTHER EXAMINATION BY MR. URIARTE

21     MR. URIARTE:  Q.  Mr. Vargas, you said there was

22  nothing on Andrew Dodge, right?  One, two, three, four,

23  five items there.  You never heard anybody complaining

24  about harassing him, you never heard that he was not

25  giving breaks, you never heard that he was not running

Case 3:19-cv-08157-VC   Document 78-1   Filed 11/15/21   Page 21 of 24

1    Q.  And when you say you do not recall, does that

2    mean it could have happened or does that mean you

3    didn't do it?

4    A.  It means that I don't have anything documented

5    that's important, and I don't recall having a

6    conversation.

7    Q.  Okay.  What about with Tracy or with HR?  Do

8    you recall talking to them about all these different

9    items?

10    A.  We had a conversation, as I said, in terms of

11    the investigation and in terms of what the letter --

12    letter said about Andrew, as I explained it before, and

13    nothing else on that.

14    MR. URIARTE:  Okay.  All right.  Thank you.

15    THE WITNESS:  Thank you.

16    MR. URIARTE:  Thank you, Mr. Vargas.

17    MR. WU:  Thank you very much for your time, Raul.

18    We appreciate it.

19    THE WITNESS:  Thank you very much.

20    MR. URIARTE:  We'll stop the record.

21    (Whereupon, the concluded at 11:15

22    o'clock a.m.)

23                    ---o0o---

24

25

Case 3:19-cv-03157-WC  Document 28-1  Filed 01/15/20  Page 22 of 24

1          CERTIFICATE OF WITNESS

2               ---o0o---

3

4          I, RAUL VARGAS, hereby declare under

5     penalty of perjury that I have read the foregoing

6     deposition testimony; and that the same is a true

7     and correct transcription of my said testimony

8     except as corrected pursuant to my rights under

9     Rule 30(e) of the Federal Rules of Civil

10    Procedure.

11

12          _____

13                    Signature

14          _____

15                    Date

16

17

18

19

20

21

22

23

24

25

Case 3:19-cv-08157-VC   Document 28-1   Filed 11/18/20   Page 23 of 24

1   STATE OF CALIFORNIA      )
                             )
2   COUNTY OF SAN FRANCISCO  )

3          I, CINDY TUGAW, a Certified Shorthand Reporter

4   of the State of California, duly authorized to

5   administer oaths pursuant to Section 8211 of the

6   California Code of Civil Procedure, do hereby certify

7   that

8                      RAUL VARGAS,

9   the witness in the foregoing deposition, was by me duly

10  sworn to testify the truth, the whole truth and nothing

11  but the truth in the within-entitled cause; that said

12  testimony of said witness was reported by me, a

13  disinterested person, and was thereafter transcribed

14  under my direction into typewriting and is a true and

15  correct transcription of said proceedings.

16         I further certify that I am not of counsel or

17  attorney for either or any of the parties in the

18  foregoing deposition and caption named, nor in any way

19  interested in the outcome of the cause named in said

20  caption.

21         Dated the 10th day of September, 2020.

22

23

24
         CINDY TUGAW
25       CSR No. 4805 (California)

<< NOGARA REPORTING SERVICE >>                    78

```
 1    Raul Vargas
      c/o Foley & Lardner
 2    555 California Street, Suite 1700
      San Francisco, CA 94104
 3    Attn:  Jason Y. Wu, Esq.

 4    Date:  September 10, 2020
      Re:  Navarro vs. Menzies
 5    Deposition Date:  Tuesday, August 25, 2020

 6    Dear Mr. Vargas,

 7            Please be advised the original transcript of
      your deposition is ready for your review.
 8            Pursuant to FRCP Rule 30(e), you have 30 days
      following the date of this notice to read, correct if
 9    necessary, and sign your transcript unless the
      attending parties and the deponent agree on the record
10    or otherwise in writing to a longer or shorter time
      period.  The deponent may change the form or the
11    substance of the answer to a question, and may either
      approve the transcript of the deposition by signing it,
12    or refuse to approve the transcript by not signing it.
      You are not required by law to read and sign your
13    deposition transcript.  All parties will be informed of
      the corrections.  The original transcript will then be
14    sealed and sent to the examining attorney pursuant to
      the applicable law.
15            You may either come to our office to read and
      sign the original transcript, or you may contact your
16    attorney or the attorney who arranged for you to be
      present at your deposition.  If they have ordered a
17    copy of the transcript, you may review their copy and
      make corrections by submitting, signing and returning
18    the attached form.  If you choose to review your
      transcript at our office, please call first to make an
19    appointment.  Should you have any question regarding
      these instructions, please call.
20
      Sincerely,
21

22
      NOGARA REPORTING SERVICE
23    5 Third Street, Suite 415
      San Francisco, California 94103
24    (415) 398-1889

25    cc:  All counsel, original deposition
```