# EXHIBIT 17

```
                  IN THE UNITED STATES DISTRICT COURT

          IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA




RENALDO NAVARRO,

              Plaintiff,

v.                                          No.  3:19-CV-8157

MENZIES AVIATION, INC.,
doing business as MENZIES
and DOES 1 through 10,
inclusive,

              Defendants.
_____/

Zoom Remote Deposition of

     ANDREW DODGE

 Tuesday, July 28, 2020
```

**CERTIFIED COPY**

```
REPORTED BY:  CINDY TUGAW, CSR #4805



              NOGARA REPORTING SERVICE
              5 Third Street, Suite 415
            San Francisco, California 94103
                   (415) 398-1889
```

```
 1                        I N D E X

 2                                              Page Number

 3    EXAMINATION BY MR. URIARTE                     4

 4                        ---o0o---

 5                      E X H I B I T S

 6    Plaintiff's

 7    Exhibit 3     Copy of two photographs         26

 8    Exhibit 5     Statement by Andrew Dodge       42
                    dated 8-16-18
 9
      Exhibit 8     Petition from Menzies           33
10                  fuelers to Menzies
                    Management
11
      Exhibit 10    Statement by Rafael             40
12                  Vasquez dated 11/18/18

13                        ---o0o---

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            BE IT REMEMBERED that, pursuant to Notice of

 2   Taking Deposition and on Tuesday, the 28th day of July,

 3   2020, commencing at the hour of 9:00 o'clock a.m.

 4   thereof, via Zoom videoconference, before me, CINDY

 5   TUGAW, a Certified Shorthand Reporter in the State of

 6   California, personally appeared,

 7                       ANDREW DODGE,

 8   Called as a witness by the Plaintiff, having been by me

 9   first duly sworn, was examined and testified as

10   hereinafter set forth.

11                         ---oOo---

12                   APPEARANCES OF COUNSEL

13   For the Plaintiff
             LIBERATION LAW GROUP, P.C.
14           2760 Mission Street
             San Francisco, California 94110
15           BY:  ARLO GARCIA URIARTE, Attorney at Law
             (415) 695-1000
16

17   For the Defendants
             FOLEY & LARDNER, LLP
18           555 California Street, Suite 1700
             San Francisco, California 94104
19           BY:  JASON Y. WU, Attorney at Law
             (415) 984-9848
20
     Also Present:  David Ho, Zoom Host.
21
                          ---oOo---
22

23

24

25
```

1   ZOOM HOST:  Good morning.  I am David Ho and I
2   will be the Zoom host.  I am going to be -- as soon as
3   the deposition gets going, I'll be off screen and I'll
4   mute myself.  The only time you will hear my voice if
5   there are any exhibits that you need to bring up.  And
6   so, Cindy, take it away.
7   THE REPORTER:  At this time, I will ask counsel to
8   stipulate on the record that there is no objection to
9   this deposition officer administering a binding oath to
10  the witness via Zoom, starting with the noticing
11  attorney.
12  MR. URIARTE:  No objection.
13  MR. WU:  No objections for defendant Menzies
14  Aviation.
15          (Whereupon, the Witness was duly sworn by the
16          Reporter.)
17                  EXAMINATION BY MR. URIARTE
18  MR. URIARTE:  Q.  Good morning, Mr. Dodge.  My
19  name is Arlo Uriarte.  I am attorney for Renaldo
20  Navarro in this matter of Mr. Navarro against Menzies.
21      Are you aware of that?
22  A.  Yes.
23  Q.  Okay.  Would you please state and then spell
24  your full name for the record, please.
25  A.  Yeah.  Andrew Dodge, A-n-d-r-e-w, and then

