1    to see what I was doing.  But he never said, hey,
2    Andrew, so and so said they didn't get their break.
3    You know what I mean?
4         Q.  Okay.  And did Renil ever suggest to you a
5    better what way of doing things?  Was there anything
6    like that?
7         A.  No, because -- no, because Renil knew how the
8    operation was as well.  Him being a general manager,
9    he's been in that position knowing how the schedules
10   work as well.  He sees that.
11        Q.  Okay.  And Renil thought that you were
12   providing the breaks properly?
13        A.  Yeah.
14        MR. URIARTE:  Okay.  Let me show you Exhibit 8.
15        VIDEO OPERATOR:  Okay.  I will bring that up
16   shortly.
17        MR. URIARTE:  Okay.
18             (Plaintiff's Exhibit 8 marked for
19             identification.)
20        MR. URIARTE:  Are you doing a screen share on
21   that, David?
22        THE WITNESS:  I see it now.
23        MR. URIARTE:  Great.  Okay.  Do you know what
24   Exhibit 8 is?  I'll give you some time to take a look
25   at that.  Do you see that at all?

1  depends on how long you're waiting for that fuel to be
2  done, you're waiting for that mechanic to be done. And
3  then, you know, we always serve out a break. You know
4  what I mean? They'd get their breaks.
5      Q. Right. But sometimes they'd just be --
6      A. It just depends on how the flights are coming
7  in and stuff like that, you know. That's how -- how we
8  ran it, you know, and that's how I was trained as well.
9  You just -- and also, like I said, sometimes you're
10 short manpower and sometimes you fuel longer a little
11 bit and then get your break. It just depends, like I
12 said, on the schedule.
13     Q. I see. What about this item here with regards
14 to "Andrew Dodge lack of experience about fueling"?
15 What do you think about that?
16     A. To be honest, that's just -- I don't know -- I
17 don't know what word he used for that, but I became a
18 supervisor because I know what I was doing. I was
19 trained on everything. I was actually -- at the time,
20 before Menzies bought us, I was considered a Class A
21 fueler, which is one of the top fuelers. Like, having
22 that title is really high, meaning I know how to do
23 everything, from fueling, defueling, driving every
24 piece of equipment on the thing, knowing how to fix
25 equipment. It's just the knowledge of fueling in

1  general, safety. I was, like, one of the top people.
2      Q. Okay. Aside from this petition, did you have
3  fuelers go up to you and complain to you about their
4  breaks, like maybe they're late, maybe they're short,
5  or anything like that?
6      Was that something that was happening in or
7  around August of 2018?
8      A. I actually had people asking me, Hey, when am
9  I going to get my break? And, you know, they'll come
10 up to me, ask me what's going on, or can I see what
11 you're planning, and I always talk to my fuelers.
12 That's the main thing about the job, is communication,
13 communication, talking and finding out, you know,
14 plans, planning things out.
15     Q. So why do you think these fuelers, you know,
16 all 26 of them, signed a petition against you? Why
17 would that happen?
18     A. Honestly, I don't know -- actually, a lot of
19 these names on here that I see people call me saying
20 that, you know, they were forced to sign a petition.
21 And they would tell me, Hey, I didn't want to sign it,
22 you know, but they were forced to sign it, or they
23 didn't read it, or stuff like that.
24     Q. I see. And they were forced to sign the
25 petition. Like, do you know by whom and why they were

1    forced to sign the petition?

2        A.   A lot of the guys -- a lot of the guys on the
3    list would call me and say Ray was telling them to sign
4    the paper to try to get me terminated or -- how do you
5    say -- demoted from being a supervisor.

6        Q.   Gotcha.  And then do you know who Rafael
7    Vasquez is?

8        A.   Yeah.  At the time, he was one -- a fueler and
9    a union representative.

10       Q.   Okay.  Did you know that it was actually
11   Rafael Vasquez who put together the petition?

12       MR. WU:  Objection.  Assumes facts not in
13   evidence.

14       MR. URIARTE:  Q.  Did you know that, Mr. Dodge?

15       A.   No, I did not.

16       MR. URIARTE:  Let's go ahead and put up Exhibit
17   10.

18            (Plaintiff's Exhibit 10 marked for
19            identification.)

