# EXHIBIT 47

DEPOSITION OF JOHN QUALLY - 07/27/2020

RENALDO NAVARRO vs. MENZIES AVIATION, INC.

CONDENSED TRANSCRIPT AND CONCORDANCE

PREPARED BY:

NOGARA REPORTING SERVICE
5 Third Street, Suite 415
San Francisco, CA  94103
Phone:  (415) 398-1889
FAX:  (415) 398-0611



Page 1

(1)             IN THE UNITED STATES DISTRICT COURT
(2)        IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA
(3)
(4)
(5) RENALDO NAVARRO,
(6)           Plaintiff,
(7) v.                               No.  3:19-CV-8157
(8) MENZIES AVIATION, INC.,
    doing business as MENZIES
(9) and DOES 1 through 10,
    inclusive,
(10)
           Defendants.
(11) _____/
(12) Zoom Remote Deposition of
(13)       JOHN QUALLY
(14) Monday, July 27, 2020
(15)        Volume I
(16)   (Pages 1 through 32)
(17)
(18)
(19)
(20)
(21) REPORTED BY:  CINDY TUGAW, CSR #4805
(22)
(23)
           NOGARA REPORTING SERVICE
(24)      5 Third Street, Suite 415
       San Francisco, California 94103
(25)          (415) 398-1889

Page 2

(1)                    I N D E X
(2)                                         Page Number
(3) EXAMINATION BY MR. URIARTE                   4
(4)                     ---o0o---
(5)                   E X H I B I T S
(6) Plaintiff's
(7) Exhibit 1    Plaintiff Renaldo               9
                 Navarro's Notice of
(8)              Deposition of John
                 Qually
(9)
    Exhibit 2    Missed Punch Form               28
(10)
(11)                    ---o0o---
(12)
...

Page 3

(1)          BE IT REMEMBERED that, pursuant to Notice of
(2) Taking Deposition and on Monday, the 27th day of July,
(3) 2020, commencing at the hour of 8:58 o'clock a.m.
(4) thereof, via Zoom videoconference, before me, CINDY
(5) TUGAW, a Certified Shorthand Reporter in the State of
(6) California, personally appeared,
(7)               JOHN QUALLY,
(8) Called as a witness by the Plaintiff, having been by me
(9) first duly sworn, was examined and testified as
(10) hereinafter set forth.
(11)                ---o0o---
(12)          APPEARANCES OF COUNSEL
(13) For the Plaintiff
        LIBERATION LAW GROUP, P.C.
(14)    2760 Mission Street
        San Francisco, California 94110
(15)    BY:  ARLO GARCIA URIARTE, Attorney at Law
        (415) 695-1000
(16)
(17) For the Defendants
        FOLEY & LARDNER, LLP
(18)    555 California Street, Suite 1700
        San Francisco, California 94104
(19)    BY:  JASON Y. WU, Attorney at Law
        (415) 984-9848
(20)
     Also Present:  David Ho, Zoom Host.
(21)
                    ---o0o---
(22)
(23)
(24)
(25)

Page 4

(1)    **THE REPORTER:**  At this time, I will ask counsel to
(2) stipulate on the record that there is no objection to
(3) this deposition officer administering a binding oath to
(4) the witness via Zoom, starting with the noticing
(5) attorney.
(6)    **MR. URIARTE:**  So stipulated.
(7)    **THE REPORTER:**  Mr. Wu?
(8)    **MR. WU:**  So stipulated on behalf of defendant,
(9) Menzies Aviation.
(10)       EXAMINATION BY MR. URIARTE
(11)   **MR. URIARTE:  Q.**  Good morning, Mr. Qually.  My
(12) name is Arlo Uriarte.  I am attorney for Renaldo
(13) Navarro.  Do you understand that?
(14)   **A.**  Yes.
(15)   **Q.**  And you are aware that Mr. Navarro has an
(16) action against Menzies for his termination?
(17)   **A.**  I heard, yes.
(18)   **Q.**  And you know that you are here for your
(19) deposition as a witness?
(20)   **A.**  Yes.
(21)   **MR. URIARTE:**  David, can we have Exhibit 1 brought
(22) up, please.
(23)   **ZOOM HOST:**  Give me one second.  I'm bringing it
(24) up right now.  Hold on.
(25)   **MR. URIARTE:**  Okay.

