# EXHIBIT 48

### DEPOSITION OF JOHN QUALLY, VOLUME II - 07/28/2020

### RENALDO NAVARRO vs. MENZIES AVIATION, INC.

CONDENSED TRANSCRIPT AND CONCORDANCE

PREPARED BY:

NOGARA REPORTING SERVICE
5 Third Street, Suite 415
San Francisco, CA  94103
Phone:  (415) 398-1889
FAX:  (415) 398-0611



**Page 33**

```
                    IN THE UNITED STATES DISTRICT COURT
           IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA


 RENALDO NAVARRO,
                    Plaintiff,
      v.                            No.   3:19-CV-8157
 MENZIES AVIATION, INC.,
      doing business as MENZIES
      and DOES 1 through 10,
      inclusive,
                    Defendants.
 _____/
      Zoom Remote Deposition of
             JOHN QUALLY
       Tuesday, July 28, 2020
             Volume II
        (Pages 33 through 58)




 REPORTED BY:   CINDY TUGAW, CSR #4805

                  NOGARA REPORTING SERVICE
                  5 Third Street, Suite 415
                 San Francisco, California 94103
                         (415) 398-1889
```

**Page 34**

```
                      I N D E X
                                       Page Number
 EXAMINATION BY MR. URIARTE                 36
                       ---o0o---
                      E X H I B I T S
 Plaintiff's
 Exhibit 6      Employee Performance        46
                Development dated
                8/20/18
                 PREVIOUSLY MARKED EXHIBITS
 Exhibit 10     Statement by Rafael         53
                Vasquez dated 11/18/18

                       ---o0o---
```

**Page 35**

```
      BE IT REMEMBERED that, pursuant to Notice of
 Taking Deposition and on Tuesday, the 28th day of July,
 2020, commencing at the hour of 2:07 o'clock p.m.
 thereof, via Zoom videoconference, before me, CINDY
 TUGAW, a Certified Shorthand Reporter in the State of
 California, personally appeared,
                       JOHN QUALLY,
 called as a witness by the Plaintiff, having been by me
 previously duly sworn, was examined and testified
 further as hereinafter set forth.
                       ---o0o---
              APPEARANCES OF COUNSEL
 For the Plaintiff
       LIBERATION LAW GROUP, P.C.
       2760 Mission Street
       San Francisco, California 94110
       BY:  ARLO GARCIA URIARTE, Attorney at Law
       (415) 695-1000

 For the Defendants
       FOLEY & LARDNER, LLP
       555 California Street, Suite 1700
       San Francisco, California 94104
       BY:  JASON Y. WU, Attorney at Law
       (415) 984-9848

    Also Present:  David Ho, Zoom Host.

                       ---o0o---
```

**Page 36**

EXAMINATION BY MR. URIARTE

**MR. URIARTE:** Let's get back on the record.

**Q.** Mr. Qually, how are you? Thank you for coming back today.

Off the record we had a little bit of a clarification discussion with your counsel. And I just wanted you to confirm that, in preparation for your deposition, that aside from your counsel, you also spoke with Tracy from HR, Andrew Dodge, and also Ran --

**A.** Randy Davies.

**Q.** -- Randy Davies, correct?

**A.** Correct.

**Q.** And then, aside from those people, did you talk to anybody else in preparation --

**A.** No.

**Q.** -- for your deposition?

**A.** No.

**Q.** That's a no?

**A.** No.

**Q.** Great. So let's just jump right in here. Yesterday you were having a little bit of a difficulty trying to remember the different supervisors and different managers that were at Menzies Aviation office in 2018. And I've got a list of names here. I wanted to throw it by you. In August of 2018, Nico, N-i-c-o,

