# EXHIBIT 49

**DEPOSITION OF TRACY AGUILERA - 08/25/2020**

**RENALDO NAVARRO vs. MENZIES AVIATION, INC.**

CONDENSED TRANSCRIPT AND CONCORDANCE

**PREPARED BY:**

**NOGARA REPORTING SERVICE**
**5 Third Street, Suite 415**
**San Francisco, CA  94103**
**Phone:  (415) 398-1889**
**FAX:  (415) 398-0611**



DEPOSITION OF TRACY AGUILERA - 08/25/2020

BSA   Case 3:19-cv-08157-VC   RENALDO NAVARRO vs. MENZIES AVIATION, INC.   Document 46-5 Filed 11/10/20   Page 3 of 17   XMAX(1/1)

**Page 1**

```
 (1)          IN THE UNITED STATES DISTRICT COURT
 (2)       IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA
 (3)
 (4)
 (5)  RENALDO NAVARRO,
 (6)              Plaintiff,
 (7)  v.                          No.  3:19-CV-8157
 (8)  MENZIES AVIATION, INC.,
      doing business as MENZIES
 (9)  and DOES 1 through 10,
      inclusive,
(10)
              Defendants.
(11)  _____/
(12)  Zoom Remote Deposition of
(13)       TRACY AGUILERA
(14)   Tuesday, August 25, 2020
(15)
(16)
(17)
(18)
(19)
(20)
(21)  REPORTED BY:  CINDY TUGAW, CSR #4805
(22)
(23)
                   NOGARA REPORTING SERVICE
(24)              5 Third Street, Suite 415
               San Francisco, California 94103
(25)                  (415) 398-1889
```

**Page 2**

```
 (1)              I N D E X
 (2)                                   Page Number
 (3)  EXAMINATION BY MR. URIARTE            5
 (4)  EXAMINATION BY MR. WU               48
 (5)  FURTHER EXAMINATION BY MR. URIARTE  53
 (6)              ---o0o---
 (7)            E X H I B I T S
 (8)  Plaintiff's
 (9)  Exhibit 8     Petition to Menzies      26
                    Management from Menzies
(10)                Fuelers
(11)  Exhibit 9     Termination notice for   48
                    Renaldo Navarro
(12)
      Exhibit 11    Employee Performance     35
(13)                Development dated
                    8/29/2018
(14)
      Exhibit 12    Email chain culminating  31
(15)                in an email from Raul
                    Vargas to Tracy Aguilera
(16)                dated August 29, 2018
(17)  Exhibit 13    Menzies Aviation Code of 18
                    Conduct
(18)
      Exhibit 14    Menzies Aviation Employee 21
(19)                Handbook California - 2017
(20)  Exhibit 15    Menzies Aviation Applicant 23
                    Declaration Form
(21)
      Exhibit 17    Employee Performance      43
(22)                Development Steps to
                    Progressive Discipline
(23)
      Exhibit 18    Job Description, Fueling   54
(24)                Supervisor (North America)
(25)
```

**Page 3**

```
 (1)              I N D E X
 (2)              (Continued)
 (3)  Plaintiff's                    Page Number
 (4)  Exhibit 19    Letter from Rafael Vasquez  41
                    to whom it may concern
 (5)                dated 11/18/2018 with
                    attached petition
 (6)
      Exhibit 20    Menzies Aviation Employee   44
 (7)                Handbook California - 2018
 (8)              ---o0o---
 (9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

**Page 4**

```
 (1)          BE IT REMEMBERED that, pursuant to Notice of
 (2)  Taking Deposition and on Tuesday, the 25th day of
 (3)  August, 2020, commencing at the hour of 1:04 o'clock
 (4)  p.m. thereof, via Zoom videoconference, before me,
 (5)  CINDY TUGAW, a Certified Shorthand Reporter in the
 (6)  State of California, personally appeared,
 (7)              TRACY AGUILERA,
 (8)  called as a witness by the Plaintiff, having been by me
 (9)  first duly sworn, was examined and testified as
(10)  hereinafter set forth.
(11)              ---o0o---
(12)        APPEARANCES OF COUNSEL
(13)  For the Plaintiff
         LIBERATION LAW GROUP, P.C.
(14)     2760 Mission Street
         San Francisco, California 94110
(15)     BY:  ARLO GARCIA URIARTE, Attorney at Law
         (415) 695-1000
(16)
(17)  For the Defendants
         FOLEY & LARDNER, LLP
(18)     555 California Street, Suite 1700
         San Francisco, California 94104
(19)     BY:  JASON Y. WU, Attorney at Law
         (415) 984-9848
(20)
      Also Present:  David Ho, Zoom Host.
(21)
                   ---o0o---
(22)
(23)
(24)
(25)
```

BSA

DEPOSITION OF TRACY AGUILERA - 08/25/2020

Case 3:19-cv-08157-VC   RENALDO NAVARRO vs. MENZIES AVIATION, INC.   Document 48-5 Filed 11/06/20   Page 4 of 17

XMAX(2/2)

**Page 5**

(1)     **THE REPORTER:**  At this time, I will ask counsel to
(2)  stipulate on the record that there is no objection to
(3)  this deposition officer administering a binding oath to
(4)  the witness via Zoom, starting with the noticing
(5)  attorney.
(6)     **MR. URIARTE:**  No objection from plaintiff.
(7)     **MR. WU:**  And no objections for defendant, Menzies
(8)  Aviation.
(9)        (Whereupon, the Witness was duly sworn by the
(10)       Reporter.)
(11)        EXAMINATION BY MR. URIARTE
(12)     **MR. URIARTE: Q.**  Good afternoon, Ms. Aguilera.
(13)     **A.**  Good afternoon.
(14)     **Q.**  Could you please state and spell your full
(15)  legal name for the record.
(16)     **A.**  Tracy T r-a-c-y, Marie, M-a-r-i-e, Aguilera,
(17)  A-g-u-i-l-e-r-a.
(18)     **Q.**  Thank you.  Have you had your deposition taken
(19)  before?
(20)     **A.**  Yes.
(21)     **Q.**  And how many times?
(22)     **A.**  Two or three.  A couple times.
(23)     **Q.**  And are these like as part of your duties as
(24)  an HR professional?
(25)     **A.**  Yes.

**Page 6**

(1)     **Q.**  All of them?  All of these depos where you
(2)  testified you testified as an HR professional?
(3)     **A.**  Yes.
(4)     **Q.**  And were they all for Menzies?
(5)     **A.**  Yes.
(6)     **Q.**  When was the last one?
(7)     **A.**  It's been a while.  It's been a while.  I
(8)  can't give you an exact time.
(9)     **Q.**  Yeah, we don't need -- we sometimes don't
(10)  expect them.  Like maybe within the last five years or
(11)  more than five years?
(12)     **A.**  Yes.
(13)     **Q.**  Has it been more than a year ago?
(14)     **A.**  I believe so.
(15)     **Q.**  So within the last one and five years,
(16)  essentially, is that correct?
(17)     **A.**  Yes.
(18)     **Q.**  Have all two or three of them occurred within
(19)  the last one and five years or some were older than
(20)  that?
(21)     **A.**  No, I believe they were within one to five
(22)  years.
(23)     **Q.**  So my name is Arlo Uriarte.  I am the attorney
(24)  for plaintiff Navarro.  And you're aware that
(25)  Mr. Navarro has an action against Menzies, correct?

**Page 7**

(1)     **A.**  Yes.
(2)     **Q.**  And you know who Renaldo Navarro is?
(3)     **A.**  Yes.
(4)     **Q.**  How long did you actually work with Mr.
(5)  Navarro?
(6)     **A.**  When Menzies Aviation purchased ASIG, so it
(7)  would be around 2017.
(8)     **Q.**  So Menzies arrived -- do you remember what
(9)  part of the year Menzies actually started their
(10)  operation in SFO --
(11)     **A.**  Yeah --
(12)     **Q.**  -- for ASIG?
(13)     **A.**  Oh, for ASIG.  Could have been June or July.
(14)     **Q.**  So about June or July 2017?
(15)     **A.**  Yes.
(16)     **Q.**  And then were you already at SFO doing other
(17)  parts of airport services for Menzies?
(18)     **A.**  Yes.
(19)     **Q.**  And then how long has Menzies been in San
(20)  Francisco Airport?
(21)     **A.**  I can't give you an exact date.
(22)     **Q.**  Yeah, what about yourself, about how long --
(23)     **A.**  I've been at SFO since 1997.
(24)     **Q.**  All for Menzies?
(25)     **A.**  No.

**Page 8**

(1)     **Q.**  And so in 1997 who did you work for?
