# EXHIBIT 50

**DEPOSITION OF RAUL VARGAS - 08/25/2020**

**RENALDO NAVARRO vs. MENZIES AVIATION, INC.**

CONDENSED TRANSCRIPT AND CONCORDANCE

**PREPARED BY:**

**NOGARA REPORTING SERVICE**
**5 Third Street, Suite 415**
**San Francisco, CA  94103**
**Phone:  (415) 398-1889**
**FAX:  (415) 398-0611**



## Page 1

<pre>
(1)          IN THE UNITED STATES DISTRICT COURT
(2)       IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA
(3)
(4)
(5)  RENALDO NAVARRO,
(6)            Plaintiff,
(7)  v.                          No.  3:19-CV-8157
(8)  MENZIES AVIATION, INC.,
     doing business as MENZIES
(9)  and DOES 1 through 10,
     inclusive,
(10)
            Defendants.
(11)  _____/
(12)  Zoom Remote Deposition of
(13)     RAUL VARGAS
(14)  Tuesday, August 25, 2020
(15)
(16)
(17)
(18)
(19)
(20)
(21)  REPORTED BY:  CINDY TUGAW, CSR #4805
(22)
(23)
              NOGARA REPORTING SERVICE
(24)        5 Third Street, Suite 415
           San Francisco, California 94103
(25)            (415) 398-1889
</pre>

## Page 3

<pre>
(1)       BE IT REMEMBERED that, pursuant to Notice of
(2)  Taking Deposition and on Tuesday, the 25th day of
(3)  August, 2020, commencing at the hour of 9:03 o'clock
(4)  a.m. thereof, via Zoom videoconference, before me,
(5)  CINDY TUGAW, a Certified Shorthand Reporter in the
(6)  State of California, personally appeared,
(7)              RAUL VARGAS,
(8)  called as a witness by the Plaintiff, having been by me
(9)  first duly sworn, was examined and testified as
(10)  hereinafter set forth.
(11)            ---o0o---
(12)       APPEARANCES OF COUNSEL
(13)  For the Plaintiff
        LIBERATION LAW GROUP, P.C.
(14)    2760 Mission Street
        San Francisco, California 94110
(15)    BY:  ARLO GARCIA URIARTE, Attorney at Law
        (415) 695-1000
(16)
(17)  For the Defendants
        FOLEY & LARDNER, LLP
(18)    555 California Street, Suite 1700
        San Francisco, California 94104
(19)    BY:  JASON Y. WU, Attorney at Law
        (415) 984-9848
(20)
     Also Present:  David Ho, Zoom Host.
(21)
              ---o0o---
(22)
(23)
(24)
(25)
</pre>

## Page 2

<pre>
(1)            I N D E X
(2)                              Page Number
(3)  EXAMINATION BY MR. URIARTE         4
(4)  EXAMINATION BY MR. WU             73
(5)  FURTHER EXAMINATION BY MR. URIARTE  74
(6)            ---o0o---
(7)          E X H I B I T S
(8)  Plaintiff's
(9)  Exhibit 1    Plaintiff Renaldo       9
               Navarro's Amended Notice
(10)              of Deposition of Raul
               Vargas
(11)
     Exhibit 8    Petition to Menzies     26
(12)              Management from Menzies
               Fuelers
(13)
     Exhibit 9    Termination notice for  60
(14)              Renaldo Navarro
(15)  Exhibit 11   Employee Performance    61
               Development dated
(16)              8/29/2018
(17)  Exhibit 12   Email chain culminating 66
               in an email from Raul
(18)              Vargas to Tracy Aguilera
               dated August 29, 2018
(19)
     Exhibit 19   Letter from Rafael Vasquez  43
(20)              to whom it may concern
               dated 11/18/2018 with
(21)              attached petition
(22)            ---o0o---
(23)
(24)
(25)
</pre>

## Page 4

<pre>
(1)    THE REPORTER:  Good morning.  At this time, I will
(2)  ask counsel to stipulate on the record that there is no
(3)  objection to this deposition officer administering a
(4)  binding oath to the witness via Zoom, starting with the
(5)  noticing attorney.
(6)    MR. URIARTE:  No objection.
(7)    MR. WU:  And no objections on behalf of Menzies
(8)  Aviation.
(9)      (Whereupon, the Witness was duly sworn by the
(10)  Reporter.)
(11)      EXAMINATION BY MR. URIARTE
(12)    MR. URIARTE:  Good morning, Mr. Vargas.
(13)    A.  Good morning.
(14)    Q.  Could you please state and spell your name for
(15)  the record.
(16)    A.  Yes, so my name is Raul Vargas, R-a-u-l, last
(17)  name V, as in Victor, a-r-g-a-s.
(18)    Q.  Okay.  And if I ask you what your formal name
(19)  is, like, for example, what's on your passport or
(20)  something like that, what would you say?
(21)    A.  Raul Herman Vargas Aroca.
(22)    Q.  And so, Herman, Herman is H-e-r-m-a-n, is that
(23)  what it is?  Herman, did you hear me?
(24)    A.  Yes, it's H-e-r-m-a-n.
(25)    Q.  And then I missed your mother's maiden name.
</pre>

DEPOSITION OF RAUL VARGAS - 08/25/2020

BSA    Case 3:19-cv-08157-VC   RENALDO NAVARRO vs. MENZIES AVIATION, INC.   Page 4 of 22    XMAX(2/2)

**Page 5**

(1)   **A.** It's A-r-o-c-a.

(2)   **Q.** A-r-o-c-a?

(3)   **A.** Yes.

(4)   **Q.** Thank you. Okay. My name is Arlo Uriarte. I

(5) am the attorney for Renaldo Navarro. And are you aware

(6) that Mr. Navarro has an action against Menzies?

(7)   **A.** Yes, I am.

(8)   **Q.** And could you please tell me what your current

(9) position is with Menzies.

(10)   **A.** I'm director of operations assigned in Los

(11) Angeles Airport.

(12)   **Q.** And then in August of 2018, what was your

(13) position?

(14)   **A.** I was the director of operation for San

(15) Francisco Airport.

(16)   **Q.** Would you say being the director of operation

(17) to Los Angeles is a promotion?

(18)   **A.** It was a promotion for me.

(19)   **Q.** When did you become director of operation for

(20) Los Angeles?

(21)   **A.** September 1st -- yes, September 1st.

(22)   **Q.** Of last year?

(23)   **A.** Yes.

(24)   **Q.** Have you had your deposition taken before?

(25)   **A.** No.

**Page 6**

(1)   **Q.** So let me just kind of go through some ground

(2) rules of what we're doing here today. First of all, we

(3) have the court reporter, Cindy. She is taking down

(4) everything that we are saying, including your attorney.

(5) And so we try to make it as easy for her as possible

(6) with regard to not talking over one another. Is that

(7) okay?

(8)   **A.** Perfect.

(9)   **Q.** Okay. And then we also need to make verbal

(10) responses, you know, because this is on video,

(11) sometimes you shake your head or you make some sort of

(12) gesture, but none of that is written onto the record

(13) unless you actually verbalize the response. Okay?

(14)   **A.** Okay.

(15)   **Q.** You have been placed under oath. Do you

(16) understand that?

(17)   **A.** I understand that.

(18)   **Q.** And do you understand what that oath means?

(19)   **A.** No.

(20)   **Q.** So what that oath means is that you have sworn

(21) to tell the truth. Okay?

(22)   **A.** Yes.

(23)   **Q.** And in swearing to tell the truth, you're also

(24) saying that you're declaring under penalty of perjury

(25) that you will tell the truth. Do you understand that

**Page 7**

(1) portion of it?

(2)   **A.** Yes, I do.

(3)   **Q.** Okay. While we are in a video deposition and

(4) while we seem to be informal and not in court, what you

(5) say and the testimony that you provide here today

(6) actually has the same weight and effect as if you were

(7) testifying in court in front of a judge, in front of a

(8) jury, in front of attorneys. It would be just the

(9) same. Do you understand that?

(10)   **A.** I do understand.

(11)   **Q.** And that makes it quite important that

(12) whatever you say here today is your best testimony,

(13) your best memory, your best recollection. Okay?

(14)   **A.** Yes.

(15)   **Q.** And if you have to -- it would be a good idea

(16) for you to qualify your response if you're not sure of

(17) the response. Do you understand that?

(18)   **A.** Yes, I do.

(19)   **Q.** If you make a response, for example, if you

(20) say "red" and then the court reporter actually writes

(21) down the word "red," we will assume that you meant red.

(22) Okay?

(23)   **A.** I do understand that.

(24)   **Q.** And later on, after you have been given the

(25) chance to actually review your testimony, sometimes

**Page 8**

(1) witnesses will change whatever they said during a

(2) deposition. But I must advise you that if you do

(3) change your testimony in a later court proceeding or in

(4) changing it in the deposition transcript, that somebody

(5) like me or another attorney or even sometimes the judge

(6) will cross-examine you or question you or doubt your

(7) credibility with regard to the changes you make to

(8) today's testimony.

(9)     Is that understandable?

(10)   **A.** I do understand that, sir.

(11)   **Q.** Thank you. Is there any reason why you cannot

(12) give your best testimony here today?

(13)   **A.** There is no reason.

(14)   **Q.** Okay. Aside from telling me what you and your

(15) attorneys have discussed, what did you do in order to

(16) prepare for today's deposition?

(17)   **A.** Well, I have my notes. And I had a meeting

(18) with Jason where he explained to me about the

(19) deposition. I've never been in one before.

(20)   **Q.** Okay. Don't tell me anything about what you

(21) talked about with Jason. When you say you have your

(22) notes, what do you mean by that?

(23)   **A.** My notes in terms of emails that I sent during

(24) that time.

(25)   **Q.** Okay. You have that in front of you?

DEPOSITION OF RAUL VARGAS - 08/25/2020

BSA    Case 3:19-cv-08157-VC   RONALD NAVARRO vs. MENZIES AVIATION, INC.   Document 46   Filed 11/06/20   Page 5 of 22    XMAX(3/3)

**Page 9**

(1)    **A.** I have it with me, yes.

(2)    **Q.** I guess, maybe during the break, maybe if you

(3) could make a copy of those notes and then send them to

(4) your attorney by email, or something like that, because

(5) we would want a copy of your notes.

(6)    **A.** Okay.

(7)    **Q.** Is that okay?

(8)    **A.** Yes. Sure.

(9)    **Q.** Okay. And then, aside from the emails that

(10) you say and your notes, anything else that you

(11) reviewed?

(12)    **A.** Anything else -- nothing else, sorry.

(13)    **Q.** Okay. Did you talk to anyone to prepare for

(14) today's deposition aside from your attorney?

(15)    **A.** I didn't talk to anybody in relation to this.

(16)    **Q.** Because of the video transmission or the data

(17) transmission, I didn't hear that totally clear, but

(18) what I assume what you said was that you have not

(19) talked to anyone in relation to -- with regards to

(20) preparing for today. Is that what you said?

(21)    **A.** Yes.

(22)    **MR. URIARTE:** So we will mark as Exhibit 1 the

(23) deposition notice. David, could you have Exhibit 1 on

(24) the screen, please. Thank you.

(25)    (Plaintiff's Exhibit 1 marked for

**Page 10**

(1)    identification.)

(2)    **MR. URIARTE: Q.** Okay. So this is always a good

(3) way of testing the technology. Mr. Vargas, do you see

(4) what's been marked as Exhibit 1 on your screen?

