# EXHIBIT 51

**DEPOSITION OF ANDREW DODGE - 07/28/2020**

**RENALDO NAVARRO vs. MENZIES AVIATION, INC.**

CONDENSED TRANSCRIPT AND CONCORDANCE

PREPARED BY:

NOGARA REPORTING SERVICE
5 Third Street, Suite 415
San Francisco, CA  94103
Phone:  (415) 398-1889
FAX:  (415) 398-0611



## Page 1

```
           IN THE UNITED STATES DISTRICT COURT
    IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA


RENALDO NAVARRO,
              Plaintiff,
v.                           No.  3:19-CV-8157
MENZIES AVIATION, INC.,
doing business as MENZIES
and DOES 1 through 10,
inclusive,
              Defendants.
_____/
Zoom Remote Deposition of
      ANDREW DODGE
Tuesday, July 28, 2020




REPORTED BY:  CINDY TUGAW, CSR #4805


              NOGARA REPORTING SERVICE
              5 Third Street, Suite 415
             San Francisco, California 94103
                    (415) 398-1889
```

## Page 2

```
                    I N D E X
                                        Page Number
EXAMINATION BY MR. URIARTE                   4
                    ---o0o---
                  E X H I B I T S
Plaintiff's
Exhibit 3    Copy of two photographs        26
Exhibit 5    Statement by Andrew Dodge      42
             dated 8-16-18
Exhibit 8    Petition from Menzies          33
             fuelers to Menzies
             Management
Exhibit 10   Statement by Rafael            40
             Vasquez dated 11/18/18
                    ---o0o---
```

## Page 3

```
         BE IT REMEMBERED that, pursuant to Notice of
Taking Deposition and on Tuesday, the 28th day of July,
2020, commencing at the hour of 9:00 o'clock a.m.
thereof, via Zoom videoconference, before me, CINDY
TUGAW, a Certified Shorthand Reporter in the State of
California, personally appeared,
                    ANDREW DODGE,
Called as a witness by the Plaintiff, having been by me
first duly sworn, was examined and testified as
hereinafter set forth.
                    ---o0o---
             APPEARANCES OF COUNSEL
For the Plaintiff
    LIBERATION LAW GROUP, P.C.
    2760 Mission Street
    San Francisco, California 94110
    BY:  ARLO GARCIA URIARTE, Attorney at Law
    (415) 695-1000

For the Defendants
    FOLEY & LARDNER, LLP
    555 California Street, Suite 1700
    San Francisco, California 94104
    BY:  JASON Y. WU, Attorney at Law
    (415) 984-9848

Also Present:  David Ho, Zoom Host.
                    ---o0o---
```

## Page 4

**ZOOM HOST:** Good morning. I am David Ho and I will be the Zoom host. I am going to be -- as soon as the deposition gets going, I'll be off screen and I'll mute myself. The only time you will hear my voice if there are any exhibits that you need to bring up. And so, Cindy, take it away.

**THE REPORTER:** At this time, I will ask counsel to stipulate on the record that there is no objection to this deposition officer administering a binding oath to the witness via Zoom, starting with the noticing attorney.

**MR. URIARTE:** No objection.

**MR. WU:** No objections for defendant Menzies Aviation.

(Whereupon, the Witness was duly sworn by the Reporter.)

EXAMINATION BY MR. URIARTE

**MR. URIARTE: Q.** Good morning, Mr. Dodge. My name is Arlo Uriarte. I am attorney for Renaldo Navarro in this matter of Mr. Navarro against Menzies.

Are you aware of that?

**A.** Yes.

**Q.** Okay. Would you please state and then spell your full name for the record, please.

**A.** Yeah. Andrew Dodge, A-n-d-r-e-w, and then

Page 5

(1) D-o-d-g-e.
(2) Q. Okay. And, Mr. Dodge, what's your current
(3) position with Menzies?
(4) A. I am a supervisor here at Menzies.
(5) Q. Have you had your deposition taken before?
(6) A. Yes.
(7) Q. And in what context?
(8) A. Can you, like, rephrase the question?
(9) Q. Yeah. Why was your deposition -- why did you
(10) provide a deposition?
(11) A. I had an incident on the -- on the airport.
(12) Q. Okay. So it was your case or was it somebody
(13) else's case?
(14) A. It was somebody else's versus Menzies.
(15) Q. Gotcha. And do you remember the name of that
(16) person?
(17) A. The first name. It was a police officer named
(18) Robert.
(19) Q. Okay. So it was a police officer who filed a
(20) lawsuit against Menzies, and you were a witness?
(21) MR. WU: I'm just going to object, relevance, to
(22) this line of questioning.
(23) But you can answer.
(24) THE WITNESS: It was something against Menzies
(25) Aviation because I was a part of it.

Page 6

(1) MR. URIARTE: Q. Okay. Was it a personal injury
(2) action? Was it -- can you give me -- do you know?
(3) A. It was just a -- it was a dispute of him
(4) saying that I hit him from the butt -- hit him from --
(5) his vehicle from behind.
(6) Q. Gotcha. And when did you provide your
(7) deposition? What year?
(8) A. Actually, it was 2020. I think it was January
(9) or February of 2020.
(10) Q. Okay. And you were driving a Menzies vehicle?
(11) A. Yes. I was driving a Menzies fueling
(12) equipment, yes. A Menzies fueling truck.
(13) Q. So I'll give you some instructions for today.
(14) Most important I think is the fact that we do have a
(15) court reporter here, Cindy, who's taking down
(16) everything that we are saying, that you will be saying,
(17) that your counsel will be saying.
(18) At the end, although we are in an informal
(19) setting and we're doing this through Zoom, your
(20) testimony, the words that you provide, the answers that
(21) you provide here today, will have the same force and
(22) effect as if you were testifying in court.
(23) Do you understand that?
(24) A. Yup.
(25) Q. You have to say yes or no as opposed to, like,

Page 7

(1) yup or --
(2) A. Yes, I understand.
(3) Q. Okay. Instead of nodding your head or --
(4) A. Yeah, I gotcha. I gotcha.
(5) Q. And then it's very important that you
(6) understand the question before you answer. A booklet
(7) will come out of this deposition. You'll be able to
(8) review it. But if you make any changes, attorneys like
(9) myself or another attorney or the court might question
(10) you or might question your credibility because you
(11) changed your answer. Okay?
(12) Do you understand that?
(13) A. Yes.
(14) Q. Are you able to provide your best testimony
(15) here today?
(16) A. Yes.
(17) Q. There's nothing precluding you from being able
(18) to articulate or remember things from the past?
(19) A. I mean, it's been a while. It's been a while
(20) since -- since I've seen Ray or seen -- had an incident
(21) with Ray, so --
(22) Q. Aside from the passage of time, are you under
(23) some sort of medication or substance that can affect
(24) your ability to remember?
(25) A. No, no substance, no.

Page 8

(1) Q. All right. Yeah, so we will -- of course, all
(2) we are entitled to here, Mr. Dodge, is your best memory
(3) and your best recollection. So if you have to qualify
(4) your memory, that's totally fine. If you don't
(5) remember, that's totally fine. I will test your
(6) memory, but we don't want you to guess. Your attorney
(7) doesn't want you guess. I don't want you to guess.
(8) Nobody wants you to guess. Okay?
(9) A. Okay.
(10) Q. I will ask for a range or an estimate, and
(11) that's very different from a guess. But let's go --
(12) when we're in those questions, let's test our memory
(13) and let's see how good your memory is with regards to
(14) those. Okay? But you can qualify. Okay?
(15) Do you understand that?
(16) A. Yes, I understand.
(17) Q. If there's any kind of technical issues that
(18) occur, if you don't hear or you're not understanding
(19) the questions, let us know. Okay? We'll work through
(20) that.
(21) A. Okay.
(22) Q. It looks like -- are you using your phone?
(23) A. Yeah, my cell phone. I don't have my laptop
(24) with me. Sorry.
(25) Q. That's fine. Are you in the office right now?

