1          IN THE UNITED STATES DISTRICT COURT

2      IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5    RENALDO NAVARRO,

6              Plaintiff,

7    v.                        No.  3:19-CV-8157

8    MENZIES AVIATION, INC.,
     doing business as MENZIES
9    and DOES 1 through 10,
     inclusive,
10
               Defendants.
11    _____/

12   Zoom Remote Deposition of

13        JOHN QUALLY

14    Monday, July 27, 2020

15         Volume I

16    (Pages 1 through 32)

17     **CERTIFIED COPY**

18

19

20

21   REPORTED BY:  CINDY TUGAW, CSR #4805

22

23

24              NOGARA REPORTING SERVICE
              5 Third Street, Suite 415
25         San Francisco, California 94103
               (415) 398-1889

1                          I N D E X

2                                          Page Number

3    EXAMINATION BY MR. URIARTE                    4

4                        ---o0o---

5                     E X H I B I T S

6    Plaintiff's

7    Exhibit 1     Plaintiff Renaldo            9
                   Navarro's Notice of
8                  Deposition of John
                   Qually
9
     Exhibit 2     Missed Punch Form           28
10

11                      ---o0o---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     BE IT REMEMBERED that, pursuant to Notice of

2  Taking Deposition and on Monday, the 27th day of July,

3  2020, commencing at the hour of 8:58 o'clock a.m.

4  thereof, via Zoom videoconference, before me, CINDY

5  TUGAW, a Certified Shorthand Reporter in the State of

6  California, personally appeared,

7                    JOHN QUALLY,

8  Called as a witness by the Plaintiff, having been by me

9  first duly sworn, was examined and testified as

10  hereinafter set forth.

11                    ---o0o---

12              APPEARANCES OF COUNSEL

13  For the Plaintiff
          LIBERATION LAW GROUP, P.C.
14        2760 Mission Street
          San Francisco, California 94110
15        BY:  ARLO GARCIA URIARTE, Attorney at Law
          (415) 695-1000
16

17  For the Defendants
          FOLEY & LARDNER, LLP
18        555 California Street, Suite 1700
          San Francisco, California 94104
19        BY:  JASON Y. WU, Attorney at Law
          (415) 984-9848
20

    Also Present:  David Ho, Zoom Host.
21
                    ---o0o---
22

23

24

25

Case 3:19-cv-08157-VC   Document 60-9   Filed 01/22/21   Page 4 of 12

1    managers, is that what it was?

2         A.  Yes.

3         Q.  And how many duty managers were there at that

4    time?

5         A.  Four.

6         Q.  Four duty managers.  And then with regards to

7    you, were the supervisors assigned to specific duty

8    managers or was it just who the duty manager was on

9    that day?

10        A.  It was basically the manager who was on duty

11   that day.

12        Q.  So then if you were working on a shift wherein

13   Mr. Navarro was there, then you would be supervising

14   Mr. Navarro.  That's how it worked?

15        A.  Yes.

16        Q.  Gotcha.  And then, so it's the supervisors,

17   then the duty managers, and then who else above the

18   duty managers?

19        A.  It would be the general manager.

20        Q.  And then anybody above the general manager?

21        A.  Now we have a director.

22        Q.  So there is a director on-site now?

23        A.  Yes.

24        Q.  But in 2018, no?

25        A.  Not that I recall, no.

1    head at this time.

2         Q.  Okay.  Great.  Thank you very much.

3            And then there was a person by the name of

4    Jeff who was from Seattle who was helping out.  Do you

5    remember that?

6         A.  Jeff Stevenson, yes.

7         Q.  And what was his role, do you remember?

8         A.  To the best of my knowledge, he was in town

9    helping out the new managers, you know, director and

10   GM, get into the station, to the best of my knowledge.

11   But I never -- you know, he had multi different tasks

12   in this station, but what his actual role was, I don't

13   know.

14        Q.  Okay.  Sounds good.  Were you involved in the

15   decision-making with regards to the suspension for Ray

16   Navarro?

17        A.  No.

18        Q.  So you were not asked by any of the managers,

19   "Hey, what's your opinion on this, do you think it's

20   correct for us to suspend Mr. Navarro?"

