```
                IN THE UNITED STATES DISTRICT COURT

           IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA



RENALDO NAVARRO,

              Plaintiff,

v.                                       No.  3:19-CV-8157

MENZIES AVIATION, INC.,
doing business as MENZIES
and DOES 1 through 10,
inclusive,

              Defendants.
_____/

Zoom Remote Deposition of

       RAUL VARGAS

 Tuesday, August 25, 2020
```

**CERTIFIED COPY**

REPORTED BY:  CINDY TUGAW, CSR #4805

NOGARA REPORTING SERVICE
5 Third Street, Suite 415
San Francisco, California 94103
(415) 398-1889

```
 1                          I N D E X

 2                                              Page Number

 3      EXAMINATION BY MR. URIARTE                    4

 4      EXAMINATION BY MR. WU                         73

 5      FURTHER EXAMINATION BY MR. URIARTE            74

 6                          ---o0o---

 7                         E X H I B I T S

 8      Plaintiff's

 9      Exhibit 1      Plaintiff Renaldo                 9
                       Navarro's Amended Notice
10                     of Deposition of Raul
                       Vargas
11
        Exhibit 8      Petition to Menzies              26
12                     Management from Menzies
                       Fuelers
13
        Exhibit 9      Termination notice for           60
14                     Renaldo Navarro

15      Exhibit 11     Employee Performance             61
                       Development dated
16                     8/29/2018

17      Exhibit 12     Email chain culminating          66
                       in an email from Raul
18                     Vargas to Tracy Aguilera
                       dated August 29, 2018
19
        Exhibit 19     Letter from Rafael Vasquez       43
20                     to whom it may concern
                       dated 11/18/2018 with
21                     attached petition

22                          ---o0o---

23

24

25
```

```
 1          BE IT REMEMBERED that, pursuant to Notice of

 2   Taking Deposition and on Tuesday, the 25th day of

 3   August, 2020, commencing at the hour of 9:03 o'clock

 4   a.m. thereof, via Zoom videoconference, before me,

 5   CINDY TUGAW, a Certified Shorthand Reporter in the

 6   State of California, personally appeared,

 7                       RAUL VARGAS,

 8   called as a witness by the Plaintiff, having been by me

 9   first duly sworn, was examined and testified as

10   hereinafter set forth.

11                        ---oOo---

12                  APPEARANCES OF COUNSEL

13   For the Plaintiff
           LIBERATION LAW GROUP, P.C.
14         2760 Mission Street
           San Francisco, California 94110
15         BY:  ARLO GARCIA URIARTE, Attorney at Law
           (415) 695-1000
16

17   For the Defendants
           FOLEY & LARDNER, LLP
18         555 California Street, Suite 1700
           San Francisco, California 94104
19         BY:  JASON Y. WU, Attorney at Law
           (415) 984-9848
20
     Also Present:  David Ho, Zoom Host.
21
                          ---oOo---
22

23

24

25
```

1    Q.  Okay.  And then with regards to forcing
2 employees to sign the petition, I saw those letters
3 from different employees, them saying whatever they're
4 saying, and then I saw the one from Andrew as well.  I
5 see that.
6         But did the investigation, or did you, ever
7 ask to talk to the fuelers?
8    A.  No.
9    Q.  Okay.  Did you ever ask to talk to the union
10 representative?
11   A.  Well, the union representative, he brought a
12 letter for me -- for me, too.
13   Q.  Right.  You mean like an additional petition,
14 is that what you're saying?
15   A.  It was a different letter.
16   Q.  What letter was that?
17   A.  It was pretty much the same as the petition.
18   Q.  Right.  But I think that -- I don't want to
19 confuse you.  We should probably maybe clear this up.
20 That second petition by Rafael Vasquez or Rafael
21 Martinez, right, is that what you're talking about?
22   A.  Yes.
23   MR. WU:  Objection.  Lack of foundation.
24   MR. URIARTE:  Q.  That second petition, that was
25 like already in October, wasn't it?