1   D-o-d-g-e.
2       Q.  Okay.  And, Mr. Dodge, what's your current
3   position with Menzies?
4       A.  I am a supervisor here at Menzies.
5       Q.  Have you had your deposition taken before?
6       A.  Yes.
7       Q.  And in what context?
8       A.  Can you, like, rephrase the question?
9       Q.  Yeah.  Why was your deposition -- why did you
10  provide a deposition?
11      A.  I had an incident on the -- on the airport.
12      Q.  Okay.  So it was your case or was it somebody
13  else's case?
14      A.  It was somebody else's versus Menzies.
15      Q.  Gotcha.  And do you remember the name of that
16  person?
17      A.  The first name.  It was a police officer named
18  Robert.
19      Q.  Okay.  So it was a police officer who filed a
20  lawsuit against Menzies, and you were a witness?
21      MR. WU:  I'm just going to object, relevance, to
22  this line of questioning.
23      But you can answer.
24      THE WITNESS:  It was something against Menzies
25  Aviation because I was a part of it.

1  A. No, more like two hours.
2  Q. Okay. Sounds good. All right.
3     Can you tell me the highest level of education
4  that you achieved.
5  A. I have some college.
6  Q. Did you graduate from college?
7  A. No, I did not.
8  Q. And when you say college, what college did you
9  go to?
10 A. I attended DeAnza Community College.
11 Q. Did you get an AA?
12 A. No. I was going for my AA.
13 Q. And when was the last time you actually
14 participated in a class at DeAnza? Like what year?
15 A. I want to say like 2015, 2016.
16 Q. And what were you trying -- what AA were you
17 trying to graduate?
18 A. Criminal justice.
19 Q. And when did you start with Menzies? What
20 year?
21 A. February of 2016.
22 Q. So February of 2016, is that with Menzies
23 already?
24 A. That was when we were ASIG.
25 Q. So that's still ASIG.

```
 1        A.   Yeah.
 2        Q.   And then shortly thereafter -- shortly
 3   thereafter, Menzies came in, is that correct?
 4        A.   Yeah, Menzies came in, like, 2018, or
 5   something like that, or in 2000 -- or like in the
 6   middle of 2018, I want to say.
 7        Q.   All right.  What was the position you had when
 8   you started with ASIG?
 9        A.   When I first started at ASIG, I was a fueler.
10        Q.   How long were you a fueler for before becoming
11   a supervisor?
12        A.   I want to say about a year.
13        Q.   And who approved your promotion to supervisor
14   from a fueler?
15        A.   Renil Lal, the general manager at the time.
16        Q.   The termination of Mr. Navarro is about August
17   of 2018.  Do you remember that?
18        A.   Yeah, I remember him not being there anymore.
19        Q.   And in August of 2018, you were a supervisor,
20   correct?
21        A.   Yes.
22        Q.   And your shift was -- can you tell me, what
23   was your shift?
24        A.   During the time -- like, your question is,
25   like -- like, now or in the past?
```

```
 1          Q.   In August of 2018.
 2          A.   I was -- I was doing swing shift and -- which
 3   would start -- swing shift.  It would probably start
 4   around, what, 2:00 or 3:00 in the afternoon until about
 5   11:00 p.m. at night.  And then I would also cover
 6   graveyard at the time, which started around 11:00 p.m.
 7   to about 7:00 a.m., if someone called off work.  I also
 8   covered people's call sicks as well.
 9          Q.   Gotcha.  Okay.  So if you had your regular
10   shift, which was the swing shift, of 2:00 to 3:00 until
11   11:00 p.m., you sometimes overlapped with the beginning
12   of Renaldo Navarro's shift, is that correct, graveyard?
13          A.   So I would see -- I would see Ray and give him
14   an update on the shift on what's going on and what
15   needs to be done, who's here, who called out.  And
16   sometimes you go a little past that because operation
17   can be a little bit busy, but we never overlapped by no
18   more than 30 minutes or 20 minutes.
19          Q.   So it would be kind of like a handoff?
20          A.   Yeah.  It's always a handoff to the next
21   supervisor.  You give them the cell phone and just talk
22   about what happened on the operation, and stuff that
23   needs to be done, or flights that come in, or flights
24   that were delayed, or anything about what's going on
25   with the fuelers, or anything about the equipment, you
```

1  know, stuff like that.