20       MR. URIARTE:  Q.  So here we go.  So this one will
21   be Exhibit 10.  And as you see, it's signed by Rafael
22   Vasquez.  I think there's a date in the bottom there of
23   November 18, 2018, when he signed this statement.

24            So did you have problems with Rafael Vasquez
25   at all in or around August or November of 2018?  Were

1    you having problems with him, Mr. Dodge?
2         A.   Rafael didn't work with me on my side of the
3    airport.
4         Q.   Oh, I see.  I see.  So he's on another side of
5    the airport?
6         A.   Yes.
7         Q.   Gotcha.  Okay.  So it looks like, from this
8    statement that he signed, that says that he was asked
9    by Menzies Aviation fuelers to write a petition on
10   behalf of the fuelers on the 130 side.
11            Did you know that they -- that these fuelers
12   submitted two petitions?  Did you know that?
13        A.   No, I did not.
14        Q.   Okay.  So, based on your responses, is it fair
15   to say that nobody from Menzies Aviation ever sat you
16   down to discuss one or two petitions that were written
17   out against you at that time while it was happening?
18        A.   No.  I'm the one that brought it up to Renil,
19   saying that there was a petition going around, because
20   one of the fuelers had called me about it.
21        Q.   So you knew that a petition was going around,
22   but nobody from Menzies Aviation management ever kind
23   of, like, sat down with you or talked to you about it,
24   right?  Is that correct?
25        A.   No, I don't -- I never, no.

```
1        Q.  And you found out that there was a petition
2   going around against you, but you never read the actual
3   petition.  Is that how it was?
4        A.  Yeah, I never got to see it, no.
5        Q.  And you're saying that the first time you saw
6   it was actually a part of this litigation.  Is that
7   what you're saying?
8        A.  Yes.
9        MR. URIARTE:  Let's put up Exhibit 5, please.
10       VIDEO OPERATOR:  Okay.  Coming up shortly.
11       MR. URIARTE:  Thank you.
12           (Plaintiff's Exhibit 5 marked for
13           identification.)
14       MR. URIARTE:  It's not a very good copy, so I
15  guess Exhibit 5, Mr. Dodge, if we can just make it
16  smaller so he sees the whole thing.  There you go.
17       A.  Yeah.
18       Q.  Is this the letter that you wrote after you
19  found out that a petition was being turned in against
20  you?
21       A.  I can't read what I wrote, but I think this is
22  the one I wrote after I found out there was a petition.
23  One of the fuelers called me.
24       Q.  Correct.  Correct.  If you go to the bottom of
25  it, I think this is your signature, right?
```

1       A.   Yeah.

2       Q.   That one there?

3       A.   Yes.

4       Q.   Okay.  And did you have a meeting with Menzies
5  management about this letter at all?

6       A.   I do not recall -- I don't remember from when
7  I wrote it.  I think I wrote it during my shift, and I
8  turned it in or -- I either wrote it in the office with
9  Raul at the time or -- I just don't remember.

10      Q.   I see.  I see.  So it's possible that you
11 wrote it with the assistance of Raul.  Is that what
12 you're saying?

13      A.   Yeah, it was Raul or Renil that told me to
14 write -- write a statement.

15      Q.   And why did they tell you to write a
16 statement?  Do you know?

17      A.   Just to have it on file that they were going
18 to look into it.

19      Q.   Okay.  But how did that meeting start?  Was
20 that -- like, why did you kind of arrive at that
21 meeting?

22      A.   Like, why did I -- are you saying, like, why
23 did I write it or --

24      Q.   No.  Well, you said that you had a meeting
25 with Raul or Renil --

1        A.   It wasn't a meeting.  It was more like a --
2   like you walk in, let them know, hey, this is what's
3   going on on the operation.  Like, here's -- like this
4   is what people are telling me.
5        Q.   Okay.
6        A.   And they tell you, hey, just write statement
7   down and --
8        Q.   Okay.  Okay.  So it started with a fueler
9   calling you and saying, Hey, there's a petition going
10  around against you.  Is that how it started?
11       A.   Yes.
12       Q.   Okay.  And then, with that information, you
13  then go to Renil or Raul.  We don't know, right?  Renil
14  or Raul or both of them?
15       A.   Yeah, it was either/or.  Yeah, it was
16  either/or.
17       Q.   So you went to either one of them to tell them
18  that?  What exactly did you tell them?
19       A.   "Oh, hey, I got a phone call from a couple of
20  fuelers on my personal cell at home saying that
21  they" -- "there was a petition going around against me
22  that they didn't want to sign, but they felt forced to
23  sign it."
24            And then when I told them that -- I don't
25  remember if it was Renil or Raul -- they just told me