Page 5

1  Q. So, Mr. Qually, could you please state your
2  name, your full name, for the record?
3  A. John David Qually.
4  Q. And your last name is Q-u-a-l-l-y, is that
5  correct?
6  A. Yes.
7  Q. And what's your current position at Menzies?
8  A. Duty manager.
9  Q. Have you had your deposition taken before?
10 A. No.
11 Q. Okay. Let me just kind of give you some idea
12 of what we're doing here today and some of the ground
13 rules with regards to depositions.
14     So we have a court reporter, as you noticed.
15 The court reporter, Cindy, she is taking down
16 everything that we are saying, so it's very important
17 that only one person speak at a time. Usually I'll be
18 doing the questions, and we will be waiting for you to
19 give us some answers. Sometimes your attorney may
20 object.
21     Do allow your attorney to finish his objection
22 before you answer. Normally you will answer after his
23 objection unless your attorney tells you not to answer.
24 But do give him some time to finish his objection, that
25 way the court reporter can have that on the record.

Page 6

1     Do you understand that?
2  A. Okay. Yes.
3  Q. It's very important that you understand the
4  question that's before you before you answer. Do you
5  understand that?
6  A. Yes.
7  Q. Okay. The reason being is that, although we
8  are in an informal setting here and we are, you know,
9  not together, and we definitely are not in a courtroom,
10 your testimony, because it's under oath before a court
11 reporter, has the same force and effect as if you were
12 testifying in court.
13     Do you understand that?
14 A. Yes.
15 Q. If you don't understand the question somehow,
16 you know, because of the way I put the words together,
17 or just because of the question that's before you and
18 you don't understand, just ask for me to rephrase it or
19 say that you don't understand it, and we'll attempt to
20 make sure that you understand the question. Okay?
21 A. Okay.
22 Q. If you need a break, we can take a break.
23 Just let me know. Usually I'll ask you to answer the
24 question before we can take a break. If for any reason
25 you need to talk to your attorney, we can always go off

Page 7

1  the record to give you some time to talk to your
2  attorney, but just let me know. If for any reason,
3  because some sort of electronic or communication break
4  here happens, we'll just kind of work through that.
5  Okay?
6  A. Okay.
7  Q. Find a way to work through that.
8     If for any reason the communication lines
9  break up so that the question is not clear, do let us
10 know about that, okay, if there is some sort of
11 transmission error or something like that.
12 A. Okay.
13 Q. We will be bringing up -- I see that it seems
14 like you're in some sort of office setting. Are you
15 using a laptop or desktop computer?
16 A. No, I'm actually on my phone.
17 Q. On your phone. So we'll give you some time
18 because sometimes we'll show you some documents, and
19 that might look a little bit small on your phone, so
20 you might have to make it bigger and all that. There's
21 not a lot of documents, but we will be showing you some
22 documents. So don't be shy or hesitate to ask for more
23 time looking at the documents before you answer
24 questions concerning those documents. Okay?
25 A. Okay.

Page 8

1  Q. Is there any reason why you can't give your
2  best testimony here today?
3  A. No.
4  Q. Are you sleep deprived at all? Did you work
5  last night?
6  A. No.
7  Q. Okay. Are you under any type of medication or
8  any substance that might affect your ability to express
9  yourself, enunciate or to remember?
10 A. No.
11 Q. Okay. So when did you become a Menzies
12 employee?
13 A. I forget the date in actuality, but I was part
14 of ASIG, which rolled into Menzies, in 2005.
15 Q. All right. So in 2005 you were an ASIG
16 employee, is that what it is?
17 A. Yes. And then recently they've merged into
18 Menzies and it just carried over.
19 Q. Right. So I think that was like 2016 or
20 sometime around there, correct?
21 A. Yeah, sounds about right.
22 Q. Yeah. Okay.
23 MR. URIARTE: David, are you ready to show us
24 Exhibit 1?
25 ZOOM HOST: Yes, I will bring it up on the screen.