Page 37

(1) was a supervisor?
(2)    A. He -- actually, I was doing a little research
(3) after that question. Nico was the nighttime duty
(4) manager.
(5)    Q. There you go. And then you have Renil Lal,
(6) right?
(7)    A. Yes.
(8)    Q. And do you remember what his position was in
(9) August 2018?
(10)    A. To the best of my knowledge, he was the
(11) temporary GM.
(12)    Q. Okay. And then you have Randy Davies, is that
(13) correct?
(14)    A. Yes, the regional vice president, yes.
(15)    Q. And then we just went through that, that he's
(16) actually regional vice president of another division.
(17)    A. Right.
(18)    Q. But do you remember who the regional vice
(19) president that was for the Menzies fueling operation at
(20) all?
(21)    A. As far as what?
(22)    Q. I think his name is Kevin something, does that
(23) ring a bell?
(24)    A. There was a Kevin Bloomberg, but he was the
(25) safety and security manager, I guess you could say.

Page 38

(1)    Q. Okay. And then you have Tracy who was at the
(2) human resources department, correct?
(3)    A. Correct.
(4)    Q. Do you remember any other supervisors during
(5) that time aside from Andrew Dodge?
(6)    A. Tuvita Tokotaha.
(7)    Q. Tuvita, T-u-v-i-t-a, correct?
(8)    A. Yes. July was also one.
(9)    Q. Who else?
(10)    A. Edsel Patawran.
(11)    Q. Anybody else?
(12)    A. I think Mark Iligan, but he's kind of part
(13) supervisor, part fueler.
(14)    Q. Okay. And his name is Mark?
(15)    A. Yes.
(16)    Q. All right. Anybody else that you remember as
(17) a supervisor?
(18)    A. Ray Santana.
(19)    Q. Ray Santana?
(20)    A. Yeah.
(21)    Q. Okay. Anybody else? And that's in August of
(22) 2018, right?
(23)    A. Yes.
(24)    Q. Okay. Anybody else?
(25)    A. That's all I can remember off the top of my

Page 39

(1) head at this time.
(2)    Q. Okay. Great. Thank you very much.
(3)       And then there was a person by the name of
(4) Jeff who was from Seattle who was helping out. Do you
(5) remember that?
(6)    A. Jeff Stevenson, yes.
(7)    Q. And what was his role, do you remember?
(8)    A. To the best of my knowledge, he was in town
(9) helping out the new managers, you know, director and
(10) GM, get into the station, to the best of my knowledge.
(11) But I never -- you know, he had multi different tasks
(12) in this station, but what his actual role was, I don't
(13) know.
(14)    Q. Okay. Sounds good. Were you involved in the
(15) decision-making with regards to the suspension for Ray
(16) Navarro?
(17)    A. No.
(18)    Q. So you were not asked by any of the managers,
(19) "Hey, what's your opinion on this, do you think it's
(20) correct for us to suspend Mr. Navarro?"
(21)    A. No.
(22)    Q. No, okay. Were you at the meeting where Ray
(23) Navarro was -- where it was communicated to Ray Navarro
(24) that he was going to be suspended?
(25)    A. No. If you -- no.

Page 40

(1)    Q. And I read your note, and I think I've got to
(2) piece it together a little bit, and let me see if this
(3) is correct. What happened was, after the suspension
(4) meeting, they asked you to deliver the suspension
(5) notice, and then Ray Navarro -- a couple of days later,
(6) and then Ray Navarro would not sign it. Is that how it
(7) happened?
(8)    A. He, as I remember, trying to serve him with a
(9) suspension document, and he did refuse to sign.
(10)    Q. But that was -- when did you try to serve --
(11) when did you try to serve it to Ray Navarro? Did that
(12) happen after the meeting, same day?
(13)    A. I believe it must have -- I can't remember a
(14) hundred percent, but it must have been before the
(15) meeting.
(16)    Q. Okay.
(17)    A. But like I say, I don't have -- not knowing
(18) when Tracy had the meeting, but, you know, so my guess
(19) would be -- like I say, it's a guess, but it was
(20) probably before the meeting with them.
(21)    Q. So because it's a guess, you don't actually
(22) know whether it was before the meeting or after the
(23) meeting?
(24)    A. Correct.
(25)    Q. You don't remember.