(2)     **A.**  I started with Ogden Aviation, then I went to
(3)  Aeroground.  And then due to the purchase of Aeroground
(4)  by Menzies, I'm now with Menzies Aviation, however,
(5)  Menzies does own Ogden.
(6)     **Q.**  Gotcha.  But when Aeroground -- when did they
(7)  get purchased by Menzies?
(8)     **A.**  I believe around 2005.
(9)     **Q.**  And what was your position in 2005 when you
(10)  started with Menzies?
(11)     **A.**  I was an HR coordinator/manager.
(12)     **Q.**  By the time in 2017 when Menzies purchased
(13)  ASIG, what was your title?
(14)     **A.**  Human resource manager.
(15)     **Q.**  And within the human resources department in
(16)  SFO, did you have other people working in the
(17)  department?
(18)     **A.**  Yes.
(19)     **Q.**  How many people did you supervise?
(20)     **A.**  Two directly and one indirectly.
(21)     **Q.**  And how do you differentiate the indirectly?
(22)     **A.**  Two were -- reported directly to me and the
(23)  third was in my office, however, she works for the
(24)  recruiting department.
(25)     **Q.**  Gotcha.  Okay.  So I think you've been doing a

**Page 9**

(1) really good job answering my basic questions there. So
(2) as you can tell, although we're in an informal setting,
(3) you have been giving testimony that the court reporter
(4) is taking down. And she will come up with a booklet
(5) that you will be able to review and make changes to.
(6) Are you aware of that?
(7)    **A.** Yes.
(8)    **Q.** And I should tell you that if you do make
(9) changes to that booklet, later on, for purposes of
(10) trial, somebody like me or another person might
(11) question you as to why you made changes. Okay?
(12)      Do you understand that?
(13)    **A.** Yes, I understand.
(14)    **Q.** And that's why we should try to make sure that
(15) you understand the question and that you provide your
(16) best testimony here today. Okay? Understood?
(17)    **A.** Understood.
(18)    **Q.** And you also understand that you're under
(19) oath, correct?
(20)    **A.** Yes.
(21)    **Q.** And you understand that oath?
(22)    **A.** Yes.
(23)    **Q.** Is there any reason why you cannot provide
(24) your best testimony here today?
(25)    **A.** No.

**Page 10**

(1)    **Q.** Are you under any type of medication or
(2) substance that affects your memory?
(3)    **A.** No.
(4)    **Q.** Did you do anything to prepare for today's
(5) deposition?
(6)    **A.** No.
(7)    **Q.** Did you talk to anybody, aside from your
(8) attorney, did you talk to anybody to prepare for
(9) today's deposition?
(10)    **A.** No, just my counsel.
(11)    **Q.** And then did you review any documents?
(12)    **A.** Just what my counsel has shown me.
(13)    **Q.** And what documents were those?
(14)    **MR. WU:** Objection. Attorney-client privilege.
(15) I'm going to instruct the witness not to answer.
(16)    **MR. URIARTE:** With regards to documents that were
(17) reviewed for today's deposition? I think we're
(18) entitled to know what she reviewed.
(19)    **MR. WU:** I think she already testified that she
(20) only reviewed what was shown to her by counsel.
(21)    **MR. URIARTE:** All right. Aside from the
(22) documents that your counsel showed you, did you review
(23) any other documents?
(24)    **A.** No.
(25)    **Q.** Do you have notes or anything in front of you

**Page 11**

(1) that you're using for today's testimony?
(2)    **A.** No.
(3)    **Q.** What's the highest level of education that you
(4) finished with?
(5)    **A.** High school.
(6)    **Q.** And then any kind of HR-related classes that
(7) you've taken in the last five years?
(8)    **A.** No.
(9)    **Q.** Any wage and hour related seminars or classes
(10) that you've taken in the last five years?
(11)    **A.** I'm sorry, I can't hear you. I didn't.
(12)    **Q.** Any kind of wage and hour seminars or
(13) compliance classes or anything like that?
(14)    **A.** No.
(15)    **Q.** And then how long have you been an HR manager
(16) for Menzies at SFO airport?
(17)    **A.** Ten years.
(18)    **Q.** When Menzies took over ASIG, did Menzies bring
(19) with it its own employment policies and handbook?
(20)    **A.** They had one, yes.
(21)    **Q.** Were those distributed to the employees that
(22) they took over in July of 2017?
(23)    **A.** I'm sorry, can you repeat the question.
(24)    **Q.** Sure. When Menzies took over ASIG in July of
(25) 2017, did they distribute the Menzies employment

**Page 12**

(1) handbooks and policies --
(2)    **A.** Not right at the time, no.
(3)    **Q.** When were those eventually distributed?
(4)    **A.** I don't have an exact date. I do know that we
(5) posted the notice stating that they would be following
(6) the Menzies Aviation policies.
(7)    **Q.** Okay. And where was that notice posted?
(8)    **A.** It was posted in the employee bulletin board.
(9)    **Q.** And then where would -- like if somebody
(10) wanted to see them, where would they see them?
(11)    **A.** They would see them in the HR department. We
(12) were preparing a package for them.
(13)    **Q.** If somebody needed to see them, you said they
(14) could see it in the HR department, is that correct?
(15)    **A.** Yes, once we put them all together.
(16)    **Q.** By August of 2018, had you put them all
(17) together?
(18)    **A.** I believe they did have a package for them.
(19)    **Q.** For each one of them?
(20)    **A.** Yes.
(21)    **Q.** Are you certain of that or are you guessing on
(22) that?
(23)    **A.** No, I believe they did have a package put
(24) together.
(25)    **Q.** And when you say "they," who's "they"?

**Page 13**

(1)    **A.** The corporate office.

(2)    **Q.** So I would imagine that the corporate office

(3) would have kind of like the same materials they would

(4) have for the other Menzies departments, other

(5) Menzies --

(6)    **A.** I'm sorry?

(7)    **Q.** I would imagine that the Menzies corporation

(8) would be using the same employment handbooks as they

(9) were using for the other services that Menzies was

(10) already doing at SFO, right? Those would be the same

(11) handbooks?

(12)    **A.** Well, yes, they have a California Menzies

(13) handbook, yes.

(14)    **Q.** So that's the part I don't understand too

(15) much. Why did it take a little bit of time to package

(16) them for the Menzies fuelers?

(17)    Did you hear the question?

(18)    **A.** No, I didn't hear your question.

(19)    **Q.** Okay. So the question is if there's a

(20) California employment handbook -- by July of 2017,

(21) Menzies was already at San Francisco Airport, correct?

(22) Ms. Aguilera?

(23)    **A.** Yes, I believe it was around July.

(24)    **Q.** No, what I mean is by July of 2017, there were

(25) already operations in San Francisco?

**Page 14**

(1)    **A.** Yes.

(2)    **Q.** Other services, correct?

(3)    **A.** Yes.

(4)    **Q.** So those services already had an employment

(5) handbook for California, correct?

(6)    **A.** Yes.

(7)    **Q.** So wasn't that the same handbook that was

(8) going to be used for Menzies fuelers?

(9)    **A.** I can't answer that because I know they were

(10) revising our handbook.

(11)    **Q.** I see. Okay. And then, but we don't know the

(12) exact date that the handbook was distributed to the

(13) Menzies fuelers?

(14)    **A.** No.

(15)    **Q.** And I took a look at the documents that were

(16) produced to us by your attorneys, and I didn't see any

(17) type of acknowledgment paperwork with regards to Mr.

(18) Navarro or acknowledging receipt of corporate policies.

(19)    **A.** Hmm.

(20)    **Q.** So do you know anything about that, whether

(21) you've seen one or anything like that?

(22)    **A.** No, I actually didn't look, but I do know that

(23) a package was put together for all of the ASIG

(24) employees for them to sign.

(25)    **Q.** Right. Because that's the normal procedure,

**Page 15**

(1) right, you give it to the employees and then they

(2) acknowledge receipt of it, correct?

(3)    **A.** Yes.

(4)    **Q.** And they acknowledge that they have been given

(5) one, isn't that the practice?

(6)    So the practice, Ms. Aguilera, is that once

(7) the handbooks become available, you provide the

(8) handbook to the employee and then they sign an

(9) acknowledgment for receipt of them, is that correct?

(10)    **A.** Yes.

(11)    **Q.** And then are you familiar with the Menzies

(12) code of conduct?

(13)    **A.** Yes.

(14)    **Q.** And that's another kind of set of policies or

(15) paperwork that's given to each employee, is that

(16) correct?

(17)    **A.** It's in the handbook, yes.