(5)    **A.** Yes.

(6)    **Q.** Are you using a laptop or a phone?

(7)    **A.** I'm using a laptop.

(8)    **Q.** Oh, great. That's better. Okay.

(9)    Have you seen this document before?

(10)    **A.** Yes.

(11)    **Q.** Great. Very good. All right.

(12)    Mr. Vargas, our information is that Mr.

(13) Navarro was terminated August 29, 2018. Do you

(14) remember that about the right time frame?

(15)    **A.** I don't remember the right time.

(16)    **Q.** Okay. Do you remember the circumstances

(17) around his termination?

(18)    **A.** Yes, I do.

(19)    **Q.** In relation to his termination, before

(20) deciding to terminate Mr. Navarro, did you actually

(21) hear about the petition going around in the workplace

(22) first?

(23)    **A.** Yes, I did.

(24)    **Q.** And how long would you say before his

(25) termination did you hear about the petition going

**Page 11**

(1) around in the workplace?

(2)    **A.** I don't recall that.

(3)    **Q.** Would you say that it was going around for a

(4) month already and then his termination happened?

(5)    **A.** I don't recall it.

(6)    **Q.** Can you give me your best estimate, like a

(7) week, or do you have a time frame in your head at all?

(8)    **A.** I don't have a time frame in my head right

(9) now.

(10)    **Q.** So you don't remember kind of like whether it

(11) was days or weeks?

(12)    **A.** I don't remember when this was brought to my

(13) attention.

(14)    **Q.** And "this" being the petition, correct?

(15)    **A.** In relation to the petition.

(16)    **Q.** I think, Mr. Vargas, we need you to speak up a

(17) little bit or maybe get closer to the microphone.

(18)    **A.** Yes.

(19)    **Q.** Thank you. So what about this: Do you

(20) remember who brought the petition to your attention?

(21)    **A.** Tracy Aguilera.

(22)    **Q.** So it was HR who actually let you know that,

(23) hey, there's this petition going around?

(24)    **A.** HR.

(25)    **Q.** Aside from Tracy, did anybody else talk to you

**Page 12**

(1) about the petition?

(2)    **A.** Nobody else talked to me. She was the first

(3) person who talked to me about the petition.

(4)    **Q.** Okay. And then when you say she's the first

(5) person, was she also the only person that talked to you

(6) about the petition?

(7)    **A.** No.

(8)    **Q.** Did anybody else talk to you about the

(9) petition before Mr. Navarro's termination?

(10)    **A.** Yes.

(11)    **Q.** Who else?

(12)    **A.** Our operation manager for fuel.

(13)    **Q.** Who was that?

(14)    **A.** I don't recall his last name. Renil.

(15)    **Q.** Renil?

(16)    **A.** Renil.

(17)    **Q.** R-e-n-i-l?

(18)    **A.** That is, yes.

(19)    **Q.** I believe he's not with the company anymore,

(20) correct?

(21)    **A.** He's not.

(22)    **Q.** Do you know where he is right now?

(23)    **A.** I do not know.

(24)    **Q.** All right. Aside from Renil, did anybody else

(25) talk to you about the petition?

Page 13

(1)    A.  Nobody else.
(2)    Q.  Okay.  What did Renil tell you about the
(3) petition?
(4)    A.  That there was a petition going around to
(5) terminate Andrew.
(6)    Q.  To terminate Andrew.  Anything else?
(7)    A.  Nothing else that I can recall.
(8)    Q.  Okay.  Did you actually read the petition?
(9)    A.  I read the petition, yes, I did.
(10)    Q.  And you read the petition before the
(11) termination?
(12)    A.  Yes, I did.
(13)    Q.  And when you read it, that's what it said, to
(14) terminate Andrew?
(15)    A.  I don't recall exactly what it says, but it
(16) was about Andrew's performance, and it was about
(17) removing Andrew from the position.
(18)    Q.  And then, aside from saying that to you,
(19) anything else Renil told you about the petition?
(20)    A.  Nothing else -- nothing else that I can
(21) recall.
(22)    Q.  Okay.  What about Tracy, what did she talk to
(23) you about the petition?
(24)    A.  Well, Tracy told me about everything that she
(25) was getting information from.  The first conversation I

Page 14

(1) had with her, it was about somebody from the union
(2) contacting her to let her know that somebody was
(3) requesting to sign a petition to the employees.
(4)    Q.  Anything else?
(5)    A.  Yes.  She mentioned that -- that employees
(6) were -- were not agreeing on signing it.
(7)    Q.  Okay.  Anything else?
(8)    A.  Nothing else that I can recall.
(9)    Q.  And then, with regards to the content of the
(10) petition, after you read it, did you make any decision
(11) related to the contents of the petition?
(12)    A.  Yes, I talked to Tracy to -- to have the
(13) investigation.
(14)    Q.  What type of investigation?
(15)    A.  An investigation about the petition and about
(16) the -- how the petition was made.
(17)    Q.  How the petition was --
(18)    A.  Performed.
(19)    Q.  Was performed?
(20)    A.  Yes.
(21)    Q.  So you mean, when you say "how the petition
(22) was performed," you mean how the petition was put
(23) together, correct?
(24)    A.  Yes.
(25)    Q.  Anything else that you asked Tracy to do in

Page 15

(1) relation to the petition?
(2)    A.  Nothing else at that time.
(3)    Q.  Okay.  And so you said to do an investigation
(4) about the petition.  What does that mean?  What did you
(5) actually tell Tracy to do?
(6)    A.  To perform an investigation about how --
(7) because we received some calls from the union, and also
(8) received some information about Andrew, that he
(9) received a message from Navarro.  So at that time it
(10) was important for me to understand how that petition
(11) was created.  How they did it.
(12)    Q.  All right.  And then you said also about how
(13) the petition was put together.  So why was it important
(14) for you to know how or who put together the petition?
(15)    A.  Because of the feedback that I received from
(16) Tracy, from HR.
(17)    Q.  And what's that information that you received
(18) from HR?
(19)    A.  As I said before, she told me that somebody
(20) from the union contact her telling her that there was a
(21) person asking for sign a petition, who was forcing the
(22) employees to do it.
(23)    Q.  And did you ever find out who actually put
(24) together the petition?
(25)    A.  Yes, we did.

Page 16

(1)    Q.  And who was it?
(2)    A.  Mr. Navarro.
(3)    Q.  I'm sorry?
(4)    A.  Mr. Navarro.
(5)    Q.  And how did you reach -- how was that
(6) conclusion reached?  Like how did you guys reach the
(7) conclusion that Mr. Navarro wrote the petition?
(8)    A.  There was an investigation done, performed by
(9) the safety department.
(10)    Q.  So the safety department person actually said
(11) Mr. Navarro wrote the petition, is that your
(12) understanding?
(13)    A.  Yes.  And also because of the messages that
(14) Andrew received from Mr. Navarro.
(15)    Q.  Right.  But that message said, "I'm holding on
(16) to the petition.  I haven't submitted it."  It doesn't
(17) say, "I wrote the petition that I'm going to give."  Do
(18) you know what I'm saying?  It says, "I'm holding on to
(19) the petition and I haven't submitted it."
(20)        So I don't know how that text message kind of
(21) leads to the conclusion that he wrote it.  Can you
(22) explain it to me?
(23)    MR. WU:  Objection.  Assumes facts not in
(24) evidence.
(25)        You can answer if you understand the question.

DEPOSITION OF RAUL VARGAS - 08/25/2020

BSA    Case 3:19-cv-08157-VC    RENALD NAVARRO vs. MENZIES AVIATION, INC.    Document 48    Filed 11/06/20    Page 7 of 22    XMAX(5/5)

**Page 17**

(1)    **MR. URIARTE: Q.** Mr. Vargas?

(2)    **A.** Well, I think that when you receive a message

(3) from -- I don't know where -- somebody in relation to a

(4) petition, that is a alert.

(5)    **Q.** Is what?

(6)    **A.** Is an alert.

(7)    **Q.** Okay. But I guess my question is how does

(8) that text message lead you to conclude that Mr. Navarro

(9) wrote the petition?

(10)    **A.** That was not the one that drove me to

(11) understand that Mr. Navarro did the petition.

(12)    **Q.** What did make you understand that Mr. Navarro

(13) wrote it?

(14)    **A.** Well, because the investigation from the

(15) safety department.

(16)    **Q.** Okay. So the investigation from the safety

(17) department actually has a report?

(18)    **A.** They have statements from employees.

(19)    **Q.** Statements from employees. Okay. Anything

(20) else?

(21)    **A.** They had a statement from employees and their

(22) final outcome out of the investigation.

(23)    **Q.** Are you talking about the final outcome as

(24) they wrote it in the email?

(25)    **A.** Yes.

**Page 18**

(1)    **Q.** Okay. So aside from the final outcome that

(2) they wrote in the email, is there another document that

(3) they put together or that was it?

(4)    **A.** No.

(5)    **Q.** That was it?

(6)    **A.** That was it.

(7)    **Q.** Okay. And then the statement from the

(8) employees, from that you conclude that Mr. Navarro

(9) wrote it?

(10)    **A.** Yes.

(11)    **Q.** Okay. So if I read those statements,

(12) somewhere in those statements it would say Mr. Navarro

(13) wrote the petition?

(14)    **A.** I think that -- no, it doesn't say about Mr.

(15) Navarro writing the petition. It's says about Mr.

(16) Navarro forcing the employees to sign the petition

(17) which is -- this isn't about writing the petition.

(18) It's about creating harassment environment in the

(19) workplace.

(20)    **Q.** Okay. I understand that. I understand that.

(21) Your attorneys have kind of said that to me many times,

(22) so I understand that. But I'm still kind of like

(23) before that, right? I'm still trying to get to the

(24) point of trying to understand how you got to the

(25) conclusion in your head that, hey, Mr. Navarro wrote

**Page 19**

(1) this petition.

(2)    **A.** Well, and if I can go back --

(3)    **Q.** Yes.

(4)    **A.** -- I never asked to investigate on who wrote

(5) the petition.

(6)    **Q.** So for you that wasn't important?

(7)    **A.** No.

(8)    **Q.** So when you finally concluded that termination

(9) was the proper discipline, that wasn't part of the --

(10) for you, that's not the important part, right?

(11)    **A.** About who wrote the petition, no, no, not at

(12) all.

(13)    **Q.** For you it was, hey, you've got this guy

(14) forcing employees to sign the petition. That's what it

(15) was, right?

(16)    **A.** Yes.

(17)    **Q.** I got it. Okay. So that leads to the

(18) question of when -- so let's say August 29 is

(19) eventually the time that he gets terminated. Do you

(20) remember about when you concluded in your head, hey, I

(21) need to terminate Mr. Navarro? Do you remember when?

(22)    **A.** The specific date, no, but it should be around

(23) that time.

(24)    **Q.** Like within days of it or within a week or --

(25)    **A.** I cannot tell. I don't -- I don't recall it.

**Page 20**

(1)    **Q.** Okay. And then with regards to forcing

(2) employees to sign the petition, I saw those letters

(3) from different employees, them saying whatever they're

(4) saying, and then I saw the one from Andrew as well. I

(5) see that.

(6)    But did the investigation, or did you, ever

(7) ask to talk to the fuelers?

(8)    **A.** No.