Page 9

(1) A. Yeah. I'm just -- I'm in one of the offices,
(2) but I'm just going to close the door.
(3) Q. Okay.
(4) A. Sorry. Okay.
(5) Q. Are you working right now? Are you on your
(6) shift or something?
(7) A. No, no. No, I'm not working right now, no.
(8) Q. All right. You got notice of this deposition
(9) some time ago, some weeks ago, is that correct?
(10) A. Yes, I -- yeah.
(11) Q. And in preparation for today's deposition, did
(12) you talk to anybody? Aside from your attorneys, did
(13) you talk to anybody?
(14) A. No.
(15) Q. Did you review any documents to prepare for
(16) today?
(17) A. With my attorney-client.
(18) Q. So you reviewed some documents with your
(19) attorney. Do you remember what documents you reviewed
(20) to prepare for today's deposition?
(21) A. Just some of the -- how do you say? What do
(22) you call the document numbers that shows you, like,
(23) different things? I don't know what you guys call
(24) them.
(25) Q. Are you talking about the complaint?

Page 10

(1) A. No. I can't think of the name. Just marked
(2) with numbers, like -- I can't think of the name.
(3) Q. If it comes back to you, let me know. Are
(4) they like -- are they documents that you prepared in
(5) the past?
(6) A. Documents I prepared?
(7) Q. Yes.
(8) A. It was like -- one was something that I wrote
(9) in the past.
(10) Q. Right. There's one letter that you wrote to
(11) management about Ray, is that correct? That one the
(12) you --
(13) A. Yeah.
(14) Q. Did you review the petition written against
(15) you at all?
(16) A. I don't recall the petition, no.
(17) Q. All right. Well, if you remember -- if you
(18) remember what that -- are you talking about a
(19) legal-looking document? Is that what you reviewed?
(20) A. I don't recall.
(21) Q. Okay. All right. So --
(22) MR. WU: Arlo?
(23) MR. URIARTE: Yes.
(24) MR. WU: I'm sorry for the interruption. Could we
(25) go off the record and could I have a breakout room with

Page 11

(1) Mr. Dodge for just a minute?
(2) MR. URIARTE: Sure. David? Are you there?
(3) VIDEO OPERATOR: Yes. Mr. Wu, we do not have a
(4) breakout room for this particular -- if we can off go
(5) of the record and have him call you, and then he can
(6) reconnect.
(7) MR. URIARTE: Or I can leave, if you want, or you
(8) guys can talk on the phone. I think you should
(9) probably mute and then talk on the phone or something.
(10) MR. WU: You know, honestly -- are we off the
(11) record?
(12) MR. URIARTE: Yes, let's go off the record, Cindy.
(13) (Brief recess.)
(14) MR. URIARTE: Let's get back on the record. We
(15) are back on the record.
(16) Q. So, Mr. Dodge, off the record we kind of had a
(17) discussion to try to refresh your recollection in
(18) regards to preparing for today's deposition. So can
(19) you just state for the record the people that you spoke
(20) with as well in preparation for today's deposition.
(21) A. Yeah. John Qually, Randy Davies, and also
(22) Tracy Aguilera as well.
(23) Q. And how long was that conversation for?
(24) A. Like a couple hours.
(25) Q. More like two hours or more like five hours?

Page 12

(1) A. No, more like two hours.
(2) Q. Okay. Sounds good. All right.
(3) Can you tell me the highest level of education
(4) that you achieved.
(5) A. I have some college.
(6) Q. Did you graduate from college?
(7) A. No, I did not.
(8) Q. And when you say college, what college did you
(9) go to?
(10) A. I attended DeAnza Community College.
(11) Q. Did you get an AA?
(12) A. No. I was going for my AA.
(13) Q. And when was the last time you actually
(14) participated in a class at DeAnza? Like what year?
(15) A. I want to say like 2015, 2016.
(16) Q. And what were you trying -- what AA were you
(17) trying to graduate?
(18) A. Criminal justice.
(19) Q. And when did you start with Menzies? What
(20) year?
(21) A. February of 2016.
(22) Q. So February of 2016, is that with Menzies
(23) already?
(24) A. That was when we were ASIG.
(25) Q. So that's still ASIG.

Page 13

(1) A. Yeah.
(2) Q. And then shortly thereafter -- shortly
(3) thereafter, Menzies came in, is that correct?
(4) A. Yeah, Menzies came in, like, 2018, or
(5) something like that, or in 2000 -- or like in the
(6) middle of 2018, I want to say.
(7) Q. All right. What was the position you had when
(8) you started with ASIG?
(9) A. When I first started at ASIG, I was a fueler.
(10) Q. How long were you a fueler for before becoming
(11) a supervisor?
(12) A. I want to say about a year.
(13) Q. And who approved your promotion to supervisor
(14) from a fueler?
(15) A. Renil Lal, the general manager at the time.
(16) Q. The termination of Mr. Navarro is about August
(17) of 2018. Do you remember that?
(18) A. Yeah, I remember him not being there anymore.
(19) Q. And in August of 2018, you were a supervisor,
(20) correct?
(21) A. Yes.
(22) Q. And your shift was -- can you tell me, what
(23) was your shift?
(24) A. During the time -- like, your question is,
(25) like -- like, now or in the past?

Page 14

(1) Q. In August of 2018.
(2) A. I was -- I was doing swing shift and -- which
(3) would start -- swing shift. It would probably start
(4) around, what, 2:00 or 3:00 in the afternoon until about
(5) 11:00 p.m. at night. And then I would also cover
(6) graveyard at the time, which started around 11:00 p.m.
(7) to about 7:00 a.m., if someone called off work. I also
(8) covered people's call sicks as well.
(9) Q. Gotcha. Okay. So if you had your regular
(10) shift, which was the swing shift, of 2:00 to 3:00 until
(11) 11:00 p.m., you sometimes overlapped with the beginning
(12) of Renaldo Navarro's shift, is that correct, graveyard?
(13) A. So I would see -- I would see Ray and give him
(14) an update on the shift on what's going on and what
(15) needs to be done, who's here, who called out. And
(16) sometimes you go a little past that because operation
(17) can be a little bit busy, but we never overlapped by no
(18) more than 30 minutes or 20 minutes.
(19) Q. So it would be kind of like a handoff?
(20) A. Yeah. It's always a handoff to the next
(21) supervisor. You give them the cell phone and just talk
(22) about what happened on the operation, and stuff that
(23) needs to be done, or flights that come in, or flights
(24) that were delayed, or anything about what's going on
(25) with the fuelers, or anything about the equipment, you

Page 15

(1) know, stuff like that.
(2) Q. Gotcha. And then, aside from yourself, so you
(3) have Andrew Dodge, you have Renaldo Navarro, a
(4) supervisor. Who else were supervisors at that time, in
(5) August of 2018?
(6) A. Just a quick question. When you mean
(7) supervisors, are you talking about supervisors as,
(8) like, in general all the supervisors, or are you
(9) talking about supervisors that I just worked with on my
(10) side of the airport?
(11) Q. No, I'm talking about the same level as you,
(12) so, like, fueling --
(13) A. So on my operation on my side of the airport,
(14) it was me, Ray Navarro, July -- I can't pronounce his
(15) last name. July, Edsel and Tevita.
(16) Q. What was the last one? I'm sorry.
(17) A. Tevita.
(18) Q. How do you spell that?
(19) A. T-e-v-i-t-a.
(20) Q. Okay. And when you say your side, is that the
(21) 103? Is what you guys called it?
(22) A. The one at the time, yes, it was is 130 side.
(23) The 1-3-0 side.
(24) Q. I mean 130.
(25) A. Yes.