21        A.  No.

22        Q.  No, okay.  Were you at the meeting where Ray

23   Navarro was -- where it was communicated to Ray Navarro

24   that he was going to be suspended?

25        A.  No.  If you -- no.

Case 3:19-cv-08157-VC   Document 60-9   Filed 01/22/21   Page 6 of 12

1    MR. WU:  And, John, we don't want you to guess

2    today.  It's a forbidden word that makes attorneys'

3    ears perk up a little bit.

4    THE WITNESS:  Yeah.

5    MR. WU:  If you have an idea, please let us know,

6    but, otherwise, don't guess.

7    THE WITNESS:  Okay.

8    MR. URIARTE:  Q.  What about with regards to the

9    termination?  Were you involved at all in the

10   decision-making behind the decision to terminate Ray

11   Navarro?

12   A.  No.

13   Q.  So nobody asked for your opinion?  You never

14   gave your opinion?

15   A.  No.

16   Q.  Did you do any investigation or ask around,

17   anything like that?

18   A.  No.

19   (Discussion off the record.)

20   MR. URIARTE:  Q.  Do you remember seeing the

21   petition that was going around against Andrew Dodge

22   before Mr. Navarro was terminated?

23   A.  No.

24   Q.  So what about today, like, have you seen that

25   petition today?  Have you seen it since his termination

Case 3:19-cv-08157-VC   Document 60-9   Filed 01/22/21   Page 7 of 12

1    at all?

2         MR. WU:  I'm going to object here on grounds of

3    attorney-client privilege and instruct the witness to

4    answer only as to whether he's seen the document

5    outside of any confidential or communications with his

6    attorneys.

7         MR. URIARTE:  Q.  That's correct, Mr. Qually, yes.

8    So my question really is whether you've ever seen the

9    -- either of the petitions, either of the two petitions

10   that were circulated, and not because your attorney

11   showed it to you but because of other events.

12        A.  As I said, no.

13        Q.  Would it be accurate to state that as a duty

14   manager, that Andrew Dodge is an employee that you

15   would have been supervising?

16        A.  At some point, yes.

17        Q.  And so it wasn't like an interest of yours to

18   figure out what it is that the fuelers were complaining

19   about against Dodge?  That wasn't an interest of yours?

20        MR. WU:  Objection.  Vague.

21        You can answer if you understand the question.

22        THE WITNESS:  I did not hear complaints directly

23   from the fuelers.

24        MR. URIARTE:  Q.  Okay.  So you're saying none of

25   the fuelers ever came up to you and said, hey, these

1   started serving the suspension?  Do you see what I'm

2   saying?

3         A.   He -- best of my knowledge, he had not served

4   his suspension.

5         Q.   So he didn't start serving the suspension

6   until you tried to serve him the suspension notice, is

7   that correct?

8         A.   To the best of my knowledge, yes.

9         Q.   Okay.  Did you leave him with a copy?

10        A.   He had a copy, yes.

11        Q.   When you say he had a copy, was the copy --

12   the copy that he had, that came from you or --

13        A.   He took a picture of it with his phone.

14        Q.   I see.  Okay.  So, okay.  All right.  And then

15   let me just read under goal and the expectation part

16   there, it says, "It is expected that employees will

17   follow all policies and procedures.  Failure to follow

18   Company policies and procedures will result in further

19   disciplinary action up to and including termination."

20            Do you read that?

21        A.   Yes.

22        Q.   Are you knowledgeable at all with regards to

23   the policies and procedures that this notice was

24   talking about?

25        A.   Directly, no.

1      Q.  It says "Failure to follow Company policies

2  and procedures..."  Do you know what company policies

3  and procedures that he failed to follow?

4      A.  Let's see.  I can't remember off my head, no.

5      Q.  Do you have an opinion as to why he was

6  suspended or terminated from Menzies, like, do you know

7  the specific violation that he may have violated?