1  feedback and it's becoming a little unclear.
2      THE WITNESS:  Okay.
3      MR. URIARTE:  Q.  Did you ever have a discussion
4  with Mr. Navarro, before this whole petition started,
5  did you ever have a discussion with Mr. Navarro about
6  Andrew Dodge?
7      A.  Not that I recall.
8      Q.  So you don't remember him going up to you and
9  trying to talk to you about concerns about Andrew
10 Dodge?
11     A.  No, I don't recall that.
12     Q.  Aside from the petition and maybe Mr. Navarro,
13 did you ever get complaints against -- or about Andrew
14 Dodge in those -- June, July, August, the time you were
15 there?
16     A.  No, I did not.
17     Q.  And so you were not involved in the promotion
18 of Mr. Dodge, correct?
19     A.  No, I was not.
20     Q.  And before being at Menzies at the San
21 Francisco Airport, where were you working?
22     A.  I was working for TAS.
23     Q.  What does that mean?
24     A.  TAS, Total Airport Services.  I worked there
25 as a general manager in San Francisco.

1  apnea, is that correct?

2      A.  In regards to the issues that they were

3  having -- that they are complaining about Andrew.

4      Q.  Okay.  So it says, "the way he supervised is

5  very unprofessional when he run the operation or

6  supervised."  Anything that was done about that?

7      A.  At the moment that I get there, I hadn't had

8  any problem with Andrew.  And I didn't get any

9  complaint from any fueler in relation to Andrew.

10     Q.  Did you talk to any of the fuelers about the

11 way he supervises is very unprofessional and run the

12 operation or supervise?

13     A.  I'm sorry, no, I did not talk to any fuelers

14 about the way he supervise.

15     Q.  Do you know if Tracy or HR did that?

16     A.  In the conversations we had, it wasn't

17 specific about his performance in terms of OTP, which

18 is operational -- on time performance, I'm sorry.

19     Q.  And then it says -- okay.  I'm sorry, I think

20 we missed the last part.  Did you say something there?

21     A.  No.

22     Q.  Okay.  "People are not taking their breaks

23 it's because the way he set up the flights."  That one,

24 did you ask about that?  Was that something that was

25 taken care of?

1  outcome of that conversation with HR.
2      Q.  Okay.  Mr. Vargas, let me put it directly
3  here.  If it's true, just theoretically, if it's true
4  that Nicco, John and Renil are covering up for the
5  mistakes of Andrew Dodge, would that be something that
6  maybe Nicco, John and Renil should be terminated for?
7      A.  I think that it would be important to make an
8  investigation before we take into consideration.
9      Q.  But that's a serious allegation, right?
10     A.  I'm sorry?
11     Q.  That's a serious allegation.
12     MR. WU:  Objection.  Improper hypothetical.
13         You can answer the question.
14     MR. URIARTE:  Q.  That's a serious allegation.
15     A.  And as I said before, for me, anything that
16 affect the environment of our employees is valid.
17     Q.  Yeah, it's valid, definitely.  But my question
18 was that would be serious, wouldn't you agree, as a
19 manager, if somebody --
20     A.  Again, it all depends on the investigation.
21 So I cannot tell you, because the letter says that,
22 but --
23     Q.  Sure.
24     A.  -- we did an investigation as we did with
25 Navarro.

1  Q.  I agree.  But that's not what I'm asking.  I'm
2  asking a more simple question, which is, if that
3  allegation by itself, right, alleging that Nicco, John
4  and Renil are covering up for the mistake of Andrew
5  Dodge, just that allegation itself, standing on its
6  own, would you characterize that as a serious
7  allegation?
8       MR. WU:  Objection.  Improper hypothetical.
9       MR. URIARTE:  You can answer.
10      THE WITNESS:  I already did.
11      MR. URIARTE:  Q.  And what was your answer?
12      A.  That I will have to perform an investigation
13 to understand exactly.
14      Q.  That would be the result, right?  That would
15 be the result, the conclusion.  I'm not talking about
16 the result or the conclusion.  I'm just talking about
17 how you would characterize an allegation such as that.
18      A.  Well, and as I said, if I see something like
19 that, I will perform an investigation.  So if I perform
20 an investigation, it means that it is important.
21      Q.  Okay.  And did you perform the investigation?
22      A.  No, I did not.  As I said, I talked to HR
23 about this case, specific case.  Based on the fact that
24 there were people harassed to sign this petition, I did
25 not perform that investigation.