2  Q. Gotcha. And then, aside from yourself, so you
3  have Andrew Dodge, you have Renaldo Navarro, a
4  supervisor. Who else were supervisors at that time, in
5  August of 2018?

6  A. Just a quick question. When you mean
7  supervisors, are you talking about supervisors as,
8  like, in general all the supervisors, or are you
9  talking about supervisors that I just worked with on my
10 side of the airport?

11 Q. No, I'm talking about the same level as you,
12 so, like, fueling --

13 A. So on my operation on my side of the airport,
14 it was me, Ray Navarro, July -- I can't pronounce his
15 last name. July, Edsel and Tevita.

16 Q. What was the last one? I'm sorry.

17 A. Tevita.

18 Q. How do you spell that?

19 A. T-e-v-i-t-a.

20 Q. Okay. And when you say your side, is that the
21 103? Is what you guys called it?

22 A. The one at the time, yes, it was is 130 side.
23 The 1-3-0 side.

24 Q. I mean 130.

25 A. Yes.

1  Why don't you give me -- have your duties --
2  have your duties as a supervisor changed from August
3  2018 to today?
4      A.  Well, up until the Corona virus in March it
5  was the same, but now I just got back from furlough, so
6  I'm kind of just doing training as of right now, going
7  back.
8      Q.  Gotcha.  Yeah, I mean, I think everybody is
9  hoping that things kind of go back to normal hopefully
10 soon, but it doesn't look that way.
11         Okay.  So let's just talk about your duties.
12 And I really want to focus on your duties and
13 responsibilities with regards to August of 2018 as a
14 supervisor.
15     A.  Yeah.
16     Q.  Can you tell me what you remember to be your
17 duties and responsibilities.
18     A.  So as a supervisor at the time -- at the time
19 was to -- when you first come in, was to get the other
20 supervisor's information:  Get the cell phone, find out
21 who's on the operation, who called out sick.  After
22 that it was to schedule the flights.
23         So I would set up -- find out what flight are
24 coming in during my shift, what time the plane was
25 coming in, what time the plane was leaving, and from

1  there put fuelers on a schedule for, hey, you're going
2  to go from this flight to this flight.
3          And also, after that, it was to drive on the
4  airport and just monitor the fuelers, if they needed
5  help with something, or also monitor their safety.  So
6  making sure they're wearing their uniform.  Making sure
7  they're wearing their vest, earplugs, had their boots
8  on.  Make sure -- just come and check on them and make
9  sure their equipment is running properly.
10         And also, if they call me, I would go assist
11 them, or, you know -- and also just change things
12 throughout the operation.  Maybe the guy might call me
13 and be, hey, my flight never showed up, and then I
14 might just change their flights around.
15     Q.  Right.  Were you also in charge of providing
16 breaks for people, like when they can go on --
17     A.  Oh, yes, of course.  So you would -- when you
18 schedule flights, you would -- before their fifth hour,
19 California law, you try to find a break period for 30
20 minutes.  There were days that sometimes the way the
21 flights came in, you know, the guys would be fueling
22 and would go over that because they're still on the
23 aircraft.  You can't just leave the aircraft.  They
24 would have to take their break after they were done
25 fueling the aircraft.