1    to write a statement down and to turn it in to them and
2    that they would look into it.
3         Q.   All right.  And then when you say -- how much
4    help did you get from Renil or Raul with regards to
5    writing the statement?  Like, did you guys --
6         A.   I don't know what -- like, from there on, I
7    don't know what they -- how they did their
8    investigation or anything like that.  So I just went on
9    and kept doing my job.
10        Q.   I see.  But with regards to writing the
11   statement, are these words totally yours?
12             Like, you sat there and started --
13        A.   Yeah, I went to a different office and wrote
14   this statement.
15        Q.   I see.  I see.  Okay.  And then you turned it
16   in?
17        A.   Yes.
18        Q.   Would it be not accurate to say that they
19   helped you with the words that are in this statement?
20        A.   Those are all me.  No, they didn't help me
21   with wording at all.
22        Q.   All right.  But when they said -- when they
23   told you to write this statement, did they tell you
24   what to write about?
25        A.   No.  They just said write -- like, write

1  what's going on, like, why -- you know, what you heard.
2  Stuff like that.
3      MR. URIARTE:  All right.  So we're done with
4  Exhibit 8.  I need like a five-minute break.  Let's see
5  where we are.  Let's take a five-minute break.  Off the
6  record.
7      MR. WU:  That's fine.  Thank you.
8          (Brief recess.)
9      MR. URIARTE:  Let's go back on the record.  We
10 don't have much more, but let me go through a couple
11 more here.
12     Q.  Mr. Dodge, you said that a fueler had called
13 you that a petition was going around.  Do you remember
14 who that fueler was?
15     A.  Yeah, Mario Caballero -- Caballero.  Mario
16 Caballero.
17     Q.  And you said that he felt like he was forced
18 to sign the petition or he didn't understand the
19 petition.  Is that what he said?
20     A.  When I -- when I received a phone call from
21 him, his first words, "Hey, Andrew, just want to let
22 you know there's a petition going around.  I didn't
23 want to sign it, but he made me sign it.  I'm just
24 letting you know.  I don't want to get into trouble or
25 anything."

1           And then -- and I said -- told him thank you,
2    and I would -- I said, "Thank you, and I will," you
3    know, "talk to management."
4           Q.   Okay.  And when you say "he made me sign it,"
5    who's "he"?
6           A.   He mentioned Ray Navarro.
7           Q.   Okay.  And, then, let's go back to Exhibit 10,
8    please.
9           VIDEO OPERATOR:  Hold on.  I'll bring it up.
10          MR. URIARTE:  Thank you.
11          THE WITNESS:  Okay.
12          MR. URIARTE:  Q.  So I wanted to discuss something
13   here.  It says, "There have been two separate Petitions
14   turned into Menzies Aviation Fueling Department
15   Director Raul Vargas."  Do you see that?
16          A.   Yes.
17          Q.   Okay.  Did Raul Vargas ever talk to you about
18   these two petitions?
19          A.   Sorry, can you repeat that one more time.  You
20   broke up.
21          Q.   Sure.  Did Raul Vargas ever talk to you about
22   two petitions being signed against you?
23          A.   No, he did not.
24          Q.   Did Raul Vargas ever talk to you about how you
25   give your breaks, and fuelers complaining against you,

1  or anything like that?
2      A.  No, he did not.
3      Q.  Did anybody from Menzies, you know, from John
4  Qually, the duty mangers, or Renil Lal at that time,
5  did any one of them kind of, like, talk to you about
6  maybe, you know, you giving your breaks better or
7  having some sort of plan of action?
8      A.  Like I said before, Renil and I spoke, but he
9  just wanted -- he reviews my schedules.  I used to turn
10 in -- we'd turn, like, you know, a shift report in
11 every night.
12     Q.  Okay.
13     A.  And, also, I would turn in my schedules to him
14 so he would see everything written down, so -- from
15 what I did.  So, basically, for example, with let's say
16 fueler A, I'd write down his flights, and in the middle
17 I'll put a "B," stands for break, and what else he did.
18 You know what I mean?  And then I also -- he could
19 research the times, you know, because -- with the phone
20 app or online.
21     Q.  Okay.  And you went through -- you went
22 through meetings with Renil Lal about that in around
23 August of 2018?
24     A.  I -- I don't remember the time or date, any of
25 that.