## Page 9

(1) Since he's using the phone, I will bring it up on the
(2) share screen.
(3) **MR. URIARTE:** Oh, okay. So share screen is better
(4) if it's by phone?
(5) **ZOOM HOST:** Yes, or he could click on the link
(6) that I sent to him if he's comfortable using the phone.
(7) **MR. URIARTE:** How do you send the link? Oh,
(8) through the Chat.
(9) **ZOOM HOST:** Yes, just click on the link that's on
(10) the Chat window.
(11) **MR. URIARTE:** Gotcha. I'm doing that right now.
(12) Oh, good. Awesome. That is nice. So then this
(13) document, each one of us can control the document, is
(14) that correct?
(15) **ZOOM HOST:** You could download it and view it,
(16) correct, each individual.
(17) **MR. URIARTE:** Okay. Gotcha. Gotcha.
(18) **ZOOM HOST:** But if the witness is having trouble
(19) seeing it on the phone, I can bring it up on the share
(20) screen if you'd like.
(21) **MR. URIARTE:** Let's see what Mr. Qually is able to
(22) do.
(23)      (Plaintiff's Exhibit 1 marked for
(24)      identification.)
(25) **MR. URIARTE: Q.** Do you see the document, Mr.

## Page 10

(1) Qually?
(2)      **A.** I do not.
(3)      **Q.** I think, if you want to look at it through the
(4) Chat, it's under the Chat window, but I guess -- yeah,
(5) can we do a share screen on that, then?
(6) **ZOOM HOST:** Okay. I will bring it up through a
(7) share screen. Coming.
(8) **MR. URIARTE: Q.** There you go. Do you see that
(9) now, Mr. Qually?
(10)      **A.** Let me go back to that. Somehow -- let's see.
(11) I got it. I got it. Yes.
(12)      **Q.** So Exhibit 1 we will mark into the record.
(13) And it is a notice of deposition of John Qually. Do
(14) you see that?
(15)      **A.** Yes.
(16)      **Q.** Okay. Were you able to -- did you receive
(17) this document before today? This is a notice for you
(18) to appear for today, essentially.
(19)      **A.** Yes.
(20)      **Q.** Did you do anything to prepare for today's
(21) deposition?
(22)      **A.** Just had a meeting with the Menzies lawyer.
(23)      **Q.** Okay. And I don't want to hear anything with
(24) regard to what you guys spoke about, you and your
(25) lawyers. Aside from meeting with your lawyers, did you

## Page 11

(1) talk to anybody else?
(2)      **A.** No.
(3)      **Q.** Did you maybe review some documents in order
(4) to prepare for today's deposition?
(5)      **A.** I reviewed the documents that were sent to me.
(6)      **Q.** Okay. Do you remember any of those documents
(7) at all?
(8)      **A.** I remember only one of them.
(9)      **Q.** Okay. What is that?
(10)      **A.** That was the initial of the statement by --
(11) let's see, how am I going to put this? It was a letter
(12) that I typed up in regards to Mr. Navarro.
(13)      **Q.** Was that the letter regarding when he was
(14) suspended and the notice of suspension, is that what
(15) you're talking about?
(16)      **A.** Yes.
(17)      **Q.** Okay. Aside from that, do you remember any of
(18) the documents that you reviewed for today's deposition?
(19)      **A.** No.
(20)      **Q.** Did you talk to Mr. Dodge at all to prepare
(21) for today's deposition?
(22)      **A.** No.
(23)      **Q.** Any of the higher-ups? Any of your
(24) co-workers?
(25)      **A.** No.

## Page 12

(1)      **Q.** Okay. All right. So let's see. So you
(2) said -- when you started with ASIG -- and is that the
(3) right way to call it, ASIG, by the way, A-S-I-G, ASIG?
(4) Do you guys say that, ASIG?
(5)      **A.** Yes.
(6)      **Q.** When you started with ASIG, what was your
(7) position with them?
(8)      **A.** Supervisor.
(9)      **Q.** Can you tell me what the duties of a
(10) supervisor would be?
(11)      **A.** The duties are basically overseeing of the --
(12) overseeing and assigning the flights to the fuelers and
(13) making communication with the airlines on -- as we go
(14) through the day.
(15)      **Q.** And by 2018, how many fuelers were assigned to
(16) a supervisor? Do you remember?
(17)      **A.** It could -- I guess it varies by shift.
(18)      **Q.** I see. What would be the range, like would
(19) you say between three and ten, or was there like a
(20) range?
(21)      **A.** I guess it depends on the shift. Some shifts
(22) had upwards of 12 to 15. Some shifts had anywhere from
(23) three to four.
(24)      **Q.** Gotcha. And the interesting -- or the date
(25) most interesting for us is August of 2018 because