**Page 41**

(1) **MR. WU:** And, John, we don't want you to guess
(2) today. It's a forbidden word that makes attorneys'
(3) ears perk up a little bit.
(4) **THE WITNESS:** Yeah.
(5) **MR. WU:** If you have an idea, please let us know,
(6) but, otherwise, don't guess.
(7) **THE WITNESS:** Okay.
(8) **MR. URIARTE: Q.** What about with regards to the
(9) termination? Were you involved at all in the
(10) decision-making behind the decision to terminate Ray
(11) Navarro?
(12)  **A.** No.
(13)  **Q.** So nobody asked for your opinion? You never
(14) gave your opinion?
(15)  **A.** No.
(16)  **Q.** Did you do any investigation or ask around,
(17) anything like that?
(18)  **A.** No.
(19)     (Discussion off the record.)
(20)  **MR. URIARTE: Q.** Do you remember seeing the
(21) petition that was going around against Andrew Dodge
(22) before Mr. Navarro was terminated?
(23)  **A.** No.
(24)  **Q.** So what about today, like, have you seen that
(25) petition today? Have you seen it since his termination

**Page 42**

(1) at all?
(2)  **MR. WU:** I'm going to object here on grounds of
(3) attorney-client privilege and instruct the witness to
(4) answer only as to whether he's seen the document
(5) outside of any confidential or communications with his
(6) attorneys.
(7)  **MR. URIARTE: Q.** That's correct, Mr. Qually, yes.
(8) So my question really is whether you've ever seen the
(9) -- either of the petitions, either of the two petitions
(10) that were circulated, and not because your attorney
(11) showed it to you but because of other events.
(12)  **A.** As I said, no.
(13)  **Q.** Would it be accurate to state that as a duty
(14) manager, that Andrew Dodge is an employee that you
(15) would have been supervising?
(16)  **A.** At some point, yes.
(17)  **Q.** And so it wasn't like an interest of yours to
(18) figure out what it is that the fuelers were complaining
(19) about against Dodge? That wasn't an interest of yours?
(20)  **MR. WU:** Objection. Vague.
(21)     You can answer if you understand the question.
(22)  **THE WITNESS:** I did not hear complaints directly
(23) from the fuelers.
(24)  **MR. URIARTE: Q.** Okay. So you're saying none of
(25) the fuelers ever came up to you and said, hey, these

**Page 43**

(1) negatives things are happening? You never heard that?
(2)  **A.** No.
(3)  **Q.** What about the video, did you ever see that
(4) video where they put together a video of Mr. Dodge
(5) sleeping and all that? Did you see that one?
(6)  **A.** No.
(7)  **Q.** You knew that a petition was going around
(8) against Mr. Dodge? Did you know that, as it was
(9) happening?
(10)  **A.** I have heard through -- that, yes, there was.
(11)  **Q.** And did you see the note that Andrew Dodge
(12) wrote, the statement he wrote around the same time that
(13) the petition was going around, was that something that
(14) you saw?
(15)  **A.** I did not.
(16)  **Q.** Do you know one way or the other if Menzies
(17) Aviation ever did an investigation with regards to the
(18) facts that are contained within those petitions?
(19)  **A.** No.
(20)  **Q.** You don't know?
(21)  **A.** I don't know if -- what was done with all the
(22) information.
(23)  **Q.** I see. Were you made aware at some point that
(24) Mr. Dodge was suffering from sleep apnea?
(25)  **A.** Yes.

**Page 44**

(1)  **Q.** And how were you made aware of that?
(2)  **A.** He brought it to our attention.
(3)  **Q.** Do you know when that was?
(4)  **A.** No, I don't have the exact date.
(5)  **Q.** Was it before or after the termination of Ray
(6) Navarro?
(7)  **A.** Before.
(8)  **Q.** A lot of time before? I think Mr. Dodge came
(9) in in 2016. And then Ray Navarro was August of 2018.
(10) So that's kind of like the time frame there. I don't
(11) know if that assists you, but do you know about when
(12) Mr. Dodge let you know of his condition?
(13)  **A.** I don't have the exact date, no.
(14)  **Q.** And did you see any kind of medical note or a
(15) medical slip or anything like that written by a doctor?
(16)  **A.** Personally, no.
(17)  **Q.** Did somebody tell you that he had one?
(18)  **A.** He told me he gave it to the general manager
(19) at the time, Renil.
(20)  **Q.** Renil Lal?
(21)  **A.** Yes.
(22)  **Q.** Did Mr. Lal ever talk to you about the note,
(23) the medical note?
(24)  **A.** No.
(25)  **Q.** Was there some sort of accommodation or a game