(18)    **Q.** Oh, so it's part of the handbook?

(19)    **A.** Yes, it is.

(20)    **Q.** Is there a separate acknowledgment of receipt

(21) for the code of conduct or it's all just one?

(22)    **A.** It's all just one.

(23)    **Q.** Was there ever a training with regards to the

(24) Menzies California handbook and code of conduct? Was

(25) there any kind of training like that?

**Page 16**

(1)    **A.** There was, when the employees came in to sign

(2) all the documents, we went over the documents with

(3) them.

(4)    **Q.** So how did that go? You called some of the

(5) employees one by one or like a seminar? How did that

(6) go?

(7)    **A.** They would come in according to their

(8) schedule, if they didn't have flights, they would come

(9) into the HR department. We would -- I would arrange it

(10) with their manager.

(11)    **Q.** Like how many people would come in at one

(12) time?

(13)    **A.** A couple at a time.

(14)    **Q.** And then when you said you would go over it

(15) with them, you actually went through some of the pages

(16) and --

(17)    **A.** What they were signing, yes.

(18)    **Q.** What they signed.

(19)    **A.** Either myself or my clerk.

(20)    **Q.** I see. Do you have an independent

(21) recollection of doing something like that with

(22) Mr. Renaldo Navarro?

(23)    **A.** No, I can't say that I do. I didn't do a lot

(24) of them. My clerk did a lot of them, most of them.

(25)    **Q.** In July or August of 2018, who was your clerk?

**Page 17**

(1)   **A.** I believe it was Loretta Katoa.

(2)   **Q.** We're going to need a spelling for the last

(3) name.

(4)   **A.** K-a-t-o-a.

(5)   **Q.** Was there another clerk or was it just

(6) Loretta?

(7)   **A.** No, I had Loretta and I had another clerk, her

(8) name was Precious.

(9)   **Q.** Do you remember her last name?

(10)   **A.** Sagaga.

(11)   **Q.** Do you know the spelling of that?

(12)   **A.** I believe it's S-a-g-a-g-a.

(13)   **Q.** What is your understanding as to why Menzies

(14) terminated Mr. Navarro?

(15)   **A.** For harassment.

(16)   **Q.** And as you know, harassment is a bit of a term

(17) of art in employment circles. So what type of

(18) harassment are we talking about? When you say

(19) harassment in this circumstance, what kind of

(20) harassment?

(21)   **A.** Unprofessional conduct, forcing employees

(22) to -- pressuring employees.

(23)   **Q.** Pressuring employees to sign the petition, is

(24) that what you mean?

(25)   **A.** Yes.

**Page 18**

(1)   **Q.** Any other reason?

(2)   **A.** No.

(3)   **Q.** Is it your understanding that -- is it your

(4) understanding that somehow in the code of conduct

(5) there's something there that addresses the concern that

(6) you're not supposed to force employees to sign a

(7) petition?

(8)   **A.** Yes.

(9)   **Q.** And do you remember seeing something like that

(10) in the code of conduct?

(11)   **A.** Yes.

(12)   **MR. URIARTE:** So, David, can we get Exhibit 13,

(13) please.

(14)     (Plaintiff's Exhibit 13 marked for

(15)     identification.)

(16)   **ZOOM HOST:** I sent a Chat to Tracy, and she should

(17) be able to open that link, and she has a laptop, so she

(18) can see the whole document.

(19)   **MR. URIARTE:** Okay. Very good. So you're not

(20) going to open it over here or --

(21)   **ZOOM HOST:** If you like, I can do that. It's up

(22) to you.

(23)   **MR. URIARTE:** Yeah, can we do that?

(24)   **ZOOM HOST:** Okay. Sure. Coming back up.

(25)   **MR. URIARTE:** I think Jason and I are kind of used

**Page 19**

(1) to that by now. Okay.

(2)   **Q.** So, Ms. Aguilera, I think what my

(3) understanding is that you -- in your laptop you also

(4) have a copy of Exhibit 13, but on your screen right now

(5) what is showing is also Exhibit 13. So if you could

(6) just let me know what part of the code of conduct I can

(7) look at with regard to forcing employees to sign the

(8) petition.

(9)   **A.** I'm having trouble seeing your -- I'll look at

(10) my handbook. It would fall under "Gross Misconduct."

(11)   **Q.** Okay. Can you give me a page number?

(12)   **A.** Page 15.

(13)   **Q.** Is that the handbook or the code of conduct?

(14)   **A.** I'm looking under the code of conduct in the

(15) handbook.

(16)   **Q.** Okay. You said gross -- I'm sorry.

(17)   **A.** It's under Section 4, "Performance Standards,"

(18) 4.1, "Code of Conduct."

(19)   **Q.** All right. Are we looking at the same

(20) document when you see the document on your screen now?

(21) Because we don't have Roman numerals on our copies that

(22) were produced by your attorneys. I guess that's all we

(23) have for the code of conduct.

(24)     Are you looking at a different document,

(25) Ms. Aguilera?

**Page 20**

(1)   **A.** I've just opened up the company handbook so I

(2) could see it better.

(3)   **Q.** I see. And you're saying in the company

(4) handbook you see it as where?

(5)   **A.** On page 15. "Performance Standards," "Code of

(6) Conduct, "Gross misconduct while on company property or

(7) while conducting company business, including attempting

(8) bodily injury, fighting or threatening violence,

(9) boisterous or disruptive activity that interferes with

(10) your job duties, others' job duties or passenger

(11) service."

(12)   **Q.** And can you tell me maybe at the bottom of the

(13) page what it says as to the date of that document?

(14)   **A.** Menzies Aviation 2017.

(15)   **MR. URIARTE:** I see. So maybe, Jason, is there a

(16) way, like if we take a break later on, for us to get a

(17) copy of what Ms. Aguilera is referring to?

(18)   **MR. WU:** Yeah, we can talk about that when we go

(19) off the record.

(20)   **MR. URIARTE:** Sounds good. I'll put that aside.

(21)   **Q.** And you said page 15, Section 4, right?

(22)   **A.** Yes.

(23)   **ZOOM HOST:** Arlo, I think I found it on the

(24) employee handbook, if you want me to bring that up

(25) or --

**Page 21**

(1)    **MR. URIARTE:** Yes, please.

(2)    **ZOOM HOST:** Hold on.

(3)    **MR. URIARTE:** Exhibit 14.

(4)    **ZOOM HOST:** Correct. Let me bring that up.

(5)    **MR. URIARTE:** Thank you.

(6)      (Plaintiff's Exhibit 14 marked for

(7)      identification.)

(8)    **MR. URIARTE:** David, I don't think it's there

(9) because I think we're looking for "Gross Misconduct" as

(10) a header.

(11)    **THE WITNESS:** It's under Section 4, "Performance

(12) Standards," and then 4.1, "Code of Conduct, and then in

(13) that body at the bottom there's "Gross Misconduct."

(14)    **MR. URIARTE: Q.** Okay. Let me take a look at

(15) 4.1. We only have copies of whatever your attorneys

(16) provided us.

(17)    **MR. WU:** Arlo, I'm looking at this right now.

(18)    **MR. URIARTE:** Yes.

(19)    **MR. WU:** If you look very closely at the bottom of

(20) each page, it looks like, for whatever reason, only the

(21) odd numbered pages got copied.

(22)    **MR. URIARTE:** Oh, I see what you mean.

(23)    **MR. WU:** 1, 3, 5, 7.

(24)    **MR. URIARTE:** Yeah, yeah. Okay. I'll fix that up

(25) during a break. Let's just go to the next topic. Very

**Page 22**

(1) good. Thank you for that. It looks like that's

(2) exactly what happened.

(3)    **Q.** So then I think, Ms. Aguilera, you were the

(4) one who put together the termination paperwork, the

(5) notice of change in status of the employee?

(6)    **A.** Yes.

(7)    **Q.** And then you were the one who put the words

(8) "Code of Conduct" in that form, is that correct?

(9)    **A.** Yes.

(10)    **Q.** And so when you said -- when you put those

(11) words "Code of Conduct," that's what you were referring

(12) to?

(13)    **A.** Yes.

(14)    **MR. URIARTE:** Give me a second.

(15)      (Discussion off the record.)

(16)    **MR. URIARTE: Q.** Okay. Was that something --

(17) with regards to the code of conduct in August of 2018,

(18) how are we going to figure out whether that policy had

(19) been communicated to the employees at that point?