(9)    **Q.** Okay. Did you ever ask to talk to the union

(10) representative?

(11)    **A.** Well, the union representative, he brought a

(12) letter for me -- for me, too.

(13)    **Q.** Right. You mean like an additional petition,

(14) is that what you're saying?

(15)    **A.** It was a different letter.

(16)    **Q.** What letter was that?

(17)    **A.** It was pretty much the same as the petition.

(18)    **Q.** Right. But I think that -- I don't want to

(19) confuse you. We should probably maybe clear this up.

(20) That second petition by Rafael Vasquez or Rafael

(21) Martinez, right, is that what you're talking about?

(22)    **A.** Yes.

(23)    **MR. WU:** Objection. Lack of foundation.

(24)    **MR. URIARTE: Q.** That second petition, that was

(25) like already in October, wasn't it?

**Page 21**

(1)    **A.** I don't recall the date.

(2)    **Q.** Okay. So, but before concluding that Navarro

(3) actually forced employees to sign the petition, I kind

(4) of want to make sure that I get all of the steps that

(5) you took to be satisfied that your conclusion was

(6) correct. All right?

(7)    **A.** Yes.

(8)    **Q.** So I saw the investigation statement. I saw

(9) the letters from the employees. That's understandable.

(10) But other than that -- and then you talked to Tracy as

(11) well, right? You had email communication with Tracy.

(12) Other than those steps, did you do any other steps?

(13)    **A.** No. Well, actually I was waiting for the

(14) final outcome from the investigation. And it was not

(15) just the feedback that I received from the safety

(16) department. Also the conversations I had with Tracy in

(17) relation to this case.

(18)    **Q.** Okay. But did you ever ask the safety

(19) department, hey, did you guys talk to the fuelers?

(20)    **A.** Yes, I did.

(21)    **Q.** And what did they say?

(22)    **A.** They told me that they -- he was -- so the

(23) safety department told me that Mr. Navarro was forcing

(24) employees to sign the petition, and he was creating --

(25) he was harassing people to have this petition signed.

**Page 22**

(1)    **Q.** Okay. So forcing employees to sign the

(2) petition. What's wrong with that?

(3)    **A.** Well, I think that when you have -- you take

(4) advantage of your rank, that is harassment because of

(5) how the other people feel.

(6)    **Q.** Anything else that's wrong with that?

(7)    **A.** Yes. So when they use this rank, people feel

(8) scared of having this confrontation with the

(9) supervisor, so they prefer to sign the petition without

(10) understanding what the petition was for.

(11)    **Q.** So are you saying that the safety department

(12) talked to everybody that signed that petition and

(13) verified whether they actually signed it or not?

(14)    **A.** I cannot guarantee that they talked to hundred

(15) percent of the employees.

(16)    **Q.** Okay. But do you know how many people they

(17) talked to?

(18)    **A.** I don't know exactly how many people they

(19) talked to.

(20)    **Q.** And then you used the word "harassment." How

(21) are you using that word "harassment"? What do you mean

(22) by that?

(23)    **A.** Well, for me, harassment is pretty much --

(24) it's to force or intimidate people. So, in this case,

(25) when he's taking his rank as a supervisor, telling

**Page 23**

(1) people to sign a petition that they don't know what

(2) it's for, that for me is intimidation. And that's how

(3) they -- the employees felt.

(4)    **Q.** How many employees are we talking about --

(5)    **A.** Well --

(6)    **Q.** -- that felt like that?

(7)    **A.** I'm sorry?

(8)    **Q.** How many employees felt like that?

(9)    **A.** I cannot tell you exactly the number of, but I

(10) can tell you in terms of the -- the statements we

(11) received. There were around three employees.

(12)    **Q.** And then there were over 20 people who signed

(13) the petition, right?

(14)    **A.** Yeah.

(15)    **Q.** So out of the more than 20 people who signed

(16) the petition, three people felt like, oh, maybe I

(17) didn't read it and then I signed it and maybe I --

(18)    **MR. WU:** Objection. Objection. Lack of

(19) foundation. Calls for speculation. Misstates prior

(20) testimony.

(21)    **MR. URIARTE: Q.** So, Mr. Vargas, when your

(22) attorney objects, we allow him to finish his objection

(23) so that it's written into the record. Please allow him

(24) to finish, and then you can answer afterwards unless

(25) your attorney tells you not to answer. Okay?

**Page 24**

(1)    **A.** So, for me, if we have people that feel that

(2) way, it's really important to ensure that we have the

(3) right environment for our employees. Harassment is a

(4) really important matter in our environment in a

(5) business.

(6)    **Q.** I got that. I got that. So you've got three

(7) people complaining about the way that the harassment --

(8)    **A.** We have -- remember -- sorry, can I --

(9)    **Q.** Please, please.

(10)    **A.** So, remember, we had those three guys, but

(11) also we had some feedback from the union saying that

(12) this person was harassing people to sign the petition.

(13)    **Q.** Okay. But what about the subject matter of

(14) the petition itself? Weren't they doing the same thing

(15) as well? You said it's very important for you that

(16) people work in a proper environment, right?

(17)    **A.** Yes.

(18)    **Q.** But the nature of the petition itself kind of

(19) complains about the environment, right?

(20)    **A.** Yes.

(21)    **Q.** Okay. So isn't that also a valid concern?

(22)    **A.** It is. Definitely it is.

(23)    **Q.** Okay. And what was done about that?

(24)    **A.** Well, I think that it's important from the

(25) extent of the document, where the document is coming

DEPOSITION OF RAUL VARGAS - 08/25/2020

BSA    Case 3:19-cv-08157-VC    RONALD NAVARRO vs. MENZIES AVIATION, INC.    Document 46 Filed 11/16/20    Page 9 of 22    XMAX(7/7)

**Page 25**

(1) from, if the document is signed by people who felt
(2) harassment. So what's the validation of that document?
(3)     **Q.** But we also have other people who didn't feel
(4) that way, right?
(5)     **A.** We don't know.
(6)     **MR. WU:** Objection. Lack of foundation.
(7) Misstates prior testimony.
(8)     **MR. URIARTE: Q.** So I guess my question is this:
(9) So the document itself, the petition itself, talks
(10) about things that they're not happy about, correct?
(11) Would you agree with that?
(12)     **A.** I disagree with it.
(13)     **Q.** Okay.
(14)     **A.** I don't agree with it because you're saying
(15) "they," and at this point, when I see there's employees
(16) forced to sign it, it means that there is somebody, one
(17) person, that is pretty much complaining for that, not
(18) the whole thing.
(19)     **Q.** I see what you're saying. You're saying
(20) because you believe that there's one person forcing
(21) people to sign, that you don't believe the petition
(22) anymore.
(23)     **A.** I don't -- I don't -- I don't have the same
(24) validity of the petition anymore.
(25)     **Q.** Validity?

**Page 26**

(1)     **A.** Validity, I'm sorry.
(2)     **Q.** No problem. I talk the same way, so I totally
(3) understand you.
(4)         Okay. I get that. I guess, from your mind, I
(5) could see how you could think that way. But that might
(6) not make sense when you take into consideration a
(7) second petition after the termination of Mr. Navarro.
(8) What about that?
(9)     **A.** The second petition, it was not brought after.
(10)     **Q.** It was. It was. It was brought after.
(11)     **MR. WU:** Objection. Assumes facts. Lack of
(12) foundation.
(13)     **MR. URIARTE:** I'll show it to you so we can put
(14) that to rest. I'll show that to you, don't worry.
(15)         So here's -- can we have Exhibit 8 up, please,
(16) David. Thank you.
(17)         (Plaintiff's Exhibit 8 marked for
(18)         identification.)
(19)     **MR. URIARTE: Q.** So, Mr. Vargas, do you see this
(20) one --
(21)     **A.** Yes.
(22)     **Q.** -- which we've been calling the first
(23) petition?
(24)         Is this the one -- do we agree this is the one
(25) that you saw initially when you say that you talked to

**Page 27**

(1) Tracy and Renil? Does that make sense?
(2)     **A.** I cannot confirm a hundred percent that this
(3) was the one.
(4)     **Q.** Okay. So if we go down a little bit, yeah,
(5) you'll see Mr. Navarro's signature on this one.
(6)     **A.** Yes.
(7)     **Q.** And this document actually comes from your
(8) company, if you see the Menzies number there, Menzies
(9) 153. And so line 24 there on the second page -- I'm
(10) sorry, line 16 of the second page has Mr. Navarro's
(11) signature. Do you see that?
(12)     **A.** Yes.
(13)     **Q.** All right. So, again, going back to your
(14) conclusion earlier, you're saying, if you think that
(15) Mr. Navarro was forcing all of these people to sign the
(16) petition, you believe the petition is now without
(17) validity, is that correct?
(18)     **A.** Well, I don't think that it has the same
(19) validity, definitely. Now, what is most important to
(20) bring out is that I had a conversation with HR about
(21) Andrew, because they were -- in the letter I believe
(22) they complained also about him falling asleep on the
(23) operation.
(24)         So I had this conversation with HR. And they
(25) explained to me and they addressed that issue before I

**Page 28**

(1) started working at Menzies. Because, again, I started
(2) June 2018. And this was happening -- this happened in
(3) August.
(4)     **Q.** Yes. Right. So you started in June of 2018,
(5) and this was happening in August. So you didn't have
(6) that much kind of context with regard to what was
(7) happening from the last year, is that correct?
(8)     **A.** (Indicates affirmatively.)
(9)     **Q.** Mr. Vargas?
(10)     **A.** Yes.
(11)     **MR. WU:** Arlo, I'm sorry to interrupt. Can we
(12) take a quick break in the next five minutes? Whatever
(13) is a good stopping point for now.
(14)     **MR. URIARTE:** That's fine. We can take a break
(15) now. No problem.
(16)     **MR. WU:** Thanks a lot, Arlo. Let's go off the
(17) record.
(18)     **MR. URIARTE:** No problem.
(19)         (Brief recess.)
(20)     **MR. URIARTE: Q.** So we were talking about Exhibit
(21) 8, Mr. Vargas. My question is with regards to the
(22) actual things that the fuelers were complaining about.
(23) And I just want to clarify something.
(24)         Was there ever an investigation by Menzies
(25) with regard to the context or the content of their

**Page 29**

(1) petition, the subject matter of their petition?
(2)     A.  Well, there was an investigation before in
(3) terms of what they were complaining about, that this
(4) was happening at the company.  And that was the
(5) conversation that I had with Tracy, with HR, in
(6) relation to this petition, what they were saying.
(7)     Q.  And what was the result of that investigation?
(8)     A.  Well, that Andrew pretty much falls asleep
(9) because he has sleep onea [sic].
(10)     Q.  You're talking about sleep apnea?
(11)     A.  Yes.
(12)     Q.  Anything else?
(13)     A.  And -- no, nothing else.
(14)     Q.  What about the complaint that rest breaks or
(15) breaks were being -- were being missed or not taken?
(16)     A.  I don't recall about that.
(17)     Q.  What about like delays that were being caused
(18) by Andrew, was that ever investigated?
(19)     A.  No, no, not brought to my attention.
(20)     Q.  So when you read this petition, I guess the
(21) focus became Mr. Navarro asking people to sign the
(22) petition.  That was your focus, right?
(23)     A.  Yeah.  The environment that he create by doing
(24) that.
(25)     Q.  Okay.  And you didn't really put focus on the