Page 16

(1) Q. How many sides were there?
(2) A. We had the 130 side, the 135 side, and we had
(3) another side -- like about three -- three or four
(4) sides.
(5) Q. Gotcha. And then above the supervisors were
(6) duty managers, correct?
(7) A. Yes.
(8) Q. And at that time, in August of 2018, who do
(9) you remember the duty managers to be?
(10) A. At the time, the duty managers were John
(11) Qually and Nico.
(12) Q. That was working the 130 side?
(13) A. Working -- duty managers were actually just
(14) the whole operation.
(15) Q. So you remember John Qually. You remember
(16) Nico. Right?
(17) A. Yes.
(18) Q. Just a second. And then Renil was the general
(19) manager, correct?
(20) A. Yes.
(21) Q. And then Randy Davies was the vice president,
(22) but he's in Texas, is that correct?
(23) A. Yeah, he was -- he was gone the beginning of
(24) 2018, though, so --
(25) Q. I see. All right. Very good.

Page 17

(1) Why don't you give me -- have your duties --
(2) have your duties as a supervisor changed from August
(3) 2018 to today?
(4) A. Well, up until the Corona virus in March it
(5) was the same, but now I just got back from furlough, so
(6) I'm kind of just doing training as of right now, going
(7) back.
(8) Q. Gotcha. Yeah, I mean, I think everybody is
(9) hoping that things kind of go back to normal hopefully
(10) soon, but it doesn't look that way.
(11) Okay. So let's just talk about your duties.
(12) And I really want to focus on your duties and
(13) responsibilities with regards to August of 2018 as a
(14) supervisor.
(15) A. Yeah.
(16) Q. Can you tell me what you remember to be your
(17) duties and responsibilities.
(18) A. So as a supervisor at the time -- at the time
(19) was to -- when you first come in, was to get the other
(20) supervisor's information: Get the cell phone, find out
(21) who's on the operation, who called out sick. After
(22) that it was to schedule the flights.
(23) So I would set up -- find out what flight are
(24) coming in during my shift, what time the plane was
(25) coming in, what time the plane was leaving, and from

Page 18

(1) there put fuelers on a schedule for, hey, you're going
(2) to go from this flight to this flight.
(3) And also, after that, it was to drive on the
(4) airport and just monitor the fuelers, if they needed
(5) help with something, or also monitor their safety. So
(6) making sure they're wearing their uniform. Making sure
(7) they're wearing their vest, earplugs, had their boots
(8) on. Make sure -- just come and check on them and make
(9) sure their equipment is running properly.
(10) And also, if they call me, I would go assist
(11) them, or, you know -- and also just change things
(12) throughout the operation. Maybe the guy might call me
(13) and be, hey, my flight never showed up, and then I
(14) might just change their flights around.
(15) Q. Right. Were you also in charge of providing
(16) breaks for people, like when they can go on --
(17) A. Oh, yes, of course. So you would -- when you
(18) schedule flights, you would -- before their fifth hour,
(19) California law, you try to find a break period for 30
(20) minutes. There were days that sometimes the way the
(21) flights came in, you know, the guys would be fueling
(22) and would go over that because they're still on the
(23) aircraft. You can't just leave the aircraft. They
(24) would have to take their break after they were done
(25) fueling the aircraft.

Page 19

(1) Q. Right. So the fuelers under your supervision,
(2) they depended on you for when they can take their
(3) breaks?
(4) A. Yes. They would take -- some of the guys
(5) were, Hey, I need to take a break, or asking ahead of
(6) time, Hey, what time am I taking my break? So
(7) everything would be coordinated depending on what's
(8) going on on the operation at the time.
(9) Q. And then, like you said, there are times where
(10) the fuelers would depend on you to help out with a
(11) particular situation. So you become kind of like an
(12) extra hand as well?
(13) A. Say that again. Like, what do you mean?
(14) Sorry.
(15) Q. Like if they're busy or they're shorthanded,
(16) you could come in also to help them?
(17) A. Yeah, if there was something going on in the
(18) operation, I would report to my duty manager, know
(19) what's going on, let him know, Hey, we're short. Can I
(20) get some assistance from your side? And if we didn't
(21) have the manpower, I would help on a flight and hook up
(22) and help, you know.
(23) Q. Exactly. Okay. And then, during the swing
(24) shift, how many fuelers did you normally supervise?
(25) A. On a busy day, on a really busy day, I have

Page 20

(1) between maybe eight to ten guys on a really busy day,
(2) with full staff.
(3) Q. Gotcha. And then if it's slow or not too
(4) busy --
(5) A. There's some nonbusy days. Probably --
(6) MR. WU: Andrew, make sure you hear Arlo's entire
(7) question before you start.
(8) THE WITNESS: Sorry.
(9) MR. URIARTE: Q. Yeah, because, Andrew, sometimes
(10) it gets hard for the court reporter, for Cindy, to
(11) actually kind of write down what we're saying if we're
(12) talking on top of each other. So let's give each
(13) other -- let's try give each other like a pause in
(14) between.
(15) A. Okay.
(16) Q. Thank you. So you said -- we were talking
(17) about, like, maybe on a slow or a normal day, how many
(18) people would you supervise?
(19) A. About maybe five or six guys.
(20) Q. Okay. In August of 2018, did you have some
(21) sort of accommodation or medical condition that where
(22) you actually asked the employer for an accommodation in
(23) the workplace?
(24) A. I had given Renil Lal a doctor's note at the
(25) time, like in 2017, from my doctor, having sleep apnea.

**Page 21**

(1) Q. And did you and the company or Renil kind of
(2) go through how to deal with the condition, the medical
(3) condition, with regards to your job and, you know, what
(4) type of -- was there any type of accommodation worked
(5) out?
(6) A. I don't recall any conversation with Renil. I
(7) just don't remember the conversations we had in the
(8) past.
(9) Q. Okay.
(10) A. I don't remember.
(11) Q. Did you have some sort of official or in place
(12) disability accommodation that kind of changed your
(13) normal workday that the company had to accommodate?
(14) Was something like that in place?
(15) A. Well, they tried, like I said -- I mean, how
(16) you say, like it was -- I remember trying to stay doing
(17) things, stay -- like stay on top of doing things, try
(18) not to just, you know, sit in one place. Just move
(19) around.
(20) Q. Right. I guess I'm asking more from like a
(21) formal perspective. Usually different companies deal
(22) with this in different ways, but usually, when an
(23) employee goes to an employer and says, hey, I have this
(24) medical condition that affects my workday, usually
(25) something is worked out, and then some things written

**Page 22**

(1) down saying, okay, well, here's what we're going to do.
(2) A. Well, see --
(3) Q. Something like that. Did you guys do
(4) something like that?
(5) A. See, with the doctor's note and what they
(6) were -- what they were reading was is that -- I don't
(7) know how to describe it. Sleep apnea is something --
(8) is a disease that you just -- I don't know how to
(9) describe it. It's just a disease that you have, and
(10) it's something hard to work with, you know, for
(11) accommodations. Do you know what I mean?
(12) Q. Yeah, yeah.
(13) A. It just happens.
(14) Q. I'm familiar with sleep apnea personally. I'm
(15) also familiar with it because we've represented people
(16) with sleep apnea, so I know it very well. Right, I
(17) understand.
(18) My understanding is sometimes the difficulty
(19) with you, probably, would be like if you become
(20) stationary, not moving or something, then you click and
(21) you fall asleep or whatever, right?
(22) A. Yes, you're right.
(23) Q. I understand that. But I guess my question
(24) more is almost like on a formal, written, you know -- I
(25) just wanted to know what procedure you went through,

**Page 23**

(1) what was in place, whether there was something --
(2) A. Yes.
(3) Q. -- in writing, or was it more informal, and
(4) you just told them the condition and nothing else.
(5) A. Well, like, even with a piece of paper from
(6) the doctor stating, because, like I said, in the past
(7) people were saying, like, I was just sleeping, but I
(8) provided a doctor's note showing what I had. I didn't,
(9) you know -- I didn't know about it either until I had
(10) to go see the doctor, and that's when I provided them
(11) with a note what I had because I had to go to sleep
(12) tests and all that, and they finally diagnosed me with
(13) that. And I had to show proof why it was happening,
(14) you know.
(15) Q. Okay. So then who did you actually give that
(16) doctor's note to?
(17) A. Renil.
(18) Q. To Renil. And then did Renil talk to you
(19) about it?
(20) A. I don't remember the -- we sat down. I just
(21) don't remember the conversation.
(22) Q. Okay. Did you guys work something out? Was
(23) there some sort of game plan or --
(24) A. I don't remember, to be honest.
(25) Q. Okay.