8          Do you have any kind of memory as to that, or

9  what's your memory with regards to that?

10     MR. WU:  Objection.  Compound.  Lack of

11  foundation.

12          You can answer if you understand the question.

13     THE WITNESS:  Can you repeat it.

14     MR. URIARTE:  Q.  Yeah.  So sitting here today and

15  looking back at the suspension and the termination, we

16  know that Menzies -- Menzies' position is he violated

17  certain policies and procedures, right?

18          So just kind of talking about that, do you

19  have a memory or an understanding in your head what it

20  is that Mr. Navarro actually violated to justify his

21  termination?

22     MR. WU:  Same objection.

23     THE WITNESS:  To justify, looking back now?

24     MR. URIARTE:  Q.  Yes.

25     A.  I can't think of it off my head, no.  I can't,

1   me, but that's it.

2        MR. URIARTE:  Q.  And did Mr. Dodge have any

3   opinion or did he kind of have his position as to why

4   these breaks were short -- I mean, the breaks weren't

5   happening, or the breaks were late, or anything like

6   that?

7        Did Andrew Dodge try to explain himself as to

8   why those things were happening?

9        MR. WU:  Objection.  Assumes facts not in

10  evidence.

11       THE WITNESS:  Yes.

12       MR. URIARTE:  Q.  And what would he say in those

13  discussions?

14       A.  He gave me the explanation of what happened

15  during the night and why some fuelers weren't able to

16  get a longer break than they did or any break at all.

17  And that's it, you know.

18       We -- there is a policy where, if they don't

19  get a break, they get a missed meal penalty.  So they

20  get paid for their lunch.

21       Q.  Did you ever have a discussion with a Rafael

22  Vasquez about Andrew Dodge?

23       A.  I might have at one point.  I don't recall.

24       Q.  And what do you remember as to that

25  discussion?

1    MR. WU:  Objection.  Lack of foundation.

2    THE WITNESS:  I don't recall what was talked about

3    in that conversation.

4    MR. URIARTE:  Q.  So -- okay.  So let's just kind

5    of clarify.  Are you saying maybe you had a discussion

6    with him about Andrew Dodge and maybe not?  Or you may

7    recall a particular discussion, you just don't remember

8    the contents of it?  Is that -- yeah, can you just

9    clarify the nature of your memory?

10   A.  We probably had a conversation, but what we

11   talked about, I don't recall.

12   Q.  Let me show you Exhibit 10.  So Exhibit 10 is

13   a statement from Rafael Vasquez, I guess, about his

14   efforts to talk to Raul Vargas about something about

15   Andrew Dodge.  If you see the date below, it says

16   November 2018.  Do you see that?

17   A.  Yes.

18   Q.  Does this refresh your recollection as to

19   about when you may have talked to Rafael Vasquez about

20   Andrew Dodge?

21   A.  No.  And, for the record, I have not seen this

22   before.

23   Q.  Okay.  Maybe another way of putting it is did

24   you talk to Rafael Vasquez before Mr. Navarro was

25   terminated or after his termination?  Do you remember

1    that at all?

2        A.  If I talked to Rafael, it would have been

3    before.

4        Q.  So here he says something about "I have spoken

5    to The Menzies Aviation Fueling Director Raul Vargas on

6    three separate occasions regarding Mr. Andrew Dodge,

7    who continues to abuse his authority and at times

8    harass Fuelers under his charge."

9            Do you have any information or knowledge with

10   regards to that allegation, "continues to abuse his

11   authority and at times harass Fuelers under his

12   charge"?

13           Does that ring a bell at all, Mr. Qually?

14       A.  No.

15       Q.  And in the complaint that you received against

16   Andrew Dodge, was there any type of language along

17   these lines or actions along these lines, like

18   harassing, abusing authority?

19           Was that the types of complaints that you

20   received?

21       A.  No.

22       Q.  So you received complaints about meal breaks

23   and rest breaks, but nothing about harassing fuelers,

24   right?  You never heard that type of complaint?

25       A.  Correct.