1    MR. URIARTE:  Okay.  Let's look at Exhibit 19,
2    please.
3        ZOOM HOST:  One second, coming up.
4        MR. URIARTE:  Q.  Actually, Mr. Vargas, did you
5    have a conversation with Renil about how many times Mr.
6    Navarro or other people had gone up to Renil with
7    regards to Andrew Dodge?
8        A.  No, I did not.  I don't recall it.
9        MR. URIARTE:  Okay.  So can we have Exhibit 19,
10   please.
11           (Plaintiff's Exhibit 19 marked for
12           identification.)
13       MR. URIARTE:  Thank you.
14       Q.  So Exhibit 19 starts with a statement by
15   Mr. Vasquez.  You know Mr. Vasquez, right?  I think you
16   called him Rafael Martinez or something like that.  It
17   might be Vasquez Martinez, actually.  But he was the
18   shop steward for Menzies, is that correct?
19       A.  Yes.
20       Q.  Okay.  And here, if you go to page 2, please.
21   Just to kind of make sure, this refers to you -- here's
22   the petition Mr. Vasquez kind of wrote up.  Does this
23   look familiar to you?
24       MR. WU:  Objection.  Assumes facts not in
25   evidence.

1   only testify to what he knows.  So I'm not going to
2   agree or disagree with that statement.
3           MR. URIARTE:  Okay.  I'll represent to you,
4   Mr. Vargas, that by September 6th, 2018, Mr. Navarro
5   was not your employee anymore.
6       Q.  So then he goes on to talk about you.  "The
7   petition was then officially turned in to the SEIU.  In
8   addition, the Petition was also turned over to Raul
9   Vargas."  Do you remember that?
10      A.  I don't recall it.  I don't recall having that
11  petition, to tell you the truth.
12      Q.  So you don't remember Mr. Vasquez getting
13  close to you and giving you some pieces of paper?
14      A.  I do not.
15      Q.  "There have been two separate Petitions turned
16  in to Menzies Aviation Fueling Department Director Raul
17  Vargas."  Do you remember that?
18      A.  Well, I believe the first one was the one that
19  they signed.
20      Q.  Okay.  And then the second one, do you
21  remember receiving a second one?
22      A.  I don't recall it.
23      Q.  Okay.  All right.  "I have spoken to Menzies
24  Aviation Fueling Director Raul Vargas on three separate
25  occasions regarding Mr. Andrew Dodge."  Do you remember

1    that?

2         A.   No, I do not.

3         Q.   When I say "Rafael Vasquez," does a face go

4    into your mind?

5         A.   Yes, I do remember Rafael who was the steward

6    that was on leave of absence during the time that I was

7    over there.

8         Q.   He was on leave of absence during the time?

9         A.   Yeah.  I don't recall if he was during the

10   time that this petition was made or not, but I recall

11   him being on leave of absence for most of the time.

12        Q.   But do you remember talking to him?

13        A.   Yes, I do remember talking to him about

14   operational things.

15        Q.   Do you remember talking to him about Andrew

16   Dodge?

17        A.   I don't recall it.

18        Q.   Do you remember talking to him three times

19   about the same topic?

20        A.   About what?

21        Q.   I'm sorry?

22        A.   About what?  Three times about what?

23        Q.   Three times about any topic but it's the same

24   topic?

25        A.   I do -- I do remember that.

1  Q. So you remember him going to you on several
2  occasions talking to you about the same topic?
3  A. About topics, about operational things.
4  Q. Okay. And what kinds of operational things
5  would he talk to you about?
6  A. Talk about issues on -- on the operation.
7  Q. Okay. Like give me an example.
8  A. Talk about attendance issues. Talking about
9  safety issues. We used to have -- we used to have
10 meetings with the union every two weeks, if I remember
11 correctly, to talk about operational issues.
12 Q. Okay. And that when you say these meetings
13 with the union every two weeks, that was Mr. Vasquez?
14 A. Some of the meetings Mr. Vasquez was in there.
15 Q. Was he the one leading the discussion for the
16 union?
17 A. No.
18 Q. Did you say "yes" or "no"?
19 A. I said no.
20 Q. Okay. So for the union somebody else talked,
21 right, not Mr. Vasquez?
22 A. Well, he was talking, too, but the lead of the
23 union was another person that I don't recall right now.
24 Q. In those meetings, do you remember them
25 talking about Andrew Dodge at all?

1   A. No, no, I don't.

2   Q. Okay. And here he says "on three separate
3   occasions regarding Mr. Andrew Dodge, who continues to
4   abuse his authority and at times harass Fuelers under
5   his charge." Did you ever talk to Mr. Vasquez about
6   that?

7   A. I don't recall it.

8   Q. Okay. So it could have happened or might not
9   have happened, what's your memory like?

10  A. I can't recall it.

11  Q. Okay. All right. So if we just scroll down
12  more pages, please, second page. Second page of
13  Exhibit 19. So the second page of Exhibit 19 looks
14  like the petition that Mr. Vasquez gave to you
15  according to him. Okay?