1  Q. Right. So the fuelers under your supervision,
2  they depended on you for when they can take their
3  breaks?
4  A. Yes. They would take -- some of the guys
5  were, Hey, I need to take a break, or asking ahead of
6  time, Hey, what time am I taking my break? So
7  everything would be coordinated depending on what's
8  going on on the operation at the time.
9  Q. And then, like you said, there are times where
10 the fuelers would depend on you to help out with a
11 particular situation. So you become kind of like an
12 extra hand as well?
13 A. Say that again. Like, what do you mean?
14 Sorry.
15 Q. Like if they're busy or they're shorthanded,
16 you could come in also to help them?
17 A. Yeah, if there was something going on in the
18 operation, I would report to my duty manager, know
19 what's going on, let him know, Hey, we're short. Can I
20 get some assistance from your side? And if we didn't
21 have the manpower, I would help on a flight and hook up
22 and help, you know.
23 Q. Exactly. Okay. And then, during the swing
24 shift, how many fuelers did you normally supervise?
25 A. On a busy day, on a really busy day, I have

```
 1   between maybe eight to ten guys on a really busy day,
 2   with full staff.
 3        Q.   Gotcha.  And then if it's slow or not too
 4   busy --
 5        A.   There's some nonbusy days.  Probably --
 6        MR. WU:  Andrew, make sure you hear Arlo's entire
 7   question before you start.
 8        THE WITNESS:  Sorry.
 9        MR. URIARTE:  Q.  Yeah, because, Andrew, sometimes
10   it gets hard for the court reporter, for Cindy, to
11   actually kind of write down what we're saying if we're
12   talking on top of each other.  So let's give each
13   other -- let's try give each other like a pause in
14   between.
15        A.   Okay.
16        Q.   Thank you.  So you said -- we were talking
17   about, like, maybe on a slow or a normal day, how many
18   people would you supervise?
19        A.   About maybe five or six guys.
20        Q.   Okay.  In August of 2018, did you have some
21   sort of accommodation or medical condition that where
22   you actually asked the employer for an accommodation in
23   the workplace?
24        A.   I had given Renil Lal a doctor's note at the
25   time, like in 2017, from my doctor, having sleep apnea.
```

1   Q.  And did you and the company or Renil kind of
2   go through how to deal with the condition, the medical
3   condition, with regards to your job and, you know, what
4   type of -- was there any type of accommodation worked
5   out?
6   A.  I don't recall any conversation with Renil.  I
7   just don't remember the conversations we had in the
8   past.
9   Q.  Okay.
10  A.  I don't remember.
11  Q.  Did you have some sort of official or in place
12  disability accommodation that kind of changed your
13  normal workday that the company had to accommodate?
14      Was something like that in place?
15  A.  Well, they tried, like I said -- I mean, how
16  you say, like it was -- I remember trying to stay doing
17  things, stay -- like stay on top of doing things, try
18  not to just, you know, sit in one place.  Just move
19  around.
20  Q.  Right.  I guess I'm asking more from like a
21  formal perspective.  Usually different companies deal
22  with this in different ways, but usually, when an
23  employee goes to an employer and says, hey, I have this
24  medical condition that affects my workday, usually
25  something is worked out, and then some things written

```
 1   what was in place, whether there was something --
 2        A.   Yes.
 3        Q.   -- in writing, or was it more informal, and
 4   you just told them the condition and nothing else.
 5        A.   Well, like, even with a piece of paper from
 6   the doctor stating, because, like I said, in the past
 7   people were saying, like, I was just sleeping, but I
 8   provided a doctor's note showing what I had.  I didn't,
 9   you know -- I didn't know about it either until I had
10   to go see the doctor, and that's when I provided them
11   with a note what I had because I had to go to sleep
12   tests and all that, and they finally diagnosed me with
13   that.  And I had to show proof why it was happening,
14   you know.
15        Q.   Okay.  So then who did you actually give that
16   doctor's note to?
17        A.   Renil.
18        Q.   To Renil.  And then did Renil talk to you
19   about it?
20        A.   I don't remember the -- we sat down.  I just
21   don't remember the conversation.
22        Q.   Okay.  Did you guys work something out?  Was
23   there some sort of game plan or --
24        A.   I don't remember, to be honest.
25        Q.   Okay.
```

1                identification.)

2        MR. URIARTE:  Q.  Mr. Dodge, do you know if

3   clicking on the Chat box -- there you go.  We have a

4   screen share.  Do you see it?

5        A.  Yes.

6        Q.  Great.  So when we were talking about

7   sleeping, I guess these pictures were taken of you.  So

8   you're saying that when you were falling asleep in the

9   office or in the vehicle like that, that was part of

10  your sleep apnea condition?

11       MR. WU:  Objection.

12       THE WITNESS:  Yeah.

13       MR. WU:  Objection.  Assumes facts not in evidence

14  that these are photos of him.