1  Q. Did Mr. Lal ever tell you that he was doing
2  that as part of, you know, investigating these
3  petitions against you?
4  A. No. He one time mentioned that Ray was
5  complaining, so he just wanted to see what I did
6  compared -- you know, compared to other supervisors and
7  how they were doing their schedules.
8  Q. I see. And -- okay. And out of those
9  meetings, was any kind of -- was there any
10 recommendation given to you as to, like, do your job
11 better, or was there any comment or anything like that?
12 A. I don't recall what he said to me at all.
13 Q. Did you have to change the way you were doing
14 things in order to give your breaks better or something
15 like that?
16 A. No. Up until March, I was doing the same way.
17 Q. And you're saying up until March of 2020?
18 A. Yeah, until I got furloughed, yes.
19 Q. Okay. Also in Exhibit 10, it says, "I have
20 spoken to The Menzies Aviation Fueling Director Raul
21 Vargas on three separate occasions regarding Mr. Dodge,
22 who continues to abuse his authority and at times
23 harass Fuelers under his charge."
24 Do you see that?
25 A. Yes, I do see that. Yeah.

1    Q.   What do you think -- what's your opinion on
2    that with regard to Rafael Vargas stating that you
3    continue to abuse your authority?
4         Do you know anything about that?
5    A.   I mean --
6    MR. WU:  Objection.  Assumes facts not in
7    evidence.
8         But you can answer.
9    MR. URIARTE:  Q.  Mr. Dodge?
10   A.   Sorry.  Okay.  I -- I mean, from when I see
11   that, I can tell you that's just not true.  I mean,
12   I've never harassed any of my employees or any of that
13   type of circumstance.
14   Q.   I see.  When you say -- when it says "abuse
15   his authority," like how would you be able to abuse
16   your authority during your shifts?
17   A.   Honestly, I don't know how I could abuse my
18   authority to this current day.  I'm still a supervisor
19   here --
20   Q.   I see.
21   A.   -- with the same employees.
22   Q.   I'm sorry.  What was that?
23   A.   I said I'm still a supervisor here with the
24   same employees.
25   Q.   Okay.  And have any fuelers gotten a complaint

```
 1   against you that you were harassing them?
 2        A.  No.
 3        Q.  Have any of the fuelers ever come up to you
 4   and said, hey, Andrew, you know, you're doing this
 5   wrong, or, you know, complained to you about not giving
 6   their breaks, or them working too hard because you're
 7   not doing your job?  Anything along those lines?
 8        A.  I've had fuelers just come up to me and try
 9   to, like, give suggestions on how they want to -- how
10   they see things -- on how they see things, but, you
11   know -- and then I have to explain to them what's going
12   on, and I'd show them, and they would understand.
13   That's about it.
14            But I've never had -- I've had someone coming
15   up to me asking when they would get their break, and I
16   would explain to them as well, you know, the situation,
17   and they would understand.
18        Q.  I see.  All right.  Can we go back to Exhibit
19   5, please.  Okay.  I know it's hard to read, but I was
20   going to start with -- well, that first sentence kind
21   of ends with "the company don't need me, that I'm a bad
22   supervisor, and all I do is cause delays."
23            What do you mean by that, "all I do is cause
24   delays"?
25        MR. WU:  Objection.  Objection.  Assumes facts not
```