Page 13

(1) that's the date that Mr. Navarro was terminated. Do
(2) you remember that?
(3)    A.  I don't remember the exact date, no.
(4)    Q.  Okay. And so a lot of my questions will refer
(5) to what the state of the employment was during those --
(6) in 2018, because there might have been changes since
(7) 2018 or changes before 2018. And that's why we'll
(8) focus on August of 2018 a lot.
(9)        So in or around August of 2018, how many
(10) supervisors did Menzies have at that time?
(11)    A.  We had I believe -- I'm trying to remember --
(12) around six to eight, I believe.
(13)    Q.  And as a duty manager, what were your duties
(14) in relation to the supervisors?
(15)    A.  Basically I was their superior. I was -- you
(16) know, interacted with them to help them accomplish what
(17) tasks they needed and make sure they had all the
(18) support that they need for their job.
(19)    Q.  Gotcha. Okay. So can we go through that a
(20) little bit, kind of like the organizational structure
(21) that Menzies had in or around August of 2018.
(22)        So you said earlier there were about, did you
(23) say, six supervisors?
(24)    A.  I believe six to about eight, yes.
(25)    Q.  And so above the supervisors are the duty

Page 14

(1) managers, is that what it was?
(2)    A.  Yes.
(3)    Q.  And how many duty managers were there at that
(4) time?
(5)    A.  Four.
(6)    Q.  Four duty managers. And then with regards to
(7) you, were the supervisors assigned to specific duty
(8) managers or was it just who the duty manager was on
(9) that day?
(10)    A.  It was basically the manager who was on duty
(11) that day.
(12)    Q.  So then if you were working on a shift wherein
(13) Mr. Navarro was there, then you would be supervising
(14) Mr. Navarro. That's how it worked?
(15)    A.  Yes.
(16)    Q.  Gotcha. And then, so it's the supervisors,
(17) then the duty managers, and then who else above the
(18) duty managers?
(19)    A.  It would be the general manager.
(20)    Q.  And then anybody above the general manager?
(21)    A.  Now we have a director.
(22)    Q.  So there is a director on-site now?
(23)    A.  Yes.
(24)    Q.  But in 2018, no?
(25)    A.  Not that I recall, no.

Page 15

(1)    Q.  Okay. And who was the general manager in
(2) August of 2018, if you know?
(3)    A.  I believe the general manager -- the acting
(4) general manager around that time was Renil, R-e-n-i-l.
(5)    Q.  And then what's the last name?
(6)    A.  Lal, L-a-l.
(7)    Q.  L-a-l?
(8)    A.  Yes.
(9)    Q.  And then, aside from yourself, who else were
(10) the duty managers?
(11)    A.  I believe -- there's been some changes since
(12) then, but Simon Casey was one of them. I can't
(13) remember the rest of them.
(14)    Q.  Okay. So you remember Simon Casey. And
(15) that's C-a-s-s-e-y?
(16)    A.  C-a-s-e-y.
(17)    Q.  C-a-s-e-y. Okay. And then yourself, and then
(18) two other duty managers?
(19)    A.  Yeah.
(20)    Q.  Okay. All right. And then before ASIG, where
(21) did you work?
(22)    A.  United Airlines.
(23)    Q.  And what was your job?
(24)    A.  Lead ramp service.
(25)    Q.  Lead?

Page 16

(1)    A.  Yeah.
(2)    Q.  What was the next?
(3)    A.  Ramp service.
(4)    Q.  Lead ramp services. Okay. And how long were
(5) you with United?
(6)    A.  Eight and a half years.
(7)    Q.  So when did you become a duty manager for ASIG
(8) or Menzies?
(9)    A.  It was back -- honestly, I don't remember the
(10) exact date, but it's been -- I've been a duty manager
(11) for roughly four years.
(12)    Q.  Four years now?
(13)    A.  Yeah.
(14)    Q.  Okay. So like 2016, around that time?
(15)    A.  Around that time.
(16)    Q.  Were you a duty manager by the time Menzies
(17) came in?
(18)    A.  Around that time, yes.
(19)    Q.  Like close, yeah. I guess the key question is
(20) when Menzies took over ASIG, were you already a duty
(21) manager or you became a duty manager after Menzies came
(22) in?
(23)    A.  I was already.
(24)    Q.  Okay. Gotcha. All right.
(25)        So we were talking about the role of