## Page 45

(1) plan with regards to how to deal with the sleep apnea,
(2) anything like that?
(3)   **A.**  Nothing directed to me.
(4)   **Q.**  Did you think that maybe the sleep apnea
(5) condition was interfering with his job?
(6)   **A.**  No.
(7)   **Q.**  You didn't think that it's of concern?
(8)   **A.**  There's always a concern, but I don't believe
(9) it interfered with his job.
(10)   **Q.**  And why is that?
(11)   **A.**  Because most of the time, as I heard, it was
(12) already, like, early in the morning, like, 1:00, 2:00,
(13) 3:00 o'clock in the morning when there's nothing on the
(14) airport. When he's actually on the airport, he was not
(15) sleeping. He was actually doing his job.
(16)   **Q.**  Did you see that one picture of him where he's
(17) inside the truck and he's sleeping? Did you see that
(18) one?
(19)   **A.**  I've seen one, yes.
(20)   **Q.**  And that's not a concern at all for Menzies?
(21)   **A.**  For me personally or Menzies? Me, personally,
(22) the time frame, no. Whether the company did, I can't
(23) say.
(24)   **Q.**  So I guess you weren't part of some sort of
(25) discussion as to whether his condition interfered with

## Page 46

(1) him being able to correctly perform his job functions,
(2) right? You weren't purview to that type of discussion?
(3)   **A.**  Correct.
(4)   **Q.**  Have you seen the termination notice of
(5) Renaldo Navarro?
(6)   **A.**  No.
(7)   **Q.**  So you saw only the suspension notice, right?
(8)   **A.**  Correct.
(9)   **Q.**  And then you actually -- did you write that?
(10) Did you actually -- were you the one who wrote it?
(11)   **A.**  The one that basically saying that he -- that
(12) I attempted to serve him the suspension notice and he
(13) refused to sign?
(14)   **Q.**  No, no, let me put it up, that way we're
(15) talking about the same thing. I'm talking about the
(16) actual notice itself.
(17)     So it's Exhibit 6, please, David.
(18)     (Plaintiff's Exhibit 6 marked for
(19)     identification.)
(20)   **MR. URIARTE:  Q.**  Do you see that, Mr. Qually?
(21)   **A.**  Oh, that one. Okay. Yes, I did -- that was
(22) the one -- that was the -- okay, yes. That was a
(23) suspension document that was tried to serve to
(24) Mr. Navarro that he refused to sign.
(25)   **Q.**  Correct. So my question first is did you type

## Page 47

(1) this up?
(2)   **A.**  Yes.
(3)   **Q.**  So you typed it up, is that right?
(4)   **A.**  You know what, hold on a minute. No, I did
(5) not type that.
(6)   **Q.**  Okay. So somebody gave this to you to -- for
(7) example, it seems like somebody filled out the field
(8) "Employee Name: Renaldo Navarro," "Today's Date,"
(9) "Airport/Location," "Clock #," "Department." Somebody
(10) put that information in there.
(11)     Were you the one who put that in there?
(12)   **A.**  Negative, no.
(13)   **Q.**  Do you know who did that?
(14)   **A.**  Do I remember, no. There's only --
(15)   **Q.**  Who asked you to serve the document?
(16)   **A.**  I believe it was HR.
(17)   **Q.**  Meaning Tracy?
(18)   **A.**  Tracy.
(19)   **Q.**  Okay. So this might refresh your recollection
(20) with regards to before or after the meeting. So it
(21) says "Today's Date" on the top there, and it says
(22) August 20, 2018. Do you see that?
(23)   **A.**  Okay.
(24)   **Q.**  And then, if you scroll down and you see your
(25) signature, it's a different date. Your signature has a