(20)    **A.** At that point, all employees should have had a

(21) copy of the handbook.

(22)    **Q.** So that would have been like almost a year,

(23) maybe a year into Menzies entering SFO fuelers, right?

(24)    **A.** I can't give you an exact date.

(25)    **Q.** So you're saying that at that point, your

**Page 23**

(1) memory is that they had the handbook at that point

(2) already, is that correct?

(3)    **A.** Yes.

(4)    **Q.** And who would know for certain whether that's

(5) true or not?

(6)    **A.** The documents should be in the files.

(7)    **Q.** Yeah, well, I guess what I can represent to

(8) you is that -- and I should show you that -- let's look

(9) at Exhibit 15, please.

(10)      (Plaintiff's Exhibit 15 marked for

(11)      identification.)

(12)    **MR. URIARTE: Q.** So here is one of those

(13) documents that lists the signature. If we look below,

(14) it's got a blank, no employee name, no employee

(15) signature. This was produced to us by your attorneys.

(16)    And so I have yet -- I mean, I guess, if you

(17) get back to your office and you see some sort of

(18) acknowledgment form that has Mr. Navarro's signature on

(19) it, I think that would be helpful, but we have yet to

(20) see that.

(21)    Okay, Ms. Aguilera? Did you understand my

(22) request?

(23)    **A.** Yes.

(24)    **Q.** All right. How did you first find out that

(25) there was a petition circulating about Andrew Dodge?

**Page 24**

(1)    **A.** The union notified me.

(2)    **Q.** And how did they notify you?

(3)    **A.** They called me. It wasn't "they." Charles

(4) called me, the man named Charles that worked in the

(5) union office.

(6)    **Q.** And what did Charles say to you?

(7)    **A.** He said, "Tracy, are you aware that there's a

(8) petition being circulated? Our members -- several

(9) members have called and complained that they were being

(10) forced to sign a petition."

(11)    **Q.** Okay. And then anything else that Charles

(12) said to you?

(13)    **A.** No.

(14)    **Q.** And so, in response to that, what did you do?

(15)    **A.** Well, I asked him if he had a copy of the

(16) petition and who was being forced, but he never got

(17) back to me on that. With that being said, I made

(18) contact with the acting general manager at the time,

(19) and his name was Renil Lal, and I told him that I

(20) received the call from the union.

(21)    **Q.** Okay. And did Renil get you a copy of the

(22) petition?

(23)    **A.** Not right away. I don't believe -- no, he did

(24) not.

(25)    **Q.** Do you know how long before you actually got a

DEPOSITION OF TRACY AGUILERA - 08/25/2020
RENALDO NAVARRO vs. MENZIES AVIATION, INC.

BSA    Case 3:19-cv-08157-VC   Document 46-8   Filed 12/11/20   Page 9 of 17    XMAX(7/7)

**Page 25**

(1) copy of it?

(2)     **A.** I got it -- actually, I got it from Raul

(3) Vargas. I'd seen it.

(4)     **Q.** I see. Okay. And did you read the petition

(5) itself?

(6)     **A.** I've seen the names on there, yes, but I

(7) didn't go through each one. I'm sorry.

(8)     **Q.** What about the topic that the petition was

(9) talking about, did you read that part?

(10)     **A.** No, I -- I gave everything to Kevin Blumberg

(11) to open up an investigation.

(12)     **Q.** And what was the investigation for?

(13)     **A.** Well, to find out what was going on.

(14)     **Q.** What do you mean, "to find out what was going

(15) on"?

(16)     **A.** With the petition, why it was being

(17) circulated.

(18)     **Q.** Okay. And then what was the conclusion of

(19) Kevin, the security person?

(20)     **A.** The conclusion?

(21)     **Q.** Yes.

(22)     **A.** It was that Rey Navarro was forcing employees

(23) to sign a petition to have Andrew Dodge removed.

(24)     **Q.** Okay. And that's what is contained in the

(25) email, right, is that what you're talking about, where

**Page 26**

(1) Mr. Blumberg actually sent an email to you with the

(2) result of his investigation?

(3)     **A.** Yes.

(4)     **Q.** Okay. So that's with regards to the inquiry

(5) as to Mr. Navarro's involvement in the petition itself,

(6) right? But what about the part of, like, what the

(7) fuelers were complaining about? Was that ever

(8) investigated?

(9)     **A.** I'm sorry, can you repeat that.

(10)     **Q.** Sure. What about the part, that section of

(11) the petition where the fuelers are asking for certain

(12) relief or what they're complaining about, right, in the

(13) petition, was that part of the petition ever

(14) investigated?

(15)     **A.** What part are you talking about?

(16)     **MR. URIARTE:** Okay. Let me show you. So let's

(17) bring up Exhibit 8.

(18)     (Plaintiff's Exhibit 8 marked for

(19)     identification.)

(20)     **MR. URIARTE: Q.** Can you see Exhibit 8,

(21) Ms. Aguilera?

(22)     **A.** Yes.

(23)     **Q.** Do you remember this to be the petition that

(24) we're talking about?

(25)     **A.** This is the one that I believe was given to

**Page 27**

(1) Raul Vargas.

(2)     **Q.** Okay. Let's scroll to page 2 just to make

(3) sure Ms. Aguilera sees the whole document. It's a

(4) three-page document.

(5)     And this is the one that has Renaldo Navarro's

(6) signature on line 16, as you see there. Do you see

(7) that, Ms. Aguilera?

(8)     **A.** Yes.

(9)     **Q.** Okay. And then it also has the signature of

(10) the other supervisor, July Macapagal. Do you see that?

(11)     **A.** Yes.

(12)     **Q.** Okay. So we've been calling this the first

(13) petition. So if we scroll back to page 1 -- and I

(14) understand that you've said that you asked the security

(15) department or Raul Vargas asked the security department

(16) to investigate the role of Mr. Navarro. I understand

(17) that part.

(18)     What I'm now distinguishing with you is with

(19) regards to the subject matter of this petition. And

(20) I'll let you read it, or if you want, I can read it for

(21) you.

(22)     Are you able to read it fine, Ms. Aguilera?

(23)     **A.** Yes, I know how to read, yes.

(24)     **Q.** Okay. So it says, "We the fuelers on Menzies

(25) 130 side would like to make a petition against Andrew

**Page 28**

(1) Dodge. The way he supervised is very unprofessional

(2) when he run the operation or supervised, people are not

(3) [taking] their breaks it's because the way he set up

(4) the flights" -- okay? -- "and he always blaming the

(5) people there's a delay or always saying lack of

(6) manpower and trucks issues."

(7)     Okay. So let's just stop there. That part of

(8) the petition, was that ever investigated?

(9)     **A.** The whole scenario was investigated by Kevin

(10) Blumberg.

(11)     **Q.** Aside from the email that contains some of

(12) Mr. Blumberg's conclusion, is there another document

(13) that addresses these concerns?

(14)     **A.** I don't have them.

(15)     **Q.** So if there is an investigation, it would be

(16) part of what Mr. Blumberg engaged in, correct? Is that

(17) correct?

(18)     **A.** Yes.

(19)     **Q.** Okay. Let's go on to the next one. "The

(20) truth is he doesn't know how to run the show, we also

(21) addressed the problem to the higher position managers

(22) (Nicco, John and Renil) as usual nothing happened,

(23) looks like they always covering his mistake or maybe

(24) these managers don't know anything about fueling also

(25) like Andrew Dodge lack of experience about fueling."

**Page 29**

(1)        Did you read this part of the petition? And
(2) pertaining to July, August of 2018, did you read this
(3) part of the petition?
(4)        A. I believe I did.
(5)        Q. And as an HR or human resources professional,
(6) when you read this part of the petition, does that put
(7) you in any type of concern?
(8)        A. Disciplinary action and -- disciplinary
(9) action -- let me back up here.
(10)        This was given to Raul. In HR I had no issues
(11) regarding Andrew's performance. This was given to Raul
(12) and we had Kevin Blumberg investigate it.
(13)        Q. Okay. Does the part about "looks like they
(14) are always covering his mistake," referring to Nicco,
(15) John and Renil, does that raise any red flags of
(16) concern for you as the HR manager?
(17)        A. No.