**Page 30**

(1) environment that Mr. Dodge was creating as alleged by
(2) this petition?
(3)     A.  Well, I did when I asked HR about that
(4) petition, about those things that happened before I got
(5) there, and that was what I received from HR.
(6)     Q.  So what I heard you say, they already --
(7)     A.  That they already took action on it.
(8)     Q.  And that's with regard to the sleep apnea?
(9)     A.  That is regard of everything.
(10)     Q.  Okay.  So you're saying you did ask Tracy
(11) about what the fuelers were talking about in the
(12) petition, correct?
(13)     A.  (Indicates affirmatively.)
(14)     Q.  Okay.  And that involved what was happening to
(15) Andrew Dodge before, and something about sleep apnea
(16) and sleeping and him falling asleep, correct?
(17)     A.  Yes.
(18)     Q.  Anything else, aside from that, that came as a
(19) result of your inquiry with regards to the petition?
(20)     A.  Also that, for me, nothing else for me to take
(21) action for.
(22)     MR. WU:  And, Raul, if you could just give a brief
(23) pause between the end of Arlo's question and the
(24) beginning of your answer.  I think sometimes, when
(25) there's a bit of overlap, is when we're getting that

**Page 31**

(1) feedback and it's becoming a little unclear.
(2)     THE WITNESS:  Okay.
(3)     MR. URIARTE:  Q.  Did you ever have a discussion
(4) with Mr. Navarro, before this whole petition started,
(5) did you ever have a discussion with Mr. Navarro about
(6) Andrew Dodge?
(7)     A.  Not that I recall.
(8)     Q.  So you don't remember him going up to you and
(9) trying to talk to you about concerns about Andrew
(10) Dodge?
(11)     A.  No, I don't recall that.
(12)     Q.  Aside from the petition and maybe Mr. Navarro,
(13) did you ever get complaints against -- or about Andrew
(14) Dodge in those -- June, July, August, the time you were
(15) there?
(16)     A.  No, I did not.
(17)     Q.  And so you were not involved in the promotion
(18) of Mr. Dodge, correct?
(19)     A.  No, I was not.
(20)     Q.  And before being at Menzies at the San
(21) Francisco Airport, where were you working?
(22)     A.  I was working for TAS.
(23)     Q.  What does that mean?
(24)     A.  TAS, Total Airport Services.  I worked there
(25) as a general manager in San Francisco.

**Page 32**

(1)     Q.  And how long were you working for TAS?
(2)     A.  Four months.
(3)     Q.  So before TAS, who did you work for?
(4)     A.  I worked before that as operation manager for
(5) a company called Emser Tile for a year.
(6)     Q.  Can you spell that?
(7)     A.  Emser is E-m, as in Mike, s, as in Sierra,
(8) e-r, as in royal, Tile, T-i-l-e.
(9)     Q.  So that's a nonairport job?
(10)     A.  It was a nonairport job.  And before that I
(11) worked for 16 years for the LATAM Airlines.  LATAM,
(12) it's L, as in Lima, A-T, tango, A-M, as in Mike,
(13) Airlines.
(14)     Q.  Where is that, LATAM Airlines?
(15)     A.  It's South America.
(16)     Q.  What country in South America?
(17)     A.  It's the biggest network airline in South
(18) America.
(19)     Q.  I thought Avianca was the biggest.
(20)     A.  No, no.
(21)     Q.  They're not?
(22)     A.  They're the oldest.
(23)     Q.  So in your job as the director of operations
(24) in San Francisco, can you just give me a list of your
(25) responsibilities there, especially when it comes to,

Page 33

(1) like, June to August of 2018. What were your duties
(2) and responsibilities?
(3)     A. Pretty much whatever -- as US director of
(4) operation, I'm looking for different -- different
(5) elements. So I have four different elements. The
(6) first one is financial. I look for all the financials
(7) of the station, all the four business lines that we
(8) have there at that moment, which it was the fueling
(9) business, the ramp business, the cargo business and the
(10) GSC business. GSC is ground service equipment. So we
(11) provide service to all the equipment that pretty much
(12) you see on the runway.
(13)     So I look also in terms of customer service,
(14) all the retention or attraction of new customers,
(15) interactions. I also look into the safety, ensuring
(16) that we run a smooth operation in a safe basis, putting
(17) all the safety processes in place to reduce every kind
(18) of risk out there on the ramp or in the different
(19) departments.
(20)     And I also look into the people. What I mean
(21) by the people, well, I make sure that environments, the
(22) retention, the attraction of new employees, and how can
(23) we retain employees in the long-term.
(24)     Q. Okay. Thank you for that. Being that you
(25) were new to the San Francisco Airport operation, before

Page 34

(1) pulling the trigger and actually recommending the
(2) termination of Mr. Navarro, did you talk to anyone with
(3) regards to that decision?
(4)     A. Yes. I talked to HR.
(5)     Q. Who else?
(6)     A. I talked to HR and nobody else about that
(7) decision.
(8)     Q. So you didn't talk to Renil and say, "Renil, I
(9) know you've been here a while. What do you think about
(10) this?"
(11)     A. I don't recall it, talking to Renil.
(12)     Q. How much did you know about Mr. Navarro at the
(13) time that you terminated him?
(14)     A. I didn't know that much about Mr. Navarro.
(15)     Q. Okay. Did you know that he had been working
(16) for Menzies a long time at that point?
(17)     A. Yes, I did.
(18)     Q. And then what were you trying to accomplish by
(19) choosing to terminate Mr. Navarro?
(20)     A. Well, I think that, as I said before, my job
(21) there is to ensure that we can retain employees. And
(22) the only way to retain employees is to ensure an
(23) environment where they work is a good environment. So
(24) when you have one person, just one person, complaining
(25) about supervisor harassment, then you need to take

Page 35

(1) actions.
(2)     Q. So your belief is that it was all Mr. Navarro
(3) complaining, it was just him?
(4)     A. I think that, based on the statements we
(5) received, they were focused on that -- on him.
(6)     Q. Okay. But what about all those other people
(7) that signed the petition?
(8)     A. Well, as I said before, we need to ensure that
(9) environment is good. So, for me, just one person
(10) complaining about harassment, it's an issue.
(11)     Q. Okay.
(12)     A. More than one, then you have a petition signed
(13) by people. So we have a person, and more than one
(14) person being harassed to sign a petition, that is a
(15) huge issue for me.
(16)     MR. URIARTE: Okay. All right. Can we take a
(17) look at Exhibit 8 again, please.
(18)     David, are you there?
(19)     ZOOM HOST: Yes, coming up shortly.
(20)     MR. URIARTE: Thank you.
(21)     ZOOM HOST: Give me one second. It's not coming
(22) up.
(23)     MR. URIARTE: No problem. Thank you, David.
(24)     Q. Let's go to the top part of Exhibit 8, please.
(25) So it says, "To: Menzies Management. Sir/madam."

Page 36

(1)     Do you read that, Mr. Vargas?
(2)     A. Yes, I do.
(3)     Q. All right. Could you read where it starts
(4) "We" for us, please.
(5)     A. "We the fuelers on Menzies 130 side would like
(6) to make a petition against Andrew Dodge." Let me --
(7)     Q. You'll have to move --
(8)     A. There it is. Thank you. I'll start again.
(9)     It says, "We the fuelers on Menzies 130 side
(10) would like to make a petition against Andrew Dodge.
(11) The way he supervised is very unprofessional when he
(12) run the operation or supervised, people are not taken
(13) their breaks it's because the way he set up the
(14) flights, and he always blaming the people there's a
(15) delay or always saying lack of manpower and trucks
(16) issues. The truth is he doesn't know how to run the
(17) show, we also addressed the problem to the higher
(18) position managers (Nicco, John and Renil) as usual
(19) nothing happened, looks like they always covering his
(20) mistake or maybe these managers don't know anything
(21) about fueling also like Andrew Dodge lack of experience
(22) about fueling."
(23)     Q. Okay.
(24)     A. "We think" --
(25)     Q. Go ahead.

**Page 37**

(1)     A. "We think this is the right time to broadcast
(2) the problem in this company. We are hoping this
(3) problem will be addressed."
(4)     Q. Okay. Was this problem ever addressed,
(5) Mr. Vargas?
(6)     A. It was addressed at the moment, but I was not
(7) there.
(8)     Q. I'm sorry?
(9)     A. It was addressed at the moment because this is
(10) old case, but I was not there when that happened.
(11)     Q. Okay. When did you go to Los Angeles?
(12)     A. September.
(13)     Q. Of?
(14)     A. September -- September 1st, 2019.
(15)     Q. So that was a year later, right?
(16)     A. Yes.
(17)     Q. So within -- from August to -- August 2018 to
(18) September 2019, was there anything done about what was
(19) written here?
(20)     A. No, as I said before, the conversation with
(21) HR, because I was not aware of all this that was
(22) happening with Andrew, I had a conversation with HR
(23) where they -- where HR told me about what happened and
(24) what the final outcome of that investigation was.
(25)     Q. With regards to the investigation on the sleep

**Page 38**

(1) apnea, is that correct?
(2)     A. In regards to the issues that they were
(3) having -- that they are complaining about Andrew.
(4)     Q. Okay. So it says, "the way he supervised is
(5) very unprofessional when he run the operation or
(6) supervised." Anything that was done about that?
(7)     A. At the moment that I get there, I hadn't had
(8) any problem with Andrew. And I didn't get any
(9) complaint from any fueler in relation to Andrew.
(10)     Q. Did you talk to any of the fuelers about the
(11) way he supervises is very unprofessional and run the
(12) operation or supervise?
(13)     A. I'm sorry, no, I did not talk to any fuelers
(14) about the way he supervise.
(15)     Q. Do you know if Tracy or HR did that?
(16)     A. In the conversations we had, it wasn't
(17) specific about his performance in terms of OTP, which
(18) is operational -- on time performance, I'm sorry.
(19)     Q. And then it says -- okay. I'm sorry, I think
(20) we missed the last part. Did you say something there?
(21)     A. No.
(22)     Q. Okay. "People are not taking their breaks
(23) it's because the way he set up the flights." That one,
(24) did you ask about that? Was that something that was
(25) taken care of?

**Page 39**

(1)     A. Well, I didn't receive no complaints about
(2) people not taking the breaks. And I want to -- can
(3) I -- the policy that I have, when I manage people, is
(4) really open. And what I do is I always invite people,
(5) when they have issues, to talk about the problems they
(6) have. The moment that I raised all those points with
(7) people, I never would receive no complaints from no
(8) fueler in relation to Andrew's performance.
(9)     Q. Okay. But if you see the second page there of
(10) this petition, they did. They did come forward, right?
(11) Because you have 25, 26 people signing.
(12)       If you have an open-door policy about letting
(13) you know about the complaint, wasn't this what these
(14) people are doing? I don't see how --
(15)     MR. WU: Objection. Lack of foundation.
(16) Misstates prior testimony.
(17)       You can answer if you understand the question.
(18)     THE WITNESS: I think that that question I already
(19) answered.
(20)     MR. URIARTE: Q. Which is you don't believe that
(21) these people were really complaining?
(22)     A. We have people feel harassed to sign this
(23) petition.
(24)     Q. So you feel every one of these people were
(25) harassed to sign this petition, is that correct?