**Page 24**

(1) A. I don't remember.
(2) Q. And was there like a piece of paper that came
(3) out of your meeting or anything like that?
(4) A. I honestly don't remember.
(5) Q. No problem. Aside from Renil, who else did
(6) you talk to about your sleep apnea?
(7) A. John Qually.
(8) Q. And what did you talk to John Qually about?
(9) A. I just let him know that I gave Renil a piece
(10) of paper stating that, hey, what the condition that I
(11) have.
(12) Q. Okay. And then -- I'm sorry. Did you and
(13) John Qually work something out or some sort of
(14) agreement or game plan, anything like that?
(15) A. I don't remember any -- I don't remember a
(16) conversation like that. I just don't remember. Too
(17) long ago.
(18) Q. So how many conversations did you have with
(19) John Qually about your sleep apnea?
(20) A. When I -- the day -- the day I gave Renil that
(21) note back in, like, 2017, or something like that, I had
(22) let John know and Nico know at the time.
(23) Q. So just one time? Just one conversation?
(24) A. Yeah. And then sometimes, like if I was -- if
(25) I was, like, nodding off, John would kind of wake me

Page 25

(1) up, and "Sorry, man." And he'd understand. He'd say,
(2) "Oh, I remember."
(3)     Q.  Gotcha.  Did you ever tell your staff -- not
(4) your staff -- the fuelers about your condition?
(5)     A.  A lot of them actually knew about it just
(6) because some of my fuelers actually have it, so the
(7) other guys kind of knew right away.
(8)     Q.  Gotcha.
(9)     A.  Yeah.
(10)    MR. URIARTE:  I've got to do something.  Let's
(11) take a five-minute break and go off the record for five
(12) minutes.
(13)    MR. WU:  No problem.  That's fine.
(14)    MR. URIARTE:  Thank you.
(15)        (Brief recess.)
(16)    MR. URIARTE:  Back on the record, Cindy?
(17)    THE REPORTER:  Yes, go ahead.
(18)    MR. URIARTE:  Let me show you what we'll mark as
(19) Exhibit 3.
(20)        David, do you have Exhibit 3, please?
(21)    VIDEO OPERATOR:  Yes.  I will bring that up
(22) shortly.
(23)    MR. URIARTE:  I think we'll need a screen share
(24) for Mr. Dodge.
(25)        (Plaintiff's Exhibit 3 marked for

Page 26

(1) identification.)
(2)     MR. URIARTE:  Q.  Mr. Dodge, do you know if
(3) clicking on the Chat box -- there you go.  We have a
(4) screen share.  Do you see it?
(5)     A.  Yes.
(6)     Q.  Great.  So when we were talking about
(7) sleeping, I guess these pictures were taken of you.  So
(8) you're saying that when you were falling asleep in the
(9) office or in the vehicle like that, that was part of
(10) your sleep apnea condition?
(11)    MR. WU:  Objection.
(12)    THE WITNESS:  Yeah.
(13)    MR. WU:  Objection.  Assumes facts not in evidence
(14) that these are photos of him.
(15)    MR. URIARTE:  So, Mr. Dodge, just let your
(16) attorney finish his objection, and then you can answer
(17) after if you understand the question.
(18)    THE WITNESS:  Sorry.  Can you repeat the question
(19) one more time?  Sorry.
(20)    MR. URIARTE:  Q.  Yes.  So in these photographs,
(21) that's you, right, in the photograph?
(22)    A.  Yeah, that's me, yes.
(23)    Q.  And are you saying that when you fall asleep
(24) like this, that you -- that these events right here
(25) were part of your sleep apnea condition?

Page 27

(1)     A.  I can tell you that in the photo, the one with
(2) the truck, yes.  The one in the office, that was at the
(3) end -- I was done with my shift already.
(4)     Q.  Gotcha.  And do you remember if the one in the
(5) office was after a graveyard shift?  Is that what that
(6) was?
(7)     A.  I can't remember the dates.  It's in the
(8) office.  I don't remember.  But I remember this -- I
(9) remember this photo.
(10)    Q.  Gotcha.  So you're saying the one in the
(11) office you were already done with your shift, and you
(12) went to the office to just nod off, is that correct?
(13)    A.  I was done.  I had transferred all my
(14) information.  I went to the office and, yeah, fell
(15) asleep.
(16)    Q.  And then the vehicle, is this -- the vehicle
(17) is a vehicle located in the tarmac?  Is that where it
(18) is?
(19)    A.  It's black and white, so I can't -- yeah.
(20)    Q.  Okay.  But you remember that the vehicle --
(21) when you were sleeping in the vehicle in this
(22) photograph, that was because of sleep apnea, is that
(23) correct?
(24)    A.  Yeah, yes.
(25)    Q.  Okay.  So we're done with Exhibit 3.

Page 28

(1) Can you tell me, by August of 2018, how long
(2) you had been working with Renaldo Navarro at that time?
(3)     A.  Good question.  Do you mean like how long had
(4) I been working with him as a co-worker, as like a --
(5) how do you say -- as a -- supervisors together or as,
(6) in general, a fueler and a supervisor?
(7)     Q.  Yes.  In general.
(8)     A.  Since I began working for ASIG in 2016, I was
(9) his night fueler.  So I began working with him as a
(10) night fueler, and then once I got promoted, I became a
(11) swing supervisor, so I would transfer my information to
(12) him.
(13)        And then while -- our schedules changed, and
(14) then I would cover the days he was off as a swing -- I
(15) mean, as a graveyard.  And then there -- if someone
(16) called off, and I would see him from the night shift or
(17) into the morning shift, or I would cover his sick day.
(18) So, yeah, I worked with him a lot.
(19)    Q.  Gotcha.  And what was your general opinion
(20) with regards to Ray Navarro and how he did his job?
(21)    A.  Oh, Ray's a great supervisor.  There's no
(22) questions asked.  He was there for a long time, and,
(23) you know, he's -- he did his job.
(24)    Q.  And you and Ray -- at some point you and Ray
(25) started to have, like, difference of opinion with

Page 29

(1) regards to mainly your work performance.
(2)     Is that like a good way of putting it?
(3)     A. Yeah, yes. We bumped -- started bumping heads
(4) after my promotion. There was just a lot of
(5) disagreements after my promotion. After my promotion,
(6) that's when we started to bump heads.
(7)     Q. Yeah. And what was coming up as an issue?
(8) Why were you guys bumping heads?
(9)     A. It was more just agreement on how we saw
(10) things, you know. The reason I say that is because he
(11) ran his shift one way, I'd run my shift a different
(12) way, and another supervisor runs their shift a
(13) different way. So he just never liked the way I did
(14) my -- the way I ran things because, also, he had more
(15) experience, and I'm the new supervisor.
(16)     Q. Gotcha. Would it be fair to say that some of
(17) the fuelers would go to Ray and complain about you?
(18)     A. I honestly do not know what fuelers spoke, you
(19) know, unless they spoke to me. I don't know what other
(20) people would say behind my back.
(21)     Q. Right. But I guess what I'm saying is, was it
(22) possible that some of the fuelers that you were
(23) supervisor -- you were supervising were complaining to
(24) him, and then he was kind of, like, bringing that
(25) complaint over to you and criticizing you because of