16  MR. WU: Assumes facts.

17  MR. URIARTE: Q. I'll kind of give you a moment
18  here to read it. Let me know when you finish reading
19  it.

20  A. Looks like kind of the same as the letter they
21  brought me when they signed the petition. It's the
22  same as the petition.

23  Q. You mean the first one?

24  A. I mean -- I don't know if this -- this letter.
25  Yeah.

1   foundation.

2          You can answer.

3          THE WITNESS:  If I get that, I will -- I will want

4   to look at it and perform an investigation.

5          MR. URIARTE:  Q.  But as far as you know, no

6   investigation happened as a result of Exhibit 19,

7   correct?

8          MR. WU:  Objection.  Lacks foundation.

9          THE WITNESS:  Can I respond?

10         MR. WU:  Yes, you can answer.  You can answer

11  unless I instruct you specifically not to.

12         THE WITNESS:  All right.  Can you repeat the

13  question.

14         MR. URIARTE:  Q.  Sure.  As far as you know, based

15  on this petition, this second petition that we called

16  it, as far as you know, no investigation happened

17  because of it?

18         A.  As far as I know, no investigation happened

19  because of it.

20         Q.  Is that correct?

21         A.  That is correct, as far as I know.

22         Q.  Very good.  Were you involved in the decision

23  to suspend Mr. Navarro while the investigation was

24  going on?

25         A.  I don't recall it.

1  A. Yes, it is a yes.

2  Q. Okay. And then did you ask or were you

3  curious, maybe you should have had a conversation with

4  Mr. Navarro?

5  A. I don't participate in the investigations.

6  Q. Maybe like a phone call to Mr. Navarro to get

7  his side of the story?

8  A. No, I do not. I do not participate in any

9  investigation.

10  Q. And do you know whether or not they actually

11  talked to Mr. Navarro and got his side of the story?

12  A. I just get the final outcome.

13  Q. You just get the final decision?

14  A. The final outcome for -- from the

15  investigation.

16  Q. My question is different. My question is when

17  you were looking at all the different elements to

18  decide whether to terminate or not, did you try to find

19  out whether somebody talked to Mr. Navarro to get his

20  side of the story?

21  A. No, I did not. I did not try to find out.

22  Q. Would you say that's kind of like basic

23  investigation right there?

24  MR. WU: Objection. Lack of foundation. Improper

25  hypothetical.

1        You can answer if you know.

2        THE WITNESS:  I won't say that is -- it all

3   depends on the kind of investigation they're running.

4        MR. URIARTE:  Q.  They -- what's the last word?

5        A.  They are running.

6        Q.  That they are running.  Okay.  But you didn't

7   look into what kind of investigation they were running?

8        A.  I just look into the final outcome of the

9   investigation.

10       Q.  And you never, like, got into your head and

11  said, what does Mr. Navarro say about all of this?

12  That's not something that you ever asked yourself?

13       A.  No, I do not.  I do not because I just look

14  into the final outcome of the investigation.  So I

15  think that that question is for the people who perform

16  the investigation.

17       Q.  So you said earlier that the goal of

18  terminating Mr. Navarro was to protect the employees

19  from the harassment, right?  The environment of

20  harassment, correct?

21       A.  Yes.

22       Q.  How is it different, in achieving that goal,

23  how is termination different from, let's say, a

24  suspension?

25       A.  Well, I think that is important, too, if you

1    Q.  Meaning Talin and Tracy?

2    A.  Yes.  So then Tracy agreed because she had a

3  conversation with Talin, so we all agreed on -- on this

4  termination.

5    MR. URIARTE:  Okay.  Why don't we take a

6  five-minute break and then we'll be right back.  Thank

7  you.

8    MR. WU:  All right.

9        (Brief recess.)

10   MR. URIARTE:  Okay, Mr. Vargas, it looks like I

11 have no further questions for you today.

12   THE WITNESS:  Okay.

13   MR. WU:  And I have just a few questions for you,

14 Raul.

15                  EXAMINATION BY MR. WU

16   MR. WU:  Q.  So, Raul, during the time you were

17 the director of operations at SFO, aside from the

18 petition, did you hear of any complaints that Andrew

19 Dodge was harassing employees?

20   A.  No, I did not.

21   Q.  During the time you were the director of

22 operations at SFO, aside from the petition, did you

23 hear of any complaints that Andrew Dodge wasn't giving

24 fuelers breaks?

25   A.  No, I did not.