15       MR. URIARTE:  So, Mr. Dodge, just let your

16  attorney finish his objection, and then you can answer

17  after if you understand the question.

18       THE WITNESS:  Sorry.  Can you repeat the question

19  one more time?  Sorry.

20       MR. URIARTE:  Q.  Yes.  So in these photographs,

21  that's you, right, in the photograph?

22       A.  Yeah, that's me, yes.

23       Q.  And are you saying that when you fall asleep

24  like this, that you -- that these events right here

25  were part of your sleep apnea condition?

```
1         A.  I can tell you that in the photo, the one with
2    the truck, yes.  The one in the office, that was at the
3    end -- I was done with my shift already.
4         Q.  Gotcha.  And do you remember if the one in the
5    office was after a graveyard shift?  Is that what that
6    was?
7         A.  I can't remember the dates.  It's in the
8    office.  I don't remember.  But I remember this -- I
9    remember this photo.
10        Q.  Gotcha.  So you're saying the one in the
11   office you were already done with your shift, and you
12   went to the office to just nod off, is that correct?
13        A.  I was done.  I had transferred all my
14   information.  I went to the office and, yeah, fell
15   asleep.
16        Q.  And then the vehicle, is this -- the vehicle
17   is a vehicle located in the tarmac?  Is that where it
18   is?
19        A.  It's black and white, so I can't -- yeah.
20        Q.  Okay.  But you remember that the vehicle --
21   when you were sleeping in the vehicle in this
22   photograph, that was because of sleep apnea, is that
23   correct?
24        A.  Yeah, yes.
25        Q.  Okay.  So we're done with Exhibit 3.
```

1          Can you tell me, by August of 2018, how long
2   you had been working with Renaldo Navarro at that time?
3       A.   Good question.  Do you mean like how long had
4   I been working with him as a co-worker, as like a --
5   how do you say -- as a -- supervisors together or as,
6   in general, a fueler and a supervisor?
7       Q.   Yes.  In general.
8       A.   Since I began working for ASIG in 2016, I was
9   his night fueler.  So I began working with him as a
10  night fueler, and then once I got promoted, I became a
11  swing supervisor, so I would transfer my information to
12  him.
13          And then while -- our schedules changed, and
14  then I would cover the days he was off as a swing -- I
15  mean, as a graveyard.  And then there -- if someone
16  called off, and I would see him from the night shift or
17  into the morning shift, or I would cover his sick day.
18  So, yeah, I worked with him a lot.
19      Q.   Gotcha.  And what was your general opinion
20  with regards to Ray Navarro and how he did his job?
21      A.   Oh, Ray's a great supervisor.  There's no
22  questions asked.  He was there for a long time, and,
23  you know, he's -- he did his job.
24      Q.   And you and Ray -- at some point you and Ray
25  started to have, like, difference of opinion with

1  you. Him saying I shouldn't be a supervisor. Stuff
2  like that.
3      Q. Yeah. And when you say scheduling, you're
4  talking about how you're scheduling the fuelers with
5  regards to their workday and them being able to take
6  breaks? Is that what it is?
7      A. Yeah, scheduling meaning how I schedule my
8  flights to my crew.
9      Q. And then breaks, what were the complaints
10 about breaks?
11     A. He was saying that I was giving the breaks
12 late or not giving their breaks at all. Stuff like
13 that.
14     Q. Did you ever inquire, you or Renil, with
15 regard to, like, where he was getting his information?
16 Because he wasn't working with you, so how did he know
17 about the breaks and the scheduling and all of that?
18     A. Renil would -- Renil would investigate, find
19 out what was going on from fuelers and ask what was
20 going on. And, if anything, Renil -- if anything was
21 questioned, Renil would ask me. But the main question,
22 Renil would ask me if I am giving the fuelers breaks.
23 He never said fuelers are complaining. It would be
24 more like, Andrew, what did you -- can I see what you
25 did, or can I see your text messages, stuff like that,