1    Q.  Oh, okay.  So he told Ray not to come early
2  anymore.  Do you see that?
3    A.  Okay, yeah.  That's a -- yeah, yeah.
4    Q.  So that would be Jeff Cook or --
5    A.  No, that's Jeff -- I don't remember his last
6  name.  I can get his last name for you, but I just
7  don't remember his last name.
8    Q.  And that Jeff -- that Jeff, you said, works
9  for Menzies in Seattle International?
10    A.  Yeah, that's his main station, yes.
11    Q.  I see.  So how come he would get involved in
12  telling Ray not to come in early?
13    A.  So the reason -- we were going through a
14  transition, you know, from ASIG to Menzies.  At the
15  time, Renil was the acting general manager.  Raul
16  Vargas was the director -- new director we had, so they
17  were getting things together.  So Jeff would come down
18  and help our station.
19    MR. URIARTE:  Gotcha.  Okay.  I have no further
20  questions.
21    MR. WU:  No questions on my end either.
22    MR. URIARTE:  Okay.  Thank you, Mr. Dodge.  Thank
23  you for your time today.  Thank you for providing this
24  deposition.
25    THE WITNESS:  You're welcome.

1  (Whereupon, the deposition
2  concluded at 10:32 o'clock a.m.)
3  ---o0o---

```
1                 CERTIFICATE OF WITNESS
2                        ---o0o---
3
4        I, ANDREW DODGE, hereby declare under
5   penalty of perjury that I have read the foregoing
6   deposition testimony; and that the same is a true
7   and correct transcription of my said testimony
8   except as corrected pursuant to my rights under
9   Rule 30(e) of the Federal Rules of Civil
10  Procedure.
11
12                      _____
                                  Signature
13
14                      _____
                                     Date
15
16
17
18
19
20
21
22
23
24
25
```

```
1    STATE OF CALIFORNIA    )
                            )
2    COUNTY OF SAN FRANCISCO )
```

3       I, CINDY TUGAW, a Certified Shorthand Reporter
4  of the State of California, duly authorized to
5  administer oaths pursuant to Section 8211 of the
6  California Code of Civil Procedure, do hereby certify
7  that

8                    ANDREW DODGE,
9  the witness in the foregoing deposition, was by me duly
10 sworn to testify the truth, the whole truth and nothing
11 but the truth in the within-entitled cause; that said
12 testimony of said witness was reported by me, a
13 disinterested person, and was thereafter transcribed
14 under my direction into typewriting and is a true and
15 correct transcription of said proceedings.

16      I further certify that I am not of counsel or
17 attorney for either or any of the parties in the
18 foregoing deposition and caption named, nor in any way
19 interested in the outcome of the cause named in said
20 caption.

21      Dated the 7th day of August, 2020.

22
23                      [signature]
24
25                      CINDY TUGAW
                        CSR No. 4805 (California)

```
 1   Andrew Dodge
     c/o Foley & Lardner
 2   555 California Street, Suite 1700
     San Francisco, CA 94104
 3   Attn:  Jason Y. Wu, Esq.

 4   Date:  August 7th, 2020
     Re:  Navarro vs. Menzies Aviation
 5   Deposition Date:  Tuesday, July 28, 2020

 6   Dear Mr. Dodge,

 7          Please be advised the original transcript of
     your deposition is ready for your review.
 8          Pursuant to FRCP Rule 30(e), you have
     30 days following the date of this notice to read,
 9   correct if necessary, and sign your transcript unless
     the attending parties and the deponent agree on the
10   record or otherwise in writing to a longer or shorter
     time period.  The deponent may change the form or the
11   substance of the answer to a question, and may either
     approve the transcript of the deposition by signing it,
12   or refuse to approve the transcript by not signing it.
     You are not required by law to read and sign your
13   deposition transcript.  All parties will be informed of
     the corrections.  The original transcript will then be
14   sealed and sent to the examining attorney pursuant to
     the applicable law.
15          You may either come to our office to read and
     sign the original transcript, or you may contact your
16   attorney or the attorney who arranged for you to be
     present at your deposition.  If they have ordered a
17   copy of the transcript, you may review their copy and
     make corrections by submitting, signing and returning
18   the attached form.  If you choose to review your
     transcript at our office, please call first to make an
19   appointment.  Should you have any question regarding
     these instructions, please call.
20
     Sincerely,
21


22
     NOGARA REPORTING SERVICE
23   5 Third Street, Suite 415
     San Francisco, California 94103
24   (415) 398-1889
     cc:  All counsel, original deposition
25
```