Page 17

(1) supervisors with regards to how they work with fuelers,
(2) right? You said earlier that you would -- one of the
(3) duties would be to assign flights to the fuelers for
(4) the shift, right?
(5)    A.  Yes.
(6)    Q.  That's one of the duties. What other duties
(7) do supervisors have?
(8)    A.  They -- besides assigning the flights, they
(9) are obviously in communication with airlines as needed.
(10) They're overseeing the safety of the operation, making
(11) sure that, you know, everything is going safely.
(12)    Q.  Okay. So is it the supervisor that's actually
(13) on the headphone with the plane during the fueling
(14) operation, or with the airline?
(15)    A.  No.
(16)    Q.  No? That could be any of the fuelers?
(17)    A.  Well, the fuelers don't communicate with the
(18) flight crew. They communicate with the airline
(19) representative.
(20)    Q.  Gotcha. Okay. And who is that? Is that the
(21) fueler or is that the supervisor?
(22)    A.  Sometimes both. But, in general, when you're
(23) actually fueling, it would be more so the fueler than
(24) the supervisor.
(25)    Q.  Okay. Are supervisors sometimes -- like do

Page 18

(1) they sometimes help with the fueling operation, like
(2) they go to the actual airplane and help with the
(3) fueling of the airplane? Do they sometimes do that?
(4)    A.  They sometimes, yes.
(5)    Q.  And earlier you said they make sure -- they
(6) ensure the safety of the operation. How are
(7) supervisors keyed to that? How are supervisors
(8) important in the safety of the operation?
(9)        Do you understand the question, Mr. Qually?
(10)    A.  Yeah. No, they're just -- they're there to,
(11) you know, ensure the fuelers are working safely. If
(12) there's any safety concerns, they do what they can to
(13) resolve them, whether it be on the fueler's end or the
(14) equipment end, you know. They help do whatever needs
(15) to be done to keep everything safe.
(16)    Q.  Gotcha. And what kinds of situations
(17) sometimes come up when it comes to the safety? Can you
(18) give us an example of safety concerns that sometimes
(19) come up?
(20)    A.  Sometimes a fueler is not following proper
(21) procedures on the fueler's end, equipment not working
(22) right. So they may have an issue with the equipment.
(23)    Q.  So is it safe to say then that the supervisors
(24) are kind of overseeing each one of these fueling
(25) operations with regards to the airplane?

Page 19

(1)    A.  Yes.
(2)    Q.  Okay. And then what other duties do
(3) supervisors have with regards to the fuelers?
(4)    A.  Basically, you know, for operational purposes,
(5) it's making sure that the flights are getting done, the
(6) fuelers are getting to the flights when they're
(7) supposed to, you know, addressing whatever issues may
(8) come up.
(9)    Q.  What about giving breaks, for example, like
(10) timing the breaks, when people can go for meal periods,
(11) when people can go for their ten-minute breaks, is that
(12) the supervisor's duties?
(13)    A.  Yes.
(14)    MR. WU:  Objection. Relevance.
(15)    MR. URIARTE:  Q.  And then what about clocking in
(16) and clocking out, do the supervisors have any duties
(17) with regards to that?
(18)    MR. WU:  Same objection.
(19)    THE WITNESS:  No.
(20)    MR. URIARTE:  Q.  Like if there are issues with
(21) regards to they forgot to clock out or, oh, they forgot
(22) to clock in, something like that, is that the
(23) supervisor's duty or is that somebody else's?
(24)    MR. WU:  Same objection.
(25)    MR. URIARTE:  Q.  Mr. Qually?

Page 20

(1)    A.  No.
(2)    Q.  So who's responsible for like fixing clock-ins
(3) and clock-outs?
(4)    MR. WU:  Same objection.
(5)    THE WITNESS:  The fueler.
(6)    MR. URIARTE:  Q.  I'm sorry?
(7)    A.  The fueler.
(8)    Q.  The fueler?
(9)    A.  Whoever did not clock in or out.
(10)    Q.  And then who does the fueler have to talk to
(11) with regards to that?
(12)    A.  They would usually come to us as the manager
(13) or go straight to payroll.
(14)    Q.  Gotcha.
(15)    MR. WU:  And, Arlo, can we assume I'm asserting
(16) the same objections for this line of questioning just
(17) to keep things flowing?
(18)    MR. URIARTE:  Sure.
(19)    MR. WU:  Thank you.
(20)    MR. URIARTE:  Q.  How does the supervisor avoid
(21) causing delays in these fuelings -- delays to the
(22) airlines, right? I hear that sometimes the fueling
(23) operation is what causes the delay, right? Can that
(24) happen, Mr. Qually?
(25)    A.  It can.