## Page 48

(1) date of August 23. Do you see that?
(2)   **A.**  Yes.
(3)   **Q.**  Does that help you or refresh your
(4) recollection at all with regards to when you served
(5) this?
(6)   **A.**  When he refused to sign, I dated it on the
(7) 23rd because that's when I tried to serve it to him.
(8)   **Q.**  I see. So that's when your encounter with him
(9) actually happened, is that correct?
(10)   **A.**  Correct.
(11)   **Q.**  So you only had one encounter with him, one
(12) attempt?
(13)   **A.**  Correct.
(14)   **Q.**  And because he was not -- he wasn't working at
(15) that point, correct?
(16)   **MR. WU:**  Objection. Vague.
(17)   **THE WITNESS:**  I can't remember --
(18)   **MR. WU:**  You can answer if you understand the
(19) question.
(20)   **THE WITNESS:**  I understand the question. I don't
(21) remember if that was his scheduled shift. I don't
(22) remember if that was his scheduled day or not.
(23)   **MR. URIARTE:  Q.**  I understand you're a little
(24) confused. By the time you were trying to serve him,
(25) was he already serving the suspension or he had not

## Page 49

1. started serving the suspension? Do you see what I'm
2. saying?
3. A. He -- best of my knowledge, he had not served
4. his suspension.
5. Q. So he didn't start serving the suspension
6. until you tried to serve him the suspension notice, is
7. that correct?
8. A. To the best of my knowledge, yes.
9. Q. Okay. Did you leave him with a copy?
10. A. He had a copy, yes.
11. Q. When you say he had a copy, was the copy --
12. the copy that he had, that came from you or --
13. A. He took a picture of it with his phone.
14. Q. I see. Okay. So, okay. All right. And then
15. let me just read under goal and the expectation part
16. there, it says, "It is expected that employees will
17. follow all policies and procedures. Failure to follow
18. Company policies and procedures will result in further
19. disciplinary action up to and including termination."
20. Do you read that?
21. A. Yes.
22. Q. Are you knowledgeable at all with regards to
23. the policies and procedures that this notice was
24. talking about?
25. A. Directly, no.

## Page 50

1. Q. It says "Failure to follow Company policies
2. and procedures..." Do you know what company policies
3. and procedures that he failed to follow?
4. A. Let's see. I can't remember off my head, no.
5. Q. Do you have an opinion as to why he was
6. suspended or terminated from Menzies, like, do you know
7. the specific violation that he may have violated?
8. Do you have any kind of memory as to that, or
9. what's your memory with regards to that?
10. MR. WU: Objection. Compound. Lack of
11. foundation.
12. You can answer if you understand the question.
13. THE WITNESS: Can you repeat it.
14. MR. URIARTE: Q. Yeah. So sitting here today and
15. looking back at the suspension and the termination, we
16. know that Menzies -- Menzies' position is he violated
17. certain policies and procedures, right?
18. So just kind of talking about that, do you
19. have a memory or an understanding in your head what it
20. is that Mr. Navarro actually violated to justify his
21. termination?
22. MR. WU: Same objection.
23. THE WITNESS: To justify, looking back now?
24. MR. URIARTE: Q. Yes.
25. A. I can't think of it off my head, no. I can't,

## Page 51

1. no.
2. Q. Did you -- like either part of the petition or
3. part of what was happening, or anything like that, did
4. you ever have a discussion with Mr. Dodge with regards
5. to his fuelers and his fuelers maybe not being able to
6. take breaks? Did you ever engage in such a discussion
7. with him?
8. A. It probably came up once or twice, yes.
9. Q. And was this once or twice before the
10. termination of Mr. Navarro?
11. A. Likely, yes.
12. Q. And can you tell us what your memory is of
13. that, like, what was that discussion about?
14. A. Basically fuelers not being able to take a
15. break just by the fact that they were shorthanded or
16. just lots of flights. Nothing I can remember in
17. general, but those are usually the only things that
18. would prevent that.
19. Q. Okay. And what brought up the need to talk to
20. Mr. Andrew Dodge about the breaks and his fuelers?
21. What brought it up to you? What kind of triggered
22. that?
23. MR. WU: Objection. Assumes facts not in
24. evidence.
25. THE WITNESS: Sometimes a fueler would complain to