(18)        Q. You were around when Mr. Dodge was promoted to
(19) supervisor, correct?
(20)        A. I believe so.
(21)        Q. Meaning that he was a fueler for about a year,
(22) then he received a promotion as a supervisor, is that
(23) correct?
(24)        A. Yes.
(25)        Q. And for that promotion, were there other

**Page 30**

(1) people vying for that promotion?
(2)        A. I don't know. I don't remember.
(3)        Q. Given that Mr. Dodge had only one year of
(4) experience, do you remember any of the old-timers,
(5) old-timer fuelers, also wanting to be a supervisor?
(6) Does that refresh your recollection at all?
(7)        A. Can you repeat the question.
(8)        Q. Sure. Mr. Dodge received a promotion to
(9) supervisor after only one year of being a fueler. At
(10) that point there were many fuelers who had worked there
(11) as fuelers for many, many years who also wanted to be a
(12) supervisor. Do you remember any of those --
(13)        A. No, we post the position, they would apply for
(14) the position, they would be reviewed by the manager,
(15) and the person best qualified for the position would be
(16) granted the promotion.
(17)        Q. And for fueling supervisor, who would be the
(18) manager that decides that?
(19)        A. It would have been the -- between the general
(20) manager and the director.
(21)        Q. So it would have been Renil and John Qually or
(22) Renil and the operations manager?
(23)        A. It would have been Renil.
(24)        Q. It would have been Renil.
(25)        A. Uh-huh.

**Page 31**

(1)        Q. And do you know where Renil is today?
(2)        A. I don't -- I know he's at the airport. I
(3) don't know where he works.
(4)        Q. Would you agree that when fuelers have an
(5) issue, they're supposed to bring their issue up to a
(6) supervisor, that's the way the chain of command works?
(7)        A. Usually, yes.
(8)        Q. And then supervisors, as part of their duties,
(9) job responsibilities, they're supposed to try to work
(10) with these issues and try to bring that up to upper
(11) management if they can't resolve it, isn't that right?
(12)        A. Yes.
(13)        MR. URIARTE: I think we're going to need to take
(14) a five-minute break, Jason. Can we get off the record,
(15) please, Cindy.
(16)        THE REPORTER: Yes.
(17)        MR. URIARTE: Thank you.
(18)        (Brief recess.)
(19)        MR. URIARTE: Let's get back on the record. All
(20) right. So why don't we take a look at Exhibit 12.
(21)        (Plaintiff's Exhibit 12 marked for
(22)        identification.)
(23)        MR. URIARTE: Q. The first one I wanted to -- I
(24) guess we can stay here. Ms. Aguilera, do you see the
(25) section of the August 29, 2018, 5:01 p.m. email from

**Page 32**

(1) Raul Vargas? And really what I first want to put my
(2) attention to -- or put your attention to, it says,
(3) "Could you also open an investigation for July" --
(4) which should be Macapagal. Do you see that,
(5) Ms. Aguilera?
(6)        MR. WU: Tracy, I think you are on mute.
(7)        THE WITNESS: I'm sorry. To answer your question,
(8) yes, I see it.
(9)        MR. WU: Thank you.
(10)        MR. URIARTE: Q. Was an investigation ever opened
(11) for July Macapagal?
(12)        A. It was turned over to Kevin Blumberg.
(13)        Q. Was there any result of that investigation
(14) that was put on paper?
(15)        A. Not that I've seen, no.
(16)        Q. Did Mr. Blumberg let you know the result of
(17) that investigation?
(18)        A. No.
(19)        Q. And then let's go down on the second page.
(20) Here is the email from Mr. Blumberg. And I just want
(21) to make sure, when we were talking about the results of
(22) the investigation of Mr. Blumberg, are we talking about
(23) this email here, August 29, 2018 at 3:58 p.m.?
(24)        A. I see it, yes.
(25)        Q. So aside from this, there's no other written

**Page 33**

(1) document that writes or has further conclusions
(2) regarding his investigation?  Ms. Aguilera?
(3)     A.  No, I don't have a copy of it.
(4)     Q.  Okay.  I guess my question is more -- when we
(5) see Mr. Blumberg's product or result of his
(6) investigation into the petition, this is what we're
(7) looking at right here, the email that he wrote to you
(8) with his conclusions, is that correct?
(9)     A.  This says a statement, yes.
(10)     Q.  Aside from this statement, is there any other
(11) written document?
(12)     A.  Not that I have.
(13)     Q.  And here his conclusion really is
(14) "unprofessional behavior by a supervisor."  Do you see
(15) that?
(16)     A.  Yes, I see it.
(17)     Q.  Just taking that kind of like in its
(18) isolation, "unprofessional behavior by a supervisor,"
(19) would that result in a termination?  Is that something
(20) that would normally result in a termination?
(21)     A.  It depends on the caliber of the -- what he's
(22) done.
(23)     Q.  And your recommendation actually was not to
(24) terminate, correct?
(25)     A.  Myself and our directors, yes -- my director,

**Page 34**

(1) yes.  Talin.
(2)     Q.  Correct.  So Talin and yourself had a
(3) discussion, and your recommendation to Mr. Vargas was
(4) not to terminate but instead issue a final warning, is
(5) that correct?
(6)     A.  It was not to terminate, yes.
(7)     Q.  Did you recommend the final warning to
(8) Mr. Vargas?
(9)     A.  I was going to.  Oh, to Mr. Vargas, no.  Let
(10) me back up, I'm sorry.
(11)     Q.  Go ahead.
(12)     A.  Yes, I did write up the document, but it
(13) was -- and my recommendation was made.
(14)     Q.  Did you actually send that document to
(15) Mr. Vargas?
(16)     A.  I don't believe so.
(17)     Q.  Now, was there ever a discussion between you
(18) and Mr. Vargas about, hey, there's an option here of
(19) issuing a final warning; was that discussion made?
(20)     A.  No.  I gave my recommendation.
(21)     Q.  So you gave your recommendation of not
(22) terminating, but you didn't communicate an option to
(23) Mr. Vargas.  Is that an accurate way of characterizing
(24) it?
(25)     A.  Not via email.  After I made my

**Page 35**

(1) recommendation, and he came up to my office and we
(2) discussed it, and that's when Kevin came up and said --
(3) and gave me the details of the investigation.
(4)     Q.  And so Raul Vargas went to your office, you
(5) had a discussion about it, and in that discussion the
(6) final warning option was discussed?
(7)     A.  He asked me why I came to that conclusion of
(8) not to terminate, and I told him based on Renaldo's
(9) tenure and what was in his personnel file.
(10)     Q.  Okay.  And what's your opinion as to why
(11) Mr. Vargas did not follow that recommendation?
(12)     A.  After speaking with Mr. Vargas and Kevin in my
(13) office and them going into detail about harassment, my
(14) opinion changed, and I reviewed it with my director,
(15) and we were in agreement to terminate him.
(16)     Q.  And then I guess I understand all of that.
(17) But I think the only kind of unclear portion of that is
(18) the -- and maybe let's pull it up.
(19)     MR. URIARTE:  If we could pull up Exhibit 11.  I
(20) wanted to kind of focus on the issue of the issuance of
(21) the final warning and what Mr. Vargas knew about that.
(22)     (Plaintiff's Exhibit 11 marked for
(23)     identification.)
(24)     MR. URIARTE:  Q.  And issuance is not the right
(25) word, right?  You drafted a document of final warning.

**Page 36**

(1)     A.  I lost you.
(2)     Q.  Here we go.  Do you see the final warning
(3) there, Ms. Aguilera?
(4)     A.  There it is.  Yes, I do.
(5)     Q.  So I want to kind of get into the
(6) circumstances of -- so you wrote this up as an option,
(7) right?  Do you see that, "Today's date:  August 29"?
(8) Did you ever show this to Mr. Vargas?
(9)     A.  I can't say that I showed this to him.
(10)     Q.  Did you discuss it as an option with him?
(11)     A.  I can't remember word for word that was said
(12) in the meeting.
(13)     Q.  But I guess my question is do you remember
(14) any -- do you have any memory as to a discussion about
(15) a final warning being an option?
(16)     A.  There could have been.  I can't tell -- I
(17) can't give you the details.
(18)     Q.  All right.  Then let's go back to Exhibit 12,
(19) please.  With regards to Mr. Blumberg's investigation,
(20) did you find out whether or not Mr. Blumberg spoke to
(21) Mr. Navarro?
(22)     A.  I don't know the details.
(23)     Q.  Do you know if Mr. Blumberg spoke to the
(24) fuelers that signed the petition?
(25)     A.  I don't know the details.

**Page 37**

(1)  MR. URIARTE:  All right.  Let's go to the last, I
(2)  guess -- if we can go to Menzies 200, which is on the
(3)  bottom, David, a little bit more, like two pages down.