**Page 40**

(1)     A. No what I believe. It's what I know. What I
(2) know is there's people that felt harassed to sign this
(3) petition.
(4)     Q. All right. But you didn't actually talk to
(5) the people, you just --
(6)     A. No, I did not. I'm sorry. I did not. I
(7) received all the documentation and find out outcome of
(8) the investigation.
(9)     Q. All right. Can we go back to the first page,
(10) please. It talks about "looks like they are always
(11) covering his mistake." Do you see that?
(12)     A. Yes, I see that.
(13)     Q. Okay. So what do you understand from that
(14) phrase?
(15)     A. From that phrase, that the duty managers are
(16) covering their mistakes.
(17)     Q. That Nicco, John and Renil is covering the
(18) mistakes of Andrew Dodge. Is that how you understand
(19) that?
(20)     A. Yes. Sorry.
(21)     Q. Did you inquire as to that? Did you do
(22) anything with regards to that statement?
(23)     A. Again, I didn't do anything about this
(24) statement other than talk to HR to understand where
(25) this was coming from. We already talked about the

## Page 41

(1) outcome of that conversation with HR.

(2)    **Q.** Okay. Mr. Vargas, let me put it directly

(3) here. If it's true, just theoretically, if it's true

(4) that Nicco, John and Renil are covering up for the

(5) mistakes of Andrew Dodge, would that be something that

(6) maybe Nicco, John and Renil should be terminated for?

(7)    **A.** I think that it would be important to make an

(8) investigation before we take into consideration.

(9)    **Q.** But that's a serious allegation, right?

(10)    **A.** I'm sorry?

(11)    **Q.** That's a serious allegation.

(12)    **MR. WU:** Objection. Improper hypothetical.

(13)    You can answer the question.

(14)    **MR. URIARTE: Q.** That's a serious allegation.

(15)    **A.** And as I said before, for me, anything that

(16) affect the environment of our employees is valid.

(17)    **Q.** Yeah, it's valid, definitely. But my question

(18) was that would be serious, wouldn't you agree, as a

(19) manager, if somebody --

(20)    **A.** Again, it all depends on the investigation.

(21) So I cannot tell you, because the letter says that,

(22) but --

(23)    **Q.** Sure.

(24)    **A.** -- we did an investigation as we did with

(25) Navarro.

## Page 42

(1)    **Q.** I agree. But that's not what I'm asking. I'm

(2) asking a more simple question, which is, if that

(3) allegation by itself, right, alleging that Nicco, John

(4) and Renil are covering up for the mistake of Andrew

(5) Dodge, just that allegation itself, standing on its

(6) own, would you characterize that as a serious

(7) allegation?

(8)    **MR. WU:** Objection. Improper hypothetical.

(9)    **MR. URIARTE:** You can answer.

(10)    **THE WITNESS:** I already did.

(11)    **MR. URIARTE: Q.** And what was your answer?

(12)    **A.** That I will have to perform an investigation

(13) to understand exactly.

(14)    **Q.** That would be the result, right? That would

(15) be the result, the conclusion. I'm not talking about

(16) the result or the conclusion. I'm just talking about

(17) how you would characterize an allegation such as that.

(18)    **A.** Well, and as I said, if I see something like

(19) that, I will perform an investigation. So if I perform

(20) an investigation, it means that it is important.

(21)    **Q.** Okay. And did you perform the investigation?

(22)    **A.** No, I did not. As I said, I talked to HR

(23) about this case, specific case. Based on the fact that

(24) there were people harassed to sign this petition, I did

(25) not perform that investigation.

## Page 43

(1)    **MR. URIARTE:** Okay. Let's look at Exhibit 19,

(2) please.

(3)    **ZOOM HOST:** One second, coming up.

(4)    **MR. URIARTE: Q.** Actually, Mr. Vargas, did you

(5) have a conversation with Renil about how many times Mr.

(6) Navarro or other people had gone up to Renil with

(7) regards to Andrew Dodge?

(8)    **A.** No, I did not. I don't recall it.

(9)    **MR. URIARTE:** Okay. So can we have Exhibit 19,

(10) please.

(11)    (Plaintiff's Exhibit 19 marked for

(12)    identification.)

(13)    **MR. URIARTE:** Thank you.

(14)    **Q.** So Exhibit 19 starts with a statement by

(15) Mr. Vasquez. You know Mr. Vasquez, right? I think you

(16) called him Rafael Martinez or something like that. It

(17) might be Vasquez Martinez, actually. But he was the

(18) shop steward for Menzies, is that correct?

(19)    **A.** Yes.

(20)    **Q.** Okay. And here, if you go to page 2, please.

(21) Just to kind of make sure, this refers to you -- here's

(22) the petition Mr. Vasquez kind of wrote up. Does this

(23) look familiar to you?

(24)    **MR. WU:** Objection. Assumes facts not in

(25) evidence.

## Page 44

(1)    **MR. URIARTE: Q.** Mr. Vargas?

(2)    **A.** I don't recall it.

(3)    **Q.** Okay. If you go to the bottom of the page,

(4) and, again, this is a document that we received from

(5) your company lawyers. Do you see the handwriting that

(6) "Raul Vargas received" -- I can't read anything more

(7) than that. Do you see that, "Raul Vargas"?

(8)    **A.** Well, "Raul Vargas," yes, I see that.

(9)    **Q.** Did you write that or somebody else wrote

(10) that?

(11)    **A.** That's not my writing.

(12)    **Q.** So let's go back to page 1. It says here, "On

(13) September 6th, 2018 I was asked by Menzies on the 130

(14) side to write up a Petition on behalf of the Fuelers on

(15) the 130 side versus Andrew Dodge. The petition was

(16) written out and signed by the Fuelers on 130 side of

(17) the SFO Team." Do you see that?

(18)    **A.** Yes.

(19)    **Q.** And just to assist you with regards to

(20) context, September 6th, 2018, Mr. Navarro was not

(21) working for Menzies anymore, correct?

(22)    **A.** I believe so. I don't recall the date, but --

(23)    **Q.** I think your attorney and I would agree that

(24) the termination documents say August 29, 2018. Okay?

(25)    **MR. WU:** And I would just say that the witness can

**Page 45**

(1) only testify to what he knows. So I'm not going to
(2) agree or disagree with that statement.
(3)     **MR. URIARTE:** Okay. I'll represent to you,
(4) Mr. Vargas, that by September 6th, 2018, Mr. Navarro
(5) was not your employee anymore.
(6)     **Q.** So then he goes on to talk about you. "The
(7) petition was then officially turned in to the SEIU. In
(8) addition, the Petition was also turned over to Raul
(9) Vargas." Do you remember that?
(10)     **A.** I don't recall it. I don't recall having that
(11) petition, to tell you the truth.
(12)     **Q.** So you don't remember Mr. Vasquez getting
(13) close to you and giving you some pieces of paper?
(14)     **A.** I do not.
(15)     **Q.** "There have been two separate Petitions turned
(16) in to Menzies Aviation Fueling Department Director Raul
(17) Vargas." Do you remember that?
(18)     **A.** Well, I believe the first one was the one that
(19) they signed.
(20)     **Q.** Okay. And then the second one, do you
(21) remember receiving a second one?
(22)     **A.** I don't recall it.
(23)     **Q.** Okay. All right. "I have spoken to Menzies
(24) Aviation Fueling Director Raul Vargas on three separate
(25) occasions regarding Mr. Andrew Dodge." Do you remember

**Page 46**

(1) that?
(2)     **A.** No, I do not.
(3)     **Q.** When I say "Rafael Vasquez," does a face go
(4) into your mind?
(5)     **A.** Yes, I do remember Rafael who was the steward
(6) that was on leave of absence during the time that I was
(7) over there.
(8)     **Q.** He was on leave of absence during the time?
(9)     **A.** Yeah. I don't recall if he was during the
(10) time that this petition was made or not, but I recall
(11) him being on leave of absence for most of the time.
(12)     **Q.** But do you remember talking to him?
(13)     **A.** Yes, I do remember talking to him about
(14) operational things.
(15)     **Q.** Do you remember talking to him about Andrew
(16) Dodge?
(17)     **A.** I don't recall it.
(18)     **Q.** Do you remember talking to him three times
(19) about the same topic?
(20)     **A.** About what?
(21)     **Q.** I'm sorry?
(22)     **A.** About what? Three times about what?
(23)     **Q.** Three times about any topic but it's the same
(24) topic?
(25)     **A.** I do -- I do remember that.

**Page 47**

(1)     **Q.** So you remember him going to you on several
(2) occasions talking to you about the same topic?
(3)     **A.** About topics, about operational things.
(4)     **Q.** Okay. And what kinds of operational things
(5) would he talk to you about?
(6)     **A.** Talk about issues on -- on the operation.
(7)     **Q.** Like give me an example.
(8)     **A.** Talk about attendance issues. Talking about
(9) safety issues. We used to have -- we used to have
(10) meetings with the union every two weeks, if I remember
(11) correctly, to talk about operational issues.
(12)     **Q.** Okay. And that when you say these meetings
(13) with the union every two weeks, that was Mr. Vasquez?
(14)     **A.** Some of the meetings Mr. Vasquez was in there.
(15)     **Q.** Was he the one leading the discussion for the
(16) union?
(17)     **A.** No.
(18)     **Q.** Did you say "yes" or "no"?
(19)     **A.** I said no.
(20)     **Q.** Okay. So for the union somebody else talked,
(21) right, not Mr. Vasquez?
(22)     **A.** Well, he was talking, too, but the lead of the
(23) union was another person that I don't recall right now.
(24)     **Q.** In those meetings, do you remember them
(25) talking about Andrew Dodge at all?

**Page 48**

(1)     **A.** No, no, I don't.
(2)     **Q.** Okay. And here he says "on three separate
(3) occasions regarding Mr. Andrew Dodge, who continues to
(4) abuse his authority and at times harass Fuelers under
(5) his charge." Did you ever talk to Mr. Vasquez about
(6) that?
(7)     **A.** I don't recall it.
(8)     **Q.** Okay. So it could have happened or might not
(9) have happened, what's your memory like?
(10)     **A.** I can't recall it.
(11)     **Q.** Okay. All right. So if we just scroll down
(12) more pages, please, second page. Second page of
(13) Exhibit 19. So the second page of Exhibit 19 looks
(14) like the petition that Mr. Vasquez gave to you
(15) according to him. Okay?
(16)     **MR. WU:** Assumes facts.
(17)     **MR. URIARTE: Q.** I'll kind of give you a moment
(18) here to read it. Let me know when you finish reading
(19) it.
(20)     **A.** Looks like kind of the same as the letter they
(21) brought me when they signed the petition. It's the
(22) same as the petition.
(23)     **Q.** You mean the first one?
(24)     **A.** I mean -- I don't know if this -- this letter.
(25) Yeah.

**Page 49**

(1)    **Q.** Okay. And then are you done reading it,

(2) Mr. Vargas? I mean -- go ahead.

(3)    **A.** Do you want me to read the entire --

(4)    **Q.** Yes, please.

(5)    **A.** Give me a couple of minutes.

(6)    **Q.** Yeah, yeah, please, take your time. I just

(7) want to make sure that your -- maybe it will refresh

(8) your recollection.

(9)    **A.** Okay. (Witness reviews document.)

(10)      Good.

(11)    **Q.** Very good. Thank you. Does that refresh your

(12) recollection at all with regards to Mr. Vasquez giving

(13) you this piece of paper?