Page 30

(1) what he heard from the fuelers you're supervising?
(2)     MR. WU: Objection. Vague. Calls for
(3) speculation.
(4)     You can answer if you know.
(5)     THE WITNESS: Yeah, I don't know. I mean, he
(6) brings stuff up, but I don't know if that was just him
(7) or the fuelers. I don't know.
(8)     MR. URIARTE: Q. Before Ray being terminated, can
(9) you maybe quantify how many times Ray complained about
(10) you or talked to you and told you that you weren't
(11) doing your job properly?
(12)     Do you remember how many times that happened?
(13)     A. We had a lot of confrontations, and he had a
(14) lot of complaints against him -- him and I when we were
(15) just having issues. I can't say a number of times, but
(16) it was lot.
(17)     Q. Would you say that more than ten times? That
(18) many?
(19)     A. Yeah, I would say more than ten times.
(20)     Q. And you and him, did you guys ever talk to a
(21) duty manager or the general manager to try to, you
(22) know, figure things out, and, you know, any of the duty
(23) managers talk to you about this situation?
(24)     A. Oh, yeah, yes. I did speak to John about the
(25) situation going on. I spoke to Nico about the

Page 31

(1) situation going on. I spoke to Renil about the
(2) situation going on.
(3)     Q. Okay. And, well, did they provide any kind of
(4) solution or any kind of course of action?
(5)     A. Yes. Renil brought -- a couple times brought
(6) us in to try to solve the -- try to solve what's going
(7) on.
(8)     Q. Yes.
(9)     A. But when Renil was speaking on a way to
(10) resolve, Ray would always kind of interrupt Renil, you
(11) know, interrupt him, wouldn't let him finish, or didn't
(12) like what he would say. So there was just a lot of
(13) things that Renil would try to fix, and then we'd come
(14) to an agreement, and then for maybe a good while it
(15) worked, and then it just -- again, we'd bump heads
(16) again.
(17)     Q. Gotcha.
(18)     A. And it was always about different things.
(19) There's a lot of different things that happened.
(20) Different subjects, though.
(21)     Q. Yeah, yeah. What are those subjects that you
(22) would remember? Like what --
(23)     A. Scheduling. It was always about how I
(24) scheduled things. It would come down to something
(25) about breaks, something about all the people don't like

Page 32

(1) you. Him saying I shouldn't be a supervisor. Stuff
(2) like that.
(3)     Q. Yeah. And when you say scheduling, you're
(4) talking about how you're scheduling the fuelers with
(5) regards to their workday and them being able to take
(6) breaks? Is that what it is?
(7)     A. Yeah, scheduling meaning how I schedule my
(8) flights to my crew.
(9)     Q. And then breaks, what were the complaints
(10) about breaks?
(11)     A. He was saying that I was giving the breaks
(12) late or not giving their breaks at all. Stuff like
(13) that.
(14)     Q. Did you ever inquire, you or Renil, with
(15) regard to, like, where he was getting his information?
(16) Because he wasn't working with you, so how did he know
(17) about the breaks and the scheduling and all of that?
(18)     A. Renil would -- Renil would investigate, find
(19) out what was going on from fuelers and ask what was
(20) going on. And, if anything, Renil -- if anything was
(21) questioned, Renil would ask me. But the main question,
(22) Renil would ask me if I am giving the fuelers breaks.
(23) He never said fuelers are complaining. It would be
(24) more like, Andrew, what did you -- can I see what you
(25) did, or can I see your text messages, stuff like that,

Page 33

(1) to see what I was doing. But he never said, hey,
(2) Andrew, so and so said they didn't get their break.
(3) You know what I mean?
(4) Q. Okay. And did Renil ever suggest to you a
(5) better what way of doing things? Was there anything
(6) like that?
(7) A. No, because -- no, because Renil knew how the
(8) operation was as well. Him being a general manager,
(9) he's been in that position knowing how the schedules
(10) work as well. He sees that.
(11) Q. Okay. And Renil thought that you were
(12) providing the breaks properly?
(13) A. Yeah.
(14) MR. URIARTE: Okay. Let me show you Exhibit 8.
(15) VIDEO OPERATOR: Okay. I will bring that up
(16) shortly.
(17) MR. URIARTE: Okay.
(18) (Plaintiff's Exhibit 8 marked for
(19) identification.)
(20) MR. URIARTE: Are you doing a screen share on
(21) that, David?
(22) THE WITNESS: I see it now.
(23) MR. URIARTE: Great. Okay. Do you know what
(24) Exhibit 8 is? I'll give you some time to take a look
(25) at that. Do you see that at all?

Page 34

(1) A. Yes, I see it.
(2) MR. WU: I'm going to object on the ground of
(3) attorney-client privilege.
(4) If you've seen this document before, you can
(5) certainly talk about that. If you've only seen it
(6) during discussions with your attorney, I'd instruct the
(7) witness not to divulge the content of any of those
(8) discussions.
(9) MR. URIARTE: Sure. Definitely, yeah. There's no
(10) question like that pending.
(11) Q. But, yeah, Mr. Dodge, don't tell me the
(12) conversation that you had with your attorney with
(13) regards to this document. What I need to inquire about
(14) is what you know about this document and your memory,
(15) events related to this document. Okay?
(16) A. Okay.
(17) Q. So, yeah. So are you able to actually see
(18) this -- well, I'm not able to -- there you go.
(19) MR. URIARTE: Actually, David, can you make it --
(20) because I'm not able to control it, can you make it so
(21) that -- there you go. That's good.
(22) Q. So have you seen this document before,
(23) Mr. Dodge? Aside from maybe looking it over with your
(24) attorney, aside from that event, before that, like in
(25) 2018, did you see this document before?

Page 35

(1) A. No, I did not.
(2) Q. Okay. So you haven't seen this document at
(3) all?
(4) A. No.
(5) Q. I see. Okay. So, essentially, like back in
(6) August of 2018, nobody at Menzies, none of the duty
(7) managers, not the general manager, Renil, nobody from
(8) Menzies went through this document with you before?
(9) A. No, they did not.
(10) Q. Okay. Can we get to page 2 of Exhibit 8,
(11) please. So this is the -- what we call -- I guess this
(12) would be the first petition. And then I think there's
(13) a third page as well. Can you get the third -- there
(14) you go.
(15) So I believe July Macapagal is a supervisor,
(16) is that correct, Mr. Dodge?
(17) A. Yes.
(18) Q. And then we go to page 2, and here on page 2 I
(19) think is where Mr. Navarro's signature is. If you look
(20) at line 16, he's the only other supervisor, I think,
(21) that also signed this.
(22) I wanted to see from -- so if you look at No.
(23) 1, the first person who signed it, can you identify to
(24) me fuelers that you've worked with.
(25) A. Fuelers that were, like, on my shift?

Page 36

(1) Q. Yes.
(2) A. Or in general worked with?
(3) Q. People that you supervised as a supervisor.
(4) A. I supervised all these people.
(5) Q. Okay. You're sure about that? There's a lot
(6) of names here.
(7) A. I supervised all these people.
(8) Q. Okay. Great. All right. That makes that
(9) easy.
(10) And then let's go to page 1. And then if we
(11) can just make page 1 a little bit bigger for -- there
(12) you go.
(13) So in the bottom there, the one you don't see
(14) in the screen -- there you go. Perfect. Thank you
(15) very much. So this is page 1. So let me just read it.
(16) It says, "To: Menzies Management. Sir/madam, We the
(17) fuelers on Menzies 130 side would like to make a
(18) petition against Andrew Dodge. The way he supervised
(19) is very unprofessional when he run the operation or
(20) supervised, people are not taken their breaks it's
(21) because the way he set up flights, and he always
(22) blaming the people there's a delay or always saying
(23) lack of man power and trucks issues."
(24) Okay. So let's kind of stick to that one --
(25) that second sentence there, "The way he supervised is