Page 21

1  Q. And what happens? Why are delays caused by
2  the fueling operation? Why does that happen?
3  A. Many different factors involved. It could be
4  the way the flights were set up for the fueler. It
5  could be an equipment issue. It varies depending on
6  the situation. I mean, there's no set reason for that.
7  Q. Is that something that the supervisors try to
8  avoid as part of their duties, they try to avoid any
9  delays?
10  A. Yes.
11  Q. And I guess they try to avoid delays by having
12  like the proper number of fuelers working there, right?
13  I mean, you have to be properly staffed in order to
14  avoid delay, correct?
15  A. That's one, yes.
16  Q. And then you have to make sure that they have
17  the right equipment, that they're doing things
18  correctly?
19  It looks like we lost -- are you still there?
20  A. Yeah, hold on just a moment.
21  What was your question again?
22  Q. Yeah, I guess that goes into what we were
23  talking about earlier, that the supervisors have to
24  make sure that the fuelers are using the right
25  equipment, they're using the right procedures and all

Page 22

1  of those kind of things, like assist in avoiding
2  delays. Is that correct?
3  MR. WU: Objection. Compound.
4  MR. URIARTE: Q. Mr. Qually?
5  A. Yes.
6  Q. All right.
7  (Discussion off the record.)
8  MR. URIARTE: Q. So you had a working
9  relationship with plaintiff Renaldo Navarro, right? Is
10  that correct, Mr. Qually?
11  A. Yes.
12  Q. Were you social with Mr. Navarro at all? Did
13  you guys like go to baptisms or Christmases or
14  whatever?
15  A. No.
16  Q. Okay. So you knew him from work only, is that
17  correct?
18  A. Yes.
19  Q. You didn't have some sort of social or
20  family-related kind of relationship, right? Is that
21  correct?
22  A. No.
23  Q. And you supervised Mr. Navarro when you were
24  the duty manager and he was the supervisor, is that
25  correct?

Page 23

1  A. Partially, yes.
2  Q. And why do you say "partially"?
3  A. Because when Mr. Navarro was the graveyard
4  supervisor, I was the morning manager, so we would just
5  see each other on passing in the morning.
6  Q. Gotcha. So it wasn't often or did that not
7  ever happen where you guys shared the majority of your
8  shift?
9  MR. WU: Objection. Vague.
10  THE WITNESS: No, we never shared --
11  MR. WU: You can answer if you understand the
12  question.
13  MR. URIARTE: Yeah.
14  THE WITNESS: No, I did not overlap on a shift
15  outside of maybe an hour or two.
16  MR. URIARTE: Q. And that's because Mr. Navarro
17  did graveyard, is that correct?
18  A. Yes.
19  Q. Which is -- in 2018, graveyard for Mr.
20  Navarro, what was that? Like 10:00 to 7:00, is that
21  what it was?
22  A. About that, yes.
23  Q. And then your morning shift was what?
24  A. I started at 5:00 a.m.
25  Q. Gotcha. Mr. Navarro, from a fueler, became a

Page 24

1  supervisor, is that correct?
2  A. I had no -- that would be my guess. I don't
3  know -- I don't have any knowledge on where he started,
4  but that's my understanding.
5  MR. WU: I don't want you to guess.
6  MR. URIARTE: Q. Yeah, no guessing.
7  I guess what I was leading to was whether you
8  had any part in recommending or having Mr. Navarro be
9  promoted from fueler to supervisor. Do you remember
10  anything like that?
11  A. No.
12  Q. So you weren't part of that process at all?
13  A. No.
14  Q. Did you and Mr. Navarro get along at all? Was
15  your relationship cordial or was it combative? How
16  would you characterize your relationship with Mr.
17  Navarro?
18  A. Working relationship was okay. No, you know,
19  just -- it was okay.
20  Q. Did Mr. Navarro ever bring up any complaints
21  to you?
22  A. From time to time, yes.
23  Q. And what would be the nature of those
24  complaints?
25  A. Varies. Could be airline issue, staffing

DEPOSITION OF JOHN QUALLY - 07/27/2020

BSA  Case 3:19-cv-08157-VC  RENALDO NAVARRO vs. MENZIES AVIATION, INC.  Document 48-8  Filed 11/19/20  Page 9 of 10  XMAX(7/7)