## Page 52

1. me, but that's it.
2. MR. URIARTE: Q. And did Mr. Dodge have any
3. opinion or did he kind of have his position as to why
4. these breaks were short -- I mean, the breaks weren't
5. happening, or the breaks were late, or anything like
6. that?
7. Did Andrew Dodge try to explain himself as to
8. why those things were happening?
9. MR. WU: Objection. Assumes facts not in
10. evidence.
11. THE WITNESS: Yes.
12. MR. URIARTE: Q. And what would he say in those
13. discussions?
14. A. He gave me the explanation of what happened
15. during the night and why some fuelers weren't able to
16. get a longer break than they did or any break at all.
17. And that's it, you know.
18. We -- there is a policy where, if they don't
19. get a break, they get a missed meal penalty. So they
20. get paid for their lunch.
21. Q. Did you ever have a discussion with a Rafael
22. Vasquez about Andrew Dodge?
23. A. I might have at one point. I don't recall.
24. Q. And what do you remember as to that
25. discussion?

## Page 53

(1) **MR. WU:** Objection. Lack of foundation.
(2) **THE WITNESS:** I don't recall what was talked about
(3) in that conversation.
(4) **MR. URIARTE: Q.** So -- okay. So let's just kind
(5) of clarify. Are you saying maybe you had a discussion
(6) with him about Andrew Dodge and maybe not? Or you may
(7) recall a particular discussion, you just don't remember
(8) the contents of it? Is that -- yeah, can you just
(9) clarify the nature of your memory?
(10) **A.** We probably had a conversation, but what we
(11) talked about, I don't recall.
(12) **Q.** Let me show you Exhibit 10. So Exhibit 10 is
(13) a statement from Rafael Vasquez, I guess, about his
(14) efforts to talk to Raul Vargas about something about
(15) Andrew Dodge. If you see the date below, it says
(16) November 2018. Do you see that?
(17) **A.** Yes.
(18) **Q.** Does this refresh your recollection as to
(19) about when you may have talked to Rafael Vasquez about
(20) Andrew Dodge?
(21) **A.** No. And, for the record, I have not seen this
(22) before.
(23) **Q.** Okay. Maybe another way of putting it is did
(24) you talk to Rafael Vasquez before Mr. Navarro was
(25) terminated or after his termination? Do you remember

## Page 54

(1) that at all?
(2) **A.** If I talked to Rafael, it would have been
(3) before.
(4) **Q.** So here he says something about "I have spoken
(5) to The Menzies Aviation Fueling Director Raul Vargas on
(6) three separate occasions regarding Mr. Andrew Dodge,
(7) who continues to abuse his authority and at times
(8) harass Fuelers under his charge."
(9)    Do you have any information or knowledge with
(10) regards to that allegation, "continues to abuse his
(11) authority and at times harass Fuelers under his
(12) charge"?
(13)    Does that ring a bell at all, Mr. Qually?
(14) **A.** No.
(15) **Q.** And in the complaint that you received against
(16) Andrew Dodge, was there any type of language along
(17) these lines or actions along these lines, like
(18) harassing, abusing authority?
(19)    Was that the types of complaints that you
(20) received?
(21) **A.** No.
(22) **Q.** So you received complaints about meal breaks
(23) and rest breaks, but nothing about harassing fuelers,
(24) right? You never heard that type of complaint?
(25) **A.** Correct.