(4)  All right.  Go up a little bit, please.  Let's see the
(5)  date stamp.  There we go.
(6)  Q.  So, Ms. Aguilera, this string of emails, did
(7)  you provide this to your attorney?  Is this something
(8)  you printed out and provided to your attorney?
(9)  A.  I sent this to my manager.  I sent it to
(10)  Talin.
(11)  Q.  Gotcha.  All right.  So you see here it says,
(12)  "On August 27, 2018, at 5:11 PM Tracy Aguilera wrote."
(13)  Do you see that?
(14)  A.  Yes.
(15)  Q.  And then it says "Talin," and then it has
(16)  different points.  Do you see that?
(17)  A.  Yes.
(18)  Q.  Okay.  And then if we go down a little bit --
(19)  a little bit down, please, David -- here's the question
(20)  I have.  It says, "Now today, 10/27/2018 Raul Vargas
(21)  receives the same petition from Rafael Martinez, no
(22)  signature just wanting Andrew removed - I did not
(23)  attach it to this email."
(24)     Do you see that?
(25)  A.  Yes, I do, and that's a typo with the date.

**Page 38**

(1)  Q.  That's a typo with the date?
(2)  A.  Yeah, it shouldn't have been October.
(3)  Q.  Okay.  So it should have been October 27,
(4)  2018?
(5)  A.  No, I believe --
(6)  Q.  I mean -- yeah.
(7)  A.  I believe it should have been August 27th.
(8)  Q.  Okay.  So you believe that to be a typo?
(9)  A.  I believe so.
(10)  Q.  All right.  So are you saying that two days
(11)  before Mr. Navarro was terminated, Mr. Rafael Martinez
(12)  also gave Raul Vargas a petition asking Andrew to be
(13)  removed?
(14)  A.  Yes.
(15)  Q.  With regards to the suspension on August 20,
(16)  who recommended and approved the suspension?
(17)  A.  Raul Vargas and Kevin Blumberg.
(18)  Q.  Before the issue with the petition, did you
(19)  receive any complaints or did you hear about complaints
(20)  from fuelers against Andrew Dodge?
(21)  A.  Only from Rey.
(22)  Q.  Did you see the pictures that were circulating
(23)  of Mr. Andrew Dodge sleeping on the job?  Was that
(24)  something that you saw?
(25)  A.  Yes, I did see one.

**Page 39**

(1)  Q.  And that was before the petition, correct?
(2)  A.  Yes.
(3)  Q.  And Rey complaining about Andrew Dodge,
(4)  wouldn't you say that that could have been part of his
(5)  duties as a supervisor?
(6)  A.  Yes.
(7)  Q.  Aside from Rey, you did not hear from fuelers
(8)  complaining about Andrew Dodge?
(9)  A.  No.
(10)  Q.  At that time, in July or August of 2018, aside
(11)  from Mr. Dodge, was there any other white supervisor
(12)  working for the fueling department?
(13)  A.  I -- I really don't know.  I can't -- I don't
(14)  know.
(15)  Q.  It could be that Mr. Dodge was the only white
(16)  supervisor?
(17)  A.  Could be.
(18)  Q.  Did you ever have a discussion with Renil with
(19)  regards to Rey Navarro's complaints against Andrew
(20)  Dodge?
(21)  A.  Yes.
(22)  Q.  And how many times do you think Renaldo
(23)  Navarro complained to Renil about Andrew Dodge?  Do you
(24)  remember any of that?
(25)  A.  No.

**Page 40**

(1)  Q.  Was it more than two times?
(2)  A.  Possibly.
(3)  Q.  Less than five and more than two, maybe?
(4)  A.  Possibly.
(5)  Q.  And with regards to -- and this happened
(6)  before the petition, correct?
(7)  A.  Him showing me the picture, yes.
(8)  Q.  And then did you see the video, the kind of
(9)  comical video that the fuelers made?
(10)  A.  No.
(11)  Q.  What about Renil and you discussing complaints
(12)  against Andrew Dodge, how many times did you guys
(13)  discuss that?
(14)  A.  I spoke to Renil a couple of times and told
(15)  him Rey's concerns.
(16)  Q.  Okay.  And what did Renil say?
(17)  A.  He would check into it.
(18)  Q.  Any result from it or any kind of follow-up
(19)  from it from Renil?
(20)  A.  No, he said he would -- well, he told me that
(21)  he would talk to Andrew, and that's it.  Rey didn't
(22)  come in and make formal complaints.  He would just --
(23)  he showed me the picture and the picture was Andrew
(24)  Dodge sitting in his car outside after -- sleeping in
(25)  his truck after he was off work.

**Page 41**

(1)  Q.  Wasn't there another picture where he was kind
(2)  of like in a Menzies vehicle as well?
(3)  A.  That's the one I'm talking about.  He was in
(4)  the Menzies truck sitting outside.
(5)  Q.  And do you remember any kind of concern about
(6)  Andrew Dodge like causing delays to flights?  Was that
(7)  something that was discussed?
(8)  A.  No, it wasn't discussed with me.
(9)  Q.  What about Andrew Dodge causing fuelers to
(10)  miss breaks?
(11)  A.  No.
(12)  Q.  Did Andrew Dodge ever get some sort of
(13)  reprimand as a result of the petition?
(14)  A.  No.
(15)  Q.  Sitting here today, do you remember if any
(16)  kind of reprimand was ever issued -- has been issued to
(17)  Andrew Dodge?
(18)  A.  No.
(19)  MR. URIARTE:  Can we have Exhibit 19, please,
(20)  David.
(21)  (Plaintiff's Exhibit 19 marked for
(22)  identification.)
(23)  MR. URIARTE:  Q.  So Exhibit 19 starts with a
(24)  statement by Mr. Rafael Vasquez.  Do you see the
(25)  document, Ms. Aguilera?

**Page 42**

(1)  A.  Yes.
(2)  Q.  It says that, quote, "On September 6th, 2018"
(3)  -- it's about nine days after the termination of
(4)  Mr. Navarro -- "I was asked by Menzies fuelers to write
(5)  a Petition on behalf of the Fuelers on 130 side vs.
(6)  Andrew Dodge.  The petition was written out and signed
(7)  by the Fuelers" and then turned over to the union.  In
(8)  addition, it was also given to Raul Vargas.
(9)  Were you made aware of this particular
(10)  petition?
(11)  A.  After it was given to Raul Vargas and given to
(12)  Kevin Blumberg.
(13)  Q.  So, and just to make sure we're speaking of
(14)  the same thing, so there was a first petition, and this
(15)  seems to be the second petition.  And this is a
(16)  separate petition, you understand that?
(17)  A.  Yes.
(18)  Q.  What came out of this second petition, if
(19)  anything?
(20)  A.  Nothing on the HR side.  There was no union
(21)  grievance, there was no complaint by the union except
(22)  for the original phone call I received.
(23)  Q.  And so you said it was given to Mr. Blumberg.
(24)  Was an investigation actually done because of this
(25)  second petition?

**Page 43**

(1)  A.  If I'm not mistaken, this is for the same
(2)  issue.
(3)  Q.  So no additional investigation was done?
(4)  A.  Not to my knowledge.
(5)  MR. URIARTE:  Now, let's go to Exhibit 17, please.
(6)  (Plaintiff's Exhibit 17 marked for
(7)  identification.)
(8)  MR. URIARTE:  Q.  Okay.  You see Exhibit 17, I
(9)  believe it's Employee Performance Development and Steps
(10)  to Progressive Discipline.
(11)  If you could go down a little bit, David, that
(12)  would be better.
(13)  This is a reverse pyramid here.  And you're
(14)  familiar with this, Ms. Aguilera?
(15)  A.  Yes, I am.
(16)  Q.  My question here really is how come
(17)  progressive discipline was not instituted?
(18)  A.  Harassment has zero tolerance.
(19)  Q.  And was it discussed as an option?
(20)  A.  I'm sorry?
(21)  Q.  Was it discussed as an option?
(22)  A.  Progressive discipline for harassment?
(23)  Q.  Yes.
(24)  A.  No.
(25)  Q.  Is that written somewhere where harassment,

**Page 44**

(1)  the type Mr. Navarro was accused of, has zero
(2)  tolerance?
(3)  A.  Any type of harassment.
(4)  Q.  If we go back to Exhibit 19, at the bottom
(5)  here it says, "I have spoken to Menzies Aviation
(6)  Fueling Director Raul Vargas on three separate
(7)  occasions regarding Andrew Dodge, who [continues] to
(8)  abuse his authority and at times harass Fuelers under
(9)  his charge."
(10)  Was that type of harassment investigated?