(14)    **A.** I don't -- I don't recall it. I mean, it

(15) looks like the same letter that the -- the fuelers

(16) signed.

(17)    **Q.** Well, if you go down a little bit, if we go to

(18) the next page, you'll see these signatures. This is

(19) the actual petition here. But, again, this is a

(20) different set of signatures. And it has Mr. Vasquez at

(21) the end there. But this is definitely a different set

(22) of signatures from Exhibit 8 which we saw earlier,

(23) which was what we're calling the first petition.

(24)    **A.** Can you move a little bit up?

(25)    **Q.** Sure.

**Page 50**

(1)    **A.** A little bit more.

(2)    **Q.** David? Yeah.

(3)    **A.** Thank you. Okay.

(4)    **Q.** Okay?

(5)    **A.** What is the first name there? Sorry.

(6)    **Q.** Yeah, I wasn't given a better copy. I don't

(7) know. Okay. So do you remember seeing these

(8) signatures at all?

(9)    **A.** I don't recall it.

(10)    **Q.** Not at all, okay. So is it safe then to say

(11) that you're not sure whether you received this second

(12) petition or not from Mr. Vasquez?

(13)    **A.** Yes.

(14)    **Q.** So you could have received it and you may not

(15) have received it. Is that like your best memory?

(16)    **A.** My best memory is that not receiving this

(17) paper.

(18)    **Q.** I'm sorry, your best memory is that you did

(19) not receive this paper?

(20)    **A.** That I don't remember receiving this paper.

(21)    **Q.** All right. So let's agree for a second that

(22) you received this paper in September. Correct? Would

(23) you have done something about it if you had received

(24) this paper in September?

(25)    **MR. WU:** Objection. Improper hypothetical. Lacks

**Page 51**

(1) foundation.

(2)      You can answer.

(3)    **THE WITNESS:** If I get that, I will -- I will want

(4) to look at it and perform an investigation.

(5)    **MR. URIARTE: Q.** But as far as you know, no

(6) investigation happened as a result of Exhibit 19,

(7) correct?

(8)    **MR. WU:** Objection. Lacks foundation.

(9)    **THE WITNESS:** Can I respond?

(10)    **MR. WU:** Yes, you can answer. You can answer

(11) unless I instruct you specifically not to.

(12)    **THE WITNESS:** All right. Can you repeat the

(13) question.

(14)    **MR. URIARTE: Q.** Sure. As far as you know, based

(15) on this petition, this second petition that we called

(16) it, as far as you know, no investigation happened

(17) because of it?

(18)    **A.** As far as I know, no investigation happened

(19) because of it.

(20)    **Q.** Is that correct?

(21)    **A.** That is correct, as far as I know.

(22)    **Q.** Very good. Were you involved in the decision

(23) to suspend Mr. Navarro while the investigation was

(24) going on?

(25)    **A.** I don't recall it.

**Page 52**

(1)    **Q.** And then did HR give you recommendation with

(2) regards to other options available aside from

(3) termination?

(4)    **A.** Well, the recommendation -- the recommendation

(5) from HR was not to terminate him.

(6)    **Q.** And you didn't follow that?

(7)    **A.** No, actually, I asked why those

(8) recommendations, which I think it's normal procedure.

(9)    **Q.** So you're saying you asked the recommendation

(10) from HR, and then what did HR say?

(11)    **A.** That based on the -- on the recommendation and

(12) the conversation they had with the director, they're

(13) recommending not to terminate, but it was just -- I'm

(14) sorry, that it was just a recommendation, I'm sorry.

(15)    **Q.** Okay. So HR's recommendation is not to

(16) terminate, right?

(17)    **A.** Yes.

(18)    **Q.** But you did not follow that, right?

(19)    **A.** No, because I -- I needed to see the final

(20) outcome of the investigation to take the right

(21) decision.

(22)    **Q.** And what did you see in the final outcome that

(23) made you conclude that termination was the right

(24) action?

(25)    **A.** I get the final outcome from safety department

**Page 53**

(1) with the statements, plus the messages from Navarro to

(2) Andrew, plus, well, the letter with the petition, the

(3) call from the union in that there is somebody

(4) instigating the people to sign this petition.

(5)     **Q.** Okay. Weren't there other options available?

(6)     **MR. WU:** Objection. Vague.

(7)     You can answer.

(8)     **THE WITNESS:** There are always different options.

(9)     **MR. URIARTE: Q.** Did you consider those options?

(10)     **A.** I think the harassment for me is -- is very

(11) important. I need to look into the environment for all

(12) the employees and not just one.

(13)     **Q.** Okay.

(14)     **A.** And I think that is important that this person

(15) was supervisor.

(16)     **Q.** So you're saying the harassment is so

(17) important that that was like a very big part of why you

(18) decided to terminate. That's what you're saying?

(19)     **A.** Yes.

(20)     **Q.** So what did you learn -- what if you learned

(21) that harassment was also going on between Andrew Dodge

(22) and the fuelers, would that be enough to terminate

(23) Andrew Dodge?

(24)     **MR. WU:** Objection. Improper hypothetical. Lacks

(25) foundation.

**Page 54**

(1)     You can answer.

(2)     **THE WITNESS:** We investigated everything.

(3) Everything -- we need to investigate everything to look

(4) into how that is affecting the employees.

(5)     **MR. URIARTE: Q.** Right. I know you have to

(6) investigate. I guess my hypothetical is more, if you

(7) learned that harassment was actually going on between

(8) Andrew Dodge and his fuelers, then it would lead to the

(9) conclusion that he should be terminated, too, right?

(10)     **MR. WU:** Same objection.

(11)     **MR. URIARTE: Q.** Is that correct, Mr. Vargas?

(12)     **A.** It is. I protect the team.

(13)     **Q.** I was looking at some of your corporate

(14) documents with regards to handbooks and HR materials

(15) and all that. And there's this thing called

(16) progressive discipline. Were you aware of that?

(17)     **A.** Yes, I am.

(18)     **Q.** Okay. And why is it that you did not use

(19) progressive discipline in this situation?

(20)     **A.** Because there are cases that they're severe,

(21) and then that's one of the outcome of the

(22) investigation.

(23)     **Q.** So it's like serious enough to terminate?

(24)     **A.** Yes.

(25)     **Q.** Is that a yes?

**Page 55**

(1)     **A.** Yes, it is a yes.

(2)     **Q.** Okay. And then did you ask or were you

(3) curious, maybe you should have had a conversation with

(4) Mr. Navarro?

(5)     **A.** I don't participate in the investigations.

(6)     **Q.** Maybe like a phone call to Mr. Navarro to get

(7) his side of the story?

(8)     **A.** No, I do not. I do not participate in any

(9) investigation.

(10)     **Q.** And do you know whether or not they actually

(11) talked to Mr. Navarro and got his side of the story?

(12)     **A.** I just get the final outcome.

(13)     **Q.** You just get the final decision?

(14)     **A.** The final outcome for -- from the

(15) investigation.

(16)     **Q.** My question is different. My question is when

(17) you were looking at all the different elements to

(18) decide whether to terminate or not, did you try to find

(19) out whether somebody talked to Mr. Navarro to get his

(20) side of the story?

(21)     **A.** No, I did not. I did not try to find out.

(22)     **Q.** Would you say that's kind of like basic

(23) investigation right there?

(24)     **MR. WU:** Objection. Lack of foundation. Improper

(25) hypothetical.

**Page 56**

(1)     You can answer if you know.

(2)     **THE WITNESS:** I won't say that is -- it all

(3) depends on the kind of investigation they're running.

(4)     **MR. URIARTE: Q.** They -- what's the last word?

(5)     **A.** They are running.

(6)     **Q.** That they are running. Okay. But you didn't

(7) look into what kind of investigation they were running?

(8)     **A.** I just look into the final outcome of the

(9) investigation.

(10)     **Q.** And you never, like, got into your head and

(11) said, what does Mr. Navarro say about all of this?

(12) That's not something that you ever asked yourself?

(13)     **A.** No, I do not. I do not because I just look

(14) into the final outcome of the investigation. So I

(15) think that that question is for the people who perform

(16) the investigation.

(17)     **Q.** So you said earlier that the goal of

(18) terminating Mr. Navarro was to protect the employees

(19) from the harassment, right? The environment of

(20) harassment, correct?

(21)     **A.** Yes.

(22)     **Q.** How is it different, in achieving that goal,

(23) how is termination different from, let's say, a

(24) suspension?

(25)     **A.** Well, I think that is important, too, if you

Page 57

(1) find out that there is a harassment in the -- in the
(2) crew and in the environment, then the only way for you
(3) to ensure that we remove that harassment from the
(4) environment is to remove the person who is doing the
(5) harassment. In that every case is different, but when
(6) you have three people complaining about it, and at the
(7) same time you have a petition involving another
(8) employee which you're trying to achieve by harassing
(9) people is -- is not good.
(10)     Q. Okay. But the part about that that needs a
(11) little bit of explanation is you have this -- you say
(12) at the same time you have this petition, but what about
(13) the people that actually wrote the petition, right? So
(14) they have a concern, right? So --
(15)     A. Well, we go back to the same -- to the same
(16) conversations we had before, of the petition, when you
(17) have somebody that is pushing somebody to sign a paper
(18) that they don't even know what it's for.
(19)     Q. Right. For those three people, right?
(20)     A. Could be one, two, three, I don't know.
(21)     Q. Now, in your emails, you mentioned July or
(22) Julie Macapagal, it M-a-c-a-p-a-g-a-l. Actually, the
(23) name of an old Filipino president. July Macapagal.
(24) Does that name sound familiar to you?
(25)     A. He's also part of a supervisor crew.

Page 58

(1)     Q. Was an investigation ever conducted?
(2)     A. Well, I investigate. I saw the name of the
(3) person that it was on that list. And I request to open
(4) an investigation about that person.
(5)     Q. Was an investigation opened?
(6)     A. Yeah, but because I needed to know if this
(7) supervisor was also -- was also harassed to sign
(8) this -- this petition.
(9)     Q. Okay. And what was the result of the
(10) investigation?
(11)     A. That he was.
(12)     Q. I'm sorry?
(13)     A. That he was. He was also intimidated to sign
(14) the paper.
(15)     Q. I'm unclear about that. What is that --
(16) that's a person, a guy, right? A male?
(17)     A. Yes.
(18)     Q. He's a guy.
(19)     A. Yes.
(20)     Q. So what was -- what was Mr. Macapagal -- what
(21) did Mr. Macapagal do?
(22)     A. He's a supervisor.
(23)     Q. Yeah, and he signed the petition, correct?
(24)     A. The petition, yes.
(25)     Q. And then what was the result of the

Page 59

(1) investigation on Mr. Macapagal?
(2)     A. That he was forced to sign that paper.
(3)     Q. That he was forced to sign the paper, is that
(4) correct?
(5)     A. Yes.
(6)     Q. You talked to Mr. Macapagal?
(7)     A. No, I did not.
(8)     Q. Okay. So who gave you the results of the
(9) investigation?
(10)     A. Safety department. It was a conversation we
(11) had.
(12)     Q. Over the telephone?
(13)     A. No, person to person.
(14)     Q. Who in the safety department?
(15)     A. Kevin Blumberg.
(16)     MR. URIARTE: Let me get you, before we forget, so
(17) it's Kevin Blumberg, B-l-u-m-b-e-r-g. All right.
(18)     Q. So he told you that Mr. Macapagal told him
(19) that he was forced to sign the petition, is that
(20) correct?
(21)     A. Yes.
(22)     Q. Did you review the termination notice before
(23) it was issued?
(24)     A. No, I did not.
(25)     MR. URIARTE: I just want to make sure we're clear

Page 60

(1) on this. Exhibit 9, please, David. Thank you.
(2)         (Plaintiff's Exhibit 9 marked for
(3)     identification.)
(4)     MR. URIARTE: So if you could just scroll all the
(5) way, David, so Mr. Vargas can see the whole document.
(6) So this will be Exhibit 9. This is "Notice to
(7) Employees as to Change in Relationship" dated August
(8) 29, 2018. I'm good with my word with regard to the
(9) date there, even though Jason did not want to go with
(10) me on it.
(11)     Q. So do you see that, Mr. Vargas?
(12)     A. Yes, I see that.
(13)     Q. Okay. So you didn't see this document before
(14) it was issued?
(15)     A. I don't recall it, but it looks like the first
(16) time that I see this document.
(17)     Q. No problem. And then when it says "Code of
(18) Conduct," does that mean anything to you?
(19)     A. Yeah.
(20)     Q. What does that mean to you?
(21)     A. It means that the person was not conducting
(22) correctly.
(23)     Q. Okay. And specifically what was he not
(24) conducting correctly?
(25)     A. He was forcing people to sign a petition.