Page 37

(1) very unprofessional when he run the operation...people
(2) are not taken their breaks it's because the way he set
(3) up flights."
(4)     And, again, this is August of 2018. At that
(5) time, I know that you, Ray and Renil had some
(6) conversations, and then you also had conversations with
(7) Renil with regards to the breaks in your text messages.
(8)     A. Uh-huh.
(9)     Q. Aside from that, did Menzies talk to you in
(10) relation to this petition about how people are
(11) complaining about their breaks? Was that a
(12) conversation that you had?
(13)     A. No.
(14)     Q. What's your opinion on that, when you read
(15) your people are not taking their breaks because of the
(16) way he sets up flights --
(17)     A. So --
(18)     Q. -- and then you have, you know, 26 people
(19) signing that statement? Can you tell me what your
(20) opinions is in regards to that or your reaction?
(21)     A. Yeah. I mean, like I said, people got their
(22) breaks. It would just be determined on how the day was
(23) set up, you know, because aircrafts, the way you fuel
(24) aircrafts, sometimes you can be on a flight for two
(25) hours, you know, three hours, you know. It just

Page 38

(1) depends on how long you're waiting for that fuel to be
(2) done, you're waiting for that mechanic to be done. And
(3) then, you know, we always serve out a break. You know
(4) what I mean? They'd get their breaks.
(5)     Q. Right. But sometimes they'd just be --
(6)     A. It just depends on how the flights are coming
(7) in and stuff like that, you know. That's how -- how we
(8) ran it, you know, and that's how I was trained as well.
(9) You just -- and also, like I said, sometimes you're
(10) short manpower and sometimes you fuel longer a little
(11) bit and then get your break. It just depends, like I
(12) said, on the schedule.
(13)     Q. I see. What about this item here with regards
(14) to "Andrew Dodge lack of experience about fueling"?
(15) What do you think about that?
(16)     A. To be honest, that's just -- I don't know -- I
(17) don't know what word he used for that, but I became a
(18) supervisor because I know what I was doing. I was
(19) trained on everything. I was actually -- at the time,
(20) before Menzies bought us, I was considered a Class A
(21) fueler, which is one of the top fuelers. Like, having
(22) that title is really high, meaning I know how to do
(23) everything, from fueling, defueling, driving every
(24) piece of equipment on the thing, knowing how to fix
(25) equipment. It's just the knowledge of fueling in

Page 39

(1) general, safety. I was, like, one of the top people.
(2)     Q. Okay. Aside from this petition, did you have
(3) fuelers go up to you and complain to you about their
(4) breaks, like maybe they're late, maybe they're short,
(5) or anything like that?
(6)     Was that something that was happening in or
(7) around August of 2018?
(8)     A. I actually had people asking me, Hey, when am
(9) I going to get my break? And, you know, they'll come
(10) up to me, ask me what's going on, or can I see what
(11) you're planning, and I always talk to my fuelers.
(12) That's the main thing about the job, is communication,
(13) communication, talking and finding out, you know,
(14) plans, planning things out.
(15)     Q. So why do you think these fuelers, you know,
(16) all 26 of them, signed a petition against you? Why
(17) would that happen?
(18)     A. Honestly, I don't know -- actually, a lot of
(19) these names on here that I see people call me saying
(20) that, you know, they were forced to sign a petition.
(21) And they would tell me, Hey, I didn't want to sign it,
(22) you know, but they were forced to sign it, or they
(23) didn't read it, or stuff like that.
(24)     Q. I see. And they were forced to sign the
(25) petition. Like, do you know by whom and why they were

Page 40

(1) forced to sign the petition?
(2)     A. A lot of the guys -- a lot of the guys on the
(3) list would call me and say Ray was telling them to sign
(4) the paper to try to get me terminated or -- how do you
(5) say -- demoted from being a supervisor.
(6)     Q. Gotcha. And then do you know who Rafael
(7) Vasquez is?
(8)     A. Yeah. At the time, he was one -- a fueler and
(9) a union representative.
(10)     Q. Okay. Did you know that it was actually
(11) Rafael Vasquez who put together the petition?
(12)     MR. WU: Objection. Assumes facts not in
(13) evidence.
(14)     MR. URIARTE: Q. Did you know that, Mr. Dodge?
(15)     A. No, I did not.
(16)     MR. URIARTE: Let's go ahead and put up Exhibit
(17) 10.
(18)     (Plaintiff's Exhibit 10 marked for
(19)     identification.)
(20)     MR. URIARTE: Q. So here we go. So this one will
(21) be Exhibit 10. And as you see, it's signed by Rafael
(22) Vasquez. I think there's a date in the bottom there of
(23) November 18, 2018, when he signed this statement.
(24)     So did you have problems with Rafael Vasquez
(25) at all in or around August or November of 2018? Were

Page 41

(1) you having problems with him, Mr. Dodge?
(2) A. Rafael didn't work with me on my side of the
(3) airport.
(4) Q. Oh, I see. I see. So he's on another side of
(5) the airport?
(6) A. Yes.
(7) Q. Gotcha. Okay. So it looks like, from this
(8) statement that he signed, that says that he was asked
(9) by Menzies Aviation fuelers to write a petition on
(10) behalf of the fuelers on the 130 side.
(11)     Did you know that they -- that these fuelers
(12) submitted two petitions? Did you know that?
(13) A. No, I did not.
(14) Q. Okay. So, based on your responses, is it fair
(15) to say that nobody from Menzies Aviation ever sat you
(16) down to discuss one or two petitions that were written
(17) out against you at that time while it was happening?
(18) A. No. I'm the one that brought it up to Renil,
(19) saying that there was a petition going around, because
(20) one of the fuelers had called me about it.
(21) Q. So you knew that a petition was going around,
(22) but nobody from Menzies Aviation management ever kind
(23) of, like, sat down with you or talked to you about it,
(24) right? Is that correct?
(25) A. No, I don't -- I never, no.

Page 42

(1) Q. And you found out that there was a petition
(2) going around against you, but you never read the actual
(3) petition. Is that how it was?
(4) A. Yeah, I never got to see it, no.
(5) Q. And you're saying that the first time you saw
(6) it was actually a part of this litigation. Is that
(7) what you're saying?
(8) A. Yes.
(9) **MR. URIARTE:** Let's put up Exhibit 5, please.
(10) **VIDEO OPERATOR:** Okay. Coming up shortly.
(11) **MR. URIARTE:** Thank you.
(12)     (Plaintiff's Exhibit 5 marked for
(13)     identification.)
(14) **MR. URIARTE:** It's not a very good copy, so I
(15) guess Exhibit 5, Mr. Dodge, if we can just make it
(16) smaller so he sees the whole thing. There you go.
(17) A. Yeah.
(18) Q. Is this the letter that you wrote after you
(19) found out that a petition was being turned in against
(20) you?
(21) A. I can't read what I wrote, but I think this is
(22) the one I wrote after I found out there was a petition.
(23) One of the fuelers called me.
(24) Q. Correct. Correct. If you go to the bottom of
(25) it, I think this is your signature, right?