Page 25

(1) issue. It just depends on the day and what he felt to
(2) complain about.
(3)   Q. And before his termination, did he ever bring
(4) up complaints against Andrew Dodge to you?
(5)   A. Yes.
(6)   Q. And what was the nature of those complaints?
(7)   A. It wasn't many. Let's see if I can remember,
(8) because it's been a while. But there was probably
(9) one -- I can remember at least one where Andrew might
(10) have been caught seen sleeping on the job.
(11)   Q. And he brought that up to you?
(12)   A. Yes.
(13)   Q. So was Andrew also a graveyard shift
(14) supervisor?
(15)   A. Yes. At that time.
(16)   Q. Okay. So you're coming in to work, and Mr.
(17) Navarro is mentioning to you that maybe Andrew Dodge
(18) was sleeping on the job. And so what would you, as a
(19) duty manager, do about that?
(20)   A. Well, there were different shifts, so they
(21) weren't working together.
(22)   Q. Okay.
(23)   A. So when the complaints came, I addressed the
(24) complaints with Andrew.
(25)   Q. Okay.

Page 26

(1)   A. And it was brought up to the higher-ups.
(2)   Q. And who were the higher-ups at that time?
(3)   A. Let's see. Who was it? Renil was one of
(4) them.
(5)   Q. Who?
(6)   A. Renil Lal. Because he was the acting GM at
(7) the time, so --
(8)   Q. Okay. Anybody else, do you remember?
(9)   A. No.
(10)   Q. Did anything happen because of the complaints
(11) that Andrew Dodge was sleeping? Do you know what
(12) happened to Andrew Dodge? Was he reprimanded? Was he
(13) written up?
(14)     Did anything happen because of that?
(15)   A. Not that I know of.
(16)   Q. Did Mr. Dodge explain to you what happened or
(17) did he admit it or anything like that?
(18)   A. He did. He had sleep depravation -- or sleep
(19) apnea, sorry.
(20)   Q. So he had sleep apnea, and so --
(21)   A. According to what I heard, what the
(22) explanation was, at times it's easy for a person to
(23) fall asleep.
(24)   Q. Aside from his -- aside from Mr. Navarro
(25) mentioning that Mr. Dodge was sleeping, any other

Page 27

(1) complaints that you -- before his termination, any
(2) complaints that Mr. Navarro brought up to you?
(3)   A. No.
(4)   Q. So that was the main thing that he brought up
(5) to you?
(6)   A. Yes.
(7)   Q. In your memory, do you remember if you were
(8) part of any kind of reprimand or disciplinary action
(9) against Mr. Navarro? Were you part of any of those?
(10)   A. No.
(11)   Q. What's your -- can you give us your sense as
(12) to how Mr. Navarro was as a supervisor? Was he a good
(13) supervisor? Was he an effective supervisor?
(14)     Do you have any sense for his abilities as a
(15) supervisor at Menzies at that time?
(16)   MR. WU: Objection. Vague. Compound.
(17)   THE WITNESS: Let's see. Without having worked
(18) with him a lot, but he -- he got the job done. He was
(19) okay. He was an okay supervisor.
(20)   MR. URIARTE: Q. Do you remember any complaints
(21) from airlines or delays or anything like that? Do you
(22) remember any of that?
(23)   A. No, not that I recall.
(24)   Q. What about with Mr. Dodge? Were there any
(25) complaints against airlines, or delays that Mr. Dodge

Page 28

(1) may have caused, or anything like that, around the time
(2) of August 2018 and before that?
(3)   A. Not that I know of.
(4)   MR. URIARTE: David, can we have Exhibit 2 brought
(5) up, please.
(6)   ZOOM HOST: Coming up shortly.
(7)   MR. URIARTE: Thank you.
(8)     (Plaintiff's Exhibit 2 marked for
(9)     identification.)
(10)   MR. URIARTE: Q. Exhibit 2. Do you see Exhibit 2
(11) at all, Mr. Qually?
(12)   A. Yes.
(13)   Q. Is that your signature on this page?
(14)   A. Yes, it is.
(15)   Q. Okay. I wasn't really sure. Okay. I'll give
(16) you a moment to take a look at it. I don't know if you
(17) remember this at all. Do you remember this document at
(18) all, Mr. Qually?
(19)   A. I remember -- obviously I signed it, so, yeah.
(20)   Q. Yeah, you could have signed it, but it doesn't
(21) mean you remember it today.
(22)   A. Well, I mean, I don't remember a lot from back
(23) then, but --
(24)   Q. Yeah. Well, let me ask you this. Do you
(25) remember having a discussion with Mr. Dodge about a