## Page 55

(1) **Q.** Aside from breaks, what other types of
(2) complaints did you receive from fuelers about Andrew
(3) Dodge?
(4) **A.** I mean, there could be many different ways,
(5) but usually the only complaints were, you know, working
(6) too much or working too hard or too many flights, stuff
(7) like that. That's pretty much it.
(8) **Q.** And that's a function of scheduling, right?
(9) Is that what that is?
(10) **A.** Correct.
(11) **MR. URIARTE:** Okay. I have no further questions
(12) for Mr. Qually.
(13) **MR. WU:** No further questions on my end, either.
(14) **MR. URIARTE:** Great. Thank you, Mr. Qually.
(15) Thanks for being patient with us. I think we're done
(16) with your deposition, and have a nice rest of the day.
(17) **THE WITNESS:** Okay. Thank you.
(18)    (Whereupon, the deposition concluded at 2:37
(19)    o'clock p.m.)
(20)          ---o0o---

## Page 56

(1)          CERTIFICATE OF WITNESS
(2)              ---o0o---
(3)
(4)    I, JOHN QUALLY, hereby declare under
(5) penalty of perjury that I have read the foregoing
(6) deposition testimony; and that the same is a true
(7) and correct transcription of my said testimony
(8) except as corrected pursuant to my rights under
(9) Rule 30(e) of the Federal Rules of Civil
(10) Procedure.
(11)
(12)      _____
(13)              Signature
(14)      _____
(15)                Date

Page 57

(1) STATE OF CALIFORNIA    )
                           )
(2) COUNTY OF SAN FRANCISCO )

(3)         I, CINDY TUGAW, a Certified Shorthand Reporter
(4) of the State of California, duly authorized to
(5) administer oaths pursuant to Section 8211 of the
(6) California Code of Civil Procedure, do hereby certify
(7) that
(8)                    JOHN QUALLY,
(9) the witness in the foregoing deposition, was by me duly
(10) sworn to testify the truth, the whole truth and nothing
(11) but the truth in the within-entitled cause; that said
(12) testimony of said witness was reported by me, a
(13) disinterested person, and was thereafter transcribed
(14) under my direction into typewriting and is a true and
(15) correct transcription of said proceedings.
(16)         I further certify that I am not of counsel or
(17) attorney for either or any of the parties in the
(18) foregoing deposition and caption named, nor in any way
(19) interested in the outcome of the cause named in said
(20) caption.
(21)         Dated the 7th day of August, 2020.
(22)
(23)
(24)
                        CINDY TUGAW
(25)            CSR No. 4805 (California)

Page 58

(1) John Qually
    c/o Foley & Lardner
(2) 555 California Street, Suite 1700
    San Francisco, CA 94104
(3) Attn:  Jason Y. Wu, Esq.
(4) Date:  August 7th, 2020
    Re:  Navarro vs. Menzies
(5) Deposition Date:  Tuesday, July 28, 2020
(6) Dear Mr. Qually,
(7)         Please be advised the original transcript of
    your deposition is ready for your review.
(8)         Pursuant to FRCP Rule 30(e), you have
    30 days following the date of this notice to read,
(9) correct if necessary, and sign your transcript unless
    the attending parties and the deponent agree on the
(10) record or otherwise in writing to a longer or shorter
    time period.  The deponent may change the form or the
(11) substance of the answer to a question, and may either
    approve the transcript of the deposition by signing it,
(12) or refuse to approve the transcript by not signing it.
    You are not required by law to read and sign your
(13) deposition transcript.  All parties will be informed of
    the corrections.  The original transcript will then be
(14) sealed and sent to the examining attorney pursuant to
    the applicable law.
(15)        You may either come to our office to read and
    sign the original transcript, or you may contact your
(16) attorney or the attorney who arranged for you to be
    present at your deposition.  If they have ordered a
(17) copy of the transcript, you may review their copy and
    make corrections by submitting, signing and returning
(18) the attached form.  If you choose to review your
    transcript at our office, please call first to make an
(19) appointment.  Should you have any question regarding
    these instructions, please call.
(20)
    Sincerely,
(21)
(22)
    NOGARA REPORTING SERVICE
(23) 5 Third Street, Suite 415
    San Francisco, California 94103
(24) (415) 398-1889
(25) cc:  All counsel, original deposition