(11)  A.  I can't tell you -- I didn't see the
(12)  investigation, but this was turned over to Kevin
(13)  Blumberg.
(14)  MR. URIARTE:  Okay.  Aside from the employee
(15)  handbook, Jason, I have no further questions.
(16)  MR. WU:  Arlo, can we go off the record for a
(17)  second?
(18)  MR. URIARTE:  Sure.
(19)  (Brief recess.)
(20)  (Plaintiff's Exhibit 20 marked for
(21)  identification.)
(22)  MR. WU:  Can we go back on the record now?
(23)  THE REPORTER:  Yes.
(24)  MR. WU:  Earlier in the deposition, Mr. Uriarte
(25)  asked Ms. Aguilera about a document that was described

DEPOSITION OF TRACY AGUILERA - 08/25/2020

BSA    Case 3:19-cv-08157-VC  RENALDO NAVARRO v. MENZIES AVIATION, INC.   Document 48  Filed 01/18/20   Page 14 of 17    XMAX(12/12)

**Page 45**

(1) as the Menzies employee handbook. That document was
(2) marked as Exhibit 14. It appears on its face that the
(3) document seems to have been missing some pages. So in
(4) the meantime, we have been able to locate what appears
(5) to be a complete version of that document, at least
(6) that was saved on our Foley system.
(7)      We haven't had a chance to confer with the
(8) client about whether it's a true and accurate copy of
(9) the employee handbook. We haven't been able to confer
(10) with our client about whether it's an accurate or
(11) authentic copy of the handbook or whether it would be
(12) responsive to any of the discovery requests that have
(13) been propounded in this case thus far.
(14)      That said, we did send a copy of that document
(15) to Mr. Uriarte as well as to the vendor handling this
(16) deposition just so that it can be used as an exhibit
(17) and for that sole purpose. That isn't a formal
(18) production, and it isn't subject to any objections
(19) that are stated in our original discovery responses.
(20)      And Mr. Uriarte is, of course, welcome to try
(21) and lay foundation for that document himself through
(22) this witness if he can.
(23)    **MR. URIARTE:** Okay. Great. Thank you, Jason.
(24)    **Q.** Ms. Aguilera, I think the first thing -- and,
(25) Jason, maybe you can help us with this -- the bottom of

**Page 46**

(1) this document has some dates on the bottom right side.
(2) The screen -- there you go. So here we have a Menzies
(3) Aviation 2018 version, and I believe the witness
(4) earlier said she was looking at a 2017 version. But
(5) let's just go through the section itself to see if
(6) maybe they are identical anyway.
(7)      So, Ms. Aguilera, could you just remind us --
(8) so the question area was concerning what part of the
(9) code of conduct did you use in order to indicate a
(10) violation that Mr. Navarro was terminated for, and then
(11) you identified the section as Section 4.1, which is
(12) found in the employee handbook. Is that correct,
(13) Ms. Aguilera?
(14)    **A.** Correct.
(15)    **Q.** Okay. And so I just want to make a
(16) distinction. So when you say -- when you say "code of
(17) conduct," not that it's a code of conduct separate
(18) handout as part of the handbook, but code of conduct,
(19) Section 4.1 of performance standards in the employment
(20) handbook, correct?
(21)    **A.** Yes.
(22)    **Q.** Okay. And then could you just take a look at
(23) Section 4.1 just to make sure that your -- because you
(24) were reading from a 2017 version. Can we at least
(25) establish whether the version you were reading or

**Page 47**

(1) reviewing is the same as what we have now which is a
(2) 2018 version.
(3)    **A.** Yes.
(4)    **Q.** Do you believe them to be the same?
(5)    **A.** Yes.
(6)    **Q.** Okay. And then could you just point to us
(7) where you were reading from earlier.
(8)    **A.** Can you go down some more? Let's see. I
(9) can't get it to go down, I don't know why.
(10)    **Q.** I think --
(11)    **A.** Where it says, "Gross misconduct while on
(12) Company property."
(13)    **Q.** Gotcha. So there's a bullet point that says,
(14) "Gross misconduct while on Company property or while
(15) conducting Company business, including: attempting
(16) bodily injury, fighting or threatening violence,
(17) boisterous or disruptive activity that interferes with
(18) your job duties, other's job duties, or passenger
(19) service." Is that the section?
(20)    **A.** Correct.
(21)    **Q.** So, again, when you wrote "code of conduct" in
(22) the termination documents, that's what you were
(23) referring to, is that correct?
(24)    **A.** Correct.
(25)    **Q.** And so let's just pull up Exhibit 9 just to be

**Page 48**

(1) on the sure side here.
(2)      (Plaintiff's Exhibit 9 marked for
(3)      Identification.)
(4)    **MR. URIARTE: Q.** Here we have Exhibit 9 which on
(5) the bottom of the page has your signature. Let me just
(6) have you identify that. Is that your signature,
(7) Ms. Aguilera?
(8)    **A.** Yes.
(9)    **Q.** And this is a document that you gave to Mr.
(10) Navarro?
(11)    **A.** Yes.
(12)    **Q.** And, again, here's where it says, "Comments:
(13) Code of Conduct." And that's the reason for his
(14) termination, correct?
(15)    **A.** Correct.
(16)    **MR. URIARTE:** So I've got no further questions,
(17) Jason.
(18)    **MR. WU:** Okay. Just a few questions from my end.
(19)      David, could we please pull up Exhibit 8.
(20)    **ZOOM HOST:** Give me one second. I need to close
(21) some of the tabs. One moment.
(22)      EXAMINATION BY MR. WU
(23)    **MR. WU: Q.** Okay, Ms. Aguilera, do you remember
(24) looking at this document earlier while Mr. Uriarte was
(25) asking you questions about this?

DEPOSITION OF TRACY AGUILERA - 08/25/2020

BSA  Case 3:19-cv-08157-VC RENALDO NAVARRO v. MENZIES AVIATION, INC. Document 48-9 Filed 11/18/20  Page 15 of 17  XMAX(13/13)

**Page 49**

(1)  **A.** Yes.

(2)  **Q.** And do you remember Mr. Uriarte asking you

(3) about the sentence that begins in the middle of that

(4) first paragraph, "The truth is he doesn't know how to

(5) run the show, we also addressed the problem to the

(6) higher position managers (Nicco, John and Renil) as

(7) usual nothing happened, looks like they always covering

(8) his mistake or maybe these managers don't know anything

(9) about fueling also like Andrew Dodge lack of experience

(10) about fueling."

(11)      Do you remember Mr. Uriarte reading that

(12) sentence to you?

(13)  **A.** Yes.

(14)  **Q.** Earlier I believe he asked you whether that

(15) sentence raised any red flags or concerns for you, and

(16) I believe your response was no. Do you remember

(17) testifying to that?

(18)  **A.** Yes.

(19)  **Q.** Why does that sentence not raise red flags or

(20) concerns for you?

(21)  **A.** Because the managers, in the positions they're

(22) in, they do know how to run an operation. Andrew, I've

(23) had no complaints about his work performance. And

(24) they've all been trained in fueling.

(25)  **Q.** And Mr. Uriarte also asked you some questions

**Page 50**

(1) later on about the extent to which you had discussions

(2) regarding Andrew Dodge's work performance. If there

(3) were issues with Andrew Dodge's work performance, would

(4) those typically be brought to your attention or to

(5) someone else's attention?

(6)  **A.** Usually it would go to the manager, if there

(7) were issues, it would go to -- it's a protocol. It

(8) would go to the supervisor, the supervisor would go to

(9) the general manager, the general manager would go to

(10) the director.

(11)      Usually if there's -- I usually get involved

(12) if it comes down to a final warning or a suspension

(13) pending termination.

(14)  **Q.** Okay. But in terms of everyday work

(15) performance, that's something that you're not usually

(16) involved with?

(17)  **A.** No.

(18)  **MR. WU:** David, we can take off Exhibit 8. Thank

(19) you.

(20)  **Q.** Mr. Uriarte also asked you about some pictures

(21) of Andrew Dodge that you had seen.

(22)  **A.** Yes.

(23)  **Q.** I think I lost count. How many photos have

(24) you seen?

(25)  **A.** One or two. I believe I can really remember

**Page 51**

(1) one.

(2)  **Q.** And in that -- I'm sorry, I didn't mean to

(3) interrupt.

(4)  **A.** Possibly two. I'm trying to think. There was

(5) one sitting -- oh, there was one sitting in the truck,

(6) but he was off duty. And he had a habit of just

(7) sitting in his truck after he got off work, and he

(8) would sleep in front of the parking lot in his truck,

(9) take a quick nap.