**Page 61**

(1) **Q.** Okay. Anything else that he wasn't doing
(2) correctly?
(3) **A.** I think that is enough for me.
(4) **Q.** I'm just trying to complete things, so I'm
(5) sorry I keep saying, "Anything else? Anything else?"
(6) I'm just making sure it's complete.
(7) So aside from him forcing people to sign the
(8) petition, anything else that might have caused him to
(9) violate code of conduct, or was that it?
(10) **A.** I think that -- I think that -- well, no,
(11) nothing -- well, but the reason why we terminate --
(12) **Q.** Yeah.
(13) **A.** -- because of forcing people to sign a
(14) petition.
(15) **MR. URIARTE:** Gotcha. Okay.
(16) And then could we have Exhibit 11, please.
(17) (Plaintiff's Exhibit 11 marked for
(18) identification.)
(19) **MR. URIARTE: Q.** So here's Exhibit 11. This one
(20) was given to us by your lawyers as well. It's Menzies
(21) 95, if you look on the bottom.
(22) **A.** Can you repeat that.
(23) **Q.** I'm sorry?
(24) **A.** Can you repeat it, please.
(25) **Q.** Sure. So this is Exhibit 11. This is a

**Page 62**

(1) document we received from your lawyers as well. It's
(2) Bates stamped Menzies 095. You see on the bottom of
(3) the document there? Based on this track on the left
(4) side there, it seems like it came from Ms. Aguilera's
(5) computer.
(6) So then, if we go up on the top part of this
(7) document, this document seems to be an employee
(8) performance development, Renaldo Navarro, August 29.
(9) Do you see that?
(10) **A.** Yes, I see it.
(11) **Q.** Okay. Did you see this document before today?
(12) **A.** No.
(13) **Q.** You have not? Okay.
(14) **A.** I don't recall it.
(15) **Q.** Okay. You don't recall it. Do you recall a
(16) discussion with Tracy, Ms. Aguilera, with regard to
(17) final warning and what could be written in the final
(18) warning, anything like that?
(19) **A.** I think -- well, there was a conversation
(20) about it in relation to the different options we had
(21) with Mr. Navarro.
(22) **Q.** Okay. But did you discuss the use of a final
(23) warning for Mr. Navarro? Did you discuss that with
(24) Ms. Aguilera?
(25) **A.** I don't recall it.

**Page 63**

(1) **Q.** All right. And here it says this option, I
(2) guess, would have placed Mr. Navarro on final warning
(3) for unprofessional conduct of a supervisor, right? Do
(4) you see that?
(5) **A.** Yes.
(6) **Q.** And it says "distributing a petition and
(7) disruption of the workforce." Do you see that?
(8) **A.** Yes, I do see it.
(9) **Q.** And then it says, "You are being placed on a
(10) Final Warning which is your last and final opportunity
(11) to" -- we don't know. I'm thinking it's like "change
(12) your behavior," maybe. I don't know. We don't know
(13) that. And then, "Any infraction, no matter how minor
(14) in any of the 4 categories of Attendance, Conduct,
(15) Safety or Work Performance, may result in your
(16) immediate discharge." Do you see that?
(17) **A.** Yes, I see that.
(18) **Q.** And then the Final Warning box is marked.
(19) **A.** Uh-huh. Yes.
(20) **Q.** Okay. And then if you see a little bit down,
(21) just to make sure, there's no signature because it was
(22) not used, presumably, correct? So my question about
(23) this document is what's wrong with this option,
(24) Mr. Vargas?
(25) **MR. WU:** Objection. Improper hypothetical. Lacks

**Page 64**

(1) foundation.
(2) **THE WITNESS:** I think that, based on the
(3) investigation we come up with, this was not the option,
(4) the right option for me at that moment.
(5) **MR. URIARTE: Q.** Thinking about it now and
(6) knowing a little bit more about the situation?
(7) **A.** I already had final outcome of the
(8) investigation. Make sure I need to have the right -- I
(9) need to take the right decision.
(10) **Q.** You still think it's the right decision then,
(11) Mr. Vargas?
(12) **A.** I do believe that it was the right decision,
(13) and that's why I took it. And you can tell when I
(14) asked Tracy on -- in terms of her recommendation,
(15) because I needed to ensure that we had all information
(16) available to take the right decision moving forward.
(17) **Q.** Okay. I guess I would have to ask, though,
(18) don't you think that a final warning, one more little
(19) mistake, may have resulted in the same outcome for you
(20) in your goal of eliminating harassment? Because your
(21) goal is to eliminate harassment.
(22) **A.** Yes.
(23) **Q.** And a final warning like this --
(24) **MR. WU:** Improper -- sorry, I didn't know if you
(25) were done with your question. I don't mean to cut off

**Page 65**

(1) your question, Arlo.

(2)    MR. URIARTE: It's okay, Jason. Go ahead with

(3) your objection.

(4)    MR. WU: The objection is improper hypothetical

(5) and lack of foundation.

(6)    MR. URIARTE: Q. Mr. Vargas?

(7)    A. I'm sorry, but I don't know. That's the

(8) reason why I'm thinking about risk, I need to ensure

(9) that we can reduce the risk as much as we can. So

(10) since I don't know what's going to happen with a

(11) warning, the way for me to reduce the risk is

(12) terminating the person.

(13)    Q. Go ahead.

(14)    A. With enough documentation to support that

(15) decision.

(16)    Q. Right. And for you the documentation is the

(17) conclusion of the security people, right? And then the

(18) statement of the three people that you're talking

(19) about.

(20)    A. Do you want me to go through it?

(21)    Q. No, no, we've gone through it. Don't worry

(22) about it. But that's your position, you felt like you

(23) had enough documentation to do a termination?

(24)    A. Yes.

(25)    Q. And you're avoiding the risk. Now, the risk

**Page 66**

(1) that you're talking about is the risk that Mr. Navarro

(2) will continue to harass, correct?

(3)    A. Yes.

(4)    MR. URIARTE: So let's go to Exhibit 12, please.

(5)    (Plaintiff's Exhibit 12 marked for

(6)    identification.)

(7)    MR. URIARTE: Q. Okay. Have you seen Exhibit 12

(8) before, Mr. Vargas?

(9)    A. Yes, I did.

(10)    Q. Did you review it for today's deposition?

(11)    A. Yes.

(12)    Q. I have a couple of questions. If we go to

(13) page 2 -- all right. So, actually, I guess we need to

(14) go to page 3. We are on the day before, August 28, at

(15) 4:27 p.m. It looks like Tracy sends you an email that

(16) says, "After reviewing the case with my HR Director."

(17) And do you know who that HR director is?

(18)    A. Talin. It's the person who's listening to us

(19) or participating today.

(20)    Q. So "After reviewing the case with my HR

(21) Director, our recommendation is not to terminate the

(22) employee at this time." Do you see that?

(23)    A. Yes, I see that.

(24)    Q. Okay. And at this point you're two months

(25) into your job. Two months into being in the San

**Page 67**

(1) Francisco Menzies fueling operation, is that correct?

(2) June, July -- oh, maybe three months.

(3)    A. Maybe three months, yes.

(4)    Q. Maybe three months, is that correct?

(5)    A. Yes.

(6)    Q. And then you know that Tracy and Talin have

(7) both been in the company a longer time than you at this

(8) point in time, correct?

(9)    A. Yes.

(10)    Q. You knew that?

(11)    A. Yes, I did.

(12)    Q. Okay. So then we go up a little bit. I guess

(13) your response to this is on page 2, actually. The

(14) bottom of page 2. And then you -- in the bottom,

(15) please, one more. No, a little bit more, David.

(16) Bottom of this page. Yeah, keep going.

(17)    MR. WU: David, it looks like you're on page 3,

(18) not page 2.

(19)    MR. URIARTE: Oh, that's why, yeah. Bottom of

(20) page 2. There you go.

(21)    Q. So I guess your response to that was to say,

(22) "Hello Tracy, Could you please explain this

(23) recommendation." Is that correct?

(24)    A. That is correct.

(25)    Q. And then, so we go up, and we have here a --

**Page 68**

(1) what do you call this -- the statement with regard to

(2) Kevin Blumberg, the safety and security manager, do you

(3) see that?

(4)    A. Yes.

(5)    Q. And this is the security conclusion that you

(6) spoke of, correct?

(7)    A. Yes.

(8)    Q. And then if we go up a little bit more, and I

(9) believe on page 1, Tracy kind of tells you, look at the

(10) statement below, look at the attachments, and the

(11) petition. I mean, you say to Tracy, right? Do you see

(12) that?

(13)    A. This is my final --

(14)    Q. I think we need to go down a little bit.

(15) Before that, Tracy actually responds to your email with

(16) regards to getting an explanation to their

(17) recommendation, right?

(18)    A. Yes.

(19)    Q. Okay. And she kind of lists all her reasons

(20) why she makes that recommendation after talking to

(21) Talin. Do you see that?

(22)    A. I don't.

(23)    Q. I'm sorry?

(24)    A. I don't see that.

(25)    Q. Well, where she says, "Please see my

**Page 69**

(1) documented findings below that I originally sent."

(2)     **A.** Right.

(3)     **Q.** I guess below might be -- yeah, do you see

(4) that? "And Kevin statement," the security person. "I

(5) have also attached the statements from the Employees

(6) and the petition." Do you see that?

(7)     Stop, David, go down a little bit. We're on

(8) the right place.

(9)     Do you see that?

(10)     **A.** Yes.

(11)     **Q.** And then she goes, "I can only make a

(12) recommendation. The final decision is yours."

(13)     **A.** Yes. Go ahead.

(14)     **Q.** No, go ahead.

(15)     **A.** She's not telling me anything. She's just

(16) telling me that the recommendation, this is my

(17) recommendation, but she's not, as HR, thinking about

(18) all the statements and documentation she got.

(19)     **Q.** Correct. Would you agree that what she said

(20) to you is she's giving you the bases of why she

(21) recommends that, right?

(22)     **A.** She's just giving me -- she's just giving me

(23) the recommendation.