Page 43

(1) A. Yeah.
(2) Q. That one there?
(3) A. Yes.
(4) Q. Okay. And did you have a meeting with Menzies
(5) management about this letter at all?
(6) A. I do not recall -- I don't remember from when
(7) I wrote it. I think I wrote it during my shift, and I
(8) turned it in or -- I either wrote it in the office with
(9) Raul at the time or -- I just don't remember.
(10) Q. I see. I see. So it's possible that you
(11) wrote it with the assistance of Raul. Is that what
(12) you're saying?
(13) A. Yeah, it was Raul or Renil that told me to
(14) write -- write a statement.
(15) Q. And why did they tell you to write a
(16) statement? Do you know?
(17) A. Just to have it on file that they were going
(18) to look into it.
(19) Q. Okay. But how did that meeting start? Was
(20) that -- like, why did you kind of arrive at that
(21) meeting?
(22) A. Like, why did I -- are you saying, like, why
(23) did I write it or --
(24) Q. No. Well, you said that you had a meeting
(25) with Raul or Renil --

Page 44

(1) A. It wasn't a meeting. It was more like a --
(2) like you walk in, let them know, hey, this is what's
(3) going on on the operation. Like, here's -- like this
(4) is what people are telling me.
(5) Q. Okay.
(6) A. And they tell you, hey, just write statement
(7) down and --
(8) Q. Okay. Okay. So it started with a fueler
(9) calling you and saying, Hey, there's a petition going
(10) around against you. Is that how it started?
(11) A. Yes.
(12) Q. Okay. And then, with that information, you
(13) then go to Renil or Raul. We don't know, right? Renil
(14) or Raul or both of them?
(15) A. Yeah, it was either/or. Yeah, it was
(16) either/or.
(17) Q. So you went to either one of them to tell them
(18) that? What exactly did you tell them?
(19) A. "Oh, hey, I got a phone call from a couple of
(20) fuelers on my personal cell at home saying that
(21) they" -- "there was a petition going around against me
(22) that they didn't want to sign, but they felt forced to
(23) sign it."
(24)     And then when I told them that -- I don't
(25) remember if it was Renil or Raul -- they just told me

Page 45

(1) to write a statement down and to turn it in to them and
(2) that they would look into it.
(3) Q. All right. And then when you say -- how much
(4) help did you get from Renil or Raul with regards to
(5) writing the statement? Like, did you guys --
(6) A. I don't know what -- like, from there on, I
(7) don't know what they -- how they did their
(8) investigation or anything like that. So I just went on
(9) and kept doing my job.
(10) Q. I see. But with regards to writing the
(11) statement, are these words totally yours?
(12) Like, you sat there and started --
(13) A. Yeah, I went to a different office and wrote
(14) this statement.
(15) Q. I see. I see. Okay. And then you turned it
(16) in?
(17) A. Yes.
(18) Q. Would it be not accurate to say that they
(19) helped you with the words that are in this statement?
(20) A. Those are all me. No, they didn't help me
(21) with wording at all.
(22) Q. All right. But when they said -- when they
(23) told you to write this statement, did they tell you
(24) what to write about?
(25) A. No. They just said write -- like, write

Page 46

(1) what's going on, like, why -- you know, what you heard.
(2) Stuff like that.
(3) MR. URIARTE: All right. So we're done with
(4) Exhibit 8. I need like a five-minute break. Let's see
(5) where we are. Let's take a five-minute break. Off the
(6) record.
(7) MR. WU: That's fine. Thank you.
(8) (Brief recess.)
(9) MR. URIARTE: Let's go back on the record. We
(10) don't have much more, but let me go through a couple
(11) more here.
(12) Q. Mr. Dodge, you said that a fueler had called
(13) you that a petition was going around. Do you remember
(14) who that fueler was?
(15) A. Yeah, Mario Caballero -- Caballero. Mario
(16) Caballero.
(17) Q. And you said that he felt like he was forced
(18) to sign the petition or he didn't understand the
(19) petition. Is that what he said?
(20) A. When I -- when I received a phone call from
(21) him, his first words, "Hey, Andrew, just want to let
(22) you know there's a petition going around. I didn't
(23) want to sign it, but he made me sign it. I'm just
(24) letting you know. I don't want to get into trouble or
(25) anything."

Page 47

(1) And then -- and I said -- told him thank you,
(2) and I would -- I said, "Thank you, and I will," you
(3) know, "talk to management."
(4) Q. Okay. And when you say "he made me sign it,"
(5) who's "he"?
(6) A. He mentioned Ray Navarro.
(7) Q. Okay. And, then, let's go back to Exhibit 10,
(8) please.
(9) VIDEO OPERATOR: Hold on. I'll bring it up.
(10) MR. URIARTE: Thank you.
(11) THE WITNESS: Okay.
(12) MR. URIARTE: Q. So I wanted to discuss something
(13) here. It says, "There have been two separate Petitions
(14) turned into Menzies Aviation Fueling Department
(15) Director Raul Vargas." Do you see that?
(16) A. Yes.
(17) Q. Okay. Did Raul Vargas ever talk to you about
(18) these two petitions?
(19) A. Sorry, can you repeat that one more time. You
(20) broke up.
(21) Q. Sure. Did Raul Vargas ever talk to you about
(22) two petitions being signed against you?
(23) A. No, he did not.
(24) Q. Did Raul Vargas ever talk to you about how you
(25) give your breaks, and fuelers complaining against you,

Page 48

(1) or anything like that?
(2) A. No, he did not.
(3) Q. Did anybody from Menzies, you know, from John
(4) Qually, the duty mangers, or Renil Lal at that time,
(5) did any one of them kind of, like, talk to you about
(6) maybe, you know, you giving your breaks better or
(7) having some sort of plan of action?
(8) A. Like I said before, Renil and I spoke, but he
(9) just wanted -- he reviews my schedules. I used to turn
(10) in -- we'd turn, like, you know, a shift report in
(11) every night.
(12) Q. Okay.
(13) A. And, also, I would turn in my schedules to him
(14) so he would see everything written down, so -- from
(15) what I did. So, basically, for example, with let's say
(16) fueler A, I'd write down his flights, and in the middle
(17) I'll put a "B," stands for break, and what else he did.
(18) You know what I mean? And then I also -- he could
(19) research the times, you know, because -- with the phone
(20) app or online.
(21) Q. Okay. And you went through -- you went
(22) through meetings with Renil Lal about that in around
(23) August of 2018?
(24) A. I -- I don't remember the time or date, any of
(25) that.

Page 49

1  Q. Did Mr. Lal ever tell you that he was doing
2  that as part of, you know, investigating these
3  petitions against you?
4  A. No. He one time mentioned that Ray was
5  complaining, so he just wanted to see what I did
6  compared -- you know, compared to other supervisors and
7  how they were doing their schedules.
8  Q. I see. And -- okay. And out of those
9  meetings, was any kind of -- was there any
10 recommendation given to you as to, like, do your job
11 better, or was there any comment or anything like that?
12 A. I don't recall what he said to me at all.
13 Q. Did you have to change the way you were doing
14 things in order to give your breaks better or something
15 like that?
16 A. No. Up until March, I was doing the same way.
17 Q. And you're saying up until March of 2020?
18 A. Yeah, until I got furloughed, yes.
19 Q. Okay. Also in Exhibit 10, it says, "I have
20 spoken to The Menzies Aviation Fueling Director Raul
21 Vargas on three separate occasions regarding Mr. Dodge,
22 who continues to abuse his authority and at times
23 harass Fuelers under his charge."
24     Do you see that?
25 A. Yes, I do see that. Yeah.

Page 50

1  Q. What do you think -- what's your opinion on
2  that with regard to Rafael Vargas stating that you
3  continue to abuse your authority?
4     Do you know anything about that?
5  A. I mean --
6  MR. WU: Objection. Assumes facts not in
7  evidence.
8     But you can answer.
9  MR. URIARTE: Q. Mr. Dodge?
10 A. Sorry. Okay. I -- I mean, from when I see
11 that, I can tell you that's just not true. I mean,
12 I've never harassed any of my employees or any of that
13 type of circumstance.
14 Q. I see. When you say -- when it says "abuse
15 his authority," like how would you be able to abuse
16 your authority during your shifts?
17 A. Honestly, I don't know how I could abuse my
18 authority to this current day. I'm still a supervisor
19 here --
20 Q. I see.
21 A. -- with the same employees.
22 Q. I'm sorry. What was that?
23 A. I said I'm still a supervisor here with the
24 same employees.
25 Q. Okay. And have any fuelers gotten a complaint