**Page 29**

(1) missed punch in about August of 2018?
(2) **A.** Not that I recall.
(3)     Can I take a five-minute break?
(4) **Q.** Sure. You need a break, you said?
(5) **A.** Yes, just for a couple of minutes.
(6)     **MR. URIARTE:** Yes, let's get off the record.
(7) Yeah, go ahead.
(8)     (Recess taken from 9:36 to 10:38 a.m.)
(9)     **MR. URIARTE:** Let's get back on the record. So
(10) the witness had asked for a break, but it's been an
(11) extended break now. I don't know even how long it's
(12) been. I know it's been --
(13)    **MR. WU:** It's been about 40 minutes.
(14)    **MR. URIARTE:** Yeah, like 40 minutes. We were able
(15) to reach the witness. His attorney, Jason Wu, was able
(16) to reach the witness, and the witness has agreed to
(17) reappear today at 3:00 o'clock to continue the
(18) deposition.
(19)    **MR. WU:** That's our understanding as well.
(20)    **MR. URIARTE:** Great. Thank you. All right, guys.
(21) Thank you very much. I'll see you at 3:00.
(22)    (Whereupon, the recessed
(23)    at 10:39 o'clock a.m.)
(24)           ---o0o---
(25)

**Page 30**

(1)           CERTIFICATE OF WITNESS
(2)              ---o0o---
(3)
(4)     I, JOHN QUALLY, hereby declare under
(5) penalty of perjury that I have read the foregoing
(6) deposition testimony; and that the same is a true
(7) and correct transcription of my said testimony
(8) except as corrected pursuant to my rights under
(9) Rule 30(e) of the Federal Rules of Civil
(10) Procedure.
(11)
(12)    _____
(13)              Signature
(14)    _____
(15)                Date

**Page 31**

(1) STATE OF CALIFORNIA    )
                           )
(2) COUNTY OF SAN FRANCISCO )
(3)     I, CINDY TUGAW, a Certified Shorthand Reporter
(4) of the State of California, duly authorized to
(5) administer oaths pursuant to Section 8211 of the
(6) California Code of Civil Procedure, do hereby certify
(7) that
(8)              JOHN QUALLY,
(9) the witness in the foregoing deposition, was by me duly
(10) sworn to testify the truth, the whole truth and nothing
(11) but the truth in the within-entitled cause; that said
(12) testimony of said witness was reported by me, a
(13) disinterested person, and was thereafter transcribed
(14) under my direction into typewriting and is a true and
(15) correct transcription of said proceedings.
(16)    I further certify that I am not of counsel or
(17) attorney for either or any of the parties in the
(18) foregoing deposition and caption named, nor in any way
(19) interested in the outcome of the cause named in said
(20) caption.
(21)    Dated the 7th day of August, 2020.
(22)
(23)
(24)
(25)              CINDY TUGAW
                 CSR No. 4805 (California)

**Page 32**

(1) John Qually
    c/o Foley & Lardner
(2) 555 California Street, Suite 1700
    San Francisco, CA 94104
(3) Attn: Jason Y. Wu, Esq.
(4) Date: August 7th, 2020
    Re: Navarro vs. Menzies
(5) Deposition Date: Monday, July 27, 2020
(6) Dear Mr. Qually,
(7)     Please be advised the original transcript of
    your deposition is ready for your review.
(8)     Pursuant to FRCP Rule 30(e), you have
    30 days following the date of this notice to read,
(9) correct if necessary, and sign your transcript unless
    the attending parties and the deponent agree on the
(10) record or otherwise in writing to a longer or shorter
    time period. The deponent may change the form or the
(11) substance of the answer to a question, and may either
    approve the transcript of the deposition by signing it,
(12) or refuse to approve the transcript by not signing it.
    You are not required by law to read and sign your
(13) deposition transcript. All parties will be informed of
    the corrections. The original transcript will then be
(14) sealed and sent to the examining attorney pursuant to
    the applicable law.
(15)    You may either come to our office to read and
    sign the original transcript, or you may contact your
(16) attorney or the attorney who arranged for you to be
    present at your deposition. If they have ordered a
(17) copy of the transcript, you may review their copy and
    make corrections by submitting, signing and returning
(18) the attached form. If you choose to review your
    transcript at our office, please call first to make an
(19) appointment. Should you have any question regarding
    these instructions, please call.
(20)
    Sincerely,
(21)
(22)
    NOGARA REPORTING SERVICE
(23) 5 Third Street, Suite 415
    San Francisco, California 94103
(24) (415) 398-1889
(25) cc: All counsel, original deposition