(10)      And I know he'd be off work because I come to

(11) work at 8:30, and he'd get off work -- I think his

(12) schedule ended, like, 6:00 or 7:00. But I would go up

(13) and sometimes I'd knock on the window and say, "Are you

(14) okay?"

(15)      "Oh, yeah, I'm just taking a nap before I

(16) drive home."

(17)      "Okay." So I knew he was off the clock.

(18)  **Q.** Okay. And do you remember anything about the

(19) other photo that you might have seen?

(20)  **A.** I believe I seen one of him sitting in the

(21) supervisor chair, but, again, he was off duty.

(22)  **Q.** And how were you able -- I'm sorry, I didn't

(23) mean to interrupt.

(24)  **A.** I was going to say I knew he was off duty

(25) because his shift ended at, again, 6:00 or 7:00. I

**Page 52**

(1) come in at 8:30. And it was -- like the picture

(2) outside, it was, you know, after 8:30, it was light

(3) out, and I actually seen him. But the one in the

(4) office I only know because, you know, even Rey would

(5) say, "This is what I took this morning," and Rey would

(6) come in later.

(7)  **Q.** Okay. So just to make sure I understood that

(8) all correctly, the photo where Andrew was sleeping in

(9) his truck, you could tell he was off duty because there

(10) was light out in the photo?

(11)  **A.** Yes, it was light, because I come in at 8:30

(12) in the morning, and he's off work by then.

(13)  **Q.** And the second photo with Andrew sleeping in

(14) the supervisor's office, you knew that he was off duty

(15) because Rey mentioned that it was a photo he took in

(16) the morning?

(17)  **A.** Yeah, exactly, yes.

(18)  **Q.** And Andrew would be off duty in the morning?

(19)  **A.** Yes, because he worked graveyard.

(20)  **Q.** Do you remember Mr. Uriarte asking you whether

(21) Mr. Navarro complaining about any issues with Andrew

(22) Dodge would be part of Mr. Navarro's duties as a

(23) supervisor?

(24)  **A.** Yes.

(25)  **Q.** And do you remember answering yes to that

**Page 53**

(1) question?

(2)    **A.** Yes.

(3)    **Q.** Okay. Would it be part of Mr. Navarro's

(4) duties as a supervisor to pressure or coerce

(5) lower-level employees into signing a petition against a

(6) fellow supervisor?

(7)    **A.** No, that's not part of his duties.

(8)    **MR. WU:** I think that's all the questions on my

(9) end.

(10)    **MR. URIARTE:** Okay.

(11)    FURTHER EXAMINATION BY MR. URIARTE

(12)    **MR. URIARTE: Q.** Ms. Aguilera, you make a point

(13) of saying that Mr. Dodge was off duty. If Mr. Dodge

(14) was not off duty and was actually on duty sleeping,

(15) that would be a problem?

(16)    **A.** Yes, it would be a problem.

(17)    **Q.** If he was sleeping inside the airport tarmac,

(18) that would be a problem?

(19)    **A.** Yes, it would be a problem that would need to

(20) be addressed.

(21)    **Q.** That would be actually not performing your

(22) essential job functions, right? Almost like an excuse

(23) for even sleep apnea, you're not performing your

(24) essential job functions, right? So that would be a

(25) major problem in a sense, correct?

**Page 54**

(1)    **MR. WU:** Objection. Improper hypothetical.

(2)    But you can answer.

(3)    **MR. URIARTE: Q.** Ms. Aguilera?

(4)    **A.** It -- it could be.

(5)    **Q.** With regards to job duties, I think we have

(6) Exhibit 18. And one of the items there is "Maintaining

(7) harmony among workers and resolving grievances" as part

(8) of the primary accountabilities and duties of a fueling

(9) supervisor. Does that make sense to you?

(10)    **A.** I'm sorry, I couldn't hear you.

(11)    **MR. URIARTE:** I'm sorry. So we're pulling up

(12) Exhibit 18.

(13)    (Plaintiff's Exhibit 18 marked for

(14)    identification.)

(15)    **MR. URIARTE: Q.** But "Maintaining harmony among

(16) workers and resolving grievances" as part of the

(17) primary accountabilities and duties of a fueling

(18) supervisor. Do you see that?

(19)    **A.** I don't see where --

(20)    **Q.** I think it's eight -- yeah, it's the eighth

(21) bullet point under "Primary Accountabilities" -- right

(22) there.

(23)    **A.** Yes, I see that.

(24)    **Q.** That's part of the duties of a fueling

(25) supervisor, correct?

**Page 55**

(1)    **A.** Yes, it's in the job description.

(2)    **MR. URIARTE:** Okay. No further questions.

(3)    **MR. WU:** Nothing else from me.

(4)    **MR. URIARTE:** Thank you, Ms. Aguilera. Thank you

(5) very much.

(6)    **MR. WU:** Thanks so much for your time, Tracy.

(7)    **THE WITNESS:** Thank you.

(8)    (Whereupon, the concluded at 2:51

(9)    o'clock p.m.)

(10)    ---o0o---

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

**Page 56**

(1)    CERTIFICATE OF WITNESS

(2)    ---o0o---

(3)

(4)    I, TRACY AGUILERA, hereby declare under

(5) penalty of perjury that I have read the foregoing

(6) deposition testimony; and that the same is a true

(7) and correct transcription of my said testimony

(8) except as corrected pursuant to my rights under

(9) Rule 30(e) of the Federal Rules of Civil

(10) Procedure.

(11)

(12) _____

(13)    Signature

(14) _____

   Date

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

## Page 57

(1) STATE OF CALIFORNIA      )
                            )
(2) COUNTY OF SAN FRANCISCO )

(3)        I, CINDY TUGAW, a Certified Shorthand Reporter

(4) of the State of California, duly authorized to

(5) administer oaths pursuant to Section 8211 of the

(6) California Code of Civil Procedure, do hereby certify

(7) that

(8)               TRACY AGUILERA,

(9) the witness in the foregoing deposition, was by me duly

(10) sworn to testify the truth, the whole truth and nothing

(11) but the truth in the within-entitled cause; that said

(12) testimony of said witness was reported by me, a

(13) disinterested person, and was thereafter transcribed

(14) under my direction into typewriting and is a true and

(15) correct transcription of said proceedings.

(16)        I further certify that I am not of counsel or

(17) attorney for either or any of the parties in the

(18) foregoing deposition and caption named, nor in any way

(19) interested in the outcome of the cause named in said

(20) caption.

(21)        Dated the 10th day of September, 2020.

(22)

(23)

(24)

                   CINDY TUGAW

(25)               CSR No. 4805 (California)

## Page 58

(1) Tracy Aguilera
    c/o Foley & Lardner
(2) 555 California Street, Suite 1700
    San Francisco, CA 94104
(3) Attn:  Jason Y. Wu, Esq.
(4) Date:  September 10, 2020
    Re:  Navarro vs. Menzies
(5) Deposition Date:  Tuesday, August 25, 2020
(6) Dear Ms. Aguilera,
(7)        Please be advised the original transcript of
    your deposition is ready for your review.
(8)        Pursuant to FRCP Rule 30(e), you have 30 days
    following the date of this notice to read, correct if
(9) necessary, and sign your transcript unless the
    attending parties and the deponent agree on the record
(10) or otherwise in writing to a longer or shorter time
    period.  The deponent may change the form or the
(11) substance of the answer to a question, and may either
    approve the transcript of the deposition by signing it,
(12) or refuse to approve the transcript by not signing it.
    You are not required by law to read and sign your
(13) deposition transcript.  All parties will be informed of
    the corrections.  The original transcript will then be
(14) sealed and sent to the examining attorney pursuant to
    the applicable law.
(15)        You may either come to our office to read and
    sign the original transcript, or you may contact your
(16) attorney or the attorney who arranged for you to be
    present at your deposition.  If they have ordered a
(17) copy of the transcript, you may review their copy and
    make corrections by submitting, signing and returning
(18) the attached form.  If you choose to review your
    transcript at our office, please call first to make an
(19) appointment.  Should you have any question regarding
    these instructions, please call.
(20)
    Sincerely,
(21)
(22)
    NOGARA REPORTING SERVICE
(23) 5 Third Street, Suite 415
    San Francisco, California 94103
(24) (415) 398-1889
(25) cc:  All counsel, original deposition