(24)     **Q.** Okay. And then she's telling you, "I cannot

(25) have the meeting with Rey at 4:30 today without a

**Page 70**

(1) decision." Do you see that?

(2)     **A.** Yes.

(3)     **Q.** Okay. Does that line kind of refresh your

(4) recollection about anything?

(5)     **A.** Yes.

(6)     **Q.** Okay. What does it refresh your recollection

(7) about?

(8)     **A.** I'm sorry, but what -- I'm not -- can you

(9) repeat that question.

(10)     **Q.** Yes. So "I cannot have the meeting with Rey

(11) at 4:30 today without a decision."

(12)     When I read that, if I was reading that, I'm

(13) like, oh, man, somebody's like rushing me, something

(14) like that. So I'm thinking that maybe in your head it

(15) refreshes your recollection with regard to how it was

(16) for you, right? Because somebody has to make a final

(17) decision, right?

(18)     What was happening at that point?

(19)     **A.** Well, but it's important to also mention that

(20) that 4:30 doesn't mean we need to have that -- that

(21) decision before that. We can move the meeting with Rey

(22) Navarro easily later on to ensure that we take the

(23) right decisions on that. That's pretty much normal

(24) process we have, if we don't have the decision, we need

(25) to investigate more.

**Page 71**

(1)     **Q.** Okay. So at this point did you think that you

(2) needed to investigate more?

(3)     **A.** Yes, definitely, because she was not answering

(4) my question on that -- at that point.

(5)     **Q.** Okay. Very good. All right. And then if we

(6) go up a little bit. So here is your response, I guess,

(7) August 29 at 5:01 p.m. And you kind of made the

(8) decision to terminate Mr. Navarro, correct?

(9)     **A.** Yes.

(10)     **Q.** So in the hour between 4:04 p.m. and 5:01

(11) p.m., what additional investigation occurred?

(12)     **A.** Well, we had a -- we had a conversation with

(13) HR also, and I reviewed all the documentation in terms

(14) of what the outcome of the investigation was. And at

(15) that point I took the decision to terminate Mr.

(16) Navarro.

(17)     **Q.** Okay. Anything else that you did in that

(18) hour?

(19)     **A.** Well, we talked -- as I say, we talked with

(20) HR, talked about the case. We collected all the

(21) documentation, put all the documentation together. And

(22) then we took the right -- the last decision, and that's

(23) why I send that email to HR.

(24)     **Q.** At this point you were not provided a document

(25) with regard to the final warning, right? You didn't

**Page 72**

(1) review that at this point?

(2)     **A.** No, I did not. That's HR. And I think that

(3) is also important to remember -- it's important to

(4) remark that HR take decisions -- decisions in terms

(5) of --

(6)     **Q.** In terms of?

(7)     **A.** The person.

(8)     **Q.** HR made decisions in terms of the person, you

(9) said?

(10)     **A.** Of the person, exactly.

(11)     **Q.** And what do you mean by that?

(12)     **A.** Because they look into everything that you're

(13) saying, or they take a look to the seniority of the

(14) person, that this person is being 15 years at the

(15) company, so they look on the -- on the recommendation

(16) of the document, warnings and all that, and then, based

(17) on that, they gave a recommendation.

(18)     Now, we, as directors, we look into the more

(19) open situation of -- in terms of the whole operation,

(20) how this will affect the rest of the employees. And

(21) during that -- during that meeting, of course, we

(22) agreed on -- on a final termination for Mr. Navarro.

(23)     **Q.** And when you say "agreed," who actually agreed

(24) with you?

(25)     **A.** HR.

**Page 73**

(1)    **Q.** Meaning Talin and Tracy?

(2)    **A.** Yes. So then Tracy agreed because she had a

(3) conversation with Talin, so we all agreed on -- on this

(4) termination.

(5)    **MR. URIARTE:** Okay. Why don't we take a

(6) five-minute break and then we'll be right back. Thank

(7) you.

(8)    **MR. WU:** All right.

(9)    (Brief recess.)

(10)    **MR. URIARTE:** Okay, Mr. Vargas, it looks like I

(11) have no further questions for you today.

(12)    **THE WITNESS:** Okay.

(13)    **MR. WU:** And I have just a few questions for you,

(14) Raul.

(15)    EXAMINATION BY MR. WU

(16)    **MR. WU: Q.** So, Raul, during the time you were

(17) the director of operations at SFO, aside from the

(18) petition, did you hear of any complaints that Andrew

(19) Dodge was harassing employees?

(20)    **A.** No, I did not.

(21)    **Q.** During the time you were the director of

(22) operations at SFO, aside from the petition, did you

(23) hear of any complaints that Andrew Dodge wasn't giving

(24) fuelers breaks?

(25)    **A.** No, I did not.

**Page 74**

(1)    **Q.** During the time you were the director of

(2) operations at SFO, aside from the petition that we've

(3) already been discussing, did you hear any complaints

(4) that Andrew Dodge wasn't running the operation

(5) smoothly?

(6)    **A.** I did not.

(7)    **Q.** During the time you were director of

(8) operations at SFO, aside from the petition, have you

(9) heard any complaints about Andrew's job performance?

(10)    **A.** No, I did not.

(11)    **Q.** During the time you were the director of

(12) operations at SFO, did you ever hear of any grievance

(13) filed by the union against Andrew Dodge?

(14)    **A.** There is nothing on Andrew Dodge.

(15)    **MR. WU:** Okay. I think that's all the questions I

(16) have on my end, Arlo, unless you have any further

(17) questions.

(18)    **MR. URIARTE:** Yeah, let me just follow up with

(19) what you just said.

(20)    FURTHER EXAMINATION BY MR. URIARTE

(21)    **MR. URIARTE: Q.** Mr. Vargas, you said there was

(22) nothing on Andrew Dodge, right? One, two, three, four,

(23) five items there. You never heard anybody complaining

(24) about harassing him, you never heard that he was not

(25) giving breaks, you never heard that he was not running

**Page 75**

(1) operations smoothly, you never heard complaints about

(2) his job performance, you never heard of grievances

(3) against Andrew Dodge, right?

(4)    **A.** I don't recall having any -- any of those

(5) conversations to nobody.

(6)    **Q.** Okay. So now you don't recall those kinds of

(7) conversations, that's correct, right?

(8)    **A.** Yes.

(9)    **Q.** Okay. But did you ever ask Renil about it,

(10) about these items?

(11)    **A.** We talked with Renil about those -- the items

(12) when -- when -- no, I don't recall, I'm sorry. No.

(13)    **Q.** Okay. So you don't recall whether you talked

(14) to Renil or not, is that correct?

(15)    **A.** No, not about that -- not about that specific

(16) topic.

(17)    **Q.** Okay. So let me just clarify this because

(18) it's a little bit unclear. You do not recall or the

(19) way you remember it is that you did not talk to Renil

(20) about it?

(21)    **A.** In relation to Renil, I do not recall talking

(22) to Renil about Andrew's performance.

(23)    **Q.** You do not recall talking to Renil about all

(24) these different items, correct?

(25)    **A.** Correct.

**Page 76**

(1)    **Q.** And when you say you do not recall, does that

(2) mean it could have happened or does that mean you

(3) didn't do it?

(4)    **A.** It means that I don't have anything documented

(5) that's important, and I don't recall having a

(6) conversation.

(7)    **Q.** Okay. What about with Tracy or with HR? Do

(8) you recall talking to them about all these different

(9) items?

(10)    **A.** We had a conversation, as I said, in terms of

(11) the investigation and in terms of what the letter --

(12) letter said about Andrew, as I explained it before, and

(13) nothing else on that.

(14)    **MR. URIARTE:** Okay. All right. Thank you.

(15)    **THE WITNESS:** Thank you.

(16)    **MR. URIARTE:** Thank you, Mr. Vargas.

(17)    **MR. WU:** Thank you very much for your time, Raul.

(18) We appreciate it.

(19)    **THE WITNESS:** Thank you very much.

(20)    **MR. URIARTE:** We'll stop the record.

(21)    (Whereupon, the concluded at 11:15

(22) o'clock a.m.)

(23)    ---o0o---

(24)

(25)

**Page 77**

(1)                 CERTIFICATE OF WITNESS

(2)                     ---o0o---

(3)

(4)         I, RAUL VARGAS, hereby declare under

(5) penalty of perjury that I have read the foregoing

(6) deposition testimony; and that the same is a true

(7) and correct transcription of my said testimony

(8) except as corrected pursuant to my rights under

(9) Rule 30(e) of the Federal Rules of Civil

(10) Procedure.

(11)

(12)         _____

                        Signature

(13)

(14)         _____

                            Date

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

**Page 78**

(1) STATE OF CALIFORNIA      )
                             )
(2) COUNTY OF SAN FRANCISCO )

(3)         I, CINDY TUGAW, a Certified Shorthand Reporter

(4) of the State of California, duly authorized to

(5) administer oaths pursuant to Section 8211 of the

(6) California Code of Civil Procedure, do hereby certify

(7) that

(8)                 RAUL VARGAS,

(9) the witness in the foregoing deposition, was by me duly

(10) sworn to testify the truth, the whole truth and nothing

(11) but the truth in the within-entitled cause; that said

(12) testimony of said witness was reported by me, a

(13) disinterested person, and was thereafter transcribed

(14) under my direction into typewriting and is a true and

(15) correct transcription of said proceedings.

(16)         I further certify that I am not of counsel or

(17) attorney for either or any of the parties in the

(18) foregoing deposition and caption named, nor in any way

(19) interested in the outcome of the cause named in said

(20) caption.

(21)         Dated the 10th day of September, 2020.

(22)

(23)

(24)

                        CINDY TUGAW

(25)                    CSR No. 4805 (California)

**Page 79**

(1) Raul Vargas
    c/o Foley & Lardner
(2) 555 California Street, Suite 1700
    San Francisco, CA 94104
(3) Attn:  Jason Y. Wu, Esq.
(4) Date:  September 10, 2020
    Re:  Navarro vs. Menzies
(5) Deposition Date:  Tuesday, August 25, 2020
(6) Dear Mr. Vargas,
(7)         Please be advised the original transcript of
    your deposition is ready for your review.
(8)         Pursuant to FRCP Rule 30(e), you have 30 days
    following the date of this notice to read, correct if
    necessary, and sign your transcript unless the
    attending parties and the deponent agree on the record
(10) or otherwise in writing to a longer or shorter time
    period.  The deponent may change the form or the
(11) substance of the answer to a question, and may either
    approve the transcript of the deposition by signing it,
(12) or refuse to approve the transcript by not signing it.
    You are not required by law to read and sign your
(13) deposition transcript.  All parties will be informed of
    the corrections.  The original transcript will then be
(14) sealed and sent to the examining attorney pursuant to
    the applicable law.
(15)         You may either come to our office to read and
    sign the original transcript, or you may contact your
(16) attorney or the attorney who arranged for you to be
    present at your deposition.  If they have ordered a
(17) copy of the transcript, you may review their copy and
    make corrections by submitting, signing and returning
(18) the attached form.  If you choose to review your
    transcript at our office, please call first to make an
(19) appointment.  Should you have any question regarding
    these instructions, please call.
(20)
        Sincerely,
(21)
(22)
    NOGARA REPORTING SERVICE
(23) 5 Third Street, Suite 415
    San Francisco, California 94103
(24) (415) 398-1889
(25) cc:  All counsel, original deposition