Page 51

1  against you that you were harassing them?
2  A. No.
3  Q. Have any of the fuelers ever come up to you
4  and said, hey, Andrew, you know, you're doing this
5  wrong, or, you know, complained to you about not giving
6  their breaks, or them working too hard because you're
7  not doing your job? Anything along those lines?
8  A. I've had fuelers just come up to me and try
9  to, like, give suggestions on how they want to -- how
10 they see things -- on how they see things, but, you
11 know -- and then I have to explain to them what's going
12 on, and I'd show them, and they would understand.
13 That's about it.
14    But I've never had -- I've had someone coming
15 up to me asking when they would get their break, and I
16 would explain to them as well, you know, the situation,
17 and they would understand.
18 Q. I see. All right. Can we go back to Exhibit
19 5, please. Okay. I know it's hard to read, but I was
20 going to start with -- well, that first sentence kind
21 of ends with "the company don't need me, that I'm a bad
22 supervisor, and all I do is cause delays."
23    What do you mean by that, "all I do is cause
24 delays"?
25 MR. WU: Objection. Objection. Assumes facts not

Page 52

1  in evidence. The document speaks for itself. But the
2  witness can answer.
3  THE WITNESS: So when you say -- I mean, what
4  you're saying is -- I'm not saying that I'm causing it.
5  What I'm saying is Ray's complaining about that I'm
6  causing delays and stuff like that.
7  MR. URIARTE: Q. Correct. Yeah, that's how I
8  understand it as well, Mr. Dodge. But these are the
9  things that Ray is saying that you're doing wrong,
10 right?
11 A. Yeah. And to be the honest, that's not true.
12 Has there been delays? Of course there's been delays.
13 But that's not just because of the way I ran my shift.
14 It's just things happen at the airport.
15 Q. So it's your opinion that when delays happen,
16 it's not because of your bad work performance. It's
17 just it would happen to any supervisor. Is that your
18 opinion?
19 A. Yeah. Yes, sorry. I mean, yes, it happens to
20 everybody.
21 Q. Okay. And you're not -- not because of lack
22 of your abilities or lack of your work, but just like
23 if some other supervisor was working that shift, there
24 would be the same delays. Is that how you would put
25 it?

Page 53

(1) A. Well, that's because every shift is different,
(2) so airplanes don't always have the same schedule on
(3) every supervisor's shift, so things happen differently
(4) to all of us.
(5) Q. Right. But your work performance has some
(6) sort of bearing with regards to delays that are caused
(7) by fueling operations, right? Isn't that what --
(8) A. Delays are caused by either aircrafts delayed
(9) by the operations at the airport, delayed by ground
(10) crew, delayed by, you know -- there's different --
(11) there's different reasons why the plane could be
(12) delayed.
(13) Q. And at least around August of 2018, is it your
(14) opinion that you weren't -- your operation, your
(15) fueling operation, wasn't really the cause of the
(16) delays that were happening? Is that your opinion on
(17) that?
(18) A. Our side -- our side, the 130 side, is a very
(19) good fueling operation. We barely took any delays.
(20) Q. Okay. And then towards the end of this
(21) letter, it says, "Ray shows up at 5:30 or 9:00 p.m.
(22) when Renil and Jeff" -- do you see "Jeff" there? Is
(23) that Jeff Cook?
(24) A. No, that's Jeff. He's a -- a manager out of
(25) Seattle International.

Page 54

(1) Q. Oh, okay. So he told Ray not to come early
(2) anymore. Do you see that?
(3) A. Okay, yeah. That's a -- yeah, yeah.
(4) Q. So that would be Jeff Cook or --
(5) A. No, that's Jeff -- I don't remember his last
(6) name. I can get his last name for you, but I just
(7) don't remember his last name.
(8) Q. And that Jeff -- that Jeff, you said, works
(9) for Menzies in Seattle International?
(10) A. Yeah, that's his main station, yes.
(11) Q. I see. So how come he would get involved in
(12) telling Ray not to come in early?
(13) A. So the reason -- we were going through a
(14) transition, you know, from ASIG to Menzies. At the
(15) time, Renil was the acting general manager. Raul
(16) Vargas was the director -- new director we had, so they
(17) were getting things together. So Jeff would come down
(18) and help our station.
(19) **MR. URIARTE:** Gotcha. Okay. I have no further
(20) questions.
(21) **MR. WU:** No questions on my end either.
(22) **MR. URIARTE:** Okay. Thank you, Mr. Dodge. Thank
(23) you for your time today. Thank you for providing this
(24) deposition.
(25) **THE WITNESS:** You're welcome.

Page 55

(1) (Whereupon, the deposition
(2) concluded at 10:32 o'clock a.m.)
(3) ---o0o---

Page 56

(1) CERTIFICATE OF WITNESS
(2) ---o0o---
(3)
(4) I, ANDREW DODGE, hereby declare under
(5) penalty of perjury that I have read the foregoing
(6) deposition testimony; and that the same is a true
(7) and correct transcription of my said testimony
(8) except as corrected pursuant to my rights under
(9) Rule 30(e) of the Federal Rules of Civil
(10) Procedure.
(11)
(12) _____
       Signature
(13)
(14) _____
       Date

**DEPOSITION OF ANDREW DODGE - 07/28/2020**

BSA   Case 3:19-cv-08157-VC  RENALDO NAVARRO vs. MENZIES AVIATION, INC. Filed 11/18/20   Page 17 of 17   XMAX(15/15)

**Page 57**

(1) STATE OF CALIFORNIA     )
                            )
(2) COUNTY OF SAN FRANCISCO )

(3)         I, CINDY TUGAW, a Certified Shorthand Reporter
(4) of the State of California, duly authorized to
(5) administer oaths pursuant to Section 8211 of the
(6) California Code of Civil Procedure, do hereby certify
(7) that
(8)                      ANDREW DODGE,
(9) the witness in the foregoing deposition, was by me duly
(10) sworn to testify the truth, the whole truth and nothing
(11) but the truth in the within-entitled cause; that said
(12) testimony of said witness was reported by me, a
(13) disinterested person, and was thereafter transcribed
(14) under my direction into typewriting and is a true and
(15) correct transcription of said proceedings.
(16)        I further certify that I am not of counsel or
(17) attorney for either or any of the parties in the
(18) foregoing deposition and caption named, nor in any way
(19) interested in the outcome of the cause named in said
(20) caption.
(21)        Dated the 7th day of August, 2020.
(22)
(23)
(24)
                      CINDY TUGAW
(25)          CSR No. 4805 (California)

**Page 58**

(1) Andrew Dodge
    c/o Foley & Lardner
(2) 555 California Street, Suite 1700
    San Francisco, CA 94104
(3) Attn:  Jason Y. Wu, Esq.
(4) Date:  August 7th, 2020
    Re:  Navarro vs. Menzies Aviation
(5) Deposition Date:  Tuesday, July 28, 2020
(6) Dear Mr. Dodge,
(7)        Please be advised the original transcript of
    your deposition is ready for your review.
(8)        Pursuant to FRCP Rule 30(e), you have
    30 days following the date of this notice to read,
(9) correct if necessary, and sign your transcript unless
    the attending parties and the deponent agree on the
(10) record or otherwise in writing to a longer or shorter
    time period.  The deponent may change the form or the
(11) substance of the answer to a question, and may either
    approve the transcript of the deposition by signing it,
(12) or refuse to approve the transcript by not signing it.
    You are not required by law to read and sign your
(13) deposition transcript.  All parties will be informed of
    the corrections.  The original transcript will then be
(14) sealed and sent to the examining attorney pursuant to
    the applicable law.
(15)        You may either come to our office to read and
    sign the original transcript, or you may contact your
(16) attorney or the attorney who arranged for you to be
    present at your deposition.  If they have ordered a
(17) copy of the transcript, you may review their copy and
    make corrections by submitting, signing and returning
(18) the attached form.  If you choose to review your
    transcript at our office, please call first to make an
(19) appointment.  Should you have any question regarding
    these instructions, please call.
(20)
    Sincerely,
(21)
(22)
    NOGARA REPORTING SERVICE
(23) 5 Third Street, Suite 415
    San Francisco, California 94103
(24) (415) 398-1889
    cc:  All counsel, original deposition
(25)